UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Case No. 1:25-cv-0538-MAV<br>Related to Case No. 1:25-cv-0535-MAV |
| THE DIOCESE OF BUFFALO, N.Y., | |
| Debtor. | **ORAL ARGUMENT REQUESTED** |
| THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF THE DIOCESE OF BUFFALO, N.Y., | Bankruptcy Court Case No. 20-10322 (CLB)<br>Chapter 11 |
| Appellant. | |

# APPELLANT'S BRIEF OF
## THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................ ii

BASIS FOR APPELLATE JURISDICTION ................................................ 2

ISSUES PRESENTED ..................................................................... 2

STANDARD OF APPELLATE REVIEW .................................................. 3

PRELIMINARY STATEMENT ............................................................ 3

STATEMENT OF THE CASE ............................................................. 8

    A.    The Diocese's Bankruptcy ..................................................... 8

    B.    The History Of The Seminary .................................................. 10

ARGUMENT ............................................................................... 11

    A.    The Diocese Did Not Promise A Forever Seminary ....................... 11

    B.    Donations For Building The Seminary Are Not Trust Property As A Matter Of New York Law ...................................................... 13

    C.    Bankruptcy Code § 544 Vitiates Any Unrecorded Restriction ........... 21

        1.    Bankruptcy Code § 544(a)(3) Applies To The Property and Seminary Proceeds ...................................................... 22

        2.    A Bona Fide Purchaser Of The Seminary Property Would Not Have Had Notice Of Any Restriction ............................... 24

    D.    The Court Incorrectly Traced Donations To The Sale Proceeds ........ 31

CONCLUSION ............................................................................ 33

# TABLE OF AUTHORITIES

**Page**

## CASES

*Agudas Chasidei Chabad of U.S. v. Gourary*,
   833 F.2d 431 (2d Cir.1987) ........................................................................ 15

*Buffalo Acad. of Sacred Heart v. Boehm Bros. Inc.*,
   267 N.Y. 242 (1935) ................................................................................... 26

*Butler v. Mathisson*,
   981 N.Y.S.2d 441 (2d Dep't 2014) ............................................................. 26

*County of Clinton v. Warehouse at Van Buren St., Inc.*,
   496 B.R. 278 (N.D.N.Y. 2013) ..................................................................... 3

*Dennis v. Buffalo Fine Arts Acad.*, 15 Misc. 3d 1106(A),
   836 N.Y.S.2d 498 (Sup. Ct. Erie County 2007) ......................................... 12

*Fields Enters. Inc. v. Bristol Harbour Vill. Ass'n*,
   191 N.Y.S.3d 856 (4th Dep't 2023) ............................................................ 30

*Gaffney v. United States DOT (In re Premier Airways, Inc.)*,
   Nos. 01-10656 B, AP 02-1238 B, 2004 Bankr. LEXIS 5
   (Bankr. W.D.N.Y. Jan. 6, 2004) .............................................................. 23-24

*In re Canney*,
   284 F.3d 362 (2d Cir. 2002) ....................................................................... 23

*In re Carpenter*,
   566 B.R. 340 (S.D.N.Y. 2017) ................................................................... 15

*In re Diocese of Buffalo*,
   No. BK 20-10322 CLB, 2025 Bankr. LEXIS 1436
   (Bankr. W.D.N.Y. June 6, 2025) ................................................................... 1

*In re Estate of Thurston*,
   746 N.Y.S.2d 343 (Sur. Ct.  Westchester County 2002) ............................ 20

*In re Friends for Long Island's Heritage*,
    911 N.Y.S.2d 412 (2d Dep't 2010) ................................................................ 20

*In re Miller*,
    462 B.R. 421 (Bankr. E.D.N.Y. 2011) ......................................................... 18

*Kingston Model R.R. Club, Inc. v. Eleven Main Grp., LLC*,
    999 N.Y.S.2d 196 (3d Dep't 2014) ............................................................... 30

*Lefkowitz v. Cornell Univ.*,
    316 N.Y.S.2d 264 (4th Dep't 1970) ............................................................. 12

*Lefkowitz v. Lebensfeld*,
    68 A.D.2d 488 (1st Dep't 1979) ....................................................... 14, 15, 16

*Leonard v. Clough*,
    133 N.Y. 292 (1892) ..................................................................................... 28

*Maxwell Commc'n Corp. PLC by Homan v. Societe Generale*
    *(In re Maxwell Commc'n Corp. plc)*, 93 F.3d 1036 (2d Cir. 1996) ............. 23

*Pu v. Grubin (In re Food Mgmt. Grp., LLC)*,
    484 B.R. 574, (S.D.N.Y. 2012) .................................................................... 23

*Purewal v. Est. of Kalsi (In re Kalsi)*,
    Nos. 20-10330 (MG), 21-01159, 2021 Bankr. LEXIS 2188, at *11
    (Bankr. S.D.N.Y. Aug. 12, 2021).................................................... 22, 24, 25

*R $^2$ Invs., LDC v. Charter Commc'ns, Inc. (In re Charter Commc'ns, Inc.)*,
    691 F.3d 476 (2d Cir. 2012) ........................................................................... 3

*Rosenstadt v. Wainwright House, Inc.*,
    No. 55786/2022, 2023 N.Y. Misc. LEXIS 36063
    (Sup. Ct. Westchester County Mar. 20, 2023) ...................................... 26, 30

*Saint Joseph's Hospital v. Bennett*,
    281 N.Y. 115 (1939) ........................................................................ 16, 17, 18

*Southland Royalty Co. v. Wamsutter LLC (In re Southland Royalty Co.)*,
    623 B.R. 64 (Bankr. D. Del. 2020).............................................................. 24

*Starr Int'l Co. v. Am. Int'l Grp., Inc.*,
    648 F. Supp. 2d 546 (S.D.N.Y. 2009)......................................................... 15

*Travellers Int'l, A.G. v. Trans World Airlines, Inc.*,
    41 F.3d 1570 (2d Cir. 1994) ............................................................................ 3

*United States v. Sun Myung Moon*,
    718 F.2d 1210 (2d Cir. 1983) ....................................................................... 12

*United States v. U.S. Gypsum Co.*,
    333 U.S. 364 (1948) ...................................................................................... 3

## **STATUTES**

11 U.S.C. § 541(c)(2) ........................................................................ 2, 14, 18, 19

11 U.S.C. § 544(a)(3) ................................................................................. *passim*

28 U.S.C. § 158(a)(1) ...................................................................................... 2

N-PCL § 513(a) ........................................................................................ 18, 19

N-PCL § 1001(d)(3) ......................................................................................... 20

N-PCL § 1002(a) ......................................................................................... 19, 20

N-PCL § 1109(c) ............................................................................................. 19

## **OTHER AUTHORITIES**

COLLIER ON BANKRUPTCY ¶ 544.03 (15th ed. rev. 2001))) ..................................... 23

5 COLLIER ON BANKRUPTCY ¶ 544.05 (R. Levin & H. Sommer eds., 16th ed.
    2025)........................................................................................................ 23

## **RULES**

Fed. R. Bankr. P. 8002(a)(1) ............................................................................ 2

Fed. R. Bankr. P. 8013 ..................................................................................... 3

Appellant the Official Committee of Unsecured Creditors (the "**Committee**") of the Diocese of Buffalo, N.Y. (the "**Diocese**") submits this brief in support of its appeal from the Decision and Order of the United States Bankruptcy Court of the Western District of New York (Bucki, U.S.C.B.J.), dated June 6, 2025 (the "**Decision,**" CA0186, reported at *In re Diocese of Buffalo*, No. BK 20-10322 CLB, 2025 Bankr. LEXIS 1436 (Bankr. W.D.N.Y. June 6, 2025)). The Bankruptcy Court erred in denying the Diocese's uncontested motion (the "**Motion**," CA0001), in which the Committee joined (the "**Joinder**," CA0112), seeking access to the $4 million proceeds (the "**Sale Proceeds**") of the Diocese's sale of certain real property (the "**Property**"). The Bankruptcy Court also erred in finding that approximately two-thirds of the Sale Proceeds are subject of an implied trust and may not be used for the purpose of funding a settlement trust in the Diocese's bankruptcy proceeding for the benefit of victims of childhood sexual abuse ("**Survivors**") at the hands of perpetrators for whom the Diocese was responsible.

The Diocese is submitting its brief on appeal of the Motion contemporaneously in counterpart case number 1:25-cv-0535-MAV. To reduce duplicative recitation of the facts and argument, the Committee respectfully refers to the Diocese's brief and incorporates it herein by reference for all purposes.

## BASIS FOR APPELLATE JURISDICTION

This is an appeal from an order of the Bankruptcy Court for the Western District of New York ("**Bankruptcy Court**") denying the Motion.   This Court has jurisdiction pursuant to 28 U.S.C. § 158(a)(1).  The Committee timely filed its notice of appeal pursuant to Bankruptcy Rule 8002(a)(1).  (CA0224).

## ISSUES PRESENTED

1.     Did the Bankruptcy Court err in deciding that a part of the Sale Proceeds of a sale of real property of the Diocese "free and clear of any interest in such property of an entity other than the estate" pursuant to Bankruptcy Code § 363 were restricted funds subject to the *cy pres* doctrine and therefore could not be used by the Diocese for the compensation of survivors of childhood sexual abuse or for other purposes?

2.     Did the Bankruptcy Court err in determining that approximately two-thirds of the Sale Proceeds are subject to an implied trust and that the Sale Proceeds are subject to the restraints of 11 U.S.C. § 541(c)(2)?

3.     Did the Bankruptcy Court err in not addressing that any alleged restrictions on transfer of the real property (including improvements thereon) formerly used for the seminary were not recorded and consequently may be avoided by the debtor in possession pursuant to Bankruptcy Code § 544(a)(3), such that no part of the Sale Proceeds are subject to any restriction on their use?

4.     Did the Bankruptcy Court err in its methods and conclusions in calculating the portions of the Sale Proceeds subject to such implied trust?

## STANDARD OF APPELLATE REVIEW

5.     A district court's standard of review of bankruptcy court decisions is well-established:

> In exercising its appellate jurisdiction, the district court distinguishes between findings of fact and conclusions of law; reviewing the former under the "clear error" standard, and the latter *de novo. R $^2$ Invs., LDC v. Charter Commc'ns, Inc. (In re Charter Commc'ns, Inc.)*, 691 F.3d 476, 483 (2d Cir. 2012); *see United States v. U.S. Gypsum Co*., 333 U.S. 364, 395, 68 S. Ct. 525, 92 L. Ed. 746 (1948) ("A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."). Where a finding is mixed—i.e., it contains both conclusions of law and factual findings—the *de novo* standard applies. *See 3Int'l, A.G. v. Trans World Airlines, Inc*., 41 F.3d 1570, 1575 (2d Cir. 1994). After applying these standards to the questions of law and fact, the district court "may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings." Fed. R. Bankr. P. 8013.

*County of Clinton v. Warehouse at Van Buren St., Inc.*, 496 B.R. 278, 280 (N.D.N.Y. 2013).

## PRELIMINARY STATEMENT

6.     In 1959, the Diocese of Buffalo announced the development of a new seminary (eventually known as Christ the King Seminary, the "**Seminary**") for the training of Diocesan clergy.  A wealthy parishioner of the Diocese donated property

(with no restrictions in the deed) and other individuals made monetary contributions that were used by the Diocese to construct the Seminary.

7.    What the Diocese did not announce, indeed it concealed at the time it solicited donations, was that dozens of priests and other Diocese-related actors had sexually abused children of the Diocese for decades, were perpetrating such abuse at the time of the donations, and would continue to do so for decades to come while they were under the supervision of the Diocese.[1]  Indeed, the seminary the Diocese built with such clerical encouragement has been alleged to be one locus of such abuse.[2]  The Committee supports the Motion because of the importance of providing Diocesan available assets to the eventual payment of its liabilities to the Survivors.

8.    In 2019, New York State adopted the Child Victims Act (codified in relevant part as CPLR 214-g) (the "**CVA**") which opened a window for Survivors to file suit against those responsible for their childhood molestation.  Some 250 claims were filed against the Diocese under the CVA prior to the Diocese commencing its bankruptcy case, and well over 850 claims relating to childhood sexual abuse were filed in the bankruptcy.  On February 28, 2020, the Diocese

---

[1] See, for example, Complaint, *People v. Diocese of Buffalo*, No. 452354/2020 (Sup. Ct. N.Y. County Dec. 2, 2020) at 31 (list of "Diocesan Priests with Substantiated Allegations of Abuse of a Minor") and ¶¶ 254, 416, 418-19, 425, 435 (identifying allegations of abuse committed in the 1950s and 1960s).

[2] Complaint, *AB 717 Doe v. St. Mary's of the Lake Roman Cath. Church Soc'y of Mt. Verno*n, No. 810854/2021 (Sup. Ct. Erie County Aug. 7, 2021) (alleging abuse from 1970 to 1973 by employee of the Seminary).

commenced its case for relief under Chapter 11 of the Bankruptcy Code (tit. 11 U.S.C.) and is seeking to resolve the Survivors' claims under the umbrella of the bankruptcy by the anticipated creation of a trust to provide them fair and equitable compensation.

9.      To that end, in 2024, as described below, the Diocese engaged in a Section 363 sale process, on broad notice,[3] approved by the Bankruptcy Court, that resulted in the sale of the Property for Sale Proceeds of more than $4 million.

10.     The Bankruptcy Court, *sua sponte*, directed the Diocese to file the Motion asking that it be allowed to access the Sale Proceeds.  (CA0001).  The Committee filed the Joinder in support of the Motion.  CA0112.  No party asserted a claim to the proceeds on the basis that they were subject to an implied trust or any other restriction.  The Diocese demonstrated in the Motion that the Sale Proceeds are not under any restriction as a matter of the New York Not-for-Profit Corporations Law ("**N-PCL**") or the Estates, Powers and Trusts Law ("**EPTL**").  No party objected to the Motion.

---

[3] The sale and motion were duly noticed.  The Diocese retained a broker to market the Seminary property.  *Order Authorizing the Retention and Employment of Hanna Commercial Real Estate as Real Estate Broker to the Diocese* [Docket No. 2523].  Pursuant to the Court approved bidding procedures, the Diocese gave Notice of the sale to, among others, the New York Attorney General and the United States Trustee. See Certificate of Service at Docket No. 3099. The Diocese also published notice of the auction and sale hearing in the Buffalo News.  See *Certificate of Service* at Docket No. 3109.

11.     Notwithstanding the facts and law put forward by the Diocese and the Committee and the absence of any opposition to the Motion, the Bankruptcy Court in the Decision found that approximately two-thirds of the Sale Proceeds are subject to an implied trust and so are restricted funds and cannot be used to compensate the Survivors, victims of horrific torts to whom the Diocese is liable.  Instead the Bankruptcy Court incorrectly inferred and imputed the purported "intent" of the donors thereby shielding the Sale Proceeds from creditors.  For example, notwithstanding the plain language in the a board resolution of St. John Vianney Seminary (a prior owner of the Seminary Property) that, in the event that the Seminary was no longer operated then "title to this property shall be reconveyed to the previous owner, The Diocese of Buffalo, N.Y.," the Bankruptcy Court, in the absence of textual support or any evidence, inferred that the purpose of the resolution was  "***presumably*** so that the Diocese could either operate a seminary or find some other appropriate use consistent with *cy pres* requirements." [Decision at 12] (emphasis added).  There was literally not a shred of evidence in the record to support the Court's interpretive leap.

12.     Similarly, as set forth in the Diocese's brief (at 24-29), the Court improperly read aspirational or prayerful statements (for example, "as long as the Seminary stands" or "please God "about the Diocese's hopes for prolonged

operation of the Seminary as enforceable promises from the Diocese that the Seminary would be operated in perpetuity.  *See* Diocese Br. at 25.

13.    Based on that judicially-manufactured assumption of donor intent, the Bankruptcy Court proceeded to find that certain of the Sale Proceeds were restricted and could not be used in the manner the Diocese determines is in its best interests. CA0200 (Decision at 14).

14.    The Decision is incorrect on every level:

- The sources that the Bankruptcy Court used to infer the donor's intent — do not support the Bankruptcy Court's determination that donors clearly and unequivocally intended that their funds would be used in perpetuity for the purpose of a Diocesan seminary.  In fact, the donors got exactly what the Diocese promised; the use of their donations for the bricks-and-mortar construction of a seminary; the Seminary was in fact built and was used by the Diocese for the education of clergy for three generations.

- New York law does not create an "implied trust" of funds donated to a charitable corporation for a particular purpose, separated from the ownership of the charity.  Rather, New York authorities are clear that any restrictions do not create a trust, and the enforcement of such restrictions is instead determined by statute.  By statute such restrictions are subordinate to the rights of a charity's creditors (such as the Survivors) in a bankruptcy.

- Whatever else may be the case, any purported restrictions may be avoided by the Diocese as debtor-in-possession under Bankruptcy Code § 544(a)(3), as they are not recorded in the chain of title to the Property.

15.     The Decision is erroneous on the facts and the law.  It should be reversed, and the Sale Proceeds should be made available to compensate the Survivors for the Diocese's liability to them.

## STATEMENT OF THE CASE

16.     To avoid a duplicative recitation of the facts of the matter, the Committee respectfully refers to, and incorporates herein by reference, the Statement of the Case in the Diocese's Brief (at 5-15).  The Committee states the following additional matter in support of its arguments herein.

### A.     The Diocese's Bankruptcy

17.     On February 28, 2020 (the "**Petition Date**"), the Diocese filed a petition for relief under chapter 11 in the wake of hundreds of lawsuits filed and claims anticipated to be made by survivors of sexual abuse (the "**Survivors**") under the New York Child Victims Act (the "**CVA**") and in anticipation of the assertion of more sexual abuse claims. CA0631 (Mendolara Aff. ¶ 9).

18.     Following years of mediation, the Diocese, its parishes and certain of its related non-debtor entities reached an agreement in principle with the Committee committing the Diocese, its parishes and certain related entities to contributing $150 million dollars to fund such a trust.

19.     At this time, one cash component of this contribution to an anticipated trust, and the potential compensation for the Survivors is all or part of the Sale Proceeds from the Property — Diocese-owned real property.

20.     To that end, in 2024, the Diocese engaged in a Section 363 sale process, approved by the Bankruptcy Court, that resulted in the sale of the Property for Sale Proceeds of more than $4 million.   When approving the proposed sale, the Bankruptcy Court expressed its desire to understand whether any interest of the donors attached to the Sale Proceeds such that under the *cy pres* doctrine there might be limitations on the future use of all or part of the Sale Proceeds.  The Court ordered the Diocese to place the Sale Proceeds into a segregated account until that issue was addressed.  The Bankruptcy Court further directed the Diocese to file a Motion to demonstrate that the sale proceeds were not subject to a use restriction.

21.     At the Bankruptcy Court's direction, the Diocese made the Motion, asking that it be allowed to access the Sale Proceeds.  CA0001.  The Committee filed the Joinder in support of the Motion. CA0112.  The Diocese demonstrated in the Motion that the Sale Proceeds are not under any restriction as a matter of the New York Not-for-Profit Corporations Law ("**N-PCL**") or the Estates, Powers and Trusts Law ("**EPTL**").

22.     The Motion was not opposed.

**B.    The History Of The Seminary**

23.    As detailed in the Motion, the Seminary Property was transferred to the Diocese by deeds from Fred H. Reuter in 1959 and 1960 (the "**Reuter Deeds**," CA0026, 0074-84 (Suchan Declaration ¶ 5 & Ex. D)).  In those deeds, Mr. Reuter covenanted that "he has not done or suffered anything whereby the said premises have been incumbered in any way whatever." *E.g.,* CA0076.  The Reuter Deeds contain no restrictive covenants.  They are stamped as received and recorded by the Erie County Clerk's Office. E.g., CA0077.

24.    In 1968, the Diocese transferred title by deeds to St. John Vianney Seminary, a New York domestic corporation (the "**1968 Deeds**").  CA0026, 0085-91 (Suchan Decl. ¶ 6 & Ex. E).  The 1968 Deeds contain warranties of title and quiet enjoyment.  Like the Reuter Deeds, the 1968 Deeds contain no restrictive covenants. CA0027, 0086-91.  The 1968 Deeds were signed by the then-Bishop of Buffalo, the Most Reverent James A. McNulty, and received and were likewise recorded by the Erie County Clerk's Office.  *E.g.,* CA0094

25.    In 1987, St. John Vianney Seminary deeded the property back to the Diocese (the "**1987 Deed**"). CA0027, 0092-94 (Suchan Decl. ¶ 10 & Ex F).  The 1987 Deed also warranted title and quiet enjoyment, has no restrictive covenants, and was signed by Edward Head, the then-Bishop of Buffalo, was subject to a lease

to Christ the King Seminary and was recorded in the Erie County Clerk's Office. CA0092-94.

26.    Christ the King Seminary ceased operations at the end of the 2020-2021 academic year.  CA0030 (Suchan Decl. ¶ 21); Diocese Br. at 10.  *See Closures of Degree-Granting    Institutions*,    N.Y.    State    Educ.    Dep't, *https://www.nysed.gov/college-university-evaluation/closures-degree-granting-institutions* (last visited Aug. 19, 2025) (Christ the King Seminary closed June 1, 2021).

## ARGUMENT

### A.    The Diocese Did Not Promise A Forever Seminary

27.    The Seminary buildings were built on the donated land, opened in 1961 and operated until 2021 when it closed because of declining enrollment and the loss, following the bankruptcy filing, of the financial support provided by the Diocese funding the Seminary's continuing operating losses.

28.    As explained in the Motion, the Diocese solicited donations for the building of the Seminary, and it used the donations for that purpose.  The Diocese did not, as part of its solicitation, promise that the funds donated would be forever used to support the Seminary.[4]  Diocese Br. at 5-7, 24-29, 20-25.

_____

[4] The aspirational statements about the perpetual operation of the Seminary upon which the Bankruptcy Court relied were hearsay contained in newspaper articles (purportedly located by the Bankruptcy Court through its own investigation) published *after* the solicitation took place,

29.    New York law is clear, that for there to be an enforceable donor restriction the restriction must be clear and unequivocal. *See, e.g., Dennis v. Buffalo Fine Arts Acad.,* 15 Misc. 3d 1106(A), 836 N.Y.S.2d 498 (Sup. Ct. Erie County 2007); *Lefkowitz v. Cornell Univ.*, 316 N.Y.S.2d 264 (4th Dep't 1970), *aff'd*, 28 N.Y.2d 876 (1971); *United States v. Sun Myung Moon*, 718 F.2d 1210, 1224 (2d Cir. 1983).

30.    As the Diocese's brief makes clear, the donation of the land was also without any restriction and there was never any restriction on the deeds.   The Seminary passed a resolution in 1970 providing that the Seminary and its land would revert to the Diocese if the Seminary were no longer operated as a seminary.

> RESOLVED that in the event the real property located on Knox Road in the Town of Aurora, owned by this corporation is no longer used as a seminary for the education of young men to the priesthood, title to this property shall be reconveyed to the previous owner, The Diocese of Buffalo, N.Y….

CA0198 (Decision at 12); *see* CA0072.

31.    The Decision omits the end of the resolution: "in consideration of the subvention made by The Diocese to the Seminary." CA0072  But that language is important— the Diocese made the $2.2 million subvention, essentially a writing evidencing indebtedness — against the Seminary Property.  Diocese Br. at 28 & n.8.

---

not subject to challenge by the Diocese or Committee on the Motion.  *See* Diocese Br. at 13-14, 33-35.

The Bankruptcy Court acknowledged that Fred Reuter (the donor of the real property) was on the Board at the time the resolution was passed. CA0198 (Decision at 12). The Bankruptcy Court went on to read into the resolution a requirement that the property so returned to the Diocese would be used to "operate a seminary or find some other appropriate use consistent with *cy pres* requirements." *Id.* The Bankruptcy Court ignores that actual language of the resolution did not give rise to any *cy pres* requirement; indeed it acknowledges that the Seminary might close at any point in the future and that the transfer of the Seminary Property would be in consideration of the subvention.

32.    The donations made to build the Seminary were used for the purpose they were given, to build a seminary. The Diocese fulfilled its legal obligations to the donors over 60 years ago. Thus, any obligation the Diocese had in respect of the donors has long since been fulfilled, while its obligations to the Survivors remain unsatisfied and in suspense while the bankruptcy pends. There was never an actual or implied agreement or representation by the Diocese that it would operate the Seminary in perpetuity. The Diocese operated the Seminary for almost 60 years before it ceased operations because it was no longer viable.

**B.    Donations For Building The Seminary Are
Not Trust Property As A Matter Of New York Law**

33.    As the Diocese explains in its brief (at 16-33), and as the Committee sets forth above, no part of the Seminary Property was under restrictions, and the

Bankruptcy Court erred in finding to the contrary.  But even were there some restriction on the Seminary Property, that restriction does not make that Property a "beneficial interest of the debtor in a trust" that is cognizable in bankruptcy.

34.    The Bankruptcy Court held:

> We agree, but find that [Seminary donations are] subject to the limitations of 11 U.S.C. § 541(c)(2), which reads as follows: "A restriction on the transfer of a beneficial interest of the debtor in a trust that is enforceable under applicable nonbankruptcy law is enforceable in a case under this title."  Here, the applicable nonbankruptcy law provides "that although gifts to a charitable organization do not create a trust in the technical sense, where a purpose is stated a trust will be implied."  *Lefkowitz v. Lebensfeld,* 68 A.D.2d 488, 496*, 417 N.Y.S.2d 715* (1st Dep't 1979). This implied trust imposes constraints that are enforceable in bankruptcy.  Consequently, proceeds traceable to The Seminary Fund Drive and the Reuter donation are restricted and may not be used to settle unrelated claims against the Diocese.

CA0198-99 (Decision at 12-13).  The Bankruptcy Court's finding that part of the Sale Proceeds is subject to an "implied trust" was erroneous.  New York law does not impress any trust on funds donated to a charitable corporation for a specified purpose.  Notably, the Bankruptcy Court did not cite any federal bankruptcy caselaw in support of its treatment of gifts to a charity for a stated purpose as being a trust for bankruptcy purposes.  The New York State authorities on which the Bankruptcy Court relied do not support the proposition – indeed those cases make clear that there is not an implied trust with respect to the Sale Proceeds.

35.    New York's definition of a "trust" is well-established:

> Under New York law, the requirements of a trust are "(1) a designated beneficiary, (2) a designated trustee, who is not the same person as the beneficiary, (3) a clearly identifiable res, and (4) the delivery of the res by the settlor to the trustee with the intent of vesting legal title in the trustee." *Starr Int'l Co. v. Am. Int'l Grp., Inc.*, 648 F. Supp. 2d 546, 559 (S.D.N.Y. 2009) (quoting *Agudas Chasidei Chabad of U.S. v. Gourary*, 833 F.2d 431, 434 (2d Cir.1987)).

*In re Carpenter*, 566 B.R. 340, 349 (S.D.N.Y. 2017).  New York cases recognize that property in the hands of a charitable corporation is not held in a trust.

36.    *Lefkowitz v. Lebensfeld*, 68 A.D.2d 488 (1st Dep't 1979), *aff'd* 51 N.Y.2d 442 (1980), on which the Bankruptcy Court relied, did not address the status of funds donated to a charity for a specific purpose.  *Lebensfeld* was a case about the power of the Attorney General to enforce gifts, not on behalf of donors, but of charity-donees (and found that the Attorney General did not in fact have standing). In *Lebensfeld*, the donor made unrestricted donations of preferred stock of a company he controlled to numerous charities.  *Id.* at 489.  The Attorney General sought to force the company to issue larger dividends on the stock that would inure to the charities as stockholders.  Contrary to the bankruptcy court's interpretation, *Lebensfeld* thus has nothing to do with judicial enforcement of restrictions on the use of donations restricted to a particular purpose.  It does not hold that a charitable gift creates an "implied trust" as a matter of bankruptcy or other law.  As such, the proposition on which the bankruptcy court relied is *dicta* (and as such was not

addressed by the Court of Appeals in its affirmance, *see Lefkowitz v. Lebensfeld*, 51

N.Y.2d 442 (1980)).

37.     Indeed, the Bankruptcy Court omitted critical qualifying language in its

citation of *Lebensfeld*.  The recapitulating language in *Lebensfeld* (page 496) quoted

by the Bankruptcy Court was explained by the *Lebensfeld* court in full on page 495:

> Thus, it is clear that the *Attorney-General's powers of
> representation and enforcement*, whether of statutory or equity
> origin, are not limited to express trusts, but encompass those
> charitable dispositions where property has been donated for a
> specific purpose. In such cases a trust will be "implied in the
> sense that the donated property will be required to be used for the
> purposes for which it was given and *it is the duty and
> responsibility of the attorney general to require that these
> purposes be effectuated*".   (See Greenfield, Practice
> Commentaries, McKinney's Cons Laws of NY, Book 17-B,
> EPTL 8-1.1, 1978-1979 Supp, p 111.)

*Lebensfeld*, 68 A.D.2d at 495 (emphasis added).   That is, even according to

*Lebensfeld,* there is no general "implied trust" in property but only the "sense" of a

trust in that the Attorney General can seek to enforce an obligation on the charity.

38.     In fact, the cases on which *Lebensfeld* itself relies are clear that a

direction in a donation does not create a trust (and thus *Lebensfeld*'s use of the word

"trust" was perhaps improvident).  *Saint Joseph's Hospital v. Bennett,* 281 N.Y. 115

(1939), the New York Court of Appeals decision on which *Lebensfeld* relies (and

which was quoted selectively by the Bankruptcy court) is worth quoting at length:

> Thus in *Wetmore v. Parker* (52 N.Y. 450), decided one week
> after *Holmes v. Mead* (*supra*) the court said (at p. 459): "No

mortmain law, restrictive as they have sometimes been, ever prevented the donors from making their gifts in such terms as would preserve the principal from dissipation. *It does not create a trust in any such sense, as that term is applied to property.* The corporation uses the property, in accordance with the law of its creation, for its own purposes; and *the dictation of the manner of its use, within the law by the donor, does not affect its ownership or make it a trustee. A person may transform himself into a trustee for another, but he cannot be a trustee for himself*."

Again in *Bird v. Merklee* (144 N.Y. 544), the court said (at p. 550): "The fact that the testator has designated the purpose for which this legacy must be used does not indicate a desire upon his part to create a trust. If it were necessary in order to sustain the bequest these words of designation by the testator might be treated as merely precatory, but we think it was entirely competent for him to apply his bounty to the whole or any one or more of the various purposes for which the corporations are authorized to hold property. This is fully reasoned by Judge Denio in *Williams v. Williams* (8 N.Y. at bottom p. 530).

"The fundamental error in this case, in the court below, and in cases that are frequently coming to the attention of this court, is the failure to recognize the fact that gifts to religious and charitable corporations to aid in carrying out the purposes for which they are organized, whether by expending the principal of a bequest, or the income of a bequest to be invested in perpetuity, do not create a trust in **any** legal sense, do not offend against the statutes of perpetuities, **are not to be judged by any of the well-known rules pertaining to the law of trusts** as applied to private individuals."

It is submitted that when the opinions in these cases are read as a whole, they merely decided that gifts to a charitable corporation, though subject to enforceable restrictions, do not create a trust in the legal sense.

*Id. at* 120-21 (emphasis added).  In conflating charitable donations with trusts, the Decision makes the exact same "fundamental error" that the Court of Appeals decried some eighty-five years ago .

39.    Section 541(c)(2) is clear; to be subject to its terms, the property at issue must be the debtor's beneficial interest in a "trust."  Courts "apply the plain meaning of the applicable Bankruptcy Code sections, unless applying the plain meaning would yield an absurd result."  *In re Miller*, 462 B.R. 421, 430 (Bankr. E.D.N.Y. 2011).  Under the plain language of Bankruptcy Code § 541(c)(2), property has to be in an actual *trust* to be taken out of reach.  As a matter of New York law, property in the hands of a charitable corporation is explicitly not in a trust.

40.    The Bankruptcy Court (CA0191 (Decision at 5)) also ignored the critical language of N-PCL § 513(a), which says:  "a *charitable corporation shall hold full ownership rights* in any assets consisting of funds or other real or personal property of any kind, *that may be given . . . or otherwise vested in such corporation in trust* for, or with a direction to apply the same to, any purpose specified in its certificate of incorporation." N-PCL § 513(a) (emphasis added).  In other words, *the statute itself* extinguishes any division between the legal and the beneficial ownership of property held by a nonprofit corporation such as the Diocese, and as such extinguishes any "trust" concerning such property.

41.    Because N-PCL § 513(a) provides the charity with "full ownership rights" – that is, all combined legal and beneficial rights, there is no beneficial interest separable from a charitable corporation's legal interest in property, such that there can be no restriction on the transfer of a "beneficial interest" of such property to which Bankruptcy Code § 541(c)(2) could apply.  The Bankruptcy Court thus erred in holding that part of the Seminary Property was trust property and that such a beneficial interest exists. Restricted assets of a nonprofit corporation are not held in trust.

42.    Moreover, Section 1002-a of the N-PCL addresses order of the liquidation of assets of not-for-profit corporations, whether by voluntary (N-PCL § 1002) or judicial (N-PCL § 1109(c)) dissolution. Section 1002-a provides, in relevant part:

> Prior to filing the certificate of dissolution with the department of state, a corporation, as applicable, shall . . .
>
> (b) Pursuant to the plan of dissolution and distribution of assets, fulfill or discharge its contracts, collect and sell its assets for cash at public or private sale, *discharge or pay its liabilities,* and do all other acts appropriate to liquidate its business;
>
> (c) Distribute the assets of the corporation that remain after paying or adequately providing for the payment of its liabilities, in the following manner:
>
> (1) assets received and held by the corporation either for a charitable purpose or which are legally required to be used for a particular purpose, shall be distributed to one or more domestic or foreign corporations or other organizations engaged in

> activities substantially similar to those of the dissolved corporation….

N-PCL § 1002-a (emphasis added). *See also* N-PCL § 1001(d)(3) (plan of liquidation to include "a statement that the assets owned by the corporation, *subject to any unpaid liabilities of the corporation*, shall be distributed as required by any gift instrument" (emphasis added)).

43.    That is, a dissolving New York not-for-profit corporation *must* satisfy its creditors *prior* to applying any *cy pres* rule to its remaining assets, including restricted assets.[5] Bankruptcy proceedings are the equivalent of judicial liquidation. *In re Estate of Thurston*, 746 N.Y.S.2d 343, 346 (Sur. Ct. Westchester County 2002) (nonprofit dissolved in Chapter 11 proceeding: "this court finds that the bankruptcy proceeding was the functional equivalent of a judicial dissolution for the purposes of determining the proper distribution of the assets of a bankrupt not-for-profit corporation"). Applying New York law, the Bankruptcy Court was obligated to place the interests of creditors ahead of donor restrictions on donated funds.

44.    The Committee wishes to emphasize the transcendent fact: the Diocese is facing over 800 claims for the sexual abuse of minors, members of its communion

---

[5] The Committee is aware of the Appellate Division's decision in *In re Friends for Long Island's Heritage*, 911 N.Y.S.2d 412 (2d Dep't 2010)). That decision involved, in addition to N-PCL 1002-a, the dissolution provisions of the Education Law, which differ, and unique collections of historical objects. To the extent that the case can be read to mean that a nonprofit corporations' restricted assets cannot be used to satisfy the nonprofit's obligations to its creditors, the Committee submits that the decision is not controlling, is wrong on the law as it disregards the plain language of the statute, and has not been subsequently cited it for that proposition.

who have suffered unimaginably for decades.   The Diocese acknowledges the importance of "offer[ing] aid and comfort to victims of abuse" and "equitable" compensation to creditors, including the Survivors (CA0631-32 (Mendolara Decl. ¶¶ 10-11).   Surely compensation to the Survivors is an important Diocesan purpose. And the assets of the Diocese would not be sufficient to pay its liabilities to the Survivors in full were these claims to proceed to judgment.   Thus, any plan of reorganization of the Diocese will leave its liability to the Survivors only partially satisfied.   The Bankruptcy Court's determination that two-thirds of the Sale Proceeds cannot be used toward the at-best partial satisfaction of the Diocese's liabilities is not supported by New York law.

45.    It is telling that the Attorney General, despite notice (CA0011), has not appeared to oppose the relief sought by the Diocese in the Motion. Nor, despite notice (*id.*), has the United States Trustee.  The Bankruptcy Court erred in assuming the interests of parties who had not appeared before it and favoring its purely hypothetical interpolation of those interests over the interests of the Survivors and the Debtor who were.

## C.    Bankruptcy Code § 544 Vitiates Any Unrecorded Restriction

46.    Having incorrectly characterized the bulk of the donations, including real property, as subject to an implied trust, the Bankruptcy Court ended its analysis

and did not consider the status of the real property – the land and the buildings on it

– under the Bankruptcy Code.  This was error.  As Judge Bucki himself has stated:

> Real property is indeed different from personalty, and the
> Bankruptcy Code incorporates distinctions that honor this
> difference. One such distinction occurs in 11 U.S.C. § 544(a)(3),
> which grants to a trustee certain rights of a bona fide purchaser
> of real property.

*Gaffney v. United States DOT (In re Premier Airways, Inc.),* Nos. 01-10656 B, AP

02-1238 B, 2004 Bankr. LEXIS 5, at *1 (Bankr. W.D.N.Y. Jan. 6, 2004) (Bucki,

B.J.).

### 1.    Bankruptcy Code § 544(a)(3) Applies To The Property and Seminary Proceeds

47.    Bankruptcy Code § 544(a)(3) provides:

> (a) The trustee shall have, as of the commencement of the case,
> and without regard to any knowledge of the trustee or of any
> creditor, the rights and powers of, or may avoid any transfer of
> property of the debtor or any obligation incurred by the debtor
> that is voidable by . . .

> (3) a bona fide purchaser of real property, other than fixtures,
> from the debtor, against whom applicable law permits such
> transfer to be perfected, that obtains the status of a bona fide
> purchaser and has perfected such transfer at the time of the
> commencement of the case, whether or not such a purchaser
> exists.

48.    "The purpose of this status is 'to cut off unperfected security interests,

secret liens and undisclosed prepetition claims against the debtor's property as of the

commencement of the case.'"  *Purewal v. Est. of Kalsi (In re Kalsi)*, Nos. 20-10330

(MG), 21-01159, 2021 Bankr. LEXIS 2188, at *11 (Bankr. S.D.N.Y. Aug. 12, 2021)

(citing *In re Canney*, 284 F.3d 362, 374 (2d Cir. 2002), quoting COLLIER ON BANKRUPTCY ¶ 544.03 (15th ed. rev. 2001)).[6]

49.    In *Gaffney*, the Federal Aviation Administration sought to enforce an unrecorded interest in favor of the government, based on a government grant for the expansion of a small local airport, against the proceeds of the bankruptcy sale of the real property at issue.  2004 Bankr. LEXIS 5 at *2-3.  The government's claimed interest in the property was not recorded in the property deeds.  *Id.* at *3.  The trustee brought an adversary proceeding to avoid the FAA's claim, and the Court granted him summary judgment, finding that Section 544 allowed the trustee to avoid the FAA's claimed but unrecorded interest.  *Id.* at *11.

50.    *Gaffney* is on point here.  First, under Section 544(a)(3):

> Essentially, the trustee enjoys the rights of a bona fide purchaser who might have perfected an acquisition of the expansion properties from the debtor as of the commencement of the case. A bona fide purchaser is someone "who buys something for value without notice of another's claim to the item or of any defects in the seller's title . . . ." BLACK'S LAW DICTIONARY 1249 (7th ed. 1999). Thus, the trustee enjoys the status of a purchaser without knowledge of any implied trust or equitable lien of the FAA.

*Id.* at *9-10.

---

[6] Though an avoidance action pursuant to Section 544(a)(3) is subject to a statute of limitations, avoidance actions may be used defensively by the debtor, including with respect to objections to claims, at any time.  *See, e.g., Pu v. Grubin (In re Food Mgmt. Grp., LLC)*, 484 B.R. 574, 583 (S.D.N.Y. 2012); *Maxwell Commc'n Corp. PLC by Homan v. Societe Generale (In re Maxwell Commc'n Corp. plc)*, 93 F.3d 1036, 1054 (2d Cir. 1996).

51.    Critically, "the trustee is not required to prove his or her bona fides. Rather, the trustee is presumed to hold the status of a bona fide purchaser of real property 'from the debtor, against whom applicable law permits such transfer to be perfected.'" *Id.* at *10.  That is, the issue is whether a bona fide purchaser for value would have had constructive notice of the restriction at the petition date, as a matter of state law, not whether the trustee had actual knowledge of any restriction.

52.    Bankruptcy Code § 544(a)(3) provides that the trustee may avoid "[a]ny interest in property that the trustee recovers under section 329(b), 363(n), 543, 550, 553, or 723 of this title."  Interests avoided under Section 544 are assets recovered under Section 550 and are therefore included within property of the estate.  *Gaffney*, 2004 Bankr. LEXIS 5, at *8.  Section 544 operates to vitiate claims for avoidable interests in real property, however characterized, including as "constructive trust," (*Purewal*, 2021 Bankr. LEXIS 2188 at *12-13 (§ 544 precludes imposition of constructive trust) or "equitable servitude" (*Southland Royalty Co. v. Wamsutter LLC (In re Southland Royalty Co.)*, 623 B.R. 64, 88 (Bankr. D. Del. 2020) (landowners cannot "impose upon future owners obligations totally unrelated to the land" outside the scope of § 544)).

### 2.    A Bona Fide Purchaser Of The Seminary Property Would Not Have Had Notice Of Any Restriction

53.    "In evaluating the trustee's rights as a hypothetical bona fide purchaser of real property, the court looks to the substantive state law pertaining to the property

that is the subject of the proceeding, in this case the law of New York." *Purewal*, 2021 Bankr. LEXIS 2188 at *12. "Under New York law, a bona fide purchaser of real property will, upon the recording of its conveyance, take title free of any unrecorded interest. N.Y. REAL PROP. LAW § 291." *Gaffney*, 2004 Bankr. LEXIS 5 at *10; *see also Purewal*, 2021 Bankr. LEXIS 2188 at *12 ("Under New York law, a bona fide purchaser is protected from any prior, unrecorded interests in the purchased property.").

54.    As to the law of New York, Real Property Law § 291 provides that any unrecorded conveyance of real property "is void as against any person who subsequently purchases or acquires . . . the same real property or any portion thereof, . . . in good faith and for a valuable consideration, from the same vendor or assignor."

55.    The New York Appellate Division summarized the law surrounding the enforcement of encumbrances on title:

- "'[T]he policy of the law is to favor the free and unobstructed use of realty'" (*Huggins v. Castle Ests., Inc.*, 36 N.Y.2d 427, 430 (1975)).

- "[A] purchaser takes with notice from the record only of incumbrances in his direct chain of title.  In the absence of actual notice before or at the time of his purchase or of other exceptional circumstances, an owner of land is only bound by restrictions if they appear in some deed of record in the conveyance to himself or his direct predecessors in

title" (*Buffalo Acad. of Sacred Heart v. Boehm Bros. Inc.*, 267 N.Y. 242, 250 (1935)).[7]

- "A purchaser is not normally required to search outside the chain of title" (*Ioannou v. Southold Town Plan. Bd.*, 758 N.Y.S.2d 358, 359 (2d Dep't 2003) (citing *Buffalo Acad. of Sacred Heart*, 267 N.Y. 242).

- Deed restrictions are strictly construed against those seeking to enforce them and will be enforced only where their existence has been established by clear and convincing proof (*see Ioannou*, 758 N.Y.S.2d at 359 (citing *Witter v. Taggart*, 78 N.Y.2d 234, 237-38 (1991)).

*Butler v. Mathisson*, 981 N.Y.S.2d 441, 444 (2d Dep't 2014) (denying enforcement of setback requirements in subdivision maps as not being deed restriction that runs with the land).

56.    Strangers to a deed are not third-party beneficiaries of a restrictive covenant unless expressly made so in the grant.  *Rosenstadt v. Wainwright House, Inc.*, No. 55786/2022, 2023 N.Y. Misc. LEXIS 36063, at *11 (Sup. Ct. Westchester County Mar. 20, 2023).

57.    "In New York, findings of constructive notice are made by an examination of record evidence showing a party's actual awareness of facts that would create a duty of reasonable inquiry, given all the circumstances." *O'Connell v. JPMorgan Chase Bank Nat'l Ass'n,* No. 12-CV-1951 (ENV), 2012 U.S. Dist.

---

[7] Again, under Section 544(a)(3) the Trustee's actual notice is not considered, only whether the Trustee might have had constructive notice of a restriction under state law.  5 COLLIER ON BANKRUPTCY ¶ 544.05 (R. Levin & H. Sommer eds., 16th ed. 2025).

LEXIS 175388, at *8 (E.D.N.Y. Dec. 11, 2012) (constructive notice where recorded mortgage mentioned a second, unrecorded mortgage).

58.    The deeds in the Seminary Property chain of title contain no restriction, or any hint of extraneous restriction, on each subsequent grantee's transfer.  *See generally* Diocese Br. at 26-27.  The Reuter Deeds (CA0074-84 (Suchan Decl. Ex. D)), from Mr. Reuter to the Diocese in 1959 and 1960 are New York statutory form deeds, in each of which the grantor "covenants that he has not done or suffered anything whereby the said premises have been incumbered in any whatever." CA0076, 0079, 83 (Suchan Decl. Ex. D at 3, 6, 10).  That language has a long-standing statutory meaning under Real Property Law § 253(3):

> 3. Freedom from incumbrances.—A covenant "that the said premises are free from incumbrances," must be construed as meaning that such premises are free, clear, discharged and unincumbered of and from all former and other gifts, grants, titles, charges, estates, judgments, taxes, assessments, liens and incumbrances, of what nature or kind soever.

N.Y. Real Prop. Law § 253 (Consol. Lexis Advance through 2025 released Chapters 1-49, 61-112) (provision adopted in 1909).  That is, not only do the Reuter Deeds not contain any restrictions, but Mr. Reuter in conveying the property agreed that there were no restrictions on the Seminary Property.  Had Mr. Reuter intended to convey the Seminary Property with a restriction, he needed to put it in the deed, and if that was his intent, he could not have covenanted that the Seminary Property was free from incumbrances.  Notably, prior to granting it to the Diocese, the property

was evidently Mr. Reuter's own home and farm property (CA0046 (Suchan Decl. Ex. A at 15)) and was not in use for a charitable or religious purpose prior to the grant.

59.    The donors' funds were used to build the seminary and, when that happened, those donations became a part of the Property, no longer a separate fund. It is axiomatic under New York law that the property encompassed by a deed includes the buildings and other improvements on the land:

> [W]here the land and the buildings thereon belong to the same person, then the buildings are a part of the real estate and pass with it upon any conveyance thereof. In such a case the grantor can retain title to the buildings only by some reservation in the deed, or by some agreement in writing which will answer the requirements of the Statute of Frauds.  Any other rule would be exceedingly dangerous, and would enable a grantor, in derogation of his grant, upon oral evidence, to reserve buildings and trees and other portions of his real estate, and thus, perhaps, defeat the main purpose of the grant.

*Leonard v. Clough*, 133 N.Y. 292, 297-98 (1892).  *See* 2 Warren's Weed New York Real Property § 19.04 (2025) (same, citing *Leonard v. Clough*).  That is, as a matter of New York law, the Seminary buildings became part of the property subject to the deed and any restriction or trust on the donated money was extinguished on their conversion to bricks and mortar, subject only to any *recorded* restrictions on the real property – of which there were none.

60.    The 1968 Deeds (CA0085-91 (Suchan Decl. Ex. E)), from the Diocese to St. John Vianney Seminary, are also without any restrictions on their face.  The

1987 Deed (CA0092-94 (Suchan Decl. Ex. F)) is without restrictions on transfer, though it identifies the then-extant ground lease to Christ the King Seminary. Christ the King Seminary is a Diocesan entity that has been closed for some four years, and the lease was extinguished. *See supra* ¶ 26; Diocese Br. at 10.

61.    There is thus no evidence of any recorded interest in the Seminary Properties that would have restricted the disposition or use of the Seminary Property, or that attached to the Sale Proceeds. Nor, given the narrow route of the transfers of title to the Seminary Property in the period (where the 1968 Deeds were both signed by the then-bishop of the Diocese acting for the Diocese or in his role at a Diocese-related entity) is there any evidence of, or reason to believe, that any other party was in a position to record a restriction.

62.    The Diocese's analysis of the absence of any enforceable restriction (Diocese Br. at 16-26) buttresses this conclusion. Even assuming, *arguendo*, that some money-donor could have a right against the Diocese with respect to the application of the proceeds of a donation,[8] that could not have risen to the level of a covenant running with the land enforceable against the Sale Proceeds.

---

[8] Notably, the *cy pres* disposition of unspent restricted funds that were later donated, according to the Diocese, clearly and unequivocally for purposes related the Seminary was addressed by New York Supreme Court. *See* Order, *In re Modification of Endowment Funds of the Found. of the Roman Cath. Diocese of Buffalo, N.Y., Inc.*, No. 814747/2020 (Sup. Ct. Erie County Nov. 25, 2020), NYSCEF Doc. No. 19.

63.     There is no evidence of any document other than the Deeds that would plausibly constitute a recorded instrument containing any restrictions on the Seminary Property.  But even if such a piece of paper existed, it would not be an enforceable interest in the Seminary Property:

> A party attempting to demonstrate that a purported restrictive covenant contained in a deed runs with the land must show that the grantor and grantee intended that the covenant should run with the land; . . . the covenant is one touching or concerning the land with which it runs; and it must appear that there is privity of estate between the promisee or party claiming the benefit of the covenant and the right to enforce it, and the promisor or party who rests under the burden of the covenant.

*Kingston Model R.R. Club, Inc. v. Eleven Main Grp., LLC*, 999 N.Y.S.2d 196, 197-98 (3d Dep't 2014) (internal quotations omitted); *see also Fields Enters. Inc. v. Bristol Harbour Vill. Ass'n,* 191 N.Y.S.3d 856, 861-62 (4th Dep't 2023) (enforcement restrictive covenants limited to owners of adjacent land or owners in a "general scheme" of improvement).  Here, there is no evidence of expressed intent, even if donors were giving to the purpose of a seminary, that any restriction associated with their gift was intended to be a covenant running with the land of the Seminary Property, nor would money donors have "privity of estate" with any owner of the Seminary Property, as they have no place in the chain of title of the Seminary Property.  *See Kingston Model R.R. Club*, 999 N.Y.S.2d at 197-98; *Rosenstadt*, 2023 N.Y. Misc LEXIS 36063 at *11-12 (third parties had no right to enforce restrictive covenant where the grant did not expressly give rights to third parties).

64.    In short, the funds donated for the construction of the seminary were used for that purpose.  Sixty years ago, those funds were turned into bricks and mortar that became incorporated into the Seminary Property that was within its deeds.  Consequently, any restriction that existed on the funds had to be included in the deeds to persist in the Property.  The deeds show no restriction; under New York law and Bankruptcy Code ¶ 544(a)(3) that is the beginning and end of the analysis.  The Sale Proceeds from the sale of the Seminary Property are not subject to any recorded restriction and, as a matter of law, any unrecorded restriction can be avoided by the Diocese as debtor-in-possession.

## D.    The Court Incorrectly Traced Donations To The Sale Proceeds

65.    Having incorrectly found that donations of funds and property were made for the purpose of a perpetual seminary, and incorrectly found an implied trust upon those funds, the Bankruptcy Court then incorrectly purported to "trace" the property donated more than sixty years ago to the present-day Proceeds.  CA0199-200 (Decision at 13-14).  The Bankruptcy Court did that by an overly simple calculation, dividing the total amount of donations (without considering the depreciation of the physical property built with that money[9]) that it (incorrectly)

_____

[9] The Decision does not address depreciation.  Had the donations been held in financial assets they might have held in value or appreciated, but once turned into physical property, they should be considered to have depreciated.  Notably, 40 years would be a typical depreciation period for buildings owned by nonprofit organizations.  *See* Kshama Kanakoor, *Depreciation for*

found to be perpetually restricted ($4,029,420) by the total amount spent on the Seminary's construction from 1959 to 1961 ($6,229,420) and arrived at a percentage, 64.68%, that it found to be subject to restrictions.  *Id.*

66.     The Bankruptcy Court's calculation, made without any resort to legal authority, is erroneous.  The Bankruptcy Court's pro rata calculation divided the amount of funds it determined was subject to restrictions (the numerator, about $4 million) by the total amount of donations and unrestricted funds used in the creation of the Seminary (the denominator, about $6 million).  *Id.*  But its use of both numbers was incorrect.  Even if the Court's calculation that $4 million of the construction cost and property was subject to restrictions for the numerator of its calculation is right, by the  Bankruptcy Court's calculation most of the numerator of  $4 million in funds was spent on bricks-and-mortar which, unlike invested funds, depreciates over time and, considering depreciation, has been diminished in value, perhaps to zero.  And its calculation of the total funds, the denominator, ignores whatever was spent by the St. John Vianney Seminary (now defunct) and the Diocese on adding, removing and maintaining improvements on the Seminary Property over sixty years.

---

*Nonprofits: An often neglected, but essential noncash expense for nonprofit organizations*, Cmty. Vision Capital & Consulting (Oct. 31, 2022), https://communityvisionca.org/depreciation-for-nonprofits/.  If that's the case, then the value of the donation-turned-to bricks-and-mortar was its salvage value even in the year 2001 and is less now.

67.    That is, the value of the Seminary at its sale in 2024, reflected in the Sale Proceeds, was not based on an unchanged and immutable physical plant and property from 1961.  Over time, the Diocese, then St. John Vianney Seminary, and then the Diocese again (the Seminary Property's successive owners over sixty years) must have made substantial maintenance, improvements and changes to the Seminary Property.

68.    These changes informed the value of the Seminary Property at its sale, likely accreting over three generations to vastly more than the original donations. These changes needed to be imputed to the numerator (as depreciation or disposed material) and to the denominator, the total funds expended on the physical Seminary Property over time.   The Bankruptcy Court did not consider these issues, much less propose a methodology to resolve them.  The Committee submits that these issues are impossible to solve metaphysically, factually or mathematically, and any resolution would be hopelessly speculative.  Given the passage of time and the expenditure of additional funds, no proportion of the Sale Proceeds can reasonably be traced back to the donations.

## **CONCLUSION**

69.    For the reasons set out in this brief, and for the reasons advanced by the Diocese in Case No. 1:25-cv-535, the Court should reverse the Decision, the Diocese

should be allowed to use the Sale Proceeds as set forth in the Motion, and the Court

should grant such other, further and different relief as to it seems just and proper.

Dated: August 20, 2025                    PACHULSKI STANG ZIEHL & JONES LLP

                                          */s/ Ilan D. Scharf*
                                          James I. Stang
                                          Ilan D. Scharf
                                          Karen B. Dine
                                          Jeffrey M. Dine
                                          1700 Broadway, 36th Floor
                                          New York, New York 10019
                                          Telephone: 212-561-7700
                                          Facsimile: 212-561-7777
                                          E-mail:  jstang@pszjlaw.com
                                                   ischarf@pszjlaw.com
                                                   kdine@pszjlaw.com
                                                   jdine@pszjlaw.com

                                          *Counsel to Official Committee of Unsecured
                                          Creditors*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that this brief meets the requirements of Bankruptcy Rule

8015(a)(7) because it contains 8,645 words, excluding the parts of the brief

exempted by Bankruptcy Rule 8015(a)(7)(B)(iii).


Dated: August 20, 2025          _/s/ Ilan D. Scharf_____
                                Ilan D. Scharf