UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NEW YORK

In re:

THE DIOCESE OF BUFFALO, N.Y.,

Debtor.

Bankruptcy Court Main Case
No. 20-10322 CLB
Chapter 11 Case

**District Court Case Nos.
1:25-cv-00535-MAV
1:25-cv-00538-MAV**

## CONSOLIDATED APPENDIX

Pursuant to Federal Rules of Bankruptcy Procedure 8009(d) and 8018(b),

appellants The Diocese of Buffalo, N.Y. and the Official Committee of Unsecured

Creditors submit this appendix with excerpts from the record, including all relevant

docket entries, motions, affidavits, the Bankruptcy Court's decisions and orders,

relevant pleadings, the notices of appeal, and relevant transcripts:

| **Document** | **Record Designation No.** | **Consolidated Appendix Page Nos.** |
|---|---|---|
| 1. Motion for Entry of an Order Authorizing, But Not Directing, The Diocese to Access the Proceeds of the Seminary Property Sale Pursuant to Sections 105(A), 541, And 363(B) of the Bankruptcy Code (Attachments: # 1 Exhibit A - Proposed Order) [Dkt. No. 3743] | 10 | 0001-23 |
| 2. Declaration of Richard C. Suchan in Support of the Motion for Entry of an Order Authorizing, But Not Directing, the Diocese to Access the Proceeds of the Seminary Property Sale Pursuant to Sections 105(a), 541 and 363(b) of the Bankruptcy Code (Attachments: # 1 Exhibit A - Archival Records # 2 Exhibit B - 12/13/68 Meeting Minutes # 3 Exhibit C - 5/29/70 Resolution # 4 Exhibit D - Reuter Deeds # 5 Exhibit E - 1968 Deeds # 6 Exhibit 1987 Deed | 11 | 0024-103 |

| | | | |
|---|---|---|---|
| | # 7 Exhibit G - Upon This Rock Campaign Materials) [Dkt. No. 3744] | | |
| 3. | Letter requesting adjournment of Motion for authority to use Seminary sale proceeds to May 8, 2025 at 10:00 a.m. and the Claim Objections to June 4, 2025 at 10:00 a.m. [Dkt. No. 3756] | 12 | 0104-106 |
| 4. | Certificate of Service re: Notice of Motion for Entry of an Order Authorizing, but Not Directing, the Diocese to Access the Proceeds of the Seminary Property Sale Pursuant to Sections 105(a), 541, and 363(b) of the Bankruptcy Code (Docket No. 3743) and Declaration of Richard C. Suchan in Support of the Motion for Entry of an Order Authorizing, but Not Directing, the Diocese to Access the Proceeds of the Seminary Property Sale Pursuant to Sections 105(a), 541, and 363(b) of the Bankruptcy Code [Dkt. No. 3779] | 13 | 0107-111 |
| 5. | Joinder to the Diocese's Motion for Entry of an Order Authorizing, But Not Directing, the Diocese to Access the Proceeds of the Seminary Property Sale Pursuant to Sections 105(a), 541, and 363(b) of the Bankruptcy Code filed on behalf of The Official Committee of Unsecured Creditors [Dkt. No. 3795] | 14 | 0112-123 |
| 6. | Transcript regarding Hearing Held on 05/08/2025 [Dkt. No. 3863] | 15 | 0124-185 |
| 7. | Decision and Order [Dkt. No. 3929] | 16 | 0186-203 |
| 8. | Diocese's Notice of Appeal [Dkt. No. 3947] | 17 | 0204-223 |
| 9. | Committee's Notice of Appeal [Dkt. No. 3949] | 18 | 0224-244 |
| 10. | Motion for Entry of Orders (I)(A) Approving Bidding Procedures for the Sale of Certain Real Property at 711 Knox Road, East Aurora, New York; (B) Authorizing and Approving the Form of Purchase Agreement; (C) Scheduling an Auction and Hearing to Consider the Sale; and (D) Approving the Form and Manner of Service of Notice of Auction and Sale Hearing; (II) Approving the Sale Free and Clear of Liens, Claims, Encumbrances and Other Interests; and (III) Granting Related Relief | 3 | 0245-320 |

| | | |
|---|---|---|
| (Attachments: # 1 Exhibit A - Proposed Bidding Procedures Order) [Dkt. No. 3031] | | |
| 11. Certificate of Service re: Notice. of Motion for Entry of Orders (I)(A) Approving Bidding Procedures for the Sale of Certain Real Property at 42 Grant Street, North Tonawanda, New York; (B) Authorizing and Approving the Form of Purchase Agreement; (C) Scheduling an Auction and Hearing to Consider the Sale; and (D) Approving the Form and Manner of Service of Notice of Auction and Sale Hearing; (II) Approving the Sale Free and Clear of Liens, Claims, Encumbrances and Other Interests; and (III) Granting Related Relief (Docket No. 3029), Notice of Motion for Entry of Orders (I)(A) Approving Bidding Procedures for the Sale of Certain Real Property at 711 Knox Road, East Aurora, New York; (B) Authorizing and Approving the Form of Purchase Agreement; (C) Scheduling an Auction and Hearing to Consider the Sale; and (D) Approving the Form and Manner of Service of Notice of Auction and Sale Hearing; (II) Approving the Sale Free and Clear of Liens, Claims, Encumbrances and Other Interest; and (III) Granting Related Relief (Docket No. 3031), Notice of Motion for Entry of Orders (I)(A) Approving Bidding Procedures for the Sale of Certain Real Property at 42 Grant Street, North Tonawanda, New York; (B) Authorizing and Approving the Form of Purchase Agreement; (C) Scheduling an Auction and Hearing to Consider the Sale; and (D) Approving the Form and Manner of Service of Notice of Auction and Sale Hearing; (II) Approving the Sale Free and Clear of Liens, Claims, Encumbrances and Other Interests; and (III) Granting Related Relief (Docket No. 3029, Pages 1-3), and Notice of Motion for Entry of Orders (I)(A) Approving Bidding Procedures for the Sale of Certain Real | 4 | 0321-346 |

| | | |
|---|---|---|
| Property at 711 Knox Road, East Aurora, New York; (B) Authorizing and Approving the Form of Purchase Agreement; (C) Scheduling an Auction and Hearing to Consider the Sale; and (D) Approving the Form and Manner of Service of Notice of Auction and Sale Hearing; (II) Approving the Sale Free and Clear of Liens, Claims, Encumbrances and Other Interest; and (III) Granting Related Relief (Docket No. 3031, Pages 1-3) [Dkt. No. 3042] | | |
| 12. Order Approving Bidding Procedures for the Sale of Certain Real Property at 711 Knox Road, East Aurora, New York; Authorizing and Approving the Form of Purchase Agreement; Scheduling an Auction and Hearing to Consider the Sale; and Approving the Form and Manner of Service of Notice of Auction and Sale Hearing [Dkt. No. 3090] | 5 | 0347-401 |
| 13. Transcript regarding Hearing Held 08/15/2024 RE: Motions for Sale of Property [Dkt. No. 3092] | 6 | 0402-429 |
| 14. Order Pursuant to Sections 105 and 363 of the Bankruptcy Code Approving the Sale of Certain Real Property at 711 Knox Road, East Aurora, Free and Clear of Liens, Claims, Obligations, Interests and Encumbrances; Authorizing The Diocese to Consummate the Transactions Related Thereto; and Granting Related Relief [Dkt. No. 3340] | 7 | 0430-477 |
| 15. Transcript regarding Hearing held on 9/24/2024 [Dkt. No. 3360] | 8 | 0478-613 |
| 16. Decision and Order [Dkt. No. 3501] | 9 | 0614-625 |
| 17. Affidavit of Charles Mendolera Regarding the Diocese's Assets and Operations and in Support of the Chapter 11 Petition and First Day Pleadings [Dkt. No. 7] | 1 | 0626-685 |
| 18. Affidavit of Rev. Peter J. Karalus Regarding Structure and Pre-Filing History of the Diocese of Buffalo and in Support of the Chapter 11 Petition and First Day Pleadings [Dkt. No. 8] | 2 | 0686-703 |

Dated:  August 20, 2025                    BOND, SCHOENECK & KING, PLLC


                                           By: /s/ Stephen A. Donato
                                                Stephen A. Donato
                                                Charles J. Sullivan
                                                Grayson T. Walter
                                                Thomas W. Simcoe
                                                Gregory J. McDonald
                                           Office and P.O. Address
                                           One Lincoln Center
                                           Syracuse, New York  13202-1355
                                           Telephone:  (315) 218-8000
                                           Email:      sdonato@bsk.com
                                                       csullivan@bsk.com
                                                       gwalter@bsk.com
                                                       tsimcoe@bsk.com
                                                       gjmcdonald@bsk.com

                                           *Attorneys for The Diocese of Buffalo, N.Y.*

                                           PACHULSKI STANG ZIEHL & JONES LLP


                                           By: /s/ Ilan D. Scharf
                                                James I. Stang
                                                Ilan D. Scharf
                                                Karen B. Dine
                                                Jeffrey M. Dine
                                           1700 Broadway, 36th Floor
                                           New York, New York 10019
                                           Telephone: 212-561-7700
                                           Facsimile: 212-561-7777
                                           Email:      jstang@pszjlaw.com
                                                       ischarf@pszjlaw.com
                                                       kdine@pszjlaw.com
                                                       jdine@pszjlaw.com

                                           *Counsel to Official Committee of Unsecured
                                           Creditors*

# CONSOLIDATED APPENDIX DOCUMENT NO. 1

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | |
| | ) | Case No. 20-10322 |
| The Diocese of Buffalo, N.Y., | ) | |
| | ) | Chapter 11 |
| Debtor. | ) | |
| | ) | |

## NOTICE OF MOTION FOR ENTRY OF AN ORDER AUTHORIZING, BUT NOT DIRECTING, THE DIOCESE TO ACCESS THE PROCEEDS OF THE SEMINARY PROPERTY SALE PURSUANT TO SECTIONS 105(a), 541, AND 363(b) OF THE BANKRUPTCY CODE

**PLEASE TAKE NOTICE**, that on March 19, 2025, the Diocese of Buffalo, N.Y. (the "Diocese"), by and through its undersigned counsel, moved (the "Motion")[1] the United States Bankruptcy Court for the Western District of New York (the "Court") for entry of an order authorizing, but not directing the Diocese to access the sale proceeds of the property located at 711 Knox Road, East Aurora, NY (the "Seminary Property") pursuant to sections 105(a), 363(b), and 541 of the Bankruptcy Code.

**PLEASE TAKE FURTHER NOTICE**, that any objections or responses to the Motion must conform to the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules for the Western District of New York and be served in accordance with Local Rule 9013-1 upon the following parties as soon as practicable: (i) counsel to the Diocese, Bond, Schoeneck & King, PLLC, One Lincoln Center, Syracuse, New York 13202, Attn: Stephen A. Donato, Charles J. Sullivan, Grayson T. Walter, and Andrew S. Rivera, (ii) the Office of the United States Trustee for the Western District of New York, 300 Pearl Street, Suite 401, Buffalo, NY 14202. Attn: Joseph W. Allen, (iii) counsel to the Official Committee of Unsecured Creditors, Pachulski, Stang, Ziehl & Jones, LLP, 10100 Santa Monica Blvd., 13th Floor, Los Angeles, California, 90067-4003, Attn. James I. Stang, and 780 Third Avenue, 34th Floor, New York, New York, 10017-2024, Attn. Ilan Scharf, and (iv) those persons who have formally appeared and requested service in this case pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedure.

**PLEASE TAKE FURTHER NOTICE THAT**, a hearing to consider the Motion and any objections related thereto will be held before the Honorable Carl L. Bucki, Chief United States Bankruptcy Judge for the Western District of New York, on **April 22, 2025** at **10:00 a.m.** (prevailing Eastern time), or as soon thereafter as counsel can be heard.

**PLEASE TAKE FURTHER NOTICE THAT**, parties can choose to appear either (i) in person at the Robert H. Jackson U.S. Courthouse, 2 Niagara Square, Buffalo, New York or (ii) telephonically (call in 1-571-353-2301, Courtroom ID 483077448#, and security pin 9999#).

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion.

1

Dated:  March 19, 2025                              BOND, SCHOENECK & KING, PLLC

                                                   By:      /s/  Stephen A. Donato
                                                   Stephen A. Donato
                                                   Charles J. Sullivan
                                                   Thomas W. Simcoe (Pro Hac Vice)
                                                   Grayson T. Walter
                                                   Andrew S. Rivera
                                                   One Lincoln Center
                                                   Syracuse, NY 13202-1355
                                                   Telephone: (315) 218-8000
                                                   Fax: (315) 218-8100
                                                   Emails:      sdonato@bsk.com
                                                                csullivan@bsk.com
                                                                tsimcoe@bsk.com
                                                                gwalter@bsk.com
                                                                arivera@bsk.com

                                                   *Attorneys for The Diocese of Buffalo, N.Y.*

21302642.v9

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| In re: | ) |
| | ) |
| | )    Case No. 20-10322 |
| The Diocese of Buffalo, N.Y., | ) |
| | )    Chapter 11 |
| Debtor. | ) |
| | ) |

**MOTION FOR ENTRY OF AN ORDER AUTHORIZING, BUT NOT DIRECTING, THE
DIOCESE TO ACCESS THE PROCEEDS OF THE SEMINARY PROPERTY SALE
PURSUANT TO SECTIONS 105(a), 541, AND 363(b) OF THE BANKRUPTCY CODE**

The Diocese of Buffalo, N.Y. (the "Diocese"), by and through its undersigned counsel,
hereby moves the Court (this "Motion") for entry of an order substantially in the form attached
hereto as *Exhibit A*, authorizing, but not directing, the Diocese to access the sale proceeds of the
property located at 711 Knox Road, East Aurora, NY (the "Seminary Property") pursuant to
11 U.S.C. §§ 105(a), 363(b), and 541.  In support of this Motion, the Diocese relies on the
*Declaration of Richard C. Suchan Concerning the History of the Seminary Property, dated March
19, 2025* (the "Suchan Declaration").  In further support of the Motion, the Diocese respectfully
states as follows:

**JURISDICTION**

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and
1334(b).

2.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory and rule-based predicates for the relief requested herein are sections
105(a), 363(b), and 541 of title 11 of the United States Code (11 U.S.C. §§ 101 *et seq*., the
"Bankruptcy Code"), and Rule 6004 of the Federal Rules of Bankruptcy Procedure (the
"Bankruptcy Rules").

## BACKGROUND

4.      On February 28, 2020 (the "Petition Date"), the Diocese filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the Western District of New York (the "Court"), commencing the Diocese's chapter 11 case (this "Chapter 11 Case").  The Diocese continues to operate its business and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for a trustee or examiner has been made in this Chapter 11 Case.

5.       On March 11, 2020, the Office of the United States Trustee appointed the Official Committee of Unsecured Creditors (the "Committee") pursuant to Bankruptcy Code section 1102 [Docket No. 92].

6.      Information regarding the Diocese's history, business operations and structure, and the events leading up to this Chapter 11 Case is set forth in the *Affidavit of Rev. Peter J. Karalus Regarding Structure and Pre-Filing History of The Diocese of Buffalo and in Support of the Chapter 11 Petition and First Day Pleadings* and the *Affidavit of Charles Mendolera Regarding the Diocese's Assets and Operations and in Support of the Chapter 11 Petition and First Day Pleadings*, each of which was filed on the Petition Date and is incorporated herein by reference [Docket Nos. 7, 8].

### *Seminary Property Sale*

7.      On July 18, 2024, the Diocese filed its *Motion for Entry of an Order (I)(A) Approving Bidding Procedures for the Sale of Certain Real Property at 711 Knox Road, East Aurora, New York; (B) Authorizing and Approving the Form of Purchase Agreement; (C) Scheduling an Auction and Hearing to Consider the Sale; and (D) Approving the Form and Manner of Service of Notice of Auction and Sale Hearing; (II) Approving the Sale Free and Clear*

4

*of Liens, Claims, Encumbrances and Other Interests; and (III) Granting Related Relief* [Docket No. 3031] (the "Sale Motion").

8.      On August 19, 2024, the Court entered an order approving certain bidding procedures for the sale of the Seminary Property, among other relief [Docket No. 3090] (the "Bidding Procedures Order").

9.      On October 28, 2024, the Diocese held an Auction for the Seminary Property in accordance with the terms of the Bidding Procedures Order, and World Mission Society, Church of God ("World Mission") was deemed the Successful Bidder with a cash bid of $4,200,000.00.

10.     On November 20, 2024, the Court entered an order approving the sale of Seminary Property to World Mission for a purchase price of $4,200,000.00 (the "Sale Proceeds") free and clear of all encumbrances, and authorizing the Diocese to consummate all transactions related to the proposed sale of the Seminary Property [Docket No. 3340] (the "Sale Order").

11.     The Sale Order specifically provides that the Sale Proceeds "shall be held by the Diocese in accordance with paragraph 17 of the Bidding Procedures Order, and shall not be disbursed except as directed by further order of this Court." *See* Sale Order, ¶ 5.

12.     The Seminary Property sale closing took place on February 14, 2025, and the Sale Proceeds were deposited in an account and are being held in accordance with paragraph 17 of the Bidding Procedures Order.

### *Potential Cy Pres Concerns*

13.     On August 15, 2024, during the hearing concerning the Bidding Procedures Order, the Court identified potential issues regarding the Diocese's ability to use the Sale Proceeds:

> If, indeed, the Seminary property was acquired and developed through the use of donations made for a particular purpose, would the Cy-près Doctrine now operate to restrict the use of those proceeds?

5

*See Transcript of August 15, 2024 Hearing on Motions for Sale of Property at 15:5-8* [Docket No. 3092] (the "August 15 H'rg. Tr.").

14.     On January 13, 2025, this Court issued its Decision and Order [Docket No. 3501] directing, among other things, that the Diocese file a motion concerning the disposition of the Sale Proceeds to be heard before the end of February, 2025.

15.     On February 20, 2025, the Diocese filed a letter requesting that the deadline to file a motion concerning the disposition of the Sale Proceeds be extended to April 30, 2025.  After a hearing held on February 26, 2025, the Court directed that Diocese file a motion concerning the disposition of the Sale Proceeds no later than March 19, 2025.

16.     The facts and circumstances regarding the history of the Seminary Property and the fund raising campaign to construct the Seminary Property are set forth in the Suchan Declaration, and are incorporated by reference herein.

## RELIEF REQUESTED

17.     The Diocese seeks entry of an order, substantially in the form attached hereto as *Exhibit A*, pursuant to sections 105(a), 363(b), and 541 of the Bankruptcy Code, authorizing, but not directing, the Diocese to access the Sale Proceeds of the Seminary Property to use same to (in part) fund a settlement pursuant to a chapter 11 plan.

## BASIS FOR REQUESTED RELIEF

### A.  This Court has Authority to Determine Property of the Estate

18.     Bankruptcy Code section 105(a) provides that the bankruptcy court with broad equitable powers to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions" of the Bankruptcy Code.  11 U.S.C. § 105(a).

19.     Section 363(b) of the Bankruptcy Code provides that the Diocese "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  The Diocese respectfully submits that the Sale Proceeds are property of the estate, and as such, the Diocese is requesting that the Diocese be authorized, but not directed, to use such proceeds in connection with funding a settlement in this case pursuant to a chapter 11 plan.

20.     It is within this Court's inherent power to determine whether assets or property of the estate:

> As one bankruptcy court stated, the determination of what constitutes property of the bankruptcy estate is inherently an issue to be determined by the bankruptcy court. Another bankruptcy court rightly indicated that, . . . the bankruptcy court always has jurisdiction to determine what is, or is not, property of the bankruptcy estate under 11 U.S.C. § 541. Furthermore, various courts have concluded that matters requiring a declaration of whether a certain asset comes within the definition of property of the estate, as set forth in section 541 of the Bankruptcy Code, are core proceedings.

*See In re Affirmative Ins. Holdings, Inc.*, 565 B.R. 566, 583 (Bankr. D. Del. 2017) (citing *In re Texaco Inc.*, 109 B.R. 609, 610 (S.D.N.Y. 1989) ("It is within the Bankruptcy Court's traditional jurisdiction to determine all matters relating to property in which the debtor has any interest.").

21.     Section 541(a) of the Bankruptcy Code provides that a debtor's estate is comprised of all legal and equitable interests of the debtor in property as of the commencement of the case, wherever located and by whomever held.  11 U.S.C. § 541(a)(1).  As the Second Circuit has explained, "[e]very conceivable interest of the debtor, future, nonpossessory, contingent, speculative, and derivative, is within the reach of § 541." *Chartschlaa v. Nationwide Mut. Ins. Co.*, 538 F.3d 116, 122 (2d Cir. 2008).  "Property held by a debtor is presumed to be property of the estate." *See In re Amp'd Mobile, Inc.*, 377 B.R. 478, 483 (Bankr. D. Del. 2007) (applying New

7

York law to determine that no constructive trust could be applied to assets of the debtor).

22.    In enacting section 541 of the Bankruptcy Code, Congress was clear that section 541 "is not intended to expand the debtor's rights against others more than they existed at the commencement of the case." H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 367–68 (1977). Accordingly, "[p]roperty interests are created and defined by state law." *Butner v. United States*, 440 U.S. 48, 54–55 (1979) (noting that "Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law").

23.    As set forth below, state law does not prohibit the Diocese from using the Sale Proceeds for the benefit of creditors, as such, the Sale Proceeds are property of the estate.

### B. The Proceeds from the Sale of the Seminary Property are Unrestricted as to Use

24.    Under New York Not-For-Profit Corporation Law ("N-PCL") § 513,[2] except as otherwise provided in N-PCL § 555 and Article 8 of the Estates, Powers and Trusts Law ("EPTL")(both discussed below), a charitable corporation that receives assets from a donor for purposes that are specified in a "gift instrument" must apply the donated assets to those purposes.[3] The term "gift instrument" is defined by the NPCL as "a record or records, including an *institutional solicitation*, under which property is granted to, transferred to, or held by an institution as an institutional fund." N-PCL § 551(c) (emphasis added). The above references to N-PCL § 555 and ETPL Article 8 refer to a charitable corporation's ability to seek judicial modification of

---

[2] The N-PCL applies to Religious Corporations like the Diocese pursuant to N.Y. Religious Corporations Law Section 2-b(1).

[3] *See* N-PCL § 513, with Revision Note (Lexis 2025) ("This section provides increased flexibility in the administration of funds received by a not-for-profit corporation for specific purposes that fall within any of its corporate purposes. The section codifies *St. Joseph's Hospital v Bennett*, 281 NY 115, 22 NE2d 305 (1939), but goes beyond that decision in providing the framework for administration of such assets within the principles of the corporation law rather than the trust law. Even if trust language is used in the conveying instrument, the receiving corporation acquires full ownership of the fund or property, subject to the duty of the directors to follow the directions of the donor. As compared with trust law, the section gives the directors greater freedom of investment, including the pooling of two or more funds. . . . The section is made applicable both to existing funds and to funds created in the future.").

8

donor-imposed restrictions (commonly referred to as *cy pres* relief, whether sought under the above statutes or the common law *cy pres* doctrine, which was explicitly not limited by N-PCL § 555). In other words, unless *cy pres* relief is obtained to modify restrictions contained in a gift instrument, the donee organization must apply the assets to the purposes specified in the gift instrument (and not to any other of its purposes). *In re United States Tr. Co.*, 8 N.Y.2d 419, 171 N.E.2d 326 (1960).

25.    However, unless the applicable gift instrument contains an explicit perpetual restriction on the right to sell donated property, or against the sale of property to be acquired with donations as specified by the gift instrument, the donee corporation may sell such property and use the proceeds for its general purposes without any need for *cy pres* relief. *See Dennis v. Buffalo Fine Arts Academy,* 15 Misc. 3d 1106(A), 836 N.Y.S.2d 498 (Erie Cty., Sup. Ct. 2007) (holding that gift instrument "needed to contain an explicit perpetual limit on the right to sell the item in order for the Board to have violated the donor's intent."); *see also Lefkowitz v. Cornell Univ.*, 35 A.D.2d 166 (App. Div. 4th Dept. 1970) (holding that donated property could be sold absent a clear expression that it be used for its purposes forever, and proceeds from sale not required to be used for the specific purpose for which property was originally donated).

26.    *Lefkowitz v. Cornell* is particularly instructive here. In *Cornell*, an uncompleted wind tunnel and research facility were donated to Cornell University. The property was transferred via a deed and bill of sale and a written proposal, drafted by the donor and accepted by Cornell, concerning the use of the gifted property to "continue research and development work then being performed at the facility" by the donor. *Cornell*, at 168. The donor also contributed sufficient funds to complete the construction of the tunnel. Additionally, Cornell solicited cash gifts from several airplane manufacturers (totaling $675,000) for the express purpose of providing working

9

capital for the research facility. *Id.*, at 169. After receiving these donations, Cornell completed

construction of the wind tunnel and then operated the research facility for more than twenty years,

until its Board of Trustees determined to sell it to a for-profit company. *Id.*, at 168.

27.    The Attorney General sought to enjoin the sale, arguing that the research and wind

tunnel facilities were donated to Cornell "for a charitable use in the nature of a public trust for

educational, research and scientific purposes," and thus, Cornell was required to forever own such

facilities or to sell them only to another nonprofit. Further, the Attorney General sought an order

directing that the proceeds from any future sale of the property must be used in accordance with

the purposes of the original donation, i.e. for research "in the field of aeronautics and allied fields."

*Id.*, at 170. The Supreme Court ruled in favor of the Attorney General, concluded that from the

circumstances surrounding the original donations and the "clear understanding of the parties," it

"appears that a 'charitable trust' was created for the restricted purpose of conducting a laboratory

to conduct scientific research and not for the purpose of supporting the general educational

programs of Cornell." *Id.*, at 170-71.

28.    However, the Fourth Department reversed, noting that although a charitable trust

was implied in the sense that the donated property had to be "devoted to the purposes for which it

was given," the issue was "not whether a charitable trust was created in the technical sense, but

whether the gift of the laboratory was made subject to a restriction that it be forever used as a

research laboratory." *Id.*, at 171. Ultimately, the Court held that:

> [T]here is no clear expression of intent that the gift to Cornell was
> subject to the restriction that it be *forever* used as a research
> laboratory for the public benefit. In fact, an examination of the deed,
> bill of sale and the list of proposals submitted to Cornell by [donor]
> leads one to the opposite conclusion.

***

10

The language used in the deed further supports this conclusion. In addition to reciting that the consideration of the conveyance was $1 and the "advancement of science and education", the deed further recites that Curtiss-Wright [the donor]" does hereby remise, release and quitclaim to (Cornell), its *successors* and *assigns* forever." (Emphasis added.)  The habendum clause on page 3 of the deed also recites "to have and to hold the premises herein granted unto the party of the second part, its successors and assigns forever". In addition, the bill of sale also uses the words "successors and assigns". It would appear that the use of these words is inconsistent with an intent that Cornell be forever obligated to operate the lab in trust for the public benefit. Additionally, there is no evidence that Cornell received the gift of the laboratory as a result of representations on its part that it would forever operate it for the public benefit.

*** 

Also the fact that Cornell solicited and received contributions from several aircraft manufacturers does not alter this result. While these cash gifts were made for the express purpose that they be used as operating capital for the laboratory, *it is undisputed that that money was used for the purpose for which it was given* and has long since been exhausted. In none of the letters from the aircraft companies is it stated that the gifts were conditioned upon Cornell's *perpetual* operation of the laboratory. Thus, while Cornell may have been obligated to operate the laboratory for some period of time during which the reasonably anticipated objectives of the donating airline companies might be fulfilled, it has fulfilled its obligations by continuously operating the lab for almost 25 years.

*** 

[W]e conclude that Cornell does not hold the laboratory facilities as a public trust but may sell them subject only to the restriction that it use the proceeds of the sale for the 'advancement of science and education.'

*See id.* at 171-72 (emphasis added).  Thus, absent a clear expression of intent that property was donated to Cornell to be used for specified purposes forever, the property could be sold. Moreover, the Court held that the proceeds of the sale would not be restricted in their use to

11

similar purposes as the original donative intent of the gift (i.e. for research in the field of aeronautics and allied fields, or to continue the donor's research and development work at the facility), but could be used for the broad purpose of the advancement of science and education.[4]

29.     The same result was reached in *Cty. of Suffolk v. Greater N.Y. Councils, Boy Scouts of Am.*, 413 N.E.2d 363, 364 (N.Y. 1980).  In that case, the New York Court of Appeals held that proceeds from the condemnation of property which had been acquired by the Boy Scouts with funds originally donated for the purpose of acquiring a camp were not themselves subject to any restriction on their use.  The Court of Appeals provided the following analysis:

> The only words of limitation in the bequest are "It is my wish that the proceeds of this gift to it shall be used for the improvement of Boy Scout Camps, or for the establishment of a new camp on Long Island for the benefit of Queens Council Boy Scouts, in memory of my husband, John Nagel, and my daughter, Jeanne Arline Nagel." Determination of the testatrix' intention is a question of law.  Not only is the bequest essentially precatory in nature ("It is my wish"), but as Special Term recognized it imposes no obligation that the camp once established be maintained "forever".  Here, there is no question that the bequest was used as a part of the funds required for the establishment of a new camp on Long Island which has been operated for some 16 years.  Here, as in Lefkowitz v Cornell Univ. (35 AD2d 166, 171, affd on opn at App Div 28 NY2d 876), "there is no clear expression of intent that the gift was subject to the restriction that it be *forever* used" for the benefit of Queens Council Boy Scouts, as distinct from Boy Scouts generally.

*See id.*, at 364 (emphasis added).  Based on this, the Court modified a lower court's order to eliminate portions requiring that condemnation proceeds be held in trust for the donor's original purposes.

---

[4] The phrase "advancement of science and education" is referenced as a "restriction" in the decision and it was contained in one of the documents associated with the transfer, but the court specifically noted that this was one of Cornell's general corporate purposes and did not treat it as imposing any specific requirement on the use of the sale proceeds.  This was stated in direct distinction from the Attorney General's assertion that the proceeds should be restricted specifically to aeronautical research in line with the donor's specified intent.

30.     The present circumstances are identical to those of the *Cornell* and *Boy Scouts*

decisions, and accordingly, the Diocese is likewise unrestricted in its ability to use the Seminary

Property sale proceeds for its general purposes, without any prior need for *cy pres* relief.  As in

*Cornell*, this matter involves donations of real property and funds that were donated for the specific

purpose of constructing facilities (the seminary) on that real property.  As set forth in the Suchan

Declaration, the available records falling within the definition of a "gift instrument" include the

Institutional Solicitations and the deeds which conveyed the Seminary Property land from Mr.

Rueter to the Diocese.  *See* Suchan Declaration ¶¶ 5 and 13-15.   The Institutional Solicitations

reflect specific commitments by the Diocese that it would use the donations to *construct* the

Seminary Property.  However, as in *Cornell* and *Boy Scouts*, there is no clear expression of intent

that the Seminary Property would, once built, be operated forever as a seminary or that, if sold,

the proceeds would be dedicated to seminary or any other specific purpose.

31.     Likewise, the deeds transferring the Seminary Property real estate are devoid of any

restrictions relating to the use or purpose of the property donated, whether presently or in

perpetuity.  In fact, exactly as in the *Cornell* case, the deeds here state that in consideration of $1,

the donor "hereby grant[s] and release[s] the subject real property "unto [the Diocese of Buffalo,

N.Y.], its successors and assigns forever," and, in the habendum clause states "to have and to hold,

the premises herein granted unto [The Diocese of Buffalo, N.Y.], its successors and assigns

forever."  *See* Suchan Declaration, ¶ 5.   As discussed in the quotation above, the *Cornell* court

viewed the presence of this language as supporting the conclusion that the donor actually intended

that, at some point, the donated property would not be used for the originally specified purpose.

This is confirmed by the fact that Mr. Reuter himself was actually serving on the Board of Trustees

of St. John Vianney when it later approved a resolution providing for the transfer of the Seminary

13

Property back to the Diocese in the event the property was "no longer used as a seminary," with respect to which he raised no objection. *See* Suchan Declaration, ¶¶ 7-8. Because Mr. Reuter did not raise any objection, it is evident that he did not intend that the Seminary Property would be used as a seminary forever.

32.    Further, although not part of a gift instrument and thus not creating legally binding restrictions, quotes from Mr. Reuter and the Diocese in contemporaneous newspaper articles are consistent with the gift instruments, indicating only that the donated funds and real property would be used to construct the Seminary Property. There is no indication in this secondary evidence of an intention that the Seminary Property would operate as a seminary forever.

33.    Furthermore, just as in *Cornell* and *Boy Scouts*, the Diocese and St. John Vianney undisputedly devoted the donated funds (along with approximately $2.2 million of its own available funds supplied by a subvention) and real property to the purposes for which they were originally given, constructing the Seminary Property. The property was then continually operated for this purpose for 60 years. As noted in the Suchan Declaration, such operations were only possible because the Diocese provided ongoing subsidies, often hundreds of thousands of dollars annually, up until the point that the Diocese itself declared bankruptcy in 2020. Accordingly, just like *Cornell* and the *Boy Scouts*, all obligations to donors have been fulfilled and the Diocese is now able to use the sale proceeds from the Seminary Property for its general purposes.[5]

---

[5] As holder of a subvention (a hybrid debt instrument authorized under N-PCL § 504) received for providing capital for the Seminary Property construction, the Diocese had a right to receive property of St. John Vianney as consideration, in this case the return of the Seminary Property itself.

14

34.     The same result applies to funds that were raised subsequent to the Seminary Property's initial construction for capital improvements to the Seminary Property.  There is no clear expression of intent in the applicable gift instruments, i.e. the solicitation materials associated with the Upon this Rock fundraising campaign, that the Seminary Property would be operated forever as a seminary.  Again, as in *Cornell* and *Boy Scouts*, the funds raised for purposes of capital improvements were in fact used for such purposes, in fulfillment of the donors' intent.  Accordingly, all obligations to donors under N-PCL § 513 with respect to funds raised for capital improvements to the Seminary Property were used in accordance with their original purposes.

35.     As such, the Diocese respectfully submits that it may lawfully using the Sale Proceeds for its general purposes, including for the benefit of its creditors, and that *cy pres* relief is not necessary prior to doing so.

### C.   The Diocese is not Holding the Sale Proceeds in Trust Because any Implied Trust has been Satisfied

36.     Bankruptcy Code section 541(d) carves out from the wide reach of property of the estate any property in which the debtor holds a legal interest but not an equitable interest.  More specifically, section 541(d) provides, in relevant part:

> [p]roperty in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest . . . becomes property of the estate . . . only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold.

11 U.S.C. § 541(d).

15

37.    Accordingly, Courts have held that where the debtor holds legal title to the assets but not an equitable interest in the assets, such assets are not property of the estate.  S*ee Begier v. Internal Revenue Service*, 496 U.S. 53, 59 (1990) ("Because the debtor does not own an equitable interest in property he holds in trust for another, that interest is not 'property of the estate.'"); *see also U.S. v. Whiting Pools, Inc.*, 462 U.S. 198, 205 n. 10 (1983) (holding that "Congress plainly excluded property of others held by the debtor in trust at the time of the filing of the petition" from inclusion in the bankruptcy estate).

38.    During the hearing August 15, 2024 concerning the Bidding Procedures, this Court identified three cases[6] for the proposition that "when a charitable donation is made for a specific purpose, a trust will be implied in the sense that the donated property will be required to be used for the purposes for which it was given."  *See* August 15 H'rg. Tr. at 14:1-4.  These three are cases fully consistent with the *Cornell* and *Boy Scouts* decisions discussed above, although they involved facts which are distinct from the present matter.

39.    The first case, *St. Joseph's* (which was favorably cited multiple times in the *Cornell* decision, which itself was in turn cited by the Court of Appeals in *Boy Scouts*, and then codified by N-PCL § 513), involved a gift that was subject to an explicit perpetual use restriction.  The donor in that case required that his gift be held "as an endowment fund and the income used for the ordinary expenses of maintenance" of the donee hospital.  *St. Joseph's Hosp.*, at 118.   The donee sought to spend the gift's corpus rather than hold it as an endowment as specified by the donor.  The Court of Appeals noted that the use of the term "endowment" required that the funds "be held intact permanently and only the income derived therefrom may be used for the purposes

---

[6] *St. Joseph's Hosp. v. Bennett*, 281 N.Y. 115, 22 N.E.2d 305 (1939); *In re United States Tr. Co.*, 8 N.Y.2d 419, 171 N.E.2d 326 (1960); and *Lefkowitz v. Lebensfeld*, 68 A.D.2d 488, 417 N.Y.S.2d 715 (1st Dept. 1979).

16

21302642.v9
Case 1-20-10322-CLB,    Doc 3743,    Filed 03/19/25,    Entered 03/19/25 17:32:59,
Description: Main Document  , Page 16 of 19

designated by the testator." *See id.*  Here, in contrast, funds were donated for current use to construct the Seminary Property and not as an endowment fund, and thus there was no implication that donated funds would be held in perpetuity.  The *Cornell* case expanded on the *St. Joseph's* decision as to how its rule applies in such circumstances, as subsequently confirmed by the Court of Appeals in *Boy Scouts*.

40.     The second case, *United States Tr. Co.* presented facts where the donor's original intent had never actually been carried out by the donee.  The donor in that case had specified that his gift should be held "for the purpose of erecting and maintaining . . . a building or buildings for the care of persons suffering from tuberculosis, to be called the Scott Memorial Home."  The donee had determined that it would not carry out the purposes for which funds were donated because the treatment of tuberculosis in sanitoriums had become obsolete and the amount of funds donated were in any event insufficient for this purpose.  The donee instead desired to use the gift for its building façade and to create an endowment – different purposes altogether.  In relevant part, the Court of Appeals held that the donee was required to seek *cy pres* relief if the donor's original purposes could no longer be accomplished rather than to unilaterally apply them to a different purpose.

41.     The third decision, *Lefkowitz v. Lebensfeld*, cites *St. Joseph's* as authority for the proposition that a donor has a right to have his or her purposes enforced as an implied trust, but otherwise involves facts and a holding that are inapposite.  That case focused on the question of whether the Attorney General had standing, on behalf of donee organizations, to bring an action to force a corporation in which the donee organization was a shareholder (as the result of a charitable gift) to issue dividends, where the donor of the corporate stock had controlled the company.  The Attorney General cited to *St. Joseph* as authority for its standing to enforce gifts.

17

Consolidated Appendix 0019

The Court concluded that the Attorney General lacked standing for reasons that are not relevant here.

42.     In sum, these cases provide that an "implied trust" is created when property is donated for a specific purpose which trust requires the donee to carry out that purpose.  If the purpose is perpetual (*St. Joseph's*), or if the donee organization intends not to carry the purpose out (*United States Tr. Co.*), *cy pres* relief must be obtained before the property can be applied to a different purpose.  However, once the purpose has been carried out (*Cornell*, *Boy Scouts*, and the present case), the implied trust has been satisfied and the funds may be used without restriction.

43.     Moreover, while these cases sometimes use the terminology "implied trust", it is not the legal sense of the word "trust" for purposes of section 541(d), but instead, as set forth above, an "implied trust" in this context simply refers to whether *cy pres* relief is needed.

44.     Therefore, in light of the forgoing, the Diocese respectfully submits that the Sale Proceeds are not held in trust for purposes of section 541(d), and are not otherwise subject to a *cy pres* review.  The Diocese respectfully further requests that the Court authorize but not direct the Diocese to access the Sale Proceeds pursuant to sections 105, 363(b), and 541 of the Bankruptcy Code.

## NO PRIOR REQUEST

45.     No prior request for the relief sought in this Motion has been made to this or any other court.

21302642.v9

**WHEREFORE**, the Diocese respectfully requests entry of an order, substantially in the form attached hereto as ***Exhibit A***: (i) authorizing, but not directing, the Diocese to access the Sale Proceeds pursuant to sections 105(a), 363(b), and 541 of the Bankruptcy Code; and (ii) granting such other and further relief as is just and proper.

Dated:  March 19, 2025

BOND, SCHOENECK & KING, PLLC

By:____/s/  Stephen A. Donato_____
Stephen A. Donato
Charles J. Sullivan
Thomas W. Simcoe (Pro Hac Vice)
Grayson T. Walter
Andrew S. Rivera
One Lincoln Center
Syracuse, NY 13202-1355
Telephone: (315) 218-8000
Fax: (315) 218-8100
Emails:        sdonato@bsk.com
                    csullivan@bsk.com
                    tsimcoe@bsk.com
                    gwalter@bsk.com
                    arivera@bsk.com

*Attorneys for The Diocese of Buffalo, N.Y.*

21302642.v9

# **EXHIBIT A**

Proposed Order

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | ) |
| | ) |
| | )    Case No. 20-10322 |
| The Diocese of Buffalo, N.Y., | ) |
| | )    Chapter 11 |
| Debtor. | ) |
| | ) |

**ORDER AUTHORIZING, BUT NOT DIRECTING, THE DIOCESE TO ACCESS
THE PROCEEDS OF THE SEMINARY PROPERTY SALE PURSUANT
TO SECTIONS 105(a), 541, AND 363(b) OF THE BANKRUPTCY CODE**

Upon Motion (the "Motion")[1] of The Diocese of Buffalo, N.Y. (the "Diocese") for entry of an order (this "Order") for entry of an order substantially in the form attached hereto as *Exhibit A*, authorizing, but not directing, the Diocese to access the sale proceeds of the property located at 711 Knox Road, East Aurora, NY (the "Seminary Property") pursuant to 11 U.S.C. §§ 105(a), 363(b), 541; the Court having reviewed the Motion; the Court finding that: (a) the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, (b) this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and (c) the relief sought in the Motion is necessary and in the best interests of the Diocese's estate, creditors, and other parties in interest; the Court finding that notice of the Motion given by the Diocese was sufficient under the circumstances; and having determined that the legal and factual bases set forth in the Motion establish just cause for the relief herein granted, and after due deliberation and cause appearing therefor;

**IT IS HEREBY ORDERED THAT:**

1.      The Motion is granted as set forth herein.

2.      All objections to the Motion or the relief requested therein that have not been made,

---

[1] Each capitalized term used, but not otherwise defined herein, shall have the meaning ascribed to such term in the Motion.

21302642.v9

Case 1-20-10322-CLB,    Doc 3743-1,    Filed 03/19/25,    Entered 03/19/25 17:32:59,
Description: Exhibit A - Proposed Order, Page 2 of 3

withdrawn, waived, or settled, and all reservations of rights included therein, are overruled on the merits.

3.      The Diocese is authorized, but not directed pursuant to sections 105, 363(b), and 541 of the Bankruptcy Code, to access the Sale Proceeds of the Seminary Property to use same to (in part) fund a settlement pursuant to a chapter 11 plan.

4.      Notwithstanding the possible applicability of Rules 6004, 7062 and 9014 of the Bankruptcy Rules, or otherwise, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

5.      The Court shall retain jurisdiction over any matter or dispute arising from or relating to the implementation of this Order.


Dated: _____, 2025                    _____
       Buffalo, New York                       Hon. Carl L. Bucki
                                               United States Bankruptcy Judge

# CONSOLIDATED APPENDIX DOCUMENT NO. 2

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NEW YORK

In re: )
)
) Case No. 20-10322
The Diocese of Buffalo, N.Y., )
) Chapter 11
Debtor. )
)

### DECLARATION OF RICHARD C. SUCHAN IN SUPPORT OF THE MOTION FOR ENTRY OF AN ORDER AUTHORIZING, BUT NOT DIRECTING, THE DIOCESE TO ACCESS THE PROCEEDS OF THE SEMINARY PROPERTY SALE PURSUANT TO SECTIONS 105(a), 541, AND 363(b) OF THE BANKRUPTCY CODE

Richard C. Suchan, declares and states as follows:

1.      I am the Chief Operating Officer ("COO") for The Diocese of Buffalo, N.Y. (the "Diocese"). I have served as COO of the Diocese since July 2021. Prior to that time, I was the Executive Director of The Foundation of the Roman Catholic Diocese of Buffalo, N.Y., Inc. (the "Foundation").

2.      I make this Declaration based upon: (a) my personal knowledge of certain facts stated herein, (b) my review of relevant documents, (c) consultation with professionals engaged by the Diocese, and (d) my experience and knowledge of Diocesan operations. If I were called to testify, I would testify to the facts as set forth herein.

3.      I am authorized by the Diocese to submit this Declaration in support of the Motion for entry of an order substantially in the form attached thereto as Exhibit A, authorizing, but not directing, the Diocese to access the sale proceeds of the property located at 711 Knox Road, East Aurora, NY (the "Seminary Property") pursuant to 11 U.S.C. §§ 105(a), 363(b), 541 ("Motion").

4.      In preparing this Declaration, I searched the Diocese's record archives for information specifically related to the fundraising efforts and construction of the Seminary

property (the "Archival Records").  A copy of Archival Records relevant to the Seminary Property is attached hereto as ***Exhibit A***.

### Chain of Title Concerning the Seminary Property

5.      The Diocese received title to the Seminary Property through three deeds conveyed by Fred H. Reuter, dated December 10, 1959, January 2, 1960, and June 13, 1960 (the "Reuter Deeds").[1]  This land was comprised of approximately 80 acres, and donated to the Diocese by Mr. Reuter.  The records reflect Mr. Reuter's understanding that the gift would be used to construct a seminary.  *See* Archival Records, pg. 14.

6.      On February 19, 1968, the Diocese transferred title to the Seminary Property to St. John Vianney Seminary, a domestic corporation organized under the laws of New York pursuant to three deeds (the "1968 Deeds").  St. John Vianney Seminary also acquired a fourth adjacent property from Mr. Rueter, which was a residential property located at 655 Knox Road, but that property was later sold and is no longer part of the "Seminary Property".

7.      Minutes of the Board of Trustees of the St. John Vianney Seminary from its December 13, 1968 meeting reference a "debt due" to the Diocese of $2.2 million and a total cost of construction of $6,129,330.   It is unclear whether any payments were ever made with respect to that debt, although it is unlikely given St. John Vianney's precarious financial condition and later closure.  Mr. Reuter was elected to the Board of Trustees at that meeting.  The Board of Trustees of the St. John Vianney Seminary minutes for the December 13, 1968 meeting are attached hereto as ***Exhibit B***.

8.      On May 29, 1970, the Board of Trustees of St. John Vianney Seminary passed a resolution (the "May 29, 1970 Resolution") providing that in the event the Seminary Property was

---

[1] On or around October 1960, the Diocese purchased approximately eight (8) acres of land adjacent to the Seminary Property from Marjorie K. Klopp.

2

"no longer used as a seminary," the Seminary Property shall be "reconveyed to the previous owner, The Diocese of Buffalo, N.Y., in consideration of the subvention made by The Diocese to the Seminary." The resolutions also included authorization of the execution of a contract evidencing the same, although no such contract was found after a diligent search of the Archives, nor was any documentation of the above-referenced subvention. Mr. Reuter continued to serve as a member of the Board of Trustees of St. John Vianney at the time when this resolution was passed. Although he was absent from that particular meeting, it appears that he was present at other meetings where it was discussed. The May 29, 1970 Resolution is attached hereto as ***Exhibit C***.

9.      On September 1 1974, St. John Vianney Seminary granted a 99-year lease to Christ the King Seminary (the "CKS Lease").

10.     On February 11, 1987, St. John Vianney Seminary deeded the Seminary Property back to the Diocese (the "1987 Deed"), subject to the CKS Lease.

11.     There are no restrictions regarding the use of the Seminary Property in the Reuter Deeds or any subsequent deeds transferring title to the Seminary Property. Copies of the Reuter Deeds, 1968 Deeds, and the 1987 Deed are attached hereto as ***Exhibit D***, ***E***, and ***F***, respectively.

**Fundraising Efforts to Construct the Seminary Property**

12.     Until approximately 1961, Our Lady of the Angels Seminary, operated a seminary at Niagara University serving the greater Buffalo area. In 1959, Our Lady of the Angels Seminary announced that it was relocating its seminary to the Albany area. *See* Archival Records, pg. 1.

13.     At that time, the Diocese was the eighth largest diocese in the country, and a seminary was critical for the education and training of priests that would serve the Diocese of Buffalo. Accordingly, in 1959, The Most Reverend Joseph A. Burke, Bishop of the Diocese at the time, announced that the Diocese would engage in a fundraising campaign (the "Diocesan

3

Seminary Fund"), with a goal of raising at least $2,500,000 to construct a seminary that was estimated to cost approximately $3,000,000.  *See id.*  The Diocesan Seminary Fund was directed by George M. Frauenheim.  *See* Archival Records, pg. 2-3.

14.    The Diocesan Seminary Fund was administered in two phases.  The first phase was the "Special Subscriptions Solicitation" phases, which was geared toward soliciting larger gifts ranging from $100-$50,000 or more, with each contribution level coming with certain benefits, such as the following examples:

> a.   $50,000 or more: a specific project, like a library;
>
> b.   $25,000: a memorial, Chapel Organ, Set of Chimes, etc.;
>
> c.   $5,000: a side alter chapel;
>
> d.   $3,000: to be contributed to a statue of St. John Vianney, Stations of the Cross or similar;
>
> e.   $1,000: a seminarian's room;
>
> f.   $500: donor's name on main alter; and
>
> g.   $100: donor to receive a Bishop's Seminary Testimonial Certificate.

*See* Archival Records, pg. 11-14, 26, 28, 33.

15.    The second phase was a solicitation from the Catholic Faithful which began with the first Sunday of Advent and culminated the evening of the second Sunday of Advent (November 29 through December 6, 1959) (the "Seminary Week Solicitation", and along with the Special Subscriptions Solicitation, the "Institutional Solicitations").    *See* Archival Records, pg. 11.  During the Seminary Week Solicitation, each Parish collected gifts from its Parishioners, and all such donation were later assessed by the Diocese for the Diocesan Seminary Fund.

16.    The Seminary Week Solicitation was comprised mostly of the sale of "Spiritual Seminary Bonds", which were sold at $25.00 each.  *See* Archival Records, pgs. 7, 24, 30.  Parish

4

pastors were invited, but not directed, to encourage parishioners to purchase Spiritual Seminary Bonds, and to explain to such Parishioners that "*[a]s long as the Seminary stands*, countless generations of seminarians will pray daily for those who have bound themselves to St. John Vianney Seminary through the purchase of this Spiritual Bond." *See* Archival Records, pg. 33 (emphasis added). Early observations and reviews of the Institutional Solicitations received estimated that 35%-40% of the total gifts received came from purchases of Spiritual Seminary Bonds. *See id.*, at 34.

17.    The Diocese conducted a thorough search of its Archival Records, and has not identified any other written records under which property was granted to or transferred to the Diocese in connection with the construction of the Seminary Property. No records were found that required or expressed an intent that any gift for the construction of the Seminary Property be used for this purpose in perpetuity.

18.    As set forth in the Archival Records, the messaging to Parishioners and potential donors was clear that the Diocese was seeking gifts for the *construction* of a seminary. All funds received through the Diocesan Seminary Fund were used for that purpose. Groundbreaking on the seminary occurred on September 8, 1960, classes began on October 1, 1961 (before construction was fully completed), and the seminary was dedicated on May 30, 1963.

19.    In 2016, the Foundation initiated a $100 million capital and endowment campaign entitled "Upon this Rock." Copies of the campaign materials are attached as hereto as ***Exhibit G***. Among the various purposes of the campaign, campaign materials indicated to potential donors that $8 million in funds would benefit Christ the King Seminary ("CKS"), with $3 million directed to making essential upgrades to classroom facilities and technology, and expanding the seminary's role as a center of retreat and religious celebration (the "CKS Capital Project Fund"), and the

remaining $5 million being used to establish an endowment fund for CKS. The Upon this Rock campaign achieved its fundraising targets (which included a combination of current donations and pledges). There were no other written records under which property was granted to or transferred to the Diocese in connection with the CKS Capital Project Fund. Such records do not include any intent or requirement that CKS would be operated as a seminary in perpetuity.

20.    Changing demographics and other factors made CKS's ongoing survival a challenge. From 2010 until its closure, CKS had operating deficits of approximately $500,000 per year. CKS relied on annual financial support for its operations from the Diocese in the amount of approximately $300,000 and extraordinary gifts to overcome this deficit. In 2018-19, Diocesan support decreased to $250,000. This support ceased in approximately February, 2020, at the time of the commencement of the Diocese's chapter 11 case.

21.    In April 2020, CKS duly resolved through its Board of Trustees to recommend that the seminary cease operations at the end of the 2020-2021 academic year, which was subsequently approved by CKS's Members.

22.    Prior to its closure, approximately $1,685,000 of the Upon this Rock proceeds had been spent on classroom facility upgrades and technology. Such projects ceased with the decision to close CKS. The equipment, technology and furniture that was part of the Upon this Rock campaign was immediately repurposed for use by the Permanent Diaconate Formation program of the Diocese.

23.    In light of the foregoing, the Diocese respectfully submits that the sale proceeds from the Seminary Property are not held in trust, and are not otherwise subject to a *cy pres* review. The Diocese respectfully further requests that the Court grant the Motion, and authorize but not

direct the Diocese to access the Sale Proceeds pursuant to sections 105, 363(b), and 541 of the

Bankruptcy Code.

I swear, under penalty of perjury under the laws of the United States of America, that the

foregoing is true and correct to the best of my knowledge, information, and belief.

Dated:  March 19, 2025                                   /s/ Richard C. Suchan
                                                         _____
                                                         Richard C. Suchan
                                                         Chief Operating Officer
                                                         The Diocese of Buffalo, N.Y.

21324358.v4

# EXHIBIT A

(Archival Records)

**Consolidated Appendix 0033**

# $3,000,000 IS NEEDED BY BUFFALO DIOCESE FOR A NEW SEMINARY

## Bishop Burke Says Part Would Be Financed Through Enlarged Charities Appeal

The Diocese of Buffalo needs a new major seminary which would cost an estimated $3,000,000.

The Most Rev. Joseph A. Burke, bishop of Buffalo, proposed the seminary as a replacement for Our Lady of the Angels Seminary at Niagara University.

Announcement was made last spring that Our Lady of the Angels Seminary will be relocated near Albany after the 1960-61 school term.

### In "Embryonic Stage"

Bishop Burke's plan stated that the new seminary would be financed in part by the annual Catholic Charities Appeal and in part from other funds.

The Rt. Rev. Msgr. Eugene A. Loftus, director of Catholic Charities Appeals, told The Buffalo Evening News that plans for a new seminary are still in an "embryonic stage" but that it is tentatively agreed to conduct the funds campaign in late November.

Noting that Our Lady of the Angels Seminary will remain at Niagara University through the 1959-60 and 1960-61 school terms, he said a diocesan seminary should be built and ready for occupancy by September 1961.

### Would Serve Diocese

The campaign will be conducted within the parishes of the Buffalo Diocese.

"It will be the first time in 104 years that the diocese has been confronted with the need of building its own seminary," Msgr. Loftus observed. "Our Lady of the Angels Seminary was built by the Vincentian Fathers in 1855 and the Seminary of Christ the King by the Franciscan Fathers in 1905.

"The seminary would be for the training of secular priests and would serve the Diocese of Buffalo exclusively."

The objective in the 1959 Catholic Charities Appeal was $1,750,000 and contributions totaled $2,155,000.

### "No Other Solution"

Bishop Burke outlined the needs as follows:

"The withdrawal of the Seminary of Our Lady of the Angels from the Diocese of Buffalo presents the diocese with one of the greatest problems of its history.

"I have given mature, and I may say, disturbing thought to our problem. I can see no solution other than the building of a diocesan major seminary.

"It is true that we still have the Seminary of Christ the King and I hope that we shall always have students in an institution that owes its foundation and development to our beloved and lamented Father Thomas.

"But Christ the King—or St. Bonaventure, as we are accustomed to call it—is already overcrowded. It serves dioceses of much greater need and less ability to meet the need than our own.

### Eighth Largest Division

"So we must face the necessity of building our own seminary. Indeed, considering that we are a diocese of nearly a million souls, the eighth largest of the ecclesiastical divisions of this country, were we not to build our own seminary we should soon be directed to do so by the Holy See.

"There are many problems in establishing a seminary. The formation of a faculty, the administration and spiritual direction, the choice of a site and the actual building. These problems we shall face and devote great study to their solution.

"There is, however, one immediate problem, that of finances. We will need about $3,000,000. Thanks to the vision of Bishop Turner, we have at hand the means of securing this vast fund —our Catholic Charities Appeal organization.

### Would Finance Part

"My idea is to use it this fall in a single campaign for $2,500,000. The rest of the $3,000,000 we should be able to finance.

"The appeal, as I envision it, would have the usual preparatory phases of the Catholic Charities Appeal: the interpretation, the special subscription phases, culminating in the general solicitation during the first week of Advent.

"My I ask first of all for your prayers. There can be no cause more dear to our priestly hearts and no need more obvious than that of a seminary.

"Any helpful suggestions you wish to offer in this vital diocesan project will meet with our sincere gratitude.

"Will you give me your hearty, priestly co-operation in raising the necessary funds? Wishing you every blessing of God."



# The Chancery
## Diocese of Buffalo

### 35 Lincoln Parkway
### Buffalo 22, New York

August 13, 1959

Reverend and dear Father:

The date for the Diocesan Seminary Fund has been designated for the week beginning with the First Sunday of Advent culminating the evening of the Second Sunday, - November 29th to December 6th, 1959.

As the priests primarily will provide the natural leadership and give rich spiritual inspiration for the new Seminary, it is important that we name a Priest Leader from each parish. He may be the Pastor or his Assistant.

Accordingly, may I respectfully request, that after mature consideration, you fill out the enclosed post card and return it to the Chancery not later than Tuesday, September the first.

Lay appointments will be made later.

Gratefully yours in Christ,

Joseph A. Burke

Bishop of Buffalo

Consolidated Appendix 0035

Catholic Union and Echo, August 14, 1959

# Bishop Names George Frauenheim to Direct Drive for Diocesan Seminary

Most Rev. Joseph A. Burke, D.D., Bishop of Buffalo, announced this week his decision to build a new major seminary in the diocese because of the forthcoming withdrawal of the Seminary of Our Lady of Angels from Niagara University to the Diocese of Albany.

Bishop Burke also announced that a $2,500,000 fund drive to build the seminary will be conducted the first week of Advent this year, under the chairmanship of George M. Frauenheim.

In a letter to the priests of the Diocese, Bishop Burke stated that the diocese is facing one of its "greatest crises" because of the withdrawal.

This was the main reason the new seminary is to be built.

He added that present overcrowded conditions at the other major seminary, Christ to King at St. Bonaventure University, added to his decision to build a new seminary.

Bishop Burke stated that there are a number of problems facing the establishment of the seminary, including the selection of a faculty, choice of site and the actual building.

He said that these problems will be faced but that the major, immediate problem was that of finances.

Estimated cost of the new seminary is $3,000,000, all but $500,000 of which will be sought this fall.



George Frauenheim

The rest, Bishop Burke hopes to finance.

Bishop Burke called for the prayers of the priests and asked them for suggestions that could be helpful in the project and their cooperation in seeking the funds.

The appointment of Mr. Frauenheim as chairman for the drive, which will be conducted from Nov. 29 to Dec. 6, gives the diocese one of its outstanding laymen as leader of the project.

A graduate of Canisius High School and College, Mr. Frauenheim heads the George J. Meyer Malt and Grain Corp.

He has been chairman of the Catholic Charities Appeal since 1954 and before that served as vice-chairman and chairman of the large gifts division of the appeal.

Mr. Frauenheim is also chairman of both the Canisius College board of regents and the college's development fund.

He is a member and past chairman of the Rosary Hill College board of advisors and vice-president and executive board member of the Bishop's Committee for Retreats.

A permanent board of advisors member and past president and director of the founders of the new Canisius High School and former president of the Canisius High School alumni club, Mr. Frauenheim is also executive committee member and area chairman of the Jesuit Seminary Building Fund, a director of the Father Boland Foundation and a member of the Knights of Columbus.

He resides with his wife and seven children at 697 LeBrun Rd., Eggertsville. He is a Knight of Malta and Knight of St. Gregory.

CHAIRMAN — Paul E. Fitzpatrick, prominent Buffalo Catholic layman, has been appointed chairman of a special subscription committee of the Diocesan Seminary Fund by Most Rev. Joseph A. Burke, D.D., Bishop of Buffalo.



## CONTENTS

I   Proposition

II  Objective

III Question

IV  Proposal as to Organization

V   Proposal as to Economics

VI  Proposal as to Action

VII Proposal for Selling

VIII Proposal for Patron

1.

**Proposition:** To finance the building of a Diocesan Seminary which will cost $3,000,000.00.

**Objective:** To raise in a "one shot" campaign $3,000,000.00 in a Diocesan campaign in the fall of 1959. To differentiate the nomenclature from the Catholic Charities Appeal, this campaign shall be known as "The Fund for the Diocesan Seminary".

**Question:** The factor of shortness of time requires immediate action and utilization of fund raising organization available.

**Proposal as to Organization:**

1. The utilization of Catholic Charities Appeal organization which is existent, accepted and successful and would solve the time deficit factor.

2. If the Catholic Charities Appeal organization is utilized, the obvious corrallory is the appointment of Monsignor Loftus as Fund Director. His ability, experience, contacts and public acceptance complement the foregoing. The same reasons suggest the appointment of Father Chambers as Assistant Fund Director. Your Excellency has established myself as Lay Chairman. There shall be appointed a Chairman of Special Subscriptions. The utilization of commercial and women's divisions is not in order in a fund drive for strictly religious purpose and would result in little or no return - hardly justifying the effort and, therefore, no such chairmen are needed.

3. A Board of Clergy Advisors should be appointed and would act similarly to the Board of Managers of Catholic Charities Appeal. The make-up at this time is a detail.

4. Monsignor Loftus and I have discussed and mentioned to His Excellency the suggestion of the formation of "The Bishop's Conference for Charity." The membership would be past Catholic Charities Appeal lay leaders whose talent, dedication, experience and influence would be retained for counselling and making subscription contacts in future Catholic Charities Appeal. This would be a reciprocal opportunity to organize it. Invitations shall be by the Bishop and organization, function and operation shall be top level.

5. To assist Diocese-wide lay acceptance, the Presidents of Diocesan organizations shall be lay Vice-Chairmen. To assist acceptance in geographical areas, representative laymen shall be appointed Vice-Chairmen, as in the Catholic Charities Appeal.

6.  Office personnel of the Catholic Charities Appeal should be drafted because of their "know how".  The Remington Rand punch card system would be just ideal.  However, so as not to weld too closely to Catholic Charities Appeal and so as not to hamper Catholic Charities office routine, a location should be established v.g. Main and Virginia.

**Proposal as to Economics:**

1.  A $3,000,000.00 Fund objective is about 50% more than 1959 Catholic Charities Appeal.

2.  We cannot just ask for money or we'll collapse.  There must be "yardsticks".  However, there cannot be "quotas" because these become ultimata and result in adverse reaction.

3.  Across the board exhortation for 50% increase ignores mountains, which are an area for greater giving and does not discount valleys, which are an area which cannot or will not give more.

4.  The plan:
a.  Every gift will be credited to a parish.
b.  There will be a "special subscription" phase which will officially terminate the day prior to the opening of the parish phase.
c.  Under the Special Subscription Chairmen, who will be assisted by their Vice-Chairmen selected for merit only, there will be a three-prong approach:

    A.  Invitation by His Excellency to carefully screened candidates (very few) to give $50,000 - $100,000 or more and in effect give the chapel or something similar.  No illusions - only two or three qualify here.  The payment can be pledged and paid over a period arranged by negotiation.

    B.  Invitation by His Excellency to carefully screened candidates (no illusions - there are not many) to give $10,000 or $15,000 over five years.  They shall be benefactors and their names so inscribed in the Seminary. (When donors dig this deep, they appreciate this). I would think that four would be a good number.

    C.  A tremendous effort to enlist $1,000 Founders, payable over three years, and whose names would be inscribed.  The Special Subscription Chairman and Vice-Chairman would exhaust all potentials themselves and work in conjunction with Parish Special Subscription Chairmen.

    D.  Remember, all contributions are credited to the parishes.  The Special Subscriptions Committee in effect spearheads an effort in advance of the general parish solicitation and asks for $1,000 and up as set forth above.  Only such gifts are inscribed in the Seminary:  1. specifying major gifts of over $25,000

3.

for a chapel, etc.   2.   Benefactors at $15,000.   3.   Founders at $1,000.

c.  The Parish phase is a one week deal as follows:
1.  The Parish Special Subscription Chairman will have worked with the Chairmen of Special Subscriptions trying to get gifts over $1,000 prior to the opening of the general phase.
2.  The Parish Special Gift Chairman, on his own with his Parish Committee prior to the opening of the parish phase, will line up as many "Remembrance" gifts as he can from $100 to $1,000 payable in installments within the year. A suitable "Remembrance" plaque from the Bishop will be given to them.
3.  The big parish effort will be the Pastor and Parish Chairman talking up "Seminary Bond" or some such name. These Bonds will go for $25.00.  If a family gives $50.00, it gets two bonds.  Will sell a bond per family member. The Bonds mature in Heaven and the interest is the Seminarians' prayers.  160,000 gave $10.00 in 1958.  If only one-half give $25.00 for a Bond, $2,000,000 is in. The balance is taken care of by the other categories.

**Proposal as to Action:**

1.  Priests' conferences in late August or early September (after organization) at which His Excellency announces program and invokes support.

2.  G. M. F. reception for Priests (similar to Catholic Charities) at which the specific program is spelled out, in a friendly atmosphere.  This should be in September, if possible.

3.  G. M. F. reception for Bishop's Conference for Charity for purpose of informing, inspiring, proposing specific program. This should be in September, if possible.

4.  G. M. F. reception for Parish Chairmen and Parish Special Subscription Chairmen to inform, inspire, set forth plan of action.

5.  Parishes should organize in October.

6.  Parishes should canvass special subscriptions in November.

7.  Special Subscription Committee should organize in September, review prospects in October and solicit in November, after Community Chest.

8.  Special Subscriptions report at luncheon on Saturday prior

to First Sunday of Advent.

9.  **Parish solicitation** first week of Advent.  Only first week in Advent
--- Want drive in the Fall
--- we can't have it in September - too soon and people busy with school, reorganizing after summer, etc.
---can't have it in October - Community Chest
---November still too soon timewise and provides no inspiring theme
---first week in Advent has theme
>> --Advent prepares "Inn"
>> also "Inn" for Christ's representatives
>> --period of sacrifice
>> --liturgy of Church
>> --although Christmas is a deterrent, it
>> could be turned around: Give "Bonds"
>> for Christmas presents

**Proposal for Selling:**

1.  **Under the Bishop's leadership and as a Diocesan matter, a crash program is better if:**
a.  Informed: Priests in pulpit, Catholic Union and Echo, radio T.V., placards showing Stable of Bethlehem with Seminary fantasia in background
b.  Inspire:  By Bishop and Priests.
c.  Sell:  Take the town by storm; cause the buying of Bonds to be a Crusade.

**Proposal for Patron:**

The Infant of Bethlehem:
1.  Merit
2.  Offset drawback of Christmas - join rather than fight
3.  The Stable for the Infant - housing for Seminarians

Consolidated Appendix 0041

# SEMINARY FUND



NOV. 29-DEC. 6, 1959

### DIOCESE OF BUFFALO

*Most Rev. Joseph A. Burke, D.D.*

## $2,500,000

c
o
p
y

November 4, 1959

Reverend and dear Father:

The Seminary Fund is making progress. The gift of Mr. & Mrs. Frederick H. Reuter was not only most generous, but it has given tone and spark to everyone. This, with the great gift of the Priests, have been announcements of unusual significance. The Special Subscriptions Committee has received a gift of $25,000 for the Main Altar and two gifts of $10,000 each for the two Sanctuary Chapels. These are from laymen. It is expected that the Bishop's Suite will be taken this week. A call on a prospective donor, once the Cause was explained, in every case so far has produced a gift within expectations. The giver consents to give more than intended.

Our chief weakness, at present, is the lack of knowledge about The Seminary Fund. People are interested. They want to know all about it. It is up to us to tell them. We have the channels. The newspapers have lavishly favored us. The Catholic Union and Echo has been zealous in its coverage. All of us know the Priest in the pulpit is the strongest voice. The Seminary Fund is a sacred Cause. It is the Priests' Cause. Pride in the Priesthood gives it holy momentum. Let us clear up all misconceptions, misunderstandings, all ignorance about The Seminary Fund.

We suggest that next Sunday be the day to urge Special Subscriptions Gifts. We had a fine meeting in the office Monday evening. It was well attended. The Chairmen are really dedicated. They had good ideas. Of course, they are reliant on the initiative of the Parish Priest. There are three salient factors. First, do not look upon The Seminary Fund just as another Appeal. It is unique. It is a Building Drive. People usually are prompted to give more to a great building that is needed. This is the first time in 112 years the Diocese has been asked for a Seminary. It is also the first time in about 50 years the Diocese has asked for a special capital structure. The last time was the New Cathedral. Second, plan the Special Subscriptions Campaign! How many people are in a position to give $5,000, $1,000, $500, and $100, in your parish? Go out and ask them. Just because they do not give it to the Charities, does not mean they are not in a position. For this Cause, many of them will. And you will find others who will sacrifice, simply because of the Priesthood. Third, and they have years to pay. Let us make next week - "Special Subscriptions Week."

Thanks for that inspiring Hotel Statler meeting on Sunday. It crowded the Ballroom and the reaction was swelling.

*Address Communications to 525 Washington St., Buffalo 3, N. Y. • Phone MO. 4494*

- 2 -

We are preparing for release a Special Subscriptions Visual Aid for the Committee and for the Prospect. The men and women asked for it at the meeting Monday night. You should have the material this week.

We are striving to reach as many $1,000 givers, as possible. They can be found in every parish. Help us, please! Call us and let us know how you are doing. Don't forget they get their name on a Seminarian's Room - and they have five years to pay.

Many Pastors, or the Priest Leader, address a personal letter to the parishioners. It is a good idea. The meeting Monday night was quite encouraging to this suggestion. Again, mobilize your parish workers for The Seminary Fund Week. Do not defer! We must guard against disappointment.

And this is important! As you know, we are using Data Processing Equipment for the Fund Cards. We are working from a Master List. This Master List is only as good as the list we have available. There are many changes from month to month, particularly in big parishes. We need your help to keep this Master List up to date. The cards we have sent you do not contain these changes. It is the Parish responsibility to take care of changes for The Seminary Fund. We are sorry, but there is little else we can do about it. But it should mean, the Parishes will provide us with an up to date Master List from this Campaign. Then we may have a suggestion, which will help the Parish, as well as this office.

Your regular Parish Cards, envelopes and the new type of Receipt Book should reach every parish this week. Be on the watch for them!

Kindly use the Sanctuary Card for the recitation after Mass and Devotions. St. Joseph and St. John Baptist Vianney will see us through.

Sincerely yours,

Rt. Rev. Msgr. Eugene A. Loftus, P. A.
Fund Director

EAL:p

Consolidated Appendix 0043

THE SEMINARY FUND PULPIT ANNOUNCEMENT                 Nov. 29 - Dec. 6, 1959

                          Patron, St. Joseph

SEMINARY FUND HEADQUARTERS
525 Washington St., Buffalo 3, N. Y.                 Sunday, November 8, 1959
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

   There are two significant phases to The Seminary Fund.  The first is the Special Subscriptions solicitation.  The second is the great call on all the Faithful of the Diocese, which takes place during the First Week of Advent, which begins three weeks from today.

   Many Large Gifts will come from individuals, family groups, institutions and organizations to erect the new Seminary.  According to plan, these gifts should be solicited and made in advance during the month of November.  The Committee would desire to call at your home, or to have you call at the Rectory.

   For $5,000 you may give a Side Altar Chapel, where Holy Mass will be celebrated each day, dedicated to your favorite Saint, where possible, and with the name of the Donor inscribed.  For $1,000 you can be the Donor of a Seminarian's Room, a recipient of remembrance in his daily prayers, with the name of the Donor inscribed.  For $500, the name of the Donor will be placed in the Main Altar, which is a blessed participation in every Mass.  And for $100, His Excellency, the Bishop, will send you a Testimonial Certificate, a treasure as a Sponsor of the Seminary for many years to come.  You do not have to pay for these gifts at once. They can be negotiated and paid for year by year.

   For the proper certification of these Special Gifts, it is well to establish them without too much deferment.  We hope that those who are in a position to give will respond with goodness and generosity.

   "All the good that Christian civilization has brought into the world is due, at least, radically to the word and works of the Catholic Priesthood."
Pope Pius XI.



# ✱✱✱ Catholic Union a...

MILLER MRS ANNA M
194 LEROY AVE
BUFFALO 14 N Y

Established 1872

Vol. 87—No. 45 ⬥ Buffalo, N. Y., Friday, Nov. 6, 1959    16 Pages—10c



**DONORS OF SEMINARY LAND** — Mr. and Mrs. Frederick H. Reuter point out on a map the location of the land near East Aurora which they have donated as the site of the new St. John Vianney Seminary. At the left is Most Rev. Joseph A. Burke, D.D., Bishop of Buffalo, and at the right Most Rev. Leo R. Smith, D.D., Auxiliary.

SEMINARY:
ST. JOHN
VIANNEY

# St. Joseph Is Patron of Diocesan Seminary Drive

*Bishop Burke has placed The Seminary Fund drive under the patronage of St. Joseph, and has written this prayer for the success of the drive which will take place Nov. 29 - Dec. 6.*

*The new diocesan Seminary will be known as the St. John Baptist Vianney Seminary, but the appeal for funds to construct the seminary is under the patronage of St. Joseph.*

O glorious St. Joseph, chosen by God to be the foster father of Jesus, the chaste spouse of Mary ever virgin, and the head of the Holy Family and then appointed by the Vicar of Christ to be the heavenly patron and defender of the Church, founded by Jesus, confidently do we implore thy powerful aid for the Church Militant on earth.

Be pleased also, selfless St. Joseph, to obtain for us the blessing of your foster Son and the Son of God on The Seminary Fund of our beloved diocese.

Provident and fearless father of the Holy Family and constant patron and protector of this part of God's Kingdom on earth, plead with Our Eternal High Priest, Our Lord and Saviour Jesus Christ, that through His blessing, our efforts to train our inspired youth for the Holy Priesthood may be crowned with gratifying success.

# National Authority Sees Big Need for Seminaries

THE INFANT U. S. CATHOLIC SEMINARY program is going to grow by thousands of students in the next 10 years, an authority on seminary systems has predicted.

And because it is due for expansion, "careful thinking and planning" should guide its development, said Rev. Cyril Dukehart, S.S., associate secretary in charge of the National Catholic Educational Association's major and minor seminary departments.

The Sulpician Father, a past president of St. Charles College, a Baltimore archdiocesan minor seminary in Catonsville, Md., spoke to the annual meeting of the NCEA's School Superintendents' Department in Washington, D. C. Represented were archdiocesan and diocesan school directors from all parts of the nation.

FATHER DUKEHART REVIEWED SOME of the conclusions from his department's recent statistical study of the 381 U. S. seminaries.

Classifying the seminary movement as in its infancy, he said that 131 of the nation's institutions to train candidates for the priesthood have been founded since 1945.

"This means there has been a 53 percent increase in the number of seminaries since 1945. More significant still, there has been a 40 percent increase since 1950," he noted.

Population studies, he added, indicate that youth between the ages of 14 and 19 will increase by 63 percent in the next decade. Applying this to the current reported enrollment of 21,625 in six-year minor seminary programs, he commented:

"By sheer weight of numbers, then, there will be at least 13,000 more minor seminarians in the U. S. by 1970 than there are now. With stepped-up vocation programs, we could have many more."

HE EMPHASIZED THAT ANY STUDY OF THE present seminary system does not change either the principles or goals of priestly training. "The only question," he said, "is whether or not our present methods are adequate or suited to reach the goals set before us."

Father Dukehart urged the school superintendents to maintain a deep interest in the training of future priests.

"The education of the clergy must be of concern to you because of the intimate role the parish priest plays in the elementary school and the increasing importance of the diocesan and religious priest as a high school administrator," he said.

Father Dukehart also suggested that seminaries be integrated with Catholic institutions of higher learning for some of their courses.

This is already being done in some places. A number of smaller religious orders, which do not operate colleges or major seminaries, have their students live together.

Catholic Union and Echo, Oct. 30, 1959          Page 7

# Reuters Give 80-Acre Tract For Seminary

## Bishop Burke Says Gift Equivalent to $100,000 Donation

The site for the new major Seminary of St. John Vianney has been selected by Most Rev. Joseph A. Burke, D.D., Bishop of Buffalo. It will be erected on a tract of land in excess of 80 acres, on Knox Rd., about one mile from the center of East Aurora.

It is the gift of Mr. and Mrs. Frederick H. Reuter, members of Immaculate Conception parish, East Aurora, who have made the site their home for 16 years. Mr. Reuter is president of Kenmore Motor Co., Inc. This gift to The Seminary Fund is the equivalent in excess of the amount of $100,000.

### Picturesque Area

It is a most picturesque, expansive and suitable location for the needs of a seminary. There are two spring-fed lakes on the property and Cazenovia Creek runs through it. Mr. and Mrs. Reuter have been using it as a breeding establishment for their Black Angus cattle, where they have raised some of the outstanding champions of that breed in the country.

All the utilities are available, including the village water supply, a high pressure gas line and electricity. There are two natural wells, one producing 3,000 gallons per hour.

"Mrs. Reuter and I are very happy that our property will be used by the Diocese of Buffalo for such a worthy and necessary purpose as a seminary," Mr. Reuter said.

### Active in Organizations

He is a member of the advisory board of Rosary Hill College, serves on the advisory board of Kenmore Mercy Hospital and is a member of the advisory board of the Franciscan Sisters of the Immaculate Conception, East Aurora, and also is a member of the advisory board of the Nazareth Nursing Home, North St., Buffalo. Mr. Reuter is also active on the Bishop's Committee for Retreats.

In announcing the site for the seminary, Bishop Burke said:

"Speaking in my own name, in the name of Bishop Smith and all of the clergy, religious and laity of the diocese, I am, of course, inexpressibly grateful to Mr. and Mrs. Fred Reuter for their lavishly generous gift to the Diocese of Buffalo of the ideally situated property that will be used for St. John Vianney Seminary.

"This memorable occurrence in the history of this part of God's Kingdom is the gratifying fulfillment of many fervent prayers.

Continued on Page 13

# Types of Gifts Listed For The Seminary Fund

The following classes of gifts have been established for The Seminary Fund:

1. A gift of $50,000, or over, is acceptable, as a memorial, for a specific project, such as a library.

2. A gift of $25,000 will be received as the donor of an outstanding memorial.

3. A gift of $5,000 will be received as the donor of a side altar chapel. A saint, chosen by the donor, will be designated, provided there is no duplication.

4. A gift of $3,000 will be received as the donor of the dedication statue of St. John Vianney.

5. A gift of $1,000 will be received as the donor of a seminarian's room.

6. A gift of $500 will place donor's name in main altar.

7. A gift of $100 will receive Bishop's Seminary Testimonial Certificate.

SEMINARY BOND, $25—Receives individually registered spiritual bond. May be purchased in multiples. "Matures in Heaven" "Treasure in Seminarians Prayers" Payable in two installments, in one year.

BUILDER—Under $25.

Gifts of $3,000 and up may be spread over any period of years that the donor desires. Those of $500 to $3,000 may be paid over a five-year period, and those of $100 over a four-year period.

Consolidated Appendix 0047

11/6/59



**DISCUSS SEMINARY FUND** — Most Rev. Joseph A. Burke, D.D., Bishop of Buffalo, lower right, and Most Rev. Leo R. Smith, D.D., Auxiliary Bishop, check details of The Seminary Fund appeal at a meeting Sunday. Surrounding them, left to right, are: Paul E. Fitzpatrick, Rt. Rev. Msgr. Eugene A. Loftus, P.A., George M. Frauenheim, Very Rev. Msgr. William L. Wozniak and Rev. James F. Chambers.

**LEADERS OF** The Seminary Fund drive representing 300 parishes in the Diocese of Buffalo met at the Hotel Statler Hilton last Sunday and were introduced to Mr. and Mrs. Frederick H. Reuter, the East Aurora couple who gave a tract of land for the new major seminary.

The Reuters were introduced by Most Rev. Joseph A. Burke, D.D., Bishop of Buffalo, who said that they have "done more for the new seminary of the Diocese of Buffalo than anyone I know."

Those attending included diocesan leaders, district priests and lay leaders, parish priest leaders and parish chairmen.

**ALSO SPEAKING** at the meeting were Most Rev. Leo R. Smith, D.D., Auxiliary Bishop of Buffalo, who said that Pope John gave his special blessing to The Seminary Fund and everyone associated with it, workers and contributors. Bishop Smith just returned from Rome where he had an audience with the Pontiff.

George M. Frauenheim, general chairman of the fund, explained the categories of giving and outlined the drive's timetable and Paul E. Fitzpatrick spoke on the work of the special subscriptions committee, which he heads.

The speakers were introduced by Rt. Rev. Msgr Eugene A. Loftus, P.A. drive director. Bishop Burke also paid special tribute to Rt. Rev. Msgr. Richard O'Brien P.A., pastor of Annunciation parish and dean of Buffalo priests who, at 97, is priest leader of the drive in his parish.

# Bishop Burke Grateful to

# Seminary Fund Donors;

# Urges All Give by Sunday



**LEFT** — Bishop Burke recites the prayer of thanksgiving before the statue of St. Joseph, patron of The Seminary Fund drive, Sunday evening in the headquarters as the goal of $2,500,000 was reached.

Catholic Union and Echo, Dec. 4, 1959

Consolidated Appendix 0049



CENTER — Bishop A. Loftus, drive director, and George M. Frauenheim, general chairman. At the far right are Most Rev. Leo R. Smith, D.D., Auxiliary Bishop of Buffalo, and Mary Ann Zawadzski, who tabulated the returns. At the left are Rt. Rev. Msgr. Eugene Burke points to the total on the blackboard as the drive goes over the top.

Consolidated Appendix 0050



**RIGHT —**
Bishop Burke is shown addressing the large crowd which filled the headquarters Sunday night.

# Bishop Praises Diocese For Its Great Response

*Most Rev. Joseph A. Burke, D.D., Bishop of Buffalo, issued the following statement this week regarding The Seminary Fund drive:*

I am most grateful for the results of The Seminary Fund thus far. This has been a tribute to the outstanding faith of the priests and people of our wonderful diocese.

The people of the Diocese of Buffalo have seen in this cause a crusade to sustain and preserve the eminence of the priesthood of Jesus Christ. The response has been commensurate with the holiness of the cause. It is gratifying to me to experience this manifestation of the unity of the priests and people with the Bishop.

As we approach the closing of The Seminary Fund campaign, I can only urge a continuance of the holy momentum of the cause. We realize from past experience the effectiveness of sustaining the advancement of the fund.

We must continue our efforts throughout the remaining days so that all who wish to assist the Bishop in the construction of St. John Vianney Seminary will be afforded the opportunity of giving before Sunday in this one campaign for funds for the seminary.

## Fund Can Use Memorial Gifts

Rt. Rev. Eugene A. Loftus, P.A., director of The Seminary Fund, made the following statement in connection with the drive:

"The Seminary Fund attracted several memorial gifts. We could start with the $100,000 gift of property in the Town of Aurora for the site of the seminary. The main altar has been donated, the two sanctuary side altar chapels, the chapel organ, the administration building foyer, chapels for every building wherein there will be a chapel, side altar chapels, the chapel crucifix, the sanctuary lamp, the statue of St. John Vianney for the main building, outdoor shrines, the Stations of the Cross, windows and vestments, the seminarians' rooms.

"The priests, of course, have underwritten the erection of the chapel building itself.

There are a few of the Stations of the Cross left, as well as chapel windows to be donated. We are accepting gifts of chalices, ciboria and vestments. We would like to hear from our friends who are desirous of giving a memorial, but are still awaiting solicitation. As a suggestion we would counsel discussing the matter with the parish priest,



## Bishop to Give Results on Radio

Most Rev. Joseph A. Burke, D.D., Bishop of Buffalo, will be heard over station WEBR on Sunday, Dec. 6, at 10:30 p.m., when he will give the final results of The Seminary Fund drive.

Also appearing on the program will be Rt. Rev. Msgr. Eugene A. Loftus, P.A., fund director; Rt. Rev. Msgr. John J. McMahon, diocesan chairman of radio and TV; George M. Frauenheim, general chairman, and Paul E. Fitzpatrick, special subscriptions chairman.

Consolidated Appendix 0051

# $2,500,000 Goal Is Surpassed on Drive's First Day

## Great Response of People Proves Holiness of Cause, Bishop Burke Emphasizes

The people of the Diocese of Buffalo far exceeded the intended $2,500,000 goal sought for the construction of the new major seminary in the diocese, which will be dedicated to St. John Vianney, the Cure of Ars and patron of parish priests.

Most Rev. Joseph A. Burke, D.D., Bishop of Buffalo announced that through Thursday, $3,401,325 had been subscribed to The Seminary Fund, $900,000 more than had been asked.

In fact, the goal was surpassed as early as last Sunday, the day the actual solicitation began, when Bishop Burke announced to a crowd of priests and laymen at the headquarters, that $2,520,854 was raised by 9:10 p.m.

The closing figure that night was $3,004,607.45.

**Expresses Gratitude**

"I am most grateful for the results of The Seminary Fund thus far," Bishop Burke said in a statement. "This has been a tribute to the outstanding faith of the priests and people of our wonderful diocese."

Emphasizing the fact that the drive does not end until this Sunday, he stated that "We must continue our efforts throughout the remaining days so that all who wish to assist the Bishop in the construction of St. John Vianney Seminary will be afforded the opportunity of giving before Sunday in this one campaign for funds for the seminary."

Bishop Burke placed special emphasis on the fact that this was the one and only campaign for the seminary and urged everyone to give as generously as they could.

Statements were issued by drive leaders during the week. They include:

**RT. REV. MSGR. EUGENE A. LOFTUS, P.A.,** drive director—The one great impression that is mine is the magnitude of our bond of Faith, which has united the priests with the laity, and both with Our Most Reverend Bishop. Great and glorious was the response as calculated in returns, but this unity is a holy asset for each of us. It is enduring for the Church we revere. The Seminary Fund is new, unique and inspiring. But our priests, priest leaders, chairmen, special subscriptions groups and the workers, drew it together into a devoted and efficient mechanism. This is not the only factor which calls for the deepest of gratitude, but it is a source, too, for becoming pride.

Continued on Page 1

## Seminary Fund Goal Exceeded On First Day

### Continued from Page 1

**GEORGE M. FRAUENHEIM, K.S.G., K.M.,** general chairman — The priesthood is the living expression of our faith in the repository of the Catholic Church. It is self evident that a responsibility exists to insure the continuance of this sacred trust. The mandate to Our Most Reverend Bishop at this time to provide a major diocesan seminary and his appeal to the reverend clergy and laity of his diocese to assist him in its fulfillment is being realized. Our diocese is thrilled to sense that our priests and people have joined together in this spiritual crusade. Hearts are overflowing with gratitude because funds are being realized to build our Seminary. The important keystone in the current success of The Seminary Fund is that our people understand the cause and want to be part of it.

**PAUL E. FITZPATRICK, K.M.,** chairman, special subscriptions — The special subscriptions division of The Seminary Fund has succeeded even beyond our expectations. I wish to express our most sincere gratitude to all the donors. However, we could never have attained this tremendous result without the zeal, the planning and the drive of the special subscriptions chairmen in the various parishes.

# Good Weather Speeds Erection

11-25-60

# of St. John Vianney Seminary



This has been a good autumn for building and the contractors have taken advantage of it to speed work on the new St. John Vianney Seminary on Knox Rd., just outside East Aurora. Most of the work to date has been below ground—foundations, utility lines and roads. This general view of the site shows some of the equipment at work. In the foreground an old tree is outlined against the gray sky.

Consolidated Appendix 0053



Foundations require big machines to dig deep into the earth that formerly was part of the Reuter farm. Here a workman inspects the progress at one end of the seminary site. In the background are the farm buildings. While no date has been set for occupancy of the first structures of the seminary, Very Rev. John L. Rowan, O.F.M., rector, hopes some of them will be ready for classes next autumn.



# Union and Echo

— Buffalo, N. Y., Friday, June 16, 1961          20 Pages—10c

## New Diocesan Seminary Gets State Charter

**Bishop Burke and Very Rev. John L. Rowan, O.F.M., rector, examine the temporary charter granted by the Board of Regents of the University of the State of New York to the new St. John Vianney Seminary which will open in the autumn on a site just outside East Aurora.**





## Work on Seminary Progresses Despite Some Difficulties

When workmen began digging the excavation for the sewage disposal plant at the new St. John Vianney Seminary near East Eurora they ran into quicksand and had to remove a much larger amount of earth than originally scheduled, as the picture at the left shows. This will not delay the opening of the seminary, however. In the picture at the right, Very Rev. John L. Rowan, O.F.M., seated, rector of the seminary, points out some of the features to Rev. Robert C. Welch, member of the faculty. The seminary is scheduled to receive its first students in September though all buildings will not be finished by then.

7/7/61

Consolidated Appendix 0056

# SEMINARY FUND



### DIOCESE OF BUFFALO

*Most Rev. Joseph A. Burke, D.D.*

NOV. 29-DEC. 6, 1959

$2,500,000

November 10, 1959

<u>TO PASTORS, PRIEST LEADERS AND CHAIRMEN:</u>

The Seminary Fund is gathering momentum and seems to be blessed by the Providence of God through the intercession of its Patron, St. Joseph.

It is now but three weeks away. With dedication and spirit, let us all move it with solicitude, organization and resolution. In great measure, it is a Cause close to the Priest.

THE SEMINARY FUND SUPPLEMENT OF THE UNION AND ECHO WILL ARRIVE IN EVERY PARISH THIS WEEK. PLEASE, DEVISE A PLAN SO THAT EACH PARISHIONER WILL TAKE A COPY TO THE HOME AND READ IT, SUNDAY, NOVEMBER 15.

Next Sunday we should begin to talk to the people about the purchase of the Spiritual Seminary Bond. The purchase gift is $25, payable in two installments. We should strive to have every family throughout the Diocese purchase one of these Bonds. They may be purchased in multiple. They "Mature in Heaven" - "Treasure is Seminarian's Prayers". The solicitation takes place "Seminary Week" - the first week in Advent, November 29 - December 6. The Seminary Bond is the basis of the Seminary Fund. Let us make a strong Appeal the next three Sundays.

The Special Subscriptions phase is now taking place in the parishes. As a matter of report, the Main Altar and the two Side Altars in the Sanctuary have been taken. Fourteen Side Altar Chapels also have been reserved. May we ask the parishes to do everything possible to help us raise our goal of two hundred, One-thousand dollar givers. We need an all out effort in this catagory. Sustain the Special Subscriptions Drive until every prospect has been reached. These gifts are from $100 up.

By all means, contact sufficient parish workers for "Seminary Week". Organize them. Call your parish meeting.

A sermon outline is enclosed to help you preach sermon on next Sunday. Our Most Reverend Bishop wishes a sermon the next three Sundays in every parish.

We have been asked about legacies in last wills. Encourage these Seminary Testaments. However, we have no way of recording them as current gifts to the Seminary Fund.

Some people are asking "Why the Seminary Fund when five million dollars was paid to Niagara University"? The only answer is that this money belongs to the Vincentian Fathers. Actually, the Diocese of Buffalo did not receive any part of it. The Seminary Fund, in reality, is needed because the Diocese of Buffalo has full

*Address Communications to 525 Washington St., Buffalo 3, N.Y. • Phone MO. 4494*

- 2 -

responsibility for the erection of the Seminary.  Whether you wish to talk about it is a matter of your own discretion.  My own opinion is – suppress it.

Try to attend the Seminary Dedication Services.  Encourage your workers also to be present.  We need the prayers behind The Seminary Fund.  This is a new Cause.  It gives an opportunity to interpret and explain it.  Well motivated and informed workers, will help the Parish Drive, and it provides occasion for publicity all over the Diocese.

## THE SEMINARY FUND RELIGIOUS SERVICES

| DISTRICT | DATE | TIME | PLACE |
|---|---|---|---|
| 1 | Wed., Nov. 18 | 7:30 P.M. | Catholic Theatre<br>426 Niagara St., Buffalo |
| 2 | Sun., Nov. 22 | 3:00 P.M. | St. Mary of Sorrows Church<br>Genesee & Rich Sts., Buffalo |
| 3 | Sun., Nov. 22 | 3:00 P.M. | St. Stanislaus Church<br>Peckham & Wilson Sts., Buffalo |
| 4 | Sun., Nov. 8 | 2:30 P.M. | St. Teresa Church<br>Seneca & Hayden Sts., Buffalo |
| 5 | Sun., Nov. 15 | 3:00 P.M. | St. Francis of Assisi<br>Broad St., Tonawanda |
| 6 | Sun., Nov. 22 | 7:30 P.M. | Our Lady of Victory Basilica |
| 7 | Sun., Nov. 15 | 4:00 P.M. | SS. Peter & Paul<br>E. Main St., Hamburg |
| 8 | Sun., Nov. 15 | 7:30 P.M. | St. Joseph Church<br>Pine & 14th St., Niagara Falls |
| 9 | Tues., Nov. 24 | 7:30 P.M. | St. Mary's Church, Medina |
| 10 | Wed., Nov. 18 | 7:30 P.M. | St. Anthony's Church<br>120 Liberty St., Batavia |
| 11 | Thurs., Nov. 12 | 8:00 P.M. | Religious Service in each individual<br>Parish in Wyoming County |
| 12 | Sun., Nov. 15 | 7:30 P.M. | Immaculate Conception<br>Wellsville |
| 13 | Sun., Nov. 15 | 3:00 P.M. | St. Mary of the Angels<br>Olean |
| 14 | Sun., Nov. 15 | 3:00 P.M. | St. Mary's Church<br>328 Washington Ave., Dunkirk |

TELECAST – SATURDAY, NOVEMBER 14 – WKBW-TV  – CHANNEL 7  – 6:00 P.M.

"The Canisius Forum"      Moderator    –  Mr. Edward M. O'Connor, LL.D.
Participants–  The Very Rev. Callistus Smith, OFM
Mr. George M. Frauenheim, K.S.G.
Monsignor Loftus

The Seminary Fund Prayer Card for Sanctuary use will arrive this week.  The suggestion is that it be recited after Mass and at Devotions.

The Seminary Fund can do great things for God.  Let us do it!

Sincerely yours,

Rt. Rev. Msgr. Eugene A. Loftus, P.A.

Consolidated Appendix 0058

A.M.D.G.

### THE SEMINARY FUND

### THE SPECIAL SUBSCRIPTIONS COMMITTEE

### GIVE DURING NOVEMBER

"That we may serve Him in holiness and justice all our days" - St. Luke I

WHEN YOU GIVE TO THE SEMINARY FUND -

You give to build a new major Seminary
You give to the Priesthood
You memorialize you and yours in the Seminary for a century
You gain merit in Heaven for an eternity

```
**********************
*  SIDE ALTAR       *
*    $5,000         *
*  Founder's Gift   *
*  (Negotiated)     *
**********************
```

There will be several Masses in the Seminary every day celebrated by the Priest Faculty, the newly ordained Priests, Bishops, Prelates and Visitors. The Seminary will need, at least, 20 Side Altar Chapels. For $5,000, one of these can be yours, with your name on it. You may even suggest your favorite Saint.

```
**********************
*  SEMINARIAN'S     *
*     ROOM          *
*    $1,000         *
* 5 years to pay    *
**********************
```

For $1,000, a Seminarian's Room will bear your name. Every year, every day, every occupant will remember you, as the Benefactor in his prayers.

```
**********************
*   PATRON          *
*                   *
*    $500           *
* 5 years to pay    *
**********************
```

Your name inscribed in the Main Altar for remembrance daily in all Masses.

```
**********************
*BISHOP'S SEMINARY  *
*   CERTIFICATE     *
*     $100          *
* 4 years to pay    *
**********************
```

To keep always as a testimony that you were a Sponsor of the new Seminary

"Ministers of Christ", faithful "Stewards of the mysteries of God", effective "keepers of God" - "equipped for every good work" - Pope Pius XII, 1951

Consolidated Appendix 0059

THE SEMINARY FUND

Nov. 29 - Dec. 6, 1959

PATRON - ST. JOSEPH

SEMINARY FUND HEADQUARTERS
525 Washington St., Buffalo 3, N. Y.

November 17, 1959

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

TO PASTORS, PRIEST LEADERS AND CHAIRMEN:

THE SEMINARY FUND IS JUST A PREPARATION WEEK AWAY.  IT IS REACHING THE
SUMMIT.  CHRIST NEVER FAILS THE CHURCH.  HE IS ONE WITH HIS PRIEST.  THE MYSTICAL
BODY OF CHRIST IS THE EMBODIMENT.  ALL OF US ARE A PART.  WE HONOR JESUS CHRIST -
"THE SUPREME AND ETERNAL PRIEST".  THIS IS THE WEEK OF "SENDING" - "AS THE FATHER
HATH SENT ME, SO I ALSO SEND YOU". (JOHN XX, 22)  "DO THIS FOR A COMMEMORATION
OF ME". (LUKE XXXI, 19)

1. Make sure your workers are ready to go.  The Priest is always ready to go.

2. Reach every giver.  There is not a Catholic who has not had the service
   of a Priest.

3. Pray - Work - Encourage - Take pride in The Seminary Fund.  We can never
   get closer to God's work.

4. Bring the spirit of Christ into every home.

5. Keep in touch with the office - Report - Visit the office often.

We have noted at the office that there has been much activity in the Special
Subscriptions phase of the Fund.  We have observed people at first looked upon The
Seminary Fund just as another Catholic Charities Appeal.  They decided they were
going to give the same thing.  But as the understanding of The Seminary Fund advanced
and deepened, usually when they were approached by a dedicated solicitor, then they
began to measure the Cause with a more realistic yardstick.  They gave much more than
they do to the annual Appeal.  And the fact that they had FIVE YEARS to pay, put the
generous gift within their grasp.  And they took great pleasure and pride in making
the gift.  In your interpretation, by all means, do not fail to mention the "extended"
or "negotiated" period of payment.

Then we noted, too, subscribers of stature were approached.  They asked for
more time to think.  Evidently they wanted to sound out what others in their bracket
were going to give.  This was a new and worthy Cause.  There was no experience to
follow.  It could be they hoped the level would be depressed.  But where the solicita-
tion was FIRM, they gave and gave gladly.

Apropos of this, we must tell you about the development in the Large Gifts.
The Seminary Fund offered the privilege of subscription to 25 Altars in the Chapel.
These carried a gift of $5,000.  The 25 Altars were taken and accepted as they were
reported to the office.  We had them all by the middle of last week.  This proves
that people want to give generously to The Seminary Fund.  This is far ahead of the
response we get in the annual Appeal.  But we are very careful in this Appeal not to
jeopardize the integrity of the Diocese.  THERE ARE NO MORE ALTARS.  However, we know
that there are still more $5,000 gifts.  We do not wish to deprive the generous peo-
ple of a Memorial.  After a conference with Our Most Reverend Bishop, a $5,000 giver
will be memorialized with a Station of the Cross, a window in the Chapel, or one of
the outdoor shrines.  Please, do not allow the complete coverage of the Altars to
discourage a $5,000 gift.

As you know, the hope is that we will be able to reach, at least 200 One
Thousand Dollar givers from all over the diocesan area.  They, too, have five years
to pay.  A little thought indicates that there are far more than 200 who can afford
to give $1,000.  These donors will be memorialized as a giver of a Seminarian's Room.
We have noted again that when properly presented, the giver finds this offer very

-2-

attractive. We know you will help us all you can to reach these people. But please report them as soon as you possibly can to the office, so that we can avoid disappointment to your Parish. THE FIRST 200 WILL GET THE PRIORITY.

DO YOU KNOW A PERSON WHO WOULD GIVE $25,000 FOR THE CHAPEL ORGAN?
DO YOU KNOW A PARTY WHO WOULD GIVE $25,000 FOR A SET OF CHIMES?
DO YOU KNOW SOMEONE WHO WOULD LIKE TO DONATE THE MONSTRANCE - $10,000?

These are big figures. But actually they do present big opportunities to people in our generation for lasting memorials with great merit. And this is a big Cause. Our cites must be big.

And, of course, there are several $500 givers, and there are large numbers of $100 givers. All of these belong to Special Subscriptions. Good organization will contact them all. How many of these will be reported? Let us take a figure of 10,000. We might call this the "glamour" side of the campaign.

But the realistic side of the campaign is the other 190,000. Here is the great expanse for giving. The aim is to interest them in taking out a $25 Seminary Bond. For the next two weeks we should call these Bonds to their attention. This sale is the basic success of The Seminary Fund. The Priest in the pulpit, the well instructed worker, the zeal for the Cause - the potential is unlimited. Suppose we could negotiate 100,000 Seminary Bonds. It is possible. We would have the whole quota right here. Most of our people, it would seem, should be inclined to buy a Bond as an individual, or group together, and buy one or more for the family contribution. The field is wide open. Concentrate on these Bonds. Try to have one, at least, in every family in the parish, in the Diocese. This is the all out effort! They can pay over two years. It actually amounts to only ONE DOLLAR per month over two years. Here and there you will meet with the exigencies of unemployment. Tell them to make a pledge. But for every employed person, there should be a Bond.

THE SEMINARY FUND INSPIRATION LUNCHEON
THE HOTEL STATLER HILTON BALL ROOM
SATURDAY - NOVEMBER 28 - 12:30 P.M.

COVER $1.50                                                        CALL MO 4494
RESERVED TABLES OF 8- $12.00                                       MISS LYONS

May we expect a Priest from every Parish, the Parish Chairman, the Special Subscriptions Chairman, friends of the Cause. Our Most Reverend Bishop invites you. Termination at two o'clock. The first reports will be made. Mr. George M. Frauenheim, Chairman - The Honorable Paul E. Fitzpatrick reporting.

Our Most Reverend Bishop desires The Seminary Fund to start in all parishes on Sunday, November 29, with a Solemn High Mass, where possible. Recite the Sanctuary Appeal Prayer after Masses and Devotions.

We are eager to help you. Do not hesitate to call the Director's Office - MO 4494.

TELECAST - SUNDAY, NOVEMBER 22 - WGR-TV - 9:15 - 9:30 A.M. -
                          "THIS MORNING'S GOSPEL"
                          Rt. Rev. Msgr. Paschal J. Tronolone, P.A.
        "        "        "    WGR-TV - 12:00 - 12:30 P.M.
                          "THEIR OUTLOOK ON THE SEMINARY FUND"
                          Niagara Seminarians - Msgr. Loftus, Moderator

**Consolidated Appendix 0061**

-3-

FOR THE PARISH MEETING
_____

1. IMPORTANT! All givers through Special Subscriptions Division and all
   Bond holders will receive a Memorial. In order to individualize them
   correctly, it is necessary to have their proper designation. Therefore,
   please have the worker ask the giver how he wishes to have his
   Certificate or Bond listed.

   | | | |
   |---|---|---|
   | a) | Full Name? | |
   | b) | In Memory of? | Full Title |
   | c) | The Family? | Full Title |
   | d) | A Relative? | Full Name |
   | e) | A Friend? | Full Name |

   Then - Write this on back of Subscription Card - correctly spelled
   and designated. Kindly write legibly! This is a big job.

2. THE NEW RECEIPT PAD - Make sure every worker understands it. It is
   designed so that each worker will be given a "Receipt Pad" with ten
   receipts. When the subscriber is about to affix signature to Subscrip-
   tion card, the worker solicitor will slide the carbonized receipt affixed
   to the pad under the subscription card so that the receipt actually
   contains the signature of the subscriber, the amount, and the worker's
   signature. The receipt pad is specifically designed so that it is easily
   processed. The change eliminates smudging. On the reverse side of the
   receipt, there is a message of gratitude from Bishop Burke.

3. REPORTS -

   a) Workers Envelopes for individual subscriptions.
   b) Captains Envelopes will accompany Workers Recorded subscriptions
                                                                  (Buff)
   c) Parish Chairman's Report will carry total of subscriptions.
      (Amounts under $100)

   The Chairman of Special Subscriptions will make his returns separately -
   not to be included with Parish Returns. The reason is, so that "Specials"
   can be posted immediately, and a record kept as to who is a Founder, a
   Benefactor, a Patron, a Sponsor, a Spiritual Bond Giver, a Builder.

   N.B. PARISH CHAIRMEN - Please fill out Form "NUMBER OF BONDS" in Parish.

   Billing dates will be in May and November, quarterly, semi-annually and
   annually.
   If there is a change of address, make the change on the contributor's
   original card. If there is a new contributor, use a new BLANK card.

4. NEW LISTING ON HEADQUARTERS BOARD -

   | COLUMN I | COLUMN II | COLUMN III | COLUMN IV |
   |---|---|---|---|
   | Parish | Total Special Subsc. | Number of Bonds | Parish Total |

5. Special Subscriptions Returns should be made early to office. You may also
   bring them to Saturday Statler Luncheon - November 28. We are taking
   Memorials in consecutive order. Early reports obviate disappointment.

6. OFFICE HOURS - SEMINARY WEEK - NOVEMBER 29 - DECEMBER 6

   | | | |
   |---|---|---|
   | Sundays | - | 2 to 10:30 P.M. |
   | Weekdays | - | 8:30 A.M. - 9:00 P.M. |

THE FINAL WEEK OF INTERPRETATION AND ORGANIZATION FOR THE NEW SEMINARY OF ST. JOHN VIANNEY, WHICH WILL SERVE FOR YEARS!

<u>NEXT WEEK - "SEMINARY WEEK"</u>

A well planned, zealous, dedicated Organization
can make it - A Glorious Week for Christ, "The Priest".

| | |
|---|---|
| TITLE: | "THE SEMINARY FUND" |
| PATRON: | St. Joseph, Patron, the Diocese of Buffalo |
| DATE: | The First Week of Advent -<br>November 29 to December 6, 1959 |
| SPONSORSHIP: | His Excellency, The Most Reverend Joseph A. Burke, D.D., Bishop of Buffalo |
| HONORARY CHAIRMAN: | His Excellency, The Most Reverend Leo R. Smith, D.D., Titular Bishop of Marida, Auxiliary Bishop of Buffalo |
| DIRECTOR: | The Right Reverend Monsignor Eugene A. Loftus, P.A. |
| ASSISTANT DIRECTOR: | The Reverend James F. Chambers, S.T.L. |
| CHAIRMAN, RADIO & TELEVISION: | Rt. Rev. Msgr. John J. McMahon, LL.D. |
| GENERAL CHAIRMAN: | Mr. George M. Frauenheim, K.S.G., K.M. |
| CHAIRMAN OF INTERPRETATION: | Mr. Walter J. Thompson |
| CHAIRMAN, SPECIAL GIFTS: | Mr. Paul E. Fitzpatrick, K.M. |
| VICE-CHAIRMEN: | Mr. Edward V. O'Neil<br>Mr. Henry J. Osinski<br>Joseph J. Ricotta, M.D. |
| DIOCESAN SEMINARY FUND OFFICE: | The Catholic Charities Building<br>525 Washington St., Buffalo 3, N. Y.<br>MOhawk 4494 |

The Seminary Fund is designed to meet the need of the Diocese of Buffalo to erect a new Seminary for the education and training of students preparing for the Holy Priesthood destined to minister unto the faithful of the Diocese of Buffalo. The Seminary will be known as the Seminary of St. John Vianney, the famous "Cure d'Ars", patron of the Secular Priesthood. It will be constructed soon within the area of the Diocese of Buffalo, located in East Aurora.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

1. The Spiritual Seminary Bond - $25 in every home - TWO YEARS TO PAY - The anchor of the Fund. Stress the Bond - Talk the Bond - Sell the Bond.

2. After a weekend conference with the Bishop, we can announce acceptance of $5,000 gift Memorials, as desired and designated by the Donor. Side Altar Chapels will be fitted into the plans. 5 YEARS TO PAY.

3. Be careful not to miss the people who will not buy a Bond. They are Builders, too. Ask them to give at least Ten Dollars. But do not miss them. Numerous gifts are a big help.

4. "The Seminarian's Room" - $1,000 - the attractive Memorial - 5 YEARS TO PAY. There are many who should respond if they are asked. You will find prospects in almost every parish.

5. Attend the Inspiration Luncheon next Saturday in the Hotel Statler Hilton Ball Room - 12:30. Termination at two o'clock. You may make your Special Subscription Returns. Fill a table - Call MOhawk 4494 for Reservations. Cover $1.50 - Table of Eight - $12.00. Ask for Miss Lyons.

6. TELECASTS: Saturday - WKBW - Channel 7 - 9:00 A.M. - Catholic Action Newsreel
           "     WBEN - Channel 4 - 4:00 P.M. - Bishop Burke
                                           Mr. Frauenheim
       Sunday  - WGR  - Channel 2 - 9:15 A.M. - Monsignor Loftus

    RADIO:      Saturday - WBEN - 6:45 P.M. - Bishop Burke

7. OFFICE HOURS:   Thanksgiving Day    -     CLOSED
                  Friday & Saturday  -     8:30 A.M. - 5:00 P.M.
                  Sundays            -     2:00 - 10:30 P.M.
                  Weekdays           -     8:30 A.M. - 9:00 P.M.
                  Saturday (Dec. 5)  -     8:30 A.M. - 5:00 P.M.

8. HEADQUARTERS RECEIPT: ONE RECEIPT WILL BE ISSUED FOR PARISH AND SPECIAL SUBSCRIPTIONS. Keep each Division Parish Total Separate. DO NOT COMBINE TOTALS. Receipt form illustrated.

| Date    1959 | THE SEMINARY FUND CASHIER'S RECEIPT | | | | |
|---|---|---|---|---|---|
| RECEIVED FROM | Number of Bonds | Division | Subscribed | Cash | Pledged |
| Code | | | | | |
| Parish | | Parish | | | |
| Town | | | | | |
| Through | | Special Subscrip. | | | |
| By | | | | | |
| (This is a temporary receipt subject to bank audit) | | TOTALS → | | | |

DO NOT FORGET: Not only cards, but Workers' Envelopes, too, should be sent to Headquarters. This will enable correction of mistakes.

9. <u>IMPORTANT! PARISH CHAIRMEN</u>: Please list number of Seminary Bonds in your parish. Fill in at bottom of Chairman's Report where there is a specific space for it. Also - Subscription card to be returned to Headquarters with contributions; receipt to be retained by contributor.
If there is a change of address, make the change on the contributor's original card. If there is a new contributor, use a new blank card.

10. PARKING: Hanna Parking - 505 Washington St. for Sundays and Weekdays. Niagara Mohawk - Behind Electric Bldg. - Sundays only.

11. TELEPHONE REPORTS: Call MOhawk 4494.

12. Religious Service at Headquarters - Sundays at 9:00 P.M.
                  <u>Visit the Office - Call the Director at any time.</u>

N.B. Instruct Workers - Write legibly on reverse side of Subscription Card proper "Individualization" of Bonds and other Memorials.

God is the Giver of every good and perfect gift. He is the Giver. When we give to God - it is really an offering. This is what makes The Seminary Fund an Offering to God. It is His Cause. What is collected all goes to Him for His Priesthood.

            "DO THIS IN COMMEMORATION OF HIM!"

November 23, 1959



# The Chancery
# Diocese of Buffalo

35 Lincoln Parkway
Buffalo 22, New York

November 24, 1959

Reverend and dear Father:

  In order to stress the spiritual nature of the Seminary Fund, may I ask you where possible to have a solemn High Mass on the First Sunday of Advent, as the official opening of the Parish Appeal.

  I am deeply enclouraged by the reports and let us all pray that the response will be heartwarming.

  Wishing you every blessing of God, I am,

    Sincerely yours in Christ,

    Joseph A. Burke

    Bishop of Buffalo

P.S. The Prothonotaries Apostolic may pontificate if they wish.

Suggested Sermon Outline for Sunday, November 29, 1959

1.  Today the faithful of the Diocese of Buffalo will be asked for the
    first time in the history of the Diocese to erect a major seminary.
    It is a great opportunity for this generation of Catholics to be
    privileged by their sacrifice to perpetuate the glory of the
    priesthood in the Diocese of Buffalo.

2.  Today the volunteer workers will call at your home to afford you the
    privilege of giving to this great cause.

3.  Request strongly that each and every family, or better still  all wage
    earners, purchase a spiritual Seminary Bond.   This Bond is truly a
    bond with Christ with His priesthood.

4.  This bond matures in heaven and yields treasure in the Seminarians'
    daily prayers.  As long as the Seminary stands, countless generations
    of seminarians will pray daily for those who have bound themselves to
    St. John Vianney Seminary through the purchase of this spiritual Bond.

5.  The terms of payment of the Seminary Bond are most reasonable.   Take
    two years to pay.  What this means is that you may take two years to
    pay.  In other words, this is an offering of about one dollar per month
    to help build this Seminary for the Diocese of Buffalo.   Each bond
    will be registered with the Bishop and will be sent to your home as a
    life time possession  as soon as it can be processed.   It will stand
    as a testimony of your generosity to The Seminary Fund.   It is your
    individual gift.

6.  Other gifts are available to The Seminary Fund.   For your guidance in
    giving where you feel you can make a special subscription, we remind
    you of the following:

    | | |
    |---|---|
    | $5,000 | Side Altar Chapel |
    | $3,000 | Stations of the Cross |
    | $1,000 | Seminarian's Room |
    | $ 500 | Name placed in Main Altar for daily memento |
    | $ 100 | Bishop's Certificate |

7.  Let us call this week SEMINARY WEEK.  When the worker calls today,
    receive him as a messenger of the Lord in this call of Christ to
    perpetuate the priesthood.

8.  Pray for the success of The Seminary Fund.
    Offer your Mass and Holy Communion today for this intention.
    Let us make this the most inspired cause the Diocese has ever undertaken
    for God and for the salvation of souls.

# SEMINARY FUND



## DIOCESE OF BUFFALO

*Most Rev. Joseph A. Burke, D.D.*

NOV. 29-DEC. 6, 1959

$2,500,000

November 30, 1959

Reverend and dear Father:

Our Divine Lord, under the patronage of the illustrious intercessor, St. Joseph, with St. John Vianney, certainly blessed The Seminary Fund yesterday.

The one great impression that is mine is the magnitude of our bond of Faith, which has united the Priests with the laity, and both with Our Most Reverend Bishop. Great and glorious was the response as calculated in returns, but this unity is a holy asset for each of us. It is enduring for the Church we revere.

The Seminary Fund is new, unique and inspiring. But our Priests, Priest Leaders, Chairmen, Special Subscriptions groups and the workers, drew it together into a devoted and efficient mechanism. This is not the only factor which calls for the deepest of gratitude, but it is a source, too, for becoming pride.

The vital aspect is to build the Seminary. In practice, this is the week to do it. We are organized, and the giver has shown a spontaneity in his response. There is undoubtedly a wave of willingness. To sustain it could easily provide the funds to build the Seminary virtually unencumbered by debt. This is an advantage. It has resulted from the rich intrinsic appeal of the cause. It is also a result of a momentum coming from the interpretation that has been made so fittingly from our pulpits. We should not lose this advantage, although we are not trying to take advantage. But as consolidated workers we can see the value of sustaining the progress of the Fund. There is no reason to feel that the Seminary shall become an adjunct to a future Appeal.

Our Most Reverend Bishop still backs the Memorials and Special Gifts, such as Altars, Seminarians' Rooms, Stations of the Cross. There are still many who would wish to give and should be solicited. As far as the Bonds are concerned, we still consider them the keystone of the Fund. I wish I could give you a statistical estimate on the Bond phase as revealed in yesterday's returns, but I cannot. It is too early to probe analysis. From conversation and observation with the Chairmen yesterday, the average should run from 35 to 40%. This could mean a total of approximately 60,000, or $1,250,000, at the end of the Fund solicitation. May I urge you to study your own parishes, and strive for full potential coverage and promotion of the Bond. May I also request that you keep in close touch with Headquarters this week. We will answer your questions and help you all we can.

In behalf of all the Priests of the Diocese, who are engaged with me in this heavenly Cause, may I thank you exceedingly for the thrilling results of yesterday. All through Seminary Week, we will continue to "go to Joseph" as we march for Christ.

Yours sincerely,

*Eugene A. Loftus*

Rt. Rev. Msgr. Eugene A. Loftus, P.A.
Fund Director

*Address Communications to 525 Washington St., Buffalo 3, N.Y. • Phone MO. 4494*

**EXHIBIT B**

(December 13, 1968 Meeting Minutes)

MINUTES OF A SPECIAL MEETING OF THE TRUSTEES
OF ST. JOHN VIANNEY SEMINARY, held at the Seminary,
East Aurora, New York, on December 13, 1968 at
8:00 P.M.

PRESENT: Most Reverend James A. McNulty, President
Most Rev. Pius A. Benincasa, Vice President
Rt. Rev. Msgr. Bernard J. McLaughlin
Very Rev. Msgr. John J. Dempsey
Very Rev. John L. Rowan
Kevin Kennedy, Secretary

ABSENT:  None

The Bishop opened the meeting with prayer.  The Secretary

read the minutes which were approved.  Father Rowan stated

that the first order of business was to elect additional

trustees as provided for by the newly amended by-laws.

The following persons were duly nominated and elected

Trustees for a term of two years:

Rt. Rev. Msgr. Sylvester J. Holbel
Rt. Rev. Msgr. Bernard D. McCarthy
Vy. Rev. Msgr. John J. Neylon
Dr. James F. Norton
Fred H. Reuter
Oscar Roaldi
Kevin Kennedy

The Bishop announced that Vy. Rev. Msgr. William J.

Grant had been appointed a deputy for administration of the

Seminary to fill the vacancy created when Msgr. McCarthy

became a trustee.  The new trustees then took their places

at the meeting and Msgr. Grant and members of the faculty came

in to the meeting.  The Bishop welcomed the new members to

their new positions.  Father Rowan said he was particularly

pleased to welcome Msgr. Grant because he had had so much to

do with the planning and construction of the Seminary.

Father Belzer, Dean of Studies and Registrar, reported that the enrollment at the Seminary was reduced slightly from 178 to 172 with three dropouts this year and sixteen last year. Twenty-nine of the students attended summer school at twelve colleges and universities paying their own way. Subjects taken were mostly of an enrichment classification. The teaching staff now numbers twenty-four. He suggested tenure for instructors and consideration be given to the 4-4-4 program. He said six or seven were studying for a masters degree in theology. Father Belzer also reported for Father King, librarian, who was unable to attend. The library has some thirty thousand books and operates on a budget of twenty-two thousand dollars for new books.

Father Wurtz, Treasurer, reported the operational deficit of the sum of forty-five thousand dollars in 1967 and ninety thousand dollars in 1968. The increase was due to a new roof on the library and other unusual repairs. The total cost of construction of the Seminary was $6,129,330. A total of $450,000 was pledged in the fund drive and $3,559,219 was collected. Of this, $601,280 has been cancelled and $339,500 is outstanding. Msgr. McCarthy pointed out that money received from estates and special donations amounts to $370,201. The debt due the Diocese is $2,200,000.

Father Caligiuri, Dean of Men, reported the spirit of Vatican II was being observed. A board of student affairs

had been formed and it was being consulted by the faculty and was being given a part in decision making.

Father Trautman, Director of Apostolate, said that an extensive program of adult education in parish schools and the two State University institutions had been established. The seminarians are getting invaluable experience.

A general discussion ensued.

Bishop McNulty expressed complete satisfaction with the reports and complemented the deans and officers of the Seminary on their work.

The employment contract was discussed, revised and approved.

There being no further business, the meeting was closed with prayer.

_____
Secretary

**EXHIBIT C**

(May 29, 1970 Resolution)

Consolidated Appendix 0072

Minutes of a Meeting of the Board of Trustees of St. John Vianney
Seminary, held at the Seminary, East Aurora, New York, on May 29,
1970, at 7:00 p.m.

PRESENT: Most Rev. James A. McNulty, Most Rev. Pius A. Benincasa, Most
        Rev. Bernard J. McLaughlin, Rev. Msgr. John J. Dempsey, Vy. Rev.
        John L. Rowan, Rev. Msgr. Sylvester J. Holbel, Rev. Msgr.
        Bernard D. McCarthy, Rev. Msgr. John J. Neylon, Dr. James F.
        Norton, Oscar Roaldi and Kevin Kennedy.

ABSENT:  Fred Reuter

        The Bishop opened the meeting with prayer.

        Father Ford reported that the faculty had discussed and then
proposed a revision of the opening sentence of the Faculty Handbook,
page 5, chapter 11, no. 1, as mandated by the Board of Trustees in its
previous meeting.  This proposed revision had been sent to each of the
Trustees before this meeting.

        A general discussion then took place regarding the meaning of
the word policy and the role of the student body, faculty and trustees.

        The proposed revision of the Faculty Handbook was approved with
changes made relating to policies by substituting the word "may" in
place of "will usually" and excising the word "major".

        Father Ford suggested that a committee be appointed for
seminary training, priestly formation, admissions policy, studies
policy and the rule of the seminary.  It was suggested that there
be representatives on the committee of the faculty and students.

        It was decided that reports would be made to the student
body regarding decision made affecting the student body.  These
reports would specify the action taken and not the discussions that
took place.

        The following resolution was duly made, seconded and carried
unanimously:

        RESOLVED that in the event the real property located on
Knox Road in the Town of Aurora, owned by this corporation is no
longer used as a seminary for the education of young men to the priest-
hood, title to this property shall be reconveyed to the previous
owner, The Diocese of Buffalo, N. Y., in consideration of the subvention
made by The Diocese to the Seminary, and be it

        FURTHER RESOLVED, that the President of this corporation
be authorized to execute a contract to carry out the intention expressed
in the previous resolution.

        Action was put off until a later meeting on the question
of discontinuing the policy of notifying Selective Service when a
student leaves the Seminary.

Consolidated Appendix 0073

Father Ford reported that a committee of three faculty members, including himself, and three students were appointed to study the various phases of seminary interrelationships with the view towards better implementing the various directives and recommendations following Vatican II regarding seminarians.

The Rector was asked if he would submit to the Trustees the revised Faculty Handbook and the revised Student Handbook before the September meeting. The Rector assured the Trustees he would do so.

There being no further business, the meeting was closed with a prayer.

_____
Secretary

**EXHIBIT D**

(Reuter Deeds)

(Laws of 1917, Chap. 681, Statutory Form C, Chap. 627 Laws of 1932)

Consolidated Appendix 0075

LIBER 6506 PAGE 285

# This Indenture,

Made the    Tenth        day of  December    Nineteen Hundred and

Fifty-nine.

**Between**    FRED H. REUTER, residing in Knox Road, East Aurora,

New York,

part y   of the first part, and

THE DIOCESE OF BUFFALO, N.Y., a domestic corporation with its principal

office located at 35 Lincoln Parkway, Buffalo, New York,

part y    of the second part,

**Witnesseth,** that the part     of the first part, in consideration of

------------------One and no more----------------------------Dollars

($1.00 and more) lawful money of the United States,

paid by the part y    of the second part,

do es    hereby grant and release unto the part y    of the second part,  its

successors    and assigns forever, all  THAT TRACT OR PARCEL OF LAND,
situate in the Town of Aurora, County of Erie and State of New York,
being part of Lot No. 48, Township 9, Range 6 of the Holland Land
Company's Survey, bounded and described as follows:

BEGINNING at a point in the center line of Knox Road, distant
2232 feet southerly from its intersection with the center line of
Willardshire Road; thence westerly at an exterior angle of 87° 36'
2097.17 feet to a point; thence northeasterly at an interior angle of
73° 00' 30", 345.47 feet to a point; thence westerly at an exterior
angle of 71° 37' 30", 597.40 feet to a point in the easterly line of
Lot No. 56, distant 12.63 feet southerly from the northeast corner of
lands in said Lot No. 56 conveyed to Fred H. Reuter by deed recorded
in Erie County Clerk's Office in Liber 3514 of Deeds at page 75 on
March 25, 1944 (designated as Parcel A therein); thence northerly along
said east line of Lot No. 56 forming an interior angle of 86° 50' with
last above line, 316.92 feet to the northwest corner of lands in Lot
No. 48 conveyed to Fred H. Reuter by deed aforesaid (designated as
Parcel B therein); thence north 88° 30' east along the north line of
lands so conveyed to Fred H. Reuter, 1200 feet to a point in the west
line of the middle third of Lot No. 48; thence south 25' east, 257
feet; thence north 88° 05' east along the north line of lands so
conveyed to said Fred H. Reuter, 1405 feet to a point in the center
line of Knox Road being the northeast corner of lands conveyed to
Fred H. Reuter by aforesaid deed; thence southerly along the said
center line of Knox Road, 360 feet to the place of beginning.

Being the same premises designated as Parcel A consisting of 25.23 Plus
or Minus, acres on the attached survey by Senior Bissell & Bronkie dated

Consolidated Appendix 0076

**Together** with the appurtenances and all the estate and rights of the party   of the first part in and to said premises,

**To have and to hold** the premises herein granted unto the part y of the second part, **its successors**    and assigns forever.

**And**

the party    of the first part covenant s that    he    ha s   not done or suffered anything whereby the said premises have been incumbered in any way whatever.

**And**    That the grantor    will receive the consideration for this conveyance and will hold the right to receive such consideration as a trust fund to be applied first for the purpose of paying the cost of the improvement and will apply the same first to the payment of the cost of the improvement before using any part of the total of the same for any other purpose.

**In Witness Whereof,** the part y    of the first part ha s hereunto set    **his**    hand    and seal    the day and year first above written.

**In Presence of**

LIBER 6506 PAGE 288

## State of New York

County of Erie } ss..

City    of Buffalo

On this    tenth    day of December, Nineteen Hundred and Fifty-nine,    before me, the subscriber, personally appeared

FRED H. REUTER,

to me personally known and known to me to be the same person described in and who executed the within Instrument, and he acknowledged to me that    he    executed the same

Cecelia F. Boutet

CECELIA F. BOUTET
Notary Public State of New York
Qualified in Erie County
My Commission expires    March 30, 1960

FILED

1959 DEC 16 AM 11 07

ERIE COUNTY
CLERKS OFFICE

RECEIVED

DEC 17 1959

Equalization Board

Quarus 48 6/6

Box 316

**Deed**
Covenant Against Grantor with Lien Covenant

FRED H. REUTER

TO    24

DIOCESE OF BUFFALO, N.Y.

Dated, December 10, 19 59

STATE OF NEW YORK
County of Erie } ss..

RECORDED ON THE

day of Dec 10 1959

at 11 o'clock A.M.

in LIBER 6506 of DEEDS

PAGE 288    and examined

Edward A Rath    CLERK

1 8 6.00 1 1

Consolidated Appendix 0078

(Laws of 1917, Chap. 681, Statutory Form C, Chap. 627 Laws of 1932)

LIBER 6514 PAGE 555

# This Indenture,

*Made the* Second *day of* January *Nineteen Hundred and* Sixty,

**Between** FRED H. REUTER, residing in Knox Road, East Aurora, New York,

*part* y *of the first part, and*

THE DIOCESE OF BUFFALO, N.Y., a domestic corporation with its principal office located at 35 Lincoln Parkway, Buffalo, New York,

*part* y *of the second part,*

**Witnesseth**, *that the party of the first part, in consideration of*

------------------ One and no more -------------------------- *Dollar*

($1.00 and no more *lawful money of the United States,*

*paid by the party of the second part,*

*does hereby grant and release unto the party of the second part,* **its** successors *and assigns forever, all* THAT TRACT OR PARCEL OF LAND, situate in the Town of Aurora, County of Erie and State of New York, being part of Lots Nos. 47, 48, 55 and 56, Township 9, Range 6 of the Holland Land Company's Survey, bounded and described as follows:

BEGINNING at a point in the easterly line of said Lot No. 56, distant 2191.5 feet southerly from the center line of Willardshire Road as measured along said east line of Lot No. 56, being the northeast corner of lands in said Lot No. 56 conveyed to Fred H. Reuter by deed recorded in Erie County Clerk's Office in Liber 3514 of Deeds at page 75 on March 25, 1944 (designated as Parcel A therein); thence southerly along said east line of Lot No. 56, 12.63 feet to a point; thence easterly at an interior angle of 93º 10', 597.40 feet to a point; thence southwesterly at an interior angle of 71º 37' 30", 535.42 feet to a point; thence southerly at an exterior angle of 170º 04', 638.55 feet to a point; thence westerly at an interior angle of 96º 14', 273.15 feet to a point; thence southerly at right angles about 825 feet to the Cazenovia Creek (formerly called the Buffalo Creek); thence westerly along the Cazenovia Creek, about 135 feet to the east line of Lot No. 55; thence southerly along said east line of Lot No. 55 to the center line of said Cazenovia Creek; thence northwesterly and northerly along said center line of Cazenovia Creek about 1965 feet to the northwesterly corner of lands in Lot No. 56 conveyed to Fred H. Reuter by aforesaid deed; thence northeasterly, northerly and easterly along the northerly and westerly lines of lands so conveyed to Fred H. Reuter by aforesaid deed the following 6 courses and distances: (1) North 66º 16' east, 188.60 feet; (2) North 9º 46' east, 268 feet; (3) North 13º 47' west, 105 feet; (4) North 36º 11' east, 106.8 feet; (5) South 73º 37' east, 273 feet and (6) South 87º 42' east, 439 feet to the point or place of beginning

Consolidated Appendix 0079

LIBER 6514 PAGE 537

**Together** with the appurtenances and all the estate and rights of the part    of the first part in and to said premises,

**To have and to hold** the premises herein granted unto the part y of the second part, its successors    and assigns forever.

**And**

the part y    of the first part covenants that    he    has    not done or suffered anything whereby the said premises have been incumbered in any way whatever.

**And**    That the grantor    will receive the consideration for this conveyance and will hold the right to receive such consideration as a trust fund to be applied first for the purpose of paying the cost of the improvement and will apply the same first to the payment of the cost of the improvement before using any part of the total of the same for any other purpose.

**In Witness Whereof,** the part    of the first part ha hereunto set    hand    and seal    the day and year first above written.

In Presence of

_____    L S

_____    L S

_____    L S

_____    L S

Being the same premises designated as Parcel D consisting of 50.62 Plus or Minus acres on the attached survey by Senior Bissell & Bronkie dated October 26, 1959.

Consolidated Appendix 0081

# State of New York

**County of** Erie } **ss..**

City **of** Buffalo

On this _second_ day of January _Nineteen Hundred and_

Sixty, _before me, the subscriber, personally appeared_

FRED H. REUTER,

_to me personally known and known to me to be the same person described in and who executed the within Instrument, and he acknowledged to me that he executed the same_

Cecelia F. Boutet

CECELIA F. BOUTET
Notary Public State of New York
Qualified in Erie County
My Commission expires March 30, 1960

RECEIVED
JAN 13 1960
Equalization Board

FILED
1960 JAN 12 PM 12 29
ERIE COUNTY
CLERKS OFFICE

Box 316

**Deed**

Covenant Against Grantor with Lien Covenant

FRED H. REUTER
83
**TO**
THE DIOCESE OF BUFFALO, N.Y.

Dated January 2nd, 19 60

STATE OF NEW YORK
County of Erie } ss.

RECORDED ON THE
day of Jan. A.D. 1960
at 8:29 o'clock P.M.
LIBER 6574 of DEEDS
PAGE 531 and examined

CLERK

Consolidated Appendix 0082

(Laws of 1917, Chap. 681, Statutory Form Q, Chap. 627 Laws of 1982)

LIBER 6557 PAGE 557

# This Indenture,

*Made the* Thirteenth *day of* June ~~February~~ *Nineteen Hundred and*

Sixty

**Between,** FRED H. REUTER, residing in Knox Road, East Aurora, New York

*party of the first part, and*

THE DIOCESE OF BUFFALO, N. Y., a domestic corporation with its principal office located at 35 Lincoln Parkway, Buffalo, New York

*part y of the second part,*

**Witnesseth,** *that the part* y *of the first part, in consideration of*

---------------One and more----------------------------- *Dollar* s

($1.00 and more ) *lawful money of the United States,*

*paid by the party of the second part,*

*do hereby grant and release unto the party of the second part,*

*and assigns forever, all* THAT TRACT OR PARCEL OF LAND, situate in the Town of Aurora, County of Erie and State of New York, being part of Lot No. 48, Township 9, Range 6 of the Holland Land Company's Survey, bounded and described as follows:

BEGINNING AT a point in the center line of Knox Road distant 2232 feet southerly from its intersection with the center line of Willardshire Road; thence westerly at an interior angle of 87° 36', 2097.17 feet to a point; thence southwesterly at an interior angle of 106° 59' 30", 189.95 feet to a point; thence southerly at an interior angle of 170° 04', 638.55 feet to a point; thence easterly at an interior angle of 83° 46', 206.85 feet to a point; thence easterly at an interior angle of 178° 52', 166.90 feet to a point; thence easterly at an interior angle of 181° 05', 425 feet to a point; thence southeasterly at an interior angle of 210° 14', 45 feet to a point; thence southeasterly at an interior angle of 196° 09', 100 feet to a point; thence southeasterly at an interior angle of 176° 47', 50 feet to a point; thence southeasterly at an interior angle of 158° 33', 53 feet to a point; thence northeasterly at an interior angle of 150° 16', 527 feet to a point; thence northeasterly at an interior angle of 165° 57', 35 feet to a point; thence northeasterly at an interior angle of 158° 13', 80 feet to a point; thence northeasterly at an exterior angle of 162° 15', 218 feet to a point; thence easterly at an interior angle of 203° 42', 400 feet to a point in the center line of Knox Road distant 406.35 feet northerly from the south line of said Lot No. 48 as measured along said center line of said Knox Road; thence northerly along said center line of Knox Road 734.67 feet to the place of beginning.
Being the same premises designated as Parcel B consisting of 42.01 ± acres on the attached survey by Senior, Bissel and Bronkie, dated 1958

Consolidated Appendix 0083

**Together** *with the appurtenances and all the estate and rights of the part    of the first part in and to said premises,*

**To have and to hold** *the premises herein granted unto the part of the second part,                    and assigns forever.*

**And**

*the part        of the first part covenant that he   ha     not done or suffered anything whereby the said premises have been incumbered in any way whatever.*

**And**   *That the grantor    will receive the consideration for this conveyance and will hold the right to receive such consideration as a trust fund to be applied first for the purpose of paying the cost of the improvement and will apply the same first to the payment of the cost of the improvement before using any part of the total of the same for any other purpose.*

**In Witness Whereof,** *the part        of the first part ha hereunto set          hand   and seal   the day and year first above written.*

**In Presence of**



Consolidated Appendix 0084

LIBER 6657 PAGE 360

**State of New York**

**County of** ERIE } ss..

CITY **of** BUFFALO

*On this* Thirteenth *day of* ~~February~~ June *Nineteen Hundred and* Sixty

*before me, the subscriber, personally appeared*

FRED H. REUTER,

*to me personally known and known to me to be the same person described in and who executed the within Instrument, and he acknowledged to me that he executed the same*

Cecelia F. Boutet

CECELIA F. BOUTET
Notary Public State of New York
Qualified in Erie County
My Commission expires March 30/1962

FILED

1960 JUN 21 PM 3 42

ERIE COUNTY
CLERK'S OFFICE

RECEIVED

JUN 23 1960

Equalization Board

Box #136 0

**Deed**

Covenant Against Grantor with Lien Covenant

FRED H. REUTER

TO $105

THE DIOCESE OF BUFFALO, N.Y.

19 60

Dated, June 13,

STATE OF NEW YORK
County of Erie ss..

RECORDED ON THE
day of June A.D. 1960
at 3:4 o'clock P.M.
LIBER 6657 of DEEDS
PAGE 360 and examined

CLERK

# EXHIBIT E

(1968 Deeds)

Consolidated Appendix 0086

# This Indenture,

*Made the* 19th *day of*

February *Nineteen Hundred and* Sixty-eight,

**Between** THE DIOCESE OF BUFFALO, N. Y., a domestic corporation with principal offices at 35 Lincoln Parkway, Buffalo, New York,

*a corporation organized under the laws of* the State of New York,

*party of the first part, and*

ST. JOHN VIANNEY SEMINARY, a domestic corporation, with principal offices at Knox Road, East Aurora, New York, *party of the second part,*

**Witnesseth** *that the party of the first part, in consideration of* one and no more

- - - - - - - - - - - - - - - - - - - - - - - - *Dollar* s ($1.00&no more)

*lawful money of the United States,* to it *paid by the party* y *of the second part, does hereby grant and release unto the party* y *of the second part,* its successors *and assigns forever, all*

THAT TRACT OR PARCEL OF LAND, situate in the Town of Aurora, County of Erie and State of New York, being part of Lots Nos. 47, 48, 55 and 56, Township 9, Range 6 of the Holland Land Company's Survey, bounded and described as follows:

BEGINNING At a point in the easterly line of said Lot No. 56, distant 2191.5 feet southerly from the center line of Willardshire Road as measured along said east line of Lot No. 56, being the northeast corner of lands in said Lot No. 56 conveyed to Fred H. Reuter by deed recorded in Erie County Clerk's Office in Liber 3514 of Deeds at page 75 on March 25, 1944 (designated as Parcel A therein); thence southerly along said east line of Lot No. 56, 12.63 feet to a point; thence easterly at an interior angle of 93° 10', 597.40 feet to a point; thence southwesterly at an interior angle of 71° 37' 30", 535.42 feet to a point; thence southerly at an exterior angle of 170° 04', 638.55 feet to a point, thence westerly at an interior angle of 96° 14', 273.15 feet to a point, thence southerly at right angles about 825 feet to the Cazenovia Creek (formerly called the Buffalo Creek); thence westerly along the Cazenovia Creek, about 135 feet to the east line of Lot No. 55; thence southerly along said east line of Lot No. 55 to the center line of said Cazenovia Creek; thence northwesterly and northerly along said center line of Cazenovia Creek about 1965 feet to the northwesterly corner of lands in Lot No. 56 conveyed to Fred H. Reuter by aforesaid deed; thence northeasterly, northerly and easterly along the northerly and westerly lines of lands so conveyed to Fred H. Reuter by aforesaid deed the following 6 courses and distances: (1) North 66° 16' east, 188.60 feet; (2) North 9° 46' east, 268 feet; (3) North 15° 47' west, 105 feet; (4) North 36° 11' east, 106.8 feet; (5) South 73° 37' east, 273 feet and (6) South 87° 42' east, 439 feet to the point or place of beginning.

Being the same premises designated as Parcel D consisting of 50.62 Plus or Minus acres on the attached survey by Senior Bissell & Bronkie dated October 26, 1959.

LIBER 7445 PAGE 128

... pur... ...the F... ...of t... ...
of the first part in and to said premises.

**To have and to hold** *the premises herein granted unto the part y* *of the second part,* its successors *and assigns forever.*

And *the party of the first part covenants as follows:*
**First,** *That the part y of the second part shall quietly enjoy the said premises;*
**Second,** *That the party of the first part will forever* **Warrant** *the title to said premises.*

**Third,** *That, in Compliance with Sec. 13 of the Lien Law, the grantor will receive the consideration for this conveyance and will hold the right to receive such consideration as a trust fund to be applied first for the purpose of paying the cost of the improvement and will apply the same first to the payment of the cost of the improvement before using any part of the total of the same for any other purpose.*

**In Presence of**

**In Witness Whereof,** *the party of the first part has caused its corporate seal to be hereunto affixed, and these presents to be signed by its duly authorized officer this 19ᵗᵖ day of February Nineteen Hundred and Sixty-eight.*

THE DIOCESE OF BUFFALO, N. Y.

By _James C. McNulty_
President

**State of New York** }
**County of** Erie } ss. *On this 19ᵗᵖ day of February Nineteen Hundred and Sixty-eight before me personally came* JAMES A. McNULTY,

*to me personally known, who, being by me duly sworn, did depose and say that* he resides in 77 Oakland Place, Buffalo, New York *that he is the* President *of* THE DIOCESE OF BUFFALO, N. Y. *the corporation described in, and which executed, the within Instrument; that he knows the seal of said corporation; that the seal affixed to said Instrument is such corporate seal; that it was so affixed by order of the Board of Directors of said corporation; and that he signed* his *name thereto by like order.*

KE...
Notar...
Qualifi...
My Com... ...arch 30, 19 68

FILED
Feb 23 12 07 PM 1968
ERIE COUNTY
CLERK'S OFFICE

CORPORATION WARRANTY WITH LIEN COVENANT

THE DIOCESE OF BUFFALO, N. Y.

TO

JOHN VIANNEY SEMINARY

Dated, February 19, 1968.

... OF NEW YORK
...UNTY CLERK'S OFFICE
Page 127
Rec...d in Liber 7445
... day of Feb
... at 12.07 o'clock P M
...ined.
Clerk

U. S. Int.
Revenue Stamps
Affixed

# This Indenture,

*Made the* 19th *day of*

*Parcel A*

February, *Nineteen Hundred and* Sixty-eight,

**Between** THE DIOCESE OF BUFFALO, N. Y., a domestic corporation, with principal offices at 35 Lincoln Parkway, Buffalo, New York,

*a corporation organized under the laws of* the State of New York,

*party of the first part, and*

ST. JOHN VIANNEY SEMINARY, a domestic corporation, with principal offices on Knox Road, East Aurora, New York,

*party of the second part,*

**Witnesseth** *that the party of the first part, in consideration of* one and no more - - - - - - - - - - - - - - - - - - - - -*Dollar* ($1.00&no more) *lawful money of the United States,* to it *paid by the party of the second part, does hereby grant and release unto the party of the second part,* its successors *and assigns forever, all*

THAT TRACT OR PARCEL OF LAND, situate in the Town of Aurora, County of Erie and State of New York, being part of Lot No. 48, Township 9, Range 6 of the Holland Land Company's Survey, bounded and described as follows:

BEGINNING at a point in the center line of Knox Road, distant 2232 feet southerly from its intersection with the center line of Willardshire Road; thence westerly at an exterior angle of 87° 36' 2097.17 feet to a point; thence northeasterly at an interior angle of 73° 00' 30", 345.47 feet to a point, thence westerly at an exterior angle of 71° 37' 30", 597.40 feet to a point in the easterly line of Lot No. 56, distant 12.63 feet southerly from the northeast corner of lands in said Lot No. 56 conveyed to Fred H. Reuter by deed recorded in Erie County Clerk's Office in Liber 3514 of Deeds at page 75 on March 25, 1944 (designated as Parcel A therein); thence northerly along said east line of Lot No. 56 forming an interior angle of 86° 30' with last above line, 316.92 feet to the northwest corner of lands in Lot No. 48 conveyed to Fred H. Reuter by deed aforesaid (designated as Parcel B therein); thence north 88° 30' east along the north line of lands so conveyed to Fred H. Reuter, 1200 feet to a point in the west line of the middle third of Lot No. 48; thence south 25' east, 257 feet; thence north 88° 05' east along the north line of lands so conveyed to said Fred H. Reuter, 1405 feet to a point in the center line of Knox Road being the northeast corner of lands conveyed to Fred H. Reuter by aforesaid deed; thence southerly along the said center line of Knox Road, 360 feet to the place of beginning.

Being the same premises designated as Parcel A consisting of 25.23 Plus or Minus, acres on the attached survey by Senior Bissell & Bronkie dated October 26, 1959.

LIBER 7445 PAGE 130

*of the first part in and to said premises,*

**To have and to hold** *the premises herein granted unto the part* y *of the second part,* its successors and *and* xxxxd *assigns forever.*

**And** *the party of the first part covenants as follows:*
**First,** *That the part* y *of the second part shall quietly enjoy the said premises;*
**Second,** *That* the party of the first part will forever **Warrant** *the title to said premises.*

**Third,** *That, in Compliance with Sec. 13 of the Lien Law, the grantor* will *receive the consideration for this conveyance and will hold the right to receive such consideration as a trust fund to be applied first for the purpose of paying the cost of the improvement and will apply the same first to the payment of the cost of the improvement before using any part of the total of the same for any other purpose.*

**In Presence of**

**In Witness Whereof,** *the party of the first part has caused its corporate seal to be hereunto affixed, and these presents to be signed by its duly authorized officer this* 19# *day of February Nineteen Hundred and Sixty-eight.*

THE DIOCESE OF BUFFALO, N. Y.

*By* James M<sup>c</sup>Nulty
President

**State of New York** } ss. *On this* 19# *day of February*
**County of** Erie *Nineteen Hundred and* Sixty-eight
*before me personally came* JAMES A. McNULTY,

*to me personally known, who, being by me duly sworn, did depose and say that he resides in* 77 Oakland Place, Buffalo, New York *that he is the* President *of* THE DIOCESE OF BUFFALO, N. Y., *the corporation described in, and which executed, the within Instrument; that he knows the seal of said corporation; that the seal affixed to said Instrument is such corporate seal; that it was so affixed by order of the Board of Directors of said corporation; and that he signed his name thereto by like order.*

FILED
Feb 23 12 07 PM '68
ERIE COUNTY
CLERK'S OFFICE



FEB 26 1968

KEV
Notar
Qualifie
My Commi...

THE DIOCESE OF BUFFALO, N. Y.
CORPORATION WARRANTY WITH LIEN COVENANT

TO

JOHN VIANNEY SEMINARY

Dated. February 19 68

STATE OF NEW YORK
ERIE COUNTY CLERK'S OFFICE
Recorded in Liber 7445 Page 129
the 23 day of Feb
A.D. 1968, at 12:07 o'clock P.M
And examined.
Clerk

KEVIN KENNEDY
Attorney at Law
76 Niagara Street
Buffalo, New York 14202

Parcel B

U. S. Int.
Revenue Stamps
Affixed

# This Indenture,

*Made the* 19th *day of*

February *Nineteen Hundred and* Sixty-eight,
**Between** THE DIOCESE OF BUFFALO, N. Y., a domestic corporation, with principal offices at 35 Lincoln Parkway, Buffalo, New York,

*a corporation organized under the laws of* the State of New York,

ST. JOHN VIANNEY SEMINARY, a domestic corporation, with principal offices on Knox Road, East Aurora, New York, *party of the first part, and*

*party of the second part,*
**Witnesseth** *that the party of the first part, in consideration of* one and no more
- - - - - - - - - - - - - - - - - - - *Dollar* (£1.00&no more)
*lawful money of the United States,* to it
*paid by the party of the second part, does hereby grant and release unto the party of the second part,* its successors *and assigns forever, all*
THAT TRACT OR PARCEL OF LAND, situate in the Town of Aurora, County of Erie and State of New York, being part of Lot No. 48, Township 9, Range 6 of the Holland Land Company's Survey, bounded and described as follows:

BEGINNING at a point in the center line of Knox Road distant 2232 feet southerly from its intersection with the center line of Willardshire Road; thence westerly at an interior angle of 87° 36', 2097.17 feet to a point; thence southwesterly at an interior angle of 106° 59' 30", 189.95 feet to a point; thence southerly at an interior angle of 170° 04', 638.55 feet to a point; thence easterly at an interior angle of 83° 46', 206.85 feet to a point; thence easterly at an interior angle of 178° 52', 166.90 feet to a point; thence easterly at an interior angle of 181° 05', 425 feet to a point; thence southeasterly at an interior angle of 210° 14', 45 feet to a point; thence southeasterly at an interior angle of 196° 09', 100 feet to a point; thence southeasterly at an interior angle of 176° 47', 50 feet to a point; thence southeasterly at an interior angle of 158° 33', 53 feet to a point; thence northeasterly at an interior angle of 150° 16', 527 feet to a point; thence northeasterly at an interior angle of 165° 57', 35 feet to a point; thence northeasterly at an interior angle of 158° 13', 80 feet to a point; thence northeasterly at an exterior angle of 162° 15', 218 feet to a point; thence easterly at an interior angle of 203° 42', 400 feet to a point in the center line of Knox Road distant 406.35 feet northerly from the south line of said Lot No. 48 as measured along said center line of said Knox Road; thence northerly along said center line of Knox Road 734.67 feet to the place of beginning.

Being the same premises designated as Parcel B consisting of 42.01± acres on the attached survey by Senior, Bissel and Bronkie, dated October 26, 1959.

LIBER 7445 PAGE 132

...pur...the...of t...
of the first part in and to said premises,

To have and to hold *the premises herein granted unto the part y of the second part,* its successors *and assigns forever.*

And *the party of the first part covenants as follows:*
**First,** *That the party of the second part shall quietly enjoy the said premises;*
**Second,** *That* the party of the first part will forever **Warrant** *the title to said premises.*

**Third,** *That, in Compliance with Sec. 13 of the Lien Law, the grantor will receive the consideration for this conveyance and will hold the right to receive such consideration as a trust fund to be applied first for the purpose of paying the cost of the improvement and will apply the same first to the payment of the cost of the improvement before using any part of the total of the same for any other purpose.*

**In Presence of**



**In Witness Whereof,** *the party of the first part has caused its corporate seal to be hereunto affixed, and these presents to be signed by its duly authorized officer this* 19th *day of* February *Nineteen Hundred and* Sixty-eight.

THE DIOCESE OF BUFFALO, N. Y.

By James C. McNulty
President

**State of New York** } ss. *On this* 19th *day of* February
**County of** Erie *Nineteen Hundred and* Sixty-eight
*before me personally came* JAMES A. McNULTY

*to me personally known, who, being by me duly sworn, did depose and say that he resides in* 77 Oakland Place, Buffalo, New York, *that he is the* President *of* THE DIOCESE OF BUFFALO, N. Y. *the corporation described in, and which executed, the within Instrument; that he knows the seal of said corporation; that the seal affixed to said Instrument is such corporate seal; that it was so affixed by order of the Board of Directors of said corporation; and that he signed his name thereto by like order.*

KEVIN KENNEDY
Notary Public, State of New York
Qualified in Erie County
My Commission... March 30, 19...

FILED
Feb 23 12 07 PM '68
ERIE COUNTY
CLERK'S OFFICE

CORPORATION WARRANTY WITH LIEN COVENANT

THE DIOCESE OF BUFFALO, N. Y.
79
TO
JOHN VIANNEY SEMINARY

February 17, 1968

STATE OF NEW YORK
ERIE COUNTY CLERK'S OFFICE
Recorded in Liber 7445 Page 131
Deeds
of 19 68, at 12:0 o'clock P. M
...examined.

Clerk

KEVIN KENNEDY
Attorney at Law
76 Niagara Street
Buffalo, New York 14202

# EXHIBIT F

(1987 Deed)

Corporation Warranty Deed—with lien covenant                899½

# This Indenture,

Made the    11th    day of    February,    in the year One Thousand

Nine Hundred and    Eighty-seven,

**Between**    ST. JOHN VIANNEY SEMINARY

a corporation organized under the Laws of the State of New York, and having its place of business in

the    Knox Road    the    Town of Aurora    ,County

of    Erie    ,and State of New York, party of the first part, and

THE DIOCESE OF BUFFALO N.Y., a domestic corporation with
offices at 795 Main Street, Buffalo, New York,    party    of the second part,

**Witnesseth,**    That the said party of the first part, in consideration of the sum of    One
and no more - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

($1.00 & no/more), lawful money of the United States, paid by the said party    of the second

part, doth hereby grant and release unto the said party    of the second part,

and assigns forever, all    THAT TRACT OF PARCEL OF LAND, situate in the Town
of Aurora, County of Erie and State of New York, being part of Lot
No. 48, Township 9, Range 6 of the Holland Land Company's Survey,
bounded and described as follows:

BEGINNING at a point in the center line of Knox
Road distant 2232 feet southerly from its intersection with the
center line of Willardshire Road; thence westerly at an interior
angle of 87° 36 ', 2097.17 feet to a point; thence southwesterly at
an interior angle of 106° 59' 30", 189.95 feet to a point; thence
southerly at an interior angle of 170° 04', 638.55 feet to a point;
thence easterly at an interior angle of 83° 46', 206.85 feet to a
point; thence easterly at an interior angle of 178° 52', 166.90 feet
to a point; thence easterly at an interior angle of 181° 05' 425
feet to a point; thence southeasterly at an interior angle of
210° 14', 45 feet to a point; thence southeasterly at an interior
angle of 196° 09', 100 feet to a point; thence southeasterly at an
interior angle of 176° 47', 50 feet to a point; thence southeasterly
at an interior angle of 158° 33', 53 feet to a point; thence north-
easterly at an interior angle of 150° 15', 527 feet to a point;
thence northeasterly at an interior angle of 165° 57', 35 feet to a
point; thence northeasterly at an interior angle of 158° 13', 80
feet to a point; thence northeasterly at an exterior angle of 162°
15' 218 feet to a point; thence easterly at an interior angle of
203° 42', 400 feet to a point in the center line of Knox Road
distant 406.35 feet northerly from the south line of said Lot No.
48 as measured along said center line of said Knox Road; thence
northerly along said center line of Knox Road 734.67 feet to the
place of beginning.

SUBJECT to a 99-year lease of the above premises to Christ the King
Seminary made as of September 1, 1974.

The property conveyed herein does not consist of all or
substantially all of the assets of the party of the first part.

LIBER 9686 PAGE 415

**TOGETHER** with the appurtenances; and all the estate and rights of the said party of the first part in and to said premises.

**TO HAVE AND TO HOLD** the above granted premises unto the said part y        of the second part,   its  successor and assigns forever.

**AND**   the said party of the first part doth covenant with the said part y        of the second part as follows:

**THAT**   the part y      of the second part shall quietly enjoy the said premises.

**THAT**   the grantor       ,in compliance with Section 13 of the Lien Law, will receive the consideration for this conveyance and will hold the right to receive such consideration as a trust fund to be applied first for the purpose of paying the cost of the improvement, and that the grantor will apply the same first to the payment of the cost of the improvement before using any part of the total of the same for any other purpose.

**THAT**   the said party of the first part will forever warrant the title to said premises.

**THAT THIS CONVEYANCE** is not of all or substantially all of the property of the party of the first part and is made in the regular course of business actually conducted by the party of the first part.

IN PRESENCE OF

**In Witness Whereof**, The party of the first part has caused its corporate seal to be hereunto affixed, and these presents to be signed by its duly authorized officer this   11th      day of     February, Nineteen Hundred and   Eighty-seven

ST. JOHN VIANNEY SEMINARY

RECEIVED
$. . . **EXEMPT** . .
REAL ESTATE
MAR  5 1987
TRANSFER TAX
19595 ERIE
COUNTY L4

By   + Edward D Head
President

**STATE OF NEW YORK**
**COUNTY OF** ERIE  } ss.  On this  11 M  day of  Feb .
Nineteen Hundred and Eighty-seven,

before me personally came    Edward D. Head

to me personally known, who, being by me duly sworn, did depose and say that      he resides in 77 Oakland Place, Buffalo, N.Y.                              that      he is the    President    of    ST. JOHN VIANNEY SEMINARY, the corporation described in, and which executed, the within Instrument; that    he knows the seal of said corporation; that the seal affixed to said Instrument is such corporate seal; that it was so affixed by order of the Board of Directors of said corporation; and that    he signed    his   name thereto by like order.

Notary Public
JOSEPH A. STOECKL
Notary Public, State of New York
Qualified in Erie County
My Commission Expires  March 30, 19 ___  P.7

# EXHIBIT G

(Upon this Rock Campaign Materials)

## The Diocese of Buffalo
has served WNY for 150+ years



**Spans 6,500 square miles and includes 8 counties:**
Allegany, Cattaraugus, Chautauqua, Erie, Genesee, Niagara, Orleans, and Wyoming



**Includes 400 priests,**
819 women religious, and 134 deacons

**29,100 youth**
are currently enrolled in
Religious Education programs



**49 Catholic schools**
provide faith-based education
to more than 15,000 students



### Outreach for 500,000+
people of all faiths and backgrounds in need each year

---





## UPON ✝ THIS ROCK

# GIVE
### and it will be
# GIVEN
to you.
Luke 6:38

The Foundation of the Roman Catholic Diocese of Buffalo

THE FOUNDATION OF THE ROMAN CATHOLIC DIOCESE OF BUFFALO
795 Main Street • Buffalo, NY 14203
(716) 847-8740 • FRCDB.org

UPON ✝ THIS ROCK
UponThisRockWNY.org

---

## OUR DIOCESE

Today, our diocese spans almost 6,500 square miles and encompasses eight counties: Allegany, Cattaraugus, Chautauqua, Erie, Genesee, Niagara, Orleans, and Wyoming. The Diocese of Buffalo numbers approximately 530,000 Catholic individuals served by 164 parishes. Our 49 Catholic schools provide a faith-based education to more than 15,000 students, and 29,100 youth are currently enrolled in Religious Education programs. We are blessed with nearly 400 priests, 266 of whom are active at this time, 819 women religious, 134 deacons, and a wealth of lay leaders and committed volunteers who serve God's people every day. The social, pastoral, and ministerial works of our Diocese provide spiritual support and outreach services to no more than 500,000 people in need, of all faiths and backgrounds, each year.

## CAMPAIGN FINANCIAL GOALS

| | |
|---|---|
| $40 million | Parish Life and Ministries |
| $16 million | Pastoral Care |
| $8 million | Christ the King Seminary |
| $7 million | Healthcare for Retired Diocesan Priests |
| $2 million | St. Joseph Cathedral |
| $10 million | Charitable Works |
| $17 million | Catholic Education |



# INVITATION TO PARTICIPATE

Upon This Rock is a historic initiative for the Diocese of Buffalo. This endeavor will transform the way we support our missions and ministerial works in perpetuity, and move us into the 21st century as a flourishing Church that is proud to evangelize and equipped to serve our community.

Over the next five years, funds raised from this effort will provide a foundation for transforming the way we tend to the pastoral, educational, and social service needs of God's people in Western New York. With the partnership of our clergy and lay leaders, each of our 164 parishes will participate in our campaign, and every Catholic household will be asked to consider participation.

We recognize and welcome this time of opportunity, and invite you to join us in this effort, as we work to preserve and build upon the foundation of our Church. The scope of our impact will be guided by the willingness of our community to come together, unified by His love, and act as true stewards of our faith.

"

**As a Catholic community, we are asked to come together to establish a robust culture of evangelization and stewardship, and a vibrant future throughout Western New York.**

## C St. Joseph Cathedral

St. Joseph Cathedral remains the "Mother Church" of the Diocese of Buffalo and the symbolic center of our Catholic community in Western New York. Upon This Rock will direct $2 million to creating an endowment fund, which will sustain the vitality of this icon of our faith in perpetuity.

# HOW WE SERVE

## Charitable Works Endowment

Upon This Rock will allocate $10 million to support the work of Catholic Charities. These funds will be placed in an endowment and will provide additional revenue to sustain and expand the essential programs of this organization, and allow Catholic Charities to address unmet needs and underserved populations.

## Catholic Education

### A Tuition Assistance for Catholic Education

Upon This Rock will increase the Tuition Assistance Endowment by $12 million, and allow us to provide assistance to 40% more students each year. This financial support will expand the assistance we are able to provide elementary school students, establish programs to support students at the high school level, and enable more families to choose Catholic Education.

### B STREAM Program Enhancements

The Diocese of Buffalo has experienced tremendous success with the initial implementation of the STREAM Program, and will continue to partner with participating schools to fund this initiative. Upon This Rock will allocate $2 million to fund leadership and professional development, as well as essential technology upgrades.

### C Campus Ministry

Upon This Rock will establish a $2 million endowment to provide funding and resources for our campus ministry programs, enabling them to continue providing essential services and support to the next generation of Catholics in Western New York.

## Pastoral Care

### A Evangelization and Catechesis Endowment

In order to effectively promote the message of the Gospel in our modern world, the Diocese of Buffalo has established the Office of Evangelization. Upon This Rock will fund a $13 million permanent and secure evangelization-focused endowment that will provide annual funding so we may transform the way in which we spread God's infinite love and foster Catholic values in our society, now and in the future.

### B Communications and Outreach

The $1 million in funds allocated to communications and outreach will upgrade and expand all of our media resources and communication tools, so that we may deliver the Good News and mission of our Church in modern formats to all people, effectively providing outreach to people of all languages and cultures.

### C Mother Teresa Home

As Catholics, we are committed to a culture which cherishes and celebrates all life. In order to build upon what the Diocese currently offers in support of the respect of all life, Upon This Rock will direct $2 million to fund the establishment and continued services of the Mother Teresa Home for pregnant women.

# THOSE WHO SERVE

## A Christ the King Seminary

Campaign funds in the amount of $3 million will be directed to making essential upgrades to classroom facilities and technology, and expanding the seminary's role as a destination for retreat and religious celebration. The remaining $5 million will be used to establish an endowment, ensuring the viability of this spiritual center of education and formation for generations to come.

## B Healthcare for Retired Diocesan Priests

The increase in the number of retired priests and increase in healthcare costs will create an inevitable shortfall and, thus, a need for additional funding. In order to be prudent and ensure adequate preparation for the future, Upon This Rock will allocate $7 million to meet the needs of our diocesan priests in their retirement.

# OUR VISION

The Diocese of Buffalo has identified Upon This Rock as a means to strengthen the essential pillars of our Church and ensure our ability to continue effectively carrying out the Lord's mission of service.

1 Those We Serve

2 Those Who Serve

3 How We Serve

# THOSE WE SERVE

## Parish Life and Ministries

Local parishes are the heart of our daily lives as Catholics; where we first come to understand what it means to know and serve Christ, receive the sacraments, celebrate our rites, and enjoy fellowship.

Consolidated Appendix 0098



> As a Catholic community, we are asked to come together to establish a robust culture of evangelization and stewardship, and a vibrant future throughout Western New York.





While the Catholic colleges and universities in Western New York fund and operate their own vibrant campus ministry programs, the Diocese provides financial support to the campus ministry programs offered at area non-Catholic colleges. These programs are essential in the development of our young adults for future roles in Catholic service, leadership, and evangelization. By fostering the Catholic faith and values of discipleship in these communities of young people, the Diocese of Buffalo ensures that the next generation of faithful will be able to continue building upon the strong foundation of our Church. Upon This Rock will establish a $2 million endowment to provide funding and resources for our campus ministry programs, enabling them to continue providing essential services and support to the next generation of Catholics in Western New York.

## INVITATION TO PARTICIPATE

Upon This Rock is a historic initiative for the Diocese of Buffalo. This endeavor will transform the way we support our missions and ministerial works in perpetuity, and move into the 21st century as a flourishing Church that is proud to evangelize and equipped to serve our community. Upon This Rock will fund extraordinary projects and programs, which will require philanthropic support beyond regular offertory, the Catholic Charities Appeal, and special collections. As we provide for God's people today, we must also prepare for and invest in our future. While this initiative is not an obligation, it is an essential opportunity to leave a legacy.

Over the next five years, funds raised from this effort will provide a foundation for transforming the way we tend to the pastoral, educational, and social service needs of God's people in Western New York. With the partnership of our clergy and lay leaders, each of our 164 parishes will participate in our campaign, and every Catholic household will be asked to consider their own participation.



We find ourselves at a transitional point in our history. We have enjoyed the gifts and sacrifices of our predecessors, and are now entrusted with passing on a stronger and more vibrant faith community to those that will come after us. We recognize and welcome this time of opportunity, and invite you to join us in this effort, as we work to preserve and build upon the foundation of our Church.

The scope of our impact will be guided by the willingness of our community to come together, unified by His love, and act as true stewards of our faith.




## OUR DIOCESE

On April 23, 1847, Pope Pius IX established the Diocese of Buffalo and appointed the Very Rev. John Timon as our first bishop. At the time, the diocese covered an expansive 16 counties and had just a handful of priests to serve a rapidly growing population.

Western New York became home to many Catholic immigrants from Germany, Ireland, Italy, Poland, and many other parts of the world, who settled here in pursuit of a better life. They joined a workforce that labored to support the commerce along the Great Lakes, farmed the land to feed a growing nation, and started businesses in service of those who came to live and work in the region. Catholicism flourished within a system of parishes that included newly established elementary schools and the construction of magnificent churches in which to worship.

Bishop John Neumann and Father Nelson Baker were icons of the early Catholic Church in Western New York. Immediately after his ordination in 1836, Neumann gave himself to the pastoral care of the residents of the Niagara Falls region. He cared for the sick and impoverished, and worked particularly closely with the recent German immigrants of the area. He founded Saints Peter and Paul Church in Williamsville, which remains a vibrant parish within the Diocese of Buffalo today. Bishop John Neumann was canonized by Pope Paul VI in 1977. Similarly selfless work, and lifelong service to the most vulnerable members of the community, earned Father Nelson Baker the title of "Padre of the Poor." In honor of Our Lady of Victory, Baker built a "city of charity," whose centerpiece is a magnificent basilica that continues to attract faithful from around the world. Father Baker was designated "Venerable" in 2011 by Pope Benedict XVI.

For more than 150 years, the Diocese of Buffalo has stood as a beacon of faith, love, and service for the Catholic community of Western New York.

In the spirit of Saint John Neumann, Venerable Nelson Baker, and the countless others who have come before us, our Catholic community strives to serve the spiritual, pastoral, and educational needs of the people in our region.

Today, our diocese spans almost 6,500 square miles and encompasses eight counties: Allegany, Cattaraugus, Chautauqua, Erie, Genesee, Niagara, Orleans, and Wyoming. The Diocese of Buffalo numbers approximately 600,000 Catholic individuals welcoming new immigrant populations from South American, African, and Middle Eastern countries, served by 164 parishes. Our 49 Catholic schools provide a faith-based education to more than 15,000 students, and 29,100 youth are currently enrolled in Religious Education programs. We are blessed with nearly 400 priests, 266 of whom are active at this time, 819 women religious, 134 deacons, and a wealth of lay leaders and committed volunteers who serve God's people every day. The social, pastoral, and ministerial works of our diocese provide spiritual support and outreach services to more than 500,000 people in need, of all faiths and backgrounds, each year.



## CAMPAIGN FINANCIAL GOALS

### Those We Serve

Parish Life
$35 million

Ministries
$5 million

Pastoral Care
$16 million

- Evangelization and Catechesis Endowment
$13 million

- Communications and Outreach
$1 million

- Mother Teresa Home
$2 million

### Those Who Serve

Christ the King Seminary
$8 million

Healthcare for Retired Diocesan Priests
$7 million

St. Joseph Cathedral
$2 million

### How We Serve

Catholic Charities
$10 million

Catholic Education
$17 million

- Tuition Assistance for Catholic Education
$12 million

- STREAM Program Enhancements
$3 million

- Campus Ministry
$2 million

**Total Goal: $100 million**

## OUR VISION

As we look to the future, we consider the abundance of blessings God has bestowed upon us, and strive to move forward with a deepened sense of discipleship and stewardship of these gifts. Upon This Rock provides each of us with a unique opportunity to carry out the mission of our faith and respond to God's call. We are now challenged to secure a lasting legacy for the future, by reshaping the ways we serve and shepherd the faithful for generations to come.

*"You are Peter, and upon this rock I will build my church" (Matthew, 16:18)*

As members of the Diocese of Buffalo, we are the foundation of our Church, and we are entrusted with building upon that foundation by welcoming and honoring God's call to serve. Therefore, the Church of Buffalo has identified *Upon This Rock* as a means to strengthen the essential pillars of our Church and ensure our ability to continue effectively carrying out the Lord's mission of service for years to come. After a period of extensive prayer and inquiry, which included in-depth discussions with hundreds of members of the clergy, laity, and Diocesan leadership, the Church of Buffalo has initiated *Upon This Rock* to bolster and fortify three crucial pillars of our foundation.

**1** Those We Serve

Strengthening our parishes as the center of our faith community, while providing pastoral care and outreach across our diocese through evangelization and stewardship.

**2** Those Who Serve

Investing in the formation and education of the next generation of clergy and providing essential care for our retired priests.

**3** How We Serve

Supporting the works of Catholic Charities and increasing availability of high quality, Catholic education.

While we have enjoyed many blessings, we face many challenges. During times of hardship and strife, we have turned to our faith in God and our Church to find comfort and strength to move forward. We are now called to look beyond ourselves and use our blessings and gifts in a way that ensures future generations will be able to find the same strength. *Upon This Rock* will have a profound impact on our service of God's kingdom in the Diocese of Buffalo.



| | |
|---|---|
| $40 million | Parish Life and Ministries |
| $16 million | Pastoral Care |
| $8 million | Christ the King Seminary |
| $7 million | Healthcare for Retired Diocesan Priests |
| $2 million | St. Joseph Cathedral |
| $10 million | Catholic Charities |
| $17 million | Catholic Education |

## TUITION RATES

The average diocesan elementary school tuition has risen to **$3,535** from **$2,927** in 2010

While the BISON Fund currently provides **1,449** Catholic elementary school students in our diocese with tuition assistance, an average of 500 students remain on the waiting list each year

The average diocesan high school tuition is currently **$9,432** and there are limited diocesan programs in place to provide financial aid at the high school level

Catholic Schools save WNY taxpayers more than **$270,000,000** per year

Quality education is only possible with a commitment to offer the best. Doing back to the formation of the Diocese, the mission of Catholic schools has been to offer that quality to all who are interested. However, many families are unable to choose Catholic education because of tuition rates that reflect the cost of providing a superior faith-based education. The average diocesan elementary school tuition has risen to $3,535 from $2,927 in 2010, increasing by 17% in six years. While the BISON Fund currently provides 1,449 Catholic elementary school students in our diocese with tuition assistance, on average of 500 students remain on the waiting list each year. Additionally, the average diocesan high school tuition is currently $9,432, and there are limited diocesan resources in place to provide financial aid at the high school level.

*Upon This Rock* will increase the Tuition Assistance Endowment by $12 million, and allow us to provide assistance to 40% more students each year. This financial support will expand the assistance we are able to provide elementary school students, establish new programs to support students at the high school level, and enable more families to choose Catholic Education.

### STREAM Program Enhancements

*We need to provide an education which teaches critical thinking and encourages the development of mature moral values" - Pope Francis, address to the Congregation for Catholic Education in Vatican City, February 13, 2014*

The STREAM Education Initiative is a diocesan investment to enhance the already excellent education provided by our Catholic schools, and support the future of Catholic education. This program provides modern 21st century learning experiences, and focuses on Science, Technology, Religion, Engineering, the Arts, and Math. Through hands-on experiences, it promotes a higher level of critical thinking and a deeper understanding of content.

The idea of emphasizing STEM subject areas has been driven by the business community over the past several years, in order to prepare a more agile and well-equipped workforce for our country's future. However, it has been increasingly evident that there is a need for innovation and creativity that is nurtured through the Arts as well. Embedded in our faith as Catholic schools, religion is woven throughout all subjects and completes a holistic education. STREAM is the necessary evolution of STEM education, providing a philosophical framework for delivering excellence in Catholic education for the future.

The Diocese of Buffalo has experienced tremendous success with the initial implementation of the STREAM Program, and will continue to partner with schools to fund this initiative. *Upon This Rock* will allocate $3 million to fund leadership and professional development, as well as essential technology upgrades.

### Campus Ministry

Campus ministry programs offer opportunities for college students to engage in a warm and welcoming environment of prayer and cultivation of the Catholic faith. These programs provide support during a transitional and often challenging time, and invite students to deepen their relationship with God through participation in the sacramental and liturgical life of the church, community outreach and service, leadership training, and prayerful retreats.

# CATHOLIC SCHOOLS' ACADEMIC SUCCESS:

**99%**
Catholic elementary school students graduate from high school

**98%**
Catholic high school students go on to college

Graduates of our Catholic high schools are awarded more than **$160 million** in college scholarships each year

---

other agencies are unable to offer. Its efforts include about 70 services to individuals, children, and families, such as basic assistance, including food pantries, comprehensive individual, family and marriage counseling for all ages, mental health and substance abuse treatment, assistance to those experiencing domestic violence and children experiencing abuse or neglect; high school equivalency and job readiness training, school-based services to remove social and emotional barriers to learning, services to support older adults and caregivers, and immigration and refugee resettlement services to those UN-designated individuals and families forced to flee their homeland for their lives.

The organization delivers these and many other services so well, and with such efficiency and transparency, that it is one of the most successful agencies of its type. In recent years, it has been awarded the highest rating possible from Charity Navigator, it meets the Better Business Bureau's 20 Standards for Charity Accountability and its services are recognized for their quality and by the National Council on Accreditation.



The Catholic Charities Annual Appeal delivers essential sustainability for the programs, enables services to remain affordable and available to all in need, and provides necessary match funding for grant-financed programs.

Upon This Rock will allocate $10 million to support the work of Catholic Charities. These funds will be placed in a distinct endowment and will provide additional revenue to sustain and expand the essential programs of this organization, and allow Catholic Charities to address unmet needs and underserved populations.

## Catholic Education

**A** Tuition Assistance for Catholic Education

*"Catholic education is one of the most important challenges for the church, currently committed to new evangelization in a historical and cultural context that is undergoing constant transformation". Pope Francis, address to the Congregation for Catholic Education in Vatican City, February 13, 2014*

Catholic schools are deeply rooted in the history of Western New York. Our schools form and support well-rounded individuals, who are grounded in faith and have a strong relationship with Jesus Christ. Every year, thousands of students from our Catholic schools spend countless hours volunteering for various charities, programs, and ministries. The education provided by Catholic schools enables our students to excel in leadership and ministry so that they are prepared to fulfill their responsibilities, ultimately leading others to know, love, and practice values of the Gospel in everyday life.

---

# NEEDS

Your parish will receive **35%** percent of your contribution to address its particular needs and aspirations

An additional **5%** of funds raised will be placed in a permanent Parish Support Endowment, which will provide resources and emergency funding to parishes in need

---

# THOSE WE SERVE

## Parish Life and Ministries

*"[A parish] is a community of communities, a sanctuary where the thirsty come to drink in the midst of their journey, and a center of constant missionary outreach" Pope Francis, "Evangelii Gaudium"*

Beyond the Holy Eucharist, local parishes are typically the most identifiable elements of the Catholic Church. These faith communities are the heart of our daily lives as Catholics, where we first come to understand what it means to know and serve Christ, receive the sacraments, celebrate our faith, and enjoy fellowship. As a Catholic community, we have a vested interest in ensuring that every parish is able to tend to the pastoral needs of each individual and family. Because of their importance in the communities they serve, the largest percentage of campaign funds will be dedicated to identifying and addressing local projects in each of our 164 parishes.

Every parish has a unique set of needs and aspirations. Some parishes are in need of physical repairs or enhancements, while others wish to develop a new program or ministry. Your parish will receive 35% percent of your contribution to address its particular needs and aspirations. An additional 5% of funds raised will be placed in a permanent Parish Support Endowment, which will provide resources and emergency funding to parishes in need.

Over time, all campaign funds will benefit your local parish through diocesan-wide ministries, programs, and direct grants. Upon This Rock will impact every parish across the eight counties in our diocese, both directly and indirectly.

## Pastoral Care

**B** Evangelization and Catechesis Endowment



*"All of us are called to offer others an explicit witness to the saving love of the Lord, who despite our imperfections offers us His closeness, His word and His strength, and gives meaning to our lives" - Pope Francis, "Evangelii Gaudium"*

Evangelizing Catholic today is very different than it was 150 years ago, or even 50 years ago.

Now, more than ever, we are challenged to share the Good News and offer a welcoming presence to the curious and those returning to the Catholic Church.

We must continue to joyfully share our faith with others by inviting them to know Jesus and join in the fullness of the Catholic faith. In order to effectively promote and spread the message of the Gospel in our modern world, the Diocese of Buffalo has established the Office of Evangelization. Upon This Rock will fund a permanent and secure evangelization-focused endowment that will provide annual funding so we may transform the way in which we spread God's infinite love and foster Catholic values in our society.





Technology has provided us with the ability to create a multifaceted digital presence to evangelize and educate people interested in learning more about joining or growing in the Catholic faith. For those who have never been part of or have drifted away from the Church, websites can be a place to answer questions and establish an understanding of what it means to be Roman Catholic. A stronger web presence will serve as a resource for people to learn more about their faith and further their understanding of Church teaching. It will also be a space where they can assess their gifts and interests to discover their unique skills and talents and identify the best ways that they can serve their parish, the diocese, and the larger Roman Catholic Church.

As a church in the 21st century, we need to re-envision the parish as a place for discipleship and a center of formation. This endowment will provide resources for all parishes to create new tools for evangelization, establish unique digital platforms, and renew the way they interact with, and reach out to, members of the community. These platforms will offer opportunities for life-long faith formation, as well as training for liturgical ministries, sacramental preparation, and faith-based family activities.

While technology is essential to our modern society, it is important to provide opportunities for people to give and experience real, living witness to God's love. Therefore, *Upon This Rock* will provide support for faith formation programs, mission opportunities, and the training of development of catechetical leadership within parishes.

**B**  Communications and Outreach

*"And He said to them, 'Go into all the world and preach the Gospel to all creation'"* (Mark, 16:15)

The New Evangelization is at the heart of the long-term vision for the Catholic Church in Western New York. Catholic communities around the world are exploring and discovering new ways to engage parishioners that have drifted away, and those who wish to be welcomed into the faith. As a diocese, we must be proactive and inviting by providing a welcoming and vibrant atmosphere that engages people spiritually, comforts them pastorally, and encourages them to explore what it means to be Catholic.

*Upon This Rock* funding will allow for the development and implementation of multi-media outreach to Catholics in the greater Western New York community. The $1 million in funds allocated to communications and outreach will upgrade and expand all of our media resources and communication tools, so we may deliver the Good News and mission of our Church in modern formats to all people and effectively provide outreach to people of all languages and cultures.

In addition to sharing the faith and inviting people into the life of the Church, our new communications and outreach efforts will help during times of transition, engage and develop lay leaders, and build faith-filled parish communities.

---

*As a diocese, we must be proactive and inviting by providing a welcoming and vibrant atmosphere that engages people spiritually, comforts them pastorally, and encourages them to explore what it means to be Catholic.*

*Upon This Rock funding will allow for the development and implementation of multi-media outreach to Catholics in the greater Western New York community.*

---

...er years, the parishes in Western New York have generously supported our ...est Health and Welfare Plan. However, the increase in the number of retired ...ests and increase in healthcare costs will create an inevitable shortfall ...d a need for additional funding. While members of our diocese continue to ...raciously give to the Retirement Fund for the Religious, Diocesan clergy are ...ot included in the allocation of those appeal funds. In order to be prudent ...d ensure adequate preparation for the future, *Upon This Rock* will allocate ...million to meet the needs of our priests in their retirement.

...though this initiative we, the parishioners they live to shepherd, will have the ...opportunity to demonstrate our gratitude for their faithful service.

**St. Joseph Cathedral**

St. Joseph's Parish was established by Buffalo's first bishop, John Timon, in 1847 and the cathedral was dedicated in 1855. Today, it remains the "Mother ...urch" of the Diocese of Buffalo and the symbolic center of our Catholic ...community in Western New York. It is everyone's parish. The history of the ...athedral is rich in faith and tradition.

...ecause of its downtown location, St. Joseph Cathedral has less than 400 ...gistered families, and sustaining the parish remains a financial challenge. As ...e spiritual center of our city, it is an indispensable treasure that symbolizes our ...orious history and provides hope for future generations of Catholics in Western ...New York. In addition to hosting all sacraments of Holy Orders in our diocese, ...he cathedral is home to over 25 special events each year, including the Red ...Mass, the Annual Respect Life Mass, and the Chrism Mass.

... Joseph Cathedral is a vital piece of our history as a diocese, and is on ...ssential part of the future of our Catholic community in Western New York. ...Downtown Buffalo has experienced exciting growth and revitalization in recent ...years, and St. Joseph Cathedral is the epicenter of Catholic outreach, community ...engagement, and evangelization in this flourishing community. Therefore, *Upon ...This Rock* will direct $2 million to creating an endowment fund, which will sustain ...he vitality of this icon of our faith in perpetuity.

# HOW WE SERVE

*...uly I tell you, whatever you did for the least of one of these brothers and ...sters of mine, you have done for me." (Matthew, 25:40)*

...Catholic Charities

...Every year, Catholic Charities puts the Gospel message into action by providing ...ital social services to more than 142,000 Western New Yorkers of all faiths and ...backgrounds. The programs of Catholic Charities bring hope to the hopeless, ...and provide support to those in need while empowering them to move forward ...nd succeed.

...ince 1923, Catholic Charities has engaged in life-sustaining work and ...fe-changing work. Some important "Matthew 25" work serves to support most ...ulnerable among us and those without a voice, offering assistance which

---

*Downtown Buffalo has experienced exciting growth and revitalization in recent years, and St. Joseph Cathedral is the epicenter of Catholic outreach, community engagement, and evangelization in this flourishing community.*

*Every year, Catholic Charities puts the Gospel message into action by providing vital social services to more than 142,000 Western New Yorkers of all faiths and backgrounds.*

## THERE ARE CURRENTLY:

**266** Active diocesan priests

**126** Retired priests

**42%** of the active clergy in our diocese will be 75 years of age or older by 2025

Our preparation and investment today will ensure that we will be able to continue providing our priests with support in the future

---

diaconate, representing the next generation of clergy dedicating their lives in service of our people. Additionally, 47 members of the laity are enrolled in the seminary's graduate programs. There are currently over 670 seminary alumni ministering in our diocese.

There has been unprecedented growth at the seminary in the last few years, and it is poised for even more. Upgrades in modern classroom facilities and educational technology, as well as continued recruitment of prominent faculty, will enable us to attract and educate even more seminarians and lay students. When we develop motivated and informed clergy and laity using modern technology, they are better prepared to serve the pastoral, educational, and social needs of those they are called to help.

Christ the King Seminary continues to host the diocese and parishes for events on its pastoral and picturesque 132-acre campus. Annually, over 9,000 people visit the campus for classes, retreats, workshops, and conferences. However, a plan is in place to augment the seminary's role as a spiritual center of formation and serve as a destination for spiritual festivals and celebrations throughout the year.

Campaign funds in the amount of $3 million will be directed to making essential upgrades to classroom facilities and technology, and expanding the seminary's role as a center of retreat and religious celebration. The remaining $5 million will be used to establish an endowment, ensuring the viability of this spiritual center of education and formation for generations to come.

**B** Healthcare for Retired Diocesan Priests

*"To become a priest or a religious is not primarily our choice. It is our answer to a calling, a calling of love." - Pope Francis, address to seminarians, novices and those discerning their vocation in Vatican City, July 7, 2013*

The Catholic faithful have long been noted for their loyal support of the priests, who have baptized and taught our children, preached the Gospel, officiated weddings, and celebrated the Eucharistic Sacrifice. Our priests have comforted us during our suffering, provided counsel, listened when we needed to be heard, and facilitated our personal relationships with God and the Catholic faith.



The clergy of the Diocese of Buffalo have dedicated their lives in service of the Lord and His people, and it is our duty to care for them upon their retirement from active ministry.

Many priests continue to serve our community of faith after retirement, and we are called to do what is necessary to provide them with adequate care. Currently, there are 266 active diocesan priests and 126 retired priests in the Diocese of Buffalo. By 2025, 42% of the active clergy in our diocese will be 75 years of age or older. Our preparation and investment today will ensure that we will be able to continue providing our priests with support in the future. The permanent

---

## THERE ARE CURRENTLY:

**42** Seminarians enrolled at Christ the King

**35** Candidates for the permanent diaconate, representing the next generation of clergy dedicating their lives in service of our people

**47** Members of the laity are enrolled in the seminary's graduate programs

**670 +** Seminary alumni ministering in our diocese

---

**1** Mother Teresa Home

*"Every child who, rather than being born, is condemned unjustly to being aborted, bears the face of Jesus Christ, bears the face of the Lord, who even before he was born, and then just after birth, experienced the world's rejection." - Pope Francis, address to Catholic healthcare professionals in Vatican City, September 20, 2013*

As Catholics, we are committed to a culture which cherishes and celebrates all promoting the sanctity of life from conception to natural death, and offers comprehensive support to assist those in need of services surrounding pro-life issues.

For example, Project Rachel exists to promote forgiveness, healing, and hope to anyone suffering from the effects of an abortion, and the St. Gianna Molla Pregnancy & Outreach Information Center provides pastoral outreach to single mothers, fathers, and young families in the early years of a child's life.

In order to build upon what the Diocese currently offers in support of the respect for all life, Upon This Rock will direct $2 million to fund the establishment and continued services of the Mother Teresa Home. This transitional residence will provide homeless pregnant women or young mothers with housing and support for six to 18 months, while they focus on improving their ability to provide for themselves and their family. In addition to safe and stable living accommodations, the Mother Teresa Home will provide residents with an array of vital programs enabling them to become effective and responsible parents, including classes in parenting skills, child development, family budgeting, and health and nutrition. The home will also offer opportunities through partnerships with Catholic Charter and other agencies for furthering education, and assistance in job preparation and attainment.

The decision to choose life can be a truly agonizing one if a woman lacks the resources or support necessary to care for her baby. It is our sincere hope that the Mother Teresa Home will alleviate some of the stress of this decision and enable more women and families to choose life by providing them with the comfort and support they will need in the wake of this important decision.

## THOSE WHO SERVE

*"...to equip the holy ones for the work of ministry, for building up the body of Christ" (Ephesians, 4:12)*

**A** Christ the King Seminary

While the origins of our seminary date back to 1857 and its history is storied and successful, the trajectory for what lies ahead is equally promising for the century before us. We are privileged and blessed to have a fully accredited seminary offering education for future priests and deacons, current clergy, and lay people pursuing graduate degrees in theology and pastoral ministry, as well as continuing education and certificate programs for those who seek a deeper and more comprehensive understanding of the faith we share. There are currently 42 seminarians enrolled at Christ the King, and 35 candidates for the permanent

# CONSOLIDATED APPENDIX DOCUMENT NO. 3



One Lincoln Center | Syracuse, NY 13202-1355 | bsk.com

CHARLES J. SULLIVAN, ESQ.
csullivan@bsk.com
P: 315.218.8144
F: 315.218.8444

March 27, 2025

**VIA ELECTRONIC FILING**

Honorable Carl L. Bucki
Chief United States Bankruptcy Judge
United States Bankruptcy Court, Western District of New York
Robert H. Jackson U.S. Courthouse
2 Niagara Square
Buffalo, New York 14202

Re:    *The Diocese of Buffalo, N.Y.* Chapter 11 Case No. 20-10322

Dear Judge Bucki:

Reference is hereby made to (a) the Debtor's Motion for Entry of an Order Authorizing, but not Directing, the Diocese to Access the Proceeds of the Seminary Property Sale Pursuant to Sections 105(a), 541, and 363(b) of the Bankruptcy Code [Docket No. 3743] (the "Seminary Motion") and (b) certain Claims Objections filed by the Diocese[1] (the "Claims Objections"). As the Court is aware, the hearing concerning the Seminary Motion and the Claims Objections is currently set for April 22, 2025.

As counsel for the Committee and counsel for the Diocese recently communicated to the Court, the Diocese and the Committee jointly request an adjournment of the hearing concerning the Seminary Motion and Claims Objections as described below in this letter. The adjournment is requested at this time because the mediators appointed in this case (Judge Melanie Cyganowski (Ret.) and Judge Patrick NeMoyer (Ret.)) have scheduled mediation to take place in this case on April 22 and April 23, 2025.

With respect to the Seminary Motion, the parties respectfully request that the Court adjourn the hearing concerning such motion to May 8, 2025 at 10:00 a.m. The requested adjournment will not affect the scheduling of submission of papers that was previously set by the Court.

With respect to the Claims Objections, the parties respectfully request that the hearing concerning same be adjourned to June 4, 2025 at 10:00 a.m. The extended period of adjournment is requested in order to facilitate multiple meetings of mediation which have been scheduled or are expected to be scheduled by the mediators during the remainder

---

[1] Docket Nos. 3559, 3577, 3558, 3567, 3569, 3582, 3560, 3553, 3576, 3564, 3554, 3583, 3556, 3565, 3579, 3570, 3571, 3561, 3639, 3563, 3551, 3562, 3566, 3573, 3584, 3557, 3555, 3572, 3585, 3574, 3550, 3586, 3581, 3578, 3568, 3575, 3580, and 3552, which are the Claims Objections filed in the Chapter 11 case that are presently returnable on April 22, 2025.

March 27, 2025
Page 2

of March, April and May.  The parties seek to adjourn the Claims Objections in order to allow mediation participants to focus on mediation rather than litigating the Objections.

Counsel for the Diocese will appear telephonically on April 22, 2025 at the originally scheduled hearing for the Seminary Motion and the Claims Objections, in order to confirm in open court the requested adjournment.

The parties appreciate the Court's time and consideration of the above requests.

Respectfully yours,

BOND, SCHOENECK & KING, PLLC

*Charles J. Sullivan*

Charles J. Sullivan

The Official Committee of Unsecured Creditors hereby joins in the foregoing request.

PACHULSKI STANG ZIEHL & JONES LLP

_____/s/  Ilan D. Scharf_____
Ilan D. Scharf

CJS/jeh

cc:    Counsel of record *(via electronic filing)*

# CONSOLIDATED APPENDIX DOCUMENT NO. 4

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| In re: | ) |
|  | ) |
|  | )    Case No. 20-10322 |
| The Diocese of Buffalo, N.Y., | ) |
|  | )    Chapter 11 |
| Debtor. | ) |
|  | ) |

### CERTIFICATE OF SERVICE

I, Gregory A. Lesage, depose and say that I am employed by Stretto, the claims & noticing agent for the Debtor in the above-captioned case.

On March 19, 2025, at my direction and under my supervision, employees of Stretto caused the following documents to be served via first-class mail on the service list attached hereto as **Exhibit A**:

- **Notice of Motion for Entry of an Order Authorizing, but Not Directing, the Diocese to Access the Proceeds of the Seminary Property Sale Pursuant to Sections 105(a), 541, and 363(b) of the Bankruptcy Code** (Docket No. 3743)

- **Declaration of Richard C. Suchan in Support of the Motion for Entry of an Order Authorizing, but Not Directing, the Diocese to Access the Proceeds of the Seminary Property Sale Pursuant to Sections 105(a), 541, and 363(b) of the Bankruptcy Code** (Docket No. 3744)

Dated: April 2, 2025

*/s/ Gregory A. Lesage*
Gregory A. Lesage
STRETTO
410 Exchange, Suite 100
Irvine, CA 92602
(855) 292-7696

**Consolidated Appendix 0109**

# **Exhibit A**

STRETTO

**Exhibit A**
Served Via First-Class Mail

| NAME | ADDRESS 1 | ADDRESS 2 | ADDRESS 3 | ADDRESS 4 | CITY | STATE | ZIP |
|---|---|---|---|---|---|---|---|
| AB 1 DOE | C/O LAW OFFICES OF STEPHEN BOYD & JOHN ELMORE | ATTN: STEPHEN BOYD | 2969 MAIN ST | | BUFFALO | NY | 14214-1003 |
| BANK OF AMERICA | ATTN: MICHAEL LARRY | 10 FOUNTAIN PLAZA | 9TH FLOOR | | BUFFALO | NY | 14202 |
| BL 1 DOE | C/O DAN CHIACCHIA ATTORNEYS, PLLC | ATTN: DANIEL J. CHIACCHIA | 5113 SOUTH PARK AVENUE | | HAMBURG | NY | 14075 |
| CATHOLIC CHARITIES OF BUFFALO, N.Y. | C/O LIPPES MATHIAS WEXLER FRIEDMAN LLP | ATTN: RAYMOND L. FINK & JOHN A. MUELLER | 50 FOUNTAIN PLAZA | SUITE 1700 | BUFFALO | NY | 14202-2216 |
| CATHOLIC MUTUAL GROUP | C/O GROSS SHUMAN PC | ATTN: ROBERT J. FELDMAN & KEVIN R. LELONEK | 465 MAIN STREET | SUITE 600 | BUFFALO | NY | 14203 |
| CATHOLIC MUTUAL RELIEF SOCIETY OF AMERICA | C/O SCHIFF HARDIN LLP | ATTN: JIN YAN, DAVID M. SPECTOR, JOSEPH MARK FISHER, EVERETT CYGAL & DANIEL SCHUFREIDER | 233 S. WACKER DRIVE | SUITE 7100 | CHICAGO | IL | 60606 |
| CATHOLIC MUTUAL RELIEF SOCIETY OF AMERICA | C/O SCHIFF HARDIN LLP | ATTN: STEVE WILAMOWSKY | 1301 AVENUE OF THE AMERICAS | FL 42 | NEW YORK | NY | 10019-6040 |
| CENTURY INDEMNITY COMPANY, AS SUCCESSOR TO CCI INSURANCE COMPANY, AS SUCCESSOR TO INSURANCE COMPANY OF NORTH AMERICA, AS SUCCESSOR TO INDEMNITY INSURANCE COMPANY OF NORTH AMERICA; FEDERAL INSURANCE COMPANY; AND ACE PROPERTY & CASUALTY INSURANCE COMPANY, AS SUCCESSOR TO AETNA INSURANCE COMPANY | C/O CLYDE & CO US LLP | ATTN: MARIANNE MAY | 340 MOUNT KEMBLE AVE | # 300 | MORRISTOWN | NJ | 07960-6656 |
| CERTAIN PERSONAL INJURY CREDITORS | C/O JEFF ANDERSON & ASSOCIATES, PA | ATTN: STACEY BENSON & JEFFREY R. ANDERSON | 366 JACKSON STREET, SUITE 100 | | ST. PAUL | MN | 55101 |
| CERTAIN PERSONAL INJURY CREDITORS | C/O THOMAS COUNSELOR AT LAW, LLC | ATTN: KATHLEEN R. THOMAS | 1 WORLD TRADE CTR | FL 85 | NEW YORK | NY | 10007-0103 |
| CITIZENS BANK | ONE CITIZENS PLAZA | | | | PROVIDENCE | RI | 02903 |
| CONTINENTAL INSURANCE COMPANY AND NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH | C/O BARCLAY DAMON, LLP | ATTN: JEFFREY A. DOVE | BARCLAY DAMON TOWER | 125 EAST JEFFERSON STREET | SYRACUSE | NY | 13202 |
| CVA CLAIMANTS | ATTN: JOHN J. FLAHERTY | 5500 MAIN STREET, SUITE 100 | | | WILLIAMSVILLE | NY | 14221 |
| CVA CLAIMANTS | C/O ANDREWS, BERNSTEIN, MARANTO, NICOTRA, PLLC | ATTN: ROBERT J. MARANTO, JR. | 420 FRANKLIN STREET | | BUFFALO | NY | 14202 |
| CVA CLAIMANTS | C/O BETTI & ASSOCIATES | ATTN: MICHELE M. BETTI | 30 WALL STREET, 8TH FLOOR | | NEW YORK | NY | 10005 |
| CVA CLAIMANTS | C/O BOUVIER LAW LLP | ATTN: MICHAEL P. CAFFERY AND MARILYN MCCORMICK | 4819 S PARK AVE | STE 1 | HAMBURG | NY | 14075-1424 |
| CVA CLAIMANTS | C/O CAMPBELL & ASSOCIATES | ATTN: JASON M. TELAAK | 69 DELAWARE AVENUE, SUITE 1010 | | BUFFALO | NY | 14202 |
| CVA CLAIMANTS | C/O FANIZZI & BARR, P.C. | ATTN: PAUL K. BARR | 7311 NIAGARA FALLS BLVD | # A | NIAGARA FALLS | NY | 14304-1717 |
| CVA CLAIMANTS | C/O FINUCANE AND HARTZELL, LLP | ATTN: THOMS C. HARTZELL, JR. | 6 NORTH MAIN STREET | | PITTSFORD | NY | 14534 |
| CVA CLAIMANTS | C/O FRANCIS LETRO LAW | ATTN: FRANCIS M. LETRO | 237 MAIN ST | STE 302 | BUFFALO | NY | 14203-2725 |
| CVA CLAIMANTS | C/O FREDERICK LAW OFFICE | ATTN: SARAH A. FREDERICK | 4467 S. BUFFALO STREET | | ORCHARD PARK | NY | 14127 |
| CVA CLAIMANTS | C/O HERMAN LAW | ATTN: JEFFREY M. HERMAN, ALEXANDRA D. SLATER, SCOTT MICHAEL DUQUIN, AND JESSE SEIDEN | 475 5TH AVE 17TH FLOOR | | NEW YORK | NY | 10017 |
| CVA CLAIMANTS | C/O HERMAN LAW FIRM, P.A. | ATTN: STUART MERMELSTEIN, JESSE SEIDEN, AND ALEXANDRA D. SLATER | 1800 N MILITARY TRL | STE 160 | BOCA RATON | FL | 33431-6386 |
| CVA CLAIMANTS | C/O HOGANWILLIG, PLLC | ATTN: ARIEL BAUERLE, STEVEN M. COHEN, AND WILLIAM A. LORENZ, JR. | 2410 NORTH FOREST ROAD, SUITE 301 | | AMHERST | NY | 14068 |
| CVA CLAIMANTS | C/O HOROWITZ LAW | ATTN: ELANA B. GOODMAN, JESSICA ARBOUR,  AND ADAM D. HOROWITZ | 110 EAST BROWARD BOULEVARD | SUITE 1530 | FORT LAUDERDALE | FL | 33301 |
| CVA CLAIMANTS | C/O JAMES, VERNON & WEEKS, P.A. | ATTN: CRAIG K. VERNON | 1626 LINCOLN WAY | | COEUR D'ALENE | ID | 83815 |
| CVA CLAIMANTS | C/O JANET, JANET & SUGGS, LLC | ATTN: ANDREW S. JANET | 19 WEST 44TH STREET | SUITE 1500 | NEW YORK | NY | 10036 |
| CVA CLAIMANTS | C/O JANET, JANET & SUGGS, LLC | ATTN: ANDREW S. JANET | 4 RESERVOIR CIRCLE | SUITE 200 | BALTIMORE | MD | 21208 |
| CVA CLAIMANTS | C/O JASON C. LUNA, PLLC | ATTN: JASON C. LUNA | 4535 SOUTHWESTERN BOULEVARD | SUITE 804B | HAMBURG | NY | 14075 |
| CVA CLAIMANTS | C/O JEFF ANDERSON & ASSOCIATES, P.A. | ATTN: JEFFREY R. ANDERSON & J. MICHAEL RECK | 363 7TH AVE | FL 12 | NEW YORK | NY | 10001-3904 |
| CVA CLAIMANTS | C/O LAURA A. AHEARN, ESQ., PLLC | ATTN: LAURA A. AHEARN | 3075 VETERANS MEMORIAL HIGHWAY | SUITE 200 | RONKONKOMA | NY | 11779 |
| CVA CLAIMANTS | C/O LAW OFFICE OF FRANK M. BOGULSKI | ATTN: FRANK M. BOGULSKI | 135 DELAWARE AVE | STE 2 | BUFFALO | NY | 14202-2415 |
| CVA CLAIMANTS | C/O LAW OFFICE OF KEVIN T. STOCKER, ESQ, P.C. | ATTN: KEVIN T. STOCKER | 2645 SHERIDAN DRIVE | | TONAWANDA | NY | 14150 |
| CVA CLAIMANTS | C/O LAW OFFICES OF ERIC B. GROSSMAN | ATTN: ERIC B. GROSSMAN | 5610 E PASEO DE TAMPICO | | TUCSON | AZ | 85750-1036 |
| CVA CLAIMANTS | C/O LAW OFFICES OF J. MICHAEL HAYES | ATTN: J. MICHAEL HAYES | 69 DELAWARE AVENUE, SUITE 1111 | | BUFFALO | NY | 14202 |
| CVA CLAIMANTS | C/O LAW OFFICES OF MICHAEL G. DOWD | ATTN: MICHAEL G. DOWD | 1981 MARCUS AVE | STE 200 | NEW HYDE PARK | NY | 11042-1055 |
| CVA CLAIMANTS | C/O LAW OFFICES OF MITCHEL GARABEDIAN | ATTN: MITCHELL GARABEDIAN | 100 STATE STREET, 6TH FLOOR | | BOSTON | MA | 02109 |
| CVA CLAIMANTS | C/O LAW OFFICES OF STEVE BOYD & JOHN ELMORE | ATTN: STEPHEN BOYD AND LEAH A. COSTANZO | 2969 MAIN ST | # 100 | BUFFALO | NY | 14214-1003 |
| CVA CLAIMANTS | C/O LIPSITZ GREEN SCIME CAMBRIA LLP | ATTN: RICHARD P. WEISBECK, JR. AND WILLIAM P. MOORE | 42 DELAWARE AVENUE, SUITE 120 | | BUFFALO | NY | 14202 |
| CVA CLAIMANTS | C/O LIPSITZ, GREEN SCIME CAMBRIA LLP | ATTN: AMY C. KELLER, CHRISTINA M CROGLIO, & BARRY N. COVERT | 42 DELAWARE AVENUE | | BUFFALO | NY | 14202 |
| CVA CLAIMANTS | C/O LYNN LAW FIRM, LLP | ATTN: MARTIN A. LYNN | 333 W WASHINGTON ST | STE 100 | SYRACUSE | NY | 13202-9200 |
| CVA CLAIMANTS | C/O MARSH LAW FIRM PLLC | ATTN: JAMES R. MARSH | 31 HUDSON YARDS, 11TH FLOOR | | NEW YORK | NY | 10001 |
| CVA CLAIMANTS | C/O MERSON LAW, PLLC | ATTN: JORDAN K. MERSON, SARAH R. CANTOS, AND MATTHEW G. MERSON | 950 THIRD AVENUE | 18TH FLOOR | NEW YORK | NY | 10022-2807 |
| CVA CLAIMANTS | C/O NOAKER LAW FIRM, LLC | ATTN: PATRICK NOAKER | 13 VILLAGE LN | | EXCELSIOR | MN | 55331-2608 |
| CVA CLAIMANTS | C/O PARKER WAICHMAN LLP | ATTN: BRETT A. ZEKOWSKI | 59 MAIDEN LANE, 6TH FLOOR | | NEW YORK | NY | 10038 |
| CVA CLAIMANTS | C/O PARKER WAICHMAN LLP | ATTN: BRETT A. ZEKOWSKI | 6 HARBOR PARK DRIVE | | PORT WASHINGTON | NY | 11050 |
| CVA CLAIMANTS | C/O PFAU COCHRAN VERTETIS AMALA PLLC | ATTN: MICHAEL T. PFAU | 701 5TH AVE | STE 4300 | SEATTLE | WA | 98104-7047 |
| CVA CLAIMANTS | C/O PHILLIPS & PAOLICELLI, LLP | ATTN: DIANE M. PAOLICELLI, MELISSA L. STEWART, ARI L. TAUB, AND DANIELLE GEORGE | 747 3RD AVENUE, 6TH FLOOR | | NEW YORK | NY | 10017 |
| CVA CLAIMANTS | C/O SCHRODER, JOSEPH & ASSOCIATES, LLP | ATTN: LINDA H. JOSEPH | 394 FRANKLIN ST | STE 2 | BUFFALO | NY | 14202-1509 |
| CVA CLAIMANTS | C/O SEEGER WEISS LLP | ATTN: STEPHEN A. WEISS | 100 CHURCH ST | #835 | NEW YORK | NY | 10007-2601 |
| CVA CLAIMANTS | C/O SIMMONS HANLY CONROY LLC | ATTN: PAUL J. HANLY, JR. | 112 MADISON AVENUE, 7TH FLOOR | | NEW YORK | NY | 10016 |
| CVA CLAIMANTS | C/O SLATER SLATER SCHULMAN LLP | ATTN: ADAM SLATER | 488 MADISON AVENUE, 20TH FLOOR | | NEW YORK | NY | 10022 |
| CVA CLAIMANTS | C/O STEVEN FOX, P.C. | ATTN: STEVEN S. FOX | 122 DEERHURST PARK BOULEVARD | | BUFFALO | NY | 14217 |
| CVA CLAIMANTS | C/O THE ABBATOY LAW FIRM, PLLC | ATTN: DAVID M. ABBATOY | 16 W MAIN ST | STE 243 | ROCHESTER | NY | 14614-1601 |
| CVA CLAIMANTS | C/O THE DIETRICH LAW FIRM | ATTN: NICHOLAS J. SHEMIK AND JOSEPH E. DIETRICH III | 101 JOHN JAMES AUDUBON PKWY | | BUFFALO | NY | 14228-1111 |
| CVA CLAIMANTS | C/O THE HIGGINS KANE LAW GROUP, P.C. | ATTN: TERRENCE P. HIGGINS | 69 DELAWARE AVENUE, SUITE 100 | | BUFFALO | NY | 14202 |
| CVA CLAIMANTS | C/O VANDETTE PENBERTHY LLP | ATTN: JAMES M. VANDETTE | 227 NIAGARA STREET | | BUFFALO | NY | 14201 |
| CVA CLAIMANTS | C/O WEITZ & LUXENBERG, P.C. | ATTN: NICHOLAS GONSALVES, JARED SCOTTO, AND JUSTINE DELANEY | 700 BROADWAY | | NEW YORK | NY | 10003 |
| EMPLOYERS INSURANCE COMPANY OF WAUSAU (FORMERLY KNOWN AS EMPLOYERS INSURANCE OF WAUSAU A MUTUAL COMPANY FORMERLY KNOWN AS EMPLOYERS MUTUAL LIABILITY INSURANCE COMPANY OF WISCONSIN) AND WAUSAU UNDERWRITERS INSURANCE COMPANY | C/O GOLDBERG SEGALLA LLP | ATTN: JEFFREY L. KINGSLEY & JONATHAN SCHAPP | 665 MAIN STREET | | BUFFALO | NY | 14203 |
| ERIE COUNTY REAL PROPERTY TAX SERVICES | 95 FRANKLIN STREET | ROOM 100 | | | BUFFALO | NY | 14202 |
| EXCELSIOR INSURANCE COMPANY, LIBERTY MUTUAL INSURANCE COMPANY, AND PEERLESS INSURANCE COMPANY | C/O CHOATE, HALL & STEWART LLP | ATTN: DOUGLAS R. GOODING & JONATHAN D. MARSHALL | TWO INTERNATIONAL PLACE | | BOSTON | MA | 02110 |
| EXCELSIOR INSURANCE COMPANY, LIBERTY MUTUAL INSURANCE COMPANY, AND PEERLESS INSURANCE COMPANY | C/O MINTZ, LEVIN, COHN, FERRIS, GLOVSKY AND POPEO, PC | ATTN: DOMINIC J. PICCA | 919 3RD AVE | FL 38 | NEW YORK | NY | 10022-3915 |

STRETTO

**Exhibit A**
Served Via First-Class Mail

| NAME | ADDRESS 1 | ADDRESS 2 | ADDRESS 3 | ADDRESS 4 | CITY | STATE | ZIP |
|---|---|---|---|---|---|---|---|
| EXCELSIOR INSURANCE COMPANY, LIBERTY MUTUAL INSURANCE COMPANY, AND PEERLESS INSURANCE COMPANY | C/O MINTZ, LEVIN, COHN, FERRIS, GLOVSKY AND POPEO, PC | ATTN: NANCY D. ADAMS, LAURA BANGE STEPHENS & GRADY R. CAMPION | ONE FINANCIAL CENTER | | BOSTON | MA | 02111 |
| FIREMAN'S FUND INSURANCE COMPANY | C/O WHITE AND WILLIAMS LLP | ATTN: SIOBHAIN P. MINAROVICH | 810 7TH AVE | FL 5 | NEW YORK | NY | 10019-5876 |
| FIVE STAR BANK | ATTN: FRAN HORNUNG | 40 FOUNTAIN PLAZA #50 | | | BUFFALO | NY | 14202 |
| FRANCISCAN FRIARS - OUR LADY OF ANGELS PROVINCE, INC. | C/O LIPPES MATHIAS WEXLER FRIEDMAN LLP | ATTN: RAYMOND L. FINK & JOHN A. MUELLER | 50 FOUNTAIN PLAZA | SUITE 1700 | BUFFALO | NY | 14202-2216 |
| HSBC BANK | ATTN: JOSEPH BURDEN | 95 WASHINGTON ST | | | BUFFALO | NY | 14203 |
| INTERNAL REVENUE SERVICE | PO BOX 7346 | | | | PHILADELPHIA | PA | 19101-7346 |
| JUDITH WILCOX HALSEY AND DIANA L. O'HARA | C/O PRYOR CASHMAN LLP | ATTN: CONRAD K. CHIU | 7 TIMES SQUARE | | NEW YORK | NY | 10036-6569 |
| KEYBANK | ATTN: ALEXANDRA WEHR | 250 DELAWARE AVE | | | BUFFALO | NY | 14202 |
| LAKE SHORE SAVINGS | 31 EAST FOURTH STREET | | | | DUNKIRK | NY | 14048 |
| M&T BANK | ATTN: ESKINDER TEFERA, SPECIAL ASSETS | ONE FOUNTAIN PLAZA, 9TH FLOOR | | | BUFFALO | NY | 14203 |
| M&T BANK | C/O HODGSON RUSS LLP | ATTN: GARRY M. GRABER | 140 PEARL STREET, SUITE 100 | | BUFFALO | NY | 14202 |
| M&T BANK | ONE M&T PLAZA | | | | BUFFALO | NY | 14203 |
| MADONNA BISHOP, ET AL. | C/O DAN CHIACCHIA ATTORNEYS, PLLC | ATTN: DANIEL J. CHIACCHIA | 5113 SOUTH PARK AVENUE | | HAMBURG | NY | 14075 |
| MANUFACTURERS AND TRADERS TRUST CO | C/O HODGSON RUSS LLP | ATTN: GARRY M. GRABER | 140 PEARL STREET, SUITE 100 | | BUFFALO | NY | 14202 |
| MANUFACTURERS AND TRADERS TRUST COMPANY | 1 M&T PLAZA | | | | BUFFALO | NY | 14203 |
| MARSH LAW FIRM PLLC AND PFAU COCHRAN VERTETIS AMALA PLLC CLAIMANTS | C/O PFAU COCHRAN VERTETIS AMALA PLLC | ATTN: LUCAS B. FRANKEN | 31 HUDSON YARDS, 11TH FLOOR | | NEW YORK | NY | 10001 |
| NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA | C/O BARCLAY DAMON LLP | ATTN: JEFFREY A. DOVE | BARCLAY DAMON TOWER | 125 EAST JEFFERSON STREET | SYRACUSE | NY | 13202 |
| NEW YORK STATE DEPARTMENT OF LABOR | STATE OFFICE CAMPUS | BUILDING #12 | ROOM 256 | | ALBANY | NY | 12240 |
| NEW YORK STATE DEPARTMENT OF LABOR – BUS. SERVICES | ATTN: DEBORAH ARBUTINA | 290 MAIN STREET | | | BUFFALO | NY | 14202 |
| NEW YORK STATE OFFICE OF PARKS, RECREATION AND HISTORIC PRESERVATION | C/O OFFICE OF THE NEW YORK STATE ATTORNEY GENERAL | CIVIL RECOVERIES BUREAU, BANKRUPTCY LITIGATION UNIT | ATTN: LOUIS J. TESTA AND MARTIN A. MOONEY | THE CAPITOL | ALBANY | NY | 12224-0341 |
| NGM INSURANCE COMPANY | C/O GERBER CIANO KELLY BRADY LLP | ATTN: MICHAEL W. GERBER & JOHN R. EWELL | 599 DELAWARE AVENUE, SUITE 100 | | BUFFALO | NY | 14202 |
| NORTHWEST BANK | 100 LIBERTY STREET | | | | WARREN | PA | 16365 |
| NYS DEPARTMENT OF ENVIRONMENTAL CONSERVATION | OFFICE OF GENERAL COUNSEL | 625 BROADWAY | | | ALBANY | NY | 12233-0001 |
| NYS DEPARTMENT OF TAXATION & FINANCE | BANKRUPTCY UNIT | PO BOX 5300 | | | ALBANY | NY | 12205-0300 |
| NYS OFFICE OF THE ATTORNEY GENERAL | MAIN PLACE TOWER, SUITE 300A | 350 MAIN STREET | | | BUFFALO | NY | 14202 |
| NYS WORKERS' COMPENSATION BOARD | ATTN: SEAN BREEN, PRINCIPAL WORKERS' COMP. EXAMINER | OFFICE OF SELF-INSURANCE | 328 STATE STREET | | SCHENECTADY | NY | 12305 |
| OBLATES OF ST. FRANCIS DESALES | C/O LIPPES MATHIAS WEXLER FRIEDMAN LLP | ATTN: RAYMOND L. FINK & JOHN A. MUELLER | 50 FOUNTAIN PLAZA | SUITE 1700 | BUFFALO | NY | 14202-2216 |
| OFFICE OF THE NEW YORK STATE ATTORNEY GENERAL | ATTN: LOUIS J. TESTA, ASSISTANT ATTORNEY GENERAL | CIVIL RECOVERIES BUREAU, BANKRUPTCY LITIGATION UNIT | THE CAPITOL | | ALBANY | NY | 12224-0341 |
| OFFICE OF THE NYS ATTORNEY GENERAL | LITIGATION BUREAU, BANKRUPTCY UNIT | THE CAPITOL | | | ALBANY | NY | 12224 |
| OFFICE OF THE UNITED STATES TRUSTEE | ATTN: JOSEPH W. ALLEN & JILL ZUBLER | OLYMPIC TOWERS | 300 PEARL STREET, SUITE 401 | | BUFFALO | NY | 14202 |
| OFFICIAL COMMITTEE OF UNSECURED CREDITORS | C/O GLEICHENHAUS, MARCHESE & WEISHAAR, PC | ATTN: SCOTT J. BOGUCKI | 43 COURT STREET | SUITE 930 | BUFFALO | NY | 14202-3100 |
| OFFICIAL COMMITTEE OF UNSECURED CREDITORS | C/O PACHULSKI, STANG, ZIEHL & JONES LLP | ATTN: JAMES I. STANG | 10100 SANTA MONICA BLVD, 13TH FLOOR | | LOS ANGELES | CA | 90067-4003 |
| OFFICIAL COMMITTEE OF UNSECURED CREDITORS | C/O PACHULSKI, STANG, ZIEHL & JONES LLP | ATTN: JAMES I. STANG, ILAN D. SCHARF, STEVEN W. GOLDEN AND BRITTANY M. MICHAEL | 780 THIRD AVENUE | 34TH FLOOR | NEW YORK | NY | 10017 |
| OUR LADY OF VICTORY INSTITUTIONS, INC. | C/O MACKENZIE HUGHES LLP | ATTN: NEIL J. SMITH | 440 S. WARREN STREET, SUITE 400 | | SYRACUSE | NY | 13202 |
| PARISH STEERING COMMITTEE | C/O ELSAESSER ANDERSON, CHTD. | ATTN: BRUCE A. ANDERSON | 320 EAST NEIDER AVENUE, SUITE 102 | | COEUR D'ALENE | ID | 83815 |
| PARISH STEERING COMMITTEE | C/O ELSAESSER ANDERSON, CHTD. | ATTN: J. FORD ELSAESSER | PO BOX 369 | | PRIEST RIVER | ID | 83856 |
| PARISH STEERING COMMITTEE | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY P. LYSTER | 1900 BAUSCH AND LOMB PL | | ROCHESTER | NY | 14604 |
| PEOPLE OF THE STATE OF NEW YORK | ATTN: LOUIS J. TESTA, ASSISTANT ATTORNEY GENERAL | OFFICE OF THE NEW YORK STATE ATTORNEY GENERAL | CIVIL RECOVERIES BUREAU, BANKRUPTCY LITIGATION UNIT | THE CAPITOL | ALBANY | NY | 12224-0341 |
| PSAS 01 DOE, PSAS 02 DOE & PSAS 03 DOE | C/O PUSATIER, SHERMAN, ABBOTT & SUGARMAN, LLP | ATTN: STEPHEN F. PUSATIER | 2464 ELMWOOD AVENUE | | KENMORE | NY | 14217 |
| RICHARD LAPORTA & HUNTER COGI WOLFE F/K/A KENNETH CHARLES HELINSKI | C/O LOTEMPIO P.C. LAW GROUP | ATTN: HEATHER M. BAUMEISTER | 181 FRANKLIN STREET | | BUFFALO | NY | 14202 |
| SELECTIVE INSURANCE COMPANY OF NEW YORK | C/O COUGHLIN MIDLIGE & GARLAND LLP | ATTN: WILLIAM T. CORBETT, JR. & LAURA A. BRADY | 350 MOUNT KEMBLE AVENUE | PO BOX 1917 | MORRISTOWN | NJ | 07962 |
| SELECTIVE INSURANCE COMPANY OF NEW YORK | C/O GIBBONS P.C. | ATTN: BRETT S. THEISEN | ONE PENNSYLVANIA PLAZA, 37TH FL | | NEW YORK | NY | 10119-3701 |
| SELECTIVE INSURANCE COMPANY OF NEW YORK | C/O GIBBONS P.C. | ATTN: ROBERT K. MALONE AND BRETT S. THEISEN | ONE GATEWAY CENTER | | NEWARK | NJ | 07102 |
| SELECTIVE INSURANCE COMPANY OF NEW YORK | C/O KENNEY SHELTON LIPTAK NOWAK LLP | ATTN: DIRK C. HAARHOFF | 85 BROAD STREET | SUITE 18-084 | NEW YORK | NY | 10004 |
| SELECTIVE INSURANCE COMPANY OF NEW YORK | C/O KENNEY SHELTON LIPTAK NOWAK LLP | ATTN: JUDITH TREGER SHELTON & DIRK C. HAARHOFF | THE CALUMET BUILDING | 233 FRANKLIN STREET | BUFFALO | NY | 14202 |
| ST. FRANCIS HIGH SCHOOL OF ATHOL SPRINGS, N.Y. | C/O LIPPES MATHIAS WEXLER FRIEDMAN LLP | ATTN: RAYMOND L. FINK & JOHN A. MUELLER | 50 FOUNTAIN PLAZA | SUITE 1700 | BUFFALO | NY | 14202-2216 |
| SWEET HOME FCU | 1960 SWEET HOME ROAD | | | | AMHERST | NY | 14228 |
| THE CONTINENTAL INSURANCE COMPANY, SUCCESSOR BY MERGER TO (1) COMMERCIAL INSURANCE COMPANY OF NEWARK, NEW JERSEY AND (2) FIREMEN'S INSURANCE COMPANY OF NEWARK, NEW JERSEY | C/O BARCLAY DAMON LLP | ATTN: JEFFREY A. DOVE | BARCLAY DAMON TOWER | 125 EAST JEFFERSON STREET | SYRACUSE | NY | 13202 |
| THE DIOCESE OF BUFFALO, N.Y. | 795 MAIN STREET | | | | BUFFALO | NY | 14203 |
| THE EUDISTS - CONGREGATION OF JESUS AND MARY, INC. | C/O LIPPES MATHIAS WEXLER FRIEDMAN LLP | ATTN: RAYMOND L. FINK & JOHN A. MUELLER | 50 FOUNTAIN PLAZA | SUITE 1700 | BUFFALO | NY | 14202-2216 |
| THE NATIONAL CATHOLIC RISK RETENTION GROUP | C/O HURWITZ & FINE, PC | ATTN: JENNIFER A. EHMAN | 1300 LIBERTY BUILDING | | BUFFALO | NY | 14202 |
| TIG INSURANCE COMPANY, NORTH RIVER INSURANCE COMPANY, AND US FIRE INSURANCE COMPANY | C/O KENNEDYS CMK LLP | ATTN: MARGARET CATALANO & JILLIAN DENNEHY | 120 MOUNTAIN VIEW BOULEVARD | | BASKING RIDGE | NJ | 07920 |
| U.S. ATTORNEY'S OFFICE | WESTERN DISTRICT OF NEW YORK | 138 DELAWARE AVENUE | | | BUFFALO | NY | 14202 |
| USA NORTHEAST PROVINCE OF THE SOCIETY OF JESUS | C/O HARRIS BEACH PLLC | ATTN: LEE E. WOODARD | 333 WEST WASHINGTON STREET | SUITE 200 | SYRACUSE | NY | 13202 |
| UTICA MUTUAL INSURANCE COMPANY, HANOVER INSURANCE COMPANY, AND SENTRY INSURANCE COMPANY AS SUCCESSOR TO MIDDLESEX MUTUAL INSURANCE COMPANY | C/O RIVKIN RADLER LLP | ATTN: M. PAUL GORFINKEL & STUART I. GORDON | 926 RXR PLAZA | | UNIONDALE | NY | 11556-0926 |

# CONSOLIDATED APPENDIX DOCUMENT NO. 5

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NEW YORK

In re:                                                    Chapter 11

THE DIOCESE OF BUFFALO, N.Y.,                            Case No. 20-10322 (CLB)

                    Debtor.

**THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS'
JOINDER TO THE DIOCESE'S MOTION FOR ENTRY OF AN ORDER
AUTHORIZING, BUT NOT DIRECTING, THE DIOCESE TO ACCESS
THE PROCEEDS OF THE SEMINARY PROPERTY SALE PURSUANT
TO SECTIONS 105(A), 541, AND 363(B) OF THE BANKRUPTCY CODE**

The Official Committee of Unsecured Creditors (the "**Committee**") of The Diocese of

Buffalo, N.Y. (the "**Diocese**"), the above-captioned debtor and debtor in possession, hereby files

this joinder (the "**Joinder**") to the Diocese's *Motion for Entry of an Order Authorizing, But Not*

*Directing, the Diocese to Access the Proceeds of the Seminary Property Sale Pursuant to Sections*

*105(a), 541, and 363(b) of the Bankruptcy Code* [Docket No. 3743] . In support of its Joinder, the

Committee states as follows:

## I.       PRELIMINARY STATEMENT

1.      The Diocese sold the Seminary Property[1] for $4.2 million.  This Court approved

the bidding procedures for the sale of the Seminary Property and the sale itself.  Motion ¶¶ 7-11.

The Sale Proceeds have been deposited into account and are being held pending the Court's

authorization for further disposition.  *Id.* ¶ 12.

2.      The Sale Proceeds represent a significant source of funding for the Diocese's

eventual contribution to a trust in settlement of the claims of the Survivors.  The availability of the

---

[1] Capitalized terms not defined herein have the meaning given to them in the Motion.

Sale Proceeds to compensate Survivors is both critical to resolution of this case and a moral imperative. Notably, no one has claimed that the Sale Proceeds are subject to any restriction on use, and the Court should not seek to out what does not exist.

3.    The Diocese in the Motion has very effectively shown that the Sale Proceeds are not under any restriction as a matter of the New York Not-for-Profit Corporations Law ("NPCL") or the Estates, Powers and Trusts Law ("EPTL"). Motion ¶¶ 24-35.

4.    While that analysis is important, the Committee submits that even if a donor could conjure some NPCL or EPTL "interest" in a donation made in respect of a seminary (and the Diocese's analysis shows that there was no such thing), a further of analysis of the Seminary Property Sale under Bankruptcy Code § 544(a)(3) and hornbook New York State real property law *requires* the conclusion that the Diocese could avoid any such restriction and that there consequently is no enforceable restriction on the disposition of the Sale Proceeds.

5.    Section 544(a)(3) puts the trustee or debtor-in-possession in the place of a bona fide purchaser of real estate (as determined under state law) at the date the petition is filed. As a bona fide purchaser, the trustee/debtor-in-possession is not bound by any restrictions of which it would not have had constructive notice (as defined by state law).

6.    Under New York law, a bona fide purchaser would not have constructive notice, and would not be bound, by unrecorded restrictive covenants concerning the Seminary Property.

7.    The evidence presented by the Diocese in the Motion demonstrates that there are no covenants, recorded or unrecorded, that as a matter of bankruptcy law could thwart the rights of the Diocese to use the Seminary Property to compensate the Survivors. The Court should grant the Motion.

## II.    RELEVANT FACTS

8.      On February 28, 2020 (the "**Petition Date**"), the Diocese filed a petition for relief under chapter 11 in the wake of hundreds of lawsuits filed by survivors of sexual abuse (the "**Survivors**") under the New York Child Victims Act (the "**CVA**") and in anticipation of the assertion of more sexual abuse claims.

9.      As detailed in the Motion, the Seminary Property was transferred to the Diocese by deeds from Fred H. Reuter in 1959 and 1960 (the "Reuter Deeds," Suchan Declaration ¶ 5 & Ex. D).  In those deeds, Mr. Reuter covenanted that "he has not done or suffered anything whereby the said premises have been incumbered in any way whatever."  *Id.* Ex. D.  The Reuter Deeds contain no restrictive covenants.  They are stamped as received and recorded by the Erie County Clerk's Office.  *Id.*

10.     In 1968, the Diocese transferred title by deeds to St. John Vianney Seminary, a New York domestic corporation (the "1968 Deeds").  *Id.* ¶ 6 & Ex. E.  The 1968 Deeds contain warranties of title and quiet enjoyment.  The 1968 Deeds likewise contain no restrictive covenants.  *Id.* Ex. E.  The 1968 Deeds were signed by the then-Bishop of Buffalo, the Most Reverent James A. McNulty, and received and were likewise recorded by the Erie County Clerk's Office.  *Id.*

11.     In 1987, St. John Vianney Seminary deeded the property back to the Diocese (the "1987 Deed").  *Id.* ¶ 10 & Ex F.  The 1987 Deed also warranted title and quiet enjoyment, was signed by Edward Head, the then-Bishop of Buffalo, was subject to a lease to Christ the King Seminary, and was recorded in the Erie County Clerk's Office.  *Id.* Ex. F.

12.     Christ the King Seminary ceased operations at the end of the 2020-2021 academic year.  *Id.* ¶ 21; *see Closures of Degree-Granting Institutions*, N.Y. State Dep't of Educ., *https://www.nysed.gov/college-university-evaluation/closures-degree-granting-institutions*  (last visited Mar. 31, 2025) (Christ the King Seminary closed June 1, 2021).

### III.    ARGUMENT

13.    Under Bankruptcy Code Section 544 and long-established New York law, the Diocese as debtor-in-possession[2] can avoid any unrecorded restrictive interest in the Property. Where, as here, there was no recorded interest encumbering the Seminary Property, the Diocese as debtor-in-possession can avoid any such claimed interest and may access the proceeds of the Seminary Sale without regard to any conjectural restriction.[3]

### A.    Bankruptcy Code § 544

14.    As this Court has stated:

> Real property is indeed different from personalty, and the Bankruptcy Code incorporates distinctions that honor this difference. One such distinction occurs in 11 U.S.C. § 544(a)(3), which grants to a trustee certain rights of a bona fide purchaser of real property."

*Gaffney v. United States DOT (In re Premier Airways, Inc.),* Nos. 01-10656 B, AP 02-1238 B, 2004 Bankr. LEXIS 5, at *1 (Bankr. W.D.N.Y. Jan. 6, 2004) (Bucki, B.J.).

15.    Bankruptcy Code § 544(a)(3) provides:

> (a) The trustee shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by . . .
>
> (3) a bona fide purchaser of real property, other than fixtures, from the debtor, against whom applicable law permits such transfer to be perfected, that obtains the status of a bona fide purchaser and has

---

[2]  The debtor-in-possession has the rights of a bankruptcy trustee.  11 U.S.C. § 1107(a).

[3] The Diocese's rights to the property also take priority over any unrecorded interest in the Seminary Property pursuant to Bankruptcy Code section 544(a)(1)(granting the trustee the rights of a hypothetical judicial lien holder).  *See, e.g., Picard v. JPMorgan Chase & Co.*, 460 B.R. 84, 93 (S.D.N.Y. 2011), *aff'd,* 721 F.3d 54 (2d Cir. 2013) ("'Any property of the debtor upon which a judgment creditor might obtain a lien under state law flows to the bankruptcy estate' for the benefit of all creditors" (internal citations omitted)).  Under New York Law a judicial lien applies to real property.  CPLR 5203.

> perfected such transfer at the time of the commencement of the case,
> whether or not such a purchaser exists.

16.    "The purpose of this status is 'to cut off unperfected security interests, secret liens and undisclosed prepetition claims against the debtor's property as of the commencement of the case.'"  *Purewal v. Est. of Kalsi (In re Kalsi)*, Nos. 20-10330 (MG), 21-01159, 2021 Bankr. LEXIS 2188, at *11 (Bankr. S.D.N.Y. Aug. 12, 2021) (citing *In re Canney*, 284 F.3d 362, 374 (2d Cir. 2002) (quoting COLLIER ON BANKRUPTCY ¶ 544.03 (15th ed. rev. 2001))).

17.    This Court considered Section 544(a)(3) comprehensively in *Gaffney*.  In *Gaffney*, the Federal Aviation Administration sought to enforce an unrecorded interest in favor of the government, based on a government grant for the expansion of a small local airport, against the proceeds of the bankruptcy sale of the real property at issue.  2004 Bankr. LEXIS 5 at *2-3.  The government's claimed interest in the property was not recorded in the property deeds.  *Id.* at *3. The trustee brought an adversary proceeding to avoid the FAA's claim, and the Court granted him summary judgment, finding that Section 544 allowed the trustee to avoid the FAA's claimed but unrecorded interest.  *Id.* at *11.

18.    The Court's thorough analysis in *Gaffney* is on point here.  First, under Section 544(a)(3):

> Essentially, the trustee enjoys the rights of a bona fide purchaser who might have perfected an acquisition of the expansion properties from the debtor as of the commencement of the case. A bona fide purchaser is someone "who buys something for value without notice of another's claim to the item or of any defects in the seller's title . . . ." BLACK'S LAW DICTIONARY 1249 (7th ed. 1999). Thus, the trustee enjoys the status of a purchaser without knowledge of any implied trust or equitable lien of the FAA.

*Id.* at *9-10.

19.    Critically, "the trustee is not required to prove his or her bona fides. Rather, the trustee is presumed to hold the status of a bona fide purchaser of real property 'from the debtor, against whom applicable law permits such transfer to be perfected.'" *Id.* at *10.  That is, the issue is whether a bona fide purchaser for value would have had constructive notice of the restriction at the petition date, as a matter of state law, not whether the trustee had actual knowledge of any restriction.

20.    Bankruptcy Code § 541(a)(3) provides that the trustee may avoid "[a]ny interest in property that the trustee recovers under section 329(b), 363(n), 543, 550, 553, or 723 of this title." Interests avoided under Section 544 are assets recovered under Section 550 and are therefore included within property of the estate. *Gaffney*, 2004 Bankr. LEXIS 5 at *8.  Section 544 operates to vitiate claims for avoidable interests in real property, however characterized, including as "constructive trust," (*Purewal*, 2021 Bankr. LEXIS 2188 at *12-13 (§ 544 precludes imposition of constructive trust) or "equitable servitude" (*Southland Royalty Co. v. Wamsutter LLC (In re Southland Royalty Co.)*, 623 B.R. 64, 88 (Bankr. D. Del. 2020) (landowners cannot "impose upon future owners' obligations totally unrelated to the land" outside the scope of § 544)).

**B.    A Bona Fide Purchaser Of The Seminary Property**
     **Would Not Have Had Notice Of Any Restriction**

21.    "In evaluating the trustee's rights as a hypothetical bona fide purchaser of real property, the court looks to the substantive state law pertaining to the property that is the subject of the proceeding, in this case the law of New York." *Purewal*, 2021 Bankr. LEXIS 2188 at*12. As the Court stated in *Gaffney*, "[u]nder New York law, a bona fide purchaser of real property will, upon the recording of its conveyance, take title free of any unrecorded interest. N.Y. REAL PROP. LAW § 291."  2004 Bankr. LEXIS at *10; *see also Purewal*, 2021 Bankr. LEXIS 2188 at

*12 ("Under New York law, a bona fide purchaser is protected from any prior, unrecorded interests in the purchased property.").

22.    As to the law of New York, Real Property Law § 291 provides that any unrecorded conveyance of real property "is void as against any person who subsequently purchases or acquires . . . the same real property or any portion thereof, . . . in good faith and for a valuable consideration, from the same vendor or assignor."

23.    The New York Appellate Division summarized the law surrounding the enforcement of encumbrances on title:

- "'[T]he policy of the law is to favor the free and unobstructed use of realty'" (*Huggins v. Castle Ests., Inc.*, 36 N.Y.2d 427, 430 (1975)).

- "[A] purchaser takes with notice from the record only of incumbrances in his direct chain of title. In the absence of actual notice before or at the time of his purchase or of other exceptional circumstances, an owner of land is only bound by restrictions if they appear in some deed of record in the conveyance to himself or his direct predecessors in title" (*Buffalo Acad. of Sacred Heart v. Boehm Bros. Inc*., 267 N.Y. 242, 250 (1935)).[4]

- "A purchaser is not normally required to search outside the chain of title" (*Ioannou v. Southold Town Plan. Bd*., 758 N.Y.S.2d 358, 359 (2d Dep't 2003) (citing *Buffalo Acad. of Sacred Heart*, 267 N.Y. 242).

- Deed restrictions are strictly construed against those seeking to enforce them and will be enforced only where their existence has been established by clear and convincing proof (*see Ioannou*, 758 N.Y.S.2d at 359 (citing *Witter v. Taggart*, 78 N.Y.2d 234, 237-38 (1991)).

---

[4] Again, under Section 544(a)(3) the Trustee's actual notice is not considered, only whether the Trustee might as a have constructive notice of a restriction under state law.  5 COLLIER ON BANKRUPTCY ¶ 544.5 (R. Levin & H. Sommer eds., 16th ed. 2025)

*Butler v. Mathisson*, 981 N.Y.S.2d 441, 444 (2d Dep't 2014) (denying enforcement of setback requirements in subdivision maps as not being deed restriction that runs with the land).

24.    Strangers to a deed are not third-party beneficiaries of a restrictive covenant unless expressly made so in the grant. *Rosenstadt v. Wainwright House, Inc.*, No. 55786/2022, 2023 N.Y. Misc. LEXIS 36063, at *11 (Sup. Ct. Westchester County Mar. 20, 2023).

25.    "In New York, findings of constructive notice are made by an examination of record evidence showing a party's actual awareness of facts that would create a duty of reasonable inquiry, given all the circumstances." *O'Connell v. JPMorgan Chase Bank Nat'l Ass'n,* No. 12-CV-1951 (ENV), 2012 U.S. Dist. LEXIS 175388, at *8 (E.D.N.Y. Dec. 6, 2012) (constructive notice where recorded mortgage mentioned a second, unrecorded mortgage).

26.    The deeds in the Seminary Property chain of title contain no restriction, or any hint of extraneous restriction, on each subsequent grantee's transfer.  The Reuter Deeds (Suchan Ex. D), from Mr. Reuter to the Diocese in 1959 and 1960 are New York statutory form deeds, in each of which the grantor "covenants that he has not done or suffered anything whereby the said premises have been incumbered in any whatever."  Suchan Ex. D at 3, 6, 10.  That language has a long-standing statutory meaning under Real Property Law § 253(3):

> 3. Freedom from incumbrances.—A covenant "that the said premises are free from incumbrances," must be construed as meaning that such premises are free, clear, discharged and unincumbered of and from all former and other gifts, grants, titles, charges, estates, judgments, taxes, assessments, liens and incumbrances, of what nature or kind soever.

N.Y. Real Prop. Law § 253 (Consol. Lexis Advance through 2025 released Chapters 1-49, 61-112) (provision adopted in 1909).  That is, not only do the Reuter Deeds not contain any restrictions, but Mr. Reuter in conveying the property agreed that there were no restrictions on the Seminary Property.  Had Mr. Reuter intended to convey the Seminary Property with a restriction, he needed

to put it in the deed, and if that was his intent, he could not have covenanted that the Seminary Property was free from incumbrances.  Notably, prior to granting it to the Diocese, the property was Mr. Reuter's own home and farm property (Suchan Decl. Ex. A at 15) and was evidently not in use for a charitable or religious purpose prior to the grant.

27.     The 1968 Deeds (Suchan Ex. E), from the Diocese to St. John Vianney Seminary, are also without any restrictions on its face.  The 1987 Deed (Suchan Ex. F) is without restrictions on transfer, though it identifies the then-extant ground lease to Christ the King Seminary.  Christ the King Seminary is a Diocesan entity that has been closed for some four years.

28.     There is thus no evidence of any recorded interest in the Seminary Properties that would have restricted the disposition or use of the Seminary Property, or that attached to the Sale Proceeds.  Nor, given the narrow route of the transfers of title to the Seminary Property in the period (where the 1968 Deeds were both signed by the then-bishop of the Diocese acting for the Diocese or in his role at a Diocese-related entity) is there any evidence of, or reason to believe, that any other party was in a position to record a restriction.

29.     The Diocese's analysis of the absence of any enforceable restriction (Motion ¶¶ 30-35) buttresses this conclusion.  Even assuming, *arguendo*, that some money-donor could have a right against the Diocese with respect to the application of the proceeds of a donation,[5] that could not have risen to the level of a covenant running with the land enforceable against the Sale Proceeds.

---

[5] The *cy pres* disposition of unspent restricted funds that were donated for purposes related the Seminary was addressed by New York Supreme Court.  *See* Order, *In re Modification of Endowment Funds of the Found. of the Roman Cath. Diocese of Buffalo, N.Y., Inc.*, No. 814747/2020 (Sup. Ct. Erie County Nov. 25, 2020), Docket No. 19.  Given that adjudication, those funds cannot form the basis of any claim of a restriction on the Seminary Property.

30.    There is no evidence of any document other than the Deeds that would plausibly constitute a recorded instrument containing any restrictions on the Seminary Property.  But even if such a piece of paper existed, it would not be an enforceable interest in the Seminary Property:

> A party attempting to demonstrate that a purported restrictive covenant contained in a deed runs with the land must show that the grantor and grantee intended that the covenant should run with the land; the covenant is one touching or concerning the land with which it runs; and it must appear that there is "privity of estate" between the promisee or party claiming the benefit of the covenant and the right to enforce it, and the promisor or party who rests under the burden of the covenant.

*Kingston Model R.R. Club, Inc. v. Eleven Main Grp., LLC*, 999 N.Y.S.2d 196, 197-98 (3d Dep't 2014) (cleaned up); *see also Fields Enters. Inc. v. Bristol Harbour Vill. Ass'n, Inc.*, 191 N.Y.S.3d 856, 861-62 (4th Dep't 2023) (enforcement restrictive covenants limited to owners of adjacent land or owners in a "general scheme" of improvement).  Here, there is no evidence of expressed intent, even if donors were giving to the purpose of a seminary, that any restriction associated with their gift was intended to be a covenant running with the land of the Seminary Property, nor would money donors have "privity of estate" with any owner of the Seminary Property, as they have no place in the chain of title of the Seminary Property.  *See Kingston Model R.R. Club*, 999 N.Y.S.2d at 197-98; *Rosenstadt*, 2023 N.Y. Misc LEXIS 36063 at *11-12 (third parties had no right to enforce restrictive covenant where the grant did not expressly give rights to third parties).

## CONCLUSION

For the reasons stated herein and by the Diocese in the Motion, the Motion should be granted, and the Court should grant such other, further and different relief as to it seems just and proper.

Dated: April 9, 2025          PACHULSKI STANG ZIEHL & JONES LLP

*/s/ Ilan D. Scharf*
James I. Stang
Ilan D. Scharf
Karen B. Dine
Jeffrey M. Dine
780 Third Avenue, 34th Floor
New York, New York 10017-2024
Telephone: 212-561-7700
Facsimile: 212-561-7777
Email: jstang@pszjlaw.com
          ischarf@pszjlaw.com
          kdine@pszjlaw.com
          jdine@pszjlaw.com

*Counsel to Official Committee of Unsecured Creditors*

# CONSOLIDATED APPENDIX DOCUMENT NO. 6

```
UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NEW YORK
-------------------------------------------------x
In Re:                                1-20-10322(CLB)
                                      Chapter 11

The Diocese of Buffalo, NY,

                Debtor.               Buffalo, New York
-------------------------------------------------x
```
**HEARING**                            May 8, 2025


                    TRANSCRIPT OF PROCEEDINGS
              BEFORE THE HONORABLE CARL L. BUCKI
                UNITED STATES BANKRUPTCY JUDGE


DEBTOR:                     BOND, SCHOENECK & KING, PLLC
                              BY:  CHARLES J. SULLIVAN, ESQ.
                              BY:  STEPHEN A. DONATO, ESQ.
                            One Lincoln Center
                            Syracuse, New York 13202
                              BY:  THOMAS W. SIMCOE, ESQ.
                            22 Corporate Woods Boulevard
                            Suite 501
                            Albany, New York 12211


TRUSTEE:                    OFFICE OF THE U.S. TRUSTEE
(Via telephone)             BY:  JOSEPH ALLEN, ESQ.
                            Olympic Towers
                            300 Pearl Street, Suite 401
                            Buffalo, New York 14202


ALSO PRESENT:               RICHARD SUCHAN, CEO
(Via telephone)             MELANIE L. CYGANOWSKI, MEDIATOR



TRANSCRIBER:                Diane S. Martens
                            dmartensreporter@gmail.com


(Proceedings recorded by electronic audio recording,
 transcript produced by computer.)

APPEARANCES - CONTINUED

```
CREDITORS            PACHULSKI, STANG, ZIEHL & JONES LLP
COMMITTEE:             BY:  ILAN D. SCHARF, ESQ.
(Via telephone)      780 Third Avenue
                     34th Floor
                     New York, New York 10017-2024

PARISHES:            WOODS OVIATT GILMAN, LLP
(Via telephone)        BY:  TIMOTHY LYSTER, ESQ.
                     1900 Bausch & Lomb Place
                     Rochester, New York 14604
                             -and-
                     ELSAESSER ANDERSON, CHTD
                       BY:  J. FORD ELSAESSER ANDERSON, ESQ.
                     320 East Neider Avenue
                     Suite 102
                     Coeur d'Alene, Idaho 83815

FOR SELECTIVE:       GIBBONS PC
(Via telephone)        BY:  BRETT S. THEISEN, ESQ.
                     One Gateway Center
                     Newark, New Jersey 07102
```

In Re: Diocese of Buffalo - BK 20-10322

1

2                    **P R O C E E D I N G S**

3                    *          *          *

4

5      **THE COURT:**  And good morning to everyone on line.  This

6   is Judge Bucki.

7      We're here for consideration of a motion in the case of

8   the Diocese of Buffalo, New York.  For those who are online,

9   I reremind you that local bankruptcy rules prohibit the

10  recording or rebroadcasting of any portion of today's

11  proceeding and I also ask everyone to please identify

12  yourselves each time that you speak we need that to

13  facilitate the preparation of a transcript should one be

14  necessary or requested.  Let me start by asking for

15  appearances for those who are in the courtroom.

16     **MR. SULLIVAN:**  Good morning, your Honor, Charles

17  Sullivan, Tom Simcoe and Steve Donato, Bond, Schoeneck & King

18  for the Diocese of Buffalo.

19     Also in the courtroom with us is chief operating officer

20  of the Diocese of Buffalo, Richard Suchan.

21     **THE COURT:**  All right.  Thank you.

22     Well, let me ask who do I have online and let me ask is

23  anyone representing the Committee.

24     **MR. SCHARF:**  Yes, your Honor.

25     **MR. SCHARF:**  Ilan Scharf, Pachulski, Stang Ziehl & Jones

In Re: Diocese of Buffalo - BK 20-10322

1   on behalf of the Committee.

2       **THE COURT:**  Thank you.

3       Do I have the United States Trustee present this

4   morning?

5       **MR. ALLEN:**  Yes, your Honor, Joseph Allen for the United

6   States Trustee.

7       **THE COURT:**  All right.  Thank you.

8       Anyone else that wants to note their appearance?

9       (Talking over each other.)

10      A    Your Honor, this is Ford ELZ and Timothy Lyster for

11  the Parishes.

12      **THE COURT:**  All right.  Thank you very much.

13      Anyone else?

14      A    Yes, your Honor, this is mall will assist now ski,

15  the mediator, appearing for the purpose of listening to the

16  argument only.

17      **THE COURT:**  All right.  Thank you very much.

18      Anyone else?

19      A    Good morning, your Honor, this is PRET thigh son

20  Gibbons PC on behalf of selective insurance.

21      **THE COURT:**  Thank you.

22      Anyone else?

23      (No response.)

24      **THE COURT:**  All right.  Well, let's begin with hearing

25  from the movant.

In Re: Diocese of Buffalo - BK 20-10322


1      Mr. Sullivan, I presume you're going to begin.

2      **MR. SULLIVAN:**  Yes, your Honor.  Charles Sullivan on

3  behalf of the Diocese.

4      Your Honor, I also wanted to let the Court know that Mr.

5  Simcoe and I plan to divide up the presentation on the motion

6  this morning, if that's acceptable to the Court.

7      **THE COURT:**  That's fine.

8      **MR. SULLIVAN:**  And, your Honor, just by way of

9  introduction of my partner, Tom Simcoe, because he's never

10  appeared in front of this Court before.  He's actually from

11  my firm's Albany office and he concentrates his practice on

12  the representation of tax exempt organizations and has

13  extensive experience advising clients on matters related to

14  charitable gifting.  So that's why we asked him to become

15  involved in this matter because we know the Court has a

16  number of questions regarding the proposed use of proceeds.

17      Your Honor, he also works extensively with each of the

18  Catholic Dioceses that are represented by our firm and so he

19  knows a fair amount about the structures and practices of the

20  Catholic organizations, your Honor.

21      Your Honor, if I may give a little bit of a roadmap for

22  this morning's presentation.

23      As I indicated, Mr. Simcoe and I are going to divide up

24  our presentation.

25      My presentation will address two points:

In Re: Diocese of Buffalo - BK 20-10322

1    First, your Honor, I plan to set the stage regarding the

2    procedural context to this motion.  And, second, I will

3    review the relevant history of the seminary and the

4    associated fundraising campaign relating to it.  I will note

5    for the Court's information that the history which is really

6    a fascinating history, your Honor, is set forth in the

7    declaration of Richard Suchan that's filed at docket number

8    3744.  I noted earlier that Mr. Suchan is present with us in

9    the courtroom today and (extraneous noise) and if he were

10   called to testify, his testimony would be consistent with the

11   information set forth in his declaration.

12   Mr. Simcoe will then address the Court regarding the

13   Diocese argument that the net proceeds of sale are

14   unrestricted as to use at the present time and are,

15   therefore, available for the Diocese to use to fund at least

16   in part, your Honor, its contribution to the Survivor Trust

17   that is to be formed under a Plan of Reorganization that will

18   be filed with the Court, you know, we anticipate later this

19   year.

20   I will note for the record, that there is no opposition

21   to the motion and the Committee has joined in the requested

22   relief on the motion.

23   **THE COURT:**  Part of the problem with opposition on this

24   is that the people that made the donation would have made it

25   in 1959, perhaps 1960 -- 65 years ago.  And let's assume that

In Re: Diocese of Buffalo - BK 20-10322

1  people who had the facilities or means to make significant

2  contributions were probably at that time at least in their

3  30s or 40s, so the part we're really looking out for the

4  intent of people who, if they're alive, would probably be

5  somewhere in their 90s, at least in their 90s or past a

6  hundred, maybe most of them well beyond that so they're dead,

7  I mean, and who's looking out for their intent?

8      **MR. SULLIVAN:**  Well, your Honor, that's not an unusual

9  set of circumstances in these sorts of situations, your

10  Honor.  And then I think you look to the records which we've

11  exposed to the Court and would make part of this motion which

12  I think speak to their intent.

13      And, moreover, your Honor, I'll note also that the New

14  York State Attorney General's Office was placed on notice of

15  this application, as well, pursuant to the noticing that went

16  out and it's frequently the role of the Attorney General's

17  Office to weigh in on such matters.

18      But, again, your Honor, I think we will address -- Mr.

19  Simcoe more specifically -- the records that we've submitted

20  that are available which address that issue.

21      As the Court is aware, the present motion was filed

22  pursuant to your Honor's direction as set forth in this

23  Court's January 13, 2025, Decision and Order that appears at

24  docket number 3501.  That Order directed, among other things,

25  your Honor, that the Diocese file a motion concerning the

In Re: Diocese of Buffalo - BK 20-10322

1    disposition of the proceeds of sale of the real property and

2    improvements owned by the Diocese that is located at

3    711 Knox Road, East Aurora, New York which I'll refer to and

4    Mr. Simcoe will refer to as the seminary property, your

5    Honor.  As the Court will recall, the Court issued an order

6    authorizing the sale of the seminary property free and clear

7    of all liens, claims and encumbrances for a price of

8    $4.2 million to World Mission Society Church of God on

9    November 20, 2024, that appears at docket number 3340.

10   Pursuant to the sale order as well as the prior Bidding

11   Procedures Order which appears at docket 3090, the Diocese

12   has held, and continues to hold the net proceeds of sale from

13   the seminary property in a segregated account pending a

14   further order of this Court.  And the closing concerning the

15   sale of that property occurred in February of this year, your

16   Honor.

17        I will also note for the Court that there is a renewed

18   sense of urgency on the part of the Diocese to bring this

19   matter before the Court for a determination because it's

20   important for the Diocese to have available for use these

21   sale proceeds in view of the settlement that has been entered

22   into in principle among the Committee, the Diocese and the

23   parishes and other Catholic affiliates that was announced in

24   court on April 22, 2025.  Your Honor, that's because the

25   Diocese plans to fund, at least in part, its portion of the

In Re: Diocese of Buffalo - BK 20-10322

1   $150,000 settlement from proceeds of certain real property

2   sales including the sale of the seminary property.  And if

3   the Diocese does not have -- it's clear, as your Honor has

4   noted, that the Diocese does not have sufficient cash and

5   investments to fund its portion of the proposed settlement.

6   Therefore, unless the Diocese is authorized to use the

7   seminary property sale proceeds to contribute to that fund as

8   proposed, that settlement, your Honor, will be placed in

9   jeopardy.

10       Your Honor, I'd like now to turn to the historical

11  background concerning the seminary before I turn the

12  microphone over to Mr. Simcoe.

13       Your Honor, the facts in support, as I mentioned

14  earlier, the facts in support of the instant application are

15  set forth in Mr. Suchan's declaration and, your Honor, the

16  Suchan declaration that attaches extensive archival records

17  of the Diocese relating to the fundraising efforts and

18  construction of the seminary property that occurred during

19  approximately 1960 to '61 into '62 because the records

20  indicate that the seminary actually began operations before

21  construction was fully completed in 1961.

22       Prior to the construction of the seminary, the Diocese

23  relied upon Our Lady of the Angel Seminary that was located

24  at Niagara University for the training of many of its

25  Diocesan priests.  That institution announced in the middle

In Re: Diocese of Buffalo - BK 20-10322

1   part of 1959 that it would cease instruction at Niagara

2   University campus and would relocate to the Albany area at

3   the end of the 1961 spring semester.

4       In response, then Bishop Joseph Burke announced in

5   August 1959 that the Diocese would engage in a fundraising

6   campaign with a goal of raising at least $2.5 million for the

7   express purposes of constructing a seminary.  The campaign

8   for the construction of the seminary was administered in two

9   phases.  There was a first sort of and necessarily typical of

10   this type of fund drive, your Honor, there was a quiet phase,

11   a special subscription phase geared towards larger gifts.

12   And then there was a general solicitation of all parishioners

13   within the Diocese that took place during the first week of

14   Advent during 1959.

15       The institutional solicitation materials that were

16   provided to prospective donors made clear that the

17   fundraising efforts were seeking gifts for the construction

18   of a seminary and made no representation that the funds would

19   be permanently committed to the operation of a seminary.  The

20   campaign was obviously successful and the Diocese exceeded

21   its fundraising goals.

22       Your Honor, at about the same time, the real property

23   was given by gift from ***Mr. Fred H. route TER by three

24   separate deeds that were dated December 10, 1959, January 2,

25   1960, and June 13, 1960.  And those parcels comprised the

In Re: Diocese of Buffalo - BK 20-10322

1   approximate 80 acres that made up the seminary real property.

2   The deeds reflected an outright conveyance of the real

3   property to the Diocese and contained no restrictions and no

4   reversionary interests.

5       Thereafter, your Honor, the total cost to construct the

6   seminary was funded by the Diocese and the records appear to

7   indicate that the total cost was in excess of $6.1 million,

8   your Honor, which was more than the amount raised pursuant to

9   the fundraising that occurred in 1959.  That cost was paid in

10  part from the fundraising proceeds but also from the proceeds

11  of a debenture given by the Diocese in the amount of

12  $2.2 million.  And, your Honor, the records don't ever

13  reflect that that debenture was repaid to the Diocese.

14      And then later, your Honor, in February -- on

15  February 19, 1968, the Diocese transferred title to the

16  seminary property to Saint John Vianney Seminary which was

17  the operating entity at the seminary at that time, your

18  Honor.

19      And then in 1970 while Mr. ***Router, who was the donor

20  of the real property, was serving on the Board of Trustees at

21  Saint John Vianney Seminary, that Board of Trustees passed a

22  resolution providing that in the event the seminary property

23  was no longer used as a seminary, that the seminary property

24  would be reconveyed back to the Diocese which, in fact, later

25  happened, your Honor in 1987.

In Re: Diocese of Buffalo - BK 20-10322

1        And then on September 1, 1974, Saint John Vianney

2   Seminary entered into a long-term lease with Christ the King

3   Seminary.  Your Honor, it was at about that time that the

4   Saint John Vianney entity no longer operated the seminary and

5   Christ the King was the successor operator of the seminary

6   who began instruction at that location in 1974.

7        As the Court's aware from the sale motion, that lease

8   with Christ the King as tenant was terminated prior to the

9   sale of the seminary property last year.

10       And then, your Honor, as I mentioned earlier, in 1987,

11  Saint John Vianney, the old operating entity conveyed the fee

12  title interest in the seminary property back to the Diocese

13  just as had been contemplated in the 1968 resolution.

14       Again, all of the deeds of conveyance that have been

15  filed with the Court demonstrate that there are no

16  restrictions, no reversionary interests, and no other

17  encumbrances upon title of the property.

18       Your Honor, I will now turn to Mr. Simcoe to address the

19  unrestricted status of the sale proceeds.

20       **THE COURT:**  Let me ask you some questions as long as I

21  have you.  Don't we have a rather complex number of

22  identifiable sources of funds.  We have Mr. Route TER's

23  donation of real property, undeveloped real property.  We

24  have funds that were specifically raised for the

25  construction.  We have additional contributions from the

72

In Re: Diocese of Buffalo - BK 20-10322

1    Diocese.

2        **MR. SULLIVAN:**  Which appear to have been from the

3    general funds of the Diocese, your Honor.

4        **THE COURT:**  That's right.

5        And then we have the cost of maintenance and upkeep over

6    a period of 60 years.

7        **MR. SULLIVAN:**  Which were subsidized by the Diocese.

8        **THE COURT:**  Well, that's right.  Then we ultimately sell

9    the property for $4.2 million.

10       Now, you have at least four, maybe if we think about it

11   there might be more than four sources of funds.  But let's

12   say, for example, that there is some indication that one of

13   those sources was given with the intent of -- with a specific

14   intent that it be used only for seminary purposes.

15       And your brief on Page 10 specifically quotes from the

16   decision in the, I believe it's the ***Cornell* case where it

17   says that there needs to be a clear expression of intent that

18   the gift was subject to the restriction that it be forever

19   used for a particular purpose.  And so perhaps the monies

20   that came from the general funds of the Diocese, there's no

21   perpetual -- no such intent for perpetual use.  Perhaps for

22   the funds of maintenance and upkeep, there's no intent for

23   perpetual use.

24       But perhaps from one of the other sources of funds,

25   there might be a intent for perpetual use.  And don't we then

In Re: Diocese of Buffalo - BK 20-10322

1   need to, if that's true, I mean, let's assume that I get past

2   the point of saying that there is the necessary intent

3   expressed by the donor, don't we need then to make some

4   allocation and if we need to make an allocation, how do I do

5   it?

6       **MR. SULLIVAN:**  So, your Honor, first of all, I think

7   we're kind of venturing squarely into the area that Mr.

8   Simcoe is better equipped to address.

9       But, secondly, your Honor, I think, I think it's our

10  position that the Court doesn't need to get to that second

11  question because there is no indication based upon the

12  records that are available, your Honor, that there was ever

13  an intent that those would be perpetual, as the Court has

14  indicated.  So I'm going to, I'm going to, if, if, your

15  Honor, will --

16      **THE COURT:**  Yes.  One other question.  I read through

17  Mr. Suchan's affidavit and that caused me to make inquiry of

18  my own.  He makes reference to the fundraising campaign, and

19  you've alluded to it already, first week of Advent in 1959.

20  And, of course, the -- so I went back and looked, which is

21  readily available digitally, at the Diocesan newspaper and

22  specifically on November 15, 1959.

23      And in that Diocesan newspaper -- which probably would

24  be readily admissible as an admission by the Diocese because

25  it's their own newspaper.  I'm not citing here from a

4

In Re: Diocese of Buffalo - BK 20-10322

1    third-party source.  But the Diocesan newspaper which at that

2    time was called the "Catholic Union and Echo" includes a

3    letter from the Bishop, Bishop Joseph Burke, in which he

4    writes to the faithful.  It says the seminary will stand for

5    centuries to come as an eloquent monument to our faith and to

6    the priesthood of Jesus Christ.  And he also asks for various

7    donations to be made as a perpetual remembrance.

8        Aren't we looking at -- when you're talking about

9    something perpetual, he's looking for people to make

10   donations as a perpetual remembrance.  Doesn't that suggest

11   an intent that it be, that these funds be used without

12   limitation for the purpose from which they were donated?

13       **MR. SULLIVAN:**  Your Honor, I can hear Mr. Simcoe

14   chomping at the bit right now to take the microphone.  So I'm

15   going to turn it over to him.

16       **THE COURT:**  Well, I'll look for those answers and, if

17   not, I'll ask them again.

18       **MR. SIMCOE:**  Good morning, your Honor, Tom Simcoe

19   representing the Diocese.  Apologies.  I had to consult my

20   colleagues how to conduct myself in a courtroom.  It's not my

21   normal place of operation.  Forgive me for any missteps.

22       **THE COURT:**  No reason -- perhaps there is intimidation

23   but we try not to intimidate anybody.  So we welcome you.

24       **MR. SIMCOE:**  Thank you very much, your Honor, I

25   appreciate that.

In Re: Diocese of Buffalo - BK 20-10322

1    If I may, your Honor, we'll outline for the Court in the

2  next few minutes under New York law, unless there is an

3  explicit requirement in a written gift instrument requiring

4  that property donated to the Diocese be used perpetually for

5  purposes of constructing and operating a seminary, the law

6  will not assume such perpetual restriction exists.  Under

7  longstanding common law principles that were recently

8  codified in New York law, the Estates, Powers & Trust Law,

9  and Not-For-Profit Corporation Law, the general principle

10  applies that whenever an organization receives funds that are

11  restricted for a particular use or purpose or property that's

12  restricted for a use or purpose, the organization is

13  obligated to use the property only for that purpose.  This is

14  sometimes referred to as a Charitable Trust or Public Trust.

15  Although no actual technical trust is created, it's just the

16  term by which the legal obligations describe.

17    So when an organization has received property for a

18  purpose like that, it is required to use it only for that

19  purpose unless it successfully petitions the Court to

20  exercise its power to modify the donor-imposed restriction

21  under Not-For-Profit Corporation Law Section 555 or Estates,

22  Powers & Trust Law 8-1.1, those codify the traditional

23  doctrine of Cy-près which is the Court's equitable power to

24  modify restrictions imposed by donors on charitable gifts.

25    So I think it's useful to distinguish among different

In Re: Diocese of Buffalo - BK 20-10322

1    kinds of donor restricted gifts and when Cy-près applies to
2    them because it helps tease out how things play out in this
3    circumstance.
4        So the first type of gift is one where the donor
5    restricts the funds to a specific purpose and in using the
6    funds or the property that's donated for the purpose, the
7    property's consumed and no longer exists once the purpose is
8    fulfilled.
9        An example of this would be, for example, a donation of
10   backpacks to be used in a school backpack program where
11   they're going to be given out to kids.  So you receive money
12   to purchase the backpacks, you receive them, you use them, in
13   furtherance of the donor's purpose and then once they've been
14   distributed, it's no longer there and there's no question
15   about what should happen with it.  So if an organization
16   receives funds for a purpose like that, before it's used then
17   to purchase the backpacks, say, if it wants to depart from
18   that intent, it's not legally able to do so unless the donor
19   consents or it goes to court and receives Cy-près release
20   which would allow it to use it for some other purpose.
21       The second type of gift is one where the gift isn't
22   consumed and it's expressly perpetual in nature.  Classic
23   example of this is an endowed scholarship, right.  A $100,000
24   is given to fund a scholarship each year for students from a
25   particular school.  So by referring to something as an

In Re: Diocese of Buffalo - BK 20-10322

1    endowment, inherently the donor has intended that the

2    property will be used forever for a purpose that will be

3    preserved forever for that purpose and the income will be

4    used for the donor's purpose.

5        So in that type of situation before the donee can use

6    the funds for a different purpose besides the scholarship or

7    before they can spend principal, again they would need to go

8    to court and obtain Cy-près relief.  This was the example the

9    case cited by the court last summer ***St. Joseph's Hospital

10   v. Bennett which had an endowment for support of a hospital.

11       So the third type of situation is the kind we have here

12   where there's property that's been given and funds used to

13   construct a facility on that property that won't be consumed

14   when the donor uses it for the purposes for which it was

15   given.  For this kind of gift, the ability to dispose of the

16   property once it's been used for the purpose depends on

17   whether there's a restriction on the use that's perpetual in

18   nature, expressly perpetual in the gift instrument pursuant

19   to which the property was given to the organization.  Gift

20   instrument, it defined it in Not-For-Profit Corporation Law

21   includes traditional gifts, devices such as wills and trusts,

22   memorandum of understanding and letter agreements and things

23   like that.

24       But also includes solicitation materials like we've

25   talked about here by which an organization requests funds

1  from donors and specifies in writing what it's going to do

2  with them.  So if a gift instrument specifies that the

3  property will be used perpetually for the purpose for which

4  it solicited, then the -- if the property that was acquired

5  was later sold, the proceeds are not available for use for

6  any other purpose until a Cy-près proceeding has been

7  successfully completed by which a Court directs a different

8  use.

9      So, the case of ***left woods v Cornell which you

10  alluded to earlier is really a key case in this area which

11  demonstrates the obligations of an organization that's

12  received both real property and funds for a particular

13  purpose and also what that organization's allowed to do once

14  it's used the property for that purpose.

15      So in the Cornell case, the donor, the Curtiss-Wright

16  Corporation contributed a mixture of real property on which

17  it was constructing a wind tunnel where it was conducting

18  scientific R and D and a laboratory as well as funds which

19  were to be used to complete the wind tunnel.

20      The property was transferred from Curtiss-Wright to

21  Cornell University by three gift instruments.  There was a

22  deed, a bill of sale, and a proposal.  And the proposal

23  included a requirement that Cornell use the property to

24  continue the research and development work that was then

25  being performed at the facility by donor.  After Cornell

In Re: Diocese of Buffalo - BK 20-10322

1    received the donations, it then completed construction of the

2    facility and operated an aeronautics research facility in the

3    same nature as Curtiss-Wright had been engaged in for nearly

4    25 years at which time it determined to sell the property to

5    a for-profit purchaser.

6        So the AG's office which has a statutory mandate and a

7    common law mandate to enforce charitable restrictions on

8    property imposed by donors on organizations that hold them

9    sought to enjoin the sale in that situation and to obtain an

10   order from the Court indicating that Cornell could only sell

11   the property to another nonprofit and any proceeds from such

12   a sale should be dedicated exclusively to aeronautics

13   research in the same nature as the donor had been engaged in.

14       The trial court issued an order as requested by the

15   Attorney General's office looking at the overall

16   circumstances of the gift and the general understanding of

17   the parties and also looking at comments that had been made

18   by various representatives of Cornell, an affiliate of

19   Cornell over the years.  It concluded that there was a

20   charitable trust that exists that implied a perpetual

21   obligation on Cornell which would apply both to the property

22   and to the proceeds from the sale of the property.

23       On appeal, the Fourth Department reversed noting that it

24   wasn't just an issue of whether a charitable trust was

25   created but whether the charitable trust that was created

In Re: Diocese of Buffalo - BK 20-10322

1  included an obligation for a perpetual use of the property

2  for a research laboratory in the same manner as originally

3  required.  To answer that question, the Fourth Department

4  focused specifically on the gift instruments that it had,

5  again that was the bill of sale, the deed and the proposal.

6  And although it found a commitment to use the property for

7  the purposes which had, you know, had been described, there

8  was no specific requirement or commitment that it would be

9  used in perpetuity for those purposes.

10      Further, the Court noted that the deed included language

11 which referred to not only Cornell but its successors and

12 assigns owning the property forever releasing the property to

13 them forever and concluded that this language would be

14 inconsistent with property which was intended to be owned by

15 Cornell and operated as such in perpetuity.  So absent a

16 clear expression that there was a perpetual use restriction,

17 one would not be imputed or assumed by the law, and Cornell

18 was free to use the property in furtherance of its, in

19 furtherance of education and scientific research which were

20 consistent with its general purposes rather than the specific

21 purposes of the original gift.

22      A second case from the Court of Appeals which is also

23 instructive in this area is ***City of Suffolk v. Greater

24 New York Councils of Boy Scouts of America.  In that case,

25 the focus was exclusively on the use of the proceeds.  Unlike

In Re: Diocese of Buffalo - BK 20-10322

1    the *Cornell* case, the property had been taken by a

2    condemnation proceeding and there was -- the question was as

3    to whether the proceeds from the condemnation were to be

4    restricted to use for a Boy Scout camp benefiting a

5    particular Council or whether they could be used by the Boy

6    Scouts for their general purposes.

7         And the same type of analysis was conducted by the Court

8    of Appeals in that case.  They cited the *Cornell* case for the

9    proposition as applied in which they looked at the gift

10   instrument in that case which was the will.  And the will

11   included language that specified that the gift of the donor

12   was to be used to establish a Boy Scouts camp in honor of the

13   donor's daughter and husband.  But in examining the bequest,

14   the Court found no indication that there was -- or any

15   language which would include a perpetual restriction or a

16   requirement that once the camp be built, it would be built

17   forever.  And based on that, the Court concluded that the

18   proceeds would be available to the Boy Scouts for its general

19   purposes and were not restricted to use for a camp.

20        So those circumstances are really essentially identical

21   to those we have here.  As your Honor pointed out, there's

22   multiple different sources of funds and property that were

23   used to construct the seminary in 1960.  There were gifts

24   from many, many donors in connection with the campaign.  The

25   gift instruments in those cases included the written

72

In Re: Diocese of Buffalo - BK 20-10322

1    correspondence and communications to donors about the uses of

2    the property.  And there is no -- although there is certainly

3    a commitment to use the funds and property to build a

4    seminary, there's no specific commitment that once built, it

5    would be operated as such in perpetuity.

6        As in the case described, the Cornell case, you

7    mentioned, they operated that facility for 25 years in

8    furtherance of the initial required purpose.  The Boy Scouts,

9    in the Boy Scouts case, the Court had noted that they had

10   operated for 16 years in fulfillment of the original trust.

11       **THE COURT:**  Well let me ask you this.  Because you're at

12   the point among many that I find interesting.

13       You have $4.2 million give or take.  And there's a

14   question I'll get to that later on about tracing that money,

15   what came from what sources.

16       Much of the argument that's set forth in both the

17   written submission and in Mr. -- well, let's say in the

18   written submission -- I forget who signed it but it's from

19   your firm -- as well as in Mr. Suchan's factual

20   representation focuses on the transfer of title of the real

21   estate.  But as I said, there's multiple sources here that

22   are going to have to be traced.

23       Let's go to the most difficult of them, what I find the

24   most difficult of them and that's the small donations.  We're

25   really dealing here with -- and I don't assume anyone's

In Re: Diocese of Buffalo - BK 20-10322

1    familiar with the Biblical references -- but we're really

2    dealing with the widow's mite, you know, the small donations

3    here that accumulate to not an insignificant amount of money.

4    And the Bishop writes to the faithful and says, come and make

5    perpetual remembrances for people.

6         Doesn't that sound like an expression of intent that

7    it's going to be used forever for this particular purpose

8    when you're talking about when the Bishop in his letter to

9    the people says your donations will constitute a perpetual

10   remembrance?  Doesn't that sound like it's really permanent

11   or --

12       **MR. SIMCOE:**  So, your Honor -- and this was, your Honor

13   is reciting the language from the Diocesan newspaper.  And

14   that was a letter from --

15       **THE COURT:**  That was a letter from the Bishop.

16       **MR. SIMCOE:**  So I mean, I think -- I would distinguish,

17   first of all, that the statement that there would be a

18   perpetual remembrance versus a perpetual use of a property

19   are distinct concepts to me.  I mean, obviously for an

20   institution to commit to operating something forever is

21   obviously something that really is almost impossible to

22   promise.  But I think the concept of perpetual remembrance is

23   distinct from operations.

24       **THE COURT:**  Well I mean the Bishop in his letter does

25   also use the word that it will be used as a seminary for

In Re: Diocese of Buffalo - BK 20-10322

1   centuries to come.

2        **MR. SIMCOE:**  For centuries to come.

3        **THE COURT:**  I mean, maybe that's not forever but that

4   sounds like a long time.

5        **MR. SIMCOE:**  Yes, your Honor.  And I apologize I do not

6   have, I didn't have a copy of that particular correspondence

7   in the archives that we reviewed in connection with this to

8   be able to speak specifically to that one iteration.  And I'm

9   not -- I wasn't clear.  What was the date of that

10  particular --

11       **THE COURT:**  It was printed in the Diocesan newspaper for

12  November 13, 1959.

13       **MR. SIMCOE:**  Okay.  So in advance of the campaign.

14       **THE COURT:**  But I mean, I see the distinction you're

15  making, or are attempting to make, maybe it's there or maybe

16  it's not.  Is there a proper distinction to be made from a

17  representation of long-lasting or permanent remembrance as

18  opposed to long lasting and permanent usage.  I don't know if

19  there's a difference.

20       **MR. SIMCOE:**  Well, I mean, remembrances can take

21  different forms.  For example, there could be other places

22  and means in which the support of donors to a particular

23  purpose can be recognized.  It actually happens quite

24  frequently that organizations will raise funds for a

25  particular part of a building or renovation of a building and

In Re: Diocese of Buffalo - BK 20-10322

1    then, you know, those who donated to that may have their

2    names, you know, subscribed somewhere in the room.

3        This is distinct from, say, something with naming rights

4    where someone's named a building which is a different sort of

5    thing.  But on a smaller scale where there's a remembrance of

6    donors and quite frequently those will be moved to another

7    location similarly -- to similarly recognize those people's

8    contributions over time.  So, I think remembrances are

9    distinct, you know, an outside, again, concept of where

10   there's naming rights associated with a large request or

11   something like that.

12       It's not uncommon for remembrances to take different

13   forms over time distinct from the actual uses of property

14   which this is part of the issue.  When you raise funds for a

15   facility after 20, 30, 40 years, the facility depreciates and

16   new money needs to be raised for the same, you know, to

17   upgrade, renovate, improve the same facility.  These things

18   always deteriorate so they're -- and then to solicit funds

19   from new donors, there's also similar -- there usually are

20   similar representations that need to memorialize the

21   contributions of those who support the next wave of

22   construction.

23       **THE COURT:**  Mr. Suchan's affidavit makes reference to

24   the campaign and in particular to a component of that

25   campaign called the seminary bond.  And today it doesn't seem

In Re: Diocese of Buffalo - BK 20-10322

1   like a lot of money.  It was $25.  No doubt in 1959, $25 went

2   a lot further than it does today but that was the amount of

3   the donation.  And it says a bond to be treasured for a

4   lifetime.  But what we're really talking about here are

5   people of modest means being solicited to go and contribute

6   their money for the purpose of building a seminary.

7        **MR. SIMCOE:**  Mm-mm.

8        **THE COURT:**  And is there not a commitment on the

9   Diocese's part to use that money for that purpose, for a

10  seminary and not for the purpose of funding a bankruptcy

11  settlement?

12       **MR. SIMCOE:**  Well, your Honor, I think there's several

13  distinct concepts at work there.  One being what the exact

14  commitments were to the donors.

15       I think with the seminary bonds in particular, there is

16  a set of, say, spiritual benefits that were associated with

17  the seminary bonds and I believe the materials related to the

18  seminary bonds did not include any statement regarding

19  perpetual operation of the seminary.  It talked about

20  maturing in heaven and that there would be prayers said by

21  the seminarians for them.  So I think there's a distinct set

22  of communications around the seminary bonds that were

23  distinct from necessarily what was included in that one

24  letter from the Bishop as opposed to the rest of the

25  materials.

27

In Re: Diocese of Buffalo - BK 20-10322

1      I think the question of whether the funds were used,

2  whether there was a commitment to construct the seminary, the

3  initial charitable trust concept that was undertaken when the

4  funds were received certainly was the case, the seminary was

5  in fact built and lasted for three generations, 60 years

6  before it closed.  So I think from the perspective of

7  fulfilling the obligation to those who contributed their

8  funds, absent that one representation in the letter from the

9  Bishop, that was absolutely fulfilled.

10      And that's, that's the principle described in the

11  *Cornell* case and in the *Boy Scouts* case, there is a

12  commitment to build the facility and then it is built and

13  that fulfills that initial charitable trust.  So then you're

14  left with do we have express commitment that it would be

15  operated in perpetuity or not.

16      **THE COURT:**  Well, shouldn't the standard be somewhat

17  different?  If Curtiss-Wright Company wants to impose a

18  specific condition for a very substantial donation, they have

19  the facility and the means to go and impose that condition.

20  And the Fourth Department ruled that they didn't impose that

21  condition and, therefore, we're not going to imply that.

22      But is it not -- is it or is it not a different

23  circumstance if you're talking about people who are donating

24  $25 a piece --

25      **MR. SIMCOE:**  I think it's --

In Re: Diocese of Buffalo - BK 20-10322

1    **THE COURT:** -- who are really relying on what their

2    clergy --

3    **MR. SIMCOE:**  Yeah.

4    **THE COURT:** -- men may say?

5    **MR. SIMCOE:**  Yeah.

6    **THE COURT:**  Or what the Diocese is saying?

7    **MR. SIMCOE:**  It's a very important distinction, your

8    Honor, and I appreciate that.  So -- and I think the

9    progression of the case law helps clarify how that works.

10    So you see in the *Cornell* case, it wasn't Curtiss-Wright

11    actually that was intervening to seek to enforce the

12    charitable trust in perpetuity.  It was the Attorney

13    General's office.  So the Attorney General's Office has that

14    statutory role.  The Attorney General speaks for donors that

15    don't speak for themselves.  That's their statutory mandate.

16    And then you see this in the statutes involving the

17    Cy-près statute itself, the first option you have to modify a

18    restriction on a fund is to ask the donor to consent to a

19    modification.  If the donor's not available, then you have to

20    go to court.  No one else can speak for the donor and the

21    Attorney General is given notice of that proceeding and then

22    speaks for them.

23    In the *Cornell* case the Attorney General intervened on

24    behalf of the charitable trust that had been in existence and

25    spoke for the donor.  Then you have the Court of Appeals,

In Re: Diocese of Buffalo - BK 20-10322

1  however, in the *Boy Scouts* case which involved an individual

2  person.  I think the amount of the gift was something around

3  $1 million so it was significant.  But the donor was gone and

4  could not speak for themself.

5       And, notably, the Attorney General's Office was not

6  involved in that proceeding.  It was a dispute between the

7  two different parts of the Boy Scouts.  The Attorney

8  General's office would no doubt have been aware of it.  And

9  what you will see is there aren't cases that intervene in

10  circumstances like these after the *Cornell* case which I

11  think --

12       **THE COURT:**  Yeah.

13       **MR. SIMCOE:**  -- because of the clarity that that law

14  does provide for donors and whether or not perpetual use

15  restrictions are created.

16       **THE COURT:**  But in both the *Boy Scout* case and in the

17  *Cornell* case, we're talking about a limited number of

18  significant donors who certainly have the ability to say I'm

19  going to put a restriction on my instruments of transfer.  In

20  the *Boy Scout* case I believe it was an estate put a

21  restriction in my will or if there's a real property

22  transfer, which we have here with Mr. Route TERZ, they

23  certainly have the opportunity to put in a restriction.

24       And many of the cases that you cite are dealing with

25  major donors.  The principle of law doesn't differ but

In Re: Diocese of Buffalo - BK 20-10322

1  perhaps the interpret -- or the evidence that we're looking

2  for is somewhat different.  When you're talking about -- not

3  the total amount of the money and I'll get to the tracing

4  issue in a moment.  But we're talking about people of modest

5  means donating money and --

6      **MR. SIMCOE:**  Yeah.

7      **THE COURT:**  -- and what evidence do we have as to

8  whether they're giving that money with the expectation that

9  I'm supporting a seminary that's going to last indefinitely?

10     **MR. SIMCOE:**  I think the statute is clear that

11 restrictions have to exist in records, written records,

12 right.

13     **THE COURT:**  But, but the --

14     **MR. SIMCOE:**  And, and --

15     **THE COURT:**  But the point I'm making --

16     **MR. SIMCOE:**  Yeah.

17     **THE COURT:**  -- is that the case interpretations you're

18 giving me are of significant donors --

19     **MR. SIMCOE:**  Mm-mm.

20     **THE COURT:**  -- not --

21     **MR. SIMCOE:**  Yeah.

22     **THE COURT:**  -- of small-time donors.

23     **MR. SIMCOE:**  I think it's notable actually the reverse

24 is somewhat notable that the Attorney General's Office is

25 intervening in the *Cornell* matter despite the presence of a

In Re: Diocese of Buffalo - BK 20-10322

1   large donor that could have enforced the restriction

2   themselves if they had cared to do so.  I, I think -- and,

3   notably, the Attorney General also received a copy of this

4   petition.  I don't believe they're present today in this

5   hearing.  But they have the statutory mandate to interpret

6   the statute to interpret these and act on behalf of everyone.

7   We frequently deal with them in matters involving small

8   endowment funds and small gifts, not as small as say $20 but

9   they certainly advocate on behalf of all of New Yorkers in

10  this area, and quite vigorously in our experience, to police,

11  to insure that charitable intent is being carried out.

12      And so I don't think that donors are, are not treated

13  the same in terms of the enforcement of their charitable

14  intent by virtue of how much they contribute.

15      **THE COURT:**  No, they should be treated the same.  But

16  the problem is what evidence do we have -- and it may be

17  entirely more limited when you're talking about the widow

18  that gives a mite.

19      **MR. SIMCOE:**  Mm-mm.

20      **THE COURT:**  And that's --

21      **MR. SIMCOE:**  Yeah, I think that's, that's true, it is

22  more limited.  I think part of the, part of the reason lies

23  in the way it is is because of the public policy of

24  institutions needing to evolve with changing circumstances

25  over time.  I think there's a, there's a need to protect

72

In Re: Diocese of Buffalo - BK 20-10322

1   donor intent but there's also a need for organizations to be

2   able to survive and change and take different kinds of

3   actions over time.

4        And I think that's where the rule that there isn't a

5   presumption in the absence of evidence about what might have

6   been intended because it becomes -- the balance tips too far

7   in the direction of presumed intent and not in the direction

8   of the needs for institutions as evolved in living

9   institutions over time to survive and thrive.

10       **THE COURT:**  Let me ask about tracing.

11       $4.2 million.  Some of which could be traced to

12  ***Mr. Route TERZ's donation of real property.  Some of which

13  might be traced to the Diocesan General Fund.  Some of which

14  may be traced to post-construction maintenance expenses from

15  the General Fund.  And some of which can be traced to small

16  donations of people in the 1959 fundraising campaign.

17       I'm not saying how I'm going to rule on any one of those

18  components but how can I trace this $4.2 million to the

19  appropriate source?

20       **MR. SIMCOE:**  Your Honor, I believe that that's part of,

21  you know, the case law does not include any kind of concept

22  or mechanism other than finding a specific intent.  And in

23  the absence of a specific restriction, I think you wind up

24  with these kinds of somewhat unworkable problems of how do

25  you trace, right.  We know that the Diocese was supporting

In Re: Diocese of Buffalo - BK 20-10322

1   the operations of the seminary to the tune of 250,000,

2   $300,000 a year for the final decade in which it operated.

3   Certainly the numbers are probably similar over a very long

4   period of time.  So to the extent you were engaged in some

5   kind of tracing operation, it might be that the actual

6   initial contributions to the seminary itself and its

7   survivability over a 60-year period were actually quite

8   small.  So I don't, there is no method prescribed in case law

9   for tracing of that nature as what you're describing.

10       **THE COURT:**  I mean, we may have this problem again with

11   the sale of Parish properties, Parishes that may be closed.

12   There was a prior proceeding in this court where I asked Mr.

13   Donato, were the decisions on closing Parishes made within

14   appreciation of the possibility or an expectation of the

15   possibility that those properties might be sold to fund a

16   settlement in this bankruptcy court.  Now there, we're

17   dealing with another difficult issue of tracing perhaps.

18       **MR. SIMCOE:**  So, your Honor, I guess my -- the next step

19   there from that, assuming you engage in that exercise, would

20   be to say, okay, so we have some portion of the proceeds that

21   we think might possibly have been subject to a perpetual use

22   restriction and the question then would be can they be

23   accessed by a Cy-près proceeding?  Because the question isn't

24   whether they're unaccessible at all.  It's just a question of

25   whether Cy-près would be needed to modify that restriction.

In Re: Diocese of Buffalo - BK 20-10322

1      And then the question -- then there would be a separate

2   analysis there as to whether the purposes of the fund have

3   become impossible to achieve with the closure of the

4   seminary, which is a separate inquiry, your Honor.  But I

5   just want to point out that really we're just entering into

6   another stage of analysis even in the event that you were

7   able to, to determine a method to trace relative value from

8   these different sources over time.

9      **THE COURT:**  I looked at the various cases that you cited

10   in your submission.  Are there any cases that specifically

11   address the instance not of a single or limited number of

12   large donors by bequest or by specific donation but rather

13   mass donations by a large number of people which is what

14   occurred here today -- or occurred in 1959, in the first week

15   of Advent in 1959?  Do you have any cases that deal

16   specifically with that type of circumstance where the only

17   donative intent memorialized is from the solicitation to the

18   people?

19      **MR. SIMCOE:**  I'm not aware of any case law of that

20   nature, your Honor.  We frequently engage in modifications of

21   funds that are funded that way because it's not uncommon for

22   endowments to be established by donations from multiple pools

23   but I'm not familiar with any case law of that nature.

24      **THE COURT:**  We're not dealing with any endowment here.

25   We're talking about people making donations of $25.

165

In Re: Diocese of Buffalo - BK 20-10322

1    **MR. SIMCOE:**  But you do see -- you see endowed funds of,
2    you know, of that nature where, say, there's a program at a
3    college that benefits a particular type of student or a
4    particular program and then many people will donate $100 even
5    in today's money, which a hundred dollars is less than $25 in
6    1960 I'm sure, where there may be hundreds of donors that
7    have contributed to it over time.  So those kinds of funds
8    are actually fairly common, and I'm certain that many
9    buildings that are owned by religious institutions across the
10   country have been funded in similar manners, cathedrals and
11   things of that type.

12   **THE COURT:**  All right.  I don't mean to disrupt your
13   argument, even though I just did.  Go right ahead.

14   **MR. SIMCOE:**  So I guess, your Honor, I mean, I think
15   we've discussed the lack of other than this letter that you
16   found, we did not find any evidence in any of the written
17   records associated with the institutional solicitation, the
18   campaign that restricted the property in perpetuity once
19   built to operate as a seminary.  The deeds from Mr. ***Route
20   TER contained no restrictions in them at all, as Mr. Sullivan
21   described.  They also contained language similar to the
22   language in the Cornell deed where the property was
23   transferred to the successors and assigns, or the transferees
24   and assigns forever which would be inconsistent with an
25   intent that it would be operated as a seminary forever.

In Re: Diocese of Buffalo - BK 20-10322

1    And further, we have the records showing Mr. Route TER

2    serving on the board of CK -- I'm sorry, of Saint John

3    Vianney Seminary when it was, when the Board passed a

4    resolution discussing the transfer of the property back to

5    the Diocese in the event that the seminary no longer was

6    operated there.  So, clearly, at least from Mr. Route TER's

7    perspective, we don't see any evidence that there was an

8    expectation that the property or an intent that the property

9    would be used as a seminary forever.

10   **THE COURT:**  But can you agree, though, that the lack of

11   expression of intent by Mr. Route TERZ may impact his

12   donation but it would have no impact on the donation of other

13   individuals?

14   **MR. SIMCOE:**  I, I think that's correct.  I think that

15   you -- for the other individuals you would only be able to

16   look to the records associated with the campaign that we

17   otherwise have as gift instruments under the law, yeah.  So,

18   in the absence of those specific restrictions, the law would

19   not impose a restriction on the proceeds of the sale for use

20   for other Diocesan purposes.

21   We also had funds that were raised more recently in

22   connection with the aupon TEUS rock campaign (phonetic) that

23   were raised for, a portion of that campaign were used for

24   facility improvements in the classrooms, technology and

25   furniture prior to the closure.  So though funds also were

In Re: Diocese of Buffalo - BK 20-10322

1    raised for that purpose and, as such, would have been subject

2    to a charitable trust or public trust to be used for that

3    purpose, which in fact they were as in the other cases that

4    we've talked about which would have satisfied that trust.

5    And, likewise, in the aupon TEUS rock campaign materials we

6    see no express commitment to use for these, the funds for

7    these purposes perpetually since used.

8        **THE COURT:**  Well have any of those funds been commingled

9    in a way that would suggest that the $4.2 million of proceeds

10   should be applied for this purpose?

11       **MR. SIMCOE:**  So the funds were spent on property.  The

12   funds were raised by the foundation, the Roman Catholic

13   Diocese of Buffalo.  Through that campaign they were then

14   contributed and used for property at the facility.

15       As noted in Mr. Suchan's declaration, a lot of the

16   property was removed when the seminary was closed and

17   re-purposed for diaconate purposes, for the diaconate

18   education program.  So they would not have been sold and

19   would not be part of the proceeds that we're talking about

20   today because that property was moved elsewhere.

21       So, I mean, in conclusion on those points, I mean, in

22   the absence of a specific perpetual restriction in a gift

23   instrument under New York law, the Diocese would not be

24   restricted in how it can use the proceeds from the sale of

25   the seminary property such that a Cy-près proceeding would be

In Re: Diocese of Buffalo - BK 20-10322

1   required to modify any restrictions on those proceeds.

2       **THE COURT:**  Do you have any basis, I mean, you make your

3   argument relative to Mr. Route TER's donation.  Were there

4   any appraisals as to the value of his donation towards --

5   what portion of the total construction cost which I think

6   somewhere in the papers was about $3 million or something on

7   that order.

8       **MR. SIMCOE:**  You know, I think the total construction

9   cost was around 6 million eventually.  The estimated cost was

10  3 million but it was 6 million which required the additional

11  support through the Diocesan debenture for 2.2 million.

12      **THE COURT:**  Do we know what, was there ever a -- we

13  could probably look at Mr. Route TER's tax returns and see

14  what he listed as the value of the property on his schedules,

15  what is it, for donations, I forget.  And maybe the tax law

16  was different in '59.  That's before my involvement with

17  preparing any tax returns.

18      But do we have any idea of an assessed value or of an

19  appraised value of the real estate that he donated?

20      **MR. SIMCOE:**  I'm not aware of any assessed or appraised

21  value.  I don't know if anyone else has...  No.  No.

22      **THE COURT:**  All right.  And so I know it's your position

23  that none of this money should be treated as under trust but

24  if I was to find that a portion of it was under trust, how am

25  I going to make an allocation?  Any suggestions at all?

159

In Re: Diocese of Buffalo - BK 20-10322

1     **MR. SIMCOE:**  Well, your Honor, I guess I would first ask

2   to consider the Cy-près Doctrine in that circumstance.  So

3   assuming there's an unknown portion, then the question would

4   be may the restriction that exists on that portion, whatever

5   it is, be modified by the Court pursuant to the Cy-près

6   standard, right?  So the Cy-près is invoked from the purposes

7   of a restriction have become unlawful, impossible to achieve,

8   impracticable or wasteful.  That's the standard under

9   Not-For-Profit Corporation Law Section 555.  And it's quite

10   common for funds to be restricted to the operation of

11   buildings or the maintenance of buildings or purpose

12   associated with a building or activity that has ceased to be

13   engaged in and, therefore, has become impossible to achieve,

14   right.

15       So if the purpose is these funds are for a seminary in

16   Buffalo and the seminary is closed, then that purpose is

17   impossible to achieve.  And so then the question is can they

18   be made available for this purpose, which would be a separate

19   question.  But I think that would be something to consider

20   before considering trying to come up with a methodology for a

21   precise allocation.  Because if Cy-près can be achieved, then

22   that exercise, you know, may be avoided.

23     **THE COURT:**  Well, you're getting into a question or an

24   argument that I was expecting you to make but I haven't heard

25   it quite yet.  And let's assume that we come up with some

In Re: Diocese of Buffalo - BK 20-10322

1  basis of allocation and pull a number out of the air, let's

2  say a million dollars -- and I'm not suggesting that there's

3  any foundation for that but for argument sake, as a

4  theoretical question, hypothetical question, I'll ask you

5  this.

6      Let's suppose that we find that of the $4.2 million, we

7  should allocate at least $1 million of that towards small

8  donations of people back in 1959 who were motivated, at least

9  by representations, that these were for perpetual use and

10 that to maintain a century, as the Bishop said in his letter,

11 for centuries to come.  And so we say, well, there's at least

12 $1 million that are subject to some sort of potential Cy-près

13 argument.  I, I was anticipating that you might argue that

14 the use for, for -- and I'm not necessarily here to rule on

15 how that can be done.  Certainly you can say, well, we're

16 going to use that $1 million to build a new seminary

17 someplace else, possibility or you could say, no, we're going

18 to use it to create an endowment for scholarships for

19 seminary students, possibly.

20     Do you have any argument that whatever funds may be

21 allocated is subject to Cy-près limitations that the use of

22 those funds for a bankruptcy settlement is within the

23 donative intent?

24     **MR. SIMCOE:**  Yes, your Honor, absolutely.  You know, I

25 think the general intent was for the Diocese and the

In Re: Diocese of Buffalo - BK 20-10322

1  advancement of the Catholic faith, right, in Western

2  New York.  I mean, that's throughout the materials is

3  present.  And I think that the circumstances are such that

4  the ability of the Diocese to survive through the bankruptcy

5  proceeding -- if I'm even using the correct terminology,

6  bankruptcy is not my, my realm -- but to come out of

7  bankruptcy as a strong institution and continue in its

8  mission is core of what the donors were seeking.

9      And it's very common in New York for funds -- let's say

10  this was like an en, viewed as an endowment fund -- for

11  endowment funds restrictions to be lifted when an

12  institutional survival is a part of the stakes of the

13  situation because the donors would -- are presumed to prefer

14  that the organization survive in strong financial health than

15  to be hobbled to have their gift restricted for some purpose

16  that can't be fulfilled because a lessened Diocese at the

17  end.

18      **THE COURT:**  If the Court were to find that some

19  portion -- undetermined -- of these funds are subject to a

20  trust fund limitation of some sort, is the appropriate order

21  of the Court one that would say, well, if some portion is

22  subject to a trust, we'll treat the whole thing as a trust?

23  Or is there another theory that if only a portion, then none

24  of it should be treated as a trust?

25      What's your position on that?

In Re: Diocese of Buffalo - BK 20-10322

1    **MR. SIMCOE:**  Well, your Honor, I believe in the first

2    instance, I believe the law is set up the way it is so that

3    these kinds of ambiguities are avoided.  So absent a clear

4    manifestation of specific intent that there be a perpetual

5    restriction, you don't need to get into -- you don't have a

6    perpetual restriction on the use of proceeds.  I think that

7    that is the, if none of it -- if almost all of it is

8    restricted, none of it is restricted is supported by that

9    same rationale.

10       I certainly think that if you are viewing a portion of

11   it as being restricted, you would have to take account for

12   the parts that were contributed by the Diocese, you know,

13   representation of the value and not view a small portion of

14   it as restricting the entire portion because you can't

15   presume the same intent from the Diocese as you might from

16   small unknown donors.

17       And certainly you can, you can presume, whatever you can

18   presume from Mr. Route TER's intent, I assume that the value

19   of the land is a significant part of the value of the

20   property today, as well as whatever it may have been in 1960.

21   So in considering the value of the sale proceeds, I think

22   that should also be part of how that's figured.

23       **THE COURT:**  Is there any authority one way or the other

24   as to whether these funds should be treated as a LIFO or FIFO

25   analysis, first-in, first out, last-in, first-out?

In Re: Diocese of Buffalo - BK 20-10322

1    **MR. SIMCOE:**  There's no case law discussing these kinds

2   of questions at all.

3        **THE COURT:**  All right.  At least not yet.  All right.

4        Anything else on behalf of the Diocese.

5    **MR. SULLIVAN:**  Your Honor, I do have two additional

6   points I'd like to make when Mr. Simcoe is finished.

7        **THE COURT:**  All right.  Thank you.

8    **MR. SULLIVAN:**  Your Honor, first of all, let me address

9   the operation of the seminary.  I think it's, I think the

10   Court is aware but I think for purposes of this record, it's

11   important to note that the seminary ceased operations not so

12   that the property could be sold to create proceeds that would

13   eventually be used to fund a settlement in this Chapter 11

14   case.

15        It ceased operations because enrollment had declined

16   significantly, given the fewer priests in training over time

17   and the fact that the seminary operations themselves were

18   operating so deeply in the red that it could no longer

19   sustain operation with the limited number of enrollees and

20   the extremely high cost to subsidize that operation.  The

21   Diocese found that it could more efficiently and more

22   effectively, you know, fulfill the formation of priest

23   obligation that it has by placing these students in other

24   institutions rather than trying to maintain this for a

25   limited number of students.

174

In Re: Diocese of Buffalo - BK 20-10322


1    So I want to be clear that this property was not sold to

2    create proceeds to fund the settlement.

3    Secondly, your Honor, I want to address the letter to

4    the faithful from Bishop Burke of November 13, 1959, that the

5    Court quoted earlier in the proceeding which was not part of

6    the record that was submitted by the Diocese.

7    Your Honor, that same letter -- I had an opportunity to

8    look at it while Mr. Simcoe was speaking -- also contains a

9    different sentence which says that as follows:  Donations

10   will help build and equip our seminary and will provide

11   unique and priceless opportunities not only to perpetuate the

12   memory of departed loved ones but to gain for them daily

13   fervent remembrance in all the masses and prayers of our

14   priests and students as long as the seminary exists.

15   So even in that same letter there is a temporal

16   limitations suggested by Bishop Burke which suggested that

17   that memorialization would only last as long as the seminary

18   did, your Honor.  So --

19   **THE COURT:**  You have the following sentence as well.

20   **MR. SULLIVAN:**  Pardon me?

21   **THE COURT:**  You have the next succeeding sentence.

22   **MR. SULLIVAN:**  Correct, your Honor.  I wanted to point

23   out to you that I don't think that the -- respectfully, your

24   Honor, I don't think that that one letter -- which is one

25   letter among many records that are available to look at --

In Re: Diocese of Buffalo - BK 20-10322

1   necessarily stands for the proposition that these gifts were

2   to be used in perpetuity to maintain the seminary, your

3   Honor.  I think even that very letter acknowledged that there

4   was a temporal limitation on that acknowledgment.

5       Your Honor, I also wanted to speak to the Court's

6   observation about the widow's mite aspect of the donations

7   here.  Your Honor, I think it's important to remember that

8   there was a very large component of this fundraising that was

9   derived from people of significant means that are not

10  indistinct from the situation that we saw in the *Cornell*

11  case.  As I mentioned to you, there was a quiet phase where

12  significant donors -- donors making significant gifts who had

13  the means and the capability to evaluate what they were

14  doing -- gave to this.  And I believe that portion of the

15  fundraising campaign was very successful, your Honor.

16      So, again, I don't have a specific breakdown for your

17  Honor but as with many of these types of financing

18  fundraising initiatives, it is the large gifts from, you

19  know, families of individuals with means that comprised a big

20  portion of this which made it successful.

21      **THE COURT:**  That's where we run into a problem.  People

22  of means making significant donations are certainly in a

23  position financially to impose restrictions of some sort.

24  But when you go out to, what was it, about a million

25  Catholics living in the Diocese of Buffalo in 1959?

In Re: Diocese of Buffalo - BK 20-10322

1    **MR. SULLIVAN:**  900,000 I think was the number.

2    **THE COURT:**  All right, so I'm not far off.

3    **MR. SULLIVAN:**  Yeah.

4    **THE COURT:**  Well, a hundred thousand is significant if

5    you're in that hundred thousand or not in that hundred

6    thousand.  Let's say 900,000 Catholics and you go out and say

7    to the people from the pulpit, from their newspaper, from

8    whatever source, you go out there and say we want to build a

9    seminary and we want you to make a sacrifice to donate money

10   for the construction of that seminary.  And so people make a

11   donation, whether it be $25, which is the seminary bond, or

12   whether it be a dollar fifty that they scrape from whatever

13   source that they have, and that money is allocated in part in

14   a trust on their part that -- and an expectation and a

15   belief, a belief that there's a need for a seminary, that

16   there's benefits to be derived from that seminary and,

17   therefore, they're going to -- and a trust that's going to be

18   used for that purpose.

19        And so these people, small donors who even if they were

20   alive -- and I suspect very few of them would be alive and if

21   they are alive, they'll be very much up in years -- they make

22   these donations with a belief that -- and a trust that their

23   donation will be used for the purpose for which it was

24   solicited.  And that sounds to me like a foundation for a

25   trust.

In Re: Diocese of Buffalo - BK 20-10322

1    Now, we have the difficult question:  How do you trace

2    the money?  What portion of it?  Maybe none because the

3    subsequent donations -- and that's why the first-in,

4    first-out/last-in, first-out assessment is so critical.  It

5    may be that those funds would have been long dissipated but

6    for the fact that there were people, Diocesan General Funds,

7    for example, that kept the place alive.  But we have parties

8    who made, who may have made donations in trust.  I'm not

9    making a ruling on this, it's more for argument sake.

10    But let's say if there are people of modest means who

11    made donations in trust with the expectation that it would be

12    used to train seminarians, the money's not there for them to

13    go and challenge that even if they were alive.  But this

14    Court cannot confirm a plan unless it satisfies the

15    requirements of law.  Section 1129 of the Bankruptcy Code.

16    So how, how do I, how do I determine if there is an interest

17    of some sort undefined, not quantified and perhaps not fully

18    quantifiable, how do we protect those interests?

19    **MR. SULLIVAN:**  Well, your Honor, first of all, I think,

20    as Mr. Simcoe indicated, we don't, we don't, respectfully,

21    your Honor, necessarily agree that the record reflects that

22    there was the commitment that it would be used in perpetuity.

23    But I also -- I also wonder whether this -- assuming

24    arguendo that Cy-près were necessary for some portion of

25    these proceeds, I think this is almost the perfect case for

In Re: Diocese of Buffalo - BK 20-10322

1  that, your Honor, right.  And why would not this Court have

2  the ability, since applying New York law, to effectively

3  apply the Cy-près Doctrine to whatever portion the Court may

4  believe is subjected to this limitation under the

5  circumstances of these facts, your Honor?  This property was

6  used for its intended purpose.  It was no longer sustainable

7  as such, and I question where this Court might have

8  jurisdiction to apply the Cy-près Doctrine to that portion

9  that the Court is concerned may be subject to those

10  restrictions.

11      **THE COURT:**  This property which sold in 2025, I believe,

12  I think it was earlier this year when it --

13      **MR. SULLIVAN:**  Yes, your Honor.

14      **THE COURT:**  -- closed.

15      **MR. SULLIVAN:**  Correct.

16      **THE COURT:**  The title of the property was in the Diocese

17  of Buffalo.

18      **MR. SULLIVAN:**  Correct.

19      **THE COURT:**  That was not always the case.  At one time

20  it was in a different entity.  And then transferred back into

21  the Diocese.

22      But if the seminary had -- if the transfers had never

23  occurred and if this property was still in, as it once was,

24  in the name of a different entity, we wouldn't even be

25  talking about this now.  That different entity would have to

In Re: Diocese of Buffalo - BK 20-10322

1   fulfill its mission which was the training of seminarians,

2   would it not?

3       **MR. SULLIVAN:**  It would, your Honor, however, I mean, I

4   think the history demonstrates that that other entity perhaps

5   held the property for the benefit of the Diocese because it,

6   the Diocese received the initial gifts which resulted in the

7   construction of the seminary and actually constructed the

8   seminary, your Honor, and apparently at the time of transfer,

9   transferred it to Saint John Vianney Seminary for no

10  consideration and it was transferred back similarly, your

11  Honor.

12      So, a, I think a correct reading of it is that that

13  entity held the property merely as custodian for the Diocese

14  during that period of time anyway.

15      **THE COURT:**  All right.  Well, let me ask if anyone else

16  on line wants to make an argument?

17      **MR. SCHARF:**  Yes, your Honor, Ilan Scharf on behalf of

18  the Committee.

19      I'm going to try not to rehash the argument that was

20  made by the Diocese because I think that it was very well

21  presented.

22      I'll note, your Honor, in addition to the Diocese's

23  arguments just to respond to some of your Honor's questions

24  that were raised, we again don't see the Bishop's letter in

25  1959 as a commitment to maintain a seminary in perpetuity.

In Re: Diocese of Buffalo - BK 20-10322

1  You know, it might be hyperbole, might be the way they

2  intended to have a seminary that lasted for longer than 60

3  years but the reality is that this Diocese closed the

4  seminary after 60 years not because of the bankruptcy but

5  because it was too expensive to maintain based on the reality

6  of the Diocese in 2020 versus the 1960s.

7       In addition, in terms of tracing, your Honor, it would

8  be virtually impossible to trace how these assets went

9  through.  And even if you could trace it, what happens to the

10 funds?  They just sit at the Diocese waiting for the next

11 sixth (phonetic) seminary to be built?

12      It's, you know, impossible to understand where donations

13 went.  I don't think that books and records exist at this

14 point to say that somebody made a $25 donation -- first of

15 all, those funds were then commingled with other funds.  So I

16 think it would just be impossible to trace exactly where that

17 $25 was spent.

18      But, you know, there were construction costs but

19 presumably there were also additional costs such as

20 purchasing furniture for books or other items that would be

21 replaced.  Then there's the question of the ongoing

22 maintenance and support by the Diocese which would have to be

23 credited against anything that people donated.

24      In addition, I think it's impossible to get into the

25 head of the donor to understand if they understood or

91

In Re: Diocese of Buffalo - BK 20-10322

1   intended this to be a perpetual gift for the seminary or a

2   gift to the seminary so that the Diocese could have a

3   seminary.  Or a gift to the Diocese because the Bishop or

4   Parish priest or the deacon was asking for a donation at that

5   time for an important issue because the Diocese needed a

6   seminary to train its clergy as the old Niagara University

7   was moving on.

8        In addition, your Honor, under our -- the Committee's

9   submission notes that Section 544(a)(3) -- I think (a)(1) as

10  well but especially (a)(3) -- should cut through all of this

11  under the strong arm powers (phonetic) as a bonafide

12  purchaser because there's, there's -- this is a unrecorded

13  interest in the property, at best.  I don't think it's an

14  interest, to the extent there's an interest, it's unrecorded.

15  There's a proof of claim process.  Nobody put in a proof of

16  claim asserting any rights to the proceeds, no ad hoc group

17  of parishioners appeared, no Attorney General objection was

18  filed, no unincorporated association came forward, no public

19  interest group came forward, nobody came forward to assert an

20  interest in these proceeds on behalf of anybody.

21       So, to some extent, we're, you know, there's nobody to

22  respond to or file an avoidance action against, if you will,

23  but Section 544, we think, especially known to adopt the

24  analysis that, your Honor, really cuts through all of this

25  and just assures us that there is -- to the extent there was

72

In Re: Diocese of Buffalo - BK 20-10322

1   some sort of interest -- and we agree with the Diocese that

2   there wasn't -- Section 544(a)(3) mows that down and makes

3   this property the estate that's available for distribution to

4   creditors.

5       And in addition, your Honor, I think we have to look at

6   the Diocese as a whole in terms of its contribution.  While

7   the seminary property's proceeds are no longer -- the

8   seminary's no longer necessary to the Diocese, the Diocese

9   has determined that it's no longer necessary for its mission.

10  In fact, it was a burden to the mission because it had to be

11  subsidized and was unaffordable.

12      And so are we going to force the Diocese to maintain an

13  asset in perpetuity even though it's unaffordable?  You know,

14  the Diocese is selling the -- has sold the property, intends

15  to use those funds for the settlement, to fund the

16  settlement.  But at the same time there are other Diocesan

17  assets that are remaining with the Diocese, other property

18  that's held in ***indictment by the Diocese, other assets

19  that they are not using to fund the settlement and those

20  assets could be -- are going to be used to further the

21  general mission of the Diocese including education of

22  seminarians to some extent, and new clergy.

23      And so I think we have to look at this as a, this is a

24  part of a whole settlement that the Diocese is maintaining

25  assets that can be used for the purpose of educating

In Re: Diocese of Buffalo - BK 20-10322

1   seminarians, even if they're not educating in the seminary

2   that's run by the Diocese.

3       And, so, based on all of the arguments as presented in

4   argument today and the pleadings, we think it's appropriate

5   to find that these proceeds are free and clear and could be

6   used to fund a settlement.

7       **THE COURT:**  All right.  I hear your argument and it

8   suggests an interesting issue.

9       Let's assume -- and maybe I should rule that the whole

10  thing is subject it Cy-près limitations or trust

11  limitations -- but let's assume for the moment for purposes

12  of argumentation that only a portion of it needs to be

13  allocated for Cy-près limitations or for trust limitations.

14  How do you make the allocation and is that an allocation that

15  this Court should consider or decide on the present motion or

16  is that something that we should defer on for a proposal that

17  might be incorporated no into a plan?

18      **MR. SCHARF:**  I think, your Honor, with respect to an

19  allocation, the Court should not be looking to allocate any

20  of these funds to -- based on the donor intent because

21  there's no clear expression of donor in the documents, in the

22  solicitation materials, et cetera.

23      In addition, your Honor, these funds were commingled

24  with various funds.  Nobody set up a special account for the

25  $25 donation or even the whole of them.  There's no record of

In Re: Diocese of Buffalo - BK 20-10322

1   that.  There's no evidence of that.

2        And, therefore, as the funds are commingled, they're put

3   out for the general purpose.  So we don't know if funds were

4   held to buy beds in the seminary in the dorm rooms or chalk

5   for the blackboard.  And so it's, it's, given the reality of

6   where we are, I don't think the Court should be engaging in

7   a, frankly, futile effort to allocate because we won't end up

8   anywhere.  We're going to go look at books and records and

9   come to the conclusion that we can't figure out where this

10  money went, what the inputs and the outputs were.  There's no

11  way to trace all these dollars.  I mean, frankly I suspect

12  bank account records no longer exist and I suspect the bank

13  statements have long been destroyed.  And so it would be

14  impossible to conduct that kind of analysis.

15       In addition, as the Diocese's argument in its very

16  well-pled papers stated under the Cy-près Doctrine, the Court

17  should find that the Cy-près Doctrine does not include a

18  donative intent here to the extent or magnitude or the

19  wording that would require a finding or lead to a finding

20  that there was a restriction there.

21       I think that the statements about having a seminary that

22  would last for centuries, you know, is something akin to what

23  was discussed in the ***Kaplan decision (phonetic) with

24  respect to *Cornell*, you know, general purposes or general

25  statements of we're going to be here for a long time do not

In Re: Diocese of Buffalo - BK 20-10322

1  equate to this seminary will have to last in perpetuity, and,
2  by the way, when you donate your money, it's going to last in
3  perpetuity.  And, you know, we don't know -- well, I'll stop
4  there.  I think that under the case law that was cited, it's
5  very clear that there's no donative intent here and the
6  ability to presume the donative intent.  I mean, it has to be
7  clearly articulated and, frankly, that's why solicitation
8  materials nowadays will often include a specific request for
9  the use of the funds.

10      So if you go on the Diocese's website -- it's been a
11 while since I've done this -- but, you know, you can click on
12 "make a donation", they'll have a list of funds you may want
13 to make a donation to.  I think that's an effort to, to suss
14 out some sort of donative intent by the donors.  But
15 certainly there's no ability or basis to assume there's a
16 perpetual donative intent when somebody is making their
17 donation.  I think that it's very logical to understand or
18 assume that when people made a donation, they were making the
19 donation for the benefit of the seminary in the Diocese to
20 train priests.

21      And as Mr. Sullivan pointed out, that lasted for three
22 generations and so they got the benefit of the bargain of a
23 seminary that would train priests and kept the Catholic
24 mission alive in Buffalo.  But there was no basis to assume
25 that it was for a perpetual donation that would trump any

In Re: Diocese of Buffalo - BK 20-10322

1    other creditor's rights to the proceeds of the property.

2        **THE COURT:**  All right.  Anyone else have anything to

3    say?

4        (No response.)

5        **THE COURT:**  Let me ask Mr. Allen, do you have a position

6    on behalf of the office of the United States Trustee.

7        **MR. ALLEN:**  We do not oppose the Diocese request, your

8    Honor.  The arguments presented, I think, did a good job of

9    explaining things to the Court, and in light of the fact that

10   the Attorney General is not appearing here, we take the

11   position the U.S. Trustee does not oppose the motion.

12       **THE COURT:**  All right.  Which you don't oppose it but

13   that doesn't necessarily mean that you're supporting it.

14       **MR. ALLEN:**  Well, I think we -- we have no objection to

15   it I guess is how I would phrase it, your Honor.  If the

16   relief that the debtor is seeking is granted in full, we

17   would have no objection to that.

18       **THE COURT:**  All right.

19       Anyone else want to say anything or anything in rebuttal

20   by the Diocese?

21       (No response.)

22       **THE COURT:**  All right.  I want everyone to understand

23   that when I have hearings, I tend to ask questions as a

24   curiosity perhaps and they reflect nothing as to what my --

25   they should reflect nothing as to what my ultimate decision's

                                                                    187

In Re: Diocese of Buffalo - BK 20-10322


1    going to be.  I try to explore all the legal issues that come

2    to mind, even perhaps ones that I may ultimately reject.  But

3    I want to find out the position of the parties and that's

4    helpful for the Court.

5         There is also the question of admissibility of

6    information and I did reference documents that were not in

7    the affidavits that were presented to the Court.  But as I

8    view it, they're public documents.  In terms of newspapers,

9    generally newspapers are not admissible because they're

10   hearsay.  However, to the extent that this is a publication

11   of the Diocese, I don't view it as hearsay.  And, so, I

12   will -- and I recognize that there is some ambiguity in those

13   documents and in particular in the Bishop's letter, as Mr.

14   Sullivan pointed out a little bit of that ambiguity and that

15   certainly is of concern to the Court.

16        I think there are many issues in this whole question, a

17   broad range of issues in terms of whether or not there is a

18   trust that was created when people made the donations,

19   whether that characterization of a trust may differ depending

20   on the source of money.  I think there is a difficult issue

21   of tracing, if tracing is even possible.  I think that --

22   there's just an enormous assortment of very difficult issues

23   on this.

24        The Court fully appreciates that the decision on this

25   may have implications in terms of other properties that might

In Re: Diocese of Buffalo - BK 20-10322

1   be presented or might be utilized for sale -- or to fund the

2   plan.  But we are bound, as I indicated earlier, by Section

3   1129 of the Bankruptcy Code which says that a court shall

4   confirm a plan only if the plan has been proposed in good

5   faith and not by any means forbidden by law.

6       And so one of the questions is whether the source of

7   funds is a source whose utilization is forbidden by law.  I'm

8   not making any ruling today on that.  I'm not making any

9   ruling at all, as I already indicated.  But I find these

10  issues to be a great challenge to the Court but one that I'll

11  take the time and decide the matter.  So we'll give that due

12  consideration.

13      I'm fully cognizant of the fact, particularly by the

14  mere presence listening in by our mediator, that this outcome

15  may impact on the feasibility of a plan.  And so I will try

16  to get this as quickly as I can but I'm not making any

17  promises.  We have some significant fee applications that I

18  need to read -- and I do read those myself -- and as well as

19  other matters beyond that but we'll try to get at this as

20  quickly as possible but I make no promise of how quickly we

21  can get at it.

22      Are there any other questions?

23      **MR. SULLIVAN:**  Not from the Diocese, your Honor, thank

24  you.

25      **THE COURT:**  All right.  I thank everyone else.  I thank

In Re: Diocese of Buffalo - BK 20-10322

1  you for your presentations.

2      For me, this is a fascinating legal question and I'm in

3  this job because I like fascinating legal questions.  So, I

4  thank you all.

5      And with that, we stand in recess.

6      (WHEREUPON, proceedings adjourned.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

In Re: Diocese of Buffalo - BK 20-10322

1

2                    *         *         *

3              **CERTIFICATE OF TRANSCRIBER**

4

5         In accordance with 28, U.S.C., 753(b), I

6  certify that this is a true and correct record of proceedings

7  from the official audio recording of the

8  proceedings held in the United States Bankruptcy Court

9  for the Western District of New York before the

10  Honorable Carl L. Bucki on May 8, 2025.

11

12

13  S/ Diane S. Martens

14  Diane S. Martens
    Transcriber
15

16

17

18

19

20

21

22

23

24

25

# CONSOLIDATED APPENDIX DOCUMENT NO. 7

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NEW YORK
-------------------------------------------------------
In re

     THE DIOCESE OF BUFFALO, N.Y.,          BK 20-10322 CLB


                  Debtor.          <u>DECISION & ORDER</u>
-------------------------------------------------------

        Bond, Schoeneck & King, PLLC
        Stephen A. Donato, Esq., Thomas W. Simcoe, Esq.,
        Charles J. Sullivan, Esq., Grayson T. Walter, Esq.,
        Andrew S. Rivera, Esq., of counsel
        One Lincoln Center
        Syracuse, New York 13202-1355
        Attorneys for The Diocese of Buffalo, N.Y.

        Pachulski Stang Ziehl & Jones LLP
        Ilan D. Scharf, Esq., James I. Stang, Esq.,
        Jeffrey M. Dine, Esq., Karen B. Dine, Esq., of counsel
        780 Third Avenue, 34th Floor
        New York, New York 10017
        Attorneys for Official Committee of Unsecured Creditors

        Woods Oviatt Gilman LLP
        Timothy P. Lyster, Esq., of counsel
        1900 Bausch & Lomb Place
        Rochester, New York 14604
        Co-Counsel for Parish Steering Committee

        Elsaesser Anderson, CHTD.
        J. Ford Elsaesser, Esq., of counsel
        320 East Neider Avenue, Suite 102
        Coeur d' Alene, Idaho 83815
        Co-Counsel for Parish Steering Committee

        Office of the U.S. Trustee
        Joseph W. Allen, Esq.
        Olympic Towers
        300 Pearl Street, Suite 401
        Buffalo, New York 14202

BK 20-10322CLB                                                            2

Carl L. Bucki, Chief U.S.B.J., W.D.N.Y.

The Diocese of Buffalo has moved to release money that was placed into a segregated account from proceeds of a sale of real property. The primary issue is whether this escrow contains funds whose use must comply with the *cy pres* doctrine of New York law.

In 1959, Fred H. Reuter offered to donate approximately 80 acres of undeveloped land on Knox Road in the Town of Aurora, New York, to the Diocese of Buffalo for use as the campus of a new seminary for the training of clergy. Contemporaneously with its acceptance of this gift, the Diocese conducted what it called "The Seminary Fund Drive." Through this campaign, the Diocese collected more than $3.5 million, all of which was spent on costs of construction. Groundbreaking occurred on September 8, 1960. Originally named in honor of Saint John Vianney, the seminary opened for classes on October 1, 1961.

From 1961 until 2021, the Knox Road property was used as a Catholic seminary, although under several different governing and ownership arrangements. At the time of construction, the property was titled in the name of the Diocese of Buffalo, N.Y. Then in 1968, the Diocese transferred ownership to St. John Vianney Seminary, a New York Corporation. In 1974, St. John Vianney Seminary leased the property to Christ the King Seminary, a Catholic institution that relocated to the same site. The real estate was reconveyed to the Diocese of Buffalo in 1987. By 2010, Christ the King Seminary was experiencing an ongoing operating deficit which was offset in part by annual subsidies from the Diocese.

The Diocese of Buffalo, N.Y., filed a petition for relief under Chapter 11 of the Bankruptcy Code on February 28, 2020.  Upon its commencement of the bankruptcy proceeding, the Diocese also discontinued its subsidy of Christ the King Seminary. Unable to rely on that financial support, the seminary ceased operations at the conclusion of the 2020-2021 academic year.

On July 18, 2024, the Diocese filed a motion to establish bidding procedures for an auction sale of the Knox Road Property.  At the hearing on that request, we questioned whether sale proceeds might be subject to restrictions under the *cy pres* doctrine.  In an order dated August 19, 2024, the Court approved the proposed sale procedures, but with a direction that "[t]he net proceeds of sale of the Property shall be placed in a segregated account held by the Diocese and shall not be disbursed therefrom except as directed by further Order of this Court."  Pursuant to this authority, the Diocese conducted an auction on October 28, 2024.  On November 20, 2024, the Court entered an Order confirming a sale to the high bidder for $4,200,000. The closing of this transaction then occurred on February 14, 2025.

The Diocese of Buffalo has now moved to access the proceeds of the seminary sale.  In paragraph 19 of its motion, the Diocese "submits that the Sale Proceeds are property of the estate, and as such, the Diocese is requesting that the Diocese be authorized, but not directed, to use such proceeds in connection with funding a settlement in this case pursuant to a chapter 11 plan."  It contends that under the Not-For-Profit Corporation Law of New York, these proceeds are not subject to any trust limitations and therefore are unrestricted as to use.  The Official Committee of

Unsecured Creditors supports the relief requested.  No one has opposed the motion.

Discussion

The confirmation of a plan is the ultimate goal for cases filed under Chapter 9, Chapter 11, Chapter 12 and Chapter 13 of the Bankruptcy Code.  In Chapter 12 and 13, some limitations apply only when "the trustee or the holder of an allowed unsecured claim objects to the confirmation of the plan."  11 U.S.C. § 1225(b)(1) and § 1325(b)(1).  But here in Chapter 11, the requirements for confirmation are absolute, whether or not anyone objects.  In particular, section 1129(a)(3) of the Bankruptcy Code states that the Court may confirm a Chapter 11 plan only if "[t]he plan has been proposed in good faith and not by any means forbidden by law."

The debtor has advised that it may wish to use the seminary proceeds to provide partial funding for its plan of reorganization.  Before undertaking the complex process of presenting a disclosure statement and plan, the debtor seeks a ruling on whether this use of proceeds represents "a means forbidden by law."  As in state court, however, the accessibility of estate property is an issue that this Court may review even on "its own motion."  *Sherman v. Richmond Hose Co. No. 2*, 230 N.Y. 462, 473 (1921).

Under New York law, a charitable corporation must honor a donor's direction and intention.  Thus, "it has been widely recognized that the stated purpose for which the donation was made constitutes a binding restriction as to the use of the donation."  18 NY Jur. 2d *Charities* § 26 (2011).  If it becomes impossible to perform those directions, then "the cy pres doctrine will be applied."  *Id.*  This equitable doctrine allows a court

to reform "a gift to charity as closely to the donor's intention as possible, so that the gift does not fail." BLACK'S LAW DICTIONARY 470 (10TH ED. 2014).

In *Saint Joseph's Hospital v. Bennett*, 281 N.Y. 115 (1939), the New York Court of Appeals confirmed the controlling rule, that religious corporations may not divert donated funds from the stated purpose of a donor.

> "No authority has been brought to our attention that a gift to a charitable corporation with the express direction that it be applied to a specific corporate purpose in a specific manner may be accepted by the corporation, and then used for a different corporate purpose in a different manner. No trust arises, it is true, in a technical sense, from such a gift for trustee and beneficiary are one. The charitable corporation is not bound by all the limitations and rules which apply to a technical trustee. It may not, however, receive a gift made for one purpose and use it for another, unless the court applying the *cy pres* doctrine so commands."

281 N.Y. at 123.

The New York State legislature has codified the holding of *Saint Joseph's Hospital v. Bennett* into the Not-for-Profit Corporation Law. *See* Comment to N.Y. NOT-FOR-PROFIT CORP. LAW § 513 (McKinney 2015). Although the Diocese of Buffalo was not incorporated under the Not-for-Profit Law, it is still subject to section 513 of this statute:

> "A corporation which is, or would be if formed under this chapter, a charitable corporation shall hold full ownership rights in any assets consisting of funds or other real or personal property of any kind, that may be given, granted, bequeathed or devised to or otherwise vested in such corporation in trust for, or with a direction to apply the same to, any purpose specified in its certificate of incorporation."

N.Y. NOT-FOR-PROFIT CORP. LAW § 513(a) (McKinney 2015).  Subdivision (a) thereby addresses the Rule against Perpetuities.  Subdivision (b) then directs that unless the *cy pres* doctrine allows a variance, "the governing board shall apply all assets thus received to the purposes specified in the gift instrument as defined in section 551 (Definitions) and to the payment of the reasonable and proper expenses of administration of such assets."

Not all donations to the Diocese of Buffalo are subject to the restraints of the *cy pres* doctrine.  To determine its applicability in the present instance, this Court must decide two forms of what is essentially the same question: whether in the language of *Saint Joseph's Hospital v. Bennett*, the seminary proceeds derive from a gift "with the express direction that it be applied to a specific corporate purpose;" or whether in the language of Not-for-Profit Law § 513(a), the seminary proceeds derive from a gift "with a direction to apply the same" to a specified purpose.  The Appellate Division of New York's Supreme Court identified the relevant issue in *Lefkowitz v. Lebensfeld*, 68 A.D.2d 488, 495-96 (1st Dept. 1979): "[A] donor who attaches conditions to his gift has a right to have his intention enforced.  But a donor who has attached no conditions has no such expectation.  He is, in effect, relying on the good will and judgment of the donee charity to utilize his gift in what the donee perceives to be the most appropriate manner" (citations omitted).

The Diocese of Buffalo began construction of the seminary on Knox Road more than 65 years ago.  Most if not all of the benefactors for this project are now deceased.  The Court was not surprised, therefore, when no one questioned the proposed

application of sale proceeds.   Death may silence the testimony of objectors and supporting witnesses, but it cannot change promises whose existence is nonetheless documented by admissible evidence.

In considering the present motion, the Court relied upon two sources of information.  The first is a compilation of archival records that were authenticated through a declaration from the debtor's Chief Operating Officer.  Secondly, at the hearing on this matter, the Court advised the parties that it would also review editions of the Catholic Union and Echo, a weekly newspaper published by the Diocese. Newspaper articles are self-authenticating under Rule 902(6) of the Federal Rules of Evidence.  Both sources are appropriately considered under hearsay exceptions for records of regularly conducted activity (*See* FED. R. EVID. 803(6)) or as statements in ancient documents (*See* FED. R. EVID. 803(16)).  Based on a careful review of these factual sources, we find that most, but not all of the sale proceeds are subject to the restraints of New York's *cy pres* doctrine.

In 1959, the Diocese reported that the real property donated by Fred Reuter had a value of $100,000.[1]  As for improvements, the Diocese has provided the minutes of a special meeting of the trustees of St. John Vianney Seminary that was held on December 13, 1968.  At that session, the treasurer reported that the total cost of seminary construction was $6,129,330.  Of this amount, $3,559,219 was collected through The Seminary Fund Drive.  An additional $370,201 was received from subsequent bequests and other special donations.  The balance of $2,200,000 was

---

[1] *Reuters Give 80-Acre Tract for Seminary*, CATHOLIC UNION AND ECHO, Nov. 6, 1959, at 1.

advanced from general funds of the Diocese.[2] Property financed from general funds would not be subject to any restriction for a specified purpose. On the other hand, the $370,201 from bequests and other donations appear to constitute gifts made with a direction for use in seminary construction. The more challenging issue is how to treat proceeds of The Seminary Fund Drive and the Reuter donation of undeveloped land.

Section 513(b) of the New York Not-for-Profit Corporation Law mandates that the Diocese apply gifted funds "to the purposes specified in the gift instrument as defined in section 551." This later section states that "'gift instrument' means a record or records, *including an institutional solicitation*, under which property is granted to, transferred to, or held by an institution as an institutional fund." N.Y. NOT-FOR-PROFIT CORP. LAW § 551(c) (McKinney 2015)(emphasis added). Subject to exclusions not here applicable, "institutional fund" is then broadly defined to mean "a fund held by an institution." N.Y. NOT-FOR-PROFIT CORP. LAW § 551(e) (McKinney 2015). For purposes of the present discussion, the controlling principle is that a gift instrument may include solicitations to the donor. Here, those solicitations confirm an expectation and understanding that proceeds of The Seminary Fund Drive would be used only for the construction of a seminary to train prospective clergy.

The historical record reveals three salient facts about The Seminary Fund Drive. The first is that its exclusive purpose was to raise funds for seminary construction. The very name of the campaign indicates this intent. In its edition for August 14, 1959, the

---

[2] It appears that the treasurer provided a rounded number for the advance from general funds of the Diocese, and that the precise number should have been stated as $2,199,910.

Diocesan newspaper reported that the bishop had "announced that a $2,500,000 fund drive to build the seminary will be conducted the first week of Advent this year."[3] On November 27, 1959, this same newspaper reiterated that "The Seminary Fund is designed to meet the need of the Diocese of Buffalo to erect a new seminary for the education and training of students preparing for the holy priesthood destined to minister unto the faithful of the Diocese of Buffalo."[4] Contributors of at least $25 were issued a "Spiritual Seminary Bond," which recited that the donation "has enabled the Diocese of Buffalo to erect The Seminary of Saint John Vianney, for the training and education of Priests."[5]

A second fact is that the Diocese contemplated that proceeds from The Seminary Fund Drive would remain distinct from general resources.  One of the archival documents provided by the Diocese was a letter dated November 4, 1959, from the Seminary Fund Director to pastors of parishes.  In this correspondence, the priests were given the following instructions for how to solicit contributions: "First, do not look upon The Seminary Fund just as another Appeal.  It is unique. It is a Building Drive."

Third, donors were assured that their contributions would be used on a project of lasting duration.  In a statement published on November 13, 1959, the Bishop declared that the "Seminary will stand, please God, for centuries to come as an

---

[3] *Bishop Names George Frauenheim to Direct Drive for Diocesan Seminary*, CATHOLIC UNION AND ECHO, Aug. 14, 1959, at 1.

[4] *Here are Some Facts About Seminary Fund*, CATHOLIC UNION AND ECHO, Nov. 27, 1959,  at 11.

[5] *A Bond with a Blessing*, CATHOLIC UNION AND ECHO, Nov. 13, 1959, at 3.

eloquent monument to our Faith."[6]  As the campaign was finishing, the Fund Director declared that the seminary "will stand in the Town of Aurora as a perpetual reminder of the great Seminary Fund of 1959."[7]  This same theme was expressed in an editorial that the Diocesan newspaper published on December 11, 1959: "St. John Vianney Seminary, standing as a permanent monument in Western New York, will be for centuries a sacred tribute to the faith of our people, and to their love for Christ's priesthood."[8]

Both in its solicitations and in its acknowledgment of gifts, the Diocese told donors that contributions to The Seminary Fund Drive would be used for the specified and lasting purpose of establishing a permanent seminary to serve the Diocese of Buffalo.  If fulfillment of that purpose becomes impractical, the *cy pres* doctrine may allow a reformation that is consistent with the donor's intent.  *See* N.Y. NOT-FOR-PROFIT CORP. LAW § 555 (McKinney 2015) and N.Y. EST. POWERS & TRUSTS art. 8 (McKinney 2002).  But today, the debtor's motion seeks to use sale proceeds for inconsistent purposes like funding a settlement of abuse claims.  Such use of proceeds from targeted gifts would violate donor intent and is therefore not permitted under New York law.

The movant argues that at least with respect to proceeds attributable to the Reuter gift, this Court should follow the ruling in *Lefkowitz v. Cornell University*, 35

---

[6]*Bishop's Message*, CATHOLIC UNION AND ECHO, Nov. 13, 1959, at 2.

[7]*Seminary Drive is $2,000,000 over Goal, $4,492,613 Donated*, CATHOLIC UNION AND ECHO, Dec. 11, 1959, at 1.

[8]Editorial, *Our People Prove Their Zeal*, CATHOLIC UNION AND ECHO, Dec. 11, 1959, at 4.

A.D.2d 166 (4th Dept. 1970).  In that case, Cornell was attempting to sell a laboratory

and wind tunnel that the Curtiss-Wright Corporation had donated to the University in

1945.  As with the seminary property, the real estate had been transferred to Cornell

through a deed that contained no restrictions as to future use.  Arguing that the sale

violated the donor's intent, New York's Attorney General obtained from the trial court

an injunction against the sale.  In reversing that decision, the Appellate Division

observed that "there is no evidence that Cornell received the gift of the laboratory as

a result of representations on its part that it would forever operate it for the public

benefit." *Id.* at 172.  As to this factor, the sale of the seminary is distinguishable.  Fred

Reuter conveyed the Knox Road property through three deeds. The earliest of these

indentures is dated December 10, 1959, at the same time that the Diocese was telling

all donors that contributions would support the establishment of a permanent

seminary.  These representations were than particularized for Mr. Reuter and his wife.

In acknowledging their gift, the Bishop issued the following statement:

> "It is also an eloquent manifestation of the faith and
> generosity of Mr. and Mrs. Reuter, who, for many
> years, have cherished the hope that their beautiful
> estate would some day become the site of a project
> which would benefit a vital activity in the life of the
> Church. Please God, for centuries to come, their names
> and their gift will be held in prayerful memory."[9]

As with all donations to The Seminary Fund Drive, the Diocese expressed an

understanding that the real property would be used permanently as a seminary.

Pursuant to the direction of Not-for-Profit Law § 513(b) and the precedent of *Saint*

---

[9] *Id.* at 13.

*Joseph's Hospital v. Bennett*, the Reuter gift is subject to the restriction that it be used for the benefit of clergy education.

In 1970, the Board of Trustees of St. John Vianney Seminary passed the following resolution:

> RESOLVED that in the event the real property located on Knox Road in the Town of Aurora, owned by this corporation is no longer used as a seminary for the education of young men to the priesthood, title to this property shall be reconveyed to the previous owner, The Diocese of Buffalo, N.Y.

Fred Reuter was then a member of the Board of Trustees, although he was not present at the meeting. Admittedly, the resolution occurred more than a decade after Mr. Reuter's donation. Nonetheless, it does confirm a commitment to long term use of the property for its intended purpose. To the extent that the seminary corporation was no longer to operate, it would return the property to the Diocese, presumably so that the Diocese could either operate a seminary or find some other appropriate use consistent with *cy pres* requirements.

The Diocese contends that the seminary on Knox Road was property of the estate under 11 U.S.C. § 541(a). We agree, but find that it is also subject to the limitations of 11 U.S.C. § 541(c)(2), which reads as follows: "A restriction on the transfer of a beneficial interest of the debtor in a trust that is enforceable under applicable nonbankruptcy law is enforceable in a case under this title." Here, the applicable nonbankruptcy law provides "that although gifts to a charitable organization do not create a trust in the technical sense, where a purpose is stated a trust will be

implied." *Lefkowitz v. Lebensfeld*, 68 A.D.2d 488, 496 (1st Dept. 1979).  This implied

trust imposes constraints that are enforceable in bankruptcy.  Consequently, proceeds

traceable to The Seminary Fund Drive and the Reuter donation are restricted and may

not be used to settle unrelated claims against the Diocese.

In 1959, the Diocese of Buffalo solicited donations big and small[10] for the special

purpose of building a seminary.  We recognize that the debtor now has another special

need for significant money to settle claims.  This current need is distinct, however, and

cannot sanction the application of resources committed by law to a different use.

When the seminary was built, the sources of funding derived from both

restricted donations and advances from a general fund.  Unfortunately, these sources

were greater in amount than the net proceeds derived from the sale in 2025.  Unable

to identify any basis to prioritize the sources of funding, we find that the sale proceeds

should be allocated between restricted and unrestricted interests on a pro-rata basis.

Conclusion

The motion of the Diocese of Buffalo is granted in part and denied in part, all in

accord with the following allocation.  When donated for use as a seminary, the land on

Knox Road had a value of $100,000.  The cost of construction was $6,129,330 and was

paid from three sources.  The sum of $2,199,910 derived from unrestricted assets of

the Diocese.  However, specific bequests of $370,201 and proceeds from The Seminary

Fund Drive in the amount of $3,559,219 were both subject to restrictions for the

---

[10]On December 11, 1959, the Diocesan newspaper reported that "a little boy met with [the Seminary Fund Director] and asked if a nickel would help the fund.  He was assured that it would and it was duly recorded." *Sidelights on The News*, CATHOLIC UNION AND ECHO, Dec. 11, 1959, at 4.

BK 20-10322CLB                                                                 14

benefit of that project.  When added to the land value, restricted sources of funding total $4,029,420.  This sum constitutes 64.68 percent of the land value and cost of construction.  As an attribute of restricted donations, this percentage may be used only in ways consistent with donor intent.

Now that the property has been liquidated, any proceeds will be traced to their source.  The Knox Road property was sold for $4,200,000.  Certain closing costs may have been paid from the sale price, and presumably some interest has accrued after the net proceeds were placed into a segregated account.  Unfortunately, the record does not establish the amount now on deposit.  Whatever that sum may be, 35.32 percent of those moneys are unrestricted funds that the Diocese may use on any allowable expenditure.  The remaining 64.68 percent remains restricted and may not be used to fund a settlement within a confirmed plan of reorganization.

So ordered.

Dated: June 6, 2025
       Buffalo, New York              Hon. Carl L. Bucki, Chief U.S.B.J., W.D.N.Y.



# Notice Recipients

District/Off: 0209−1                    User: admin                    Date Created: 6/6/2025
Case: 1−20−10322−CLB                    Form ID: pdforder               Total: 7

**Recipients of Notice of Electronic Filing:**
aty    Ilan D Scharf    ischarf@pszjlaw.com
aty    Stephen A. Donato    sdonato@bsk.com
aty    Timothy Patrick Lyster    tlyster@woodsoviatt.com

TOTAL: 3

**Recipients submitted to the BNC (Bankruptcy Noticing Center):**
db     The Diocese of Buffalo, N.Y.    795 Main Street    Buffalo, NY 14203
pr     Charles Mendolera    c/o The Diocese of Buffalo, N.Y.    795 Main Street    Buffalo, NY 14203
smg    Office of the U.S. Trustee    300 Pearl Street, Suite 401    Olympic Towers    Buffalo, NY 14202
       Elsaesser Anderson, CHTD.    J. Ford Elsaesser, Esq.    320 East Neider Avenue, Suite 102    Coeur d'
       Alene, Idaho 83815

TOTAL: 4

**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF NEW YORK**

In Re:                                         Case No.: 1−20−10322−CLB
                                               Chapter: 11
   The Diocese of Buffalo, N.Y.

                                               Tax ID: 16−0743984
                 Debtor(s)

## NOTICE OF ENTRY

   **PLEASE TAKE NOTICE** of the entry of the Order referenced below, duly entered in the within action in the Clerk's Office of the United States Bankruptcy Court, Western District of New York on **June 6, 2025**. The Clerk of Court of the United States Bankruptcy Court, Western District of New York, hereby certifies that a copy of the subject Order was sent to all parties in interest herein as required by the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure.

Docket          Decision and Order. Signed on 6/6/2025. (RE: related document(s)3743
#3929:          Generic Motion filed by Debtor The Diocese of Buffalo, N.Y.). NOTICE
                OF ENTRY. (Pinto, M.)

Date: June 6, 2025                             Lisa Bertino Beaser
                                               Clerk of Court

Form ntcentry/Doc 3929
www.nywb.uscourts.gov

# Notice Recipients

District/Off: 0209−1                     User: admin                    Date Created: 6/6/2025
Case: 1−20−10322−CLB                     Form ID: ntcentry               Total: 7

**Recipients of Notice of Electronic Filing:**
aty        Ilan D Scharf          ischarf@pszjlaw.com
aty        Stephen A. Donato       sdonato@bsk.com
aty        Timothy Patrick Lyster        tlyster@woodsoviatt.com

TOTAL: 3

**Recipients submitted to the BNC (Bankruptcy Noticing Center):**
db         The Diocese of Buffalo, N.Y.       795 Main Street       Buffalo, NY 14203
pr         Charles Mendolera         c/o The Diocese of Buffalo, N.Y.       795 Main Street       Buffalo, NY 14203
smg        Office of the U.S. Trustee       300 Pearl Street, Suite 401       Olympic Towers       Buffalo, NY 14202
           Elsaesser Anderson, CHTD.       J. Ford Elsaesser, Esq.       320 East Neider Avenue, Suite 102       Coeur d'
           Alene, Idaho 83815

TOTAL: 4

# CONSOLIDATED APPENDIX DOCUMENT NO. 8

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NEW YORK

In re:

THE DIOCESE OF BUFFALO, N.Y.,

Case No. 20-10322 CLB
Chapter 11 Case

Debtor.

## NOTICE OF APPEAL

**PLEASE TAKE NOTICE** that The Diocese of Buffalo, N.Y. submits this Notice of

Appeal in conformity with Bankruptcy Form B4171A and in accordance with Federal Rule of

Bankruptcy Procedure 8003.

## Part 1: Identify the Appellant(s)

1. Name(s) of appellant(s):

   The Diocese of Buffalo, N.Y.

2. Position of appellant(s) in the adversary proceeding or bankruptcy case that is the subject
   of this appeal:

   For appeals in an adversary proceeding.

   o Plaintiff
   o Defendant
   o Other (describe)

   For appeals in a bankruptcy case and not in
   an adversary proceeding.

   ☒ Debtor
   o Creditor
   o Trustee
   o Other
   (describe)_____

## Part 2:  Identify the subject of this appeal

1. Describe the judgment, order, or decree appealed from:  Decision and Order [Dkt. 3929],
   a copy of which is attached as **Exhibit A**.

2. State the date on which the judgment, order, or decree was entered: June 6, 2025.

## Part 3:  Identify the other parties to the appeal

List the names of all parties to the judgment, order, or decree appealed from and the names,
addresses, and telephone numbers of their attorneys (attach additional pages if necessary):

1. Party:   The Diocese of             Attorney:    Stephen A. Donato, Esq.

Buffalo, N.Y.                          Charles J. Sullivan, Esq.
(Appellant)                            Grayson T. Walter, Esq.
                                       Thomas W. Simcoe, Esq.
                                       Gregory J. McDonald, Esq.
                                       Bond, Schoeneck & King, PLLC
                                       One Lincoln Center
                                       Syracuse, NY 13202
                                       Telephone No.: (315) 218-8000

2.  Party:  The Official        Attorneys:  James Stang, Esq.
            Committee of                    Ilan D. Scharf, Esq.
            Unsecured Creditors             Karen B. Dine, Esq.
            (additional Appellant)          Jeffrey M. Dine, Esq.
                                            Pachulski Stang Ziehl & Jones, LLP
                                            780 Third Avenue, 34th Floor
                                            New York, NY 10017-2024
                                            Telephone No.: (212) 561-7700

3.  Party:  Office of the United  Attorney:  Joseph W. Allen, Esq.
            States Trustee                   Olympic Towers
                                             300 Pearl Street, Suite 401
                                             Buffalo, NY 14202
                                             Telephone No.: (716) 551-5541

**Part 4:  Optional election to have appeal heard by District Court (applicable only in certain districts)**

Not applicable.

**Part 5: Sign below**

/s/  Stephen A. Donato                          Date:  June 18, 2025
Signature of attorney for appellant(s) (or appellant(s)
if not represented by an attorney)

Name, address, and telephone number of attorney
(or appellant(s) if not represented by an attorney):
Stephen A. Donato
Charles J. Sullivan
Grayson T. Walter
Thomas W. Simcoe
Gregory J. McDonald
Bond, Schoeneck & King, PLLC
One Lincoln Center
Syracuse, New York 13202
315-218-8000

2

JS 44 (Rev. 03/24)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

The Diocese of Buffalo, N.Y.

**DEFENDANTS**

See attached Schedule A for other parties to the appeal

**(b)** County of Residence of First Listed Plaintiff  Erie
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

See attached Schedule A

Attorneys *(If Known)*

See attached Schedule A

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1  U.S. Government
Plaintiff

☒ 3  Federal Question
*(U.S. Government Not a Party)*

☐ 2  U.S. Government
Defendant

☐ 4  Diversity
*(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*and One Box for Defendant)*
*(For Diversity Cases Only)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☒ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | Product Liability |  |  | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 367 Health Care/ Pharmaceutical Personal Injury |  | **INTELLECTUAL PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | Product Liability |  | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability |  | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** |  | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud ☐ 371 Truth in Lending |  | ☐ 840 Trademark ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** |  | ☐ 485 Telephone Consumer Protection Act |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act |  | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice |  | ☐ 720 Labor/Management Relations | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise |  |  | ☐ 740 Railway Labor Act | ☐ 861 HIA (1395ff) ☐ 862 Black Lung (923) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | ☐ 791 Employee Retirement Income Security Act | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence |  |  | ☐ 896 Arbitration |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General |  | **FEDERAL TAX SUITS** | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
|  | ☐ 448 Education | ☐ 550 Civil Rights ☐ 555 Prison Condition ☐ 560 Civil Detainee - Conditions of Confinement | ☐ 465 Other Immigration Actions |  |  |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1  Original
Proceeding

☐ 2  Removed from
State Court

☐ 3  Remanded from
Appellate Court

☐ 4  Reinstated or
Reopened

☐ 5  Transferred from
Another District
*(specify)*

☐ 6  Multidistrict
Litigation -
Transfer

☐ 8  Multidistrict
Litigation -
Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 USC 158

Brief description of cause:
Appeal of U.S. Bankruptcy Decision and Order

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION**
UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:    ☐ Yes    ☒ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions)*

JUDGE  Hon. Carl L. Bucki

DOCKET NUMBER  BK 20-10322

DATE
June 18, 2025

SIGNATURE OF ATTORNEY OF RECORD
/s/ Stephen A. Donato, Esq.

**FOR OFFICE USE ONLY**

RECEIPT #         AMOUNT         APPLYING IFP         JUDGE         MAG. JUDGE

## SCHEDULE A

| PARTY | COUNSEL |
|---|---|
| **The Diocese of Buffalo, N.Y. (Appellant)** | Stephen A. Donato, Esq.<br>Charles J. Sullivan, Esq.<br>Grayson T. Walter, Esq.<br>Thomas W. Simcoe, Esq.<br>Gregory J. McDonald, Esq.<br>BOND, SCHOENECK & KING, PLLC<br>One Lincoln Center<br>Syracuse, NY 13202<br>Telephone No.: (315) 218-8000 |
| **The Official Committee of Unsecured Creditors (additional Appellant)** | James Stang, Esq.<br>Ilan D. Scharf, Esq.<br>Karen B. Dine, Esq.<br>Jeffrey M. Dine, Esq.<br>PACHULSKI STANG ZIEHL & JONES, LLP<br>780 Third Avenue, 34th Floor<br>New York, NY 10017-2024<br>Telephone No.: (212) 561-7700 |
| **Office of the United States Trustee** | Joseph W. Allen, Esq.<br>Olympic Towers<br>300 Pearl Street, Suite 401<br>Buffalo, NY 14202<br>Telephone No.: (716) 551-5541 |

# EXHIBIT A

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NEW YORK
--------------------------------------------------------
In re

THE DIOCESE OF BUFFALO, N.Y.,                           BK 20-10322 CLB


                        Debtor.                  DECISION & ORDER
--------------------------------------------------------

                    Bond, Schoeneck & King, PLLC
                    Stephen A. Donato, Esq., Thomas W. Simcoe, Esq.,
                    Charles J. Sullivan, Esq., Grayson T. Walter, Esq.,
                    Andrew S. Rivera, Esq., of counsel
                    One Lincoln Center
                    Syracuse, New York 13202-1355
                    Attorneys for The Diocese of Buffalo, N.Y.

                    Pachulski Stang Ziehl & Jones LLP
                    Ilan D. Scharf, Esq., James I. Stang, Esq.,
                    Jeffrey M. Dine, Esq., Karen B. Dine, Esq., of counsel
                    780 Third Avenue, 34th Floor
                    New York, New York 10017
                    Attorneys for Official Committee of Unsecured Creditors

                    Woods Oviatt Gilman LLP
                    Timothy P. Lyster, Esq., of counsel
                    1900 Bausch & Lomb Place
                    Rochester, New York 14604
                    Co-Counsel for Parish Steering Committee

                    Elsaesser Anderson, CHTD.
                    J. Ford Elsaesser, Esq., of counsel
                    320 East Neider Avenue, Suite 102
                    Coeur d' Alene, Idaho 83815
                    Co-Counsel for Parish Steering Committee

                    Office of the U.S. Trustee
                    Joseph W. Allen, Esq.
                    Olympic Towers
                    300 Pearl Street, Suite 401
                    Buffalo, New York 14202

Carl L. Bucki, Chief U.S.B.J., W.D.N.Y.

The Diocese of Buffalo has moved to release money that was placed into a segregated account from proceeds of a sale of real property.  The primary issue is whether this escrow contains funds whose use must comply with the *cy pres* doctrine of New York law.

In 1959, Fred H. Reuter offered to donate approximately 80 acres of undeveloped land on Knox Road in the Town of Aurora, New York, to the Diocese of Buffalo for use as the campus of a new seminary for the training of clergy. Contemporaneously with its acceptance of this gift, the Diocese conducted what it called "The Seminary Fund Drive."  Through this campaign, the Diocese collected more than $3.5 million, all of which was spent on costs of construction.  Groundbreaking occurred on September 8, 1960.  Originally named in honor of Saint John Vianney, the seminary opened for classes on October 1, 1961.

From 1961 until 2021, the Knox Road property was used as a Catholic seminary, although under several different governing and ownership arrangements.  At the time of construction, the property was titled in the name of the Diocese of Buffalo, N.Y. Then in 1968, the Diocese transferred ownership to St. John Vianney Seminary, a New York Corporation.  In 1974, St. John Vianney Seminary leased the property to Christ the King Seminary, a Catholic institution that relocated to the same site.  The real estate was reconveyed to the Diocese of Buffalo in 1987.  By 2010, Christ the King Seminary was experiencing an ongoing operating deficit which was offset in part by annual subsidies from the Diocese.

The Diocese of Buffalo, N.Y., filed a petition for relief under Chapter 11 of the Bankruptcy Code on February 28, 2020.  Upon its commencement of the bankruptcy proceeding, the Diocese also discontinued its subsidy of Christ the King Seminary. Unable to rely on that financial support, the seminary ceased operations at the conclusion of the 2020-2021 academic year.

On July 18, 2024, the Diocese filed a motion to establish bidding procedures for an auction sale of the Knox Road Property.  At the hearing on that request, we questioned whether sale proceeds might be subject to restrictions under the *cy pres* doctrine.  In an order dated August 19, 2024, the Court approved the proposed sale procedures, but with a direction that "[t]he net proceeds of sale of the Property shall be placed in a segregated account held by the Diocese and shall not be disbursed therefrom except as directed by further Order of this Court."  Pursuant to this authority, the Diocese conducted an auction on October 28, 2024.  On November 20, 2024, the Court entered an Order confirming a sale to the high bidder for $4,200,000. The closing of this transaction then occurred on February 14, 2025.

The Diocese of Buffalo has now moved to access the proceeds of the seminary sale.  In paragraph 19 of its motion, the Diocese "submits that the Sale Proceeds are property of the estate, and as such, the Diocese is requesting that the Diocese be authorized, but not directed, to use such proceeds in connection with funding a settlement in this case pursuant to a chapter 11 plan."  It contends that under the Not-For-Profit Corporation Law of New York, these proceeds are not subject to any trust limitations and therefore are unrestricted as to use.  The Official Committee of

Unsecured Creditors supports the relief requested.  No one has opposed the motion.

Discussion

The confirmation of a plan is the ultimate goal for cases filed under Chapter 9, Chapter 11, Chapter 12 and Chapter 13 of the Bankruptcy Code.  In Chapter 12 and 13, some limitations apply only when "the trustee or the holder of an allowed unsecured claim objects to the confirmation of the plan." 11 U.S.C. § 1225(b)(1) and § 1325(b)(1).  But here in Chapter 11, the requirements for confirmation are absolute, whether or not anyone objects.  In particular, section 1129(a)(3) of the Bankruptcy Code states that the Court may confirm a Chapter 11 plan only if "[t]he plan has been proposed in good faith and not by any means forbidden by law."

The debtor has advised that it may wish to use the seminary proceeds to provide partial funding for its plan of reorganization.  Before undertaking the complex process of presenting a disclosure statement and plan, the debtor seeks a ruling on whether this use of proceeds represents "a means forbidden by law."  As in state court, however, the accessibility of estate property is an issue that this Court may review even on "its own motion." *Sherman v. Richmond Hose Co. No. 2*, 230 N.Y. 462, 473 (1921).

Under New York law, a charitable corporation must honor a donor's direction and intention.  Thus, "it has been widely recognized that the stated purpose for which the donation was made constitutes a binding restriction as to the use of the donation." 18 NY Jur. 2d *Charities* § 26 (2011).  If it becomes impossible to perform those directions, then "the cy pres doctrine will be applied." *Id.*  This equitable doctrine allows a court

to reform "a gift to charity as closely to the donor's intention as possible, so that the gift does not fail." BLACK'S LAW DICTIONARY 470 (10ᵀᴴ ED. 2014).

In *Saint Joseph's Hospital v. Bennett*, 281 N.Y. 115 (1939), the New York Court of Appeals confirmed the controlling rule, that religious corporations may not divert donated funds from the stated purpose of a donor.

> "No authority has been brought to our attention that a gift to a charitable corporation with the express direction that it be applied to a specific corporate purpose in a specific manner may be accepted by the corporation, and then used for a different corporate purpose in a different manner. No trust arises, it is true, in a technical sense, from such a gift for trustee and beneficiary are one. The charitable corporation is not bound by all the limitations and rules which apply to a technical trustee. It may not, however, receive a gift made for one purpose and use it for another, unless the court applying the *cy pres* doctrine so commands."

281 N.Y. at 123.

The New York State legislature has codified the holding of *Saint Joseph's Hospital v. Bennett* into the Not-for-Profit Corporation Law. *See* Comment to N.Y. NOT-FOR-PROFIT CORP. LAW § 513 (McKinney 2015). Although the Diocese of Buffalo was not incorporated under the Not-for-Profit Law, it is still subject to section 513 of this statute:

> "A corporation which is, or would be if formed under this chapter, a charitable corporation shall hold full ownership rights in any assets consisting of funds or other real or personal property of any kind, that may be given, granted, bequeathed or devised to or otherwise vested in such corporation in trust for, or with a direction to apply the same to, any purpose specified in its certificate of incorporation."

N.Y. NOT-FOR-PROFIT CORP. LAW § 513(a) (McKinney 2015).  Subdivision (a) thereby addresses the Rule against Perpetuities.  Subdivision (b) then directs that unless the *cy pres* doctrine allows a variance, "the governing board shall apply all assets thus received to the purposes specified in the gift instrument as defined in section 551 (Definitions) and to the payment of the reasonable and proper expenses of administration of such assets."

Not all donations to the Diocese of Buffalo are subject to the restraints of the *cy pres* doctrine.  To determine its applicability in the present instance, this Court must decide two forms of what is essentially the same question: whether in the language of *Saint Joseph's Hospital v. Bennett*, the seminary proceeds derive from a gift "with the express direction that it be applied to a specific corporate purpose;" or whether in the language of Not-for-Profit Law § 513(a), the seminary proceeds derive from a gift "with a direction to apply the same" to a specified purpose.  The Appellate Division of New York's Supreme Court identified the relevant issue in *Lefkowitz v. Lebensfeld*, 68 A.D.2d 488, 495-96 (1st Dept. 1979): "[A] donor who attaches conditions to his gift has a right to have his intention enforced.  But a donor who has attached no conditions has no such expectation.  He is, in effect, relying on the good will and judgment of the donee charity to utilize his gift in what the donee perceives to be the most appropriate manner" (citations omitted).

The Diocese of Buffalo began construction of the seminary on Knox Road more than 65 years ago.  Most if not all of the benefactors for this project are now deceased.  The Court was not surprised, therefore, when no one questioned the proposed

application of sale proceeds.  Death may silence the testimony of objectors and supporting witnesses, but it cannot change promises whose existence is nonetheless documented by admissible evidence.

In considering the present motion, the Court relied upon two sources of information.  The first is a compilation of archival records that were authenticated through a declaration from the debtor's Chief Operating Officer.  Secondly, at the hearing on this matter, the Court advised the parties that it would also review editions of the Catholic Union and Echo, a weekly newspaper published by the Diocese. Newspaper articles are self-authenticating under Rule 902(6) of the Federal Rules of Evidence.  Both sources are appropriately considered under hearsay exceptions for records of regularly conducted activity (*See* FED. R. EVID. 803(6)) or as statements in ancient documents (*See* FED. R. EVID. 803(16)).  Based on a careful review of these factual sources, we find that most, but not all of the sale proceeds are subject to the restraints of New York's *cy pres* doctrine.

In 1959, the Diocese reported that the real property donated by Fred Reuter had a value of $100,000.[1]  As for improvements, the Diocese has provided the minutes of a special meeting of the trustees of St. John Vianney Seminary that was held on December 13, 1968.  At that session, the treasurer reported that the total cost of seminary construction was $6,129,330.  Of this amount, $3,559,219 was collected through The Seminary Fund Drive.  An additional $370,201 was received from subsequent bequests and other special donations.  The balance of $2,200,000 was

---

[1] *Reuters Give 80-Acre Tract for Seminary*, CATHOLIC UNION AND ECHO, Nov. 6, 1959, at 1.

advanced from general funds of the Diocese.[2]  Property financed from general funds would not be subject to any restriction for a specified purpose.  On the other hand, the $370,201 from bequests and other donations appear to constitute gifts made with a direction for use in seminary construction.  The more challenging issue is how to treat proceeds of The Seminary Fund Drive and the Reuter donation of undeveloped land.

Section 513(b) of the New York Not-for-Profit Corporation Law mandates that the Diocese apply gifted funds "to the purposes specified in the gift instrument as defined in section 551."  This later section states that "'gift instrument' means a record or records, *including an institutional solicitation*, under which property is granted to, transferred to, or held by an institution as an institutional fund."  N.Y. NOT-FOR-PROFIT CORP. LAW § 551(c) (McKinney 2015)(emphasis added).  Subject to exclusions not here applicable, "institutional fund" is then broadly defined to mean "a fund held by an institution."  N.Y. NOT-FOR-PROFIT CORP. LAW § 551(e) (McKinney 2015).  For purposes of the present discussion, the controlling principle is that a gift instrument may include solicitations to the donor.   Here, those solicitations confirm an expectation and understanding that proceeds of The Seminary Fund Drive would be used only for the construction of a seminary to train prospective clergy.

The historical record reveals three salient facts about The Seminary Fund Drive.  The first is that its exclusive purpose was to raise funds for seminary construction.  The very name of the campaign indicates this intent.  In its edition for August 14, 1959, the

---

[2]It appears that the treasurer provided a rounded number for the advance from general funds of the Diocese, and that the precise number should have been stated as $2,199,910.

Diocesan newspaper reported that the bishop had "announced that a $2,500,000 fund drive to build the seminary will be conducted the first week of Advent this year."[3] On November 27, 1959, this same newspaper reiterated that "The Seminary Fund is designed to meet the need of the Diocese of Buffalo to erect a new seminary for the education and training of students preparing for the holy priesthood destined to minister unto the faithful of the Diocese of Buffalo."[4] Contributors of at least $25 were issued a "Spiritual Seminary Bond," which recited that the donation "has enabled the Diocese of Buffalo to erect The Seminary of Saint John Vianney, for the training and education of Priests."[5]

A second fact is that the Diocese contemplated that proceeds from The Seminary Fund Drive would remain distinct from general resources. One of the archival documents provided by the Diocese was a letter dated November 4, 1959, from the Seminary Fund Director to pastors of parishes. In this correspondence, the priests were given the following instructions for how to solicit contributions: "First, do not look upon The Seminary Fund just as another Appeal. It is unique. It is a Building Drive."

Third, donors were assured that their contributions would be used on a project of lasting duration. In a statement published on November 13, 1959, the Bishop declared that the "Seminary will stand, please God, for centuries to come as an

---

[3] *Bishop Names George Frauenheim to Direct Drive for Diocesan Seminary*, CATHOLIC UNION AND ECHO, Aug. 14, 1959, at 1.

[4] *Here are Some Facts About Seminary Fund*, CATHOLIC UNION AND ECHO, Nov. 27, 1959, at 11.

[5] *A Bond with a Blessing*, CATHOLIC UNION AND ECHO, Nov. 13, 1959, at 3.

eloquent monument to our Faith."[6]  As the campaign was finishing, the Fund Director declared that the seminary "will stand in the Town of Aurora as a perpetual reminder of the great Seminary Fund of 1959."[7]  This same theme was expressed in an editorial that the Diocesan newspaper published on December 11, 1959: "St. John Vianney Seminary, standing as a permanent monument in Western New York, will be for centuries a sacred tribute to the faith of our people, and to their love for Christ's priesthood."[8]

Both in its solicitations and in its acknowledgment of gifts, the Diocese told donors that contributions to The Seminary Fund Drive would be used for the specified and lasting purpose of establishing a permanent seminary to serve the Diocese of Buffalo.  If fulfillment of that purpose becomes impractical, the *cy pres* doctrine may allow a reformation that is consistent with the donor's intent.  *See* N.Y. NOT-FOR-PROFIT CORP. LAW § 555 (McKinney 2015) and N.Y. EST. POWERS & TRUSTS art. 8 (McKinney 2002).  But today, the debtor's motion seeks to use sale proceeds for inconsistent purposes like funding a settlement of abuse claims.  Such use of proceeds from targeted gifts would violate donor intent and is therefore not permitted under New York law.

The movant argues that at least with respect to proceeds attributable to the Reuter gift, this Court should follow the ruling in *Lefkowitz v. Cornell University*, 35

---

[6]*Bishop's Message*, CATHOLIC UNION AND ECHO, Nov. 13, 1959, at 2.

[7]*Seminary Drive is $2,000,000 over Goal, $4,492,613 Donated*, CATHOLIC UNION AND ECHO, Dec. 11, 1959, at 1.

[8]Editorial, *Our People Prove Their Zeal*, CATHOLIC UNION AND ECHO, Dec. 11, 1959, at 4.

A.D.2d 166 (4th Dept. 1970). In that case, Cornell was attempting to sell a laboratory and wind tunnel that the Curtiss-Wright Corporation had donated to the University in 1945. As with the seminary property, the real estate had been transferred to Cornell through a deed that contained no restrictions as to future use. Arguing that the sale violated the donor's intent, New York's Attorney General obtained from the trial court an injunction against the sale. In reversing that decision, the Appellate Division observed that "there is no evidence that Cornell received the gift of the laboratory as a result of representations on its part that it would forever operate it for the public benefit." *Id.* at 172. As to this factor, the sale of the seminary is distinguishable. Fred Reuter conveyed the Knox Road property through three deeds. The earliest of these indentures is dated December 10, 1959, at the same time that the Diocese was telling all donors that contributions would support the establishment of a permanent seminary. These representations were than particularized for Mr. Reuter and his wife. In acknowledging their gift, the Bishop issued the following statement:

> "It is also an eloquent manifestation of the faith and generosity of Mr. and Mrs. Reuter, who, for many years, have cherished the hope that their beautiful estate would some day become the site of a project which would benefit a vital activity in the life of the Church. Please God, for centuries to come, their names and their gift will be held in prayerful memory."[9]

As with all donations to The Seminary Fund Drive, the Diocese expressed an understanding that the real property would be used permanently as a seminary. Pursuant to the direction of Not-for-Profit Law § 513(b) and the precedent of *Saint*

---

[9]*Id.* at 13.

*Joseph's Hospital v. Bennett*, the Reuter gift is subject to the restriction that it be used

for the benefit of clergy education.

In 1970, the Board of Trustees of St. John Vianney Seminary passed the

following resolution:

> RESOLVED that in the event the real property
> located on Knox Road in the Town of Aurora, owned by
> this corporation is no longer used as a seminary for the
> education of young men to the priesthood, title to this
> property shall be reconveyed to the previous owner,
> The Diocese of Buffalo, N.Y.

Fred Reuter was then a member of the Board of Trustees, although he was not present

at the meeting.  Admittedly, the resolution occurred more than a decade after Mr.

Reuter's donation.  Nonetheless, it does confirm a commitment to long term use of the

property for its intended purpose.  To the extent that the seminary corporation was no

longer to operate, it would return the property to the Diocese, presumably so that the

Diocese could either operate a seminary or find some other appropriate use consistent

with *cy pres* requirements.

The Diocese contends that the seminary on Knox Road was property of the

estate under 11 U.S.C. § 541(a).  We agree, but find that it is also subject to the

limitations of 11 U.S.C. § 541(c)(2), which reads as follows: "A restriction on the

transfer of a beneficial interest of the debtor in a trust that is enforceable under

applicable nonbankruptcy law is enforceable in a case under this title."  Here, the

applicable nonbankruptcy law provides "that although gifts to a charitable organization

do not create a trust in the technical sense, where a purpose is stated a trust will be

13

implied." *Lefkowitz v. Lebensfeld*, 68 A.D.2d 488, 496 (1st Dept. 1979).  This implied
trust imposes constraints that are enforceable in bankruptcy.  Consequently, proceeds
traceable to The Seminary Fund Drive and the Reuter donation are restricted and may
not be used to settle unrelated claims against the Diocese.

In 1959, the Diocese of Buffalo solicited donations big and small[10] for the special
purpose of building a seminary.  We recognize that the debtor now has another special
need for significant money to settle claims.  This current need is distinct, however, and
cannot sanction the application of resources committed by law to a different use.

When the seminary was built, the sources of funding derived from both
restricted donations and advances from a general fund.  Unfortunately, these sources
were greater in amount than the net proceeds derived from the sale in 2025.  Unable
to identify any basis to prioritize the sources of funding, we find that the sale proceeds
should be allocated between restricted and unrestricted interests on a pro-rata basis.

Conclusion

The motion of the Diocese of Buffalo is granted in part and denied in part, all in
accord with the following allocation.  When donated for use as a seminary, the land on
Knox Road had a value of $100,000.  The cost of construction was $6,129,330 and was
paid from three sources.  The sum of $2,199,910 derived from unrestricted assets of
the Diocese.  However, specific bequests of $370,201 and proceeds from The Seminary
Fund Drive in the amount of $3,559,219 were both subject to restrictions for the

---

[10]On December 11, 1959, the Diocesan newspaper reported that "a little boy met with [the Seminary Fund
Director] and asked if a nickel would help the fund.  He was assured that it would and it was duly recorded."
*Sidelights on The News*, CATHOLIC UNION AND ECHO, Dec. 11, 1959, at 4.

benefit of that project. When added to the land value, restricted sources of funding total $4,029,420. This sum constitutes 64.68 percent of the land value and cost of construction. As an attribute of restricted donations, this percentage may be used only in ways consistent with donor intent.

Now that the property has been liquidated, any proceeds will be traced to their source. The Knox Road property was sold for $4,200,000. Certain closing costs may have been paid from the sale price, and presumably some interest has accrued after the net proceeds were placed into a segregated account. Unfortunately, the record does not establish the amount now on deposit. Whatever that sum may be, 35.32 percent of those moneys are unrestricted funds that the Diocese may use on any allowable expenditure. The remaining 64.68 percent remains restricted and may not be used to fund a settlement within a confirmed plan of reorganization.

So ordered.

Dated: June 6, 2025
        Buffalo, New York            Hon. Carl L. Bucki, Chief U.S.B.J., W.D.N.Y.



# CONSOLIDATED APPENDIX DOCUMENT NO. 9

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NEW YORK

In re:

THE DIOCESE OF BUFFALO, N.Y.,

Case No. 20-10322 CLB
Chapter 11 Case

                                            Debtor.

## NOTICE OF APPEAL

**PLEASE TAKE NOTICE** that the Official Committee of Unsecured Creditors (the

"**Committee**") of The Diocese of Buffalo, N.Y. (the "**Diocese**") submits this Notice of Appeal in

conformity with Bankruptcy Form B4171A and in accordance with Federal Rule of Bankruptcy

Procedure 8003.

## Part 1: Identify the Appellant(s)

1.  Name(s) of appellant(s):

    The Official Committee of Unsecured Creditors (the "**Committee**") of The Diocese of
    Buffalo, N.Y. (the "**Diocese**"),

2.  Position of appellant(s) in the adversary proceeding or bankruptcy case that is the subject
    of this appeal:

    | For appeals in an adversary proceeding. | For appeals in a bankruptcy case and not in an adversary proceeding. |
    |---|---|
    | o Plaintiff | |
    | o Defendant | o Debtor |
    | o Other (describe) | o Creditor |
    | | o Trustee |
    | | X Other (describe): Creditors Committee |

## Part 2:  Identify the subject of this appeal

1.  Describe the judgment, order, or decree appealed from:  Decision and Order [Dkt. 3929],
    a copy of which is attached as **Exhibit A**.

2.  State the date on which the judgment, order, or decree was entered: June 6, 2025.

**Part 3:  Identify the other parties to the appeal**

List the names of all parties to the judgment, order, or decree appealed from and the names, addresses, and telephone numbers of their attorneys (attach additional pages if necessary):

1.  Party:   The Official Committee of Unsecured Creditors *(Appellant)*

    Attorneys:   James Stang, Esq.
    Ilan D. Scharf, Esq.
    Karen B. Dine, Esq.
    Jeffrey M. Dine, Esq.
    Pachulski Stang Ziehl & Jones, LLP
    1700 Broadway, 36th Floor
    New York, NY 10019
    Telephone No.: (212) 561-7700

2.  Party:   The Diocese of Buffalo, N.Y. *(additional Appellant)*

    Attorney:   Stephen A. Donato
    Charles J. Sullivan
    Grayson T. Walter
    Thomas W. Simcoe
    Gregory J. McDonald
    Bond, Schoeneck & King, PLLC
    One Lincoln Center
    Syracuse, NY 13202
    Telephone No.: (315) 218-8000

3.  Party:   Office of the United States Trustee

    Attorney   Joseph W. Allen, Esq.
    Olympic Towers
    300 Pearl Street, Suite 401
    Buffalo, NY 14202
    Telephone No.: (716) 551-5541

**Part 4:  Optional election to have appeal heard by District Court (applicable only in certain districts)**

        Not applicable.

**Part 5: Sign below**

/s/ Ilan D. Scharf                                                    Date:  June 18, 2025
Signature of attorney for appellant(s) (or appellant(s)
if not represented by an attorney)

Name, address, and telephone number of attorney
(or appellant(s) if not represented by an attorney):


PACHULSKI STANG ZIEHL & JONES LLP
James I. Stang
Ilan D. Scharf
Karen B. Dine
Jeffrey M. Dine
1700 Broadway, 36th Floor
New York, New York 10019
Telephone: 212-561-7700

3

# CIVIL COVER SHEET    Consolidated Appendix 0228

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Official Committee of Unsecured Creditors of the Diocese of Buffalo, N.Y. | See attached Schedule A for other parties to the appeal |

**(b)** County of Residence of First Listed Plaintiff   Not Applicable
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant _____
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

See attached Schedule A

Attorneys *(If Known)*

See attached Schedule A

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1   U.S. Government Plaintiff
- ☒ 3   Federal Question *(U.S. Government Not a Party)*
- ☐ 2   U.S. Government Defendant
- ☐ 4   Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☒ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| | | **PERSONAL PROPERTY** | **LABOR** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | ☐ 861 HIA (1395ff) | ☐ 485 Telephone Consumer Protection Act |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | | | ☐ 864 SSID Title XVI | |
| | | | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | **FEDERAL TAX SUITS** | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | ☐ 896 Arbitration |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 USC 158
Brief description of cause:
Appeal of U.S. Bankruptcy Decision and Order

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☒ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE Hon. Carl L. Bucki    DOCKET NUMBER BK 20-10322

DATE
06/18/2025

SIGNATURE OF ATTORNEY OF RECORD
/s/ Ilan D. Scharf

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

## SCHEDULE A

| PARTY | COUNSEL |
|---|---|
| **The Official Committee of Unsecured Creditors (Appellant)** | James Stang, Esq.<br>Ilan D. Scharf, Esq.<br>Karen B. Dine, Esq.<br>Jeffrey M. Dine, Esq.<br>PACHULSKI STANG ZIEHL & JONES, LLP<br>1700 Broadway, 36th Floor<br>New York, NY 10019<br>Telephone: (212) 561-7700 |
| **The Diocese of Buffalo, N.Y. (additional Appellant)** | Stephen A. Donato, Esq.<br>Charles J. Sullivan, Esq.<br>Grayson T. Walter, Esq.<br>Thomas W. Simcoe, Esq.<br>Gregory J. McDonald, Esq.<br>BOND, SCHOENECK & KING, PLLC<br>One Lincoln Center<br>Syracuse, NY 13202<br>Telephone: (315) 218-8000 |
| **Office of the United States Trustee** | Joseph W. Allen, Esq.<br>Olympic Towers<br>300 Pearl Street, Suite 401<br>Buffalo, NY 14202<br>Telephone: (716) 551-5541 |

# EXHIBIT A

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NEW YORK
--------------------------------------------------------
In re

     THE DIOCESE OF BUFFALO, N.Y.,             BK 20-10322 CLB


                Debtor.              <u>DECISION & ORDER</u>
--------------------------------------------------------

                Bond, Schoeneck & King, PLLC
                Stephen A. Donato, Esq., Thomas W. Simcoe, Esq.,
                Charles J. Sullivan, Esq., Grayson T. Walter, Esq.,
                Andrew S. Rivera, Esq., of counsel
                One Lincoln Center
                Syracuse, New York 13202-1355
                Attorneys for The Diocese of Buffalo, N.Y.

                Pachulski Stang Ziehl & Jones LLP
                Ilan D. Scharf, Esq., James I. Stang, Esq.,
                Jeffrey M. Dine, Esq., Karen B. Dine, Esq., of counsel
                780 Third Avenue, 34th Floor
                New York, New York 10017
                Attorneys for Official Committee of Unsecured Creditors

                Woods Oviatt Gilman LLP
                Timothy P. Lyster, Esq., of counsel
                1900 Bausch & Lomb Place
                Rochester, New York 14604
                Co-Counsel for Parish Steering Committee

                Elsaesser Anderson, CHTD.
                J. Ford Elsaesser, Esq., of counsel
                320 East Neider Avenue, Suite 102
                Coeur d' Alene, Idaho 83815
                Co-Counsel for Parish Steering Committee

                Office of the U.S. Trustee
                Joseph W. Allen, Esq.
                Olympic Towers
                300 Pearl Street, Suite 401
                Buffalo, New York 14202

BK 20-10322CLB                                                                                  2

Carl L. Bucki, Chief U.S.B.J., W.D.N.Y.

The Diocese of Buffalo has moved to release money that was placed into a segregated account from proceeds of a sale of real property. The primary issue is whether this escrow contains funds whose use must comply with the *cy pres* doctrine of New York law.

In 1959, Fred H. Reuter offered to donate approximately 80 acres of undeveloped land on Knox Road in the Town of Aurora, New York, to the Diocese of Buffalo for use as the campus of a new seminary for the training of clergy. Contemporaneously with its acceptance of this gift, the Diocese conducted what it called "The Seminary Fund Drive." Through this campaign, the Diocese collected more than $3.5 million, all of which was spent on costs of construction. Groundbreaking occurred on September 8, 1960. Originally named in honor of Saint John Vianney, the seminary opened for classes on October 1, 1961.

From 1961 until 2021, the Knox Road property was used as a Catholic seminary, although under several different governing and ownership arrangements. At the time of construction, the property was titled in the name of the Diocese of Buffalo, N.Y. Then in 1968, the Diocese transferred ownership to St. John Vianney Seminary, a New York Corporation. In 1974, St. John Vianney Seminary leased the property to Christ the King Seminary, a Catholic institution that relocated to the same site. The real estate was reconveyed to the Diocese of Buffalo in 1987. By 2010, Christ the King Seminary was experiencing an ongoing operating deficit which was offset in part by annual subsidies from the Diocese.

The Diocese of Buffalo, N.Y., filed a petition for relief under Chapter 11 of the Bankruptcy Code on February 28, 2020.  Upon its commencement of the bankruptcy proceeding, the Diocese also discontinued its subsidy of Christ the King Seminary. Unable to rely on that financial support, the seminary ceased operations at the conclusion of the 2020-2021 academic year.

On July 18, 2024, the Diocese filed a motion to establish bidding procedures for an auction sale of the Knox Road Property.  At the hearing on that request, we questioned whether sale proceeds might be subject to restrictions under the *cy pres* doctrine.  In an order dated August 19, 2024, the Court approved the proposed sale procedures, but with a direction that "[t]he net proceeds of sale of the Property shall be placed in a segregated account held by the Diocese and shall not be disbursed therefrom except as directed by further Order of this Court."  Pursuant to this authority, the Diocese conducted an auction on October 28, 2024.  On November 20, 2024, the Court entered an Order confirming a sale to the high bidder for $4,200,000. The closing of this transaction then occurred on February 14, 2025.

The Diocese of Buffalo has now moved to access the proceeds of the seminary sale.  In paragraph 19 of its motion, the Diocese "submits that the Sale Proceeds are property of the estate, and as such, the Diocese is requesting that the Diocese be authorized, but not directed, to use such proceeds in connection with funding a settlement in this case pursuant to a chapter 11 plan."  It contends that under the Not-For-Profit Corporation Law of New York, these proceeds are not subject to any trust limitations and therefore are unrestricted as to use.  The Official Committee of

Unsecured Creditors supports the relief requested.  No one has opposed the motion.

Discussion

The confirmation of a plan is the ultimate goal for cases filed under Chapter 9, Chapter 11, Chapter 12 and Chapter 13 of the Bankruptcy Code.  In Chapter 12 and 13, some limitations apply only when "the trustee or the holder of an allowed unsecured claim objects to the confirmation of the plan."  11 U.S.C. § 1225(b)(1) and § 1325(b)(1).  But here in Chapter 11, the requirements for confirmation are absolute, whether or not anyone objects.  In particular, section 1129(a)(3) of the Bankruptcy Code states that the Court may confirm a Chapter 11 plan only if "[t]he plan has been proposed in good faith and not by any means forbidden by law."

The debtor has advised that it may wish to use the seminary proceeds to provide partial funding for its plan of reorganization.  Before undertaking the complex process of presenting a disclosure statement and plan, the debtor seeks a ruling on whether this use of proceeds represents "a means forbidden by law."  As in state court, however, the accessibility of estate property is an issue that this Court may review even on "its own motion."  *Sherman v. Richmond Hose Co. No. 2*, 230 N.Y. 462, 473 (1921).

Under New York law, a charitable corporation must honor a donor's direction and intention.  Thus, "it has been widely recognized that the stated purpose for which the donation was made constitutes a binding restriction as to the use of the donation."  18 NY JUR. 2d *Charities* § 26 (2011).  If it becomes impossible to perform those directions, then "the cy pres doctrine will be applied."  *Id.*  This equitable doctrine allows a court

to reform "a gift to charity as closely to the donor's intention as possible, so that the gift does not fail." BLACK'S LAW DICTIONARY 470 (10TH ED. 2014).

In *Saint Joseph's Hospital v. Bennett*, 281 N.Y. 115 (1939), the New York Court of Appeals confirmed the controlling rule, that religious corporations may not divert donated funds from the stated purpose of a donor.

> "No authority has been brought to our attention that a gift to a charitable corporation with the express direction that it be applied to a specific corporate purpose in a specific manner may be accepted by the corporation, and then used for a different corporate purpose in a different manner. No trust arises, it is true, in a technical sense, from such a gift for trustee and beneficiary are one. The charitable corporation is not bound by all the limitations and rules which apply to a technical trustee. It may not, however, receive a gift made for one purpose and use it for another, unless the court applying the *cy pres* doctrine so commands."

281 N.Y. at 123.

The New York State legislature has codified the holding of *Saint Joseph's Hospital v. Bennett* into the Not-for-Profit Corporation Law. *See* Comment to N.Y. NOT-FOR-PROFIT CORP. LAW § 513 (McKinney 2015). Although the Diocese of Buffalo was not incorporated under the Not-for-Profit Law, it is still subject to section 513 of this statute:

> "A corporation which is, or would be if formed under this chapter, a charitable corporation shall hold full ownership rights in any assets consisting of funds or other real or personal property of any kind, that may be given, granted, bequeathed or devised to or otherwise vested in such corporation in trust for, or with a direction to apply the same to, any purpose specified in its certificate of incorporation."

N.Y. NOT-FOR-PROFIT CORP. LAW § 513(a) (McKinney 2015). Subdivision (a) thereby addresses the Rule against Perpetuities. Subdivision (b) then directs that unless the *cy pres* doctrine allows a variance, "the governing board shall apply all assets thus received to the purposes specified in the gift instrument as defined in section 551 (Definitions) and to the payment of the reasonable and proper expenses of administration of such assets."

Not all donations to the Diocese of Buffalo are subject to the restraints of the *cy pres* doctrine. To determine its applicability in the present instance, this Court must decide two forms of what is essentially the same question: whether in the language of *Saint Joseph's Hospital v. Bennett*, the seminary proceeds derive from a gift "with the express direction that it be applied to a specific corporate purpose;" or whether in the language of Not-for-Profit Law § 513(a), the seminary proceeds derive from a gift "with a direction to apply the same" to a specified purpose. The Appellate Division of New York's Supreme Court identified the relevant issue in *Lefkowitz v. Lebensfeld*, 68 A.D.2d 488, 495-96 (1st Dept. 1979): "[A] donor who attaches conditions to his gift has a right to have his intention enforced. But a donor who has attached no conditions has no such expectation. He is, in effect, relying on the good will and judgment of the donee charity to utilize his gift in what the donee perceives to be the most appropriate manner" (citations omitted).

The Diocese of Buffalo began construction of the seminary on Knox Road more than 65 years ago. Most if not all of the benefactors for this project are now deceased. The Court was not surprised, therefore, when no one questioned the proposed

application of sale proceeds. Death may silence the testimony of objectors and supporting witnesses, but it cannot change promises whose existence is nonetheless documented by admissible evidence.

In considering the present motion, the Court relied upon two sources of information. The first is a compilation of archival records that were authenticated through a declaration from the debtor's Chief Operating Officer. Secondly, at the hearing on this matter, the Court advised the parties that it would also review editions of the Catholic Union and Echo, a weekly newspaper published by the Diocese. Newspaper articles are self-authenticating under Rule 902(6) of the Federal Rules of Evidence. Both sources are appropriately considered under hearsay exceptions for records of regularly conducted activity (*See* FED. R. EVID. 803(6)) or as statements in ancient documents (*See* FED. R. EVID. 803(16)). Based on a careful review of these factual sources, we find that most, but not all of the sale proceeds are subject to the restraints of New York's *cy pres* doctrine.

In 1959, the Diocese reported that the real property donated by Fred Reuter had a value of $100,000.[1] As for improvements, the Diocese has provided the minutes of a special meeting of the trustees of St. John Vianney Seminary that was held on December 13, 1968. At that session, the treasurer reported that the total cost of seminary construction was $6,129,330. Of this amount, $3,559,219 was collected through The Seminary Fund Drive. An additional $370,201 was received from subsequent bequests and other special donations. The balance of $2,200,000 was

---

[1] *Reuters Give 80-Acre Tract for Seminary*, CATHOLIC UNION AND ECHO, Nov. 6, 1959, at 1.

advanced from general funds of the Diocese.[2] Property financed from general funds would not be subject to any restriction for a specified purpose.  On the other hand, the $370,201 from bequests and other donations appear to constitute gifts made with a direction for use in seminary construction.  The more challenging issue is how to treat proceeds of The Seminary Fund Drive and the Reuter donation of undeveloped land.

    Section 513(b) of the New York Not-for-Profit Corporation Law mandates that the Diocese apply gifted funds "to the purposes specified in the gift instrument as defined in section 551." This later section states that "'gift instrument' means a record or records, *including an institutional solicitation*, under which property is granted to, transferred to, or held by an institution as an institutional fund."  N.Y. NOT-FOR-PROFIT CORP. LAW § 551(c) (McKinney 2015)(emphasis added).  Subject to exclusions not here applicable, "institutional fund" is then broadly defined to mean "a fund held by an institution."  N.Y. NOT-FOR-PROFIT CORP. LAW § 551(e) (McKinney 2015).  For purposes of the present discussion, the controlling principle is that a gift instrument may include solicitations to the donor.   Here, those solicitations confirm an expectation and understanding that proceeds of The Seminary Fund Drive would be used only for the construction of a seminary to train prospective clergy.

    The historical record reveals three salient facts about The Seminary Fund Drive. The first is that its exclusive purpose was to raise funds for seminary construction.  The very name of the campaign indicates this intent.  In its edition for August 14, 1959, the

---

[2]It appears that the treasurer provided a rounded number for the advance from general funds of the Diocese, and that the precise number should have been stated as $2,199,910.

Diocesan newspaper reported that the bishop had "announced that a $2,500,000 fund drive to build the seminary will be conducted the first week of Advent this year."[3] On November 27, 1959, this same newspaper reiterated that "The Seminary Fund is designed to meet the need of the Diocese of Buffalo to erect a new seminary for the education and training of students preparing for the holy priesthood destined to minister unto the faithful of the Diocese of Buffalo."[4] Contributors of at least $25 were issued a "Spiritual Seminary Bond," which recited that the donation "has enabled the Diocese of Buffalo to erect The Seminary of Saint John Vianney, for the training and education of Priests."[5]

A second fact is that the Diocese contemplated that proceeds from The Seminary Fund Drive would remain distinct from general resources. One of the archival documents provided by the Diocese was a letter dated November 4, 1959, from the Seminary Fund Director to pastors of parishes. In this correspondence, the priests were given the following instructions for how to solicit contributions: "First, do not look upon The Seminary Fund just as another Appeal. It is unique. It is a Building Drive."

Third, donors were assured that their contributions would be used on a project of lasting duration. In a statement published on November 13, 1959, the Bishop declared that the "Seminary will stand, please God, for centuries to come as an

---

[3] *Bishop Names George Frauenheim to Direct Drive for Diocesan Seminary*, CATHOLIC UNION AND ECHO, Aug. 14, 1959, at 1.

[4] *Here are Some Facts About Seminary Fund*, CATHOLIC UNION AND ECHO, Nov. 27, 1959, at 11.

[5] *A Bond with a Blessing*, CATHOLIC UNION AND ECHO, Nov. 13, 1959, at 3.

eloquent monument to our Faith."[6]  As the campaign was finishing, the Fund Director declared that the seminary "will stand in the Town of Aurora as a perpetual reminder of the great Seminary Fund of 1959."[7]  This same theme was expressed in an editorial that the Diocesan newspaper published on December 11, 1959: "St. John Vianney Seminary, standing as a permanent monument in Western New York, will be for centuries a sacred tribute to the faith of our people, and to their love for Christ's priesthood."[8]

Both in its solicitations and in its acknowledgment of gifts, the Diocese told donors that contributions to The Seminary Fund Drive would be used for the specified and lasting purpose of establishing a permanent seminary to serve the Diocese of Buffalo.  If fulfillment of that purpose becomes impractical, the *cy pres* doctrine may allow a reformation that is consistent with the donor's intent.  *See* N.Y. NOT-FOR-PROFIT CORP. LAW § 555 (McKinney 2015) and N.Y. EST. POWERS & TRUSTS art. 8 (McKinney 2002).  But today, the debtor's motion seeks to use sale proceeds for inconsistent purposes like funding a settlement of abuse claims.  Such use of proceeds from targeted gifts would violate donor intent and is therefore not permitted under New York law.

The movant argues that at least with respect to proceeds attributable to the Reuter gift, this Court should follow the ruling in *Lefkowitz v. Cornell University*, 35

---

[6]*Bishop's Message*, CATHOLIC UNION AND ECHO, Nov. 13, 1959, at 2.

[7]*Seminary Drive is $2,000,000 over Goal, $4,492,613 Donated*, CATHOLIC UNION AND ECHO, Dec. 11, 1959, at 1.

[8]Editorial, *Our People Prove Their Zeal*, CATHOLIC UNION AND ECHO, Dec. 11, 1959, at 4.

A.D.2d 166 (4th Dept. 1970).  In that case, Cornell was attempting to sell a laboratory

and wind tunnel that the Curtiss-Wright Corporation had donated to the University in

1945.  As with the seminary property, the real estate had been transferred to Cornell

through a deed that contained no restrictions as to future use.  Arguing that the sale

violated the donor's intent, New York's Attorney General obtained from the trial court

an injunction against the sale.   In reversing that decision, the Appellate Division

observed that "there is no evidence that Cornell received the gift of the laboratory as

a result of representations on its part that it would forever operate it for the public

benefit." *Id.* at 172.  As to this factor, the sale of the seminary is distinguishable.  Fred

Reuter conveyed the Knox Road property through three deeds. The earliest of these

indentures is dated December 10, 1959, at the same time that the Diocese was telling

all donors that contributions would support the establishment of a permanent

seminary.  These representations were than particularized for Mr. Reuter and his wife.

In acknowledging their gift, the Bishop issued the following statement:

> "It is also an eloquent manifestation of the faith and
> generosity of Mr. and Mrs. Reuter, who, for many
> years, have cherished the hope that their beautiful
> estate would some day become the site of a project
> which would benefit a vital activity in the life of the
> Church.  Please God, for centuries to come, their names
> and their gift will be held in prayerful memory."[9]

As with all donations to The Seminary Fund Drive, the Diocese expressed an

understanding that the real property would be used permanently as a seminary.

Pursuant to the direction of Not-for-Profit Law § 513(b) and the precedent of *Saint*

---

[9]*Id.* at 13.

*Joseph's Hospital v. Bennett*, the Reuter gift is subject to the restriction that it be used for the benefit of clergy education.

In 1970, the Board of Trustees of St. John Vianney Seminary passed the following resolution:

> RESOLVED that in the event the real property located on Knox Road in the Town of Aurora, owned by this corporation is no longer used as a seminary for the education of young men to the priesthood, title to this property shall be reconveyed to the previous owner, The Diocese of Buffalo, N.Y.

Fred Reuter was then a member of the Board of Trustees, although he was not present at the meeting. Admittedly, the resolution occurred more than a decade after Mr. Reuter's donation. Nonetheless, it does confirm a commitment to long term use of the property for its intended purpose. To the extent that the seminary corporation was no longer to operate, it would return the property to the Diocese, presumably so that the Diocese could either operate a seminary or find some other appropriate use consistent with *cy pres* requirements.

The Diocese contends that the seminary on Knox Road was property of the estate under 11 U.S.C. § 541(a). We agree, but find that it is also subject to the limitations of 11 U.S.C. § 541(c)(2), which reads as follows: "A restriction on the transfer of a beneficial interest of the debtor in a trust that is enforceable under applicable nonbankruptcy law is enforceable in a case under this title." Here, the applicable nonbankruptcy law provides "that although gifts to a charitable organization do not create a trust in the technical sense, where a purpose is stated a trust will be

implied." *Lefkowitz v. Lebensfeld*, 68 A.D.2d 488, 496 (1st Dept. 1979). This implied trust imposes constraints that are enforceable in bankruptcy. Consequently, proceeds traceable to The Seminary Fund Drive and the Reuter donation are restricted and may not be used to settle unrelated claims against the Diocese.

In 1959, the Diocese of Buffalo solicited donations big and small[10] for the special purpose of building a seminary. We recognize that the debtor now has another special need for significant money to settle claims. This current need is distinct, however, and cannot sanction the application of resources committed by law to a different use.

When the seminary was built, the sources of funding derived from both restricted donations and advances from a general fund. Unfortunately, these sources were greater in amount than the net proceeds derived from the sale in 2025. Unable to identify any basis to prioritize the sources of funding, we find that the sale proceeds should be allocated between restricted and unrestricted interests on a pro-rata basis.

Conclusion

The motion of the Diocese of Buffalo is granted in part and denied in part, all in accord with the following allocation. When donated for use as a seminary, the land on Knox Road had a value of $100,000. The cost of construction was $6,129,330 and was paid from three sources. The sum of $2,199,910 derived from unrestricted assets of the Diocese. However, specific bequests of $370,201 and proceeds from The Seminary Fund Drive in the amount of $3,559,219 were both subject to restrictions for the

---

[10]On December 11, 1959, the Diocesan newspaper reported that "a little boy met with [the Seminary Fund Director] and asked if a nickel would help the fund. He was assured that it would and it was duly recorded." *Sidelights on The News*, CATHOLIC UNION AND ECHO, Dec. 11, 1959, at 4.

BK 20-10322CLB                                                                14

benefit of that project.  When added to the land value, restricted sources of funding total $4,029,420.  This sum constitutes 64.68 percent of the land value and cost of construction.   As an attribute of restricted donations, this percentage may be used only in ways consistent with donor intent.

Now that the property has been liquidated, any proceeds will be traced to their source.  The Knox Road property was sold for $4,200,000.  Certain closing costs may have been paid from the sale price, and presumably some interest has accrued after the net proceeds were placed into a segregated account.  Unfortunately, the record does not establish the amount now on deposit.  Whatever that sum may be, 35.32 percent of those moneys are unrestricted funds that the Diocese may use on any allowable expenditure.  The remaining 64.68 percent remains restricted and may not be used to fund a settlement within a confirmed plan of reorganization.

So ordered.

Dated: June 6, 2025
        Buffalo, New York                Hon. Carl L. Bucki, Chief U.S.B.J., W.D.N.Y.



# CONSOLIDATED APPENDIX DOCUMENT NO. 10

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 20-10322 (CLB) |
| The Diocese of Buffalo, N.Y., | ) | |
| | ) | Chapter 11 |
| Debtor. | ) | |
| | ) | |

### NOTICE OF MOTION FOR ENTRY OF ORDERS (I)(A) APPROVING BIDDING PROCEDURES FOR THE SALE OF CERTAIN REAL PROPERTY AT 711 KNOX ROAD, EAST AURORA, NEW YORK; (B) AUTHORIZING AND APPROVING THE FORM OF PURCHASE AGREEMENT; (C) SCHEDULING AN AUCTION AND HEARING TO CONSIDER THE SALE; AND (D) APPROVING THE FORM AND MANNER OF SERVICE OF NOTICE OF AUCTION AND SALE HEARING; (II) APPROVING THE SALE FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS; AND (III) GRANTING RELATED RELIEF

**PLEASE TAKE NOTICE**, that on July 18, 2024, The Diocese of Buffalo, N.Y. (the "Diocese"), by and through its undersigned counsel, filed with the United States Bankruptcy Court for the Western District of New York (the "Court") the *Motion for Entry of an Order (I)(A) Approving Bidding Procedures for the Sale of Certain Real Property at 711 Knox Road, East Aurora, New York; (B) Authorizing and Approving the Form of Purchase Agreement; (C) Scheduling an Auction and Hearing to Consider the Sale; and (D) Approving the Form and Manner of Service of Notice of Auction and Sale Hearing; (II) Approving the Sale Free and Clear of Liens, Claims, Encumbrances and Other Interests; and (III) Granting Related Relief* (the "Sale Motion").[1]

**PLEASE TAKE FURTHER NOTICE**, that the Diocese, by and through its counsel, will move before the Honorable Carl L. Bucki, Chief United States Bankruptcy Judge for the Western District of New York on the **15th day of August, 2024 at 1:00 p.m.** (the "Bidding Procedures Hearing"), or as soon thereafter as counsel may be heard, for an Order: (a) approving bidding procedures in connection with the sale of certain real property located at 711 Knox Road, East Aurora, New York 14052 (the "Property"); (b) authorizing and approving the form of the proposed purchase agreement submitted by World Mission Society, Church of God a NJ Nonprofit Corporation; (c) scheduling an auction (the "Auction") and the date and time of the hearing to approve the sale of the Property; and (d) approving the form and manner of service of notice of the Bidding Procedures and the Auction and Sale Hearing.

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Sale Motion.

**PLEASE TAKE FURTHER NOTICE**, that parties can choose to appear at the Bidding Procedures Hearing either (i) in person at the Robert H. Jackson U.S. Courthouse, 2 Niagara Square, Buffalo, New York or (ii) telephonically (call in 1-571-353-2301, Courtroom ID 483077448#, and security pin 9999#).

**PLEASE TAKE FURTHER NOTICE**, that pursuant to the Sale Motion, the Diocese is seeking authority to conduct a sale of the Property outside of the ordinary course of its business pursuant to 11 U.S.C. § 363(b) free and clear of any liens, claims, encumbrances and other interests prior to the entry of an order of confirmation in its above-captioned chapter 11 case.

**PLEASE TAKE FURTHER NOTICE**, that the Property proposed to be sold in the Sale Motion consists of the real property owned by the Diocese and located at 711 Knox Road, East Aurora, New York 14052 and the improvements thereon constituting the former Christ the King Seminary Campus, consisting of 18 total buildings on a campus situated on approximately 117 acres located near the Village of East Aurora, New York. The initial bid for the Property is $3,800,000.00 and the initial bidder is World Mission Society, Church of God a NJ Nonprofit Corporation ("WMS"). If approved by the Court, the proposed sale will be subject to the submission of higher or better offers by other bidders at the Auction. The Property does not constitute all or substantially all of the Diocese's assets, and the proposed sale of the Property will have no material impact on the reorganization of the Diocese.

**PLEASE TAKE FURTHER NOTICE**, that the Diocese believes that the sale of the Property to WMS or to an alternate purchaser pursuant to a higher or better offer submitted in conformity with the Bidding Procedures, represents the best opportunity to realize value from the Property for the Diocese's bankruptcy estate.

**PLEASE TAKE FURTHER NOTICE**, that all affidavits and memoranda in opposition to the relief requested in the Sale Motion, if any, shall be filed with the Clerk of the United States Bankruptcy Court for the Western District of New York as soon as practicable.

**PLEASE TAKE FURTHER NOTICE**, that all affidavits and memoranda in opposition to the relief requested in the Sale Motion shall be served upon (i) counsel to the Diocese, Bond, Schoeneck & King, PLLC, One Lincoln Center, Syracuse, New York 13202, Attn: Stephen A. Donato, Charles J. Sullivan, and Grayson T. Walter, (ii) the Office of the United States Trustee for the Western District of New York, 300 Pearl Street, Suite 401, Buffalo, New York 14202, Attn: Joseph W. Allen, (iii) counsel to the Official Committee of Unsecured Creditors, Pachulski, Stang, Ziehl & Jones, LLP, 10100 Santa Monica Blvd., 13th Floor, Los Angeles, California, 90067-4003, Attn: James I. Stang, and 780 Third Avenue, 34th Floor, New York, New York, 10017-2024, Attn: Ilan Scharf, and (iv) those persons who have formally appeared and requested service in this case pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedure.

18105936.v1

**PLEASE TAKE FURTHER NOTICE**, that copies of the Sale Motion and all other documents filed in the Diocese's chapter 11 case may be obtained free of charge via the case management website maintained by the Diocese's noticing agent at https://case.stretto.com/dioceseofbuffalo or by contacting the undersigned counsel for the Diocese.

Dated: July 18, 2024                    BOND, SCHOENECK & KING, PLLC

By:    /s/ *Charles J. Sullivan*
        Stephen A. Donato
        Charles J. Sullivan
        Grayson T. Walter
        Justin S. Krell
        Jeffrey D. Eaton
        One Lincoln Center
        Syracuse, NY 13202-1355
        Telephone: (315) 218-8000
        Fax: (315) 218-8100
        Emails:    sdonato@bsk.com
                    csullivan@bsk.com
                    gwalter@bsk.com
                    jkrell@bsk.com
                    jeaton@bsk.com

        *Attorneys for The Diocese of Buffalo, N.Y.*

3

Consolidated Appendix 0249

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | |
| | ) | Case No. 20-10322 (CLB) |
| The Diocese of Buffalo, N.Y., | ) | |
| | ) | Chapter 11 |
| Debtor. | ) | |
| | ) | |

**MOTION FOR ENTRY OF ORDERS (I)(A) APPROVING BIDDING PROCEDURES FOR THE SALE OF CERTAIN REAL PROPERTY AT 711 KNOX ROAD, EAST AURORA, NEW YORK; (B) AUTHORIZING AND APPROVING THE FORM OF PURCHASE AGREEMENT; (C) SCHEDULING AN AUCTION AND HEARING TO CONSIDER THE SALE; AND (D) APPROVING THE FORM AND MANNER OF SERVICE OF NOTICE OF AUCTION AND SALE HEARING; (II) APPROVING THE SALE FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS; AND (III) GRANTING RELATED RELIEF**

The Diocese of Buffalo, N.Y. (the "Diocese"), by and through its undersigned counsel, hereby moves this Court (this "Motion") for entry of an order substantially in the form attached hereto as ***Exhibit A*** (the "Bidding Procedures Order"): (a) approving bidding procedures in substantially the form attached as ***Exhibit 1*** to the Bidding Procedures Order (the "Bidding Procedures") in connection with the sale of certain real property located at 711 Knox Road, East Aurora, New York 14052 (the "Property"); (b) authorizing and approving the form of the proposed purchase agreement (the "Purchase Agreement") submitted by World Mission Society, Church of God a NJ Nonprofit Corporation ("WMS" or the "Stalking Horse Bidder"), a copy of which is attached as ***Exhibit 2*** to the Bidding Procedures Order; (c) scheduling an auction (the "Auction") and the date and time of the hearing to approve the sale of the Property (the "Sale Hearing"); and (d) approving the form and manner of service of notice of the Bidding Procedures and the Auction and Sale Hearing in substantially the form attached to the Bidding Procedures Order as ***Exhibit 3*** (the "Notice of Auction and Sale Hearing").

The Diocese further requests that at the Sale Hearing, subject to the results of the Auction and the Bidding Procedures set forth herein, this Court enter an order (the "Sale Order") (i) approving and authorizing the sale of the Property (the "Sale Transaction") free and clear of any liens, claims, encumbrances and other interests (collectively, "Encumbrances"), pursuant to the terms of the Successful Bid (as defined herein); and (ii) granting related relief. In support of this Motion, the Diocese respectfully represents as follows:

## JURISDICTION

1.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.

2.      This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

3.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      The statutory and rule-based predicates for the relief requested herein are sections 105, 363 and 503 of title 11 of the United States Code (11 U.S.C. § 101, *et seq.*, the "Bankruptcy Code"), Rules 6004 and 9007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 6004-1 of the Local Rules of Bankruptcy Procedure for the Western District of New York (the "Local Rules").

## BACKGROUND

5.      On February 28, 2020 (the "Petition Date"), the Diocese filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (11 U.S.C. § 101 *et seq.*, as amended, the "Bankruptcy Code") with the United States Bankruptcy Court for the Western District of New York (the "Court"), commencing the Diocese's chapter 11 case (this "Chapter 11 Case"). The Diocese continues to operate its business and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2

6.      On March 12, 2020, the Office of the United States Trustee appointed the Official Committee of Unsecured Creditors (the "Committee") pursuant to Bankruptcy Code section 1102 [Docket No. 92].  No request for a trustee or examiner has been made in this Chapter 11 Case, and as of the date of this filing, no other official committees have been appointed or designated.

## A.      The Property and the Purchase Agreement

7.      The Property is the former Christ the King Seminary Campus, consisting of 18 total buildings on a campus situated on approximately 117 acres located near the Village of East Aurora, New York.  Since the closure of the Seminary on or about 2020, the Property has seen limited use, and the continued ownership and maintenance of the Property is burdensome to the Diocese and its estate.

8.      On August 24, 2023, the Diocese filed an Application for Entry of an Order Authorizing the Retention and Employment of Hanna Commercial Real Estate (the "Broker"), as the real estate broker to market and sell the Property [Docket No. 2479].

9.      On September 27, 2023, the Court entered an *Order Authorizing the Retention and Employment Hanna Commercial Real Estate as Real Estate Broker to the Diocese* [Docket No. 2523] (the "Broker Order") and authorized the Diocese to engage the Broker as real estate broker for the Diocese in this Chapter 11 Case to market the Property.

10.     After the entry of the Broker Order, the Broker began marketing the Property for sale, resulting in an offer from WMS.  Following negotiations with WMS, the Diocese and WMS entered into the Purchase Agreement, whereby WMS agreed to purchase the Property for $3,800,000.00, and to act as the stalking horse bidder for the Property, subject to higher or better offers through competitive bidding as proposed herein.

3

11.     The Diocese believes that the sale of the Property to WMS, or to an alternate purchaser pursuant to a higher or better offer submitted in conformity with the Bidding Procedures, represents the best opportunity to realize value from the Property for the Diocese's bankruptcy estate.  Additionally, the proceeds from sale of the Property, along with other excess real property, are needed to fund a potential plan of reorganization.  Further, the sale of this Property, along with other excess real property, is a key component of current and future negotiations with the Committee.

## **RELIEF REQUESTED**

12.     By this Motion, the Diocese seeks the Court's approval to sell the Property to WMS for $3,800,000.00 (subject to higher and better offers), free and clear of all Encumbrances pursuant to section 363(f) of the Bankruptcy Code.

13.     To implement this relief, the Diocese seeks entry of two orders:

(a)     first, the Bidding Procedures Order, a proposed form of which (with exhibits) is attached hereto as ***Exhibit A***:

  i.      allowing for a competitive bid process with respect to the Property;

  ii.     approving Bidding Procedures, including setting a deadline and approving requirements and procedures for interested parties to submit bids for the Property;

  iii.    approving the form of proposed Purchase Agreement;

  v.      scheduling the Auction and the Sale Hearing to approve the sale of the Property to the bidder (the "Successful Bidder") submitting the highest or otherwise best offer acceptable to the Diocese (the "Successful Bid"); and

  vi.     approving the form and manner of service of the Notice of Auction and Sale Hearing.

(b)     second, the Sale Order, authorizing and approving the Sale Transaction to the Successful Bidder pursuant to the terms of the Successful Bid.

## Proposed Sale of the Property

14.     The Diocese believes that the sale of the Property is in the best interests of its estate, its creditors and other parties in interest, and the sale proposed herein represents the best opportunity for the Diocese to realize value from the Property for benefit of its bankruptcy estate.

15.     Pursuant to Local Rule 6004-1, the Diocese submits that the Property proposed to be sold does not represent all or substantially all of the Diocese's assets, and its sale will facilitate the Diocese's ability to reorganize.

### A.    The Purchase Agreement

16.     Following the substantial marketing efforts of the Broker, the Diocese and WMS engaged in good faith negotiations, which culminated in the Purchase Agreement.  The salient terms of the Purchase Agreement are as follows:[1]

> (a)    The Parties.  The Diocese as seller and WMS as buyer.
>
> (b)    The Property.    The real property to be sold (together with all improvements and fixtures located thereon) is located in the Town of East Aurora, County of Erie, and State of New York, commonly known as **711 Knox Road, Tax Map Parcel No. 163.00-3-23**, which is shown outlined on the property sketch attached to the Purchase Agreement as *Exhibit 1*, and is more particularly described on *Exhibit 2* attached to the Purchase Agreement.
>
> (c)    Purchase Price.  $3,800,000.00, in cash comprising a $380,000.00 deposit, with the remaining $3,420,000.00 due at closing, subject to any closing adjustments.
>
> (d)    Conditions.  The proposed sale is subject to certain conditions, including: (i) approval by the Bankruptcy Court; and (ii) bidding increments of no less than $100,000.00.

---

[1] This summary of the terms of the Purchase Agreement is intended solely to provide the Court and interested parties with a brief overview of the terms thereof.  All capitalized terms not otherwise defined herein have the meaning set forth in the Purchase Agreement.  In the event of any inconsistency between the terms as described in this Motion and the Purchase Agreement, the Purchase Agreement will control.

     (e)   <u>Higher or Better Offers</u>.  As set forth in further detail below, the sale of the Property is subject to the submission of competing bids by third parties of higher or otherwise better offers.

**B.**    **Proposed Bidding Procedures**

17.    To ensure that the sale maximizes the value of the Property for the benefit of the Diocese's estate, the Diocese seeks to implement a competitive bidding process.  As described more fully in the Bidding Procedures and the Bidding Procedures Order, if competing offers for the Property are received, the Diocese intends to hold an auction, and to pursue a sale to the bidder that submits the highest or otherwise best offer acceptable to the Diocese.  The Diocese respectfully requests that the Bidding Procedures Order approve the proposed Bidding Procedures to govern the submission of competing bids for the Property.

18.    The proposed Bidding Procedures contain the following provisions:[2]

    (a)   <u>Qualified Bidders</u>:  In order to participate in the bidding process, a bidder for the Property (a "<u>Potential Bidder</u>") must be an "<u>Qualified Bidder</u>."  A Qualified Bidder is a person or group of persons who has provided the Diocese with a signed Purchase Agreement along with a marked copy showing any changes from the Purchase Agreement, along with proof of funds, which may include, current audited financial statements, evidence of committed financing, or such other financial and credit-quality disclosures as may be reasonably requested by, and satisfactory to the Diocese, in consultation with the Committee, evidencing the Potential Bidder's financial wherewithal to consummate the Sale Transaction and pay the purchase price for the Property to the Diocese in cash.

    (b)   <u>Due Diligence</u>:  The Bidding Procedures permit all Qualified Bidders to conduct site visits and obtain reasonable due diligence information between the entry of the Bidding Procedures Order and the Bid Deadline (defined below).

---

[2] This summary of the Bidding Procedures is provided for the convenience of the Court and interested parties.  In the event of any inconsistencies between this summary and the Bidding Procedures approved by the Bidding Procedures Order, the Bidding Procedures and the Bidding Procedures Order shall control.

(c)     Qualified Bids: The Diocese, in consultation with the Committee, shall determine whether a bid qualifies as a "Qualified Bid." To constitute a Qualified Bid, a bid must be an offer from a Qualified Bidder received by the Diocese before the Bid Deadline (defined below) and:

i.      be submitted in writing;

ii.     provide for a purchase price, payable in full, in cash, at closing, which exceeds the cash consideration set forth in the Purchase Agreement by at least $100,000.00 (the "Initial Minimum Overbid").

iii.    be on terms that are not more burdensome or conditional in any material respect than the terms of the Purchase Agreement;

iv.     not be conditioned on obtaining financing, the outcome of any due diligence investigation, or on the receipt of any third-party approvals or consents (excluding required Bankruptcy Court approval and any third-party approvals or consents contemplated in the Purchase Agreement);

v.      not request or entitle the Potential Bidder to any break-up fee, expense reimbursement, or similar type of payment;

vi.     include a binding and definitive purchase agreement for the Property, in substantially the same form as the Purchase Agreement and executed by the Qualified Bidder (a "Qualified Bidder Contract"), together with a marked copy showing any proposed changes from the Purchase Agreement, and a clean electronic copy in Microsoft Word readable format;

vii.    be accompanied by a cash, certified bank check, or wire transfer deposit equal to 10% of the purchase price set forth in the Qualified Bidder Contract;

viii.   fully disclose the identity of each entity that will be bidding for the Property or otherwise participating in connection with such bid, the complete terms of any such participation, and identify no more than three (3) representatives authorized to appear and act on behalf of such Qualified Bidder at the Auction ("Authorized Bidder Representatives");

ix.     include an acknowledgment and representation that the Qualified Bidder has had an opportunity to consider all due diligence regarding the Property prior to submitting its bid and that it has relied solely upon its own independent review, investigation and inspection of any documents or the Property in making its bid;

7

x.    confirm that, if selected as the Successful Bidder or the Back-Up Bidder, such bidder will complete the Sale Transaction within five (5) business days following the date on which (A) the Bankruptcy Court's order approving the sale shall have become a final and non-appealable order, and (B) the Diocese shall have provided written notice of its readiness to consummate the Sale Transaction;

xi.    certify that the bidder has not, and is not, engaged in any collusion with respect to its bid or the Sale Transaction; and

xii.    provide that such bid shall remain open and irrevocable until:

(A)    if such bid is not the Successful Bid or Back-Up Bid (as each term is defined below), the entry by the Bankruptcy Court of an order approving the sale of the Property to another Qualified Bidder;

(B)    if such bid is the Successful Bid, the closing of the Sale Transaction to such Successful Bidder; or

(C)    if such bid is chosen by the Diocese to be the Back-Up Bid, the date which is the earlier to occur of: (i) the closing of the Sale Transaction to the Successful Bidder or (ii) the closing of the Sale Transaction to such Back-Up Bidder.

(d)    <u>Bid Deadline</u>:  All Qualified Bids must be actually received no later than 12:00 noon (prevailing Eastern time) sixty (60) days after the entry of the Bidding Procedures Order (the "<u>Bid Deadline</u>"), by counsel to the Diocese, Bond, Schoeneck & King, PLLC, One Lincoln Center, Syracuse, New York 13202 (Attn: Stephen A. Donato, Charles J. Sullivan, Grayson T. Walter, Justin S. Krell and Jeffrey D. Eaton (Telephone (315) 218-8000; email:  sdonato@bsk.com,  csullivan@bsk.com, gwalter@bsk.com, jkrell@bsk.com and jeaton@bsk.com).  The Diocese may extend the Bid Deadline in its discretion but is not obligated to do so.

(e)    <u>Auction</u>:  If the Diocese receives one or more Qualified Bids (in addition to the Purchase Agreement submitted by the Stalking Horse Bidder which shall become deemed to be a Qualified Bid), prior to the Bid Deadline, the Diocese shall conduct the Auction for the sale of the Property.  The Auction shall take place on [_____ __, 2024 at 12:00 noon] (prevailing Eastern time) at the offices of Bond, Schoeneck & King, PLLC, The Avant Building, Suite 900, 200 Delaware Avenue, Buffalo, New York 14202-2107, or at such other time and place as the Diocese may notify all Qualified Bidders.  Only the Stalking Horse Bidder and those Qualified Bidders who timely submitted a Qualified Bid will be eligible to participate in the Auction.

8

At the commencement of the Auction, the Diocese shall announce the Qualified Bid that it has determined represents the highest or otherwise best bid for the Property (the "Starting Qualified Bid") and the overall consideration value ascribed to such bid (the "Bid Value").

Each Qualified Bidder present at the Auction will be permitted to increase its Qualified Bid in turns (each such increased Qualified Bid, a "Qualified Overbid"), provided that each Qualified Overbid must exceed the Bid Value of the then-highest or otherwise best Qualified Overbid, by at least one hundred thousand dollars ($100,000.00) (the "Minimum Bid Increment"), with the Minimum Bid Increment subject to modification in the Diocese's sole and absolute discretion. During the course of the Auction, the Diocese will inform the participants which Qualified Overbid reflects the then-highest or otherwise best offer for the Property and the Bid Value ascribed thereto.

At the conclusion of the Auction, the Diocese will announce (i) the Qualified Bid which the Diocese, in consultation with the Committee, deems to represent the highest or otherwise best bid for the Property (such bid being the "Successful Bid" and the Qualified Bidder submitting such bid, the "Successful Bidder") and (ii) the next highest or otherwise best bid (the "Back-Up Bid" and the party submitting such bid, the "Back-Up Bidder"). As a condition precedent to the Diocese declaring any bid the Successful Bid or the Back-Up Bid, the Diocese may require the Successful Bidder or Back-Up Bidder to deposit additional cash or immediately available funds such that their total deposit shall be not less than ten percent (10%) of the purchase price of their respective Successful Bid or Back-Up Bid. Any deposits not applied in satisfaction of the obligations of the Successful Bidder or Back-Up Bidder shall be returned not later than five (5) business days following the consummation of the Sale Transaction.

No bids submitted after the conclusion of the Auction shall be considered unless a motion to reopen the Auction is made on notice, prior to the Sale Hearing, to all Qualified Bidders who attended and submitted a bid at the Auction and such motion is granted by the Court.

(f)   Sale Hearing:  The Diocese requests that the Court schedule the Sale Hearing approximately five business (5) days following the Auction, or as soon thereafter as may be convenient for the Court. At the Sale Hearing, the Diocese will seek entry of an order, among other things, authorizing and approving the sale of the Property to the Successful Bidder, as determined by the Diocese in consultation with the Committee.

(j)     <u>Back-Up Bid</u>:  Following the entry of the Sale Order, if the Successful Bidder fails to consummate the approved Sale Transaction in accordance with the terms of its Successful Bid because of a breach or failure to perform on the part of such Successful Bidder, the Diocese may terminate its agreement to sell the property to the Successful Bidder, retain the Successful Bidder's deposit, and maintain the right to pursue all available remedies whether legal or equitable against such Successful Bidder.  In the event the Diocese elects to so terminate, the Backup Bid, shall automatically be deemed to be the Successful Bid with respect to the Property, and the Diocese shall be authorized to effectuate the sale of the Property to the Backup Bidder without further order of the Bankruptcy Court.

**A.**     **The proposed Sale Transaction is within the sound business judgment of the Diocese and should be approved.**

19.     Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  A debtor in possession is given these rights by section 1107(a) of the Bankruptcy Code. *See* 11 U.S.C. §1107(a).  Moreover, section 105(a) of the Bankruptcy Code provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. §105(a).

20.     Courts have uniformly held that approval of a proposed sale of property pursuant to section 363(b) of the Bankruptcy Code is appropriate if a court finds that the transaction represents a reasonable business judgment on the part of the debtor.  *See, e.g.*, *In re Chateaugay Corp.,* 973 F.2d 141 (2d Cir. 1992); *Comm. of Equity Sec. Holders v. Lionel Corp (In re Lionel Corp.).* 772 F.2d 1063, 1071 (2d Cir. 1983); *see also Official Committee of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.),* 147 B.R. 650, 656 (S.D.N.Y. 1992), *appeal dismissed,* 3 F.3d 49 (2d Cir. 1993) (quoting *Van Gorkom,* 488 A.2d 858, 872 (Del. 1985) ("the business judgment rule 'is a presumption that in making a business

10

17963105.v4-7/18/24
Case 1-20-10322-CLB,    Doc 3031,    Filed 07/18/24,    Entered 07/18/24 15:21:09,
Description: Main Document  , Page 13 of 21

decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interest of the company',", which has continued applicability in bankruptcy)).

21.     Courts generally show great deference to a debtor in possession's decisions when applying the business judgment standard. *See In re Global Crossing, Ltd.,* 295 B.R. 726, 744 n.58 (Bankr. S.D.N.Y. 2003) ("[T]he Court does not believe that it is appropriate for a bankruptcy court to substitute its own business judgment for that of the [d]ebtors and its advisors, so long as they have satisfied the requirements articulated in the caselaw."). Deference is inappropriate only if such business judgment is "so manifestly unreasonable that it could not be based on sound business judgment, but only on bad faith, or whim or caprice." *Lubrizol Enterprises, Inc. v. Richmond Metal Finishers, Inc. (In re Richmond Metal Finishers, Inc.),* 756 F.2d 1043, 1047 (4th Cir. 1985); *see also In re Integrated Res., Inc.,* 147 B.R. at 656 (holding that there is a strong presumption "that in making a business decision[,] the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company").

22.     The Diocese respectfully submits that the proposed sale to the Successful Bidder (as determined following the competitive bidding process outlined above) satisfies the "sound business reason test" and represents a prudent and proper exercise of the Diocese's business judgment. Because the Property is no longer used as a seminary, it is unnecessary for reorganization of the Diocese, and in fact has become a burden to the Diocese and its estate. Moreover, the Stalking Horse Bid was received following an extensive public marketing process, and represents the highest and best offer received to date. The Diocese believes that a prompt

11

17963105.v4-7/18/24
Case 1-20-10322-CLB,    Doc 3031,    Filed 07/18/24,    Entered 07/18/24 15:21:09,
Description: Main Document  , Page 14 of 21

sale of the Property is the best way to realize value from the Property for the benefit of its estate and to support the administration, and ultimately the resolution, of this Chapter 11 Case.

23.    The Bidding Procedures further provide for an expeditious but controlled, fair and open competitive bidding process that that will encourage participation by financially capable bidders who demonstrate their ability to complete a transaction, thereby ensuring that the Diocese can obtain the best offer available for the Property.

24.    Although the Property at issue represents only a fraction of the Diocese's overall chapter 11 estate, it is part of a larger portfolio of underutilized and/or non-essential real property that the Diocese intends to market for sale to benefit its creditors and to contribute towards a future plan of reorganization.    Accordingly, the Diocese respectfully submits that its determination to pursue a sale at this time, and to accept an offer of $3,800,000.00 (subject to higher or better offers) for the Property is a practical and reasonable exercise of its business judgment.    Further, the sale of the Property and others is an important component of the Diocese's continued negotiations with the Committee toward a settlement.

25.    Based on the foregoing, the sale of the Property is justified by sound business reasons and in the best interests of the Diocese and its estate.    Accordingly, pursuant to section 363(b) of the Bankruptcy Code, the Diocese requests approval of the sale of the Property to the Successful Bidder as determined in accordance with the Bidding Procedures.

**B.    The proposed Bidding Procedures are in the best interests of the Diocese, its creditors and its estate.**

26.    The Bidding Procedures outlined herein will both invite competitive bids to allow the Diocese to realize the greatest value for the Property and enable the Diocese to consummate a sale of the Property within a reasonable time frame.    The Bidding Procedures are fair, reasonable

12

and necessary to promote the highest or best sale price, without imposing undue obstacles to the competitive bidding process.

27.     The Diocese respectfully submits that the proposed $100,000.00 minimum bidding increment is reasonably necessary to facilitate an efficient auction process and because no breakup fee is proposed as part of the Bidding Procedures, will not create an undue impediment for any interested party seeking to submit a competing bid.

28.     The Bidding Procedures are a necessary tool to preserve and enhance the value of the Diocese's estate and will not unduly hamper the submission of competing bids.  Rather, the Bidding Procedures will ensure that only parties with (i) a serious and legitimate interest in acquiring the Property and (ii) the financial means to consummate a transaction quickly, will participate in an open Auction process.

29.     For the foregoing reasons, the Diocese respectfully submits that this Court should authorize and approve the Bidding Procedures pursuant to section 363(b) of the Bankruptcy Code.

**C.     The sale of the Property free and clear of Encumbrances is authorized under section 363(f) of the Bankruptcy Code.**

30.     At the Sale Hearing, the Diocese intends to seek entry of the Sale Order approving the sale free and clear of all Encumbrances.  The Diocese will seek to sell the Property free and clear of all Encumbrances to the fullest extent possible pursuant to section 363(f) of the Bankruptcy Code, including, without limitation, successor liability or similar theories and the Successful Bidder will be protected from liability for and cannot be pursued for any claims against the Diocese.  In addition, the Diocese requests that the Sale Order include findings that the Sale Transaction is not a fraudulent conveyance.

13

31.     Section 363(f) of the Bankruptcy Code provides:

The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if --

(1)     applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(2)     such entity consents;

(3)     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4)     such interest is in bona fide dispute; or

(5)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. §363(f).

32.     Section 363(f) of the Bankruptcy Code permits the Diocese, with court approval, to sell assets free and clear of all liens, claims, interests, charges and encumbrances (with any such liens, claims, interests, charges and encumbrances attaching to the net proceeds of the sale with the same rights and priorities therein as in the sold assets).

33.     In the instant case, the Diocese is unaware of any (a) liens, encumbrances or interests, or (b) "claims" as defined in section 101(5) of the Bankruptcy Code, that have been asserted specifically against the Property.  In the event any party asserts that they may have a lien, encumbrance, interest, or claim, the Diocese submits that the Property may nevertheless be sold free and clear pursuant to section 363(f)(4) because any such liens, claims, interests, or encumbrances are subject to a bona fide dispute, or pursuant to section 363(f)(5) because the holder could be compelled in a legal or equitable proceeding to accept a money satisfaction of their interest.

14

17963105.v4-7/18/24
Case 1-20-10322-CLB,    Doc 3031,    Filed 07/18/24,    Entered 07/18/24 15:21:09,
Description: Main Document  , Page 17 of 21

**D.    Buyer's good faith**

34.    Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

35.    The Second Circuit has indicated that a party would have to show fraud or collusion between the buyer and the debtor-in-possession or trustee or other bidders to demonstrate a lack of good faith. *See In re Colony Hill Assocs.,* 111 F.3d 269, 276 (2d Cir. 1997) ("Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders").

36.    While the sale to the Stalking Horse Bidder remains subject to higher or better bids, the Diocese notes for the Court that it is not aware of any connection between the Stalking Horse Bidder or its principals and the Diocese.

37.    The Diocese intends to make an appropriate showing at the Sale Hearing that the Successful Bid submitted by the Successful Bidder is the result of a negotiated, arm's-length transaction, in which such Successful Bidder at all times acted in good faith.  The Diocese thus requests that the Court find that the Successful Bidder will be purchasing the Property in good faith within the meaning of section 363(m) of the Bankruptcy Code.

**E.    Notice of the proposed Sale Transaction is adequate under the circumstances.**

38.    A copy of the proposed Notice of Auction and Sale Hearing is attached to the Bidding Procedures Order as ***Exhibit 3***.  The Notice of Auction and Sale Hearing will provide

interested parties with notice of the entry of the Bidding Procedures Order, the location of the Property proposed to be sold, the establishment of the Bidding Procedures and Bid Deadline, and the scheduled date and time of the Auction and Sale Hearing.

39.     The Diocese proposes to publish a copy of the Notice of Auction and Sale Hearing in the *Buffalo News*, not later than five (5) business days following entry of the Bidding Procedures Order (subject to applicable submissions deadlines). The Diocese shall further serve the Notice of Auction and Sale Hearing upon: (i) the Office of the United States Trustee for the Western District of New York; (ii) counsel to the Official Committee of Unsecured Creditors; (iii) all parties filing Notices of Appearance and requests for papers in this Chapter 11 Case; (iv) all required governmental agencies; (v) all known parties who have expressed a bona fide interest in acquiring the Property during the pendency of this Chapter 11 Case; (vi) all creditors in the Chapter 11 Case; and (vii) all persons known or reasonably believed to have asserted any lien, claim, encumbrance, or other interest in or upon any of the Property.

40.     The Diocese respectfully submits that the form of the proposed Notice of Auction and Sale Hearing, and the publication and service thereof, should be deemed adequate and sufficient notice of the Sale Hearing and Sale Transaction pursuant to Bankruptcy Rule 2002. Accordingly, the Diocese respectfully requests that the Bidding Procedures Order approve the proposed form and manner of service of the Notice of Auction and Sale Hearing.

**F.     Relief from Bankruptcy Rule 6004(h) is appropriate.**

41.     Under Bankruptcy Rule 6004(h), unless the Court orders otherwise, all orders authorizing the sale of property pursuant to section 363 of the Bankruptcy Code are automatically stayed for fourteen (14) days after entry of the order.  Fed. R. Bankr. P. 6004(h). The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to

16

17963105.v4-7/18/24
Case 1-20-10322-CLB,   Doc 3031,   Filed 07/18/24,   Entered 07/18/24 15:21:09,
Description: Main Document  , Page 19 of 21

appeal before the order is implemented. *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h).

42.    In order to facilitate a prompt closing, the Diocese respectfully requests that the Court waive the fourteen (14) day stay period under Bankruptcy Rule 6004(h).

## NOTICE

43.    Notice of this Motion will be provided to: (i) the Office of the United States Trustee for the Western District of New York; (ii) counsel to the Official Committee of Unsecured Creditors; (iii) all parties filing notices of appearance and requests for papers in this Chapter 11 Case; (iv) all required governmental agencies and taxing authorities; (v) all creditors in the Chapter 11 Case; (vi) all persons known or reasonably believed to have asserted any lien, claim, encumbrance, or other interest in or upon any of the Property; (vii) and parties who known to have expressed an interest in purchasing the Property.  In light of the relief requested, the Diocese submits that no other or further notice is necessary or required.

**WHEREFORE,** the Diocese respectfully requests that the Court (i) enter the Bidding Procedures Order: (a) approving the Bidding Procedures; (b) authorizing and approving the form of the proposed Purchase Agreement; (c) scheduling the Auction and Sale Hearing; and (d) approving the form and manner of the Notice of Auction and Sale Hearing; and, following the Sale Hearing (ii) enter the Sale Order approving the Sale Transaction and authorizing the sale of the Property to the Successful Bidder; and (iii) grant such other and further relief as the Court may deem just and proper.

Dated:  July 18, 2024

BOND, SCHOENECK & KING, PLLC


By:_____/s/ *Charles J. Sullivan*_____
    Stephen A. Donato
    Charles J. Sullivan
    Grayson T. Walter
    Justin S. Krell
    Jeffrey D. Eaton
    One Lincoln Center
    Syracuse, NY 13202-1355
    Telephone: (315) 218-8000
    Fax: (315) 218-8100
    Emails:   sdonato@bsk.com
             csullivan@bsk.com
             gwalter@bsk.com
             jkrell@bsk.com
             jeaton@bsk.com


    *Attorneys for The Diocese of Buffalo, N.Y.*

# Exhibit A

Bidding Procedures Order

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 20-10322 (CLB) |
| The Diocese of Buffalo, N.Y., | ) | |
| | ) | Chapter 11 |
| Debtor. | ) | |
| | ) | |

### ORDER (A) APPROVING BIDDING PROCEDURES FOR THE SALE OF CERTAIN REAL PROPERTY AT 711 KNOX ROAD, EAST AURORA, NEW YORK; (B) AUTHORIZING AND APPROVING THE FORM OF PURCHASE AGREEMENT; (C) SCHEDULING AN AUCTION AND HEARING TO CONSIDER THE SALE; (D) APPROVING THE FORM AND MANNER OF SERVICE OF NOTICE OF AUCTION AND SALE HEARING; AND (E) GRANTING RELATED RELIEF

Upon consideration of the motion [Docket No. ____] (the "Motion")[1] filed by The Diocese of Buffalo, N.Y. (the "Diocese") for entry of an order pursuant to sections 105, 363, and 503 of title 11 of the United States Code (the "Bankruptcy Code") and Rule 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"): (i)(a) approving bidding procedures in connection with the sale of certain real property located at 711 Knox Road, East Aurora, New York 14052 (the "Property"); (b) authorizing and approving the form of the proposed purchase agreement (the "Purchase Agreement") submitted by World Mission Society, Church of God a NJ Nonprofit Corporation (the "Stalking Horse Bidder"); (c) scheduling an auction (the "Auction") and the date and time of the hearing to approve the sale of the Property (the "Sale Hearing"); and (d) approving form and manner of service of notice of auction and sale hearing (the "Notice of Auction and Sale Hearing"); (ii) approving and authorizing the sale of the

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion or the Bidding Procedures, as applicable.

Property (the "Sale Transaction") free and clear of any liens, claims, encumbrances and other interests (collectively, "Encumbrances") pursuant to the terms of the Successful Bid (as defined herein); and (iii) granting related relief; and it appearing that the relief requested in the Motion is in the best interests of the Diocese, its estate, creditors, and other parties in interest; and good and sufficient cause appearing therefor, it is hereby:

**FOUND AND DETERMINED THAT:**[2]

A.    This Court has jurisdiction over the Motion and the transactions contemplated therein pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue in this district is proper under 28 U.S.C. §§ 1408 and 1409.

B.    Good and sufficient notice of the Motion and the relief sought therein has been given under the circumstances, and no other or further notice is required except as set forth herein.  A reasonable opportunity to object or be heard regarding the relief provided herein has been afforded to parties in interest.

C.    The Diocese has articulated good and sufficient business reasons for this Court to approve the bidding procedures attached hereto as ***Exhibit 1*** (the "Bidding Procedures").

D.    The Bidding Procedures are reasonably designed to maximize the consideration to be received for the Property.

E.    The Stalking Horse Bidder is not an "insider" or "affiliate" of the Diocese, as those terms are defined in section 101 of the Bankruptcy Code, and no common identity of incorporators, directors, or controlling stakeholders exist between the Stalking Horse Bidder and the Diocese.  The Stalking Horse Bidder and the Diocese, together with their respective counsel

---

[2]  Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when applicable.  *See* Bankruptcy Rule 7052.

2

17963105.v4-7/18/24

Case 1-20-10322-CLB,    Doc 3031-1,    Filed 07/18/24,    Entered 07/18/24 15:21:09,
Description: Exhibit A - Proposed Bidding Procedures Order, Page 3 of 54

and advisors, have acted in "good faith" and at "arm's length" within the meaning of section 363(m) of the Bankruptcy Code in connection with the negotiation of the agreement for the sale of the Property attached hereto as ***Exhibit 2*** (the "Purchase Agreement").

F.      The Diocese has demonstrated and proved to the satisfaction of this Court that a sale of the Property, pursuant to the terms of the Purchase Agreement, subject to higher or better offers, is in the best interests of the Diocese, its creditors, and its estate, and the Diocese's decision to enter into the Purchase Agreement with the Stalking Horse Bidder represents a prudent exercise of the Diocese's sound business judgment.

G.      The publication and service of the Notice of the Auction and Sale Hearing attached hereto as ***Exhibit 3***, as described in the Motion, is reasonably calculated to provide all interested parties with adequate and proper notice of the proposed Sale Transaction, the Bidding Procedures, the Auction, and the Sale Hearing.

H.      The Diocese has articulated good and sufficient reasons for this Court to grant the relief set forth herein.  The entry of this Bidding Procedures Order is in the best interests of the Diocese, its estate, creditors, and other parties in interest.

**THEREFORE, IT IS HEREBY ORDERED THAT:**

1.      The Motion is granted as set forth herein.

2.      All objections to the Motion relating to the relief provided herein that have not been withdrawn, waived or settled, and all reservations of rights included therein, are hereby overruled and denied on the merits.

3.      The Bidding Procedures attached hereto as ***Exhibit 1*** are incorporated herein and are hereby approved in their entirety, and the Bidding Procedures shall govern the submission, receipt, and analysis of all bids to purchase the Property.  Any party desiring to submit a bid for the Property shall comply with the Bidding Procedures and this Order.

3

4.     The form of the Purchase Agreement attached hereto as ***Exhibit 2*** is hereby approved. The offer by the Stalking Horse Bidder to purchase the Property pursuant to the terms of the Purchase Agreement is a Qualified Bid and the Stalking Horse Bidder is a Qualified Bidder for all purposes under the Bidding Procedures.

5.     In accordance with the terms of the Purchase Agreement, the Diocese shall return to the Stalking Horse Bidder its $380,000.00 deposit, payable in the event the Diocese, at no fault of the Stalking Horse Bidder, consummates a sale of the Property to a Successful Bidder other than the Stalking Horse Bidder.

6.     The deadline for submitting bids for the Property (the "Bid Deadline") is 12:00 noon (prevailing Eastern Time) on _____, 2024. No bid shall be deemed to be a Qualified Bid (as defined in the Bidding Procedures) or otherwise considered for any purposes unless such bid is received by the Diocese prior to the Bid Deadline and otherwise satisfies all requirements set forth in the Bidding Procedures.

7.     If more than one Qualified Bid for the Property is timely received by the Diocese in accordance with the Bidding Procedures, the Diocese shall hold an Auction for the Property. The Auction shall take place at the offices of Bond, Schoeneck & King, PLLC, The Avant Building, Suite 900, 200 Delaware Avenue, Buffalo, New York 14202-2107, on [_____ __, 2024 at 12:00 noon (prevailing Eastern Time), or on such other date and time as the Diocese shall notify all Qualified Bidders and other invitees.

8.     Each Qualified Bidder participating at the Auction will be required to confirm that it has not engaged in any collusion with respect to the bidding or the proposed Sale Transaction. The Stalking Horse Bidder will be permitted, but not obligated, to submit overbids at the Auction.

4

9.      The Notice of Auction and Sale Hearing, in substantially the form attached hereto as *Exhibit 3*, is hereby approved.

10.     Not later than five (5) business days following entry of this Bidding Procedures Order, the Diocese shall cause (a) a copy of the Notice of Auction and Sale Hearing, and (b) a copy of the Bidding Procedures Order, with exhibits, to be sent by first-class mail postage prepaid, to: (i) the Office of the United States Trustee for the Western District of New York; (ii) counsel to the Official Committee of Unsecured Creditors; (iii) all parties filing Notices of Appearance and requests for papers in this Chapter 11 Case; (iv) all required governmental agencies; (v) all known parties who have expressed a bona fide interest in acquiring the Property during the pendency of this Chapter 11 Case; (vi) all creditors in the Chapter 11 Case; (vii) all persons known or reasonably believed to have asserted any lien, claim, encumbrance, or other interest in or upon any of the Property; and (viii) all parties who are known to have expressed an interest in purchasing the Property.

11.     The Diocese shall arrange for publication of a copy of the Notice of Auction and Sale Hearing in the *Buffalo News* not later than five (5) business days following entry of this Bidding Procedures Order (subject to applicable submissions deadlines).

12.     If the Diocese does not receive any Qualified Bids (other than the Purchase Agreement) prior to the Bid Deadline: (a) the Diocese may cancel the Auction; (b) the Stalking Horse Bidder will be deemed the Successful Bidder for the Property; and (c) the Diocese shall be authorized to seek approval of the Purchase Agreement and the Sale Transaction to the Stalking Horse Bidder at the Sale Hearing.

13.     The Sale Hearing shall be held before this Court on [_____ __, 2024 at __:00 _.m. (prevailing Eastern time), or as soon thereafter as counsel and interested parties may be heard.

17963105.v4-7/18/24

Case 1-20-10322-CLB,     Doc 3031-1,     Filed 07/18/24,     Entered 07/18/24 15:21:09,
Description: Exhibit A - Proposed Bidding Procedures Order, Page 6 of 54

14.     The Sale Hearing may be adjourned, from time to time, without further notice to creditors or other parties in interest other than as reflected on the Bankruptcy Court's docket or announcement of said adjournment in open Court or on this Court's calendar on the date scheduled for the Sale Hearing.

15.     Except as otherwise provided in this Bidding Procedures Order, the Diocese reserves the right as it may reasonably determine to be in the best interests of its estate, in the Diocese's business judgment, in consultation with the Committee, and subject to conformity with the Bidding Procedures to: (a) determine which bidders are Qualified Bidders; (b) determine which bids are Qualified Bids; (c) determine which Qualified Bid is the highest or best proposal and which is the next highest or best proposal; (d) reject any bid that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bidding Procedures or the requirements of the Bankruptcy Code, or (iii) not in the best interests of the Diocese and its estate; (e) waive terms and conditions set forth herein with respect to all potential bidders or impose additional terms and conditions with respect to all bidders; (f) extend the deadlines set forth herein; (g) adjourn or cancel the Auction or Sale Hearing without further notice; and (h) modify the Bidding Procedures as the Diocese, in its business judgment, may determine to be in the best interest of its estate or to withdraw the Motion at any time with or without prejudice.

16.     The Diocese is hereby authorized to take all actions necessary or appropriate to effectuate the terms of this Bidding Procedures Order.

17.     Notwithstanding anything to the contrary in Bankruptcy Rule 6004(h), or otherwise, this Bidding Procedures Order shall be effective immediately upon its entry.

18.     This Court shall retain jurisdiction over any matters related to or arising from the implementation of this Order.

6

Dated: _____
      Buffalo, New York

                                 _____
                                 Hon. Carl L. Bucki
                                 Chief United States Bankruptcy Judge

17963105.v4-7/18/24

## **Exhibit 1**

(to Bidding Procedures Order)

Bidding Procedures

17963105.v4-7/18/24

Case 1-20-10322-CLB,    Doc 3031-1,    Filed 07/18/24,    Entered 07/18/24 15:21:09,
Description: Exhibit A - Proposed Bidding Procedures Order, Page 9 of 54

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | |
| | ) | Case No. 20-10322 (CLB) |
| The Diocese of Buffalo, N.Y., | ) | |
| | ) | Chapter 11 |
| Debtor. | ) | |
| | ) | |

### BIDDING PROCEDURES FOR THE SALE OF 711 KNOX ROAD, EAST AURORA, NEW YORK OF THE DIOCESE OF BUFFALO, N.Y.

Set forth below are the bidding procedures (the "<u>Bidding Procedures</u>") to be employed with respect to the proposed sale (the "<u>Sale Transaction</u>") of certain real property located at 711 Knox Road, East Aurora, New York 14052 (the "<u>Property</u>") by The Diocese of Buffalo, N.Y. (the "<u>Diocese</u>"). The Sale Transaction is subject to competitive bidding as set forth herein and approval by the United States Bankruptcy Court for the Western District of New York (the "<u>Bankruptcy Court</u>") pursuant to section 363 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>").

On __, 2024, the Diocese filed the *Motion for Entry of Orders (I)(A) Approving Bidding Procedures for the Sale of Certain Real Property at 711 Knox Road, East Aurora, New York; (B) Authorizing and Approving the Form of Purchase Agreement; (C) Scheduling an Auction and Hearing to Consider the Sale; and (D) Approving the Form and Manner of Service of Notice of Auction and Sale Hearing; (II) Approving the Sale Free and Clear of Liens, Claims, Encumbrances and Other Interests; and (III) Granting Related Relief* [Docket No. ____] (the "<u>Sale Motion</u>").

On _____, 2024, the Bankruptcy Court entered an order [Docket No. ___] (the "<u>Bidding Procedures Order</u>")[1] which, among other things, approved (i) these Bidding Procedures and (ii) the form of purchase agreement with World Mission Society, Church of God A NJ Nonprofit Corporation (the "<u>Stalking Horse Bidder</u>") attached as an exhibit to the Sale Motion (the "<u>Purchase Agreement</u>").

These Bidding Procedures describe, among other things, the Property available for sale, the form of bids and the manner in which bidders and bids become qualified, the coordination of diligence efforts, the conduct of the Auction (as defined herein), the ultimate selection of the Successful Bidder (as defined herein) and the Court's approval thereof (the "<u>Bidding Process</u>").

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Sale Motion and the Bidding Procedures Order, as applicable.

In the event of any disagreement as to the interpretation or application of these Bidding Procedures, the Bankruptcy Court shall have jurisdiction to hear and resolve such dispute.

Copies of the Sale Motion and all exhibits thereto may be obtained by contacting the Diocese's counsel: Bond, Schoeneck & King, PLLC, One Lincoln Center, Syracuse, New York 13202, Attn: Stephen A. Donato, Charles J. Sullivan, Grayston T. Walter and Jeffrey D. Eaton (Telephone (315) 218-8000; email: sdonato@bsk.com, csullivan@bsk.com, gwalter@bsk.com and jeaton@bsk.com), or they may be downloaded by visiting the Bankruptcy Court's electronic case management website at https://ecf.nywb.uscourts.gov/ or for free at https://case.stretto.com/dioceseofbuffalo.

## Property to be Sold

The real property to be sold (together with all improvements and fixtures located thereon) is located at 711 Knox Road, East Aurora, New York 14052.

The Sale Transaction will be conducted on "as is, where is" basis and without representations or warranties of any kind, nature, or description by the Diocese, its agents or the Diocese's bankruptcy estate, except to the extent set forth in the Purchase Agreement. Except as otherwise provided in the Purchase Agreement or in the Bankruptcy Court's order approving the Sale Transaction, the Property shall be sold to the Successful Bidder free and clear of all liens, claims, encumbrances, and other interests ("Encumbrances"), with such Encumbrances to attach solely to the net proceeds of the sale.

## Participation Requirements

In order to participate in the Bidding Process, a bidder for the Property (a "Potential Bidder") must be an "Qualified Bidder." A Qualified Bidder is a person or group of persons who has provided the Diocese with current audited financial statements, evidence of committed financing, or such other financial and credit-quality disclosures as may be reasonably requested by, and satisfactory to the Diocese, in consultation with the Official Committee of Unsecured Creditors (the "Committee"), evidencing the Potential Bidder's financial wherewithal to consummate the Sale Transaction and pay the purchase price for the Property to the Diocese in cash.

The Diocese, in its discretion, shall determine whether a bid qualifies as an "Qualified Bid." To constitute a Qualified Bid, a bid must be an offer from a Qualified Bidder received by the Diocese before the Bid Deadline (defined below) and:

(i)     be submitted in writing;

(ii)    provide for a purchase price, payable in full, in cash, upon the Sale closing date, which exceeds the cash consideration set forth in the Purchase Agreement by at least $100,000.00 (the "Initial Minimum Overbid").

(iii)   be on terms that are not more burdensome or conditional in any material respect than the terms of the Purchase Agreement;

2

17963105.v4-7/18/24

Case 1-20-10322-CLB,     Doc 3031-1,     Filed 07/18/24,     Entered 07/18/24 15:21:09,
Description: Exhibit A - Proposed Bidding Procedures Order, Page 11 of 54

(iv)     not be conditioned on obtaining financing, the outcome of any due diligence investigation, or on the receipt of any third-party approvals or consents (excluding required Bankruptcy Court approval and any third-party approvals or consents contemplated in the Purchase Agreement);

(v)      not request or entitle the bidder to any break-up fee, expense reimbursement, or similar type of payment;

(vi)     include a binding and definitive purchase agreement for the Property, in substantially the same form as the Purchase Agreement and executed by the Qualified Bidder (a "Qualified Bidder Contract"), together with a marked copy showing any changes from the Purchase Agreement, and a clean electronic copy in Microsoft Word readable format;

(vii)    be accompanied by a cash, certified bank check, or wire transfer deposit equal to 10% of the purchase price set forth in the Qualified Bidder Contract;

(viii)   fully disclose the identity of each entity that will be bidding for the Property or otherwise participating in connection with such bid, the complete terms of any such participation, and identify no more than three (3) representatives authorized to appear and act on behalf of such Qualified Bidder at the Auction ("Authorized Bidder Representatives");

(ix)     include an acknowledgment and representation that the Qualified Bidder has had an opportunity to consider all due diligence regarding the Property prior to submitting its bid and that it has relied solely upon its own independent review, investigation and inspection of any documents or the Property in making its bid;

(x)      confirm that, if selected as the Successful Bidder or the Back-Up Bidder, such bidder will complete the Sale Transaction within five (5) business days following the date on which (A) the Bankruptcy Court's order approving the sale shall have become a final and non-appealable order, and (B) the Diocese shall have provided written notice of its readiness to consummate the Sale Transaction;

(xi)     certify that the bidder has not, and is not, engaged in any collusion with respect to its bid or the Sale Transaction; and

(xii)    provide that such bid shall remain open and irrevocable until:

    (A)     if such bid is not the Successful Bid or Back-Up Bid (as each term is defined below), the entry by the Bankruptcy Court of an order approving the sale of the Property to another Qualified Bidder;

    (B)     if such bid is the Successful Bid, the closing of the Sale Transaction to such Successful Bidder; or

    (C)     if such bid is chosen by the Diocese to be the Back-Up Bid, the date which is the earlier to occur of: (i) the closing of the Sale Transaction to the

3

17963105.v4-7/18/24

Case 1-20-10322-CLB,    Doc 3031-1,    Filed 07/18/24,    Entered 07/18/24 15:21:09,    Description: Exhibit A - Proposed Bidding Procedures Order, Page 12 of 54

Successful Bidder or (ii) the closing of the Sale Transaction to such Back-Up Bidder.

As promptly as practicable after receiving a bid from a Potential Bidder, the Diocese shall determine, in consultation with the Committee, and shall notify the Potential Bidder in writing, whether the Potential Bidder is a Qualified Bidder and whether the bid is a Qualified Bid. Notwithstanding anything to the contrary herein, the Stalking Horse Bidder is a Qualified Bidder, and the Purchase Agreement is a Qualified Bid, for all purposes of these Bidding Procedures.

## **Bid Deadline**

All Qualified Bids must be actually received at or before 12:00 noon (prevailing Eastern Time) on _____, 2024 (the "Bid Deadline"), by counsel to the Diocese, Bond, Schoeneck & King, PLLC, One Lincoln Center, Syracuse, New York 13202 (Attn: Stephen A. Donato, Charles J. Sullivan, Grayson T. Walter, Justin S. Krell and Jeffrey D. Eaton (Telephone (315) 218-8000; email: sdonato@bsk.com, csullivan@bsk.com, gwalter@bsk.com, jkrell@bsk.com and jeaton@bsk.com). The Diocese may extend the Bid Deadline in its discretion but is not obligated to do so.

As soon as practicable following the Bid Deadline, the Diocese will review all timely-received bids and will provide copies of all bids deemed to be Qualified Bids to counsel to the Committee, and the Office of the United States Trustee for the Western District of New York (the "UST").

## **"As-is" Sale / Diligence**

The Sale of the Property shall be on an "as-is" basis, without any representations or warranties provided by the Diocese, except those set forth in the Purchase Agreement.

Each Potential Bidder shall comply with all reasonable requests for information by the Diocese or its advisors regarding such Potential Bidder's financial wherewithal and ability to consummate the Sale. Failure by any Potential Bidder to comply with requests for additional information from the Diocese may be a basis for the Diocese, in its discretion, to determine that a Potential Bidder is not a Qualified Bidder, or that any bid is not a Qualified Bid.

Prior to the Bid Deadline, the Diocese shall provide any Potential Bidder deemed to be a Qualified Bidder with reasonable site access and due diligence information upon request. In no instance shall the Diocese have any obligation to produce or furnish any information not already within the Diocese's possession and control.

Potential Bidders are advised to exercise their own discretion before relying on any information regarding the Property provided by anyone other than the Diocese or its representatives.

By submitting their bid, each Qualified Bidder shall be deemed to acknowledge and represent that it has had an opportunity to inspect and examine the Property and that it has relied

solely upon its own independent review, investigation and/or inspection of any documents in making its bid, and that it did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Property, or the completeness of any information provided in connection with the Bidding Process except as expressly stated in the Qualified Bidder Contract submitted with its Qualified Bid.

## **Auction**

If no Qualified Bids (other than the Purchase Agreement submitted by the Stalking Horse Bidder, which shall be deemed as a Qualified Bid) are received on or prior to the Bid Deadline, the Stalking Horse Bidder shall be the Successful Bidder (as defined below) and the Diocese shall seek authorization to sell the Property to the Stalking Horse Bidder without further competitive bidding.

If the Diocese receives more than one Qualified Bid prior to the Bid Deadline, the Diocese shall conduct an Auction ("Auction") for the Sale of the Property. The Auction shall take place on _____ __, 2024 at 12:00 noon (prevailing Eastern Time) at the offices of Bond, Schoeneck & King, PLLC, The Avant Building, Suite 900, 200 Delaware Avenue, Buffalo, New York 14202-2107, or at such other time and place as the Diocese may notify all Qualified Bidders. Only the Stalking Horse Bidder and those Qualified Bidders who timely submitted a Qualified Bid will be eligible to participate in the Auction.

At the commencement of the Auction, the Diocese shall announce the Qualified Bid that it has determined represents the highest or otherwise best bid for the Property (the "Starting Qualified Bid") and the overall consideration value ascribed to such bid (the "Bid Value").

Each Qualified Bidder present at the Auction will be permitted to increase its Qualified Bid in turns (each such increased Qualified Bid, a "Qualified Overbid"), provided that each Qualified Overbid thereafter must exceed the Bid Value of the then-highest or otherwise best Qualified Overbid, by at least one hundred thousand dollars ($100,000.00) (the "Minimum Bid Increment"). During the course of the Auction, the Diocese will inform the participants which Qualified Overbid reflects the then-highest or otherwise best offer for the Property and the Bid Value ascribed thereto.

During the Auction, the Diocese is permitted at any time to request any additional financial information of any Qualified Bidder.

The Auction may be adjourned from time to time by the Diocese, but it shall not be concluded until each Qualified Bidder present at the Auction has been given an opportunity to submit a Qualified Overbid with knowledge of the Bid Value ascribed to the Starting Qualified Bid or then-highest Qualified Overbid, as applicable.

At the conclusion of the Auction the Diocese will announce (i) the Qualified Bid which the Diocese, in consultation with the Committee, deems to represent the highest or otherwise best bid for the Property (such bid being the "Successful Bid" and the Qualified Bidder submitting such bid, the "Successful Bidder") and (ii) the next highest or otherwise best bid (the "Back-Up

5

17963105.v4-7/18/24
Case 1-20-10322-CLB    Doc 3031-1    Filed 07/18/24    Entered 07/18/24 15:21:09,
Description: Exhibit A - Proposed Bidding Procedures Order, Page 14 of 54

Bid" and the party submitting such bid, the "<u>Back-Up Bidder</u>").  As a condition precedent to the Diocese declaring any bid the Successful Bid or the Back-Up Bid, the Diocese may require the Successful Bidder or Back-Up Bidder to deposit additional cash or immediately available funds such that their total deposit shall be not less than (10%) of the purchase price of their respective Successful Bid or Back-Up Bid.  Any deposits not applied in satisfaction of the obligations of the Successful Bidder or Back-Up Bidder shall be returned not later than five (5) business days following the consummation of the Sale Transaction.

No bids submitted after the conclusion of the Auction shall be considered unless a motion to reopen the Auction is made on notice, prior to the Sale Hearing, to all Qualified Bidders who attended and submitted a bid at the Auction and such motion is granted by the Court.

All Qualified Bids and Qualified Overbids submitted by Qualified Bidders prior to or at the Auction shall remain open and irrevocable as follows:

       (a)     if such bid is not the Successful Bid or Back-Up Bid, until the entry by the Bankruptcy Court of an order approving the Sale to another Qualified Bidder;

       (b)     if such bid is the Successful Bid, until the closing of the Sale to such Successful Bidder; or

       (c)     if such bid is the Back-Up Bid, until the date which is the earlier to occur of: (i) the closing of the Sale to the Successful Bidder or (ii) the closing of the Sale to such Back-Up Bidder.

## **The Sale Hearing**

A hearing to approve the sale transaction (the "<u>Sale Hearing</u>") is scheduled to take place on _____ __, 2024 at __:00 noon (prevailing Eastern time) before the Honorable Carl L. Bucki, Chief Judge of the United States Bankruptcy Court for the Western District of New York, at the Robert H. Jackson United States Courthouse, 2 Niagara Square, Buffalo, NY 14202. Objections to the Sale must be in writing, comply with the Local Bankruptcy Rules for the Western District of New York, and be filed with the Bankruptcy Court as soon as practicable in advance of the Sale Hearing.  At the Sale Hearing, the Diocese will seek entry of an order (the "<u>Sale Order</u>"), among other things, authorizing and approving the sale of the Property to the Successful Bidder (or in the alternative, the Back-Up Bidder), as determined by the Diocese in the Diocese's business judgment and in accordance with the Bidding Procedures, pursuant to the terms and conditions set forth in the Purchase Agreement or Qualified Bidder Contract, as applicable, and as the same may be modified by any Qualified Overbid submitted at the Auction. The Sale Hearing may be adjourned or rescheduled without notice other than as reflected on the Bankruptcy Court's docket or by an announcement of the adjourned date in open court at the Sale Hearing.

The Diocese shall be deemed to have accepted a Qualified Bid only when (i) such Bid is declared the Successful Bid (or the Back-Up Bid) in accordance with these Bidding Procedures,

6

17963105.v4-7/18/24

Case 1-20-10322-CLB,    Doc 3031-1,    Filed 07/18/24,    Entered 07/18/24 15:21:09,
Description: Exhibit A - Proposed Bidding Procedures Order, Page 15 of 54

(ii) definitive documentation has been executed in respect thereof, and (iii) the Bankruptcy Court has entered the Sale Order.

Following the entry of the Sale Order, if the Successful Bidder fails to consummate the approved Sale Transaction in accordance with the terms of its Successful Bid because of a breach or failure to perform on the part of such Successful Bidder, the Diocese may terminate its agreement to sell the property to the Successful Bidder, retain the Successful Bidder's deposit, and maintain the right to pursue all available remedies whether legal or equitable against such Successful Bidder.  In the event the Diocese elects to so terminate, the Backup Bid, shall automatically be deemed to be the Successful Bid with respect to the Property, and the Diocese shall be authorized to effectuate the sale of the Property to the Backup Bidder without further order of the Bankruptcy Court.

The Diocese shall return any deposits to all Qualified Bidders, other than the Successful Bidder and the Back-Up Bidder, within five (5) business days following the date on which the Sale Order becomes a final and non-appealable order.  The deposit of the Successful Bidder shall be applied to, and deducted from, the Successful Bidder's obligations under the Successful Bid at the closing of the Sale Transaction.  The deposit of the Back-Up Bidder shall be returned to the Back-Up Bidder within five (5) business days following the date its bid is no longer required to remain open and irrevocable as set forth herein.

## Reservation of Rights

The Diocese reserves all rights to terminate the Bidding Process at any time if the Diocese determines, in consultation with the Committee, that the Bidding Process is not in the best interest of the Diocese's bankruptcy estate.  In addition, the Diocese reserves the right not to submit for approval to the Bankruptcy Court any bid (regardless of whether it may be a Qualified Bid under these Bidding Procedures) if the Diocese has reason to believe that such bid was not submitted in good faith or other similar reason.  Without limiting the generality of the foregoing, the Diocese may reject at any time before entry of the Sale Order, any bid that it determines, in consultation with the Committee, is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code or the Bidding Procedures, or (iii) not in the best interests of the Diocese, its estate and creditors.  The Diocese shall further have the right to amend the rules set forth herein for the Bidding Process or impose such other or additional terms and conditions for the Bidding Process which the Diocese determines, in consultation with the Committee, are in the best interests of the chapter 11 estate, provided that such modifications are not inconsistent with these Bidding Procedures or the Bidding Procedures Order.

*      *      *

## **Exhibit 2**

(to Bidding Procedures Order)

Purchase Agreement

17963105.v4-7/18/24

Case 1-20-10322-CLB,     Doc 3031-1,     Filed 07/18/24,     Entered 07/18/24 15:21:09,
Description: Exhibit A - Proposed Bidding Procedures Order, Page 17 of 54

PURCHASE AND SALE AGREEMENT

*June*

This PURCHASE AND SALE AGREEMENT (this "Agreement"), dated as of the _12+h_ day of ~~May~~ 2024 (the "Effective Date"), is entered into between **THE DIOCESE OF BUFFALO, N.Y.**, a New York special act corporation created by the New York State Legislature pursuant to Chapter 568 of the Laws of 1951, having an address at 795 Main Street, Buffalo, NY 14203 ("Seller"), and **WORLD MISSION SOCIETY, CHURCH OF GOD A NJ NONPROFIT CORPORATION**, a New Jersey not-for-profit corporation authorized to conduct business in New York, having an address at 880 Jackson Avenue, New Windsor, New York 12553 ("Purchaser"); each a "Party", and collectively, the "Parties").

## RECITALS

WHEREAS, Seller is the owner of real property located in the Town of Aurora, County of Erie, and State of New York, commonly known as **711 Knox Road, Tax Map Parcel No. 163.00-3-23** in the Town of Aurora, County of Erie, and State of New York, which is shown outlined on the property sketch attached hereto as **Exhibit A-1**, and is more particularly described on **Exhibit A-2** attached hereto (together with all improvements and fixtures located thereon, the "Property").

WHEREAS, on February 28, 2020 (the "Petition Date") Seller filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (11 U.S.C. § 101 et seq., the "Bankruptcy Code") with the United States Bankruptcy Court for the Western District of New York (the "Bankruptcy Court"), commencing Seller's chapter 11 case (this "Bankruptcy Case");

WHEREAS, Seller continues to operate its business and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, Seller retained Hanna Commercial Real Estate ("Hanna CRE") to serve as a real estate broker with respect to the proposed sale of the Property;

WHEREAS, Seller listed the Property for sale with Hanna CRE beginning on or about November 2, 2023;

WHEREAS, subject to the terms and conditions hereof, Seller desires to sell to Purchaser, and Purchaser desires to purchase the Property from Seller;

WHEREAS, the transaction contemplated by this Agreement is subject to the approval of the Bankruptcy Court, which approval will include, among other things, issuance by the Bankruptcy Court of a Bidding Procedures Order directing the manner in which a bidding procedure will be conducted for solicitation of competing offers from third parties for the purchase of the Property; and

WHEREAS, depending upon the outcome of bidding pursuant to the Bidding Procedures Order, this Agreement and the transactions contemplated herein will be consummated pursuant to a sale order to be entered in the Bankruptcy Case, or, in the alternative, this Agreement may be terminated by Seller, as hereinafter provided.

1

**Purchase and Sale Agreement
for 711 Knox Road, Aurora, NY**

17429967.12

Case 1-20-10322-CLB    Doc 3031-1    Filed 07/18/24    Entered 07/18/24 15:21:09,
Description: Exhibit A - Proposed Bidding Procedures Order, Page 18 of 54

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS

For purposes of this Agreement (including any Exhibits or Schedules attached hereto), the following terms shall have the meanings ascribed to them below, unless the context clearly requires otherwise:

1.1    "**Bankruptcy Case**" shall have the meaning given to it in the Recitals to this Agreement.

1.2    "**Bankruptcy Code**" shall have the meaning given to it in the Recitals to this Agreement.

1.3    "**Bankruptcy Court**" shall have the meaning given to it in the Recitals to this Agreement.

1.4    "**Bargain and Sale Deed**" shall mean the deed to be delivered at Closing by Seller to Purchaser in the form attached hereto as **Exhibit B**.

1.5    "**Bidding Procedures**" shall mean the bidding procedures governing the process by which the sale of the Property shall occur, which are attached to the Bidding Procedures Order as Exhibit 1.

1.6    "**Bidding Procedures Order**" shall mean an order of the Bankruptcy Court: (i) approving the terms of this Agreement, subject to higher and better bids; (ii) establishing procedures for Seller's solicitation of competing offers to purchase the Property from third parties; (iii) establishing procedures for an auction to determine the highest or otherwise best offer for the Property; and (iv) scheduling a hearing to consider entry of the Sale Order.

1.7    "**Business Day(s)**" shall mean calendar days, exclusive of Saturdays, Sundays and holidays on which banking institutions in New York are authorized by Law to close.

1.8    "**Claim**" shall mean any claim within the meaning of section 101(5) of the Bankruptcy Code.

1.9    "**Closing**" shall mean the closing of the transaction as set forth in Section 7.1 of this Agreement.

1.10    "**Closing Date**" shall mean the date of Closing.

1.11    "**Encumbrance**" shall mean any Lien, Claim, Interest, or defect in title, whether imposed by Law, agreement, understanding or otherwise.  For the avoidance of doubt, rights of way and easements of record shall not be considered an Encumbrance under this Agreement.

2

**Purchase and Sale Agreement
for 711 Knox Road, Aurora, NY**

17429967.12

Case 1-20-10322-CLB,    Doc 3031-1,    Filed 07/18/24,    Entered 07/18/24 15:21:09,
Description: Exhibit A - Proposed Bidding Procedures Order, Page 19 of 54

1.12    "**Effective Date**" shall mean June 12, 2024.

1.13    "**Escrow Agent**" shall mean the Seller's attorneys, Bond, Schoeneck & King, PLLC.

1.14    "**Excluded Items**" shall mean any and all religious materials and texts located within the library on the day of Closing.

1.15    "**Interest**" shall mean any interest in, or related to, the Property within the meaning of section 363(f) of the Bankruptcy Code, and all mortgages, Leases, or other interests, pledges, security interests, rights of setoff, successor liabilities, conditions, obligations to allow participation, agreements or rights, rights asserted in litigation matters, competing rights of possession, obligations to lend, matters filed of record that relate to, evidence or secure an obligation of Sellers (and all created expenses and charges) of any type under, among other things, any document, instrument, agreement, affidavit, matter filed of record, cause, or state or federal law, whether known or unknown, legal or equitable, and all Liens, rights of offset, replacement liens, adequate protection liens, charges, obligations.

1.16    "**Law**" shall mean all federal, state and local laws, ordinances, rules, regulations, standards, and Orders.

1.17    "**Leases**" shall mean all leases, subleases, licenses, concessions, options, extension letters, assignments, termination agreements, subordination agreements, nondisturbance agreements, estoppel certificates and other agreements, whether written or oral, and any amendments or supplements to any of the foregoing.

1.18    "**Liability**" shall mean any liability or obligation of whatever kind or nature (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated and whether due or to become due).

1.19    "**Lien**" shall mean any charge against or Interest in the Property to secure payment of a debt or performance of an obligation (statutory or otherwise), deed of trust, mortgage, pledge, security interest, security agreement, hypothecation, preference, priority, or right of recovery.

1.20    "**Order**" shall mean any award, decision, injunction, judgment, order, ruling, subpoena, or verdict entered, issued, made, or rendered by any court, or administrative agency.

1.21    "**Permitted Exception**" shall have the meaning given to such term in Section 9.2.

1.22    "**Person**" shall mean any individual, corporation, general or limited partnership, limited liability company, joint venture, estate, trust, association, or other legal organization.

1.23    "**Proceeding**" shall mean any action, demand, complaint, inquiry, suit, injunction, dispute, arbitration, audit, hearing, investigation, litigation, citation, notice of violation (or similar notice), or suit (whether civil or criminal) commenced, brought, conducted, or heard by or before, or otherwise involving, any Person.

**Purchase and Sale Agreement
for 711 Knox Road, Aurora, NY**

17429967.12

Case 1-20-10322-CLB,    Doc 3031-1,    Filed 07/18/24,    Entered 07/18/24 15:21:09,
Description: Exhibit A - Proposed Bidding Procedures Order, Page 20 of 54

1.24    "**Property**" shall have the meaning given to such term in the Recitals of this Agreement.

1.25    "**Remaining Personal Property**" shall mean any items of equipment and personal property, aside from the Excluded Items, remaining on the Property on the day of the Closing.

1.26    "**Sale Order**" shall mean an Order of the Bankruptcy Court in form and substance reasonably acceptable to Purchaser and Seller authorizing the sale of the Property to Purchaser in accordance with the terms and conditions set forth herein, free and clear of any Encumbrances pursuant to section 363(f) of the Bankruptcy Code.

1.27    "**Tax**" and "**Taxes**" shall mean individually or collectively, as appropriate, any and all U.S. or non-U.S., federal, state, county, local, municipal or other taxes, charges, imposts, rates, fees, levies or other assessments.

1.28    "**Title Company**" shall mean a reputable title company to be selected by Purchaser.

1.29    "**Transaction**" shall mean the purchase and sale of the Property contemplated by this Agreement.

## ARTICLE II
## AGREEMENTS TO SELL AND PURCHASE; RELATED MATTERS

2.1.    **Agreement to Sell and Purchase the Property**.  On the Closing Date, subject to the performance of the parties of the terms and provisions of this Agreement and satisfaction of the terms and conditions set forth in the Sale Order, Seller shall sell, convey, assign, transfer, and deliver to Purchaser, and Purchaser shall purchase, acquire, and accept from Seller, the Property, free and clear of all Encumbrances, except as otherwise expressly provided in this Agreement.

2.2.    **Condition of Property**.  Seller is selling and Purchaser is acquiring the Property "AS IS" "WHERE IS", and with all faults, as provided in **ARTICLE XII** below.

2.3.    **Personal Property.**  Seller shall have the right at any time prior to Closing to remove from the Property any religious items and other equipment and personal property which Seller elects to remove and retain. For the avoidance of doubt, the pews shall be considered religious items under this Agreement. Purchaser agrees to accept possession of the Property at Closing with any Remaining Personal Property included in the sale (at no additional cost to Purchaser) on an "AS IS" "WHERE IS" basis.  Seller shall deliver to Purchaser at Closing a quitclaim bill of sale conveying Seller's interest in any such Remaining Personal Property. To the extent any such Remaining Personal Property is owned by an entity affiliated with Seller, Seller shall deliver to Purchaser a quitclaim bill of sale executed by such affiliated entity. Purchaser shall at the time of Closing provide Seller with evidence reasonably satisfactory to Seller demonstrating that Purchaser is exempt from New York State Sales Tax in connection with the purchase of any such Remaining Personal Property. Notwithstanding anything to the contrary contained herein, the Remaining Personal Property does not encompass or include the Excluded Items.

**Purchase and Sale Agreement
for 711 Knox Road, Aurora, NY**

17429967.12

2.4.    **Building Systems and Fixtures.**  Notwithstanding the foregoing, Seller agrees not to remove from the Property any of the following to the extent they are in place on the Property as of the Effective Date of this Agreement, and that all such items shall be included in the sale to Purchaser, as fixtures to the Property:  any natural gas and electric fixtures, facilities, appliances and wiring, fixtures and related equipment, all emergency generators, engines, boilers, elevators, incinerators, motors, heating, ventilation, and air conditioning equipment, affixed cabinetry, sinks, basins, water closets, lavatory fixtures, faucets, and pipes, all electrical and telephone systems, components, wiring, transformers, electrical boxes, switches, lighting fixtures, and bulbs, any sprinkler systems, fire prevention and extinguishing apparatus, any central music and public address systems, any burglar alarms, security systems and equipment, remote control devices for overhead doors, any window shades, awnings, screens, blinds, installed carpeting, drapes, and curtains. Seller makes no representation or warranty that any of the foregoing items are in place on the Property.

## ARTICLE III
## PURCHASE PRICE

3.1.    **Purchase Price**.  The Purchase Price for the Property shall be THREE MILLION EIGHT HUNDRED THOUSAND AND 00/100 DOLLARS ($3,800,000.00) (the "Purchase Price"), payable as follows:

    3.1.1.    **Deposit**.  Within five (5) days after the Effective Date, Purchaser shall deposit in escrow with Seller's attorneys, Bond, Schoeneck and King, PLLC, an earnest money deposit of THREE HUNDRED EIGHTY THOUSAND AND 00/100 DOLLARS ($380,000.00) (the "Earnest Money Deposit") in a non-interest bearing account, which Earnest Money Deposit is to become part of the Purchase Price, or be returned, if required under the terms of this Agreement.

    3.1.2.    **Balance**.  The balance of the Purchase Price shall be paid, plus or minus Closing adjustments, as the case may be, in wire transferred funds of United States currency to Seller in accordance with the terms of the Sale Order.

3.2.    **Cash Transaction**. Purchaser acknowledges that Purchaser's representation below that the transaction contemplated herein is a "Cash Transaction" was a determinative factor in Seller's acceptance of Purchaser's offer. To that end, Purchaser shall, on or before the Effective Date, provide Seller with evidence reasonably satisfactory to Seller confirming Purchaser's ability to purchase the Property pursuant to this Agreement without obtaining financing or funding from outside funding sources ("Proof of Funds").

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller makes no representations or warranties, express or implied, except those expressly contained or incorporated in this Agreement. All of the representations and warranties of Seller contained in this Agreement are to the best of Seller's knowledge, made as of the Effective Date, and except as otherwise set forth herein, shall merge with the Quitclaim Deed and shall not survive

**Purchase and Sale Agreement
for 711 Knox Road, Aurora, NY**

17429967.12
Case 1-20-10322-CLB,    Doc 3031-1,    Filed 07/18/24,    Entered 07/18/24 15:21:09,
Description: Exhibit A - Proposed Bidding Procedures Order, Page 22 of 54

the Closing. Subject to the foregoing, Seller represents and warrants unto Purchaser as of the date hereof, as follows:

4.1.  **Organization**.  Seller is a New York special act corporation created by the New York State Legislature pursuant to Chapter 568 of the Laws of 1951, duly organized, validly existing, and in good standing under the laws of the State of New York, and subject to the Bankruptcy Court's entry of the Sale Order, Seller has the legal power, right and authority to enter into this Agreement and the instruments referenced herein, and to consummate the transaction contemplated herein.

4.2.  **Power and Authority**.  All requisite corporate action has been taken by Seller in connection with entering into this Agreement, the documents and instruments referenced herein, and the consummation of the transaction contemplated hereby.  Subject to the Bankruptcy Court's entry of the Sale Order, no consent, authority, licensing, or approval of any partner, shareholder, trustee, trustor, beneficiary, creditor, investor, or other party is required for Seller to execute and deliver this Agreement and the instruments and documents referenced herein or consummate the transaction contemplated by this Agreement. The individual(s) executing this Agreement and the instruments referenced herein on behalf of Seller have the legal power, right, and actual authority to bind Seller to the terms and conditions hereof and thereof.

4.3.  **Consents**.  Subject to the Bankruptcy Court's entry of the Sale Order, no consent, approval, waiver, license, permit, or certificate of authority any other third Person is required in connection with the execution, delivery or performance by Seller of this Agreement or the consummation by Seller of the transactions contemplated hereby.

4.4.  **Foreign Person**. Seller is not a "foreign person" as defined in §1445(f)(3) of the Internal Revenue Code and regulations promulgated thereunder, which Seller shall so certify at Closing (via "Non-Foreign Person Affidavit").

4.5.  **Encumbrances**.  Except as otherwise expressly provided in this Agreement, at the Closing, Seller will convey the Property free and clear of all Encumbrances, as provided in the Sale Order, subject to any rights of way or easements of record.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

5.1.  **Power and Authority**.  All requisite action (corporate, trust, partnership or otherwise) has been taken by Purchaser in connection with entering into this Agreement, the documents and instruments referenced herein, and the consummation of the transaction contemplated hereby.  No consent, authority, licensing or approval of any partner, shareholder, trustee, trustor, beneficiary, creditor, investor, regulatory authority or other party is required for Purchaser to execute and deliver this Agreement and the instruments and documents referenced herein or consummate the transaction contemplated by this Agreement. The individual(s) executing this Agreement and the instruments referenced herein on behalf of Purchaser have the legal power, right, and actual authority to bind Purchaser to the terms and conditions hereof and thereof.

**Purchase and Sale Agreement
for 711 Knox Road, Aurora, NY**

17429967.12

Case 1-20-10322-CLB,    Doc 3031-1,    Filed 07/18/24,    Entered 07/18/24 15:21:09,
Description: Exhibit A - Proposed Bidding Procedures Order, Page 23 of 54

5.2.    **Sufficient Funds**.  The transaction contemplated by this Agreement is a "Cash Transaction", and Purchaser has as of the date hereof, and will have as of the Closing, sufficient funds in cash in its possession to pay the Purchase Price and the Earnest Money Deposit as the same become due and payable under this Agreement, without obtaining financing or funding from outside funding sources.

5.3.    **Certain Relationships**.  Purchaser represents and warrants to Seller (i) that neither Purchaser nor any Person or entity that directly or indirectly owns any interest in Purchaser nor any of its officers, directors or members is a Person or entity with whom U.S. Persons or entities are restricted from doing business under regulations of the Office of Foreign Asset Control ("OFAC") of the U.S. Department of the Treasury (including those named on OFAC's Specially Designated and Blocked Persons List) or under any statute, executive order (including, but not limited to, Executive Order 13224 ("Executive Order") signed on September 24, 2001 and titled "Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism"), or other governmental action, (ii) that Purchaser's activities do not violate the International Money Laundering Abatement and Financial Anti-Terrorism Act of 2001 or the regulations or orders promulgated thereunder (as amended from time to time, the "Money Laundering Act"), and (iii) that so long as this Agreement is in full force and effect, Purchaser shall comply with the Executive Order and with the Money Laundering Act.

5.4.    **Foreign Person**.  Purchaser is not a "foreign person" as defined in §1445(f)(3) of the Internal Revenue Code and the regulations promulgated thereunder.

## ARTICLE VI
## CONDITIONS TO CLOSING

6.1.    **Conditions to Obligations of Each Party**.  The respective obligations of each Party to consummate the transactions contemplated hereby shall be subject to the satisfaction at or prior to the Closing of the following conditions:

6.1.1.    **Sale Order**. The Bankruptcy Court shall have entered the Sale Order.

6.2.    **Additional Conditions to Obligations of Purchaser**. The obligations of the Purchaser to consummate the transactions contemplated hereby are subject to satisfaction or waiver by the following additional conditions:

6.2.1.    **Representations and Warranties**.  The representations and warranties of Seller set forth in this Agreement shall be materially true and correct as of the Effective Date and as of the Closing Date, as if made as of such time (except to the extent that such representations and warranties expressly speak as of another date, in which case such representations and warranties shall be true and correct as of such date).

6.2.2.    **Agreements and Covenants**.  Seller shall have performed and complied with all of its covenants hereunder in all material respects through the Closing.

**Purchase and Sale Agreement
for 711 Knox Road, Aurora, NY**

17429967.12

Case 1-20-10322-CLB,    Doc 3031-1,    Filed 07/18/24,    Entered 07/18/24 15:21:09,
Description: Exhibit A - Proposed Bidding Procedures Order, Page 24 of 54

6.2.3.   **Documents**. All of the documents, instruments and agreements required to be executed and/or delivered by Seller on or prior to Closing pursuant to **Section 7.1.1** of this Agreement shall have been executed by the parties thereto other than the Purchaser and delivered to the Purchaser.

6.3.   **Additional Conditions to Obligations of Seller**. The obligations of Seller to consummate the transactions contemplated hereby are subject to satisfaction or waiver by Seller of the following additional conditions:

6.3.1.   **Representations and Warranties**. The representations and warranties of the Purchaser set forth in this Agreement shall be materially true and correct as of the Closing Date, as if made as of such time (except to the extent that such representations and warranties expressly speak as of another date, in which case such representations and warranties shall be true and correct as of such date).

6.3.2.   **Agreements and Covenants**. Purchaser shall have paid the full Purchase Price performed and complied with all of its other covenants hereunder in all material respects through the Closing.

6.3.3.   **Documents**. All of the documents, instruments and agreements required to be executed and/or delivered by Purchaser on or prior to Closing pursuant to **Section 7.1.2** of this Agreement shall have been executed by the parties thereto other than Seller and delivered to Seller.

## ARTICLE VII
## CLOSING; DELIVERIES AND ACTIONS TAKEN AT THE CLOSING

7.1.   **Closing Date**. The Closing of the purchase and sale of the Property and any other transactions contemplated in this Agreement shall occur no later than the date that is five (5) Business Days after the date of the entry of the Sale Order or such other later date as the parties may mutually agree.  The parties agree that TIME IS OF THE ESSENCE with respect to the occurrence of the Closing Date. The Closing shall be held via escrow and wire transfer through the offices of Seller's attorney.

7.1.1.   **Deliveries by Seller at the Closing**. At the Closing, Seller shall cause to be executed and delivered to Purchaser the following documents with respect to the Property being conveyed:

7.1.1.1.   a duly executed and acknowledged Bargain and Sale Deed;

7.1.1.2.   a Quitclaim Bill of Sale conveying title to the Remaining Personal Property:

7.1.1.3.   two (2) counterparts of a duly executed Closing Statement setting forth all closing adjustments and prorations for the Property (the "Closing Statement");

8

**Purchase and Sale Agreement**
**for 711 Knox Road, Aurora, NY**

7.1.1.4.  two (2) counterparts of duly executed Water Supply Assignment and Assumption Agreements (as hereinafter defined);

7.1.1.5.  a Non-Foreign Person Affidavit signed by Seller;

7.1.1.6.  a copy of the Sale Order; and

7.1.1.7.  such other agreements, instruments, and documents of conveyance and transfer executed by Seller, in form and substance reasonably acceptable to Purchaser, as may be reasonably necessary or desirable to convey the Property to Purchaser free and clear of all Encumbrances, except as otherwise expressly provided in this Agreement.

7.1.2.     **Deliveries by the Purchaser at the Closing**. At the Closing, Purchaser shall cause to be delivered to Seller the following:

7.1.2.1.  the Purchase Price, by wire transfer of immediately available funds (subject to prorations and adjustments, including, but not limited to, a credit for the Earnest Money Deposit) by no later than 2:00 p.m. (eastern time);

7.1.2.2.  two (2) counterparts of a Closing Statement setting forth all closing adjustments and prorations for the Property;

7.1.2.3.  two (2) counterparts of duly executed Water Supply Assignment and Assumption Agreements (as hereinafter defined); and

7.1.2.4.  such other agreements, instruments, and documents as Seller may reasonably request to consummate the purchase and sale transaction contemplated hereby.

### ARTICLE VIII
### TERMINATION

8.1.     **Termination.**  This Agreement may be terminated at any time prior to Closing:

8.1.1.     by mutual written agreement of Purchaser and Seller;

8.1.2.     by Seller or Purchaser, by written notice to the other, if the Bankruptcy Court has not granted the Sale Order by July 15, 2024;

8.1.3.     by Seller, by written notice to Purchaser, if the Closing shall not have occurred on or before the date that is ten (10) Business Days after the date of entry of the Sale Order (as may be extended by written agreement of Purchaser and Seller); provided, however, that Seller is not in material breach of any of its representations and warranties contained in this Agreement and has not failed in any material respect to perform any of its obligations hereunder;

**Purchase and Sale Agreement
for 711 Knox Road, Aurora, NY**

17429967.12

Case 1-20-10322-CLB,    Doc 3031-1,    Filed 07/18/24,    Entered 07/18/24 15:21:09,
Description: Exhibit A - Proposed Bidding Procedures Order, Page 26 of 54

8.1.4.    by Purchaser, by written notice to Seller, if there shall have been a material breach by Seller of any of its representations, warranties, covenants or agreements contained in this Agreement, which breach would result in the failure to satisfy one or more of the conditions set forth in this Agreement, and such material breach or other event or condition shall be incapable of being cured or, if capable of being cured, shall not have been cured within twenty-one (21) calendar days after written notice thereof shall have been received by Seller; provided, that Purchaser is not in material breach of this Agreement as of such date;

8.1.5.    by Seller, if there shall have been a material breach by Purchaser of any of its representations, warranties, covenants or agreements contained in this Agreement, which breach would result in the failure to satisfy one or more of the conditions set forth in this Agreement, and such material breach or other event or condition shall be incapable of being cured or, if capable of being cured, shall not have been cured within ten (10) calendar days after written notice thereof shall have been received by Purchaser; provided, that no Seller is in material breach of this Agreement as of such date; or

8.1.6.    by Purchaser on or after the date the Sale Order ceases to be in full force and effect, or is revoked, rescinded, vacated, materially modified, reversed or stayed, or otherwise rendered ineffective by a court of competent jurisdiction.

## ARTICLE IX
## EVIDENCE OF TITLE AND WATER SUPPLY AGREEMENTS

9.1.    **Abstract of Title.**  Within thirty (30) days following the Effective Date, Seller shall, deliver to Purchaser (or its attorneys) a 60-year title abstract and tax search of the Property (the "Title Search"). Purchaser shall be responsible for obtaining a commitment for title insurance prepared by a title company of Purchaser's choice covering the Property (the "Title Commitment"), committing the Title Company to issue to Purchaser, upon the recording of the Bargain and Sale Deed, an ALTA fee title insurance policy in the full amount of the Purchase Price, together with legible copies of all documents referenced in Schedules B-1 or B-2 to the Title Commitment. Purchaser shall be responsible for paying the cost of the Title Search at the Closing, and Purchaser shall be solely responsible for the cost of the procurement and issuance of the Title Commitment and the premium for the title insurance policy, such responsibility shall survive the Closing or cancellation of this Agreement.

9.2.    **Condition to Title**. The Property shall be sold and conveyed, and Purchaser shall purchase the Property, (i) free and clear of all Liens pursuant to Section 363(f) of the Bankruptcy Code, with such Liens to attach to the consideration to be received by Seller in the same priority and subject to the same defenses and avoidability, if any, as before the Closing, and (ii) subject to: (a) the terms and conditions of the Sale Order, (b) such title exceptions affecting the Property as the Title Company (or any other reputable title insurance company licensed to do business in the State of New York) shall, at regular rates, be willing to omit as exceptions to coverage, and (c) those matters listed in Exhibit "C-1" to this Agreement (collectively, the "Permitted Exceptions"). Seller

10    **Purchase and Sale Agreement**
**for 711 Knox Road, Aurora, NY**

17429967.12

Case 1-20-10322-CLB,    Doc 3031-1,    Filed 07/18/24,    Entered 07/18/24 15:21:09,
Description: Exhibit A - Proposed Bidding Procedures Order, Page 27 of 54

and Purchaser hereby expressly agree that the state of title set forth in the Sale Order and Exhibit "C-1" hereto, including the Permitted Exceptions, reflect good, marketable, insurable and acceptable title to the Property.

9.3.    **Survey**.  Purchaser shall have the right, but not the obligation, to order a new survey of the Property (a "Survey"), at Purchaser's sole cost and expense and, if Purchaser elects to obtain a Survey, Purchaser shall deliver a copy of the Survey to Seller upon receipt. Notwithstanding the foregoing, Closing shall not be subject to or conditioned upon Purchaser's or Seller's receipt of or Title Company's review a Survey.

9.4.    **Approval of Water Supply Agreements**.  Within thirty (30) days following the Effective Date, Seller shall deliver to Purchaser (or its attorneys) copies of the existing agreements between Seller and the owners of three residential properties located adjacent to the Property (collectively, the "Water Supply Agreements") pursuant to which Seller furnishes water to such property owners on the terms and conditions set forth in the Water Supply Agreements.  Seller shall, at the time of Closing, assign to Purchaser all of Seller's rights under the Water Supply Agreements, and Purchaser shall assume all of Seller's obligations thereunder pursuant to written assignment and assumption agreements (collectively, the "Water Supply Assignment and Assumption Agreements").

## ARTICLE X
## CLOSING ADJUSTMENTS

10.1.    **Apportionment**. The following shall be apportioned on the Closing Statement against sums due Seller at Closing:

10.1.1.    Seller shall pay for the New York real property transfer tax due, if any, in connection with this transaction.

10.1.2.    Purchaser shall pay all recording fees and other charges and fees payable in connection with the recording of the Bargain and Sale Deed.

10.1.3.    Purchaser shall also pay for (1) the examination and search fees incurred by the Title Company to prepare the Title Search; (2) the examination and search fees incurred by the Title Company to acquire the Title Commitment, (3) all premiums charged on the owner's policy of title insurance issued to Purchaser pursuant to the Title Commitment, including, without limitation, the costs of any endorsements or extended title insurance coverage requested by Purchaser, and (4) the charges for preparing the Survey, if applicable.

10.1.4.    Each party shall bear its own attorneys' fees in connection with its negotiation, due diligence investigation and conduct of the transaction.

10.2.    **Real Estate Taxes and Other Charges**. Real estate taxes, utilities, including but not limited to water charges, sewer, rents and fuel, and all other customary items shall be adjusted, apportioned and allowed as of the Closing Date, if necessary by an estimated tax calculation, with

**Purchase and Sale Agreement
for 711 Knox Road, Aurora, NY**

17429967.12

Case 1-20-10322-CLB,    Doc 3031-1,    Filed 07/18/24,    Entered 07/18/24 15:21:09,
Description: Exhibit A - Proposed Bidding Procedures Order, Page 28 of 54

the Closing Date being a day of income and expense to the Purchaser. If at any time up to the Closing Date, the Property or any part thereof shall be or shall have been affected by an assessment or assessments for municipal improvements whether or not confirmed or completed an whether or not payable in installments, then for purpose of this Agreement, the proportional share of all of the unpaid installments of any such assessment(s), which are to become due and payable after the delivery of the Bargain and Sale Deed contemplated hereunder, shall be paid by the Purchaser. Installments allocable to period prior to the Closing and unpaid as of the Closing Date shall be paid by Seller or allowed as a reduction in the Purchase Price.

## ARTICLE XI
## POSSESSION

11.1.    **Right to Possession**. Right to possession of, and control over, the Property shall transfer to Purchaser on the Closing Date. On the Closing Date, Seller shall:

> 11.1.1.    Transfer possession to Purchaser of the Property in AS-IS, WHERE IS condition.

> 11.1.2.    Transfer and deliver to Purchaser all keys, pass keys, pass codes, security codes, locks and safe combinations and all other similar items in Seller's possession as Purchaser may require to obtain occupation and control of the Property.

> 11.1.3.    Make available to Purchaser originals of all documents, instruments and agreements in Seller's possession that are required to be transferred to Purchaser by this Agreement.

11.2    **Limited Right to Post-Occupancy**. Notwithstanding the foregoing and provided that Seller notifies Purchaser prior to the entry of the Sale Order, Seller shall have the right to store, maintain, and remove the Excluded Items from the library until December 31, 2024 (the "Post-Occupancy"), the terms and conditions substantially set forth in **Exhibit D**.

## ARTICLE XII
## AS-IS, WAIVER AND RELEASE

12.1.    As a material inducement to the execution and delivery of this Agreement by Seller and the performance by Seller of its duties and obligations hereunder, Purchaser does hereby acknowledge, represent, warrant and agree, to and with Seller, that (i) Purchaser is purchasing the Property in an "AS-IS" condition as of the Closing Date with respect to any facts, circumstances, conditions and defects, latent or patent; (ii) Seller has no obligation to repair or correct any such facts, circumstances, conditions or defects or compensate Purchaser for same; (iii) Purchaser has undertaken all such physical inspections and examinations of the Property as Purchaser deems necessary or appropriate under the circumstances, and that based upon same, Purchaser is and will be relying strictly and solely upon such inspections and examinations and the advice and counsel of its agents and officers, and Purchaser is and will be fully satisfied that the Purchase Price is fair and adequate consideration for the Property; (iv) Seller is not making and has not made any warranty or representation with respect to all or any part of the Property (including, but not limited

12                              **Purchase and Sale Agreement**
**for 711 Knox Road, Aurora, NY**

17429967.12

Case 1-20-10322-CLB,    Doc 3031-1,    Filed 07/18/24,    Entered 07/18/24 15:21:09,
Description: Exhibit A - Proposed Bidding Procedures Order, Page 29 of 54

to, any matters contained in documents made available or delivered to Purchaser in connection with this Agreement as an inducement to Purchaser to enter into this Agreement and thereafter to purchase the Property or for any other purpose); and (v) by reason of all of the foregoing, Purchaser shall assume the full risk of any loss or damage occasioned by any fact, circumstance, condition or defect pertaining to the physical and financial condition of the Property, including without limitation the presence of any asbestos containing material, hazardous, toxic or radioactive waste, substance or materials in, on, under or about the Property, and Purchaser hereby expressly and unconditionally waives and releases Seller and all of their parents, subsidiaries, Affiliates and partnerships, and its and their respective officers, directors, shareholders, partners, agents and employees, and their respective successors, heirs and assigns and each of them (individually and collectively, the "Released Parties") from any and all rights and claims against Seller and/or the Released Parties with respect to the condition of the Property, including without limitation any rights of Purchaser under the State or Federal Comprehensive Environmental Response, Compensation and Liability Act, as amended from time to time, or similar Laws.  Purchaser acknowledges and agrees that the foregoing waiver and release includes all rights and claims of Purchaser against Seller pertaining to the condition of the Property, whether heretofore or now existing or hereafter arising, or which could, might, or may be claimed to exist, of whatever kind or nature, whether known or unknown, suspected or unsuspected, liquidated or unliquidated, each as though fully set forth herein at length, which in any way arise out of, or are connected with, or relate to, the condition of the Property.  The foregoing provisions shall survive the Closing Date and the consummation of the transaction contemplated by this Agreement.

## ARTICLE XIII
## DEFAULT

13.1.    **Seller Default**. In the event that Seller shall be in material default hereunder for any reason other than Purchaser's default, Purchaser may deliver a written notice to Seller stating with particularity the alleged default of Seller, the action required by Seller to cure such default, and Purchaser's intent to exercise its remedies provided below if the default is not cured.  Seller shall have twenty-one (21) days after receipt of such notice to cure the alleged default to Purchaser's reasonable satisfaction (and the Closing Date shall be delayed, if necessary, until the end of such twenty-one (21) day period).  In the event such default is not cured within such twenty-one (21) day period, then Purchaser may elect, as its sole and exclusive remedy, to seek to enforce specific performance only for failure to cause the Property to be conveyed in accordance with the terms and provisions hereof (without any reduction in the Purchase Price) or to terminate this Agreement by written notice to Seller and the Title Company, whereupon Purchaser shall be entitled to a full refund of the Earnest Money Deposit.  It is expressly understood and agreed that the remedy of specific performance shall not be available to enforce any other obligation of Seller hereunder other than a failure to cause the Property to be conveyed in accordance with the terms and provisions of this Agreement.  Purchaser shall be deemed to have elected to terminate this Agreement if Purchaser fails to file suit for specific performance against Seller in Bankruptcy Court, or, with the permission of Bankruptcy Court, in a court having jurisdiction in the county and state in which the Property is located, on or before thirty (30) days following the date upon which the Closing was to have occurred pursuant to this Agreement.  Notwithstanding anything to the contrary contained herein, Purchaser shall have no right to specific performance of this Agreement, nor shall Seller have any authority or obligation to transfer the Property to Purchaser

13

**Purchase and Sale Agreement
for 711 Knox Road, Aurora, NY**

17429967.12

Case 1-20-10322-CLB,    Doc 3031-1,    Filed 07/18/24,    Entered 07/18/24 15:21:09,
Description: Exhibit A - Proposed Bidding Procedures Order, Page 30 of 54

pursuant to this **Article XIII** absent the entry of a Sale Order by the Bankruptcy Court authorizing and directing such conveyance of the Property by Seller to Purchaser.

13.2.  **Purchaser Default**.  In the event that Purchaser shall be in default hereunder for any reason other than Seller's default, Seller may deliver a written notice to Purchaser stating with particularity the alleged default of Purchaser, the action required by Purchaser to cure such default and Seller's intent to terminate this Agreement if the default is not cured.  Purchaser shall have ten (10) days after receipt of such notice to cure the alleged default to Seller's reasonable satisfaction (and the Closing Date shall be delayed, if necessary, until the end of such ten (10) day period).  In the event such default is not cured within such ten (10) day period, then Seller may, as Seller's sole and exclusive remedy for such default, terminate this Agreement by written notice to Purchaser and the Title Company, whereupon Seller shall be entitled to retain the Earnest Money Deposit as full liquidated damages for such default of Purchaser.  It is hereby agreed that Seller's damages in the event of a default by Purchaser hereunder are uncertain and difficult to ascertain, and that the Earnest Money Deposit constitutes a reasonable liquidation of such damages and is intended not as a penalty, but as full liquidated damages.  Purchaser covenants not to bring any action or suit challenging the amount of liquidated damages provided hereunder in the event of such default.  Notwithstanding anything to the contrary contained herein, this provision shall in no way affect or impair Seller's right of recovery under any indemnity given by Purchaser in favor of Seller under this Agreement.

### ARTICLE XIV
### WAIVER OF INSPECTION, VIOLATIONS, AND LOCAL REQUIREMENTS

14.1.  Purchaser expressly waives any and all right to an inspection of the Property by a licensed inspector, licensed contractor or licensed engineer prior to the Closing Date.

14.2.  Notwithstanding the foregoing, Seller grants Purchaser and any Representative of Purchaser, after reasonable notice to Seller, reasonable access to conduct a final walk through of the Property with all utilities in service within forty-eight (48) hours prior to the Closing to ensure that all conditions of this Agreement have been met by Seller.

14.3.  Purchaser shall accept the Property subject to any and all violations of law, rules, regulations, ordinances, orders or requirements issued by any Federal, state, county, municipal or other department or governmental agency having jurisdiction against or affecting the Property (collectively, "Violations").  Seller shall have no obligation to cure or remove any Violations existing as of the Effective Date.

14.4.  To the extent the Town of Aurora, County of Erie, State of New York, or any other governmental agency or authority having jurisdiction (collectively, "Governmental Authorities") imposes requirements for issuance certificates of occupancy, certificates of compliance, certificates of inspection of sanitary sewer and/or storm sewer fixtures or facilities, or any other inspection and/or certification requirements in connection with and as a condition to the sale of the Property (collectively, "Local Requirements"), Purchaser shall be deemed to have waived all such Local Requirements to the extent the same are waivable.  To the extent any such Local

**Purchase and Sale Agreement**
**for 711 Knox Road, Aurora, NY**

17429967.12

Case 1-20-10322-CLB,    Doc 3031-1,    Filed 07/18/24,    Entered 07/18/24 15:21:09,
Description: Exhibit A - Proposed Bidding Procedures Order, Page 31 of 54

Requirement or Local Requirements are not waivable by Purchaser, Purchaser shall comply with the Local Requirement(s) in question at Purchaser's sole cost.

## ARTICLE XV
## BROKER

15.1.    **Broker Commission**.    In connection with the consummation of the sale contemplated by this Agreement, Seller shall be solely responsible for paying a broker's commission to Hanna CRE from the proceeds of the Purchase Price and pursuant to the terms of a separate agreement in an amount not to exceed five percent (5%) of the gross profit.    No commissions shall be due or payable to Hanna CRE unless and until the Closing contemplated hereby occurs.    Purchaser and Seller each represent and warrant to the other that, except for the Hanna CRE, they have not employed, retained or consulted with any other broker, agent or finder in connection with the solicitation of Purchaser, the negotiations in connection with this Agreement or the purchase and sale referenced herein.

## ARTICLE XVI
## BIDDING PROCEDURES AND ALTERNATIVE TRANSACTION

16.1.    **Sale Motion**.    The Parties acknowledge that this Agreement is subject to approval of the Bankruptcy Court, which approval will include, among other things, issuance by the Bankruptcy Court of a Bidding Procedures Order directing the manner in which a bidding procedure will be conducted for solicitation of competing offers from third parties for the purchase of the Property.    Depending upon the outcome of the bidding procedure, this Agreement may be subject to termination by Seller, as hereinafter provided.    Seller shall file a motion to approve this Agreement (the "Sale Motion") and to establish reasonable bidding procedures (the "Bidding Procedures") within twenty-one (21) days of the Effective Date of this Agreement.

16.2.    **Higher Bids**.    This Agreement is subject to higher and better offers pursuant to the Bidding Procedures to be established by the Bankruptcy Court, and is subject to termination pursuant to **Article VIII**.

16.3.    **Alternative Transaction**.    If the Bankruptcy Court shall enter a final Sale Order approving a purchase of the Property by an Alternative Bidder (as hereinafter defined), then Seller shall terminate this Agreement, by written notice to Purchaser, Purchaser shall be entitled to receive a refund of the Earnest Money Deposit, and Seller shall be free to consummate a sale of the Property to the Alternative Bidder (and "Alternative Transaction").

16.4.    **The Bidding Procedures**.    Subject to the approval by the Bankruptcy Court, Bidding Procedures shall include the following:

16.4.1.    the procedures for solicitation of competing offers from third parties for the purchase of the Property (each, a "Alternative Bidder");

16.4.2.    any bid submitted by an Alternative Bidder shall include proof of funds and a signed Purchase and Sale Agreement along with a marked copy showing any changes from this Agreement;

15

**Purchase and Sale Agreement**
**for 711 Knox Road, Aurora, NY**

17429967.12

Case 1-20-10322-CLB,    Doc 3031-1,    Filed 07/18/24,    Entered 07/18/24 15:21:09,
Description: Exhibit A - Proposed Bidding Procedures Order, Page 32 of 54

16.4.3.    any bid submitted by an Alternative Bidder must exceed the Purchase Price set forth in this Agreement by Ten Thousand Dollars ($10,000.00) (the "Initial Overbid");

16.4.4.    any subsequent bidding after the Initial Overbid shall be in minimum increments of $100,000.00, with minimum subject to modification in the Seller's sole and absolute discretion;

16.4.5.    the procedures for an auction to determine the highest and best offer for the Property (the "Successful Bidder");

16.4.6.    such further terms as are determined to be necessary by Seller in order to obtain Bankruptcy Court approval of the Bidding Procedures; and

16.4.7.    Purchaser shall be allowed to participate in the bidding process along with Alternative Bidders.

16.5.    **Backup Bidder**.  In the event that the Purchaser is not the Successful Bidder in the bidding process, the Purchaser's bid (as reflected in this Agreement or in any higher bid placed by Purchaser during the bidding process) shall remain irrevocable as the backup bidder (the "Backup Bidder") until the earliest of: (i) a period of sixty (60) days from the Sale Order, or (ii) the closing of a sale with the Successful Bidder.

## ARTICLE XVII
## MISCELLANEOUS

17.1.    **Amendment**. This Agreement shall not be amended, modified, supplemented, or revoked, except by a writing signed by Seller and Purchaser.

17.2.    **Governing Law**.  This Agreement shall be governed by and construed, interpreted and enforced in accordance with the Laws of the State of New York without regard to conflicts of Laws or choice of Laws principles thereof that would cause the application of the Laws of any jurisdiction other than the State of New York.

17.3.    **Binding Effect**.  This Agreement shall bind the parties hereto, their respective heirs, successors and assigns.  Except as set forth in **Section 17.5** hereof, neither Purchaser nor Seller may assign its interest hereunder without the prior written approval of the other party.

17.4.    **Notices**.  All notices required under this Agreement shall be in writing and shall be: (i) personally delivered; (ii) sent by certified mail, return receipt requested, postage pre-paid; or (iii) sent by nationally recognized overnight air courier service at the expense of sender, addressed to the parties hereto at their respective addresses set forth below.  Such notice or other communication shall be deemed given upon delivery, or if delivery is refused, upon refusal to accept delivery. Notice hereunder may be given at the following addresses:

If to Seller:                          The Diocese of Buffalo, N.Y.
                                       795 Main Street

**Purchase and Sale Agreement
for 711 Knox Road, Aurora, NY**

17429967.12

Case 1-20-10322-CLB,    Doc 3031-1,    Filed 07/18/24,    Entered 07/18/24 15:21:09,
Description: Exhibit A - Proposed Bidding Procedures Order, Page 33 of 54

|                      |                                                      |
|----------------------|------------------------------------------------------|
|                      | Buffalo, New York 14203                              |
|                      | Attn: Richard Suchan                                 |
| With a copies to:    | Bond Schoeneck & King PLLC                           |
|                      | 110 W. Fayette Street                                |
|                      | One Lincoln Center                                   |
|                      | Syracuse, New York 13202                             |
|                      | Attn:  Charles Sullivan, Esq.                        |
|                      |         Jeffrey Eaton, Esq.                          |
|                      | Email: csullivan@bsk.com                             |
|                      |         jeaton@bsk.com                               |
|                      |                                                      |
|                      | Bond, Schoeneck & King PLLC                          |
|                      | 200 Delaware Avenue                                  |
|                      | Suite 900                                            |
|                      | Buffalo, New York 14202                              |
|                      | Email: swheeler@bsk.com                              |
|                      | Attn: Sarah Wheeler, Esq.                            |
| If to Purchaser:     | World Mission Society, Church of God                 |
|                      | a New Jersey Nonprofit Corporation                   |
|                      | Email: Eduard.Rodriguez@zionusa.org                  |
|                      | Attn: Eduard Rodriguez                               |
|                      |                                                      |
| With a copy to:      | Augello & Matteliano, LLP                            |
|                      | 403 Main Street, Suite 420                           |
|                      | Buffalo, New York 14202                              |
|                      | Email:    traugello@damglaw.com                      |
|                      | Attn:   Thomas R. Augello, Esq.                      |

The above notwithstanding, notice may be given by email from one party's attorney to the other party's attorney, with a copy by first class mail, addressed to the respective attorney above. Notice upon brokers, realtors, or other third parties shall be deemed courtesy copies only.

   17.5.   **Time for Performance**.   Time shall be of the essence for purposes of this Agreement.

   17.6.   **Assignability**.  Purchaser shall not have the right to assign this Agreement and its rights hereunder without Seller's prior written consent, unless such assignment is to a single asset entity in which Purchaser owns a controlling interest, in which case, Seller's consent shall not be required, provided, however, that upon such assignment, Purchaser shall in no way be released or relieved of any of its obligations under this Agreement.

**Purchase and Sale Agreement
for 711 Knox Road, Aurora, NY**

17429967.12

Case 1-20-10322-CLB,    Doc 3031-1,    Filed 07/18/24,    Entered 07/18/24 15:21:09,
Description: Exhibit A - Proposed Bidding Procedures Order, Page 34 of 54

17.7.   **Number and Gender**.  Whenever required by the context or use in this Agreement, the singular word shall include the plural word and the masculine gender shall include the feminine and/or neuter gender, and vice versa.

17.8.   **Captions**.  The paragraph titles, headings and/or captions contained herein have been inserted solely as a means of reference and convenience.  Such captions shall not affect the interpretation or construction of this Agreement and shall not define, limit, extend or otherwise describe the scope of this Agreement or the intent of any provision hereof.

17.9.   **Counterparts and Electronic Delivery**.  This Agreement may be executed in any number of counterparts, each of which, when executed, shall be deemed to be an original, all of which shall be deemed to be one and the same instrument.  This Agreement may be delivered by Facsimile or email transmission, and facsimile, email, or photocopies of the fully executed Agreement shall have the same force and effect as originals.

17.10.  **Legal Counsel**.  Purchaser and Seller acknowledge that they have been, or have had the opportunity to be, represented by legal counsel in connection with this Agreement and that this Agreement is the product of extensive negotiations between the parties.  Purchaser and Seller agree that the fact that this Agreement or one or more provisions hereof were drafted by one party or the other shall not affect the meaning or interpretation of this Agreement.

17.11.  **Waiver**.  No action taken pursuant to this Agreement, including any investigation by or on behalf of any party, shall be deemed to constitute a waiver by any party taking such action of compliance with any representation, warranty, covenant, or agreement contained herein.  The waiver by any party hereto of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

17.12.  **Third Party Beneficiaries**. Nothing in this Agreement is intended, nor shall anything herein be construed, to confer any rights, legal or equitable, in any Person other than the parties hereto and their permitted successors and assigns.  There are no third party beneficiaries to this Agreement.

17.13.  **Cooperation and Further Assurances**.  The Parties shall use their respective commercially reasonable efforts to (a) take or cause to be taken all actions, and to do or cause to be done all other things, necessary, proper or advisable to expeditiously satisfy the closing conditions set forth herein and to consummate the transactions contemplated hereby as promptly as practicable and evidence the consummation of the transactions contemplated hereby, and (b) obtain in a timely manner all necessary waivers, consents and approvals and to effect all necessary registrations and filings in connection with the foregoing.  Seller shall assist with such other post-closing matters as Purchaser may reasonably request, provided that the performance of such matters is within Seller's ordinary course of business and does not require an order of the Bankruptcy Court.

**Purchase and Sale Agreement
for 711 Knox Road, Aurora, NY**

17429967.12

17.14.  **No Merger**. Except as otherwise expressly provided herein, the provisions of this Agreement containing agreements between the parties relating to actions occurring after Closing shall not be merged into the instruments of Closing but shall expressly survive and be enforceable according to their terms.

17.15.  **Notification of Certain Matters**.  From time to time prior to the Closing Date, the Parties shall promptly notify each other of the occurrence or non-occurrence of any event or circumstance that as applicable, indicates (a) that any of the representations and warranties set forth herein may not be, will not be, or are not, true and correct, or (b) any failure on its part to comply with or satisfy, in any material respect, any covenant, agreement or condition to be complied with or satisfied by it pursuant hereto (any such notification, a "Required Notification"); provided, however, that in each case, such disclosure shall not be deemed to (i) amend or supplement any Schedule hereto, or (ii) cure any breach of such representation, warranty, covenant or agreement or satisfy any condition set forth herein.

17.16.  **Entire Agreement**. This Agreement, including the exhibits and schedules, contains the entire agreement between Seller and Purchaser pertaining to the transaction contemplated hereby and fully supersedes all prior agreements and understandings between Seller and Purchaser pertaining to such transaction. If any provision hereof is determined by a court of competent jurisdiction to be invalid or unenforceable, the remainder of this Agreement shall nonetheless remain in full force and effect. This Agreement may be amended, modified, or supplemented only by an instrument in writing signed by the parties.

17.17.  **Escrow Agent and Earnest Money Deposit.** The Earnest Money Deposit made by Purchaser under the terms of this Agreement shall be held by the Seller's attorneys, **Bond, Schoeneck & King, PLLC** in a non-interest-bearing attorney's trust account, in accordance with and subject to the following provisions:

(a)    Escrow Agent, without risk to Escrow Agent, except for willful misconduct or fraud, shall place the Earnest Money Deposit in a non-interest bearing bank attorney trust account maintained at a commercial bank, savings bank or savings and loan association.

(b)    At the Closing, if any, Escrow Agent shall disburse the Earnest Money Deposit to Seller, and said Earnest Money Deposit shall be credited to the Purchase Price.

(c)    Upon receipt of written demand therefor signed by Seller, stating that Purchaser have defaulted in the performance of Purchaser's obligations under this Agreement and that Seller has terminated this Agreement on account of said default of Purchaser, Escrow Agent shall, subject to the provisions of **Section 17.17(g)**, disburse the Earnest Money Deposit to Seller; provided, however, that Escrow Agent shall not honor such demand until not less than five (5) days after the date on which Escrow Agent shall have given notice to Purchaser (in the manner specified in this Agreement for notices to be given).

(d)    Upon receipt of written demand therefor signed by Purchaser, stating that this Agreement has been terminated and that Purchaser are entitled under the terms of this Agreement to the return of the Earnest Money Deposit, Escrow Agent shall, subject to the provisions of **Section 17.17(g)**, disburse the Earnest Money Deposit to Purchaser; provided,

however, that Escrow Agent shall not honor such demand until not less than five (5) days after the date on which Escrow Agent shall have given notice to Seller (in the manner specified in this Agreement for notices to be given).

(e)     If an action or proceeding is commenced by either party to determine the rights of the parties to the Earnest Money Deposit, all attorneys' fees and court costs of the prevailing party shall be borne by whoever shall not prevail in such action or proceeding.

(f)     It is agreed that the duties of Escrow Agent are only as herein specifically provided, are purely ministerial in nature and that Escrow Agent shall incur no liability whatsoever except for willful misconduct or fraud. Seller and Purchaser hereby release Escrow Agent from any act done or omitted to be done by Escrow Agent in good faith in the performance of Escrow Agent's duties hereunder. If requested at Closing, Seller and/or Purchaser shall execute and deliver general releases in the usual form to Escrow Agent.

(g)     Escrow Agent is acting only as a stakeholder with respect to the Earnest Money Deposit. If any dispute shall arise as to whom the Earnest Money Deposit is to be disbursed, Escrow Agent shall not disburse the Earnest Money Deposit to either party but in such event shall hold the same until receipt by Escrow Agent of a written authorization signed by Seller and Purchaser directing the disposition of same, or in the absence of such authorization, Escrow Agent may hold the Earnest Money Deposit until the final determination of the rights of the parties in an appropriate action or proceeding. If such written authorization is not given, or an action or proceeding for such determination is not begun and diligently continued, Escrow Agent may, but is not required to, bring any appropriate action or proceeding for interpleader or other leave to place the Earnest Money Deposit in court pending such determination. All costs of such action or proceeding, including, without limitation, attorneys' fees of Escrow Agent are to be borne by the party who shall not prevail in such action or proceeding. Upon delivery of the Earnest Money Deposit in the manner herein provided, Escrow Agent shall have no further liability hereunder or otherwise. Escrow Agent shall have the right to represent Seller in any dispute between Purchaser and Seller with respect to the Earnest Money Deposit.

(h)     Escrow Agent has executed this Agreement solely to acknowledge Escrow Agent's receipt of the Earnest Money Deposit by check subject to collection, and to evidence Escrow Agent's agreement to act as escrow agent in accordance with the provisions of this **Section 17.17.**

**[Signature Pages Follow]**

20

**Purchase and Sale Agreement**
**for 711 Knox Road, Aurora, NY**

17429967.12

Case 1-20-10322-CLB,    Doc 3031-1,    Filed 07/18/24    Entered 07/18/24 15:21:09,
Description: Exhibit A - Proposed Bidding Procedures Order, Page 37 of 54

**In Witness Whereof** the parties have executed this Agreement as of the day and year first written above.

SELLER: Diocese of Buffalo

_____
Signature

_____
Name

_____
Title

[Seller Signature Page – 711 Knox Road, Town of Aurora, New York]

Purchase and Sale Agreement
for 711 Knox Road, Aurora, NY

17429967 12

**PURCHASER**: World Mission Society, Church of God A
NJ Nonprofit Corporation

Signature

JOO CHEOL KIM
Name

PRESIDENT
Title

[Purchaser Signature Page – 711 Knox Road, Town of Aurora, New York]

**ESCROW AGENT**: Bond, Schoeneck & King, PLLC

_____
Signature

_____
Name

_____
Title

[Escrow Agent Signature Page – 711 Knox Road, Town of Aurora, New York]

23

Purchase and Sale Agreement
for 711 Knox Road, Aurora, NY

17429967.12

## Exhibit A-1

Property Sketch



Exhibit A

Purchase and Sale Agreement
for 711 Knox Road, Aurora, NY

17429967.12

Case 1-20-10322-CLB,     Doc 3031-1,     Filed 07/18/24,     Entered 07/18/24 15:21:09,
Description: Exhibit A - Proposed Bidding Procedures Order, Page 41 of 54

## Exhibit A-2

Legal Description of the Property

### PARCEL A

ALL THAT TRACT OR PARCEL OF LAND, situate in the Town of Aurora, County of Erie and State of New York, being part of Lot No. 48, Township 9, Range 6 of the Holland Land Company's Survey, bounded and described as follows:

BEGINNING at a point in the center line of Knox Road, distant 2232 feet southerly from its intersection with the center line of Willardshire Road; thence westerly at an exterior angle of 87° 36', 2097.17 feet to a point; thence northeasterly at an interior angle of 73° 00' 30", 345.47 feet to a point; thence westerly at an exterior angle of 71° 37' 30", 597.40 feet to a point in the easterly line of Lot No. 56, distant 12.63 feet southerly from the northeast corner of lands in said Lot No. 56 conveyed to Fred H. Reuter by deed recorded in Erie County Clerk's Office in Liber 3514 of Deeds at page 75 on March 25, 1944 (designated as Parcel A therein); thence northerly along said east line of Lot No. 56 forming an interior angle of 86° 50' with last above line, 316.92 feet to the northwest corner of lands in Lot No. 48 conveyed to Fred H. Reuter by deed aforesaid (designated as Parcel B therein); thence north 88° 30' east along the north line of lands so conveyed to Fred H. Reuter, 1200 feet to a point in the west line of the middle third of Lot No. 48; thence south 25' east, 257 feet; thence north 88° 05' east along the north line of lands so conveyed to said Fred H. Reuter, 1405 feet to a point in the center line of Knox Road being the northeast corner of lands conveyed to Fred H. Reuter by aforesaid deed; thence southerly along the said center line of Knox Road, 360 feet to the place of beginning.

### PARCEL B

ALL THAT TRACT OF PARCEL OF LAND, situate in the Town of Aurora, County of Erie and State of New York, being part of Lot No. 48, Township 9, Range 6 of the Holland Land Company's Survey, bounded and described as follows:

BEGINNING at a point in the center line of Knox Road distant 2232 feet southerly from its intersection with the center line of Willardshire Road; thence westerly at an interior angle of 87° 36.', 2097.17 feet to a point; thence southwesterly at an interior angle of 106° 59' 30", 189.95 feet to a point; thence southerly at an interior angle of 170° 04', 638.55 feet to a point; thence easterly at an interior angle of 83° 46', 206.85 feet to a point; thence easterly at an interior angle of 178° 52', 166.90 feet to a point; thence easterly at an interior angle of 181° 05' 425 feet to a point; thence southeasterly at an interior angle of 210º 14', 45 feet to a point; thence southeasterly at an interior angle of 196° 09', 100 feet to a point; thence southeasterly at an interior angle of 176° 47', 50 feet to a point; thence southeasterly at an interior angle of 158° 33', 53 feet to a point; thence northeasterly at an interior angle of 150° 15', 527 feet to a point; thence northeasterly at an interior angle of 165° 57', 35 feet to a point; thence northeasterly at an interior angle of 158° 13', 80 feet to a point; thence northeasterly at an exterior angle of 162° 15' 218 feet to a point; thence easterly at an interior angle of 203º 42', 400 feet to a point in the center line of Knox Road distant 406.35 feet northerly from the south line of said Lot No. 48 as measured along said center line of said Knox Road; thence northerly along said center line of Knox Road 734.67 feet to the place of beginning.

**Exhibit A**                    **Purchase and Sale Agreement
for 711 Knox Road, Aurora, NY**

17429967.12
Case 1-20-10322-CLB,    Doc 3031-1,    Filed 07/18/24,    Entered 07/18/24 15:21:09,
Description: Exhibit A - Proposed Bidding Procedures Order, Page 42 of 54

**PARCEL C**

ALL THAT TRACT OR PARCEL OF LAND, situate in the Town of Aurora, County of Erie and State of New York, being part of Lots Nos. 47, 48, 55 and 56, Township 9, Range 6 of the Holland Land Company's Survey, bounded and described as follows:

BEGINNING at a point in the easterly line of said Lot No. 56, distant 2191.5 feet southerly from the center line of Willardshire Road as measured along said east line of Lot No. 56, being the northeast corner of lands in said Lot No. 56 conveyed to Fred H. Reuter by deed recorded in Erie County clerk's Office in Liber 3514 of Deeds at page 75 on March 25, 1944 (designated as Parcel A therein); thence southerly along said east line of Lot No. 56, 12.63 feet to a point; thence easterly at an interior angle of 93° 10', 597.40 feet to a point; thence southwesterly at an interior angle of 71° 37' 30", 535.42 feet to a point; thence southerly at an exterior angle of 170° 04', 638.55 feet to a point; thence westerly at an interior angle of 96° 14', 273.15 feet to a point; thence southerly at right angles about 825 feet to the Cazenovia Creek (formerly called the Buffalo Creek); thence westerly along the Cazenovia Creek, about 135 feet to the east line of Lot No. 55; thence southerly along said east line of Lot No. 55 to the center line of said Cazenovia Creek; thence northwesterly and northerly along said center line of Cazenovia Creek about 1965 feet to the northwesterly corner of lands in Lot No. 56 conveyed to Fred H. Reuter by aforesaid deed; thence northeasterly, northerly and easterly along the northerly and westerly lines of lands so conveyed to Fred H. Reuter by aforesaid deed the following 6 courses and distances: (1) North 66° 16' east, 188.60 feet; (2) North 9° 46' east, 268 feet; (3) North 13° 47' west, 105 feet; (4) North 36° 11' east, 106.8 feet; (5) South 73° 37' east, 273 feet and (6) South 87° 42' east, 439 feet to the point or place of beginning.

Exhibit A                                    Purchase and Sale Agreement
                                                    for 711 Knox Road, Aurora, NY

17429967.12

Case 1-20-10322-CLB,    Doc 3031-1,    Filed 07/18/24,    Entered 07/18/24 15:21:09,
Description: Exhibit A - Proposed Bidding Procedures Order, Page 43 of 54

**Exhibit B**

Bargain and Sale Deed

**THIS INDENTURE**, made the _____ day of _____ 2024,

BETWEEN

**Diocese of Buffalo**, a New York special act corporation created by the New York State Legislature pursuant to Chapter 568 of the Laws of 1951, having an office at 795 Main Street, Buffalo, New York 14203, party of the first part,

and,

**World Mission Society, Church of God a NJ Nonprofit Corporation**, a New Jersey not-for-profit corporation authorized to conduct business in New York, having an address at 880 Jackson Avenue, New Windsor, New York 12553, party of the second part,

**WITNESSETH** that the said party of the first part, in consideration of One Dollar ($1.00 and No More), lawful money of the United States, paid by the party of the second part, do hereby grant and release unto the party of the second part, the theirs or successors and assigns of the party of the second part forever,

**ALL THAT TRACT AND PARCEL OF LAND**,

Pursuant to Sections _____ of the _____, the Bankruptcy Court of _____ approved the sale contemplated herein by an Order dated _____ and located at Index No. _____ (the "Order"), attached hereto as **Schedule A** shall be incorporated herein and shall be understood to be a part hereof.

TOGETHER with all right, title and interest, if any, of the party of the first part, in and to any streets and roads abutting the above-described premises to the center lines thereof; TOGETHER with the appurtenances and all the estate and rights of the party of the first part in and to said premises; TO HAVE AND TO HOLD the premises herein granted unto the party of the second part, the heirs or successors and assigns of the party of the second part forever.

AND the party of the first part, in compliance with Section 13 of the Lien Law, covenants that the party first part will receive the consideration for this conveyance and will hold the right to receive such consideration as a trust fund to be applied first for the purpose of paying the cost of the improvement and will apply the same first to the payment of the cost of the improvement before using any part of the total of the same for any other purpose.

The word "party" shall be construed as if it read "parties" whenever the sense of this indenture so requires.

**Exhibit B**                           **Purchase and Sale Agreement**
                                        **for 711 Knox Road, Aurora, NY**

17429967.12

Case 1-20-10322-CLB,   Doc 3031-1,   Filed 07/18/24,   Entered 07/18/24 15:21:09,
Description: Exhibit A - Proposed Bidding Procedures Order, Page 44 of 54

IN WITNESS WHEREOF, the party of the first part has duly executed this deed the day and year first above written.

## DIOCESE OF BUFFALO

_____
Signature

_____
Name

_____
Title

STATE OF NEW YORK          )
                           )SS.:
COUNTY OF ERIE             )


On the _____ of _____ in the year 2024, before me, the undersigned, a notary public in and for said state, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his/her/their capacity, and that by his/her/their signature on the instrument, the individual or the person upon behalf of which the individual acted, executed the instrument.


_____
Notary Public

**Exhibit B**                    **Purchase and Sale Agreement**
                                 **for 711 Knox Road, Aurora, NY**

17429967.12

**Exhibit C-1**

**PERMITTED EXCEPTIONS**

**Exhibit C**

**Purchase and Sale Agreement**
**for 711 Knox Road, Aurora, NY**

17429967.12

Case 1-20-10322-CLB,    Doc 3031-1,    Filed 07/18/24,    Entered 07/18/24 15:21:09,
Description: Exhibit A - Proposed Bidding Procedures Order, Page 46 of 54

## Exhibit D

POST-OCCUPANCY AGREEMENT

**REAL PROPERTY**: a portion of real property located in the Town of Aurora, County of Erie, New York, commonly known as 711 Knox Road, Aurora, New York, Tax Map No. 163.00-3-23 (the "Real Property")

**SELLERS**:    Diocese of Buffalo

**PURCHASER**:  World Mission Society, Church of God a NJ Nonprofit Corporation

**SELLER'S ATTORNEY**: Bond, Schoeneck & King, PLLC, Attn: Charles Sullivan, Esq.; Jeffrey Eaton, Esq.; and Sarah Wheeler, Esq.

**BUYER'S ATTORNEY**: Augello & Matteliano, LLP, Attn: Thomas R. Augello, Esq.

WHEREAS, Seller and Purchaser (collectively, the "Parties") have entered into to that certain Purchase and Sale Agreement, dated May _____, 2024 (the "Agreement"), with respect to the above-described Real Property;

WHEREAS, due to constraints outside the Parties reasonable control, Seller requires additional time to remove religious materials and texts (the "Excluded Items") currently located on the Real Property, more specifically, located in the library (the "Library");

WHEREAS, Seller and/or its agents or contractors shall have access to the Library, together with ingress and egress through the Real Property, during reasonable business hours and upon reasonable notice to Purchaser, to remove the Excluded Items;

WHEREAS, Seller and/or its agents or contractors shall remove the Excluded Items on or before December 31, 2024 (the "Occupancy Period");

WHEREAS, the Parties hereby agree to provide for a hold back of sale proceeds due to Seller under the Agreement until such a time as Seller and/or its agents or contractors removes the Excluded Items from the Library, the terms and conditions of which are outlined below (the "Post-Occupancy Agreement"); and

NOW THEREFORE, in consideration of the mutual promises and covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.    The Parties agree the per diem value of Seller's sole use and occupancy of the Library after Closing is _____ ($____.00) (the "Per Diem Rate"). At Closing, Seller shall withhold from the sale proceeds received an amount equal to the Per Diem Rate multiplied by the number of days remaining in the calendar year (the "Withheld Funds"). The Withheld Funds

Exhibit D                    Purchase and Sale Agreement
for 711 Knox Road, Aurora, NY

17429967.12
Case 1-20-10322-CLB,    Doc 3031-1,    Filed 07/18/24,    Entered 07/18/24 15:21:09,
Description: Exhibit A - Proposed Bidding Procedures Order, Page 47 of 54

shall be deposited with Seller's Attorney and held in escrow until the Excluded Items are removed from the Real Property.

2.     Upon notification that the Excluded Items were removed from the Library, Seller's Attorney shall calculate the number of days the Excluded Items remained in the Library after Closing and multiply the same by the Per Diem Rate (the "Rent"). Seller's Attorney shall release to Purchaser the Rent from the Withheld Funds. Any Withheld Funds remaining after the deduction of Rent shall be promptly released to Seller.

3.     During the Occupancy Period, Purchaser affirmatively agrees to ensure the Library remains locked, with access and use strictly limited to Seller and/or its agents or contractors.

4.     Seller's attorneys shall not be liable for any act or omission to act under this Post-Occupancy Agreement, except for its own gross negligence or willful misconduct. The Seller's attorney may act upon any instrument or signature believed by it to be genuine and may assume that any person purporting to give any notice or instruction hereunder, reasonably believed by it to be authorized, has been duly authorized to do so. In the event that Seller's attorney should at any time be confronted with inconsistent or conflicting claims or demands by the parties hereto, Seller's attorneys shall have the right to interplead said parties in any court of competent jurisdiction and request that such court determine such respective rights of the parties with respect to this Agreement, and upon doing so, Seller's attorneys shall be released from any obligations or liability to either party as a consequence of any such claims or demands. After the Withheld Funds are disbursed, Seller's attorneys' duties and obligations hereunder shall cease and this Post-Occupancy Agreement shall terminate.

5.     Notices. All notices, demands or request provided for or permitted to be given pursuant to this Escrow Agreement must be in writing. All notices, demands and requests to be sent to the Parties shall be personally delivered, emailed, or sent by mail, postage prepaid, or delivered by a recognized overnight or same day courier or delivery service and addressed to the intended recipient of such notice at the address or email for such Party as set forth below or otherwise provided to the other Parties. All such notices, demands, or requests shall be effective on personal delivery or, upon electronic transmission, or if mailed, three (3) days following deposit in the mail as required by this Section.

6.     Seller's financial obligations arising out of or relating to or in connection with the storage of the Excluded Items during the Occupancy Period shall at no time exceed the amount of the Withheld Funds.

7.     Purchaser, as record title owner, shall be responsible for the payment and maintenance of any utilities servicing the Library and Real Property and the real property taxes and assessments affecting the Library and the Real Property.

8.     This Post-Occupancy Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which, when taken together, constitute one

Exhibit D                    Purchase and Sale Agreement
for 711 Knox Road, Aurora, NY

17429967.12

Case 1-20-10322-CLB,    Doc 3031-1,    Filed 07/18/24,    Entered 07/18/24 15:21:09,
Description: Exhibit A - Proposed Bidding Procedures Order, Page 48 of 54

and the same instrument. Moreover, signatures transmitted electronically by email, facsimile, or PDF, among others, shall be binding as if original.

9. Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to them in the Post-Occupancy Agreement.

10. Any provision of the Post-Occupancy Agreement not expressly amended or modified herein shall remain in full force and effect.

11. Neither this Post-Occupancy Agreement, nor any rights or obligations under it, may be assigned by either party without the prior written consent of the other party.

12. The recitals of this Post-Occupancy Agreement are hereby incorporated herein as if fully set forth.

[SIGNATURE PAGE TO FOLLOW]

**Exhibit D**                     **Purchase and Sale Agreement**
                                  **for 711 Knox Road, Aurora, NY**

17429967.12

IN WITNESS WHEREOF, the undersigned have executed this Post-Occupancy Agreement as of this 12 day of May, 2024.

SELLER:    June    THE DIOCESE OF BUFFALO

_Richard C. Suchan_
Signature

RICHARD C. Suchan
Name

Chief Operating Officer
Title

PURCHASER:    WORLD MISSION SOCIETY, CHURCH OF GOD A NJ NONPROFIT CORPORATION

_Joocheol Kim_
Signature

JOO CHEOL KIM
Name

PRESIDENT __ __
Title

Exhibit D    Purchase and Sale Agreement    for 71

**Exhibit 3**

(to Bidding Procedures Order)

Notice of Auction and Sale Hearing

2

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 20-10322 (CLB) |
| The Diocese of Buffalo, N.Y., | ) | |
| | ) | Chapter 11 |
| Debtor. | ) | |
| | ) | |

### *NOTICE OF AUCTION AND SALE HEARING*

PLEASE TAKE NOTICE OF THE FOLLOWING:

1.      On July __, 2024, the Diocese filed the *Motion for Entry of Orders (I)(A) Approving Bidding Procedures for the Sale of Certain Real Property at 711 Knox Road, East Aurora, New York; (B) Authorizing and Approving the Form of Purchase Agreement; (C) Scheduling an Auction and Hearing to Consider the Sale; and (D) Approving the Form and Manner of Service of Notice of Auction and Sale Hearing; (II) Approving the Sale Free and Clear of Liens, Claims, Encumbrances and Other Interests; and (III) Granting Related Relief* [Docket No. ____] (the "Sale Motion")[1].

2.      The Diocese is seeking to sell certain real property located at 711 Knox Road, East Aurora, New York 14052 (the "Property") to World Mission Society, Church of God a NJ Nonprofit Corporation or such other purchaser who may submit the highest or otherwise best offer for the Property.

3.      On ____, 2024, the United States Bankruptcy Court for the Western District of New York (the "Bankruptcy Court") entered an order [Docket No. ____] (the "Bidding Procedures Order") approving bidding procedures (the "Bidding Procedures") and granting other relief related to the proposed sale of the Property.  The Bidding Procedures approved by the Court are attached as ***Exhibit 1*** to the Bidding Procedures Order.  Pursuant to the Bidding Procedures Order, if the Diocese receives more than one Qualified Bid for the Property, an Auction for the Property shall take place on _____ __, 2024 at 12:00 noon (prevailing Eastern time) at the offices of Bond, Schoeneck & King, PLLC, The Avant Building, Suite 900, 200 Delaware Avenue, Buffalo, New York 14202-2107.  Only parties that have submitted Qualified Bids in accordance with the Bidding Procedures by the Bid Deadline may participate in the Auction.  Any party that wishes to take part in this process and submit a bid for the Property must submit a Qualified Bid prior to the Bid Deadline and in accordance with the Bidding Procedures.

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Sale Motion.

4.      The Sale Hearing to consider approval of the sale of the Property to the Successful Bidder or Back-Up Bidder free and clear of all liens, claims, encumbrances and other interests will be held before the before the Honorable Carl L. Bucki, United States Bankruptcy Court for the Western District of New York, at the United States Courthouse, 2 Niagara Square, Buffalo, NY 14202 on _____ __, 2024 at __:00 noon (prevailing Eastern time), or at such other time thereafter as counsel may be heard.  The Sale Hearing may be adjourned from time to time without further notice to creditors or parties in interest other than reflected on the Bankruptcy Court's docket or by announcement of the adjournment in open court on the date scheduled for the Sale Hearing.

5.      Parties can choose to appear either (i) in person at the Robert H. Jackson Courthouse, 2 Niagara Square, Buffalo, New York or (ii) telephonically (call in 1-571-353-2301, Courtroom ID 483077448#, and security pin 9999#).

6.      Objections, if any, to the sale, or the relief requested in the Sale Motion must: (a) be in writing; (b) comply with the Bankruptcy Rules and the Local Rules; (c) be filed with the Clerk of the Bankruptcy Court for the Western District of New York (Buffalo Division), as soon as practicable in advance of the Sale Hearing; and (d) be served upon (i) counsel to the Diocese, Bond, Schoeneck & King, PLLC, One Lincoln Center, Syracuse, New York 13202, Attn: Stephen A. Donato, Charles J. Sullivan, Grayson T. Walter, Justin S. Krell and Jeffrey D. Eaton (ii) the Office of the United States Trustee for the Western District of New York, 300 Pearl Street, Suite 401, Buffalo, NY 14202. Attn:  Joseph W. Allen, (iii) counsel to the Official Committee of Unsecured Creditors, Pachulski, Stang, Ziehl & Jones, LLP, 10100 Santa Monica Blvd., 13th Floor, Los Angeles, California, 90067-4003, Attn. James I. Stang, and 780 Third Avenue, 34th Floor, New York, New York, 10017-2024, Attn. Ilan Scharf, and (iv) those persons who have formally appeared and requested service in this case pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedure.  UNLESS AN OBJECTION IS SERVED AND FILED IN ACCORDANCE WITH THIS NOTICE, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT AND THE BANKRUPTCY COURT MAY GRANT THE RELIEF REQUESTED IN THE MOTION WITHOUT FURTHER HEARING OR NOTICE.

7.      This Notice is subject to the fuller terms and conditions of the Sale Motion, the Bidding Procedures Order, and the Bidding Procedures, which shall control in the event of any conflict and the Diocese encourages parties-in-interest to review such documents in their entirety.  Parties interested in receiving more information regarding the sale of the Property or obtaining a copy of any of the foregoing documents may make a written request to counsel to the Diocese, Bond Schoeneck & King, PLLC, One Lincoln Center, Syracuse, New York, 13202, Attn: Stephen A. Donato, Charles J. Sullivan, Grayson T. Walter, Justin S. Krell and Jeffrey D. Eaton.  In addition, copies of the Sale Motion, the Bidding Procedures Order, the Bidding Procedures and this Notice can be obtained free of charge at https://case.stretto.com/dioceseofbuffalo and are on file with the Clerk of the Bankruptcy Court.

17963105.v4-7/18/24

Case 1-20-10322-CLB,    Doc 3031-1,    Filed 07/18/24,    Entered 07/18/24 15:21:09,
Description: Exhibit A - Proposed Bidding Procedures Order, Page 53 of 54

**Consolidated Appendix 0320**

Dated: _____, 2024                    BOND, SCHOENECK & KING, PLLC


By:    /s/ *Charles J. Sullivan*
    Stephen A. Donato
    Charles J. Sullivan
    Grayson T. Walter
    Justin S. Krell
    Jeffrey D. Eaton
    One Lincoln Center
    Syracuse, NY 13202-1355
    Telephone: (315) 218-8000
    Fax: (315) 218-8100
    Emails:   sdonato@bsk.com
            csullivan@bsk.com
            gwalter@bsk.com
            jkrell@bsk.com
            jeaton@bsk.com

*Attorneys for The Diocese of Buffalo, N.Y.*

3

# CONSOLIDATED APPENDIX DOCUMENT NO. 11

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | ) |
| | ) |
| | ) Case No. 20-10322 |
| The Diocese of Buffalo, N.Y., | ) |
| | ) Chapter 11 |
| Debtor. | ) |
| | ) |

### CERTIFICATE OF SERVICE

     I, Christopher Chiu, depose and say that I am employed by Stretto, the claims & noticing agent for the Debtor in the above-captioned case.

     On July 18, 2024, at my direction and under my supervision, employees of Stretto caused the following documents to be served via first-class mail on the service list attached hereto as **Exhibit A**:

- **Notice of Motion for Entry of Orders (I)(A) Approving Bidding Procedures for the Sale of Certain Real Property at 42 Grant Street, North Tonawanda, New York; (B) Authorizing and Approving the Form of Purchase Agreement; (C) Scheduling an Auction and Hearing to Consider the Sale; and (D) Approving the Form and Manner of Service of Notice of Auction and Sale Hearing; (II) Approving the Sale Free and Clear of Liens, Claims, Encumbrances and Other Interests; and (III) Granting Related Relief** (Docket No. 3029)

- **Notice of Motion for Entry of Orders (I)(A) Approving Bidding Procedures for the Sale of Certain Real Property at 711 Knox Road, East Aurora, New York; (B) Authorizing and Approving the Form of Purchase Agreement; (C) Scheduling an Auction and Hearing to Consider the Sale; and (D) Approving the Form and Manner of Service of Notice of Auction and Sale Hearing; (II) Approving the Sale Free and Clear of Liens, Claims, Encumbrances and Other Interest; and (III) Granting Related Relief** (Docket No. 3031)

[SPACE INTENTIONALLY LEFT BLANK]

Furthermore, on July 18, 2024, at my direction and under my supervision, employees of Stretto caused the following documents to be served via first-class mail on the service list attached hereto as **Exhibit B**, and on one thousand five hundred forty-two (1,542) confidential parties not included herein:

- **Notice of Motion for Entry of Orders (I)(A) Approving Bidding Procedures for the Sale of Certain Real Property at 42 Grant Street, North Tonawanda, New York; (B) Authorizing and Approving the Form of Purchase Agreement; (C) Scheduling an Auction and Hearing to Consider the Sale; and (D) Approving the Form and Manner of Service of Notice of Auction and Sale Hearing; (II) Approving the Sale Free and Clear of Liens, Claims, Encumbrances and Other Interests; and (III) Granting Related Relief** (Docket No. 3029, Pages 1-3)

- **Notice of Motion for Entry of Orders (I)(A) Approving Bidding Procedures for the Sale of Certain Real Property at 711 Knox Road, East Aurora, New York; (B) Authorizing and Approving the Form of Purchase Agreement; (C) Scheduling an Auction and Hearing to Consider the Sale; and (D) Approving the Form and Manner of Service of Notice of Auction and Sale Hearing; (II) Approving the Sale Free and Clear of Liens, Claims, Encumbrances and Other Interest; and (III) Granting Related Relief** (Docket No. 3031, Pages 1-3)

Furthermore, on July 18, 2024, at my direction and under my supervision, employees of Stretto caused the following document to be served via first-class mail on Collins Law, PLLC, Attn: Timothy R. Collins at 3407 Delaware Avenue, Suite 257, Tonawanda, NY 14217:

- **Notice of Motion for Entry of Orders (I)(A) Approving Bidding Procedures for the Sale of Certain Real Property at 42 Grant Street, North Tonawanda, New York; (B) Authorizing and Approving the Form of Purchase Agreement; (C) Scheduling an Auction and Hearing to Consider the Sale; and (D) Approving the Form and Manner of Service of Notice of Auction and Sale Hearing; (II) Approving the Sale Free and Clear of Liens, Claims, Encumbrances and Other Interests; and (III) Granting Related Relief** (Docket No. 3029)

[SPACE INTENTIONALLY LEFT BLANK]

Furthermore, on July 18, 2024, at my direction and under my supervision, employees of Stretto caused the following document to be served via first-class mail on Augello & Matteliano, LLP, Attn: Thomas R. Augello at 403 Main Street, Suite 420, Buffalo, NY 14202:

- **Notice of Motion for Entry of Orders (I)(A) Approving Bidding Procedures for the Sale of Certain Real Property at 711 Knox Road, East Aurora, New York; (B) Authorizing and Approving the Form of Purchase Agreement; (C) Scheduling an Auction and Hearing to Consider the Sale; and (D) Approving the Form and Manner of Service of Notice of Auction and Sale Hearing; (II) Approving the Sale Free and Clear of Liens, Claims, Encumbrances and Other Interest; and (III) Granting Related Relief** (Docket No. 3031)

Dated: July 26, 2024

*/s/ Christopher Chiu*
Christopher Chiu
STRETTO
410 Exchange, Suite 100
Irvine, CA 92602
(855) 292-7696

# **Exhibit A**

 STRETTO

**Exhibit A**
Served Via First-Class Mail

| NAME | ADDRESS 1 | ADDRESS 2 | ADDRESS 3 | ADDRESS 4 | CITY | STATE | ZIP |
|------|-----------|-----------|-----------|-----------|------|-------|-----|
| AB 1 DOE | C/O LAW OFFICE OF S BOYD & J ELMORE | 2969 MAIN ST | ATTN: STEPHEN BOYD | | BUFFALO | NY | 14214-1003 |
| ABP WALSH FOUNDATION & ABP WALSH HS | C/O MORGAN & ASSOCIATES, PLLC | 201 NORTH UNION STREET SUITE 410 | ATTN: MICHAEL A. MORGAN | | OLEAN | NY | 14760 |
| BANK OF AMERICA | ATTN: MICHAEL LARRY | 10 FOUNTAIN PLAZA 8TH FLOOR | | | BUFFALO | NY | 14202 |
| BL 1 DOE | C/O DAN CHIACCHIA ATTORNEYS, PLLC | 5113 SOUTH PARK AVENUE | ATTN: DANIEL J. CHIACCHIA | | HAMBURG | NY | 14075 |
| CATH MUT RELIEF SOCIETY OF AMERICA | C/O SCHIFF HARDIN LLP | 1301 AVENUE OF THE AMERICAS FL 42 | ATTN: STEVE WILAMOWSKY | | NEW YORK | NY | 10019-6040 |
| CATH MUT RELIEF SOCIETY OF AMERICA | C/O SCHIFF HARDIN LLP | 233 S WACKER DRIVE SUITE 7100 | ATTN: JIN YAN, D SPECTOR, J FISHER | EVERETT CYGAL & DANIEL SCHUFREIDER | CHICAGO | IL | 60606 |
| CATHOLIC CHARITIES OF BUFFALO, N.Y. | C/O LIPPES MATHIAS WEXLER FRIEDMAN | 50 FOUNTAIN PLAZA SUITE 1700 | ATTN: RAYMOND FINK & JOHN MUELLER | | BUFFALO | NY | 14202-2216 |
| CATHOLIC MUTUAL GROUP | C/O GROSS SHUMAN PC | 465 MAIN STREET SUITE 600 | ATTN: R FELDMAN & L ELONEK | | BUFFALO | NY | 14203 |
| CENTURY INDEMNITY COMPANY ET AK | C/O CLYDE & CO US LLP | 340 MOUNT KEMBLE AVE # 300 | ATTN: MARIANNE MAY | | MORRISTOWN | NJ | 07960-6656 |
| CERTAIN PERSONAL INJURY CREDITORS | C/O JEFF ANDERSON & ASSOCIATES, PA | 366 JACKSON STREET SUITE 100 | ATTN: S BENSON & J ANDERSON | | ST. PAUL | MN | 55101 |
| CERTAIN PERSONAL INJURY CREDITORS | C/O THOMAS COUNSELOR AT LAW, LLC | 1 WORLD TRADE CTR FL 85 | ATTN: KATHLEEN R. THOMAS | | NEW YORK | NY | 10007-0103 |
| CITIZENS BANK | | ONE CITIZENS PLAZA | | | PROVIDENCE | RI | 02903 |
| CONTINENTAL INS CO & NATLUNION FIRE | C/O BARCLAY DAMON, LLP | B DAMON TOWER 125 E JEFFERSON ST | ATTN: JEFFREY A. DOVE | | SYRACUSE | NY | 13202 |
| CVA CLAIMANTS | ATTN: JOHN J. FLAHERTY | 5500 MAIN STREET SUITE 100 | | | WILLIAMSVILLE | NY | 14221 |
| CVA CLAIMANTS | C/O ANDREWS, BERNSTEIN ET AL | 420 FRANKLIN STREET | ATTN: ROBERT J. MARANTO, JR. | | BUFFALO | NY | 14202 |
| CVA CLAIMANTS | C/O BETTI & ASSOCIATES | 30 WALL STREET 8TH FLOOR | ATTN: MICHELE M. BETTI | | NEW YORK | NY | 10005 |
| CVA CLAIMANTS | C/O BOUVIER LAW LLP | 4819 S PARK AVE STE 1 | ATTN: M CAFFERY AND M MCCORMICK | | HAMBURG | NY | 14075-1424 |
| CVA CLAIMANTS | C/O CAMPBELL & ASSOCIATES | 69 DELAWARE AVENUE SUITE 1010 | ATTN: JASON M. TELAAK | | BUFFALO | NY | 14202 |
| CVA CLAIMANTS | C/O FANIZZI & BARR, P.C. | 7311 NIAGARA FALLS BLVD # A | ATTN: PAUL K. BARR | | NIAGARA FALLS | NY | 14304-1717 |
| CVA CLAIMANTS | C/O FINUCANE AND HARTZELL, LLP | 6 NORTH MAIN STREET | ATTN: THOMS C. HARTZELL, JR. | | PITTSFORD | NY | 14534 |
| CVA CLAIMANTS | C/O FRANCIS LETRO LAW | 237 MAIN ST STE 302 | ATTN: FRANCIS M. LETRO | | BUFFALO | NY | 14203-2725 |
| CVA CLAIMANTS | C/O FREDERICK LAW OFFICE | 4467 S BUFFALO STREET | ATTN: SARAH A. FREDERICK | | ORCHARD PARK | NY | 14127 |
| CVA CLAIMANTS | C/O HERMAN LAW | 434 WEST 33RD STREET PENTHOUSE | ATTN: JEFFREY M. HERMAN | | NEW YORK | NY | 10001 |
| CVA CLAIMANTS | C/O HERMAN LAW FIRM, P.A. | 1800 N MILITARY TRL STE 160 | ATTN: STUART MERMELSTEIN | | BOCA RATON | FL | 33431-6386 |
| CVA CLAIMANTS | C/O HOGANWILLIG, PLLC | 2410 NORTH FOREST ROAD SUITE 301 | ATTN: A BAUERLE AND M LORENZ, JR. | | AMHERST | NY | 14068 |
| CVA CLAIMANTS | C/O HOROWITZ LAW | 110 EAST BROWARD BOULEVARD STE 1530 | ATTN: E GOODMAN & A HOROWITZ | | FORT LAUDERDALE | FL | 33301 |
| CVA CLAIMANTS | C/O JAMES, VERNON & WEEKS, P.A. | 1626 LINCOLN WAY | ATTN: CRAIG K. VERNON | | COEUR D'ALENE | ID | 83815 |
| CVA CLAIMANTS | C/O JANET, JANET & SUGGS, LLC | 19 WEST 44TH STREET SUITE 1500 | ATTN: ANDREW S. JANET | | NEW YORK | NY | 10036 |
| CVA CLAIMANTS | C/O JANET, JANET & SUGGS, LLC | 4 RESERVOIR CIRCLE SUITE 200 | ATTN: ANDREW S. JANET | | BALTIMORE | MD | 21208 |
| CVA CLAIMANTS | C/O JASON C. LUNA, PLLC | 4535 SOUTHWESTERN BLVD STE 804B | ATTN: JASON C. LUNA | | HAMBURG | NY | 14075 |
| CVA CLAIMANTS | C/O JEFF ANDERSON & ASSOCIATES, PA | 363 7TH AVE FL 12 | ATTN: J ANDERSON & J M RECK | | NEW YORK | NY | 10001-3904 |
| CVA CLAIMANTS | C/O LAURA A. AHEARN, ESQ., PLLC | 3075 VETERANS MEMORIAL HWY STE 200 | ATTN: LAURA A. AHEARN | | RONKONKOMA | NY | 11779 |
| CVA CLAIMANTS | C/O LAW OFFICE OF FRANK M. BOGULSKI | 135 DELAWARE AVE STE 2 | ATTN: FRANK M. BOGULSKI | | BUFFALO | NY | 14202-2415 |
| CVA CLAIMANTS | C/O LAW OFFICE OF KEVIN T. STOCKER | 2645 SHERIDAN DRIVE | ATTN: KEVIN T. STOCKER | | TONAWANDA | NY | 14150 |
| CVA CLAIMANTS | C/O LAW OFFICE OF S BOYD & J ELMORE | 2969 MAIN ST # 100 | ATTN: STEPHEN BOYD AND L COSTANZO | | BUFFALO | NY | 14214-1003 |
| CVA CLAIMANTS | C/O LAW OFFICES OF ERIC B. GROSSMAN | 5610 E PASEO DE TAMPICO | ATTN: ERIC B. GROSSMAN | | TUCSON | AZ | 85750-1036 |
| CVA CLAIMANTS | C/O LAW OFFICES OF J. MICHAEL HAYES | 69 DELAWARE AVENUE SUITE 1111 | ATTN: J. MICHAEL HAYES | | BUFFALO | NY | 14202 |
| CVA CLAIMANTS | C/O LAW OFFICES OF M GARABEDIAN | 100 STATE STREET 6TH FLOOR | ATTN: MITCHELL GARABEDIAN | | BOSTON | MA | 02109 |
| CVA CLAIMANTS | C/O LAW OFFICES OF MICHAEL G. DOWD | 1981 MARCUS AVE STE 200 | ATTN: MICHAEL G. DOWD | | NEW HYDE PARK | NY | 11042-1055 |
| CVA CLAIMANTS | C/O LIPSITZ GREEN SCIME CAMBRIA LLP | 42 DELAWARE AVENUE SUITE 120 | ATTN: RICHARD WEISBECK AND W MOORE | | BUFFALO | NY | 14202 |
| CVA CLAIMANTS | C/O LIPSITZ, GREEN SCIME CAMBRIA | 42 DELAWARE AVENUE | ATTN: AMY C. KELLER & BARRY COVERT | | BUFFALO | NY | 14202 |
| CVA CLAIMANTS | C/O LYNN LAW FIRM, LLP | 333 W WASHINGTON ST STE 100 | ATTN: MARTIN A. LYNN | | SYRACUSE | NY | 13202-9200 |
| CVA CLAIMANTS | C/O MARSH LAW FIRM PLLC | 31 HUDSON YARDS | ATTN: JAMES R. MARSH | | NEW YORK | NY | 10001-2170 |
| CVA CLAIMANTS | C/O MARSH LAW FIRM PLLC | 31 HUDSON YARDS 11TH FLOOR | ATTN: JAMES R. MARSH | | NEW YORK | NY | 10001 |
| CVA CLAIMANTS | C/O MERSON LAW, PLLC | 950 THIRD AVENUE 18TH FLOOR | ATTN: JORDAN K. MERSON | | NEW YORK | NY | 10022-2897 |
| CVA CLAIMANTS | C/O NOAKER LAW FIRM, LLC | 13 VILLAGE LN | ATTN: PATRICK NOAKER | | EXCELSIOR | MN | 55331-2608 |
| CVA CLAIMANTS | C/O PARKER WAICHMAN LLP | 59 MAIDEN LANE 6TH FLOOR | ATTN: BRETT A. ZEKOWSKI | | NEW YORK | NY | 10038 |
| CVA CLAIMANTS | C/O PARKER WAICHMAN LLP | 6 HARBOR PARK DRIVE | ATTN: BRETT A. ZEKOWSKI | | PORT WASHINGTON | NY | 11050 |
| CVA CLAIMANTS | C/O PFAU COCHRAN VERTETIS AMALA | 701 5TH AVE STE 4300 | ATTN: MICHAEL T. PFAU | | SEATTLE | WA | 98104-7047 |
| CVA CLAIMANTS | C/O PHILLIPS & PAOLICELLI, LLP | 747 3RD AVENUE 6TH FLOOR | ATTN: DIANE M. PAOLICELLI | | NEW YORK | NY | 10017 |
| CVA CLAIMANTS | C/O SCHRODER, JOSEPH & ASSOCIATES | 394 FRANKLIN ST STE 2 | ATTN: LINDA H. JOSEPH | | BUFFALO | NY | 14202-1509 |
| CVA CLAIMANTS | C/O SEEGER WEISS LLP | 100 CHURCH ST #835 | ATTN: STEPHEN A. WEISS | | NEW YORK | NY | 10007-2601 |
| CVA CLAIMANTS | C/O SIMMONS HANLY CONROY LLC | 112 MADISON AVENUE 7TH FLOOR | ATTN: PAUL J. HANLY, JR. | | NEW YORK | NY | 10016 |
| CVA CLAIMANTS | C/O SLATER SLATER SCHULMAN LLP | 488 MADISON AVENUE 20TH FLOOR | | | NEW YORK | NY | 10022 |
| CVA CLAIMANTS | C/O STEVEN FOX, P.C. | 122 DEERHURST PARK BOULEVARD | ATTN: STEVEN S. FOX | | BUFFALO | NY | 14217 |
| CVA CLAIMANTS | C/O THE ABBATOY LAW FIRM, PLLC | 16 W MAIN ST STE 243 | ATTN: DAVID M. ABBATOY | | ROCHESTER | NY | 14614-1601 |
| CVA CLAIMANTS | C/O THE DIETRICH LAW FIRM | 101 JOHN JAMES AUDUBON PKWY | ATTN: N SHEMIK AND J DIETRICH III | | AMHERST | NY | 14228-1111 |
| CVA CLAIMANTS | C/O THE HIGGINS KANE LAW GROUP, PC | 69 DELAWARE AVENUE SUITE 1100 | ATTN: TERRENCE P. HIGGINS | | BUFFALO | NY | 14202 |
| CVA CLAIMANTS | C/O VANDETTE PENBERTHY LLP | 227 NIAGARA STREET | ATTN: JAMES M. VANDETTE | | BUFFALO | NY | 14201 |
| CVA CLAIMANTS | C/O WEITZ & LUXENBERG, P.C. | 700 BROADWAY | ATTN: NICHOLAS GONSALVES | | NEW YORK | NY | 10003 |
| EMPLOYERS INSURANCE CO OF WAUSAU | C/O GOLDBERG SEGALLA LLP | 665 MAIN STREET | ATTN: J KINGSLEY & J SCHAPP | | BUFFALO | NY | 14203 |
| ERIE COUNTY REAL PROPERTY TAX SVCS | | 95 FRANKLIN STREET ROOM 100 | | | BUFFALO | NY | 14202 |
| EXCELSIOR, LIBERTY MUTUAL, PEERLESS | C/O CHOATE, HALL & STEWART LLP | TWO INTERNATIONAL PLACE | ATTN: D GOODING & J MARSHALL | | BOSTON | MA | 02110 |
| EXCELSIOR, LIBERTY MUTUAL, PEERLESS | C/O MINTZ, LEVIN, COHN ET AL | 919 3RD AVE FL 38 | ATTN: DOMINIC J. PICCA | | NEW YORK | NY | 10022-3915 |
| EXCELSIOR, LIBERTY MUTUAL, PEERLESS | C/O MINTZ, LEVIN, COHN ET AL | ONE FINANCIAL CENTER | ATTN: NANCY ADAMS, LAURA STEPHENS | GRADY R. CAMPION | BOSTON | MA | 02111 |
| FIREMAN'S FUND INSURANCE COMPANY | C/O WHITE AND WILLIAMS LLP | 7 TIMES SQUARE SUITE 2900 | ATTN: SIOBHAIN P. MINAROVICH | | NEW YORK | NY | 10036-6524 |
| FIVE STAR BANK | ATTN: FRAN HORNUNG | 40 FOUNTAIN PLAZA #50 | | | BUFFALO | NY | 14202 |



**Exhibit A**
Served Via First-Class Mail

| NAME | ADDRESS 1 | ADDRESS 2 | ADDRESS 3 | ADDRESS 4 | CITY | STATE | ZIP |
|---|---|---|---|---|---|---|---|
| FRANCISCAN FRIARS | C/O LIPPES MATHIAS WEXLER FRIEDMAN | 50 FOUNTAIN PLAZA SUITE 1700 | ATTN: RAYMOND FINK & JOHN MUELLER | | BUFFALO | NY | 14202-2216 |
| HSBC BANK | ATTN: JOSEPH BURDEN | 95 WASHINGTON ST | | | BUFFALO | NY | 14203 |
| INTERNAL REVENUE SERVICE | | PO BOX 7346 | | | PHILADELPHIA | PA | 19101-7346 |
| JUDITH W HALSEY AND DIANA O'HARA | C/O PRYOR CASHMAN LLP | 7 TIMES SQUARE | ATTN: CONRAD K. CHIU | | NEW YORK | NY | 10036-6569 |
| KEYBANK | ATTN: ALEXANDRA WEHR | 250 DELAWARE AVE | | | BUFFALO | NY | 14202 |
| LAKE SHORE SAVINGS | | 31 EAST FOURTH STREET | | | DUNKIRK | NY | 14048 |
| M&T BANK | | ONE FOUNTAIN PLAZA 9TH FLOOR | | | BUFFALO | NY | 14003 |
| M&T BANK | ATTN: ESKINDER TEFERA | ONE FOUNTAIN PLAZA 9TH FLOOR | | | BUFFALO | NY | 14003 |
| M&T BANK | C/O HODGSON RUSS LLP | 140 PEARL STREET SUITE 100 | ATTN: GARRY M. GRABER | | BUFFALO | NY | 14202 |
| M&T BANK | | ONE M&T PLAZA | | | BUFFALO | NY | 14203 |
| MADONNA BISHOP, ET AL. | C/O CHIACCHIA & FLEMING, LLP | 5113 SOUTH PARK AVENUE | ATTN: DANIEL J. CHIACCHIA | | HAMBURG | NY | 14075 |
| MANUFACTURERS AND TRADERS TRUST CO | C/O HODGSON RUSS LLP | 140 PEARL STREET SUITE 100 | ATTN: GARRY M. GRABER | | BUFFALO | NY | 14202 |
| MANUFACTURERS AND TRADERS TRUST CO | | 1 M&T PLAZA | | | BUFFALO | NY | 14203 |
| NATL CATHOLIC RISK RETENTION GROUP | C/O HURWITZ & FINE, PC | 1300 LIBERTY BUILDING | ATTN: JENNIFER A. EHMAN | | BUFFALO | NY | 14202 |
| NATL UNIONFIRE INS CO OF PITTSBURGH | C/O BARCLAY DAMON LLP | B DAMON TOWER 125 E JEFFERSON ST | ATTN: JEFFREY A. DOVE | | SYRACUSE | NY | 13202 |
| NEW YORK ST DEPT OF LABOR BUS SVCS | ATTN: DEBORAH ARBUTINA | 290 MAIN STREET | | | BUFFALO | NY | 14202 |
| NEW YORK STATE DEPARTMENT OF LABOR | | BUILDING #12 ROOM 256 | | | ALBANY | NY | 12240 |
| NGM INSURANCE COMPANY | C/O GERBER CIANO KELLY BRADY LLP | 599 DELAWARE AVENUE SUITE 100 | ATTN: DANIEL W. GERBER & J EWELL | | BUFFALO | NY | 14202 |
| NORTHWEST BANK | | 100 LIBERTY STREET | | | WARREN | PA | 16365 |
| NY ST OFFICE PARKS REC & HIST PRES | C/O OFFICE OF THE NEW YORK STATE AG | THE CAPITOL | ATTN: LOUIS J. TESTA AND M MOONEY | CIV RECOVERIES BUREAU BANKRLIT UNIT | ALBANY | NY | 12224-0341 |
| NYS DEPT OF ENVIRONMENTAL CONSERVATION | OFFICE OF GENERAL COUNSEL | 625 BROADWAY | | | ALBANY | NY | 12233-0001 |
| NYS DEPT OF TAXATION & FINANCE | BANKRUPTCY UNIT | PO BOX 5300 | | | ALBANY | NY | 12205-0300 |
| NYS OFFICE OF THE ATTORNEY GENERAL | MAIN PLACE TOWER, SUITE 300A | 350 MAIN STREET | | | BUFFALO | NY | 14202 |
| NYS WORKERS' COMPENSATION BOARD | ATTN: SEAN BREEN | 328 STATE STREET | OFFICE OF SELF-INSURANCE | | SCHENECTADY | NY | 12305 |
| OBLATES OF ST. FRANCIS DESALES | C/O LIPPES MATHIAS WEXLER FRIEDMAN | 50 FOUNTAIN PLAZA SUITE 1700 | ATTN: RAYMOND FINK & JOHN MUELLER | | BUFFALO | NY | 14202-2216 |
| OFFICE OF THE NEW YORK STATE AG | ATTN: LOUIS J. TESTA | THE CAPITOL | CIV RECOVERIES BUREAU BANKRLIT UNIT | | ALBANY | NY | 12224-0341 |
| OFFICE OF THE NYS ATTORNEY GENERAL | LITIGATION BUREAU, BANKRUPTCY UNIT | THE CAPITOL | | | ALBANY | NY | 12224-0341 |
| OFFICE OF THE UNITED STATES TRUSTEE | ATTN: JOSEPH W. ALLEN & JILL ZUBLER | OLYMPIC TOWERS 300 PEARL ST STE 401 | | | BUFFALO | NY | 14202 |
| OUR LADY OF VICTORY INSTITUTIONS | C/O MACKENZIE HUGHES LLP | 440 S WARREN STREET SUITE 400 | ATTN: NEIL J. SMITH | | SYRACUSE | NY | 13202 |
| PARISH STEERING COMMITTEE | C/O ELSAESSER ANDERSON, CHTD. | 320 EAST NEIDER AVENUE SUITE 102 | ATTN: BRUCE A. ANDERSON | | COEUR D'ALENE | ID | 83815 |
| PARISH STEERING COMMITTEE | C/O ELSAESSER ANDERSON, CHTD. | PO BOX 369 | ATTN: J. FORD ELSAESSER | | PRIEST RIVER | ID | 83856 |
| PARISH STEERING COMMITTEE | C/O WOODS OVIATT GILMAN LLP | 1900 BAUSCH AND LOMB PL | ATTN: TIMOTHY P. LYSTER | | ROCHESTER | NY | 14604 |
| PEOPLE OF THE STATE OF NEW YORK | C/O OFFICE OF THE NEW YORK STATE AG | THE CAPITOL | CIV RECOVERIES BUREAU BANKRLIT UNIT | OFFICE OF THE NEW YORK STATE AG | ALBANY | NY | 12224-0341 |
| PSAS 01, 02, 03 DOE | C/O PUSATIER, SHERMAN, ET AL | 2464 ELMWOOD AVENUE | ATTN: STEPHEN F. PUSATIER | | KENMORE | NY | 14217 |
| RICHARD LAPORTA & HUNTER COGI WOLFE | C/O LOTEMPIO P.C. LAW GROUP | 181 FRANKLIN STREET | ATTN: HEATHER M. BAUMEISTER | | BUFFALO | NY | 14202 |
| SELECTIVE INSURANCE COMPANY OF NY | C/O COUGHLIN MIDLIGE & GARLAND LLP | 350 MOUNT KEMBLE AVENUE PO BOX 1917 | ATTN: W CORBETT, JR. & L BRADY | | MORRISTOWN | NJ | 07962 |
| SELECTIVE INSURANCE COMPANY OF NY | C/O GIBBONS P.C. | ONE GATEWAY CENTER | ATTN: R MALONE AND B THEISEN | | NEWARK | NJ | 07102 |
| SELECTIVE INSURANCE COMPANY OF NY | C/O GIBBONS P.C. | ONE PENNSYLVANIA PLAZA 37TH FL | ATTN: BRETT S. THEISEN | | NEW YORK | NY | 10119-3701 |
| SELECTIVE INSURANCE COMPANY OF NY | C/O KENNEY SHELTON LIPTAK NOWAK LLP | 110 WALL STREET SUITE 04-061 | ATTN: DIRK C. HAARHOFF | | NEW YORK | NY | 10005 |
| SELECTIVE INSURANCE COMPANY OF NY | C/O KENNEY SHELTON LIPTAK NOWAK LLP | THE CALUMET BLDG 233 FRANKLIN ST | ATTN: J SHELTON & D HAARHOFF | | BUFFALO | NY | 14202 |
| ST FRANCIS HS OF ATHOL SPRINGS NY | C/O LIPPES MATHIAS WEXLER FRIEDMAN | 50 FOUNTAIN PLAZA SUITE 1700 | ATTN: RAYMOND FINK & JOHN MUELLER | | BUFFALO | NY | 14202-2216 |
| SWEET HOME FCU | | 1960 SWEET HOME ROAD | | | AMHERST | NY | 14228 |
| THE CONTINENTAL INSURANCE COMPANY | C/O BARCLAY DAMON LLP | B DAMON TOWER 125 E JEFFERSON ST | ATTN: JEFFREY A. DOVE | | SYRACUSE | NY | 13202 |
| THE DIOCESE OF BUFFALO, N.Y. | | 795 MAIN STREET | | | BUFFALO | NY | 14203 |
| THE EUDISTS | C/O LIPPES MATHIAS WEXLER FRIEDMAN | 50 FOUNTAIN PLAZA SUITE 1700 | ATTN: RAYMOND FINK & JOHN MUELLER | | BUFFALO | NY | 14202-2216 |
| TIG, NORTH RIVER, US FIRE INS CO | C/O KENNEDYS CMK LLP | 120 MOUNTAIN VIEW BOULEVARD | ATTN: MARGARET CATALANO & J DENNEHY | | BASKING RIDGE | NJ | 07920 |
| U.S. ATTORNEY'S OFFICE | WESTERN DISTRICT OF NEW YORK | 138 DELAWARE AVENUE | | | BUFFALO | NY | 14202 |
| UNSECURED CREDITORS COMMITTEE | C/O GLEICHENHAUS, MARCHESE ET AL | 43 COURT STREET SUITE 930 | ATTN: SCOTT J. BOGUCKI | | BUFFALO | NY | 14202-3100 |
| UNSECURED CREDITORS COMMITTEE | C/O PACHULSKI, STANG, ZIEHL & JONES | 10100 SANTA MONICA BLVD 13TH FLOOR | ATTN: JAMES I. STANG | | LOS ANGELES | CA | 90067-4003 |
| UNSECURED CREDITORS COMMITTEE | C/O PACHULSKI, STANG, ZIEHL & JONES | 780 THIRD AVENUE 34TH FLOOR | ATTN: JAMES STANG, ILAN SCHARF | STEVEN GOLDEN AND BRITTANY MICHAEL | NEW YORK | NY | 10017 |
| USA NE PROVINCE OF SOCIETY OF JESUS | C/O HARRIS BEACH PLLC | 333 WEST WASHINGTON STREET STE 200 | ATTN: LEE E. WOODARD | | SYRACUSE | NY | 13202 |
| UTICA MUTUAL INSURANCE CO ET AL | C/O RIVKIN RADLER LLP | 926 RXR PLAZA | ATTN: M P GORFINKEL & S GORDON | | UNIONDALE | NY | 11556-0926 |

# **Exhibit B**



**Exhibit B**
Served Via First-Class Mail

| NAME | ADDRESS 1 | ADDRESS 2 | ADDRESS 3 | ADDRESS 4 | CITY | STATE | ZIP |
|---|---|---|---|---|---|---|---|
| 21ST CENTURY PREMIER INSURANCE COMPANY (F/K/A NATIONAL BEN FRANKLIN FIRE INSURANCE CO. OF PITTSBURGH, PA) | 21ST CENTURY PREMIER INS. CO. | 21ST CENTURY PLAZA | 3 BEAVER VALLEY ROAD | | WILMINGTON | DE | 19803-1115 |
| 360 PSG.COM | 678 SHERIDAN DR | | | | TONAWANDA | NY | 14150-7855 |
| A ADVANCED LOCK & KEY INC | 671 ENGLEWOOD AVE | | | | BUFFALO | NY | 14223 |
| A&T DEVELOPMENT, LLC | ATTN: MICHAEL SHANE | 757 EAST STATE STREET | | | OLEAN | NY | 14760 |
| ABBEY OF THE GENESEE | C/O HARRIS BEACH PLLC | ATTN: PHILIP G. SPELLANE | 99 GARNSEY ROAD | | PITTSFORD | NY | 14534 |
| ACE PROPERTY AND CASUALTY INSURANCE (SUCCESSOR-IN-INTEREST TO AETNA INSURANCE COMPANY) | ACE PROPERTY & CASUALTY INSURANCE | P.O. BOX 1000 | 436 WALNUT STREET | | PHILADELPHIA | PA | 19106 |
| ACS TECHNOLOGIES INC | PO BOX 202010 | | | | FLORENCE | SC | 29502-2010 |
| ADAM JAROSZ | ST GREGORY THE GREAT | | | | WILLIAMSVILLE | NY | 14221 |
| ADP, INC. | PO BOX 842875 | | | | BOSTON | MA | 02284-2875 |
| ALBA HOUSE COMMUNICATIONS | 2187 VICTORY BOULEVARD | | | | STATEN ISLAND | NY | 10314 |
| ALBA M. QUIROA | C/O NYS DIVISION OF HUMAN RIGHTS | 350 MAIN STREET | # 1000B | | BUFFALO | NY | 14202-3750 |
| ALBA QUIROA | C/O NYS DIVISION OF HUMAN RIGHTS | 350 MAIN ST | # 1000B | | BUFFALO | NY | 14202-3750 |
| ALBERT TURANO | C/O BROWN CHIARI LLP | ATTN: DAVID W. OLSON | 2470 WALDEN AVENUE | | BUFFALO | NY | 14225 |
| ALENA PICCILLO | 106 KINGS TRAIL | | | | WILLIAMSVILLE | NY | 14221 |
| ALENA PICCILLO | C/O THE STAMM LAW FIRM | ATTN: BRIAN G. STAMM | 1127 WEHRLE DRIVE, #100 | | WILLIAMSVILLE | NY | 14221-5430 |
| ALL SAINTS ROMAN CATHOLIC CHURCH SOCIETY OF BUFFALO | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ALL SAINTS ROMAN CATHOLIC PARISH OF LOCKPORT, NEW YORK | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ALL STATE FIRE & SECURITY | 400 MINERAL SPRINGS ROAD | | | | BUFFALO | NY | 14224-1016 |
| ALLEGANY STATE PARK | ALLEGANY REGIONAL HEADQUARTERS | ATTN: ASSISTANT DIRECTOR OF PARKS | 2373 ASP ROUTE 1 | SUITE 3 | SALAMANCA | NY | 14779 |
| ALLPRO PARKING, LLC | SINCLAIR BUILDING | 465 WASHINGTON ST | SUITE 105 | | BUFFALO | NY | 14203 |
| ALLSTATE SIGN AND PLAQUE | 70 BURT DRIVE | | | | DEER PARK | NY | 11729-5744 |
| ALPS ELEVATOR INSPECTION SERVICES, INC. | ATTN: SHARON RICES, PRESIDENT | PO BOX 605 | | | BUFFALO | NY | 14207-0605 |
| ALVITI CREATIONS, INC | 385 JOHN L DITSCH BOULEVARD | | | | ATTLEBORO FALLS | MA | 02763 |
| AMANDA PARADOWSKI | 491 TONAWANDA CREEK RD | | | | AMHERST | NY | 14228-1230 |
| AMC CLEANING SERVICE | 423 ENGLEWOOD AVE | | | | BUFFALO | NY | 14223 |
| AMERICAN FEDERATION OF MUSICIANS | ATTN: CHRIS BRAY | 49988 DINGLE STREET | | | AYLMER | ON | N5H 2R1 |
| AMERICAN GUARANTEE AND LIABILITY INSURANCE COMPANY, PROVIDENCE WASHINGTON INSURANCE COMPANY, AND ZURICH AMERICAN INSURANCE COMPANY | C/O STEPTOE & JOHNSON LLP | ATTN: HARRY LEE, JOHN O'CONNOR & WILLIAM CARSON | 1330 CONNECTICUT AVE, NW | | WASHINGTON | DC | 20036 |
| AMERICAN IRRIGATION, INC | 5474 SHUNPIKE ROAD | | | | LOCKPORT | NY | 14094 |
| AMERICAN RE-INSURANCE CORPORATION | C/O MUNICH REINSURANCE AMERICA, INC. | BRIAN MCCORMICK | 555 COLLEGE ROAD EAST | PO BOX 5241 | PRINCETON | NJ | 08543 |
| AMERICAN ALTERNATIVE INSURANCE CORPORATION (SUCCESSOR-IN-INTEREST TO AMERICAN UNION INSURANCE COMPANY OF NEW YORK) | AMERICAN ALTERNATIVE INS. CORP. | 555 COLLEGE ROAD EAST | | | PRINCETON | NJ | 08543-5421 |
| AMERICAN AUTOMOBILE INSURANCE COMPANY | AMERICAN AUTOMOBILE INS. CO. | 225 WEST WASHINGTON STREET | SUITE 1800 | | CHICAGO | IL | 60606-3484 |
| AMERICAN GUARANTEE AND LIABILITY INSURANCE COMPANY | 1299 ZURICH WAY | | | | SCHAUMBURG | IL | 60196 |
| AMERICAN INSURANCE COMPANY | 225 W. WASHINGTON STREET | SUITE 1800 | | | CHICAGO | IL | 60606-3484 |
| AMHERST ALARM, INC | 435 LAWRENCE BELL DRIVE | | | | AMHERST | NY | 14221 |
| AMHERST ALARM, INC. | 2361 WEHRLE DRIVE | STE 1 | | | AMHERST | NY | 14221 |
| ANGELUS PRESS | 613 W LASLEY ST | | | | SAINT MARYS | KS | 66536-1718 |
| ANNIN | PO BOX 970076 | | | | BOSTON | MA | 02297-0076 |
| ARCHBISHOP WALSH HIGH SCHOOL | 208 N. 24TH STREET | | | | OLEAN | NY | 14760 |
| ARENTFOX SCHIFF LLP | ATTN: J. MARK FISHER, DANIEL SCHUFREIDER, EVERETT CYGAL, DAVID SPECTOR, JIN YAN, STEVE WILAMOWSKY | 1301 AVENUE OF THE AMERICAS | FL 42 | | NEW YORK | NY | 10019-6040 |
| ARENTFOX SCHIFF LLP | ATTN: J. MARK FISHER, DANIEL SCHUFREIDER, EVERETT CYGAL, DAVID SPECTOR, JIN YAN, STEVE WILAMOWSKY | 233 SOUTH WACKER DRIVE | SUITE 7100 | | CHICAGO | IL | 60606 |
| ARROWOOD INDEMNITY COMPANY (AS SUCCESSOR-IN-INTEREST TO AMERICAN AND FOREIGN INSURANCE COMPANY, EAGLE INDEMNITY COMPANY OF NEW YORK, GLOBE INDEMNITY COMPANY, NEW AMSTERDAM CASUALTY COMPANY, SAFEGUARD INSURANCE COMPANY AND ROYAL GLOBE INSURANCE COMPANY) | C/O COUGHLIN MIDLIGE & GARLAND LLP | ATTN: STEVEN G. ADAMS | 88 PINE STREET, 28TH FLOOR | WALL STREET PLAZA | NEW YORK | NY | 10005 |
| ARROWOOD INDEMNITY COMPANY (SUCCESSOR-IN-INTEREST TO AMERICAN AND FOREIGN INSURANCE COMPANY,EAGLE INDEMNITY COMPANY OF NEW YORK, GLOBE INDEMNITY COMPANY,PHOENIX ASSURANCE COMPANY OF NEW YORK) | C/O COUGHLIN MIDLIGE & GARLAND LLP | ATTN: LORRAINE ARMENTI AND TANYA MASCARICH | 350 MOUNT KEMBLE AVENUE | | MORRISTOWN | NJ | 07962 |
| ARROWOOD INDEMNITY COMPANY (SUCCESSOR-IN-INTEREST TO AMERICAN AND FOREIGN INSURANCE COMPANY, EAGLE INDEMNITY COMPANY OF NEW YORK, GLOBE INDEMNITY COMPANY, PHOENIX ASSURANCE COMPANY OF NEW YORK, NEW AMSTERDAM CASUALTY COMPANY, AND SAFEGUARD INSURANCE COMPANY) | ARROWOOD INDEMNITY COMPANY | 3600 ARCO CORPORATE DRIVE | | | CHARLOTTE | NC | 28273 |
| ARTHUR J. GALLAGHER RISK MANAGEMENT SERVICES- WHITE PLAINS | 2 WESTCHESTER PARK DR. | | | | WHITE PLAINS | NY | 10604 |
| ARTHUR SMITH | ADDRESS REDACTED | | | | HAMBURG | NY | 14075-4068 |
| ARTISTIC MANUFACTURING CORP. | 602 THIRD STREET SW | | | | ALTOONA | IA | 50009 |
| ARTYE/GROSTE | 200 SOUTH AVENUE 66 | | | | LOS ANGELES | CA | 90042 |
| ASCENSION ROMAN CATHOLIC PARISH OF BATAVIA, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ASSUMPTION ROMAN CATHOLIC CHURCH SOCIETY (MAGYAR) OF LACKAWANNA, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ASSUMPTION ROMAN CATHOLIC CHURCH SOCIETY OF BUFFALO, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| AT&T | ACCOUNT NO. XXXXXXX8615, XXXXX8274 | PO BOX 6463 | | | CAROL STREAM | IL | 60197-6463 |
| AT&T | PO BOX 5014 | | | | CAROL STREAM | IL | 60197-5014 |
| AT&T MOBILITY | PO BOX 6463 | | | | CAROL STREAM | IL | 60197-6463 |
| ATWOOD-HAMLIN MFG. | 5614 KENOSHA STREET | PO BOX 578 | | | RICHMOND | IL | 60071 |
| AUGELLO & MATTELIANO, LLP | ATTN: THOMAS R. AUGELLO | 403 MAIN STREET, SUITE 420 | | | BUFFALO | NY | 14202 |
| AUTOM | 1013 VETERANS DRIVE | | | | LEWISBURG | TN | 37091 |
| AVE MARIA PRESS | PO BOX 428 | | | | NOTRE DAME | IN | 46556 |
| AYLSTOCK, WITKIN, KREIS & OVERHOLTZ, PLLC | ATTN: MARY LIU | 17 EAST MAIN STREET | | | PENSACOLA | FL | 32502 |
| B & H PHOTO | 420 NINTH AVENUE | | | | NEW YORK | NY | 10001 |
| BAKER HALL, FKA ST. JOSEPH'S MALE ORPHAN ASYLUM, SUCCESSOR BY MERGER TO OUR LADY OF VICTORY INFANT HOME, DBA BAKER VICTORY SERVICES, DBA OLV HUMAN SERVICES | C/O CONNORS LLP | ATTN: RANDALL WHITE | 1000 LIBERTY BUILDING | 424 MAIN STREET | BUFFALO | NY | 14202 |



**Exhibit B**
Served Via First-Class Mail

| NAME | ADDRESS 1 | ADDRESS 2 | ADDRESS 3 | ADDRESS 4 | CITY | STATE | ZIP |
|------|-----------|-----------|-----------|-----------|------|-------|-----|
| BANK DIRECT | 150 NORTH FIELD DRIVE | SUITE 190 | | | LAKE FOREST | IL | 60045 |
| BANKDIRECT CAPITAL FINANCE | ATTN: RICHARD TWARDOWSKI AND DEBRA DALICANDRO | 150 N FIELD DR | STE 190 | | LAKE FOREST | IL | 60045 |
| BARCLAY DAMON | ATTN: JEFFREY DOVE AND KEVIN SZCZEPANSKI | BARCLAY DAMON TOWER | 125 EAST JEFFERSON STREET | | SYRACUSE | NY | 13202 |
| BARTON COTTON, RPS | C/O PROCESSING CENTER | PO BOX 471380 | | | TULSA | OK | 74174-1380 |
| BEACON BUILDERS/ALLIED | PO BOX 418527 | | | | BOSTON | MA | 02241-8527 |
| BEACON ROOFING SUPPLY | PO BOX 418527 | | | | BOSTON | MA | 02241-8527 |
| BEDIVERE INSURANCE COMPANY (F/K/A POTOMAC INSURANCE COMPANY AND SUCCESSOR-IN-INTEREST TO GENERAL ACCIDENTINSURANCE COMPANY OF AMERICA) | BEDIVERE INSURANCE COMPANY | 1880 JFK BOULEVARD | SUITE 801 | | PHILADELPHIA | PA | 19103 |
| BEE GROUP NEWSPAPERS | 5564 MAIN STREET | | | | WILLIAMSVILLE | NY | 14221-5410 |
| BETH DALEY | 18 CAROLINE LANE | | | | DEPEW | NY | 14043 |
| BEVERLY A. MATISZ AND STEPHEN W. MATISZ | 9782 HAIGHT RD | | | | BARKER | NY | 14012-9633 |
| BEVERLY A. MATISZ AND STEPHEN W. MATISZ | C/O RAMOS & RAMOS | ATTN: JOSEPH L. NICASTRO | 37 FRANKLIN STREET | SUITE 1100 | BUFFALO | NY | 14202 |
| BFC PRINT NETWORK, INC. | 626 N FRENCH RD | STE 4 | | | BUFFALO | NY | 14228-2105 |
| BISHOP TIMON HIGH SCHOOL | 601 MCKINLEY PARKWAY | | | | BUFFALO | NY | 14220 |
| BISHOP TIMON HIGH SCHOOL | ATTN EDWARD C. COSGROVE | 525 DELAWARE AVENUE | | | BUFFALO | NY | 14202 |
| BISON ELEVATOR SERVICE, INC. | ELLICOTT SQUARE BUIDING | 295 MAIN STREET, #932 | | | BUFFALO | NY | 14203 |
| BISON PAINTING & DECORATING | 1783 KENMORE AVE | | | | KENMORE | NY | 14217 |
| BLANK ROME LLP | ATTN: JAMES MURRAY | 1825 EYE STREET NW | | | WASHINGTON | DC | 20006 |
| BLATNER'S AUTO SERVICE INC | 601 ERIE AVE | | | | NORTH TONAWANDA | NY | 14120 |
| BLESSED MARY ANGELA R.C. PARISH OF DUNKIRK, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| BLESSED MOTHER TERESA OF CALCUTTA ROMAN CATHOLIC PARISH OF DEPEW, NEW YORK | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| BLESSED SACRAMENT RC CHURCH | 1035 DELAWARE AVENUE | | | | BUFFALO | NY | 14209 |
| BLESSED SACRAMENT ROMAN CATHOLIC CHURCH SOCIETY OF ANDOVER | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| BLESSED SACRAMENT ROMAN CATHOLIC CHURCH SOCIETY OF BUFFALO, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| BLESSED SACRAMENT ROMAN CATHOLIC CHURCH SOCIETY OF DELEVAN, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| BLESSED SACRAMENT ROMAN CATHOLIC CHURCH SOCIETY OF TONAWANDA | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| BLESSED TRINITY ROMAN CATHOLIC CHURCH SOCIETY OF BUFFALO, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| BLISS MANUFACTURING CO. | 50 BACON STREET | PO BOX 3440 | | | PAWTUCKET | RI | 02861-0998 |
| BONADIO & CO., LLP | 100 CORPORATE PARKWAY | SUITE 200 | | | AMHERST | NY | 14226 |
| BOYS & GIRLS CLUB OF JAMESTOWN, INC. | C/O WEBSTER SZANYI LLP | ATTN: HEATHER DECHERT | 424 MAIN STREET | SUITE 1400 | BUFFALO | NY | 14202 |
| BPK ENTERPRISES, INC. | 89 BRANDEL AVENUE | | | | LANCASTER | NY | 14086 |
| BRIAN KISZEWSKI | 6820 CLINTON STREET | | | | ELMA | NY | 14059 |
| BUFFALO GRAND HOTEL | 120 CHURCH STREET | | | | BUFFALO | NY | 14202 |
| BUFFALO INDUSTRIAL CHEMICALS | PO BOX 664 | | | | NORTH TONAWANDA | NY | 14120 |
| BUFFALO MATERIAL HANDLING | 125 TAYLOR DRIVE | | | | DEPEW | NY | 14043 |
| BUFFALO WATER | ACCOUNT NO. XXXX2490, XXXX9250, XX6200, XXXX6400, XXXX8200, XXXX7800, XXXX3100, | 281 EXCHANGE ST | | | BUFFALO | NY | 14204 |
| BUFFALO WATER | ACCOUNT NO. XXXX2490, XXXX9250, XXX6200, XXXX6400, XXXX8200, XXXX7800, XXXX3100, | PO BOX 18 | | | BUFFALO | NY | 14240-0018 |
| BUTLAK ORNAMENTAL IRON | 513 COMMERCIAL STREET | | | | FARNHAM | NY | 14061 |
| C S BEHLER, INC. | 203 ST. MARY'S STREET | | | | LANCASTER | NY | 14086 |
| CADEIO | 7600 OLD KEENE MILL RD | | | | SPRINGFIELD | VA | 22152 |
| CAMCOR, INC. | 2273 SOUTH CHURCH STREET | PO BOX 1899 | | | BURLINGTON | NC | 27216-1899 |
| CAMP TURNER, INC. | C/O GIBSON, MCASKILL & CROSBY, LLP | 69 DELAWARE AVENUE | SUITE 900 | | BUFFALO | NY | 14202 |
| CARDINAL O'HARA HIGH SCHOOL | 39 O'HARA ROAD | | | | TONAWANDA | NY | 14150 |
| CARDINAL O'HARA HIGH SCHOOL | C/O CONNORS LLP | ATTN: RANDALL WHITE | 1000 LIBERTY BUILDING | 424 MAIN STREET | BUFFALO | NY | 14202 |
| CARMELITE MONASTERY | 75 CARMEL ROAD | | | | BUFFALO | NY | 14214 |
| CAROL ANNE CORNELIUS | C/O BUILDINGS & PROPERTIES | | | | BUFFALO | NY | 14203 |
| CAROLINA WHOLESALE | OFFICE MACHINE COMPANY, INC. | PO BOX 60790 | | | CHARLOTTE | NC | 28260 |
| CASCADE RECOVERY | 1845 EMERSON STREET | | | | ROCHESTER | NY | 14606 |
| CASCADES RECOVERY U.S., INC. | 321 WALDEN AVENUE | | | | DEPEW | NY | 14043 |
| CATHEDRAL ART MEDAL CO., INC. | PO BOX 6146 | | | | PROVIDENCE | RI | 02940-6146 |
| CATHEDRAL CANDLE CO | 510 KIRKPATRICK STREET | | | | SYRACUSE | NY | 13208-2100 |
| CATHOLIC ACADEMY OF NIAGARA FALLS FKA ST. DOMINIC SAVIO MIDDLE SCHOOL | C/O CONNORS LLP | ATTN: RANDALL WHITE | 1000 LIBERTY BUILDING | 424 MAIN STREET | BUFFALO | NY | 14202 |
| CATHOLIC ACADEMY OF WEST BUFFALO | 1069 DELAWARE AVENUE | | | | BUFFALO | NY | 14209-1605 |
| CATHOLIC BOOK PUBLISHING | 77 WEST END ROAD | | | | TOTOWA | NJ | 07512 |
| CATHOLIC CEMETERIES OF THE ROMAN | CATHOLIC DIOCESE OF BUFFALO, INC. | 4000 ELMWOOD AVENUE | | | BUFFALO | NY | 14217 |
| CATHOLIC CEMETERIES OF THE ROMAN CATHOLIC DIOCESE OF BUFFALO, INC. | 4000 ELMWOOD AVENUE | | | | KENMORE | NY | 14217 |
| CATHOLIC CHARITIES | 741 DELAWARE AVE. | | | | BUFFALO | NY | 14209 |
| CATHOLIC HEALTH SYSTEM, INC. | C/O PHILLIPS LYTLE LLP | ATTN: ANGELA Z. MILLER | 125 MAIN STREET | | BUFFALO | NY | 14203 |
| CATHOLIC HEALTH SYSTEM, INC. | PRESIDENT, CORPORATE OFFICE | 144 GENESEE STREET | | | BUFFALO | NY | 14203 |
| CATHOLIC MEN'S FELLOWSHIP | OF WNY. INC. | | | | ORCHARD PARK | NY | 14127 |
| CATHOLIC MUTUAL GROUP | ATTN: MICHAEL INTRIERI, PRESIDENT AND CEO | 10843 OLD MILL ROAD | | | OMAHA | NE | 68154 |
| CATHOLIC MUTUAL GROUP | C/O ARENTFOX SCHIFF LLP | ATTN: BRETT D. GOODMAN | 1301 AVENUE OF THE AMERICAS, 42ND FLOOR | | NEW YORK | NY | 10019 |
| CATHOLIC MUTUAL GROUP | C/O SCHIFF HARDIN LLP | ATTN: JOSEPH MARK FISHER | 233 S WACKER DRIVE | SUITE 7100 | CHICAGO | IL | 60606 |
| CATHOLIC PURCHASING SERVICES | 580 WASHINGTON STREET | | | | NEWTON | MA | 02458 |
| CATHOLIC WOMEN OF BUFFALO, INC | PO BOX 89 | | | | NIAGARA FALLS | NY | 14304 |
| CAVANAGH COMPANY | 610 PUTNAM PIKE | | | | GREENVILLE | RI | 02828 |
| CCLI | CHRISTIAN COPYRIGHT LICENSING INTERNATIONAL | 17205 SE MILL PLAIN BLVD | SUITE 150 | | VANCOUVER | WA | 98683 |
| CDW COMPUTER CENTERS, INC. | 75 REMITTANCE DRIVE | SUITE 1515 | | | CHICAGO | IL | 60675-1515 |
| CEMETERY - ST. MARY'S CEMETERY, SARDINIA | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| CENTURY INDEMNITY COMPANY | PO BOX 1000 | 436 WALNUT STREET | | | PHILADELPHIA | PA | 19106 |
| CERTAIN UNDERWRITERS AT LLOYD'S, LONDON AND CERTAIN LONDON MARKET COMPANIES | CERTAIN UNDERWRITERS AT LLOYD'S LONDON | C/O MENDES & MOUNT | 750 SEVENTH AVENUE | | NEW YORK | NY | 10019 |



**Exhibit B**
Served Via First-Class Mail

| NAME | ADDRESS 1 | ADDRESS 2 | ADDRESS 3 | ADDRESS 4 | CITY | STATE | ZIP |
|---|---|---|---|---|---|---|---|
| CERTAIN UNDERWRITERS AT LLOYD'S, LONDON | C/O CLYDE & CO LLP | ATTN: CATALINA J. SUGAYAN AND ROBERT E. SWEENEY, JR. | 30 S WACKER DR | STE 2600 | CHICAGO | IL | 60606-7512 |
| CHAGALL DESIGN LIMITED | 20625 BELSHAW AVENUE | | | | CARSON | CA | 90746 |
| CHAPPELLE VILLAS CONDOMINIUM B | 210 CHARTER OAKS DR | | | | AMHERST | NY | 14228 |
| CHAPPELLE VILLAS CONDOMINIUM B | 21-A BRISTOL DRIVE | | | | AMHERST | NY | 14228 |
| CHAPPELLE VILLAS CONDOMINIUM B | 21-A BRISTOL DRIVE | | | | AMHERST | NY | 14228 |
| CHAPPELLE VILLAS CONDOMINIUM B | 21-A BRISTOL DRIVE | | | | AMHERST | NY | 14228 |
| CHAPPELLE VILLAS CONDOMINIUM B | C/O PHILLIPS LYTLE LLP | ATTN: ANGELA Z. MILLER | 125 MAIN ST | | BUFFALO | NY | 14203 |
| CHARISMATIC RENEWAL | 129 LAVERACK AVE | | | | LANCASTER | NY | 14086-1848 |
| CHAR-LITE PRODUCTS, INC. | 111 E. 11TH STREET | | | | TULSA | OK | 74104 |
| CHARTER COMMUNITIES ASSOCIATION, INC. | 17-A BRISTOL DRIVE | | | | AMHERST | NY | 14228 |
| CHARTER COMMUNITIES ASSOCIATION, INC. | 210 CHARTER OAKS DR | | | | AMHERST | NY | 14228 |
| CHARTER COMMUNITIES ASSOCIATION, INC. | C/O PHILLIPS LYTLE LLP | ATTN: ANGELA Z. MILLER | 125 MAIN ST | | BUFFALO | NY | 14203 |
| CHEF'S RESTAURANT | 291 SENECA STREET | | | | BUFFALO | NY | 14204 |
| CHELUS, HERDZIK, SPEYER & MONTE PC | ATTN: THOMAS SPEYER | 438 MAIN STREET | TENTH FLOOR | | BUFFALO | NY | 14202 |
| CHIACCHIA & FLEMING, LLP | ATTN: ANDREW FLEMING | 5113 SOUTH PARK AVENUE | | | HAMBURG | NY | 14075 |
| CHOATE HALL & STEWART LLP | ATTN: DAVID ATTISANI, J.P. AND KEVIN FINNERTY | TWO INTERNATIONAL PLACE | | | BOSTON | MA | 02110 |
| CHRIST OUR HOPE ROMAN CATHOLIC CHURCH SOCIETY OF FRENCH CREEK | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| CHRIST THE KING PARISH | 30 LAMARCK DRIVE | | | | SNYDER | NY | 14226 |
| CHRIST THE KING SEMINARY | 795 MAIN ST | | | | BUFFALO | NY | 14203-1215 |
| CHRIST THE KING SEMINARY | C/O ELSAESSER ANDERSON, CHTD. | ATTN: FORD ELSAESSER, JR | 414 CHURCH STREET | SUITE 201 | SANDPOINT | ID | 83864 |
| CHRIST THE KING SEMINARY | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY P. LYSTER | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| CHRIST THE KING SEMINARY, EAST AURORA, NY | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| CHRISTIAN RISO | 334 EAST HAZELTINE AVE. | | | | KENMORE | NY | 14217 |
| CHRISTINA JAWORSKI | 137 PURITAN RD | | | | TONAWANDA | NY | 14150-8527 |
| CHUDY PAPER | 2615 WALDEN AVENUE | | | | CHEEKTOWAGA | NY | 14225 |
| CHURCH OF CHRIST, THE KING, SNYDER | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| CHURCH OF ST. JOHN BAPTIST OF WEST VALLEY, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| CHURCH OF THE ANNUNCIATION | 7580 CLINTON STREET | | | | ELMA | NY | 14059 |
| CHURCH OF THE ANNUNCIATION OF ELMA, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| CHURCH OF THE HOLY TRINITY DUNKIRK, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| CINTAS | 160 JAMES E CASEY DRIVE | | | | BUFFALO | NY | 14206 |
| CINTAS | PO BOX 630910 | | | | CINCINNATI | OH | 45263-0910 |
| CITRIX SYSTEMS, INC. | 851 W. CYPRESS CREEK ROAD | | | | FORT LAUDERDALE | FL | 33309-2009 |
| CITY OF BUFFALO WATER | ATTN: DONALD R. FOREMAN | 281 EXCHANGE ST | | | BUFFALO | NY | 14204 |
| CITY OF OLEAN | ACCOUNT NO. XX-XX30-40 | PO BOX 668 | | | OLEAN | NY | 14760 |
| CITY OF OLEAN | CITY CLERK'S OFFICE | | | | OLEAN | NY | 14760 |
| CLEVE-HILL TIRE AND AUTO | 1050 MAIN STREET | | | | BUFFALO | NY | 14209 |
| CLIFFORD JACKSON | 258 PARKER AVE | | | | CHEEKTOWAGA | NY | 14206-1938 |
| CLYDE & CO / NJ | ATTN: MARIANNE MAY | 340 MT. KEMBLE AVENUE | SUITE 300 | | MORRISTOWN | NJ | 07960 |
| CLYDE & CO US LLP | ATTN: CATALINA SUGAYAN AND ROBERT SWEENEY | 30 S WACKER DR | STE 2600 | | CHICAGO | IL | 60606-7512 |
| COLLINS LAW, PLLC | ATTN: TIMOTHY R. COLLINS | 3407 DELAWARE AVENUE, SUITE 257 | | | TONAWANDA | NY | 14217 |
| COLUMBIA CASUALTY COMPANY | 151 N. FRANKLIN STREET | | | | CHICAGO | IL | 60606 |
| COMDOC, INC. | PO BOX 936697 | | | | ATLANTA | GA | 31193-6697 |
| CONCESSIONS MANAGEMENT BUREAU | NEW YORK STATE OFFICE OF PARKS, RECREATION AND HISTORIC PRESERVATION | ATTN: DIRECTOR | 625 BROADWAY | | ALBANY | NY | 12238 |
| CONNORS & VILARDO, LLP | ATTN: RANDALL WHITE | 1020 LIBERTY BUILDING | 420 MAIN STREET | | BUFFALO | NY | 14202 |
| CONNORS LLP | 1000 LIBERTY BUILDING | 424 MAIN STREET | | | BUFFALO | NY | 14202 |
| CONNORS LLP | ATTN: RANDALL D. WHITE | 1000 LIBERTY BUILDING | 424 MAIN STREET | | BUFFALO | NY | 14202 |
| CONTINENTAL CASUALTY COMPANY | 151 N. FRANKLIN STREET | | | | CHICAGO | IL | 60606 |
| COPIER FAX BUSINESS TECHNOLOGIES, INC. | 465 ENDICOTT STREET | | | | BUFFALO | NY | 14203 |
| COREY AUTO SALES, INC. | 5230 TRANSIT ROAD | | | | DEPEW | NY | 14043 |
| CORONATION OF THE BLESSED VIRGIN MARY ROMAN CATHOLIC CHURCH SOCIETY OF BUFFALO, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| CORPUS CHRISTI, BUFFALO | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| COUGHLIN MIDLIGE & GARLAND LLP | ATTN: LAURA ANNE BRADY, WILLIAM CORBETT JR., STEVEN GARY ADAMS, LORRAINE ARMENTI, AND TANYA MASCARICH | 350 MOUNT KEMBLE AVENUE | PO BOX 1917 | | MORRISTOWN | NJ | 07962 |
| COUGHLIN MIDLIGE & GARLAND LLP | ATTN: STEVEN GARY ADAMS, LORRAINE ARMENTI, AND TANYA MASCARICH | 88 PINE STREET 28TH FLOOR | WALL STREET PLAZA | | NEW YORK | NY | 10005 |
| COUNSEL ON BEHALF OF BILLY EVANS AND HEATHER EVANS, INDIVIDUAL AND AS NATURAL GUARDIANS OF O.E. | C/O STEVE BOYD, P.C. | ATTN: LEAH COSTANZO | 2969 MAIN STREET, SUITE 100 | | BUFFALO | NY | 14214 |
| CRIBS FOR KIDS | 5450 SECOND AVENUE | | | | PITTSBURGH | PA | 15207 |
| CRYSTAL PRINTING | PO BOX 561 | | | | BUFFALO | NY | 14225-0561 |
| CS BEHLER, INC. | ATTN: THOMAS G. CASARSA | 203 ST. MARY'S STREET | | | LANCASTER | NY | 14086 |
| CVA CLAIMANTS | C/O BERNACKI LAW | ATTN: JOHN E. BERNACKI, JR. | 11 STATE STREET, SUITE #200 | | PITTSFORD | NY | 14534 |
| CVA CLAIMANTS | C/O CURIS LAW, PLLC | ATTN: ANTIGONE CURIS | 52 DUANE STREET, FLOOR 7 | | NEW YORK | NY | 10007 |
| CVA CLAIMANTS | C/O FREESE & GOSS | ATTN: TIM K. GOSS | 3500 MAPLE AVENUE, SUITE 1100 | | DALLAS | TX | 75219 |
| CVA CLAIMANTS | C/O JAMES, VERNON AND WEEKS, PA | ATTN: CRAIG K. VERNON AND LEANDER L. JAMES | 20 VESEY STREET, 7TH FLOOR | | NEW YORK | NY | 10007 |
| CVA CLAIMANTS | C/O JAMES, VERNON AND WEEKS, PA | ATTN: CRAIG K. VERNON AND LEANDER L. JAMES | 75 SOUTH CLINTON AVENUE | 510 CLINTON SQUARE | ROCHESTER | NY | 14604 |
| CVA CLAIMANTS | C/O LAFFEY, BUCCI, & KENT | ATTN: GUY D'ANDREA | 1100 LUDLOW STREET | SUITE 300 | PHILADELPHIA | PA | 19107 |
| CVA CLAIMANTS | C/O LAW OFFICE OF DARREN WOLF | ATTN: DARREN WOLF | 400 NORTH ST. PAUL STREET | SUITE 700 | DALLAS | TX | 75201 |
| CVA CLAIMANTS | C/O LAW OFFICES OF ROBERT J. RENNA, PC | ATTN: ROBERT J. RENNA | 26 COURT STREET, SUITE 303 | | BROOKLYN | NY | 11242 |
| CVA CLAIMANTS | C/O LAW OFFICES OF STEVE BOYD & JOHN ELMORE | ATTN: STEPHEN BOYD | 2969 MAIN ST | | BUFFALO | NY | 14214-1003 |
| CVA CLAIMANTS | C/O LEVY KONIGSBERG, LLP | ATTN: ANNA KULL, JOHN GUINAN & TIFFANY CRUZ | 101 GROVERS MILL ROAD | SUITE 105 | LAWRENCE TWP | NJ | 08648 |
| CVA CLAIMANTS | C/O LIEFF, CABRASER, HEIMANN & BERNSTEIN | ATTN: ANNKA K. MARTIN | 250 HUDSON STREET, 8TH FLOOR | | NEW YORK | NY | 10013 |
| CVA CLAIMANTS | C/O MALONEY & MALONEY | ATTN: MARY E. MALONEY | 206 3RD STREET, #21 | | NIAGARA FALLS | NY | 14303 |
| CVA CLAIMANTS | C/O MARC J. BERN & PARTNERS, LLP | ATTN: ALEXANDRA COLELLA | 60 E 42ND ST | STE 1400 | NEW YORK | NY | 10165-1499 |
| CVA CLAIMANTS | C/O MATTHEWS & ASSOCIATES | ATTN: DAVID P. MATTHEWS | 244 5TH AVENUE, SUITE 2882 | | NEW YORK | NY | 10001 |
| CVA CLAIMANTS | C/O MORGENSTERN DEVOESICK PLLC | ATTN: JASON P. DIONISIO AND MAURA C. MCGUIRE | 1080 PITTSFORD VICTOR ROAD, #200 | | PITTSFORD | NY | 14534 |



**Exhibit B**
Served Via First-Class Mail

| NAME | ADDRESS 1 | ADDRESS 2 | ADDRESS 3 | ADDRESS 4 | CITY | STATE | ZIP |
|---|---|---|---|---|---|---|---|
| CVA CLAIMANTS | C/O SCHROEDER LAW OFFIC, PLLC | ATTN: KAREN BEYEA-SCHROEDER | PO BOX 131747 | | THE WOODLANDS | TX | 77393 |
| CVA CLAIMANTS | C/O SEEGER WEISS LLP | ATTN: YASMINE G. MEYER | 55 CHALLENGER ROAD | | RIDGEFIELD PARK | NJ | 07660 |
| CVA CLAIMANTS | C/O THE LAW OFFICE OF DAVID P. MARCUS | ATTN: DAVID P. MARCUS | 8416 MAIN STREET | | WILLIAMSVILLE | NY | 14221 |
| CVA CLAIMANTS | C/O TREVETT CRISTO | ATTN: MELANIE S. WOLK | 500 CANAL VIEW BLVD | STE 600 | ROCHESTER | NY | 14623-2832 |
| D.C. APPLIANCE REPAIR | 3368 RANDALL ROAD | | | | RANSOMVILLE | NY | 14131 |
| D.P. MURPHY CO., INC. | 1340 LINCOLN AVE | STE 2 | | | HOLBROOK | NY | 11741-2255 |
| DADANT | 51 S. SECOND STREET | | | | HAMILTON | IL | 62341-1399 |
| DAN ALTAN | 2707 CONGRESS STREET, #1R | | | | SAN DIEGO | CA | 92110 |
| DANIEL W. TUERK | 6282 WEST MAIN STREET | | | | BYRON | NY | 14422 |
| DANIEL BIALKOWSKI | ADDRESS REDACTED | | | | WEST SENECA | NY | 14206 |
| DAVID COOPER | 499 29TH STREET | | | | NIAGARA FALLS | NY | 14303 |
| DAVIS  ELECTRICAL SUPPLY | 10550 KELLER RD | | | | CLARENCE | NY | 14031-1058 |
| DC SUPPLIES | 7460 WARREN PARKWAY, SUITE 100 | | | | FRISCO | TX | 75034 |
| DE LAGE LANDEN FINANCIAL SERVICES, INC. | 1111 OLD EAGLE SCHOOL ROAD | | | | WAYNE | PA | 19087 |
| DEACON DANIEL GOLINSKI | 135 WESTBROOK DRIVE | | | | CHEEKTOWAGA | NY | 14225 |
| DELL FINANCIAL SERVICES | PAYMENT PROCESSING CENTER | PO BOX 5275 | | | CAROL STREAM | IL | 60197-5275 |
| DELTA DEVELOPMENT OF WESTERN NY, INC. | 525 WASHINGTON STREET | | | | BUFFALO | NY | 14203 |
| DENISE YORK | 113 BUSH GARDENS | | | | ALDEN | NY | 14004 |
| DENNIS FRONCZAK | ADDRESS REDACTED | | | | N TONAWANDA | NY | 14120-2306 |
| DENTONS US LLP | ATTN: GEOFFREY MILLER | 1221 AVENUE OF THE AMERICAS | STE 25TH | | NEW YORK | NY | 10020 |
| DEPEW MILK CO. INC. | PO BOX 187 | | | | DEPEW | NY | 14043-0187 |
| DESALES CATHOLIC SCHOOL | 6914 CHESTNUT RIDGE ROAD | | | | LOCKPORT | NY | 14094 |
| DEWANDA LOATMAN | 188 HAMPSHIRE ST | | | | BUFFALO | NY | 14213-2019 |
| DEWANDA LOATMAN | C/O ANDREWS, BERNSTEIN, MARANTO & NICORTA, PLLC | ATTN: ROBERT J. MARANTO, JR. | 420 FRANKLIN STREET | | BUFFALO | NY | 14202 |
| DIANE DAMINSKI | 168 VERN LANE | | | | CHEEKTOWAGA | NY | 14227 |
| DIOCESAN CEMETERIES | 4000 ELMWOOD AVENUE | | | | BUFFALO | NY | 14217 |
| DIOCESAN COUNSELING CENTER | 16 COLUMBUS ST | | | | CHEEKTOWAGA | NY | 14227 |
| DIOCESE OF ERIE | ATTN: JAMES BOGNIAK | | | | ERIE | PA | 16514-0397 |
| DIVAL SAFETY EQUIPMENT, INC. | 1721 NIAGARA STREET | | | | NORTH BUFFALO | NY | 14207 |
| DIVINE MERCY ROMAN CATHOLIC PARISH OF NIAGARA FALLS, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| DIVINE WORD HOUSE | C/O FR. CHESTER SMITH | | | | INDIANAPOLIS | IN | 46260 |
| DOBMEIER JANITOR SUPPLY INC | 354 ENGLEWOOD AVE | | | | BUFFALO | NY | 14223 |
| DOMINICAN NUNS OF THE PERPETUAL ROSARY | 2734 SEMINARY RD SE | | | | HEATH | OH | 43056-9339 |
| DONALD WEIGEL | 4189 FOXWOOD LANE | | | | WILLIAMSVILLE | NY | 14221 |
| DOUGLAS & LONDON PC | ATTN: ALICIA ELISAYED AND ROBIN J. BOND | 59 MAIDEN LN | 6TH FLOOR | | NEW YORK | NY | 10038 |
| DOWNEY-GOODLEIN ELEVATOR CORP. | 12 PIXLEY INDUSTRIAL PKWY. | | | | ROCHESTER | NY | 14624 |
| DOYLE SECURITY SYSTEMS | ATTN: MATT STUCZYNSKI | 81 BENBRO DRIVE | | | BUFFALO | NY | 14225 |
| DR. MICHAEL LAFEVER | DIOCESE OF BUFFALO | | | | BUFFALO | NY | 14203 |
| D'YOUVILLE COLLEGE | ONE D'YOUVILLE SQUARE | | | | BUFFALO | NY | 14201-1084 |
| EAGLE SYSTEMS, INC. | 2421 HARLEM ROAD | | | | BUFFALO | NY | 14225 |
| EATON OFFICE SUPPLY | 180 JOHN GLENN DRIVE | | | | AMHERST | NY | 14228-2292 |
| ELBERS LANDSCAPE SERIVCE, INC. | ATTN: KEVIN F. BURKE, GENERAL MANAGER | 2900 MAIN STREET | | | BUFFALO | NY | 14214 |
| ELSAESSER ANDERSON, CHTD. | ATTN: FORD ELSAESSER, JR. AND BRUCE ALAN ANDERSON | 320 E NEIDER AVE | SUITE 102 | | COEUR D'ALENE | ID | 83815 |
| ELSAESSER ANDERSON, CHTD. | ATTN: FORD ELSAESSER, JR. AND BRUCE ALAN ANDERSON | PO BOX 369 | | | PRIEST RIVER | ID | 83856-0369 |
| EMKAY CANDLE COMPANY | PO BOX 370 | | | | CAMILLUS | NY | 13031-0370 |
| EMPIRE BRONZE CORPORATION | 1130 NORTH RIDGE AVENUE | | | | LOMBARD | IL | 60148 |
| EMPLOYERS FIRE INSURANCE COMPANY: EMPLOYERS INSURANCE COMPANY OF WAUSAU (FORMERLY KNOWN AS EMPLOYERS INSURANCE OF WAUSAU A MUTUAL COMPANY FORMERLY KNOWN AS EMPLOYERS MUTUAL LIABILITY INSURANCE COMPANY OF WISCONSIN)  AND WAUSAU UNDERWRITERS INSURANCE COMPANY; NATIONWIDE INSURANCE COMPANY OF AMERICA; NATIONWIDE MUTUAL INSURANCE COMPANY) F/K/A FARM BUREAU MUTUAL AUTOMOBILE INSURANCE COMPANY) | C/O GOLDBERG SEGALLA LLP | ATTN: JEFFREY L. KINGSLEY, JONATHAN SCHAPP, AND ADAM R. DURST | 665 MAIN STREET, SUITE 400 | | BUFFALO | NY | 14203 |
| EMPLOYERS INSURANCE COMPANY OF WAUSAU | C/O LIBERTY MUTUAL INSURANCE | ATTN: DAVID H. LONG, PRESIDENT | 175 BERKELEY STREET | | BOSTON | MA | 02116 |
| EMPLOYERS' FIRE INSURANCE COMPANY | 1880 JFK BLVD | SUITE 801 | | | PHILADELPHIA | PA | 19103 |
| ENTERPRISE RENT-A-CAR | PO BOX 843829 | | | | KANSAS CITY | MO | 64184-3829 |
| EPIPHANY OF OUR LORD ROMAN CATHOLIC PARISH COMMUNITY, LANGFORD, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ERIE COUNTY WATER AUTHORITY | ACCOUNT NO. XXXXX714-7, XXXXX580-9, XXXXX793-0, XXXXX794-2 | 295 MAIN ST. | RM 350 | | BUFFALO | NY | 14203 |
| ERIE COUNTY WATER AUTHORITY | ACCOUNT NO. XXXXX714-7, XXXXX580-9, XXXXX793-0, XXXXX794-2 | PO BOX 5148 | | | BUFFALO | NY | 14240-5148 |
| EUGENE RUSZCZYK | 5592 BIRCHWOOD DRIVE | | | | LAKEVIEW | NY | 14085 |
| EVOLVE TECHNOLOGY SERVICES | 501 JOHN JAMES AUDUBON PARKWAY | SUITE 201 | | | AMHERST | NY | 14228 |
| EXCELSIOR INSURANCE COMPANY | 175 BERKELEY STREET | | | | BOSTON | MA | 02116 |
| F & T SNOWPLOWING & REPAIR, INC. | ATTN: GEORGE W. THOMAS, PRESIDENT | 165 EAST AVE | | | BUFFALO | NY | 14222-3171 |
| F. C. ZIEGLER CO. | 2111 E. 11TH STREET | | | | TULSA | OK | 74104 |
| F. J. REMEY CO., INC. | 121 WILLIS AVENUE | PO BOX 589 | | | MINEOLA | NY | 11501-0589 |
| FAIR AMERICAN INSURANCE AND REINSURANCE COMPANY (F/K/A PUTNAM REINSURANCE COMPANY) | C/O ZEICHNER ELLMAN & KRAUSE LLP | ATTN: MICHAEL S. DAVIS | 1211 AVENUE OF THE AMERICAS | | NEW YORK | NY | 10036 |
| FAIR AMERICAN INSURANCE AND REINSURANCE COMPANY (F/K/A PUTNAM REINSURANCE COMPANY) | ONE LIBERTY PLAZA | 165 BROADWAY | | | NEW YORK | NY | 10006 |
| FAITH CATHOLIC | P O BOX 26006 | | | | LANSING | MI | 48909 |
| FATOUMA MOHAMED | C/O LIPSITZ GREEN SCIME CAMBRIA, LLP | ATTN: MICHAEL P. STEUERMER | 42 DELAWARE AVENUE, #120 | | BUFFALO | NY | 14202 |
| FEDERAL INSURANCE COMPANY | 202B HALL'S MILL ROAD | | | | WHITEHOUSE STATION | NJ | 08889 |
| FEDERAL INSURANCE COMPANY | C/O CHUBB | 436 WALNUT STREET | WA04K | | PHILADELPHIA | PA | 19106 |
| FEDEX  KINKO'S | PO BOX 672085 | | | | DALLAS | TX | 75267-2085 |
| FEDEX SHIPPING | PO BOX 371461 | | | | PITTSBURGH | PA | 15250-7461 |
| FIREMAN'S FUND INSURANCE COMPANY | 225 W. WASHINGTON STREET | SUITE 1800 | | | CHICAGO | IL | 60606-3484 |



**Exhibit B**
Served Via First-Class Mail

| NAME | ADDRESS 1 | ADDRESS 2 | ADDRESS 3 | ADDRESS 4 | CITY | STATE | ZIP |
|---|---|---|---|---|---|---|---|
| FIREMAN'S FUND INSURANCE COMPANY | C/O CT CORPORATION SYSTEM | 330 N BRAND BLVD | STE 700 | | GLENDALE | CA | 91203-2336 |
| FIREMAN'S FUND INSURANCE COMPANY | C/O VIVIAN IMPERIAL, REGISTERED AGENT | 330 N BRAND BLVD | STE 700 | | GLENDALE | CA | 91203-2336 |
| FIREMAN'S FUND INSURANCE COMPANY | C/O WHITE AND WILLIAMS | ATTN: JON T. POWERS | 7 TIMES SQUARE, SUITE 2900 | 1459 BROADWAY | NEW YORK | NY | 10036 |
| FIRESIDE CATHOLIC PUBLISHING | PO BOX 780189 | | | | WICHITA | KS | 67278-0189 |
| FIRST STUDENT INC | 22157 NETWORK PLACE | | | | CHICAGO | IL | 60673-1221 |
| FLYNN MANUFACTURING CO. | 7166 NORTH SAGINAW STREET | | | | MOUNT MORRIS | MI | 48458 |
| FORUM COMMUNICATIONS PRINTING | 4601 16TH AVENUE NORTH | | | | FARGO | ND | 58107-2965 |
| FOUNDATION OF THE ROMAN | CATHOLIC DIOCESE OF BUFFALO | | | | BUFFALO | NY | 14203-1250 |
| FOX FENCE INC | 2637 LOCKPORT ROAD | | | | NIAGARA FALLS | NY | 14305 |
| FRANCISCAN FRIARS | 2 UNCATENA ROAD NORTH | | | | FALMOUTH | MA | 02540-4149 |
| FRANCISCAN FRIARS - HOLY NAME PROVINCE (NY) | ATTN: JOSEPH CAVOTO | 129 WEST 31ST STREET | 2ND FLOOR | | NEW YORK | NY | 10001 |
| FRANCISCAN FRIARS - HOLY NAME PROVINCE (NY) | C/O ARCHER & GREINER, P.C. | ATTN: ANTHONY D. DOUGHERTY AND ALLEN G. KADISH | 1211 AVENUE OF THE AMERICAS, SUITE 2750 | | NEW YORK | NY | 10036 |
| FRANKLIN X MCCORMICK, INC. | 7402 W. BECHER STREET | | | | WEST ALLIS | WI | 53219 |
| G.D. | C/O MERSON LAW, PLLC | ATTN: JORDAN K. MERSON | 950 3RD AVE | STE 1800 | NEW YORK | NY | 10022-2897 |
| GALLAGHER ELEVATOR COMPANY, INC. | 70 HAYMARKET SQ | | | | EAST AMHERST | NY | 14051-1702 |
| GELLERT SCALI BUSENKELL & BROWN LLC | ATTN: ROBERT GERARD SCUMACI | 1201 N. ORANGE STREET, SUITE 300 | | | WILMINGTON | DE | 19801 |
| GERBER CIANO KELLY BRADY LLP | ATTN: JOHN RYAN EWELL AND DANIEL GRABER | PO BOX 1060 | | | BUFFALO | NY | 14201 |
| GHENT MANUFACTURING INC. | 2999 HENKLE DRIVE | | | | LEBANON | OH | 45036 |
| GIBSON, MCASKILL & CROSBY LLP | ATTN: ROBERT G. SCUMACI | 69 DELAWARE AVENUE | SUITE 900 | | BUFFALO | NY | 14202 |
| GIMIGLIANO MAURIELLO & MALONEY | ATTN: JOHN MALONEY | 16 WEST 22ND STREET | 10TH FLOOR | | NEW YORK | NY | 10010 |
| GLOBAL INDUSTRIAL | 29833 NETWORK PLACE | | | | CHICAGO | IL | 60673-1298 |
| GLOBAL IP, INC. | 1275 HARLEM ROAD | | | | BUFFALO | NY | 14206 |
| GLOBALQUEST SOLUTIONS | ATTN: JERRY FIAL | 2813 WEHRLE DRIVE, SUITE 3 | | | WILLIAMSVILLE | NY | 14221 |
| GOLDBERG SEGALLA LLP | ATTN: ADAM DURST, JEFFREY KINGSLEY, JONATHAN SCHAPP, AND SHARON ANGELINO | 665 MAIN STREET SUITE 400 | | | BUFFALO | NY | 14203 |
| GOOD SHEPARD | 5442 TONAWANDA CREEK ROAD | | | | NORTH TONAWANDA | NY | 14120 |
| GREAT AMERICAN INSURANCE COMPANY (SUCCESSOR-IN-INTEREST TO AGRICULTURAL INSURANCE COMPANY) | C/O SKARZYNSKI MARICK & BLACK LLC | ATTN: KAREN M. DIXON & MICHAEL M. MARICK | 353 NORTH CLARK STREET | SUITE 3650 | CHICAGO | IL | 60654 |
| GREAT AMERICAN INSURANCE COMPANY (SUCCESSOR-IN-INTEREST TO AGRICULTURAL INSURANCE COMPANY) | GREAT AMERICAN INS. CO. | 301 EAST 4TH STREET | 24TH FLOOR | | CINCINNATI | OH | 45202 |
| GREAT AMERICAN INSURANCE COMPANY OF NEW YORK (SUCCESSOR-IN-INTEREST TO AMERICAN NATIONAL FIRE INSURANCE COMPANY) | GREAT AMERICAN INS. CO. | 301 EAST 4TH STREET | 24TH FLOOR | | CINCINNATI | OH | 45202 |
| GROSS SHUMAN | ATTN: ROBERT FELDMAN AND KEVIN LELONEK | 600 LAFAYETTE COURT | 465 MAIN STREET | | BUFFALO | NY | 14203 |
| GUARD CONTRACTING CORPORATION | 455 COMMERCE DR | STE 5 | | | AMHERST | NY | 14228-2313 |
| GUERCIO AND SONS | 250 GRANT ST | | | | BUFFALO | NY | 14213 |
| GUEST HOUSE | 1601 JOSELYN ROAD | | | | LAKE ORION | MI | 48361 |
| HANOVER INSURANCE COMPANY (SUCCESSOR-IN-INTEREST TO MASSACHUSETTS BONDING AND INSURANCE COMPANY) | 440 LINCOLN STREET | | | | WORCESTER | MA | 01653 |
| HARBRO CHURCH ARTS, INC. | 231 HERBERT AVENUE | BOX 776 | | | CLOSTER | NJ | 07624-0776 |
| HARFORD MUTUAL INSURANCE COMPANY | HARFORD MUTUAL INSURANCE GROUP | 200 NORTH MAIN STREET | | | BEL AIR | MD | 21014-3544 |
| HARTFORD ACCIDENT AND INDEMNITY COMPANY AND HARTFORD FIRE INSURANCE COMPANY (BOTH IMPROPERLY SUED AS PREDECESSORS-IN-INTEREST TO THE HARTFORD FINANCIAL SERVICES GROUP) AND NEW ENGLAND INSURANCE COMPANY (IMPROPERLY SUED AS NEW ENGLAND INSURANCE COMPANY F/K/A NEW ENGLAND REINSURANCE CORPORATION) | C/O GIMIGLIANO MAURIELLO & MALONEY, A PROFESSIONAL ASSOCIATION | ATTN: JOHN MALONEY | 163 MADISON AVENUE, SUITE 500 | PO BOX 1449 | MORRISTOWN | NJ | 07962-1449 |
| HARTFORD STEAM BOILER INSPECTION AND INSURANCE COMPANY | ONE STATE STREET | PO BOX 5024 | | | HARTFORD | CT | 06102-5024 |
| HELEN L. YOOD | 50 QUAIL HOLLOW LANE | | | | EAST AMHERST | NY | 14051 |
| HELEN YOOD | C/O NYS DIVISION OF HUMAN RIGHTS | 350 MAIN ST | # 1000B | | BUFFALO | NY | 14202-3750 |
| HERITAGE HOUSE INC | 919 SOUTH MAIN STREET | | | | SNOWFLAKE | AZ | 85937 |
| HERITAGE PIPE ORGANS, INC. | 1372 CLINTON STREET | | | | BUFFALO | NY | 14206 |
| HODGSON RUSS, LLP | ATTN: GARY M. GRABER, HUGH RUS, III | THE GUARANTY BUILDING | 140 PEARL STREET SUITE 100 | | BUFFALO | NY | 14202-4040 |
| HOLDING COMPANY OF ST. JOSEPH AND THE LITTLE FLOWER AKA THE LITTLE SEMINARY OF ST. JOSEPH AND THE LITTLE FLOWER | 564 DODGE STREET | | | | BUFFALO | NY | 14208 |
| HOLY ANGELS, BUFFALO | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| HOLY APOSTLES PETER AND PAUL ROMAN CATHOLIC CHURCH SOCIETY OF BUFFALO, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| HOLY APOSTLES ROMAN CATHOLIC PARISH OF JAMESTOWN, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| HOLY CROSS ROMAN CATHOLIC CHURCH SOCIETY OF BUFFALO, NEW YORK | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| HOLY FAMILY OF JESUS, MARY, AND JOSEPH ROMAN CATHOLIC CHURCH OF NIAGARA FALLS, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| HOLY FAMILY OF JESUS, MARY, AND JOSEPH ROMAN CATHOLIC CHURCH SOCIETY OF BELMONT, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| HOLY FAMILY ROMAN CATHOLIC CHURCH SOCIETY OF MACHIAS, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| HOLY FAMILY ROMAN CATHOLIC CHURCH SOCIETY OF ALBION, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| HOLY NAME OF JESUS, BUFFALO | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| HOLY ROSARY OF THE BLESSED VIRGIN MARY ROMAN CATHOLIC CHURCH SOCIETY OF WILSON, NEW YORK | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| HOLY SPIRIT (UK. BYZ.), LACKAWANNA | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| HOLY SPIRIT ROMAN CATHOLIC CHURCH SOCIETY OF BUFFALO, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| HOLY SPIRIT ROMAN CATHOLIC CHURCH SOCIETY OF NORTH COLLINS, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| HOLY TRINITY PARISH | 211 EAGLE STREET | | | | MEDINA | NY | 11103 |
| HOLY TRINITY ROMAN CATHOLIC CHURCH OF MEDINA, NEW YORK | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| HOLY TRINITY ROMAN CATHOLIC CHURCH SOCIETY OF NIAGARA FALLS, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| HOME FIRST AND MARINE INSURANCE COMPANY OF CALIFORNIA D/B/A FIREMAN'S FUND INSURANCE COMPANY | FIREMAN'S FUND INSURANCE COMPANY | 1 PROGRESS POINT PKWY | STE 200 | | O FALLON | MD | 63368-2213 |
| HON COMPANY | C/O EATON OFFICE SUPPLY | 200 OAK STREET | | | MUSCATINE | IA | 52761 |
| I.D. BOOTH, INC. | 620 WILLIAM STREET | PO BOX 579 | | | ELMIRA | NY | 14902 |
| IDRIVE, INC. | REMOTEPC DIVISION | 26115 MUREAU ROAD | SUITE A | | CALABASAS | CA | 91302 |
| IEVOLVE | ATTN: DAVID MELLER | 501 JOHN JAMES AUDUBON PARKWAY | SUITE 201 | | AMHERST | NY | 14228 |
| IGNATIUS PRESS | PO BOX 1339 | | | | FORT COLLINS | CO | 80522 |
| IMG, INC. F/K/A KEYSTONE FILM PRODUCTION | 825 MAIN STREET | | | | BUFFALO | NY | 14203 |



**Exhibit B**
Served Via First-Class Mail

| NAME | ADDRESS 1 | ADDRESS 2 | ADDRESS 3 | ADDRESS 4 | CITY | STATE | ZIP |
|---|---|---|---|---|---|---|---|
| IMMACULATE CONCEPTION | 6 MAPLE AVENUE | | | | WELLSVILLE | NY | 14895-1594 |
| IMMACULATE CONCEPTION ROM. CATH. CHURCH SOCIETY OF BUFFALO | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| IMMACULATE CONCEPTION ROM. CATH. CHURCH SOCIETY OF NORTH RIDGE, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| IMMACULATE CONCEPTION ROMAN CATHOLIC CHURCH SOCIETY OF CASSADAGA, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| IMMACULATE CONCEPTION ROMAN CATHOLIC CHURCH SOCITY OF EDEN CENTER, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| IMMACULATE CONCEPTION ROMAN CATHOLIC CHURCH SOCITY OF NEW OREGON | 510 OAKWOOD AVENUE | | | | EAST AURORA | NY | 14052-2394 |
| IMMACULATE CONCEPTION SCHOOL | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| IMMACULATE CONCEPTION SCHOOL OF ALLEGANY COUNTY, WELLSVILLE, NY | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| IMMACULATE CONCEPTION, EAST BETHANY | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| IMMACULATE HEART OF MARY ROMAN CATHOLIC CHURCH SOCIETY OF BUFFALO, NEW YORK | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| IMMACULATE HEART OF MARY ROMAN CATHOLIC PARISH, DARIEN CENTER | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| IMPERIAL WOODWORKS, INC. | PO BOX 7835 | | | | WACO | TX | 76714-7835 |
| INDEMNITY INSURANCE COMPANY OF NORTH AMERICA | PO BOX 1000 | 436 WALNUT STREET | | | PHILADELPHIA | PA | 19106 |
| INFANT OF PRAGUE ROMAN CATHOLIC CHURCH SOCIETY OF CHEEKTOWAGA, NEW YORK | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| INSURANCE ARCHEOLOGY GROUP | ATTN: MICHELE PIERRO | 75 ORIENT WAY, SUITE 302 | | | RUTHERFORD | NJ | 07070 |
| INSURANCE COMPANY OF NORTH AMERICA | PO BOX 1000 | 436 WALNUT STREET | | | PHILADELPHIA | PA | 19106 |
| INTEGON NATIONAL INSURANCE COMPANY (F/K/A BANKERS AND SHIPPERS INSURANCE COMPANY | PO BOX 3199 | | | | WINSTON-SALEM | NC | 27102-3199 |
| INTERNAL REVENUE SERVICE | INSOLVENCY GROUP I | NIAGARA CENTER, 2ND FLOOR | 130 S. ELMWOOD AVENUE | | BUFFALO | NY | 14202 |
| J. S. PALUCH CO., INC. | WORLD LIBRARY PUBLICATIONS | PO BOX 2703 | | | SCHILLER PARK | IL | 60176 |
| J.C. EHRLICH | PO BOX 13848 | | | | READING | PA | 19612-3848 |
| JACK W HUNT & ASSOCIATES, INC. | 1120 LIBERTY BUILDING | 424 MAIN STREET | | | BUFFALO | NY | 14202 |
| JAMES F. GRANVILLE | C/O LIPSITZ GREEN SCIME CAMBRIA, LLP | ATTN: THOMAS M. MERCURE | 42 DELAWARE AVENUE | SUITE 120 | BUFFALO | NY | 14202-3924 |
| JAMES GRANVILLE | C/O LIPSITZ GREEN SCIME CAMBRIA, LLP | ATTN: THOMAS MERCURE | 42 DELAWARE AVENUE, #120 | | BUFFALO | NY | 14202 |
| JAMES MORONEY, INC. | 670 EAST AIRY STREET | SUITE 1 | | | NORRISTOWN | PA | 19401 |
| JAMES SPIELMAN | ADDRESS REDACTED | | | | ALLENTOWN | PA | 14707 |
| JAMES SPIELMAN | C/O BURDEN, HAFNER & HANSEN, LLC | ATTN: DONNA L BURDEN | 605 BRISBANE BUILDING | 403 MAIN STREET | BUFFALO | NY | 14203 |
| JAYE TRAPASSO | 499 ORCHARD PLACE | | | | NORTH TONAWANDA | NY | 14120 |
| JCL TELECOMMUNICATION, LLC | 5667 HOMESTEAD ROAD | | | | HAMBURG | NY | 14075 |
| JEFF ANDERSON & ASSOCIATES, P.A. | ATTN: MICHAEL G. FINNEGAN | 366 JACKSON STREET, SUITE 100 | | | ST. PAUL | MN | 55101 |
| JEFFERY L. POLISOTO AND TRAVY E. POLISOTO | 97 LANDINGS DRIVE | | | | AMHERST | NY | 14228 |
| JEFFERY L. POLISOTO AND TRAVY E. POLISOTO | ATTN: ROBERT J. MARANTO | 420 FRANKLIN STREET | | | BUFFALO | NY | 14202 |
| JEFFERY POLISOTO | C/O ANDREWS BERNSTEIN MARANTO & NICOTRA | ATTN: ROBERT J. MARANTO, JR. | 420 FRANKLIN STREET | | BUFFALO | NY | 14202 |
| JEFFREY L. POLISOTO AND TRACY E. POLISOTO | C/O ANDREWS BERNSTEIN, MARANTO & NICORTA, PLLC | 420 FRANKLIN STREET | | | BUFFALO | NY | 14202 |
| JENNIFER A. MITCHELL, LPC | 410 E. TAYLOR STREET | SUITE H | | | GRIFFIN | GA | 30224 |
| JENNIFER L. SKY | C/O JOHN J. DELMONTE | 2706 PINE AVENUE | PO BOX 2146 NMS | | NIAGARA FALLS | NY | 14301 |
| JENNIFER SKY AND KEVIN SKY | ATTN: JOHN L. DELMONTE | 2706 PINE AVENUE | PO BOX 2146 NMS | | NIAGARA FALLS | NY | 14301 |
| JEWELED CROSS COMPANY, INC. | PO BOX 4910 | | | | RUMFORD | RI | 02916-0910 |
| JOANNE M. GLOSEK | 15 WOODS BLUFF COURT NORTH | | | | BATH | PA | 18014 |
| JODI MARTIN | C/O CANTER, LUKASIK & PANEPINTO, P.C. | ATTN: MICHAEL V. BOOTH | 1600 MAIN PLACE TOWER | 350 MAIN STREET | BUFFALO | NY | 14202 |
| JOHANNA RICHARDS | 1165 STONY POINT RD. | | | | GRAND ISLAND | NY | 14072 |
| JOHN JERZEWSKI | 29 ROSARY BLVD | | | | CHEEKTOWAGA | NY | 14225 |
| JOHN KOVACH | C/O LIPSITZ GREEN SCIME CAMBRIA, LLP | ATTN: WILLIAM P. MOORE | 42 DELAWARE AVENUE, #120 | | BUFFALO | NY | 14202 |
| JOHN KOVACH AND JEAN KOVACH | ATTN: WILLIAM P. MOORE | 42 DELAWARE AVE. | SUITE 120 | | BUFFALO | NY | 14202-3924 |
| JOHN SCHOLL | THE DIOCESE OF BUFFALO, N.Y. | 795 MAIN STREET | | | BUFFALO | NY | 14203 |
| JOHNSON CONTROLS FIRE PROTECTION LP | ATTN: SANDY LJAFFRADO | 6850 MAIN STREET, SUITE 3 | | | WILLIAMSVILLE | NY | 14221 |
| JONES DAY | ATTN: JOHN D. GOETZ | 500 GRANT STREET, SUITE 4500 | | | PITTSBURGH | PA | 15219-2514 |
| JONES DAY - PITTSBURGH | ATTN: JOHN GOETZ, BENJAMIN THOMSON | 250 VESEY STREET | | | NEW YORK | NY | 10281 |
| JUSTIN STEEG | 767 RIDGE ROAD | | | | BUFFALO | NY | 14218 |
| KARIMA DUNSTON | C/O GELBER & O'CONNELL, LLC | ATTN: KRISTOPHER A. SCHWARZMUELLER | 2140 HOPKINS RD | | GETZVILLE | NY | 14068-1111 |
| KATHLEEN DAIGLER | 8055 STAHLEY ROAD | | | | EAST AMHERST | NY | 14051 |
| KATHRYN MARASZEK | 120 KNOX ROAD | | | | EAST AURORA | NY | 14052 |
| KATIE PREJEAN | 1428 WEDGEWOOD ST | | | | LAKE CHARLES | LA | 70605-6124 |
| KAY ZAYAC, AS ADMINISTRATOR OF THE ESTATE OF TIMOTHY ZAYAC | ATTN: GEORGE V.C. MUSCATO | 107 EAST AVENUE | | | LOCKPORT | NY | 14094 |
| KEMCO SALES, LLC | 119 DESPATCH DRIVE | | | | EAST ROCHESTER | NY | 14445 |
| KENNEY SHELTON LIPTAK NOWAK LLP | ATTN: JUDITH TREGER SHELTON, DIRK HAAROFF, AND JEFFREY CARLINO | 233 FRANKLIN STREET | THE CALUMET BLDG. | | BUFFALO | NY | 14202 |
| KENNEY SHELTON LIPTAK NOWAK LLP | ATTN: JUDITH TREGER SHELTON, DRIK HAAROFF, AND JEFFREY CARLINO | 110 WALL STREET SUITE 04-061 | | | NEW YORK | NY | 10005 |
| KFI SEATING | PO BOX 3622 | 1533 BANK STREET | | | LOUISVILLE | KY | 40201-3622 |
| KOLBE CATHOLIC REGIONAL ELEMENTARY SCHOOL | C/O CONNORS LLP | ATTN: RANDALL WHITE | 1000 LIBERTY BUILDING | 424 MAIN STREET | BUFFALO | NY | |
| KOLEY'S | 2951 HARNEY STREET | | | | OMAHA | NE | 68131 |
| KONE INC. | 10 PIXLEY INDUSTRIAL PKWY. | | | | ROCHESTER | NY | 14624 |
| KRUEGER INTERNATIONAL | PO BOX 204576 | | | | DALLAS | TX | 75320-4576 |
| KRYSTAL'S OMEGA DELI | & CATERING | | | | CHEEKTOWAGA | NY | 14227 |
| LAMORAK INSURANCE COMPANY (F/K/A ONEBEACON AMERICA INSURANCE COMPANY F/K/A COMMERCIAL UNION INSURANCE COMPANY F/K/A EMPLOYERS COMMERCIAL UNION INSURANCECOMPANY) | 1880 JFK BLVD. | SUITE 801 | | | PHILADELPHIA | PA | 19103 |
| LATINA BOULEVARD FOODS | ATTN: ANN SIDONI | 1 SCRIVNER DRIVE, SUITE 1 | | | CHEEKTOWAGA | NY | 14227 |
| LAW OFFICES OF RONALD J. KIM, PC | ATTN: RONALD J. KIM | PO BOX 318 | | | SARATOGA SPRINGS | NY | 12866-0318 |
| LEAF | PO BOX 5066 | | | | HARTFORD | CT | 6102 |
| LEAF CAPITAL FUNDING, LLC | 1720 A CIRCLE STREET | | | | MOBERLY | MO | 65270 |
| LEAF CAPITAL FUNDING, LLC (ACCOUNT #100-4624419-001) | C/O LEGAL DEPARTMENT | 2005 MARKET ST | 14TH FLOOR | | PHILADELPHIA | PA | 19103 |
| LEBRO'S RESTURANT | 330 CAMPBELL BLVD. | | | | GETZVILLE | NY | 14068 |



**Exhibit B**
Served Via First-Class Mail

| NAME | ADDRESS 1 | ADDRESS 2 | ADDRESS 3 | ADDRESS 4 | CITY | STATE | ZIP |
|---|---|---|---|---|---|---|---|
| LG 26 DOE | C/O LAURA A. AHEARN, ESQ., PLLC | ATTN: LAURA A. AHEARN | 3075 VETERANS MEMORIAL HIGHWAY, SUITE 200 | | RONKONKOMA | NY | 11779 |
| LG 26 DOE | C/O LIPSITZ GREEN SCIME CAMBRIA, LLP | ATTN: RICHARD P. WEISBECK, JR. | 42 DELAWARE AVENUE, SUITE 120 | | BUFFALO | NY | 14202 |
| LG 29 DOE | C/O LAURA A. AHEARN, ESQ., PLLC | ATTN: LAURA A. AHEARN | 3075 VETERANS MEMORIAL HIGHWAY, SUITE 200 | | RONKONKOMA | NY | 11779 |
| LG 29 DOE | C/O LIPSITZ GREEN SCIME CAMBRIA, LLP | ATTN: RICHARD P. WEISBECK, JR. | 42 DELAWARE AVENUE, SUITE 120 | | BUFFALO | NY | 14202 |
| LIBERTY MUTUAL INSURANCE COMPANY | 175 BERKERLEY STREET | | | | BOSTON | MA | 02116-5066 |
| LIBERTY MUTUAL INSURANCE COMPANY | PO BOX 1442 | | | | NEW YORK | NY | 10116-1442 |
| LIGUORI | ATTN: DIANA POTTS #802210 | ONE LIGUORI DRIVE | | | LIGUORI | MO | 63057 |
| LINSTAR | 430 LAWRENCE BELL DRIVE, SUIT E1 | | | | BUFFALO | NY | 14221-7085 |
| LINSTAR, INC. | 430 LAWRENCE BELL DR | STE 16 | | | BUFFALO | NY | 14221-7085 |
| LIPPES MATHIAS WEXLER FRIEDMAN LLP | 50 FOUNTAIN PLAZA | SUITE 1700 | | | BUFFALO | NY | 14202 |
| LIPSITZ GREEN SCIME CAMBRIA LLP | ATTN: AMY KELLER | 42 DELAWARE AVENUE, SUITE 120 | | | BUFFALO | NY | 14202 |
| LISA SCHIEBER | 244 BULLIS ROAD | | | | WEST SENECA | NY | 14224 |
| LITURGY TRAINING PUBLICATIONS | 3949 SOUTH RACINE AVENUE | | | | CHICAGO | IL | 60609 |
| LOYOLA PRESS | PO BOX 6692 | | | | CAROL STREAM | IL | 60197-6692 |
| LUCY IPPOLITO | C/O LAW OFFICES OF ROBERT BERKUN | ATTN: ROBERT D. BERKUN | 501 JOHN JAMES AUDUBON PKWY | STE 300 | BUFFALO | NY | 14226-1143 |
| LUDLOW COMPOSITES CORP. | PO BOX 771956 | | | | DETROIT | MI | 48277-1956 |
| LUIS MOLINA ACEDO, S.A. | ARTISTIC SILVER | JUSTO DORADO, 12 | | | MADRID | | 28040 |
| LUX MUNDI | 15958 OCEAN AVENUE | SUITE 12 | | | BOHEMIA | NY | 11716 |
| LUZ M. RAMOS | 2 KIRBY AVENUE | | | | BUFFALO | NY | 14218 |
| LW GRAPHICS | 2175 STALEY ROAD | | | | GRAND ISLAND | NY | 14072 |
| M&T BANK | ATTN: CALVIN LEUNG | 345 MAIN ST. | | | BUFFALO | NY | 14203 |
| MACKENZIE HUGHES, LLP | ATTN: NEIL J. SMITH | 440 SOUTH WARREN ST | SUITE 400 | | SYRACUSE | NY | 13202 |
| MAILFINANCE | 25881 NETWORK PLACE | | | | CHICAGO | IL | 60673-1258 |
| MAILFINANCE | 478 WHEELERS FARMS ROAD | | | | MILFORD | CT | 06461 |
| MAIN FORD GENERAL SUPPLY | PO BOX 60740 | | | | ROCHESTER | NY | 14606-0740 |
| MALHAME COMPANY | 34 WILLIS AVE | | | | MINEOLA | NY | 11501-4406 |
| MALHAME VESTMENT COMPANY | PO BOX 370 | | | | CAMILLUS | NY | 13031-0370 |
| MANUFACTURERS AND TRADERS TRUST COMPANY | ATTN: ESKINDER TEFERA, SPECIAL ASSETS | 1 FOUNTAIN PLAZA, 9TH FLOOR | | | BUFFALO | NY | 14203 |
| MANUFACTURERS AND TRADERS TRUST COMPANY D/B/A M&T BANK | ONE M&T PLAZA | | | | BUFFALO | NY | 14203 |
| MARGARET MARTINEZ | 40 JONES STREET (UPPER) | | | | BUFFALO | NY | 14206 |
| MARIAN EQUILS | C/O VIOLA CUMMINGS & LINDSAY | ATTN: ROBERT VIOLA | 770 MAIN STREET | | NIAGARA FALLS | NY | 14301 |
| MARIAN EQUILS AND TERRY EQUILS | C/O VIOLA, CUMMINGS & LINDSAY, LLP | ATTN: ROBERT VIOLA | 770 MAIN STREET | | NIAGARA FALLS | NY | 14301 |
| MARILYN BROWN | C/O HOGAN WILLING | 2410 NORTH FOREST ROAD | SUITE 301 | | AMHERST | NY | 14068 |
| MARY BETH MCCORMICK, LMHC | 713 LAKE STREET | | | | ANGOLA | NY | 14006 |
| MARY C. CIULLA AND EMANUELE CIULLA | C/O CELLINO & BARNES | ATTN: RICHARD P. AMICO | 350 MAIN STREET | SUITE 2500 | BUFFALO | NY | 14202 |
| MARY CERANSKI | 113 MILL VALLEY COURT | | | | EAST AMHERST | NY | 14051 |
| MARY CERANSKI | C/O LIPSITZ GREEN SCIME CAMBRIA LLP | ATTN: THOMAS M. MERCURE | 42 DELAWARE AVENUE | SUITE 120 | BUFFALO | NY | 14202 |
| MARY CERANSKI, INDIVIDUALLY AND AS PARENT AND NATURAL GUARDIAN OF N.C., AN INFANT | C/O LIPSITZ GREEN SCIME CAMBRIA LLP | ATTN: CHRISTINA CROGLIO | 42 DELAWARE AVENUE | SUITE 120 | BUFFALO | NY | 14202 |
| MARY CIULLA | C/O CELLINO & BARNES | ATTN: RICHARD P. AMICO | 350 MAIN STREET, SUITE 2500 | | BUFFALO | NY | 14202 |
| MARY IMMACULATE ROMAN CATHOLIC PARISH OF PAVILION, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| MARY LYNCH | 635 OXBOW LANE | | | | LEWISTON | NY | 14092 |
| MARY LYNCH | C/O FANIZZI & BARR, P.C. | ATTN: PAUL K. BARR | 7311 NIAGARA FALLS BLVD | | NIAGARA FALLS | NY | 14304 |
| MARY PALMER | 6188 KELLER AVENUE | | | | NEWFANE | NY | 14108 |
| MATTHEW KANDEFER INC. | PO BOX 1046 | | | | TONAWANDA | NY | 14151 |
| MATTHEWS & ASSOCIATES | ATTN: LIZA ROYS AND DAVID P. MATTHEWS | 2905 SACKETT STREET | | | HOUSTON | TX | 77098 |
| MAUREEN PFEIFER | 568 LORETTA STREET | | | | TONAWANDA | NY | 14150 |
| MCVAN COMPANY | 35 FRANK MOSSBERG DRIVE | | | | ATTLEBORO | MA | 02703 |
| MDS | PO BOX 572152 | | | | TARZANA | CA | 91357 |
| MEGAN NIXON | 16614 CLYDESDALE RUN | | | | SCHERTZ | TX | 78154-3927 |
| MERCHANTS INSURANCE GROUP | ATTN: CYNTHIA J. KLEIN | PO BOX 78 | | | BUFFALO | NY | 14240 |
| MERCHANTS MUTUAL INSURANCE COMPANY | 250 MAIN ST | | | | BUFFALO | NY | 14240 |
| MERCHANTS MUTUAL INSURANCE COMPANY | C/O HURWITZ & FINE, PC | ATTN: BRIAN D. BARNAS | 1300 LIBERTY BUILDING | | BUFFALO | NY | 14202 |
| MERSON LAW PLLC | ATTN: ANTIGONE CURIS AND JORDAN MERSON | 950 3RD AVE | STE 1800 | | NEW YORK | NY | 10022-2897 |
| METLIFE | PO BOX 8500-3895 | | | | PHILADELPHIA | PA | 19178-3895 |
| METROPOLITAN CASUALTY INSURANCE COMPANY | 700 QUAKER LANE | | | | WARWICK | RI | 02887 |
| MICHAEL ARNOLD | C/O 795 MAIN STREET | | | | BUFFALO | NY | 14203 |
| MICHAEL JUSTINGER | 2581 GIRDLE ROAD | | | | ELMA | NY | 14059 |
| MICHAEL LEE | 4572 MILLER ROAD | | | | NIAGARA FALLS | NY | 14304 |
| MICHAEL REYES | 225 WEDGEWOOD DR | | | | WILLIAMSVILLE | NY | 14221-1464 |
| MICHAEL SALTARELLI | C/O ST. FRANCIS OF ASSISI | 144 BROAD STREET | | | TONAWANDA | NY | 14150 |
| MICHELLE KOSTEK | 39 QUAIL RUN LANE | | | | LANCASTER | NY | 14086 |
| MICHIGAN MILLERS MUTUAL INSURANCE COMPANY | PO BOX 30060 | | | | LANSING | MI | 48909 |
| MILLENNIUM HOTEL BUFFALO | 2040 WALDEN AVENUE | | | | CHEEKTOWAGA | NY | 14225 |
| MINISTRY TRAINING SOURCE | PO BOX 2786 | | | | SPRINGFIELD | MO | 65801-2786 |
| MISSIONARY OBLATES OF MARY IMMACULATE | ATTN: CARRIE K. HUFF | 1142 S. MICHIGAN AVE | SUITE 5AB | | CHICAGO | IL | 60605 |
| MISSIONARY OBLATES OF MARY IMMACULATE | C/O HARRIS BEACH PLLC | ATTN: LEE E. WOODARD | 333 WEST WASHINGTON STREET | SUITE 200 | SYRACUSE | NY | 13202 |
| MISSIONARY OBLATES OF MARY IMMACULATE EASTERN AMERICAN PROVINCE, INC. | ATTN: CARRIE K. HUFF | 1142 S. MICHIGAN AVE | SUITE 5AB | | CHICAGO | IL | 60605 |
| MISSIONARY OBLATES OF MARY IMMACULATE EASTERN AMERICAN PROVINCE, INC. | C/O HARRIS BEACH PLLC | ATTN: LEE E. WOODARD | 333 WEST WASHINGTON STREET | SUITE 200 | SYRACUSE | NY | 13202 |
| MISSIONARY OBLATES OF MARY IMMACULATE EASTERN PROVINCE, INC. | ATTN: CARRIE K. HUFF | 1142 S. MICHIGAN AVE | SUITE 5AB | | CHICAGO | IL | 60605 |
| MISSIONARY OBLATES OF MARY IMMACULATE EASTERN PROVINCE, INC. | C/O HARRIS BEACH PLLC | ATTN: LEE E. WOODARD | 333 WEST WASHINGTON STREET | SUITE 200 | SYRACUSE | NY | 13202 |
| MISSIONARY OBLATES OF MARY IMMACULATE, OMI, DBA HOLY ANGELS PARISH | C/O HARRIS BEACH PLLC | ATTN: TERRANCE P. FLYNN | 726 EXCHANGE STREET | SUITE 1000 | BUFFALO | NY | 14210 |
| MOLLY PYC | C/O HARDY MARBLE | ATTN: BRADLEY D. MARBLE | 172 EAST AVENUE | | LOCKPORT | NY | 14094 |
| MONASTERY ICONS | PO BOX 1429 | | | | WEST CHESTER | OH | 45071-1429 |
| MORGAN SERVICES, INC. | 325 LOUISIANA STREET | | | | BUFFALO | NY | 14204-2508 |
| MOSS & BARNETT | ATTN: CHARLES EDWIN JONES | 150 SOUTH FIFTH STREET | SUITE 1200 | | MINNEAPOLIS | MN | 55402 |
| MOST PRECIOUS BLOOD ROM. CATH. CHURCH SOCIETY OF ANGOLA | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |



**Exhibit B**
Served Via First-Class Mail

| NAME | ADDRESS 1 | ADDRESS 2 | ADDRESS 3 | ADDRESS 4 | CITY | STATE | ZIP |
|---|---|---|---|---|---|---|---|
| MOTHER OF DIVINE GRACE ROMAN CATHOLIC CHURCH SOCIETY OF CHEEKTOWAGA, NEW YORK | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| MRAK, LLC DBA POINTS NORTH | 371 CANAL PARK DRIVE | SUITE 210 | | | DULUTH | MN | 55802 |
| N.A. CUDECK LTD | 111 FIRE TOWER ROAD | | | | TONAWANDA | NY | 14150 |
| N.A.C. LIMITED | SNOWPLOWING SERVICES | 111 FIRE TOWER ROAD | | | TONAWANDA | NY | 14150 |
| NATIONAL CHURCH GOODS ASSOC. | 800 ROOSEVELT ROAD | BUILDING C, SUITE 312 | | | GLEN ELLYN | IL | 60137 |
| NATIONAL FUEL | ACCOUNT NO. XXXXX21 10, XXXXX27 09, XXXXX25 02, XXXXX26 05, XXXXX34 11, XXXXX90 09, XXXXX85 02, XXXXX38 04, XXXXX71 04, XXXXX19 02, XXXXX69 05, XXXXX37 08, XXXXX12 01 | 409 MAIN ST. | | | BUFFALO | NY | 14203 |
| NATIONAL FUEL | ACCOUNT NO. XXXXX21 10, XXXXX27 09, XXXXX25 02, XXXXX26 05, XXXXX34 11, XXXXX90 09, XXXXX85 02, XXXXX38 04, XXXXX71 04, XXXXX19 02, XXXXX69 05, XXXXX37 08, XXXXX12 01 | PO BOX 371835 | | | PITTSBURGH | PA | 15250-7835 |
| NATIONAL FUEL GAS DISTRIBUTION CORP. | 6363 MAIN STREET | | | | WILLIAMSVILLE | NY | 14221 |
| NATIONAL GRID | 300 ERIE BOULEVARD WEST | | | | SYRACUSE | NY | 13202 |
| NATIONAL GRID | ACCOUNT NO. XXXXX-X4104, XXXXX-X9107 , XXXXX-X4105, XXXXX-X3105, XXXXX-X7101, XXXXX-X0109, XXXXX-X6103, XXXXX-X7102, XXXXX-X4103, | XXXXX-X404, XXXXX-X3111, XXXXX-X8003, XXXXX-X3123, XXXXX-X8102, XXXXX-X6004, XXXXX-X5104 | 300 ERIE BLVD | | WEST SYRACUSE | NY | 13202 |
| NATIONAL PUBLIC SEATING CORP. | PO BOX 371376 | | | | PITTSBURGH | PA | 15250-7376 |
| NATIONAL SURETY CORPORATION | 149 ENTIN ROAD | | | | CLIFTON | NJ | 07014 |
| NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURG, P.A. | 225 W. WASHINGTON STREET | SUITE 1800 | | | CHICAGO | IL | 60606 |
| NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA | 175 WATER STREET | 18TH FLOOR | | | NEW YORK | NY | 10038 |
| NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA | C/O CARLTON FIELDS, PA | 700 NW 1ST AVE | STE 1200 | | MIAMI | FL | 33136-4118 |
| NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA | C/O CARLTON FIELDS, PA | ATTN: ROBERT WAGNER DIUBALDO, MICHAEL MARGULIES & NORA ANNE VALENZA-FROST | 405 LEXINGTON AVENUE | 36TH FLOOR | NEW YORK | NY | 10174-0002 |
| NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA | C/O CORPORATION SERVICE COMPANY | 2595 INTERSTATE DRIVE | SUITE 103 | | HARRISBURG | PA | 17110 |
| NATIONWIDE INSURANCE COMPANY OF AMERICA. | ONE WEST NATIONWIDE BLVD | 1-04-701 | | | COLUMBUS | OH | 43215-2220 |
| NATIONWIDE INSURANCE COMPANY OF AMERICA,EMPLOYERS INSURANCE COMPANY OF WAUSAU (F/K/A EMPLOYERS INSURANCE OF WAUSAU A MUTUAL COMPANY F/K/A EMPLOYERS MUTUAL LIABILITY INSURANCE COMPANY OF WISCONSIN), AND NATIONWIDE MUTUAL INSURANCE COMPANY (F/K/A FARM BUREAU MUTUAL AUTOMOBILE INSURANCE COMPANY) | C/O GOLDBERG SEGALLA LLP | ATTN: ADAM R. DURST, JONATHAN SCHAPP & JEFFREY L. KINGSLEY | 665 MAIN STREET | | BUFFALO | NY | 14203 |
| NATIONWIDE MUTUAL INSURANCE COMPANY (F/K/A FARM BUREAU MUTUAL AUTOMOBILE INSURANCE COMPANY) | ONE WEST NATIONWIDE BLVD | 1-04-701 | | | COLUMBUS | OH | 43215-2220 |
| NATIVITY OF THE BLESSED VIRGIN ROMAN CATHOLIC CHURCH SOCIETY OF BUFFALO | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| NATIVITY OF THE BLESSED VIRGIN ROMAN CATHOLIC CHURCH SOCIETY OF HARRIS HILL, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| NELSON FINE ART & GIFTS | 980 LINCOLN AVENUE | | | | STEUBENVILLE | OH | 43952 |
| NETWORK OF RELIGIOUS COMMUNITIES | C/O REV. DR. G. STANDORD BRATTON | 1272 DELAWARE AVENUE | | | BUFFALO | NY | 14209-2401 |
| NEW ENGLAND INSURANCE COMPANY (F/K/A NEW ENGLAND REINSURANCE CORPORATION) | 100 HIGH STREET | | | | BOSTON | MA | 02110 |
| NEW HAMPSHIRE INSURANCE COMPANY | 175 WATER STREET | 18TH FLOOR | | | NEW YORK | NY | 10038 |
| NEW HAMPSHIRE INSURANCE COMPANY (F/K/A MAINLAND INSURANCE COMPANY, SUCCESSOR-IN-INTEREST TO NEW YORK CASUALTY INSURANCE COMPANY) | HARLEYSVILLE INSURANCE COMPANY OF NEW YORK | PO BOX 182144 | | | COLUMBUS | OH | 43218-2144 |
| NEW YORK CENTRAL MUTUAL FIRE INSURANCE COMPANY | CENTRAL PLAZA EAST | | | | EDMESTON | NY | 13335 |
| NEW YORK STATE CATHOLIC CONFERENCE | 465 STATE STREET | | | | ALBANY | NY | 12203-1004 |
| NEW YORK STATE DEPARTMENT OF LABOR | C/O UNEMPLOYMENT INSURANCE DIVISION | GOVERNOR W. AVERELL HARRIMAN STATE OFFICE CAMPUS | BUILDING 12 | ROOM 256 | ALBANY | NY | 12240 |
| NEWGENERATION SOFTWARE, INC. | 3835 NORTH FREEWAY BOULEVARD, SUITE | | | | SACRAMENTO | CA | 95834 |
| NEWTON DISTRIBUTING CO., INC. | 245 WEST DISTRIBUTING COMPANY | | | | NATICK | MA | 01760 |
| NGM INSURANCE COMPANY (SUCCESSOR-IN-INTEREST TO NATIONAL GRANGE MUTUALI NSURANCE COMPANY) | 4601 TOUCHTON ROAD EAST | SUITE 3400 | | | JACKSONVILLE | FL | 32246 |
| NIAGARA AQUARIUM FOUNDATION | 701 WHIRLPOOL STREET | | | | NIAGARA FALLS | NY | 14301 |
| NIAGARA CATHOLIC JUNIOR SENIOR HIGH SCHOOL | C/O CONNORS LLP | ATTN: RANDALL WHITE | 1000 LIBERTY BUILDING | 424 MAIN STREET | BUFFALO | NY | 14202 |
| NIAGARA FALLS CATHOLIC SCHOOLS NETWORK | C/O CONNORS LLP | ATTN: RANDALL WHITE | 1000 LIBERTY BUILDING | 424 MAIN STREET | BUFFALO | NY | 14202 |
| NIAGARA FALLS WATER BOARD | ACCOUNT NO. XXXXXXX04-001 | 745 MAIN STREET | | | NIAGARA FALLS | NY | 14302-1950 |
| NIAGARA FALLS WATER BOARD | ACCOUNT NO. XXXXXXX04-001 | PO BOX 1950 | | | NIAGARA FALLS | NY | 14302-1950 |
| NOELLE CERANSKI | 113 MILL VALLEY COURT | | | | EAST AMHERST | NY | 14051 |
| NORTH RIVER INSURANCE COMPANY | 305 MADISON AVENUE | P.O. 1973 | | | MORRISTOWN | NJ | 07960 |
| NORTH WEST BANK | PO BOX 128 | | | | WARREN | PA | 16365 |
| NORTHERN CHAUTAUQUA CATHOLIC SCHOOL | C/O ELSAESSER ANDERSON, CHTD. | ATTN: FORD ELSAESSER, JR | 414 CHURCH STREET | SUITE 201 | SANDPOINT | ID | 83864 |
| NORTHERN CHAUTAUQUA CATHOLIC SCHOOL | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY P. LYSTER | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| NORTHERN CHAUTAUQUA CATHOLIC SCHOOL, DUNKIRK, NY | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| NOTRE DAME HIGH SCHOOL OF BATAVIA | 73 UNION STREET | | | | BATAVIA | NY | 14020 |
| NYS OFFICE OF PARKS RECREATION | HISTORIC PRESERVATION | | | | SALAMANCA | NY | 14779 |
| NYS OFFICE OF PARKS, RECREATION & HISTORIC PRESERVATION | 625 BROADWAY | | | | ALBANY | NY | 12207 |
| NYSEG | ACCOUNT NO. XXXX-XXX3-765 | PO BOX 5240 | | | BINGHAMTON | NY | 13902-5204 |
| NYSEG | ACCOUNT NO. XXXX-XXX3-765 | PO BOX 847812 | | | BOSTON | MA | 02284-7812 |
| OASIS PROPERTY SERVICE LLC | 1035 NEW ROAD | | | | WEST AMHERST | NY | 14228 |
| O'BRIEN & FORD PC | ATTN: CHRISTOPHER J. O'BRIEN | 4549 MAIN ST | SUITE 201 | | BUFFALO | NY | 14226 |
| OCO INTERNATIONAL | PO BOX 376 | | | | NEWPORT | VT | 05855 |
| OFFICE DEPOT | PO BOX 633204 | | | | CINCINNATI | OH | 45263-3204 |
| OFFICIAL COMMITTEE OF UNSECURED CREDITORS | C/O PACHULSKI STANG ZIEHL & JONES LLP | ATTN: ILAN SCHARF, JAMES STANG, PETER KEANE, KEN BROWN, BRITTANY MICHAEL, IAIN NASATIR, JOHN FIERO, AND STEVEN GOLDEN | 919 N. MARKET STREET 17TH FLOOR | | WILMINGTON | DE | 19801 |
| OLD ST. PATRICK'S, BUFFALO | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| OLEAN 2020, LLC | 295 MAIN STREET, SUITE 700 | | | | BUFFALO | NY | 14203 |
| O'MELVENY & MYERS LLP | ATTN: TANC SCHIAVONI AND MATTHEW HINKER | TIMES SQUARE TOWER | 7 TIMES SQUARE | | NEW YORK | NY | 10036 |
| OMNI UNDERWRITING MANAGERS LLC | PO BOX 62937 | | | | VIRGINIA BEACH | VA | 23466 |
| ONE LICENSE | 7343 S MASON AVENUE | | | | CHICAGO | IL | 60638 |



**Exhibit B**
Served Via First-Class Mail

| NAME | ADDRESS 1 | ADDRESS 2 | ADDRESS 3 | ADDRESS 4 | CITY | STATE | ZIP |
|---|---|---|---|---|---|---|---|
| ONE LICENSE, LLC | 7343 S. MASON AVENUE | | | | CHICAGO | IL | 60638 |
| ORBIS BOOKS | PO BOX 301 | | | | MARYKNOLL | NY | 10545-0301 |
| ORDER OF ST. PAUL, FIRST HERMIT - THE PAULINE FATHERS, DBA CORPUS CHRISTI PARISH | C/O CONNORS LLP | ATTN: RANDALL WHITE | 1000 LIBERTY BUILDING | 424 MAIN STREET | BUFFALO | NY | 14202 |
| OREGON CATHOLIC PRESS | PO BOX 35147 #3368 | | | | SEATTLE | WA | 98124-5147 |
| ORKIN | 15 HAZELWOOD DR | STE 110 | | | BUFFALO | NY | 14228-2229 |
| ORLANDI STATUARY, INC. | 1801 NORTH CENTRAL PARK AVENUE | | | | CHICAGO | IL | 60647 |
| ORVILLE'S APPLIANCES | 4555 N. BAILEY AVENUE | | | | AMHERST | NY | 14226 |
| OUR LADY HELP OF CHRISTIANS ROMAN CATHOLIC CHURCH OF CHEEKTOWAGA, NEW YORK | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| OUR LADY HELP OF CHRISTIANS, EAST BENNINGTON | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| OUR LADY OF ANGELS ROMAN CATHOLIC CHURCH SOCIETY OF CUBA | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| OUR LADY OF BISTRICA ROMAN CATHOLIC CHURCH SOCIETY OF LACKAWANNA, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| OUR LADY OF BLACK ROCK SCHOOL, BUFFALO, NY | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| OUR LADY OF CHARITY CATHOLIC PARISH, BUFFALO | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| OUR LADY OF CZESTOCHOWA RC CHURCH | 63 CENTER AVENUE | | | | NORTH TONAWANDA | NY | 14120 |
| OUR LADY OF CZESTOCHOWA ROMAN CATHOLIC CHURCH SOCIETY OF FORKS | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| OUR LADY OF CZESTOCHOWA ROMAN CATHOLIC CHURCH SOCIETY OF NORTH TONAWANDA, NEW YORK | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| OUR LADY OF FATIMA ROMAN CATHOLIC CHURCH SOCIETY OF ELBA, NEW YORK | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| OUR LADY OF FATIMA SHRINE | PO BOX 167 | | | | YOUNGSTOWN | NY | 14174-0167 |
| OUR LADY OF GOOD COUNSEL ROMAN CATHOLIC CHURCH SOCIETY OF DARIEN CENTER, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| OUR LADY OF GRACE MARY ROMAN CATHOLIC CHURCH SOCIETY OF WOODLAWN, NEW YORK | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| OUR LADY OF HOPE ROMAN CATHOLIC PARISH OF BUFFALO, NEW YORK | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| OUR LADY OF LEBANON ROMAN CATHOLIC CHURCH SOCIETY OF NIAGARA FALLS | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| OUR LADY OF LORETTO ROMAN CATHOLIC CHURCH SOCIETY OF BUFFALO, NEW YORK, INCORPORATED | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| OUR LADY OF LORETTO ROMAN CATHOLIC CHURCH SOCIETY OF FALCONER, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| OUR LADY OF LOURDES ROMAN CATHOLIC SOCIETY OF BEMUS POINT, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| OUR LADY OF LOURDES, BUFFALO | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| OUR LADY OF MERCY ROMAN CATHOLIC PARISH OF LEROY, NEW YORK | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| OUR LADY OF MOUNT CARMEL ROMAN CATHOLIC CHURCH SOCIETY OF NIAGARA FALLS, NEW YORK | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| OUR LADY OF MOUNT CARMEL ROMAN CATHOLIC CHURCH SOCIETY OF SILVER CREEK, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| OUR LADY OF MT. CARMEL ROMAN CATHOLIC CHURCH SOCIETY OF BRANT, NEW YORK | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| OUR LADY OF MT. CARMEL, BUFFALO | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| OUR LADY OF PEACE ROMAN CATHOLIC CHURCH PARISH OF SALAMANCA, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| OUR LADY OF PEACE ROMAN CATHOLIC CHURCH SOCIETY OF CLARENCE | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| OUR LADY OF PERPETUAL HELP ROMAN CATHOLIC CHURCH SOCIETY OF BUFFALO, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| OUR LADY OF PERPETUAL HELP ROMAN CATHOLIC CHURCH SOCIETY OF LAKEVIEW | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| OUR LADY OF POMPEII ROMAN CATHOLIC CHURCH OF LANCASTER | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| OUR LADY OF THE BLESSED SACRAMENT CHURCH SOCIETY OF DEPEW, NEW YORK | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| OUR LADY OF THE LAKE ROMAN CATHOLIC PARISH OF BARKER AND LYNDONVILLE, N.Y | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| OUR LADY OF THE ROSARY ROMAN CATHOLIC CHURCH SOCIETY OF NIAGARA FALLS, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| OUR LADY OF THE SACRED HEART | 3146 ABBOTT ROAD | | | | ORCHARD PARK | NY | 14127 |
| OUR LADY OF THE SACRED HEART ROMAN CATHOLIC CHURCH SOCIETY OF COLDEN, NEW YORK | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| OUR LADY OF THE SACRED HEART ROMAN CATHOLIC CHURCH SOCIETY OF HAMBURG, NEW YORK | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| OUR LADY OF THE SNOWS ROMAN CATHOLIC CHURCH SOCIETY OF PANAMA, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| OUR LADY OF VICTORY HOMES OF CHARITY | ATTN: MELINDA BUCKLEY | 780 RIDGE ROAD | | | LACKAWANNA | NY | 14218 |
| OUR LADY OF VICTORY HOMES OF CHARITY | ATTN: MELINDA BUCKLEY, CFO | 780 RIDGE ROAD | | | LACKAWANNA | NY | 14218 |
| OUR LADY OF VICTORY HOMES OF CHARITY | C/O PHILLIPS LYTLE LLP | ATTN: ANGELA Z MILLER | 125 MAIN STREET | | BUFFALO | NY | 14203 |
| OUR LADY OF VICTORY HOMES OF CHARITY | C/O PHILLIPS LYTLE LLP | ATTN: ANGELA Z. MILLER | 125 MAIN STREET | | BUFFALO | NY | 14203 |
| OUR LADY OF VICTORY HOMES OF CHARITY, DBA OLV CHARITIES | 780 RIDGE ROAD | | | | LACKAWANNA | NY | 14218 |
| OUR LADY OF VICTORY INSTITUTIONS, INC. | C/O PHILLIPS LYTLE LLP | ONE CANALSIDE | 125 MAIN STREET | | BUFFALO | NY | 14203 |
| OUR LADY OF VICTORY NATIONAL SHRINE | 767 RIDGE ROAD | | | | LACKAWANNA | NY | 14218 |
| OUR LADY OF VICTORY NATIONAL SHRINE, LACKAWANNA | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| OUR LADY OF VICTORY ROMAN CATHOLIC CHURCH SOCIETY OF FREWSBURG, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| OUR MOTHER OF GOOD COUNSEL ROMAN CATHOLIC CHURCH SOCIETY OF BLASDELL, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| OUR SUNDAY VISITOR PUBLISHING | PO BOX 4013 | | | | CAROL STREAM | IL | 60197-4013 |
| P&A ADMINISTRATIVE SERVICES, INC. | 6400 MAIN ST | STE 210 | | | WILLIAMSVILLE | NY | 14221-5803 |
| P&A GROUP | 6400 MAIN ST | STE 210 | | | WILLIAMSVILLE | NY | 14221-5803 |
| PAETEC COMMUNICATIONS, INC. | 20 S CLINTON AVE | | | | ROCHESTER | NY | 14604-1715 |
| PAETEC COMMUNICATIONS, INC. | 300 PEARL STREET | | | | BUFFALO | NY | 14202 |



**Exhibit B**
Served Via First-Class Mail

| NAME | ADDRESS 1 | ADDRESS 2 | ADDRESS 3 | ADDRESS 4 | CITY | STATE | ZIP |
|---|---|---|---|---|---|---|---|
| PALIARE ROLAND ROSENBERG ROTHSTEIN LLP | ATTN: ANDREW LOKAN | 155 WELLINGTON STREET WEST 35TH FLOOR | | | TORONTO | ON | M5V 3H1 |
| PALM GARDENS, INC. | PO BOX 428 | | | | ALAMO | TX | 78516-0428 |
| PARISH STEERING COMMITTEE | C/O ELSAESSER ANDERSON, CHTD. | ATTN: J. FORD ELSAESSER | 535 HIGH STREET | | PRIEST RIVER | ID | 83856 |
| PATRICK SHEA | 170 RICE ROAD | | | | ELMA | NY | 14049 |
| PAUL WEISENBURGER | 105 BERNICE DRIVE | | | | BUFFALO | NY | 14225 |
| PAULINE BOOKS AND MEDIA | 50 SAINT PAUL'S AVENUE | | | | BOSTON | MA | 02130-3491 |
| PAULIST PRESS | 997 MACARTHUR BOULEVARD | | | | MAHWAH | NJ | 07430 |
| PAWTUCKET INSURANCE COMPANY | 25 MAPLE ST | | | | PAWTUCKET | RI | 02862 |
| PAWTUCKET INSURANCE COMPANY | C/O HAGERTY & BRADY | ATTN: MICHAEL A. BRADY | 69 DELAWARE AVE. | SUITE 1010 | BUFFALO | NY | 14202-3875 |
| PB-3 DOE | C/O FANIZZI & BARR. P.C. | ATTN: PAUL K. BARR | 7311 NIAGARA FALLS BLVD | | NIAGARA FALLS | NY | 14304 |
| PB-3 DOE | C/O PHILLIPS & PAOLICELLI, LLP | ATTN: DIANE M. PAOLICELLI | 747 3RD AVENUE, 6TH FLOOR | | NEW YORK | NY | 10017 |
| PB-4 DOE | C/O FANIZZI & BARR, P.C. | ATTN: PAUL K. BARR | 7311 NIAGARA FALLS BLVD | | NIAGARA FALLS | NY | 14304 |
| PB-4 DOE | C/O PHILLIPS & PAOLICELLI, LLP | ATTN: DIANE M. PAOLICELLI | 747 3RD AVENUE, 6TH FLOOR | | NEW YORK | NY | 10017 |
| PEERLESS INSURANCE COMPANY | 175 BERKELEY STREET | | | | BOSTON | MA | 02116 |
| PEMA USA LMII CORPORATION | 1560 GULF BLVD UNIT 1006 | | | | CLEARWATER BEACH | FL | 33767-2982 |
| PENCO PRODUCTS | PO BOX 901176 | | | | CLEVELAND | OH | 44190 |
| PENNSYLVANIA LUMBERMENS MUTUAL INSURANCE COMPANY | ONE COMMERCE SQUARE | 2005 MARKET STREET, SUITE 1200 | | | PHILADELPHIA | PA | 19103-7008 |
| PEP INDUSTRIES | 725 NORTH WISCONSON AVENUE | | | | VILLA PARK | IL | 60181 |
| PHIL CHRISTNER | 691 CLEVELAND DRIVE | | | | BUFFALO | NY | 14225 |
| PHOENIX & LONDON ASSURANCE LIMITED | CONTINENTAL INSURANCE COMPANY | 151 N. FRANKLIN STREET | | | CHICAGO | IL | 60606 |
| PHOENIX INSURANCE COMPANY | ONE TOWER SQUARE | | | | HARTFORD | CT | 06115 |
| PHOENIX MANAGEMENT SERVICES, LLC | ATTN: RICHARD SZEKELYI | 1382 W. 9TH STREET | SUITE 310 | | CLEVELAND | OH | 44113 |
| PLAN ADMINISTRATOR, LLC | PO BOX 413 | | | | SOMERS | CT | 06071-0413 |
| PORTVILLE, WESTON MILLS | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| POVINELLI CUTLERY & SHARPENING SERVICES INC | 5439 LEETE RD | | | | LOCKPORT | NY | 14094-1245 |
| PRINCE OF PEACE ROMAN CATHOLIC CHURCH SOCIETY AND ST. CHARLES BORROMEO CHAPEL, NIAGARA FALLS | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| PRINTERY HOUSE | U.S. HIGHWAY 136 AT COUNTY ROAD VV | PO BOX 12 | | | CONCEPTION | MO | 64433 |
| PROGRESSIVE BRONZE PRODUCTS | 4670 AZALEA DR | | | | NAPLES | FL | 34119-9060 |
| PROSOURCE | 2495 GRAND ISLAND BLVD | UNIT 6 | | | GRAND ISLAND | NY | 14072-1796 |
| PROVIDENCE WASHINGTON INSURANCE COMPANY | PO BOX 100165 | | | | COLUMBIA | SC | 29202-3165 |
| QBE INSURANCE CORPORATION AS SUCCESSOR-IN-INTEREST TO UNIGARD INSURANCE COMPANY (AS SUCCESSOR-IN-INTEREST TO JAMESTOWN MUTUAL INSURANCE COMPANY) | C/O GOLDBERG SEGALLA LLP | ATTN: SHARON ANGELINO AND MICHAEL T. GLASCOTT | 665 MAIN STREET | | BUFFALO | NY | 14203 |
| QUALITY BINDERY SERVICES INC | 501 AMHERST ST | | | | BUFFALO | NY | 14207 |
| QUEEN OF ALL SAINTS, LACKAWANNA | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| QUEEN OF ANGELS PARISH | 144 WARSAW STREET | | | | LACKAWANNA | NY | 14218 |
| QUEEN OF ANGELS R.C. CHURCH OF LACKAWANNA, NY | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| QUEEN OF HEAVEN ROMAN CATHOLIC CHURCH SOCIETY OF WEST SENECA, NEW YORK | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| QUEEN OF MARTYRS ROMAN CATHOLIC CHURCH SOCIETY OF CHEEKTOWAGA, NEW YORK | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| QUEEN OF THE MOST HOLY ROSARY, BUFFALO | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| R. J. TOOMEY COMPANY | 1013 VETERANS DRIVE | | | | LEWISBURG | TN | 37091 |
| RANDOM HOUSE, INC. | PO BOX 223384 | | | | PITTSBURGH | PA | 15251-2384 |
| RELIGIOUS ART INC. | PO BOX 458 | 170 WILBUR PLACE, SUITE 400 | | | BOHEMIA | NY | 11716 |
| REMOTEPC DIVISION | 26115 MUREAU ROAD, SUITE A | | | | CALABASAS | CA | 91302 |
| REPUBLIC SERVICES | ACCOUNT NO. X-XXXX- XXX7998, X-XXXX-XXX8002, X-XXXX-XXXXX1998, X-XXXX-XXX8009, X-XXXX-XXX6192, X-XXXX-XXX7988 | 5600 NIAGARA FALLS BLVD | | | NIAGARA FALLS | NY | 14304-1532 |
| REPUBLIC SERVICES #111 | ACCOUNT NO. X-XXXX- XXX7998, X-XXXX-XXX8002, X-XXXX-XXXXX1998, X-XXXX-XXX8009, X-XXXX-XXX6192, X-XXXX-XXX7988 | PO BOX 9001099 | | | LOUISVILLE | KY | 40290-1099 |
| REPUBLIC SERVICES #111 | PO BOX 9001099 | | | | LOUISVILLE | KY | 40290-1099 |
| RESURRECTION ROMAN CATHOLIC CHURCH SOCIETY OF CHEEKTOWAGA, NEW YORK | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| RESURRECTION ROMAN CATHOLIC PARISH OF BATAVIA, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| REV PATRICK ZENGIERSKI | 1219 ELMWOOD AVE | | | | BALO | NY | 14222 |
| REV ROY HERBERGER | 15 GREENWICH DRIVE | APT 2 | | | EAST AMHERST | NY | 14228 |
| REV. SEAN PAUL FLEMING | 50 FRANKLIN ST. | | | | BUFFALO | NY | 14202 |
| REV. VINCENT BECKER | 3532 ROUTE 77 | | | | VARYSBURG | NY | 14167 |
| REV.CHARLES E. SLISZ | 125 EDWARD ST. | APT 1C | | | BUFFALO | NY | 14201 |
| RGIS LLC | 345 OWEN LN | STE 131 | | | WACO | TX | 76710-5587 |
| RICHARD LACROIX | 233 OVERBROOK AVE. | | | | TONAWANDA | NY | 14150 |
| RICHARD MALONE | C/O THE DIOCESE OF BUFFALO, N.Y. | 795 MAIN STREET | | | BUFFALO | NY | 14203 |
| RICHARD SUCHAN | 795 MAIN STREET | | | | BUFFALO | NY | 14203 |
| RISKONNECT CLEARSIGHT LLC | PO BOX 1500 | | | | CAROL STREAM | IL | 60132 |
| RITA HAYEK | C/O THE GARAS LAW FIRM, LLP | ATTN: JOHN C. GARAS | 8203 MAIN STREET | SUITE 13 | WILLIAMSVILLE | NY | 14221 |
| RIVKIN RADLER LLP | ATTN: BRIAN ADE AND PAUL GORFINKEL | 25 MAIN STREET | COURT PLAZA NORTH | | HACKENSACK | NJ | 07601 |
| ROBERT BARRY | C/O DOLCE PANEPINTO, PC | ATTN: MARC C. PANEPINTO | 1260 DELAWARE AVENUE | | BUFFALO | NY | 14209 |
| ROBERT F. GAISER, INC. | BOX 807 | 292 MAIN STREET | | | BUTLER | RN | 07405 |
| ROBERT L. KISTLER SERVICE CORP. | 300 MILE CROSSING BOULEVARD | | | | ROCHESTER | NY | 14624 |
| ROBERT MARK AUDIO | 93 GROELL AVENUE | | | | CHEEKTOWAGA | NY | 14227 |
| ROBERT SMITH FURNITURE | 1013 VETERANS DRIVE | | | | LEWISBURG | TN | 37901 |
| ROMAN CATHOLIC CHURCH OF ST. MARY'S, EAST ARCADE | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ROMAN CATHOLIC DIOCESE OF ALBANY | 40 NORTH MAIN AVENUE | | | | ALBANY | NY | 12203 |
| ROMAN, INC. | 8027 SOLUTIONS CENTER | | | | CHICAGO | IL | 60677-8000 |
| RONALD MIERZWA | ADDRESS REDACTED | | | | ELLICOTTVILLE | NY | 14731 |
| ROYAL GLOBE INSURANCE COMPANY | ROYAL INSURANCE COMPANY OF AMERICA | PO BOX 1000 | | | CHARLOTTE | NC | 28201-1000 |
| RSUI INDEMNITY COMPANY (SUCCESSOR-IN-INTEREST TO BUFFALO INSURANCE COMPANY) | 945 EAST PACES FERRY ROAD | SUITE 1800 | | | ATLANTA | GA | 30326-1125 |
| RUFUS COLE JR. | 141 ORLEANS STREET | | | | BUFFALO | NY | 14211 |



**Exhibit B**
Served Via First-Class Mail

| NAME | ADDRESS 1 | ADDRESS 2 | ADDRESS 3 | ADDRESS 4 | CITY | STATE | ZIP |
|---|---|---|---|---|---|---|---|
| RYAN SERVICES, LLC D/B/A UPSTATE REPAIRS | 325 FLETCHER STREET | | | | TONAWANDA | NY | 14150 |
| S.S. PETER & PAUL'S GERMAN CATHOLIC CHURCH HAMBURG N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| SACRED HEART MISSION, KNAPP CREEK | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| SACRED HEART OF JESUS | 5337 GENESEE STREET | | | | BOWMANSVILLE | NY | 14026-1098 |
| SACRED HEART OF JESUS ROMAN CATHOLIC CHURCH SOCIETY OF BOWMANSVILLE, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| SACRED HEART ROMAN CATHOLIC CHURCH SOCIETY OF ANGELICA, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| SACRED HEART ROMAN CATHOLIC CHURCH SOCIETY OF BENNINGTON, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| SACRED HEART ROMAN CATHOLIC CHURCH SOCIETY OF FRIENDSHIP | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| SACRED HEART ROMAN CATHOLIC CHURCH SOCIETY OF LAKEWOOD, NEW YORK | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| SACRED HEART ROMAN CATHOLIC CHURCH SOCIETY OF MEDINA, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| SACRED HEART ROMAN CATHOLIC CHURCH SOCIETY OF PORTVILLE, NEW YORK | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| SACRED HEART ROMAN CATHOLIC CHURCH SOCIETY OF SUSPENSION BRIDGE, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| SACRED HEART, BUFFALO | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| SACRED HEART, DUNKIRK | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| SAFEGUARD | PO BOX 88043 | | | | CHICAGO | IL | 60680-1043 |
| SAFESPAN SCAFFOLDING, LLC | 252 FILLMORE AVENUE | | | | TONAWANDA | NY | 14150 |
| SAGE SOFTWARE, INC. | 14855 COLLECTIONS CENTER DRIVE | | | | CHICAGO | IL | 60693 |
| SAINT ANTHONY'S ROMAN CATHOLIC CHURCH SOCIETY OF FARNHAM, NEW YORK | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| SAINT ANTHONY'S ROMAN CATHOLIC CHURCH SOCIETY OF FREDONIA NEW YORK | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| SAINT BERNARD'S ROMAN CATHOLIC CHURCH SOCIETY OF BUFFALO, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| SAINT CASIMIR'S ROMAN CATHOLIC CHURCH SOCIETY OF BUFFALO, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| SAINT GEORGE'S ROMAN CATHOLIC CHURCH SOCIETY OF NIAGARA FALLS, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| SAINT GERARD'S ROMAN CATHOLIC CHURCH SOCIETY OF BUFFALO, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| SAINT ISIDORE ROMAN CATHOLIC PARISH OF PERRY, NEW YORK | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| SAINT JOHN GUALBERTUS' ROMAN CATHOLIC CHURCH SOCIETY OF CHEEKTOWAGA, ERIE CO., N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| SAINT JOHN PAUL II ROMAN CATHOLIC PARISH COMMUNITY, LAKEVIEW | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| SAINT JOHN XXIII ROMAN CATHOLIC PARISH OF WEST SENECA, NEW YORK | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| SAINT JUDE THE APOSTLE ROMAN CATHOLIC PARISH OF NORTH TONAWANDA, NEW YORK | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| SAINT MARTIN OF TOURS ROMAN CATHOLIC CHURCH AT BUFFALO, NEW YORK | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| SAINT MARY'S PLACE | 702 TERRACE HEIGHTS | | | | WINONA | MN | 55987-1320 |
| SAINT MAXIMILIAN KOLBE ROMAN CATHOLIC PARISH OF CORFU, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| SAINT PADRE PIO ROMAN CATHOLIC PARISH, OAKFIELD | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| SAINT PATRICK'S ROMAN CATHOLIC CHURCH SOCIETY, FILLMORE | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| SAINT PETER AND SAINT PAUL'S ROMAN CATHOLIC CHURCH OF WHITE CORNERS, HAMBURG | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| SAINTS PETER AND PAUL'S CHURCH OF JAMESTOWN, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| SAINTS PETER AND PAUL'S ROMAN CATHOLIC CHURCH SOCIETY OF WILLIAMSVILLE | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| SAN FRANCIS IMPORTS | 9265 BORDEN AVENUE | | | | SUN VALLEY | CA | 91352 |
| SAN ROCCO ROMAN CATHOLIC CHURCH, HULBERTON | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| SANTANDER CONSUMER USA INC. D/B/A/ CHRYSLER CAPITAL AS SERVICER FOR CCAP AUTO LEASE LTD. | PO BOX 961275 | | | | FORT WORTH | TX | 76161 |
| SCHILLER & KNAPP LLP | ATTN: MARTIN A. MOONEY | 15 CORNELL RD | SUITE 1 | | LATHAM | NY | 12110-1490 |
| SCHINDLER ELEVATOR CORPORATION | 80 CURTWRIGHT DRIVE, SUITE 3 | | | | WILLIAMSVILLE | NY | 14221-7055 |
| SCHOOL SPECIALTY INC. | 32656 COLLECTION CENTER DRIVE | | | | CHICAGO | IL | 60693 |
| SELECTIVE INSURANCE COMPANY OF AMERICA | ATTN: JOHN J. MARCHIONI, PRESIDENT AND CEO | 40 WANTAGE AVENUE | | | BRANCHVILLE | NJ | 07890 |
| SHANNON ROUNSEVILLE | C/O CELLINO & BARNES | ATTN: RICHARD P. AMICO, ESQ | 350 MAIN STREET, SUITE 2500 | | BUFFALO | NY | 14202 |
| SHANNON ROUNSEVILLIE | ATTN: RICHARD P. AMICO | 16 W. MAIN STREET | 6TH FLOOR | | ROCHESTER | NY | 14612 |
| SHAWN ABRAM | 10321 CHESTNUST ST. | | | | DUNKIRK | NY | 14048 |
| SHEILA DUNNIGAN | C/O LAW OFFICES OF ROBERT BERKUN | ATTN: ROBERT D. BERKUN | 501 JOHN JAMES AUDUBON PKWY | STE 300 | BUFFALO | NY | 14228-1143 |
| SHERWIN WILLIAMS CO. | 1470 MAIN STREET | | | | BUFFALO | NY | 14209 |
| SIGMA ACTUARIAL | CONSULTING GROUP INC | | | | BRENTWOOD | TN | 37027 |
| SIMPLEXGRINNEL, LP | ATTN: SANDY LAFFRADO | 27 JACKSON RD | STE 303 | | DEVENS | MA | 01434-4037 |
| SINGER COMPANY | 520 SOUTH FULTON STREET | | | | MOUNT VERNON | NY | 10550 |
| SISTERS OF GOOD SHEPHERD AND THE ROMAN CATHOLIC RELIGIOUS INSTITUTE OF THE RELIGIOUS OF THE GOOD SHEPHERD | C/O ARCHER & GREINER, PC | ATTN: LINDA S. ROTH, ANTHONY D. DOUGHERTY, AND TREVOR A. PRINCE, JR. | 1211 AVENUE OF THE AMERICAS | | NEW YORK | NY | 10036 |
| SISTERS OF MERCY OF THE AMERICAS NEW YORK, PENNSYLVANIA, PACIFIC WEST COMMUNITY INC | C/O PHILLIPS LYTLE LLP | ATTN: RYAN A LEMA | 125 MAIN STREET | | BUFFALO | NY | 14203 |
| SISTERS OF MERCY OF THE AMERICAS NEW YORK, PENNSYLVANIA, PACIFIC WEST COMMUNITY INC | C/O SISTERS OF THE AMERICAS | ATTN: RUTH M THOMAS | 8403 COLESVILLE RD SUITE 400 | | SILVER SPRING | MD | 20910 |
| SISTERS OF OUR LADY OF GOOD SHEPHERD | C/O ARCHER & GREINER, PC | ATTN: ANTHONY DOUGHERTY | 1211 AVENUE OF THE AMERICAS | SUITE 2750 | NEW YORK | NY | 10036 |
| SISTERS OF SAINT FRANCIS OF THE NEUMANN COMMUNITIES | C/O MACKENZIE HUGHES LLP | ATTN: NEIL J. SMITH | 440 SOUTH WARREN ST | SUITE 400 | SYRACUSE | NY | 13202 |
| SISTERS OF ST. FRANCIS OF HOLY NAME PROVINCE, INC | ATTN: JO-ANNE GRABOWSKI | 4421 LOWER RIVER ROAD | | | STELLA NIAGARA | NY | 14144 |
| SISTERS OF ST. FRANCIS OF HOLY NAME PROVINCE, INC. | ATTN: SISTER JO-ANNE GRABOWSKI | 4421 LOWER RIVER ROAD | | | STELLA NIAGARA | NY | 14144 |
| SLABBINCK ART STUDIO | LIEVEN BAUWENSSTRAAT | | | | BRUGES | | 8200 |
| SOCIETY OF OBLATE FATHERS FOR MISSIONS AMONG THE POOR | ATTN: CARRIE K. HUFF | 1142 S. MICHIGAN AVE | SUITE 5AB | | CHICAGO | IL | 60605 |
| SOCIETY OF OBLATE FATHERS FOR MISSIONS AMONG THE POOR | C/O HARRIS BEACH PLLC | ATTN: LEE E. WOODARD | 333 WEST WASHINGTON STREET | SUITE 200 | SYRACUSE | NY | 13202 |
| SOLAR LIBERTY | 6500 SHERIDAN DRIVE | | | | BUFFALO | NY | 14221 |
| SOLIVARI S. R. L. | VIA A CORTI, 29 | SUITE 120 | | | BERGAMO | | 24126 |
| SOPHIA INSTITUTE PRESS | BOX 5284 | | | | MANCHESTER | NH | 03108 |
| SOUTH BUFFALO CATHOLIC NOTRE DAME ACADEMY, BUFFALO, NY | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| SOUTH BUFFALO CATHOLIC SCHOOL NOTRE DAME ACADEMY | C/O ELSAESSER ANDERSON, CHTD. | ATTN: FORD ELSAESSER, JR | 414 CHURCH STREET | SUITE 201 | SANDPOINT | ID | 83864 |
| SOUTH BUFFALO CATHOLIC SCHOOL NOTRE DAME ACADEMY | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY P. LYSTER | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| SOUTHERN TIER CATHOLIC SCHOOL | 921 N UNION ST | | | | OLEAN | NY | 14760-1429 |



**Exhibit B**
Served Via First-Class Mail

| NAME | ADDRESS 1 | ADDRESS 2 | ADDRESS 3 | ADDRESS 4 | CITY | STATE | ZIP |
|---|---|---|---|---|---|---|---|
| SOUTHTOWNS CATHOLIC SCHOOL | 2052 LAKEVIEW ROAD | | | | LAKE VIEW | NY | 14085 |
| SPARTA INSURANCE COMPANY (SUCCESSOR-IN-INTEREST TO AMERICAN EMPLOYERS' INSURANCE COMPANY) | 5 BATTERSON PARK ROAD | 3RD FLOOR | | | FARMINGTON | CT | 06032 |
| SPECTRUM | 1600 DUBLIN RD | | | | COLUMBUS | OH | 43215 |
| SPECTRUM | ACCOUNT NO. XXX-XXXXXXXX1-001, XXX-XXXXXXXX1-001, XXXX9901 | 4145 S. FALKENBURG RD. | | | RIVERVIEW | FL | 33578-8652 |
| SPECTRUM STUDENT PERIODICAL | ACCOUNT NO. XXX-XXXXXXXX1-001, XXX-XXXXXXXX1-001, XXXX9901 | PO BOX 4617 | | | CAROL STREAM | IL | 60197-4617 |
| SPIRIT CATALOG GROUP | ATTN HELENE POLLEY | | | | BUFFALO | NY | 14260 |
| SPORTS SUPPLY GROUP | 3 BLACKSMITH LANE | | | | EAST NORTHPORT | NY | 11731 |
| SRI TAX CONSULTING | PO BOX 660176 | | | | DALLAS | TX | 75266-0176 |
| SS. HYACINTH & HEDWIG, DUNKIRK | 40 SANGELWOOD DRIVE | | | | GETZVILLE | NY | 14068 |
| SS. JOACHIM & ANNE ROMAN CATHOLIC CHURCH OF ATTICA, NEW YORK | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| SS. PETER AND PAUL ROMAN CATHOLIC CHURCH OF DEPEW, NEW YORK | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| SS. RITA AND PATRICK ROMAN CATHOLIC CHURCH SOCIETY OF BUFFALO, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST ANTHONY RC CHURCH | 1030 CENTRAL AVE | | | | DUNKIRK | NY | 14048-3421 |
| ST GREGORY THE GREAT ROMAN CATHOLIC CHURCH SOCIETY OF AMHERST NY | ATTN: REV. LEON J BIERNAT | 200 ST. GREGORY CT | | | WILLIAMSVILLE | NY | 14221 |
| ST GREGORY THE GREAT ROMAN CATHOLIC CHURCH SOCIETY OF AMHERST NY | C/O PHILLIPS LYTLE LLP | ATTN: ANGELA Z MILLER | 125 MAIN STREET | | BUFFALO | NY | 14203 |
| ST JOHN THE BAPTIST SCHOOL | 1085 ENGLEWOOD AVENUE | | | | KENMORE | NY | 14223-1982 |
| ST JOSEPH'S COLLEGIATE INSTITUTE | ATTN: CHRISTOPHER FULCO | 845 KENMORE AVENUE | | | BUFFALO | NY | 14223 |
| ST TIMOTHY | 565 EAST PARK DR | | | | TONAWANDA | NY | 14150 |
| ST. ADALBERT'S ROM. CATH. CHURCH SOCIETY OF BUFFALO, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. AGATHA'S ROMAN CATHOLIC CHURCH SOCIETY OF BUFFALO | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. AGNES CATHOLIC CHURCH SOCIETY | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. ALBERT THE GREAT ROMAN CATHOLIC CHURCH SOCIETY OF NORTH TONAWANDA, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. ALOYSIUS CHURCH OF SPRINGVILLE | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. ALOYSIUS GONZAGA ROMAN CATHOLIC CHURCH SOCIETY OF CHEEKTOWAGA, NEW YORK, INCORPORATED | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. ALOYSIUS PARISH | 190 FRANKLIN STREET | | | | SPRINGVILLE | NY | 14141 |
| ST. ALOYSIUS REGIONAL SCHOOL | 190 FRANKLIN ST | | | | SPRINGVILLE | NY | 14141-1198 |
| ST. AMBROSE'S ROMAN CATHOLIC CHURCH OF BUFFALO | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. AMELIA'S ROMAN CATHOLIC CHURCH SOCIETY OF THE TOWN OF TONAWANDA, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. ANDREW KIM ROMAN CATHOLIC CHURCH, TONAWANDA | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. ANDREW POLISH ROMAN CATHOLIC CHURCH SOCIETY OF THE DIOCESE OF BUFFALO | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. ANDREW'S COUNTRY DAY SCHOOL | 1545 SHERIDAN DRIVE | | | | KENMORE | NY | 14217 |
| ST. ANDREW'S ROMAN CATHOLIC CHURCH | SOCIETY OF TOWN OF TONAWANDA, NY INC. | 1525 SHERIDAN DRIVE | | | BUFFALO | NY | 14217 |
| ST. ANDREW'S ROMAN CATHOLIC CHURCH SOCIETY OF THE TOWN OF TONAWANDA, NEW YORK, INCORPORATED | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. ANN'S FRENCH CHURCH, NIAGARA FALLS | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. ANN'S ROMAN CATHOLIC CHURCH OF BUFFALO, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. ANTHONY OF PADUA PARISH | 160 COURT STREET | | | | BUFFALO | NY | 14202 |
| ST. ANTHONY'S ROMAN CATHOLIC CHURCH SOCIETY OF BATAVIA, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. ANTHONY'S ROMAN CATHOLIC CHURCH SOCIETY OF BUFFALO | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. ANTHONY'S ROMAN CATHOLIC CHURCH SOCIETY OF LACKAWANNA, NEW YORK | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. ANTHONY'S ROMAN CATHOLIC CHURCH SOCIETY OF LIME ROCK, NEW YORK | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. ANTHONY'S ROMAN CATHOLIC CHURCH SOCIETY OF LOCKPORT | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. AUGUSTINE NEGRO MISSION, BUFFALO | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. AUGUSTINE'S ROMAN CATHOLIC CHURCH SOCIETY OF DEPEW, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. AUGUSTINE'S ROMAN CATHOLIC CHURCH SOCIETY OF RAPIDS-CLARENCE CENTER, NEW YORK | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. BARBARA ROMAN CATHOLIC CHURCH SOCIETY, LACKAWANNA | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. BARNABAS ROMAN CATHOLIC CHURCH SOCIETY OF CHEEKTOWAGA, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. BARTHOLOMEW, BUFFALO | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. BENEDICT PARISH | 1317 EGGERT ROAD | | | | EGGERTSVILLE | NY | 14226 |
| ST. BENEDICT ROMAN CATHOLIC CHURCH | 1317 EGGERT ROAD | | | | BUFFALO | NY | 14226 |
| ST. BENEDICT THE MOOR, BUFFALO | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. BENEDICT'S ROMAN CATHOLIC CHURCH SOCIETY OF EGGERTSVILLE | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. BERNADETTE ROMAN CATHOLIC CHURCH OF ARMOR, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. BERNARD'S ROMAN CATHOLIC CHURCH OF YOUNGSTOWN, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. BONAVENTURE'S ROMAN CATHOLIC CHURCH SOCIETY OF ALLEGANY | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. BONAVENTURE'S ROMAN CATHOLIC CHURCH SOCIETY OF WEST SENECA, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. BONIFACE, BUFFALO | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. BRENDAN ON THE LAKE ROMAN CATHOLIC PARISH OF NEWFANE, OLCOTT, AND WILSON | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. BRENDAN'S ROMAN CATHOLIC CHURCH SOCIETY OF ALMOND, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. BRIDGET'S ROM. CATH. CHURCH SOCIETY OF NEWFANE, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. BRIDGET'S ROMAN CATHOLIC CHURCH SOCIETY OF BERGEN, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. BRIGID, BUFFALO | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. BRIGID'S ROMAN CATHOLIC CHURCH SOCIETY OF BERGEN, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. CATHERINE OF SIENA ROMAN CATHOLIC CHURCH SOCIETY OF WEST SENECA, NEW YORK | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. CECILIA'S CHURCH, SHELDON | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. CECILIA'S ROMAN CATHOLIC CHURCH SOCIETY OF OAKFIELD, NEW YORK | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |



**Exhibit B**
Served Via First-Class Mail

| NAME | ADDRESS 1 | ADDRESS 2 | ADDRESS 3 | ADDRESS 4 | CITY | STATE | ZIP |
|---|---|---|---|---|---|---|---|
| ST. CHARLES BORROMEO ROMAN CATHOLIC CHURCH OF OLCOTT | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. CHARLES BORROMEO, NIAGARA FALLS | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. CHARLES ROMAN CATHOLIC CHURCH SOCIETY OF NIAGARA FALLS, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. CHARLES, LACKAWANNA | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. CHRISTOPHER'S ROMAN CATHOLIC CHURCH SOCIETY OF TONAWANDA | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. CLARE ROMAN CATHOLIC CHURCH SOCIETY OF BUFFALO, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. COLUMBA, BUFFALO | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. COLUMBA'S ROMAN CATHOLIC CHURCH SOCIETY OF BUFFALO, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. DOMINIC ROMAN CATHOLIC CHURCH OF CHAUTAUQUA COUNTY | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. EDMUND'S ROMAN CATHOLIC CHURCH OF TONAWANDA, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. ELIZABETH ANN SETON ROMAN CATHOLIC CHURCH SOCIETY OF DUNKIRK, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. ELIZABETH, CHERRY CREEK | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. ELIZABETH'S ROMAN CATHOLIC CHURCH OF BUFFALO, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. FLORIAN'S ROMAN CATHOLIC CHURCH OF BUFFALO, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. FRANCIS CABRINI, COLLINS CENTER | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. FRANCIS CHURCH SOCIETY OF TONAWANDA VILLAGE | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. FRANCIS DE SALES, BUFFALO | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. FRANCIS OF ASSISI ROMAN CATHOLIC CHURCH SOCIETY OF ATHOL SPRINGS, NEW YORK | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. FRANCIS OF ASSISI ROMAN CATHOLIC CHURCH SOCIETY OF BUFFALO | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. FRANCIS' ROMAN CATHOLIC CHURCH SOCIETY OF CORFU, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. GABRIEL'S ROMAN CATHOLIC CHURCH OF BLOSSOM | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. GEORGE'S ROMAN CATHOLIC CHURCH SOCIETY OF JEWETTVILLE, NEW YORK | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. GIANNA MOOLLA PREGNANCY OUTREACH | CHAUTAUQUA COUNTY SATELLITE | 32 MOORE AVENUE | | | FREDONIA | NY | 14063 |
| ST. GREGORY THE GREAT ROMAN CATHOLIC CHURCH SOCIETY OF AMHERST, N.Y. | C/O PHILLIPS LYTLE LLP | ATTN: ANGELA Z. MILLER | 125 MAIN STREET | | BUFFALO | NY | 14203 |
| ST. GREGORY THE GREAT ROMAN CATHOLIC CHURCH SOCIETY OF AMHERST, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. HEDWIG ROMAN CATHOLIC CHURCH SOCIETY OF DUNKIRK, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. HELEN, HINSDALE | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. HYACINTH R.C. CHURCH SOCIETY OF DUNKIRK | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. HYACINTH'S ROMAN CATHOLIC CHURCH SOCIETY OF LACKAWANNA | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. ISAAC JOGUES, SHERMAN | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. ISAAC OF SYRIA SKETE | 25266 PILGRIMS WAY | | | | BOSCOBEL | WI | 53805 |
| ST. ISIDORE'S ROMAN CATHOLIC CHURCH SOCIETY OF EAST OTTO, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. JAMES MAJOR ROMAN CATHOLIC CHURCH SOCIETY OF WESTFIELD, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. JAMES' ROMAN CATHOLIC CHURCH SOCIETY OF BUFFALO, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. JAMES' ROMAN CATHOLIC CHURCH SOCIETY OF DEPEW, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. JAMES' ROMAN CATHOLIC CHURCH SOCIETY OF JAMESTOWN, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. JOACHIM, BUFFALO | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. JOAN OF ARC ROMAN CATHOLIC CHURCH SOCIETY OF PERRYSBURG, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. JOHN BAPTIST ROMAN CATHOLIC CHURCH SOCIETY OF CARROLLTON | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. JOHN BAPTIST'S ROM. CATH. CHURCH SOCIETY OF BOSTON, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. JOHN BOSCO ROMAN CATHOLIC CHURCH SOCIETY OF SHERIDAN, NY | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. JOHN CATHOLIC CHURCH OF ALDEN ERIE COUNTY | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. JOHN DE LA SALLE ROMAN CATHOLIC CHURCH OF LASALLE, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. JOHN DE LASALLE | 8477 BUFFALO AVENUE | | | | NIAGARA FALLS | NY | 14304 |
| ST. JOHN FISHER ROMAN CATHOLIC CHURCH SOCIETY OF SOUTH DAYTON, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. JOHN KANTY ROMAN CATHOLIC CHURCH SOCIETY OF BUFFALO | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. JOHN KANTY ROMAN CATHOLIC SOCIETY | 101 SWINBURNE STREET | | | | BUFFALO | NY | 14212 |
| ST. JOHN MARON ROMAN CATHOLIC CHURCH SOCIETY OF BUFFALO, NEW YORK | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. JOHN NEUMANN | PO BOX 9 | | | | STRYKERSVILLE | NY | 14145 |
| ST. JOHN NEUMANN ROMAN CATHOLIC CHURCH OF WYOMING COUNTY | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. JOHN OF THE CROSS, WHITESVILLE | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. JOHN THE BAPTIST ROMAN CATHOLIC CHURCH, KENMORE, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. JOHN THE BAPTIST SCHOOL | 1085 ENGLEWOOD AVENUE | | | | BUFFALO | NY | 14223-1982 |
| ST. JOHN THE EVANGELIST ROMAN CATHOLIC CHURCH OF BUFFALO, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. JOHN THE EVANGELIST ROMAN CATHOLIC CHURCH SOCIETY OF SINCLAIRVILLE, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. JOHN VIANNEY ROMAN CATHOLIC CHURCH SOCIETY OF ORCHARD PARK, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. JOHN VIANNEY SEMINARY | C/O ELSAESSER ANDERSON, CHTD. | ATTN: FORD ELSAESSER, JR | 414 CHURCH STREET | SUITE 201 | SANDPOINT | ID | 83864 |
| ST. JOHN VIANNEY SEMINARY | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY P. LYSTER | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. JOHN'S ROMAN CATHOLIC CHURCH SOCIETY OF JAMESTOWN | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. JOHN'S ROMAN CATHOLIC CHURCH SOCIETY OF OLEAN, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. JOSEPH CATHEDRAL, BUFFALO | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. JOSEPH INVESTMENT FUND, INC. | MODERATOR OF THE CURIA/PRES. | 795 MAIN STREET | | | BUFFALO | NY | 14203 |
| ST. JOSEPH NEW CATHEDRAL, BUFFALO | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. JOSEPH PARISH | 1030 CENTRAL AVE | | | | DUNKIRK | NY | 14048-3421 |
| ST. JOSEPH REGIONAL SCHOOL | 2 SUMMIT STREET | | | | BATAVIA | NY | 14020 |
| ST. JOSEPH ROMAN CATHOLIC CHURCH SOCIETY OF LYNDONVILLE, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. JOSEPH, JAMESTOWN | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. JOSEPHAT'S ROMAN CATHOLIC CHURCH OF CHEEKTOWAGA, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. JOSEPH'S CATH. CHURCH OF HOLLAND | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. JOSEPH'S COLLEGIATE INSTITUTE | ATTN: CHRISTOPHER FULCO | 845 KENMORE AVENUE | | | BUFFALO | NY | 14604 |
| ST. JOSEPH'S R.C. CHURCH SOCIETY OF ALBION | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. JOSEPH'S ROM. CATH. CHURCH SOCIETY OF BATAVIA, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. JOSEPH'S ROMAN CATHOLIC CHURCH SOCIETY OF SCIO, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. JOSEPH'S ROMAN CATHOLIC CHURCH OF BUFFALO PLAINS | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |



**Exhibit B**
Served Via First-Class Mail

| NAME | ADDRESS 1 | ADDRESS 2 | ADDRESS 3 | ADDRESS 4 | CITY | STATE | ZIP |
|---|---|---|---|---|---|---|---|
| ST. JOSEPHS ROMAN CATHOLIC CHURCH OF FREDONIA, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. JOSEPH'S ROMAN CATHOLIC CHURCH SOCIETY OF BLISS, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. JOSEPH'S ROMAN CATHOLIC CHURCH SOCIETY OF GOWANDA, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. JOSEPH'S ROMAN CATHOLIC CHURCH SOCIETY OF LEROY, NEW YORK | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. JOSEPH'S ROMAN CATHOLIC CHURCH SOCIETY OF LOCKPORT, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. JOSEPH'S ROMAN CATHOLIC CHURCH SOCIETY OF NORTH TONAWANDA, NEW YORK | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. JOSEPH'S ROMAN CATHOLIC CHURCH SOCIETY OF PERRY (WYOM. CO. NY) | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. JOSEPH'S ROMAN CATHOLIC CHURCH SOCIETY OF VARYSBURG, NEW YORK | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. JOSEPH'S ROMAN CATHOLIC CHURCH, OF NIAGARA FALLS, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. JUDE'S ROMAN CATHOLIC CHURCH SOCIETY OF SARDINIA, NEW YORK | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. KATHARINE DREXEL ROMAN CATHOLIC CHURCH SOCIETY OF BUFFALO, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. LAWRENCE'S ROMAN CATHOLIC CHURCH SOCIETY OF BUFFALO | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. LEO THE GREAT PARISH | 885 SWEET HOME ROAD | | | | AMHERST | NY | 14226 |
| ST. LEO THE GREAT ROMAN CATHOLIC CHURCH, AMHERST, NEW YORK | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. LEO'S ROMAN CATHOLIC CHURCH SOCIETY OF NIAGARA FALLS, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. LOUIS ROMAN CATHOLIC CHURCH OF BUFFALO, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. LUCY, BUFFALO | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. LUKE, BUFFALO | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. MARGARET'S ROMAN CATHOLIC CHURCH SOCIETY OF BUFFALO, NEW YORK | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. MARK'S ROMAN CATHOLIC CHURCH SOCIETY OF BUFFALO, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. MARK'S ROMAN CATHOLIC CHURCH SOCIETY OF KENDALL, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. MARK'S ROMAN CATHOLIC CHURCH SOCIETY OF RUSHFORD, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. MARTHA ROMAN CATHOLIC PARISH OF DEPEW, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. MARTIN DE PORRES ROMAN CATHOLIC CHURCH SOCIETY OF BUFFALO, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. MARTIN OF TOURS | 260 OKELL ST | | | | BUFFALO | NY | 14220-2212 |
| ST. MARTIN'S CHURCH SOCIETY LANGFORD ERIE COUNTY | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. MARY CHAPEL, UK. BYZ., BUFFALO | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. MARY MAGDALENE, BUFFALO | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. MARY OF LOURDES ROMAN CATHOLIC CHURCH SOCIETY OF CHAUTAUQUA | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. MARY OF SORROWS, BUFFALO | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. MARY OF THE ANGELS PARISH | 202 S. UNION STREET | | | | OLEAN | NY | 14760 |
| ST. MARY OF THE IMMACULATE CONCEPTION, NORTH COLLINS | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. MARY QUEEN OF THE ROSARY, STRYKERSVILLE | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. MARY REDEMPTORIST, BUFFALO | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. MARY ROMAN CATHOLIC CHURCH SOCIETY OF ARCADE, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. MARY, DUNKIRK | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. MARY'S CATHOLIC CHURCH SOCIETY OF EAST EDEN | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. MARY'S CATHOLIC CHURCH SOCIETY OF PAVILION, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. MARY'S HIGH SCHOOL | 142 LAVERACK AVENUE | | | | LANCASTER | NY | 14086 |
| ST. MARY'S HIGH SCHOOL | ATTN: NICHOLAS FLUME | 142 LAVERACK AVE | | | LANCASTER | NY | 14086 |
| ST. MARY'S HIGH SCHOOL | C/O PHILLIPS LYTLE LLP | ATTN: ANGELA Z MILLER | 125 MAIN STREET | | BUFFALO | NY | 14203 |
| ST. MARY'S HOSPITAL, EDWARD ST., BUFFALO | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. MARY'S OF THE LAKE ROMAN CATHOLIC CHURCH SOCIETY OF MOUNT VERNON | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. MARY'S R CATHOLIC CHURCH SOCIETY OF NIAGARA FALLS, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. MARY'S ROMAN CATHOLIC CHURCH SOCIETY OF BATAVIA, N.Y | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. MARY'S ROMAN CATHOLIC CHURCH SOCIETY OF BELMONT, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. MARY'S ROMAN CATHOLIC CHURCH SOCIETY OF BOLIVAR, NEW YORK | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. MARY'S ROMAN CATHOLIC CHURCH SOCIETY OF CANASERAGA, NEW YORK | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. MARY'S ROMAN CATHOLIC CHURCH SOCIETY OF CATTARAUGUS, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. MARY'S ROMAN CATHOLIC CHURCH SOCIETY OF HOLLEY | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. MARY'S ROMAN CATHOLIC CHURCH SOCIETY OF LITTLE VALLEY, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. MARY'S ROMAN CATHOLIC CHURCH SOCIETY OF MAYVILLE, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. MARY'S ROMAN CATHOLIC CHURCH SOCIETY OF MEDINA, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. MARY'S ROMAN CATHOLIC CHURCH SOCIETY OF STRYKERSVILLE | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. MARY'S ROMAN CATHOLIC CHURCH SOCIETY OF SWORMVILLE | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. MARY'S ROMAN CATHOLIC CHURCH SOCIETY SILVER SPRINGS, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. MARY'S ROMAN CATHOLIC CHURCH SOCIETY, GASPORT | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. MATTHEW, BUFFALO | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. MATTHIAS ROMAN CATHOLIC CHURCH SOCIETY OF FRENCH CREEK, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. MICHAEL ARCHANGEL ROMAN CATHOLIC CHURCH SOCIETY OF LACKAWANNA | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. MICHAEL THE ARCHANGEL MISSION, WESTON MILLS | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. MICHAEL'S ROMAN CATHOLIC CHURCH SOCIETY OF WARSAW, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. MICHAEL'S ROMAN CATHOLIC SOCIETY OF SOUTH BYRON | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. MONICA, BUFFALO | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. NICHOLAS ROMAN CATHOLIC CONGREGATION OF NORTH JAVA, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. NICHOLAS, BUFFALO | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. PACIFICUS CHURCH & CEMETERY ASSOCIATION OF HUMPHREY | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. PATRICK, BUFFALO | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. PATRICK, LIMESTONE RIDGE | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. PATRICK'S ROM. CATH. CHURCH SOCIETY OF HARTLAND NY | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. PATRICK'S ROMAN CATHOLIC CHURCH OF BELFAST, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. PATRICK'S ROMAN CATHOLIC CHURCH SOCIETY OF BROCTON | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. PATRICK'S ROMAN CATHOLIC CHURCH SOCIETY OF CRITTENDEN, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. PATRICK'S ROMAN CATHOLIC CHURCH SOCIETY OF LIMESTONE, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |



**Exhibit B**
Served Via First-Class Mail

| NAME | ADDRESS 1 | ADDRESS 2 | ADDRESS 3 | ADDRESS 4 | CITY | STATE | ZIP |
|------|-----------|-----------|-----------|-----------|------|-------|-----|
| ST. PATRICK'S ROMAN CATHOLIC CHURCH SOCIETY OF RANDOLPH, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. PATRICK'S ROMAN CATHOLIC CHURCH SOCIETY OF SALAMANCA, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. PATRICK'S ROMAN CATHOLIC CHURCH SOCIETY OF THE CITY OF LOCKPORT | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. PATRICK'S ROMAN CATHOLIC CHURCH SOCIETY OF WHEATVILLE, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. PAUL FIRE AND MARINE INSURANCE COMPANY | ONE TOWER SQUARE | | | | HARTFORD | CT | 06183 |
| ST. PAUL FIRE AND MARINE INSURANCE COMPANY; ST. PAUL MERCURY INSURANCE COMPANY; TRAVELERS CASUALTY AND SURETY COMPANY (SUCCESSOR-IN-INTEREST TO AETNA CASUALTY AND SURETY COMPANY); TRAVELERS INDEMNITY COMPANY (SUCCESSOR-IN-INTEREST TO GULF INSURANCE COMPANY); U.S. FIDELITY AND GUARANTY COMPANY | C/O DENTONS US LLP | ATTN: GEOFFREY M. MILLER | 1221 AVENUE OF THE AMERICAS, STE 25 | | NEW YORK | NY | 10020 |
| ST. PAUL MERCURY INSURANCE COMPANY | ONE TOWER SQUARE | | | | HARTFORD | CT | 06183 |
| ST. PAUL OF THE CROSS ROMAN CATHOLIC CHURCH SOCIETY OF DAYTON, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. PAUL PARISH | 33 VICTORIA BOULEVARD | | | | KENMORE | NY | 14217 |
| ST. PAUL'S BENEVOLENT, EDUCATIONAL AND MISSIONARY INSTITUTE, INC. | C/O BURDEN, HAFNER & HANSEN, LLC | ATTN: SARAH E. HANSEN | 403 MAIN STEET | 605 BRISBANE BUILDING | BUFFALO | NY | 14203 |
| ST. PAUL'S ROMAN CATHOLIC CHURCH SOCIETY OF KENMORE | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. PETER CLAVER NEGRO MISSION, BUFFALO | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. PETER, CARROLLTON | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. PETER'S FRENCH CHURCH, BUFFALO | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. PETER'S HOSPITAL | 800 NIAGARA FALLS BOULEVARD | | | | NORTH TONAWANDA | NY | 14120 |
| ST. PETER'S ROMAN CATHOLIC CHURCH SOCIETY OF LEROY | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. PETER'S ROMAN CATHOLIC CHURCH SOCIETY OF LEWISTON, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. PHILIP THE APOSTLE PARISH | 950 LOSSON ROAD | | | | CHEEKTOWAGA | NY | 14227 |
| ST. PHILIP THE APOSTLE ROMAN CATHOLIC CHURCH SOCIETY OF CHEEKTOWAGA, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. PHILOMENA'S ROMAN CATHOLIC CHURCH SOCIETY OF FRANKLINVILLE, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. PIUS X ROMAN CATHOLIC CHURCH SOCIETY OF TOWN OF AMHERST, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. RAPHAEL PARISH | 3840 MACKLEM AVENUE | | | | NIAGARA FALLS | NY | 14305-1897 |
| ST. RAPHAEL'S ROMAN CATHOLIC PARISH OF NIAGARA FALLS, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. RITA, BUFFALO | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. ROSE OF LIMA ROMAN CATHOLIC CHURCH SOCIETY OF FORESTVILLE | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. ROSE OF LIMA ROMAN CATHOLIC CHURCH SOCIETY OF BUFFALO | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. STANISLAUS CHURCH SOCIETY | 123 TOWNSEND STREET | | | | BUFFALO | NY | 14212 |
| ST. STANISLAUS PARISH, BUFFALO | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. STANISLAUS KOSTKA'S ROMAN CATHOLIC CHURCH SOCIETY OF NIAGARA FALLS, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. STANISLAUS KOSTKA'S ROMAN CATHOLIC CHURCH SOCIETY OF PERRY, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. STEPHEN PROTOMARTYR, AMHERST | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. STEPHEN'S ROM. CATH. CHURCH SOCIETY OF BUFFALO | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. STEPHEN'S ROMAN CATHOLIC CHURCH OF GRAND ISLAND, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. STEPHEN'S ROMAN CATHOLIC CHURCH SOCIETY, MIDDLEPORT | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. TERESA OF THE INFANT JESUS ROMAN CATHOLIC CHURCH OF NIAGARA FALLS | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. TERESA'S ROMAN CATHOLIC CHURCH SOCIETY OF BUFFALO, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. THERESA OF AVILA ROMAN CATHOLIC CHURCH OF AKRON, NY | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. THOMAS AQUINAS' ROMAN CATHOLIC CHURCH SOCIETY OF BUFFALO | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. THOMAS MORE, RIPLEY | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | | | ROCHESTER | NY | 14604 |
| ST. TIMOTHY'S ROMAN CATHOLIC CHURCH SOCIETY OF TONAWANDA, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. VALENTINE'S ROMAN CATHOLIC CHURCH SOCIETY OF BUFFALO | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. VINCENT DE PAUL ROMAN CATHOLIC PARISH OF NIAGARA FALLS, NEW YORK | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. VINCENT DE PAUL, BUFFALO | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. VINCENTS ROMAN CATHOLIC CHURCH OF SPRINGBROOK, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. VINCENT'S ROMAN CATHOLIC CHURCH SOCIETY OF ATTICA, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. VINCENT'S ROMAN CATHOLIC CHURCH SOCIETY OF NORTH EVANS | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| ST. WILLIAM'S ROMAN CATHOLIC CHURCH, WEST SENECA | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| STACY SCHUMACHER | 702 CHARLESGATE CIRCLE | | | | EAST AMHERST | NY | 14051 |
| STATE OF NEW YORK | OFFICE OF PARKS, RECREATION & HISTORIC PRESERVATION | ATTN: MAGGIE A. CLEMENTS | 625 BROADWAY | | ALBANY | NY | 12207 |
| STEVE BOYD, PC | ATTN: STEVE BOYD | 2969 MAIN STREET, SUITE 100 | | | BUFFALO | NY | 14214 |
| STEVEN D ROTH | 795 MAIN ST | | | | BUFFALO | NY | 14203 |
| STONISH'S LAWN CARE & SNOWPLOWING | 79 MEYER ROAD | | | | AMHERST | NY | 14226 |
| STS PETER AND PAUL R.C. CHURCH SOCIETY ARCADE, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| STS. AGATHA AND AMBROSE ROMAN CATHOLIC PARISH OF BUFFALO, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| STS. COLUMBA-BRIGID ROMAN CATHOLIC CHURCH OF BUFFALO, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| STS. PETER AND PAUL'S ROMAN CATHOLIC CHURCH HAMBURG NY | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| SUDBURY BRASS GOODS CO., INC. | C/O CHRISTIAN BRANDS | 1013 VETERANS DRIVE | | | LEWISBURG | TN | 37091 |
| SULLIVAN'S CLEANING & RESTORATION SERV. | 5953 SOUTHWOOD DR | | | | LOCKPORT | NY | 14094-9269 |
| SURDEJ WEB SOLUTIONS | 6 VILLAGE VIEW | | | | LANCASTER | NY | 14086 |
| SYSCO FOOD SERVICES OF SYRACUSE | 2508 WARNERS ROAD | | | | WARNERS | NY | 13164 |
| TAN BOOKS AND PUBLISHERS | PO BOX 269 | | | | GASTONIA | NC | 28053-0269 |
| TERRA SANCTA GUILD | 2031 STOUT DRIVE, UNIT 1 | | | | WARMINISTER | PA | 18974 |
| THE ANNUNCIATION ROMAN CATHOLIC CHURCH SOCIETY OF BUFFALO, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| THE ASCENSION ROMAN CATHOLIC CHURCH SOCIETY OF NORTH TONAWANDA | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| THE ASSUMPTION ROMAN CATHOLIC CHURCH SOCIETY OF ALBION | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| THE ASSUMPTION ROMAN CATHOLIC CHURCH SOCIETY OF PORTAGEVILLE, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| THE BOYS AND GIRLS CLUB OF JAMESTOWN | 62 ALLEN STREET | | | | JAMESTOWN | NY | 14701 |



**Exhibit B**
Served Via First-Class Mail

| NAME | ADDRESS 1 | ADDRESS 2 | ADDRESS 3 | ADDRESS 4 | CITY | STATE | ZIP |
|---|---|---|---|---|---|---|---|
| THE BUFFALO NEWS | ONE NEWS PLAZA | PO BOX 100 | | | BUFFALO | NY | 14240 |
| THE BUFFALO NEWS INC. | DBA TBN MEDIA | | | | TONAWANDA | NY | 14151 |
| THE CANISIUS HIGH SCHOOL OF BUFFALO NY | ATTN: EDWARD C. COSGROVE | 525 DELAWARE AVENUE | | | BUFFALO | NY | 14202 |
| THE CATHOLIC SOCIETY OF ST. MARY'S CHURCH, LOCKPORT | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| THE CHURCH OF ST. MARY OF THE ANGELS, OLEAN | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| THE CHURCH OF THE ASSUMPTION OF LANCASTER, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| THE CONTINENTAL INSURANCE COMPANY | 100 MATSONFORD ROAD | SUITE 200 | | | RADNOR | PA | 19087 |
| THE CONTINENTAL INSURANCE COMPANY | C/O DINO E. ROBUSTO, CHIEF EXECUTIVE OFFICER | 151 N. FRANKLIN STREET | | | CHICAGO | IL | 60606 |
| THE CONTINENTAL INSURANCE COMPANY | C/O PLEVIN & TURNER LLP | ATTN: MARK D. PLEVIN | 580 CALIFORNIA STREET, 12TH FLOOR | | SAN FRANCISCO | CA | 94104 |
| THE CONTINENTAL INSURANCE COMPANY | C/O PLEVIN & TURNER LLP | ATTN: MIRANDA H. TURNER | 1701 PENNSYLVANIA AVE, NW, SUITE 200 | | WASHINGTON | DC | 20006 |
| THE CONTINENTAL INSURANCE COMPANY (SUCCESSOR-IN-INTEREST TO BOSTON OLD COLONY INSURANCE COMPANY, COMMERCIAL INSURANCE COMPANY OF NEWARK, NEW JERSEY (F/K/A COMMERCIAL CASUALTY INSURANCE COMPANY), FIDELITY AND CASUALTY COMPANY OF NEW YORK, GLENS FALLS INSURANCE COMPANY (F/K/A FIDELITY-PHENIX INSURANCE COMPANY), AND LONDON GUARANTEE AND ACCIDENT COMPANY) | CONTINENTAL INSURANCE COMPANY | 151 N. FRANKLIN STREET | | | CHICAGO | IL | 60606 |
| THE DIOCESE OF BUFFALO, N.Y. | C/O BOND, SCHOENECK & KING, PLLC | ATTN: BRENDAN M. SHEEHAN | ONE LINCOLN CENTER | | SYRACUSE | NY | 13202 |
| THE DIOCESE OF BUFFALO, N.Y. | C/O BOND, SCHOENECK & KING, PLLC | ATTN: STEPHEN A. DONATO, CHARLES J. SULLIVAN, GRAYSON T. WALTER | ONE LINCOLN CENTER | | SYRACUSE | NY | 13202-1355 |
| THE FOUNDATION OF THE ROMAN CATHOLIC DIOCESE OF BUFFALO, NY, INC. | C/O HODGSON RUSS LLP | THE GUARANTY BUILDING, SUITE 100 | 140 PEARL STREET | | BUFFALO | NY | 14202-0404 |
| THE GOOD SHEPHERD ROMAN CATHOLIC CHURCH SOCIETY OF PENDLETON, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| THE HARTFORD FINANCIAL SERVICES GROUP (SUCCESSOR-IN-INTEREST TO HARTFORD ACCIDENT AND INDEMNITY COMPANY AND HARTFORD FIRE INSURANCE COMPANY) | HARTFORD ACCIDENT AND INDEMNITY COMPANY | ONE HARTFORD PLAZA | | | HARTFORD | CT | 06155-0001 |
| THE HERMITAGE ART COMPANY, INC. | PO BOX 2499 | | | | ANDERSON | IN | 46018 |
| THE HOLY CROSS ROMAN CATHOLIC CHURCH SOCIETY OF SALAMANCA, NEW YORK | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| THE HOLY FAMILY ROMAN CATHOLIC CHURCH SOCIETY OF THE CITY OF BUFFALO | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| THE HOLY FOURTEEN HELPERS OF THE TOWN OF WEST SENECA, MIDDLE EBENEZER | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| THE HOLY NAME OF MARY ROMAN CATHOLIC CHURCH SOCIETY OF EAST PEMBROKE, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| THE HOLY NAME OF MARY ROMAN CATHOLIC CHURCH SOCIETY OF ELLICOTTVILLE, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| THE HOLY NAME ROMAN CATHOLIC CHURCH SOCIETY OF BUFFALO, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| THE HOME DEPOT | DEPT. 32-2505082358 | PO BOX 78047 | | | PHOENIX | AZ | 85062-8047 |
| THE IMMACULATE CONCEPTION ROMAN CATHOLIC CHURCH SOCIETY OF EAST AURORA, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| THE IMMACULATE CONCEPTION ROMAN CATHOLIC CHURCH SOCIETY OF WELLSVILLE, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| THE KAUFER CO. | 52014TH AVENUE SOUTH | | | | SEATTLE | WA | 98108 |
| THE LAW OFFICE OF FRED LICHTMACHER | ATTN: FRED LICHTMACHER, ESQ. | 116 W 23RD STREET, SUITE 500 | | | NEW YORK | NY | 10011 |
| THE LEAFLET MISSAL COMPANY | 976 W. MINNEHAHA AVENUE | | | | SAINT PAUL | MN | 55104 |
| THE LITURGICAL PRESS | PO BOX 7500 | | | | COLLEGEVILLE | MN | 56321-7500 |
| THE MOST HOLY REDEEMER ROMAN CATHOLIC CHURCH SOCIETY OF CHEEKTOWAGA, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| THE NATIONAL CATHOLIC RISK RETENTION GROUP | 199 MAIN STREET | | | | BURLINGTON | VT | 05402 |
| THE NATIONAL CATHOLIC RISK RETENTION GROUP | C/O JOHNSON & BELL | ATTN: GLENN FENCL | 33 W. MONROE STREET | STE 2700 | CHICAGO | IL | 60603 |
| THE NATIONAL CATHOLIC RISK RETENTION GROUP, INC. | ATTN: DENNIS H. O'HARA, PRESIDENT & CEO | 801 WARRENVILLE ROAD | SUITE 620 | | LISLE | IL | 60532-4348 |
| THE NATIVITY ROMAN CATHOLIC CHURCH SOCIETY OF ORCHARD PARK, NEW YORK | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| THE PRECIOUS BLOOD ROMAN CATHOLIC CHURCH SOCIETY OF BUFFALO, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| THE PROVINCE OF THE MOST HOLY NAME OF JESUS | CHRIST THE KING SEMINARY | ATTN: PROVINCIAL MINISTER | 795 MAIN ST | | BUFFALO | NY | 14203-1215 |
| THE PROVINCE OF THE MOST HOLY NAME OF JESUS, NY | 5877 BIRCH COURT | | | | OAKLAND | CA | 94618 |
| THE QUEEN OF PEACE ROMAN CATHOLIC CHURCH SOCIETY OF BUFFALO | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| THE ROMAN CATHOLIC CHURCH OF ST. FRANCISCUS XAVARIUS, BUFFALO | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| THE ROMAN CATHOLIC INSTITUTE OF THE RELIGIOUS OF THE GOOD SHEPHERD | C/O ARCHER & GREINER, P.C. | ATTN: ANTHONY DOUGHERTY | 1211 AVENUE OF THE AMERICAS | SUITE 2750 | NEW YORK | NY | 10036 |
| THE SACRED HEART OF JESUS ROMAN CATHOLIC CHURCH SOCIETY OF BATAVIA, NEW YORK | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| THE ST. FRANCIS XAVIER GERM. ROM. CATH. CONGREGATION, BUFFALO | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| THE ST. JOHN BAPTIST'S SOCIETY NORTH BUFFALO | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| THE ST. JOHN THE BAPTIST ROMAN CATH CONGREGATION, LOCKPORT | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| THE TRUSTEES OF THE CATHOLIC SOCIETY OF SAINT MARYS CHURCH LOCKPORT | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| THE TUCKER GROUP, LLC | ATTN: GREGORY W. TUCKER | 1723 PARK AVE | | | BALTIMORE | MD | 21217-4336 |
| THE VISITATION ROMAN CATHOLIC CHURCH SOCIETY OF BUFFALO, N.Y. | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| THERESA WALKER | 2485 BAUER ROAD | | | | EDEN | NY | 14057 |
| THYSSENKRUPP ELEVATOR | 245 SUMMIT POINT DRIVE, SUITE | | | | HENRIETTA | NY | 14467 |
| TIERRANET | PO BOX 502010 | | | | SAN DIEGO | CA | 92150-2010 |
| TIG INSURANCE COMPANY (SUCCESSOR-IN-INTEREST TO AMERICAN SURETY COMPANY OF NEW YORK) | 250 COMMERCIAL STREET, SUITE 5000 | | | | MANCHESTER | NH | 03101 |
| TIME WARNER CABLE | ACCOUNT NO. XXX9901, XXXX9901 | 1900 BLUE CREST LANE | | | SAN ANTONIO | TX | 78247 |
| TIME WARNER CABLE | ACCOUNT NO. XXX9901, XXXX9901 | PO BOX 223085 | | | PITTSBURG | PA | 15251-2085 |
| TIME WARNER CABLE | ACCOUNT NO. XXX-XXXXXXXX1-001, XXX-XXXXXXXX1-001, XXX-XXXXXXXX1-001, XXX-XXXXXXXX1-001, XXX-XXXXXXXX5-001, XXX- | 4145 S. FALKENBURG RD. | | | RIVERVIEW | FL | 33578-8652 |



**Exhibit B**
Served Via First-Class Mail

| NAME | ADDRESS 1 | ADDRESS 2 | ADDRESS 3 | ADDRESS 4 | CITY | STATE | ZIP |
|---|---|---|---|---|---|---|---|
| TIME WARNER CABLE | ACCOUNT NO. XXX-XXXXXXX1-001, XXX-XXXXXXXX1-001, XXX-XXXXXXXX1-001, XXX-XXXXXXXX1-001, XXX-XXXXXXX5-001, XXX- | PO BOX 4617 | | | CAROL STREAM | IL | 60197-4617 |
| TIME WARNER CABLE | PO BOX 177 | | | | FREDONIA | NY | 14063-1993 |
| TIME WARNER CABLE | PO BOX 4617 | | | | CAROL STREAM | IL | 60167-4617 |
| TIME WARNER CABLE BUSINESS CLASS | 6601 KIRKVILLE ROAD | | | | EAST SYRACUSE | NY | 13057 |
| TIMOTHY AND KAY ZAYAC | C/O MUSCATO, DIMILLO & VONA, LLP | ATTN: GEORGE V.C. MUSCATO | 107 EAST AVENUE | | LOCKPORT | NY | 14094 |
| TOPS MARKETS LLC | 6592 PAYSPHERE CIRCLE | | | | CHICAGO | IL | 60674-3249 |
| TRANE U.S. INC. | 45 EARHART DRIVE | SUITE 103 | | | BUFFALO | NY | 14221-7809 |
| TRANSFIGURATION ROMAN CATHOLIC CHURCH SOCIETY, OLEAN | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| TRANSFIGURATION, BUFFALO | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| TRAUB LIEBERMAN | ATTN: ERIC D. SUBEN | SEVEN SKYLINE DRIVE | | | HAWTHORNE | NY | 10532 |
| TRAVELER'S INDEMNITY COMPANY (SUCCESSOR-IN-INTEREST TO GULF INSURANCE COMPANY) | ONE TOWER SQUARE | | | | HARTFORD | CT | 06183 |
| TRAVELERS CASUALTY AND SURETY COMPANY (SUCCESSOR- IN-INTEREST TO AETNA CASUALTY AND SURETY COMPANY) | ONE TOWER SQUARE | | | | HARTFORD | CT | 06183 |
| TRI-DELTA RESOURCES | 15 NORTH STREET | | | | CANANDAIGUA | NY | 14424 |
| TRUGREEN COMMERCIAL | 100 MID COUNTY DRIVE | | | | ORCHARD PARK | NY | 14127 |
| TRUGREEN LAWNCARE | 100 MID COUNTY DR | | | | ORCHARD PARK | NY | 14127 |
| TRUSTEES OF ST. PATRICK CHURCH, TOWN OF JAVA | C/O WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER, ESQ. | 1900 BAUSCH & LOMB PLACE | | ROCHESTER | NY | 14604 |
| TURF TEC OF W N.Y., INC. | 5096 LOCKPORT ROAD | | | | LOCKPORT | NY | 14094 |
| TURNER-CARROLL HIGH SCHOOL | C/O CONNORS LLP | ATTN: RANDALL WHITE | 1000 LIBERTY BUILDING | 424 MAIN STREET | BUFFALO | NY | 14202 |
| U.S. FOOD SERVICE, INC. - CASH & CARRY | 136 NIAGARA FRONTIER FOOD TERMINAL | | | | BUFFALO | NY | 14206 |
| U.S. FIDELITY AND GUARANTY COMPANY | ONE TOWER SQUARE | | | | HARTFORD | CT | 06183 |
| U.S. FIRE INSURANCE COMPANY | PO BOX 1973 | | | | MORRISTOWN | NJ | 07962 |
| U.S. FIRE INSURANCE COMPANY AND PACIFIC EMPLOYERS INSURANCE COMPANY | C/O O'MELVENY & MYERS LLP | ATTN: TANCRED V. SCHIAVONI & ADAM P. HABERKORN | 1301 AVENUE OF THE AMERICAS | | NEW YORK | NY | 10019 |
| U.S. FIRE INSURANCE COMPANY AND PACIFIC EMPLOYERS INSURANCE COMPANY | C/O CLYDE & CO US LLP | ATTN: MARIANNE MAY | 340 MT. KEMBLE AVE., SUITE 300 | | MORRISTOWN | NJ | 07960 |
| U.S. PROVINCE OF THE MISSIONARY OBLATES OF MARY IMMACULATE | ATTN: CARRIE K. HUFF | 1142 S. MICHIGAN AVE | SUITE 5AB | | CHICAGO | IL | 60605 |
| U.S. PROVINCE OF THE MISSIONARY OBLATES OF MARY IMMACULATE | C/O HARRIS BEACH PLLC | ATTN: LEE E. WOODARD | 333 WEST WASHINGTON STREET | SUITE 200 | SYRACUSE | NY | 13202 |
| U.S. PROVINCE OF THE MISSIONARY OBLATES OF MARY IMMACULATE | ATTN: CARRIE K. HUFF | 1142 S. MICHIGAN AVE | SUITE 5AB | | CHICAGO | IL | 60605 |
| U.S. PROVINCE OF THE MISSIONARY OBLATES OF MARY IMMACULATE, INC. | C/O HARRIS BEACH PLLC | ATTN: LEE E. WOODARD | 333 WEST WASHINGTON STREET | SUITE 200 | SYRACUSE | NY | 13202 |
| UB SPORTS PROPERTIES, LLC | UBSP C/O UNIVERSITY OF BUFFALO | DIVISION OF ATHLETICS | 102 ALUMNI AREA | | BUFFALO | NY | 14260 |
| ULINE | PO BOX 88741 | | | | CHICAGO | IL | 60680-1741 |
| UNICOM PROTECTION, INC. | 1806 EAST AVENUE | | | | ROCHESTER | NY | 14610 |
| UNIFIRST CORPORATION | 3999 JEFFREY BOULEVARD | | | | BUFFALO | NY | 14219 |
| UNIGARD INSURANCE COMPANY (SUCCESSOR IN INTEREST TO JAMESTOWN MUTUAL INSURANCE COMPANY) | ONE GENERAL DRIVE | | | | SUN PRAIRIE | WI | 53596 |
| UNITED PARCEL SERVICE | PO BOX 809488 | | | | CHICAGO | IL | 60680-9488 |
| US ENVIRONMENTAL PROTECTION AGENCY, REGION 2 | ATTN: DOUGLAS FISCHER, OFFICE OF REGIONAL COUNSEL | 290 BROADWAY, 17TH FLOOR | | | NEW YORK | NY | 10007-1866 |
| USCCB | PO BOX 96429 | | | | WASHINGTON | DC | 20090-6429 |
| VALVOLINE INSTANT OIL CHANGE | BUFFALO LUBE ASSOCIATES LP | 90 EARHART DRIVE, SUITE 4 | | | WILLIAMSVILLE | NY | 14221 |
| VANESSA DEROSA | A/K/A VANESSA DEROSA-WREST | C/O HOGAN WILLING | ATTN: WILLIAM A. LORENZ AND STEVEN M. COHEN | 2410 NORTH FOREST ROAD, SUITE 301 | AMHERST | NY | 14068 |
| VERITAS POLSKA, INC. | 3908 ETHEL AVE | | | | STUDIO CITY | CA | 91604-2203 |
| VERIZON | 500 TECHNOLOGY DRIVE | SUITE 500 | | | SPRING | MO | 63304 |
| VERIZON | ACCOUNT NO. XXX-XXX-XXX- XX01-18, XXX-XXX-XXX-XX01-37, XXX-XXX-XXX-XX01-89, XXXX-XXX-XXX-XX01-33, XXXXXXXX-XX001, XXXX-XXX-XXX-XX01-13, XXX-XXX-XXX-XX01-32, XXX-XXX-XXX-XX01-27 | 500 TECHNOLOGY DR. | SUITE 500 | | WELDON SPRING | MO | 63304 |
| VERIZON | ACCOUNT NO. XXX-XXX-XXX- XX01-18, XXX-XXX-XXX-XX01-37, XXX-XXX-XXX-XX01-89, XXX-XXX-XXX-XX01-33, XXXXXXXX-XX001, XXXX-XXX-XXX-XX01-13, XXX-XXX-XXX-XX01-32, XXX-XXX-XXX-XX01-27 | PO BOX 15124 | | | ALBANY | NY | 12212-5124 |
| VERIZON | PO BOX 408 | | | | NEWARK | NJ | 07101-0408 |
| VETERAN'S SEASONAL SERVICES | 6138 VERSAILLES ROAD | | | | LAKE VIEW | NY | 14085 |
| VIRCO MANUFACTURING CORP. | PO BOX 677010 | | | | DALLAS | TX | 75267-7610 |
| VITEC SOLUTIONS, LLC | 611 JAMISON ROAD, SUITE 4104 | | | | ELMA | NY | 14059 |
| W.D. | C/O HERMAN LAW FIRM, P.A. | ATTN: STEWART S. MERMELSTEIN | 1800 N MILITARY TRL | STE 160 | BOCA RATON | FL | 33431-6386 |
| WADDELL | PO BOX 18 | | | | GREENFIELD | OH | 45123 |
| WALSH DUFFIELD COMPANIES, INC. | 801 MAIN STREET | | | | BUFFALO | NY | 14203 |
| WALSH HUSKIES, LLC | ATTN: JESS ANDERSON, MEMBER | 446 YORK STREET | | | OLEAN | NY | 14760 |
| WAUSAU INSURANCE COMPANIES | 2000 WESTWOOD DRIVE | | | | WAUSAU | WI | 54401 |
| WAUSAU UNDERWRITERS INSURANCE COMPANY | C/O LIBERTY MUTUAL INSURANCE | ATTN: DAVID H. LONG, PRESIDENT | 175 BERKELEY STREET | | BOSTON | MA | 02116 |
| WEAVER METAL & ROOFING INC. | 40 APPENHEIMER AVENUE | | | | BUFFALO | NY | 14214 |
| WEBSTER SZANYI LLP | ATTN: HEATHER L. DECHERT | 657 PERSONS STREET | | | EAST AURORA | NY | 14052 |
| WEGMAN'S FOOD MARKETS INC | PO BOX 92217 | | | | ROCHESTER | NY | 14692-0217 |
| WEST-HERR AUTOMOTIVE GROUP | PO BOX 1998 | | | | BLASDELL | NY | 14219 |
| WESTPORT INSURANCE CORPORATION (SUCCESSOR-IN-INTEREST TO THE MANHATTAN FIRE AND MARINE INSURANCE COMPANY | 1200 MAIN STREET | SUITE 800 | | | KANSAS CITY | MO | 64105 |
| WEX BANK | PO BOX 5727 | | | | CAROL STREAM | IL | 60197-5727 |
| WILCRO, INC. | PO BOX 834 | | | | ORCHARD PARK | NY | 14127-0834 |
| WILL & BAUMER | 1013 VETERANS DRIVE | | | | LEWISBURG | TN | 37091 |
| WILLIAM GAYMON | 366 MARTHA AVENUE | | | | BUFFALO | NY | 14215 |
| WILLIAM J. HIRTEN COMPANY, LLC | 96 FRANK MOSSBERG DRIVE | | | | ATTLEBORO | MA | 02703 |
| WILLIS TOWERS WATSON US LLC | LOCKBOX 28025 | | | | CHICAGO | IL | 60673-1280 |
| WILMER CUTLER PICKERING HALE & DORR LLP | ATTN: CRAIG GOLDBLATT AND LAUREN LIFLAND | 1875 PENNSYLVANIA AVENUE NW | | | WASHINGTON | DC | 20006 |
| WILMERHALE | ATTN: CRAIG GOLDBLATT AND LAUREN LIFLAND | 7 WORLD TRADE CENTER | 250 GREENWICH STREET | | NEW YORK | NY | 10007 |
| WINDSTREAM | ACCOUNT NO. XXXX6008, XXX3743 | PO BOX 25310 | | | LITTLE ROCK | AR | 72221-5310 |
| WINDSTREAM | ACCOUNT NO. XXXX6008, XXX3743 | PO BOX 9001013 | | | LOUISVILLE | KY | 40290-1013 |
| WITTBURN ENTERPRISES, INC. | 36 CYPRUS STREET | | | | BUFFALO | NY | 14204 |



**Exhibit B**
Served Via First-Class Mail

| NAME | ADDRESS 1 | ADDRESS 2 | ADDRESS 3 | ADDRESS 4 | CITY | STATE | ZIP |
|------|-----------|-----------|-----------|-----------|------|-------|-----|
| WITTBURN ENTERPRISES, INC. | PO BOX 1122 | | | | BUFFALO | NY | 14205 |
| WIX.COM | PO BOX 40190 | | | | SAN FRANCISCO | CA | 94140-0190 |
| WIX.COM, INC. | 100 GANSEVOORT ST | | | | NEW YORK | NY | 10014-1477 |
| WOERNER INDUSTRIES, INC. | 485 HAGUE STREET | | | | ROCHESTER | NY | 14606 |
| WOODS OVIATT GILMAN LLP | ATTN: TIMOTHY LYSTER | 1900 BAUSCH & LOMB PLACE | | | ROCHESTER | NY | 14604 |
| XTREME DISCOUNT MATTRESS | 3514 DELAWARE AVENUE | | | | KENMORE | NY | 14217 |
| YEVETTE ANGEL | 336 BISSELL AVENUE | | | | BUFFALO | NY | 14211 |
| ZURICH AMERICAN INSURANCE COMPANY (SUCCESSOR-IN-INTEREST TO MARYLAND CASUALTY COMPANY) | 1299 ZURICH WAY | | | | SCHAUMBURG | IL | 60196 |

# CONSOLIDATED APPENDIX DOCUMENT NO. 12

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | |
| | ) | Case No. 20-10322 (CLB) |
| The Diocese of Buffalo, N.Y., | ) | |
| | ) | Chapter 11 |
| Debtor. | ) | |
| | ) | |

### ORDER (A) APPROVING BIDDING PROCEDURES FOR THE SALE OF CERTAIN REAL PROPERTY AT 711 KNOX ROAD, EAST AURORA, NEW YORK; (B) AUTHORIZING AND APPROVING THE FORM OF PURCHASE AGREEMENT; (C) SCHEDULING AN AUCTION AND HEARING TO CONSIDER THE SALE; (D) APPROVING THE FORM AND MANNER OF SERVICE OF NOTICE OF AUCTION AND SALE HEARING; AND (E) GRANTING RELATED RELIEF

Upon consideration of the motion [Docket No. 3031] (the "Motion")[1] filed by The Diocese of Buffalo, N.Y. (the "Diocese") for entry of an order pursuant to sections 105, 363, and 503 of title 11 of the United States Code (the "Bankruptcy Code") and Rule 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"): (i)(a) approving bidding procedures in connection with the sale of certain real property located at 711 Knox Road, East Aurora, New York 14052 (the "Property"); (b) authorizing and approving the form of the proposed purchase agreement (the "Purchase Agreement") submitted by World Mission Society, Church of God a NJ Nonprofit Corporation (the "Stalking Horse Bidder"); (c) scheduling an auction (the "Auction") and the date and time of the hearing to approve the sale of the Property (the "Sale Hearing"); and (d) approving form and manner of service of notice of auction and sale hearing (the "Notice of Auction and Sale Hearing"); (ii) approving and authorizing the sale of the

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion or the Bidding Procedures, as applicable.

Property (the "Sale Transaction") free and clear of any liens, claims, encumbrances and other interests (collectively, "Encumbrances") pursuant to the terms of the Successful Bid (as defined herein); and (iii) granting related relief; and it appearing that the relief requested in the Motion is in the best interests of the Diocese, its estate, creditors, and other parties in interest; and good and sufficient cause appearing therefor, it is hereby:

**FOUND AND DETERMINED THAT:**[2]

A.    This Court has jurisdiction over the Motion and the transactions contemplated therein pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue in this district is proper under 28 U.S.C. §§ 1408 and 1409.

B.    Good and sufficient notice of the Motion and the relief sought therein has been given under the circumstances, and no other or further notice is required except as set forth herein.  A reasonable opportunity to object or be heard regarding the relief provided herein has been afforded to parties in interest.

C.    The Diocese has articulated good and sufficient business reasons for this Court to approve the bidding procedures attached hereto as *Exhibit 1* (the "Bidding Procedures").

D.    The Bidding Procedures are reasonably designed to maximize the consideration to be received for the Property.

E.    The Stalking Horse Bidder is not an "insider" or "affiliate" of the Diocese, as those terms are defined in section 101 of the Bankruptcy Code, and no common identity of incorporators, directors, or controlling stakeholders exist between the Stalking Horse Bidder and the Diocese.  The Stalking Horse Bidder and the Diocese, together with their respective counsel

---

[2]  Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when applicable.  *See* Bankruptcy Rule 7052.

2

and advisors, have acted in "good faith" and at "arm's length" within the meaning of section 363(m) of the Bankruptcy Code in connection with the negotiation of the agreement for the sale of the Property attached hereto as *Exhibit 2* (the "Purchase Agreement").

F.      The Diocese has demonstrated and proved to the satisfaction of this Court that a sale of the Property, pursuant to the terms of the Purchase Agreement, subject to higher or better offers, is in the best interests of the Diocese, its creditors, and its estate, and the Diocese's decision to enter into the Purchase Agreement with the Stalking Horse Bidder represents a prudent exercise of the Diocese's sound business judgment.

G.      The publication and service of the Notice of the Auction and Sale Hearing attached hereto as *Exhibit 3*, as described in the Motion, is reasonably calculated to provide all interested parties with adequate and proper notice of the proposed Sale Transaction, the Bidding Procedures, the Auction, and the Sale Hearing.

H.      The Diocese has articulated good and sufficient reasons for this Court to grant the relief set forth herein.  The entry of this Bidding Procedures Order is in the best interests of the Diocese, its estate, creditors, and other parties in interest.

**THEREFORE, IT IS HEREBY ORDERED THAT:**

1.      The Motion is granted as set forth herein.

2.      All objections to the Motion relating to the relief provided herein that have not been withdrawn, waived or settled, and all reservations of rights included therein, are hereby overruled and denied on the merits.

3.      The Bidding Procedures attached hereto as *Exhibit 1* are incorporated herein and are hereby approved in their entirety, and the Bidding Procedures shall govern the submission, receipt, and analysis of all bids to purchase the Property.  Any party desiring to submit a bid for the Property shall comply with the Bidding Procedures and this Order.

3

4.     The form of the Purchase Agreement attached hereto as *Exhibit 2* is hereby approved.  The offer by the Stalking Horse Bidder to purchase the Property pursuant to the terms of the Purchase Agreement is a Qualified Bid and the Stalking Horse Bidder is a Qualified Bidder for all purposes under the Bidding Procedures.

5.     In accordance with the terms of the Purchase Agreement, the Diocese shall return to the Stalking Horse Bidder its $380,000.00 deposit, payable in the event the Diocese, at no fault of the Stalking Horse Bidder, consummates a sale of the Property to a Successful Bidder other than the Stalking Horse Bidder.

6.     The deadline for submitting bids for the Property (the "Bid Deadline") is 12:00 noon (prevailing Eastern Time) on October 23, 2024.  No bid shall be deemed to be a Qualified Bid (as defined in the Bidding Procedures) or otherwise considered for any purposes unless such bid is received by the Diocese prior to the Bid Deadline and otherwise satisfies all requirements set forth in the Bidding Procedures.

7.     If more than one Qualified Bid for the Property is timely received by the Diocese in accordance with the Bidding Procedures, the Diocese shall hold an Auction for the Property. The Auction shall take place at the offices of Bond, Schoeneck & King, PLLC, The Avant Building, Suite 900, 200 Delaware Avenue, Buffalo, New York 14202-2107, on October 28, 2024 at 12:00 noon (prevailing Eastern Time), or on such other date and time as the Diocese shall notify all Qualified Bidders and other invitees.

8.     Each Qualified Bidder participating at the Auction will be required to confirm that it has not engaged in any collusion with respect to the bidding or the proposed Sale Transaction. The Stalking Horse Bidder will be permitted, but not obligated, to submit overbids at the Auction.

4

9.      The Notice of Auction and Sale Hearing, in substantially the form attached hereto as ***Exhibit 3***, is hereby approved.

10.     Not later than five (5) business days following entry of this Bidding Procedures Order, the Diocese shall cause (a) a copy of the Notice of Auction and Sale Hearing, and (b) a copy of the Bidding Procedures Order, with exhibits, to be sent by first-class mail postage prepaid, to: (i) the Office of the United States Trustee for the Western District of New York; (ii) counsel to the Official Committee of Unsecured Creditors; (iii) all parties filing Notices of Appearance and requests for papers in this Chapter 11 Case; (iv) all required governmental agencies; (v) all known parties who have expressed a bona fide interest in acquiring the Property during the pendency of this Chapter 11 Case; (vi) all creditors in the Chapter 11 Case; (vii) all persons known or reasonably believed to have asserted any lien, claim, encumbrance, or other interest in or upon any of the Property; and (viii) all parties who are known to have expressed an interest in purchasing the Property.

11.     The Diocese shall arrange for publication of a copy of the Notice of Auction and Sale Hearing in the *Buffalo News* not later than five (5) business days following entry of this Bidding Procedures Order (subject to applicable submissions deadlines).

12.     If the Diocese does not receive any Qualified Bids (other than the Purchase Agreement) prior to the Bid Deadline: (a) the Diocese may cancel the Auction; (b) the Stalking Horse Bidder will be deemed the Successful Bidder for the Property; and (c) the Diocese shall be authorized to seek approval of the Purchase Agreement and the Sale Transaction to the Stalking Horse Bidder at the Sale Hearing.

13.     The Sale Hearing shall be held before this Court on October 29, 2024 at 11:00 a.m. (prevailing Eastern time), or as soon thereafter as counsel and interested parties may be heard.

14.     The Sale Hearing may be adjourned, from time to time, without further notice to creditors or other parties in interest other than as reflected on the Bankruptcy Court's docket or announcement of said adjournment in open Court or on this Court's calendar on the date scheduled for the Sale Hearing.

15.     Except as otherwise provided in this Bidding Procedures Order, the Diocese reserves the right as it may reasonably determine to be in the best interests of its estate, in the Diocese's business judgment, in consultation with the Committee, and subject to conformity with the Bidding Procedures to: (a) determine which bidders are Qualified Bidders; (b) determine which bids are Qualified Bids; (c) determine which Qualified Bid is the highest or best proposal and which is the next highest or best proposal; (d) reject any bid that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bidding Procedures or the requirements of the Bankruptcy Code, or (iii) not in the best interests of the Diocese and its estate; (e) waive terms and conditions set forth herein with respect to all potential bidders or impose additional terms and conditions with respect to all bidders; (f) extend the deadlines set forth herein; (g) adjourn or cancel the Auction or Sale Hearing without further notice; and (h) modify the Bidding Procedures as the Diocese, in its business judgment, may determine to be in the best interest of its estate or to withdraw the Motion at any time with or without prejudice.

16.     The Diocese is hereby authorized to take all actions necessary or appropriate to effectuate the terms of this Bidding Procedures Order.

6

17.    The net proceeds of sale of the Property shall be placed in a segregated account held by the Diocese and shall not be disbursed therefrom except as directed by further Order of this Court.

18.    Notwithstanding anything to the contrary in Bankruptcy Rule 6004(h), or otherwise, this Bidding Procedures Order shall be effective immediately upon its entry.

19.    This Court shall retain jurisdiction over any matters related to or arising from the implementation of this Order.

Dated:    August 19, 2024
         Buffalo, New York



Hon. Carl L. Bucki
Chief United States Bankruptcy Judge

FILED

AUG 19 2024

BANKRUPTCY COURT
BUFFALO, N.Y.

7

Consolidated Appendix 0355

**Exhibit 1**

(to Bidding Procedures Order)

Bidding Procedures

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 20-10322 (CLB) |
| The Diocese of Buffalo, N.Y., | ) | |
| | ) | Chapter 11 |
| Debtor. | ) | |
| | ) | |

## BIDDING PROCEDURES FOR THE SALE OF 711 KNOX ROAD, EAST AURORA, NEW YORK OF THE DIOCESE OF BUFFALO, N.Y.

Set forth below are the bidding procedures (the "Bidding Procedures") to be employed with respect to the proposed sale (the "Sale Transaction") of certain real property located at 711 Knox Road, East Aurora, New York 14052 (the "Property") by The Diocese of Buffalo, N.Y. (the "Diocese"). The Sale Transaction is subject to competitive bidding as set forth herein and approval by the United States Bankruptcy Court for the Western District of New York (the "Bankruptcy Court") pursuant to section 363 of title 11 of the United States Code (the "Bankruptcy Code").

On July 18, 2024, the Diocese filed the *Motion for Entry of Orders (I)(A) Approving Bidding Procedures for the Sale of Certain Real Property at 711 Knox Road, East Aurora, New York; (B) Authorizing and Approving the Form of Purchase Agreement; (C) Scheduling an Auction and Hearing to Consider the Sale; and (D) Approving the Form and Manner of Service of Notice of Auction and Sale Hearing; (II) Approving the Sale Free and Clear of Liens, Claims, Encumbrances and Other Interests; and (III) Granting Related Relief* [Docket No. 3031] (the "Sale Motion").

On _____, 2024, the Bankruptcy Court entered an order [Docket No. ___] (the "Bidding Procedures Order")[1] which, among other things, approved (i) these Bidding Procedures and (ii) the form of purchase agreement with World Mission Society, Church of God A NJ Nonprofit Corporation (the "Stalking Horse Bidder") attached as an exhibit to the Sale Motion (the "Purchase Agreement").

These Bidding Procedures describe, among other things, the Property available for sale, the form of bids and the manner in which bidders and bids become qualified, the coordination of diligence efforts, the conduct of the Auction (as defined herein), the ultimate selection of the Successful Bidder (as defined herein) and the Court's approval thereof (the "Bidding Process").

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Sale Motion and the Bidding Procedures Order, as applicable.

In the event of any disagreement as to the interpretation or application of these Bidding Procedures, the Bankruptcy Court shall have jurisdiction to hear and resolve such dispute.

Copies of the Sale Motion and all exhibits thereto may be obtained by contacting the Diocese's counsel: Bond, Schoeneck & King, PLLC, One Lincoln Center, Syracuse, New York 13202, Attn: Stephen A. Donato, Charles J. Sullivan, Grayston T. Walter and Jeffrey D. Eaton (Telephone (315) 218-8000; email: sdonato@bsk.com, csullivan@bsk.com, gwalter@bsk.com and jeaton@bsk.com), or they may be downloaded by visiting the Bankruptcy Court's electronic case management website at https://ecf.nywb.uscourts.gov/ or for free at https://case.stretto.com/dioceseofbuffalo.

## Property to be Sold

The real property to be sold (together with all improvements and fixtures located thereon) is located at 711 Knox Road, East Aurora, New York 14052.

The Sale Transaction will be conducted on "as is, where is" basis and without representations or warranties of any kind, nature, or description by the Diocese, its agents or the Diocese's bankruptcy estate, except to the extent set forth in the Purchase Agreement. Except as otherwise provided in the Purchase Agreement or in the Bankruptcy Court's order approving the Sale Transaction, the Property shall be sold to the Successful Bidder free and clear of all liens, claims, encumbrances, and other interests ("Encumbrances"), with such Encumbrances to attach solely to the net proceeds of the sale.

## Participation Requirements

In order to participate in the Bidding Process, a bidder for the Property (a "Potential Bidder") must be an "Qualified Bidder." A Qualified Bidder is a person or group of persons who has provided the Diocese with current audited financial statements, evidence of committed financing, or such other financial and credit-quality disclosures as may be reasonably requested by, and satisfactory to the Diocese, in consultation with the Official Committee of Unsecured Creditors (the "Committee"), evidencing the Potential Bidder's financial wherewithal to consummate the Sale Transaction and pay the purchase price for the Property to the Diocese in cash.

The Diocese, in its discretion, shall determine whether a bid qualifies as an "Qualified Bid." To constitute a Qualified Bid, a bid must be an offer from a Qualified Bidder received by the Diocese before the Bid Deadline (defined below) and:

(i)     be submitted in writing;

(ii)    provide for a purchase price, payable in full, in cash, upon the Sale closing date, which exceeds the cash consideration set forth in the Purchase Agreement by at least $100,000.00 (the "Initial Minimum Overbid").

(iii)   be on terms that are not more burdensome or conditional in any material respect than the terms of the Purchase Agreement;

2

18240355.v3-8/19/24
Case 1-20-10322-CLB,    Doc 3090,    Filed 08/19/24,    Entered 08/19/24 16:17:44,
Description: Main Document  , Page 10 of 53

(iv)    not be conditioned on obtaining financing, the outcome of any due diligence investigation, or on the receipt of any third-party approvals or consents (excluding required Bankruptcy Court approval and any third-party approvals or consents contemplated in the Purchase Agreement);

(v)    not request or entitle the bidder to any break-up fee, expense reimbursement, or similar type of payment;

(vi)    include a binding and definitive purchase agreement for the Property, in substantially the same form as the Purchase Agreement and executed by the Qualified Bidder (a "Qualified Bidder Contract"), together with a marked copy showing any changes from the Purchase Agreement, and a clean electronic copy in Microsoft Word readable format;

(vii)    be accompanied by a cash, certified bank check, or wire transfer deposit equal to 10% of the purchase price set forth in the Qualified Bidder Contract;

(viii)    fully disclose the identity of each entity that will be bidding for the Property or otherwise participating in connection with such bid, the complete terms of any such participation, and identify no more than three (3) representatives authorized to appear and act on behalf of such Qualified Bidder at the Auction ("Authorized Bidder Representatives");

(ix)    include an acknowledgment and representation that the Qualified Bidder has had an opportunity to consider all due diligence regarding the Property prior to submitting its bid and that it has relied solely upon its own independent review, investigation and inspection of any documents or the Property in making its bid;

(x)    confirm that, if selected as the Successful Bidder or the Back-Up Bidder, such bidder will complete the Sale Transaction within five (5) business days following the date on which (A) the Bankruptcy Court's order approving the sale shall have become a final and non-appealable order, and (B) the Diocese shall have provided written notice of its readiness to consummate the Sale Transaction;

(xi)    certify that the bidder has not, and is not, engaged in any collusion with respect to its bid or the Sale Transaction; and

(xii)    provide that such bid shall remain open and irrevocable until:

    (A)    if such bid is not the Successful Bid or Back-Up Bid (as each term is defined below), the entry by the Bankruptcy Court of an order approving the sale of the Property to another Qualified Bidder;

    (B)    if such bid is the Successful Bid, the closing of the Sale Transaction to such Successful Bidder; or

    (C)    if such bid is chosen by the Diocese to be the Back-Up Bid, the date which is the earlier to occur of: (i) the closing of the Sale Transaction to the

3

18240355.v3-8/19/24
Case 1-20-10322-CLB,    Doc 3090,    Filed 08/19/24,    Entered 08/19/24 16:17:44,
Description: Main Document , Page 11 of 53

Successful Bidder or (ii) the closing of the Sale Transaction to such Back-Up Bidder.

As promptly as practicable after receiving a bid from a Potential Bidder, the Diocese shall determine, in consultation with the Committee, and shall notify the Potential Bidder in writing, whether the Potential Bidder is a Qualified Bidder and whether the bid is a Qualified Bid. Notwithstanding anything to the contrary herein, the Stalking Horse Bidder is a Qualified Bidder, and the Purchase Agreement is a Qualified Bid, for all purposes of these Bidding Procedures.

## Bid Deadline

All Qualified Bids must be actually received at or before 12:00 noon (prevailing Eastern Time) on October 23, 2024 (the "Bid Deadline"), by counsel to the Diocese, Bond, Schoeneck & King, PLLC, One Lincoln Center, Syracuse, New York 13202 (Attn: Stephen A. Donato, Charles J. Sullivan, Grayson T. Walter, Justin S. Krell and Jeffrey D. Eaton (Telephone (315) 218-8000; email: sdonato@bsk.com, csullivan@bsk.com, gwalter@bsk.com, jkrell@bsk.com and jeaton@bsk.com). The Diocese may extend the Bid Deadline in its discretion but is not obligated to do so.

As soon as practicable following the Bid Deadline, the Diocese will review all timely-received bids and will provide copies of all bids deemed to be Qualified Bids to counsel to the Committee, and the Office of the United States Trustee for the Western District of New York (the "UST").

## "As-is" Sale / Diligence

The Sale of the Property shall be on an "as-is" basis, without any representations or warranties provided by the Diocese, except those set forth in the Purchase Agreement.

Each Potential Bidder shall comply with all reasonable requests for information by the Diocese or its advisors regarding such Potential Bidder's financial wherewithal and ability to consummate the Sale. Failure by any Potential Bidder to comply with requests for additional information from the Diocese may be a basis for the Diocese, in its discretion, to determine that a Potential Bidder is not a Qualified Bidder, or that any bid is not a Qualified Bid.

Prior to the Bid Deadline, the Diocese shall provide any Potential Bidder deemed to be a Qualified Bidder with reasonable site access and due diligence information upon request. In no instance shall the Diocese have any obligation to produce or furnish any information not already within the Diocese's possession and control.

Potential Bidders are advised to exercise their own discretion before relying on any information regarding the Property provided by anyone other than the Diocese or its representatives.

By submitting their bid, each Qualified Bidder shall be deemed to acknowledge and represent that it has had an opportunity to inspect and examine the Property and that it has relied

4

solely upon its own independent review, investigation and/or inspection of any documents in making its bid, and that it did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Property, or the completeness of any information provided in connection with the Bidding Process except as expressly stated in the Qualified Bidder Contract submitted with its Qualified Bid.

## **Auction**

If no Qualified Bids (other than the Purchase Agreement submitted by the Stalking Horse Bidder, which shall be deemed as a Qualified Bid) are received on or prior to the Bid Deadline, the Stalking Horse Bidder shall be the Successful Bidder (as defined below) and the Diocese shall seek authorization to sell the Property to the Stalking Horse Bidder without further competitive bidding.

If the Diocese receives more than one Qualified Bid prior to the Bid Deadline, the Diocese shall conduct an Auction ("Auction") for the Sale of the Property. The Auction shall take place on October 28, 2024 at 12:00 noon (prevailing Eastern Time) at the offices of Bond, Schoeneck & King, PLLC, The Avant Building, Suite 900, 200 Delaware Avenue, Buffalo, New York 14202-2107, or at such other time and place as the Diocese may notify all Qualified Bidders. Only the Stalking Horse Bidder and those Qualified Bidders who timely submitted a Qualified Bid will be eligible to participate in the Auction.

At the commencement of the Auction, the Diocese shall announce the Qualified Bid that it has determined represents the highest or otherwise best bid for the Property (the "Starting Qualified Bid") and the overall consideration value ascribed to such bid (the "Bid Value").

Each Qualified Bidder present at the Auction will be permitted to increase its Qualified Bid in turns (each such increased Qualified Bid, a "Qualified Overbid"), provided that each Qualified Overbid thereafter must exceed the Bid Value of the then-highest or otherwise best Qualified Overbid, by at least one hundred thousand dollars ($100,000.00) (the "Minimum Bid Increment"). During the course of the Auction, the Diocese will inform the participants which Qualified Overbid reflects the then-highest or otherwise best offer for the Property and the Bid Value ascribed thereto.

During the Auction, the Diocese is permitted at any time to request any additional financial information of any Qualified Bidder.

The Auction may be adjourned from time to time by the Diocese, but it shall not be concluded until each Qualified Bidder present at the Auction has been given an opportunity to submit a Qualified Overbid with knowledge of the Bid Value ascribed to the Starting Qualified Bid or then-highest Qualified Overbid, as applicable.

At the conclusion of the Auction the Diocese will announce (i) the Qualified Bid which the Diocese, in consultation with the Committee, deems to represent the highest or otherwise best bid for the Property (such bid being the "Successful Bid" and the Qualified Bidder submitting such bid, the "Successful Bidder") and (ii) the next highest or otherwise best bid (the "Back-Up

Bid" and the party submitting such bid, the "Back-Up Bidder"). As a condition precedent to the Diocese declaring any bid the Successful Bid or the Back-Up Bid, the Diocese may require the Successful Bidder or Back-Up Bidder to deposit additional cash or immediately available funds such that their total deposit shall be not less than (10%) of the purchase price of their respective Successful Bid or Back-Up Bid. Any deposits not applied in satisfaction of the obligations of the Successful Bidder or Back-Up Bidder shall be returned not later than five (5) business days following the consummation of the Sale Transaction.

No bids submitted after the conclusion of the Auction shall be considered unless a motion to reopen the Auction is made on notice, prior to the Sale Hearing, to all Qualified Bidders who attended and submitted a bid at the Auction and such motion is granted by the Court.

All Qualified Bids and Qualified Overbids submitted by Qualified Bidders prior to or at the Auction shall remain open and irrevocable as follows:

       (a)    if such bid is not the Successful Bid or Back-Up Bid, until the entry by the Bankruptcy Court of an order approving the Sale to another Qualified Bidder;

       (b)    if such bid is the Successful Bid, until the closing of the Sale to such Successful Bidder; or

       (c)    if such bid is the Back-Up Bid, until the date which is the earlier to occur of: (i) the closing of the Sale to the Successful Bidder or (ii) the closing of the Sale to such Back-Up Bidder.

## The Sale Hearing

A hearing to approve the sale transaction (the "Sale Hearing") is scheduled to take place on October 29, 2024 at 11:00 a.m. (prevailing Eastern time) before the Honorable Carl L. Bucki, Chief Judge of the United States Bankruptcy Court for the Western District of New York, at the Robert H. Jackson United States Courthouse, 2 Niagara Square, Buffalo, NY 14202. Objections to the Sale must be in writing, comply with the Local Bankruptcy Rules for the Western District of New York, and be filed with the Bankruptcy Court as soon as practicable in advance of the Sale Hearing. At the Sale Hearing, the Diocese will seek entry of an order (the "Sale Order"), among other things, authorizing and approving the sale of the Property to the Successful Bidder (or in the alternative, the Back-Up Bidder), as determined by the Diocese in the Diocese's business judgment and in accordance with the Bidding Procedures, pursuant to the terms and conditions set forth in the Purchase Agreement or Qualified Bidder Contract, as applicable, and as the same may be modified by any Qualified Overbid submitted at the Auction. The Sale Hearing may be adjourned or rescheduled without notice other than as reflected on the Bankruptcy Court's docket or by an announcement of the adjourned date in open court at the Sale Hearing.

The Diocese shall be deemed to have accepted a Qualified Bid only when (i) such Bid is declared the Successful Bid (or the Back-Up Bid) in accordance with these Bidding Procedures,

(ii) definitive documentation has been executed in respect thereof, and (iii) the Bankruptcy Court has entered the Sale Order.

Following the entry of the Sale Order, if the Successful Bidder fails to consummate the approved Sale Transaction in accordance with the terms of its Successful Bid because of a breach or failure to perform on the part of such Successful Bidder, the Diocese may terminate its agreement to sell the property to the Successful Bidder, retain the Successful Bidder's deposit, and maintain the right to pursue all available remedies whether legal or equitable against such Successful Bidder.  In the event the Diocese elects to so terminate, the Backup Bid, shall automatically be deemed to be the Successful Bid with respect to the Property, and the Diocese shall be authorized to effectuate the sale of the Property to the Backup Bidder without further order of the Bankruptcy Court.

The Diocese shall return any deposits to all Qualified Bidders, other than the Successful Bidder and the Back-Up Bidder, within five (5) business days following the date on which the Sale Order becomes a final and non-appealable order.  The deposit of the Successful Bidder shall be applied to, and deducted from, the Successful Bidder's obligations under the Successful Bid at the closing of the Sale Transaction.  The deposit of the Back-Up Bidder shall be returned to the Back-Up Bidder within five (5) business days following the date its bid is no longer required to remain open and irrevocable as set forth herein.

## Reservation of Rights

The Diocese reserves all rights to terminate the Bidding Process at any time if the Diocese determines, in consultation with the Committee, that the Bidding Process is not in the best interest of the Diocese's bankruptcy estate.  In addition, the Diocese reserves the right not to submit for approval to the Bankruptcy Court any bid (regardless of whether it may be a Qualified Bid under these Bidding Procedures) if the Diocese has reason to believe that such bid was not submitted in good faith or other similar reason.  Without limiting the generality of the foregoing, the Diocese may reject at any time before entry of the Sale Order, any bid that it determines, in consultation with the Committee, is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code or the Bidding Procedures, or (iii) not in the best interests of the Diocese, its estate and creditors.  The Diocese shall further have the right to amend the rules set forth herein for the Bidding Process or impose such other or additional terms and conditions for the Bidding Process which the Diocese determines, in consultation with the Committee, are in the best interests of the chapter 11 estate, provided that such modifications are not inconsistent with these Bidding Procedures or the Bidding Procedures Order.

*      *      *

## Exhibit 2

(to Bidding Procedures Order)

Purchase Agreement

PURCHASE AND SALE AGREEMENT

*June*

This PURCHASE AND SALE AGREEMENT (this "Agreement"), dated as of the *12th* day of ~~May~~ 2024 (the "Effective Date"), is entered into between **THE DIOCESE OF BUFFALO, N.Y.**, a New York special act corporation created by the New York State Legislature pursuant to Chapter 568 of the Laws of 1951, having an address at 795 Main Street, Buffalo, NY 14203 ("Seller"), and **WORLD MISSION SOCIETY, CHURCH OF GOD A NJ NONPROFIT CORPORATION**, a New Jersey not-for-profit corporation authorized to conduct business in New York, having an address at 880 Jackson Avenue, New Windsor, New York 12553 ("Purchaser"; each a "Party", and collectively, the "Parties").

## RECITALS

WHEREAS, Seller is the owner of real property located in the Town of Aurora, County of Erie, and State of New York, commonly known as **711 Knox Road, Tax Map Parcel No. 163.00-3-23** in the Town of Aurora, County of Erie, and State of New York, which is shown outlined on the property sketch attached hereto as **Exhibit A-1**, and is more particularly described on **Exhibit A-2** attached hereto (together with all improvements and fixtures located thereon, the "Property").

WHEREAS, on February 28, 2020 (the "Petition Date") Seller filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (11 U.S.C. § 101 et seq., the "Bankruptcy Code") with the United States Bankruptcy Court for the Western District of New York (the "Bankruptcy Court"), commencing Seller's chapter 11 case (this "Bankruptcy Case");

WHEREAS, Seller continues to operate its business and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, Seller retained Hanna Commercial Real Estate ("Hanna CRE") to serve as a real estate broker with respect to the proposed sale of the Property;

WHEREAS, Seller listed the Property for sale with Hanna CRE beginning on or about November 2, 2023;

WHEREAS, subject to the terms and conditions hereof, Seller desires to sell to Purchaser, and Purchaser desires to purchase the Property from Seller;

WHEREAS, the transaction contemplated by this Agreement is subject to the approval of the Bankruptcy Court, which approval will include, among other things, issuance by the Bankruptcy Court of a Bidding Procedures Order directing the manner in which a bidding procedure will be conducted for solicitation of competing offers from third parties for the purchase of the Property; and

WHEREAS, depending upon the outcome of bidding pursuant to the Bidding Procedures Order, this Agreement and the transactions contemplated herein will be consummated pursuant to a sale order to be entered in the Bankruptcy Case, or, in the alternative, this Agreement may be terminated by Seller, as hereinafter provided.

1

**Purchase and Sale Agreement
for 711 Knox Road, Aurora, NY**

17429967.12

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS

For purposes of this Agreement (including any Exhibits or Schedules attached hereto), the following terms shall have the meanings ascribed to them below, unless the context clearly requires otherwise:

1.1     "**Bankruptcy Case**" shall have the meaning given to it in the Recitals to this Agreement.

1.2     "**Bankruptcy Code**" shall have the meaning given to it in the Recitals to this Agreement.

1.3     "**Bankruptcy Court**" shall have the meaning given to it in the Recitals to this Agreement.

1.4     "**Bargain and Sale Deed**" shall mean the deed to be delivered at Closing by Seller to Purchaser in the form attached hereto as **Exhibit B**.

1.5     "**Bidding Procedures**" shall mean the bidding procedures governing the process by which the sale of the Property shall occur, which are attached to the Bidding Procedures Order as Exhibit 1.

1.6     "**Bidding Procedures Order**" shall mean an order of the Bankruptcy Court: (i) approving the terms of this Agreement, subject to higher and better bids; (ii) establishing procedures for Seller's solicitation of competing offers to purchase the Property from third parties; (iii) establishing procedures for an auction to determine the highest or otherwise best offer for the Property; and (iv) scheduling a hearing to consider entry of the Sale Order.

1.7     "**Business Day(s)**" shall mean calendar days, exclusive of Saturdays, Sundays and holidays on which banking institutions in New York are authorized by Law to close.

1.8     "**Claim**" shall mean any claim within the meaning of section 101(5) of the Bankruptcy Code.

1.9     "**Closing**" shall mean the closing of the transaction as set forth in Section 7.1 of this Agreement.

1.10     "**Closing Date**" shall mean the date of Closing.

1.11     "**Encumbrance**" shall mean any Lien, Claim, Interest, or defect in title, whether imposed by Law, agreement, understanding or otherwise. For the avoidance of doubt, rights of way and easements of record shall not be considered an Encumbrance under this Agreement.

2

1.12    **"Effective Date"** shall mean June 12, 2024.

1.13    **"Escrow Agent"** shall mean the Seller's attorneys, Bond, Schoeneck & King, PLLC.

1.14    **"Excluded Items"** shall mean any and all religious materials and texts located within the library on the day of Closing.

1.15    **"Interest"** shall mean any interest in, or related to, the Property within the meaning of section 363(f) of the Bankruptcy Code, and all mortgages, Leases, or other interests, pledges, security interests, rights of setoff, successor liabilities, conditions, obligations to allow participation, agreements or rights, rights asserted in litigation matters, competing rights of possession, obligations to lend, matters filed of record that relate to, evidence or secure an obligation of Sellers (and all created expenses and charges) of any type under, among other things, any document, instrument, agreement, affidavit, matter filed of record, cause, or state or federal law, whether known or unknown, legal or equitable, and all Liens, rights of offset, replacement liens, adequate protection liens, charges, obligations.

1.16    **"Law"** shall mean all federal, state and local laws, ordinances, rules, regulations, standards, and Orders.

1.17    **"Leases"** shall mean all leases, subleases, licenses, concessions, options, extension letters, assignments, termination agreements, subordination agreements, nondisturbance agreements, estoppel certificates and other agreements, whether written or oral, and any amendments or supplements to any of the foregoing.

1.18    **"Liability"** shall mean any liability or obligation of whatever kind or nature (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated and whether due or to become due).

1.19    **"Lien"** shall mean any charge against or Interest in the Property to secure payment of a debt or performance of an obligation (statutory or otherwise), deed of trust, mortgage, pledge, security interest, security agreement, hypothecation, preference, priority, or right of recovery.

1.20    **"Order"** shall mean any award, decision, injunction, judgment, order, ruling, subpoena, or verdict entered, issued, made, or rendered by any court, or administrative agency.

1.21    **"Permitted Exception"** shall have the meaning given to such term in Section 9.2.

1.22    **"Person"** shall mean any individual, corporation, general or limited partnership, limited liability company, joint venture, estate, trust, association, or other legal organization.

1.23    **"Proceeding"** shall mean any action, demand, complaint, inquiry, suit, injunction, dispute, arbitration, audit, hearing, investigation, litigation, citation, notice of violation (or similar notice), or suit (whether civil or criminal) commenced, brought, conducted, or heard by or before, or otherwise involving, any Person.

1.24    **"Property"** shall have the meaning given to such term in the Recitals of this Agreement.

1.25    **"Remaining Personal Property"** shall mean any items of equipment and personal property, aside from the Excluded Items, remaining on the Property on the day of the Closing.

1.26    **"Sale Order"** shall mean an Order of the Bankruptcy Court in form and substance reasonably acceptable to Purchaser and Seller authorizing the sale of the Property to Purchaser in accordance with the terms and conditions set forth herein, free and clear of any Encumbrances pursuant to section 363(f) of the Bankruptcy Code.

1.27    **"Tax"** and **"Taxes"** shall mean individually or collectively, as appropriate, any and all U.S. or non-U.S., federal, state, county, local, municipal or other taxes, charges, imposts, rates, fees, levies or other assessments.

1.28    **"Title Company"** shall mean a reputable title company to be selected by Purchaser.

1.29    **"Transaction"** shall mean the purchase and sale of the Property contemplated by this Agreement.

## ARTICLE II
## AGREEMENTS TO SELL AND PURCHASE; RELATED MATTERS

2.1.    **Agreement to Sell and Purchase the Property**.  On the Closing Date, subject to the performance of the parties of the terms and provisions of this Agreement and satisfaction of the terms and conditions set forth in the Sale Order, Seller shall sell, convey, assign, transfer, and deliver to Purchaser, and Purchaser shall purchase, acquire, and accept from Seller, the Property, free and clear of all Encumbrances, except as otherwise expressly provided in this Agreement.

2.2.    **Condition of Property**.  Seller is selling and Purchaser is acquiring the Property "AS IS" "WHERE IS", and with all faults, as provided in **ARTICLE XII** below.

2.3.    **Personal Property.**  Seller shall have the right at any time prior to Closing to remove from the Property any religious items and other equipment and personal property which Seller elects to remove and retain. For the avoidance of doubt, the pews shall be considered religious items under this Agreement. Purchaser agrees to accept possession of the Property at Closing with any Remaining Personal Property included in the sale (at no additional cost to Purchaser) on an "AS IS" "WHERE IS" basis.  Seller shall deliver to Purchaser at Closing a quitclaim bill of sale conveying Seller's interest in any such Remaining Personal Property. To the extent any such Remaining Personal Property is owned by an entity affiliated with Seller, Seller shall deliver to Purchaser a quitclaim bill of sale executed by such affiliated entity. Purchaser shall at the time of Closing provide Seller with evidence reasonably satisfactory to Seller demonstrating that Purchaser is exempt from New York State Sales Tax in connection with the purchase of any such Remaining Personal Property. Notwithstanding anything to the contrary contained herein, the Remaining Personal Property does not encompass or include the Excluded Items.

Purchase and Sale Agreement
for 711 Knox Road, Aurora, NY

17429967.12

2.4.    **Building Systems and Fixtures.**  Notwithstanding the foregoing, Seller agrees not to remove from the Property any of the following to the extent they are in place on the Property as of the Effective Date of this Agreement, and that all such items shall be included in the sale to Purchaser, as fixtures to the Property:  any natural gas and electric fixtures, facilities, appliances and wiring, fixtures and related equipment, all emergency generators, engines, boilers, elevators, incinerators, motors, heating, ventilation, and air conditioning equipment, affixed cabinetry, sinks, basins, water closets, lavatory fixtures, faucets, and pipes, all electrical and telephone systems, components, wiring, transformers, electrical boxes, switches, lighting fixtures, and bulbs, any sprinkler systems, fire prevention and extinguishing apparatus, any central music and public address systems, any burglar alarms, security systems and equipment, remote control devices for overhead doors, any window shades, awnings, screens, blinds, installed carpeting, drapes, and curtains. Seller makes no representation or warranty that any of the foregoing items are in place on the Property.

**ARTICLE III**
**PURCHASE PRICE**

3.1.    **Purchase Price**.  The Purchase Price for the Property shall be THREE MILLION EIGHT HUNDRED THOUSAND AND 00/100 DOLLARS ($3,800,000.00) (the "Purchase Price"), payable as follows:

> 3.1.1.    **Deposit**.  Within five (5) days after the Effective Date, Purchaser shall deposit in escrow with Seller's attorneys, Bond, Schoeneck and King, PLLC, an earnest money deposit of THREE HUNDRED EIGHTY THOUSAND AND 00/100 DOLLARS ($380,000.00) (the "Earnest Money Deposit") in a non-interest bearing account, which Earnest Money Deposit is to become part of the Purchase Price, or be returned, if required under the terms of this Agreement.

> 3.1.2.    **Balance**.  The balance of the Purchase Price shall be paid, plus or minus Closing adjustments, as the case may be, in wire transferred funds of United States currency to Seller in accordance with the terms of the Sale Order.

3.2.    **Cash Transaction**. Purchaser acknowledges that Purchaser's representation below that the transaction contemplated herein is a "Cash Transaction" was a determinative factor in Seller's acceptance of Purchaser's offer. To that end, Purchaser shall, on or before the Effective Date, provide Seller with evidence reasonably satisfactory to Seller confirming Purchaser's ability to purchase the Property pursuant to this Agreement without obtaining financing or funding from outside funding sources ("Proof of Funds").

**ARTICLE IV**
**REPRESENTATIONS AND WARRANTIES OF SELLER**

Seller makes no representations or warranties, express or implied, except those expressly contained or incorporated in this Agreement. All of the representations and warranties of Seller contained in this Agreement are to the best of Seller's knowledge, made as of the Effective Date, and except as otherwise set forth herein, shall merge with the Quitclaim Deed and shall not survive

5

the Closing. Subject to the foregoing, Seller represents and warrants unto Purchaser as of the date hereof, as follows:

4.1.    **Organization**.  Seller is a New York special act corporation created by the New York State Legislature pursuant to Chapter 568 of the Laws of 1951, duly organized, validly existing, and in good standing under the laws of the State of New York, and subject to the Bankruptcy Court's entry of the Sale Order, Seller has the legal power, right and authority to enter into this Agreement and the instruments referenced herein, and to consummate the transaction contemplated herein.

4.2.    **Power and Authority**.  All requisite corporate action has been taken by Seller in connection with entering into this Agreement, the documents and instruments referenced herein, and the consummation of the transaction contemplated hereby.  Subject to the Bankruptcy Court's entry of the Sale Order, no consent, authority, licensing, or approval of any partner, shareholder, trustee, trustor, beneficiary, creditor, investor, or other party is required for Seller to execute and deliver this Agreement and the instruments and documents referenced herein or consummate the transaction contemplated by this Agreement. The individual(s) executing this Agreement and the instruments referenced herein on behalf of Seller have the legal power, right, and actual authority to bind Seller to the terms and conditions hereof and thereof.

4.3.    **Consents**.  Subject to the Bankruptcy Court's entry of the Sale Order, no consent, approval, waiver, license, permit, or certificate of authority any other third Person is required in connection with the execution, delivery or performance by Seller of this Agreement or the consummation by Seller of the transactions contemplated hereby.

4.4.    **Foreign Person**. Seller is not a "foreign person" as defined in §1445(f)(3) of the Internal Revenue Code and regulations promulgated thereunder, which Seller shall so certify at Closing (via "Non-Foreign Person Affidavit").

4.5.    **Encumbrances**.  Except as otherwise expressly provided in this Agreement, at the Closing, Seller will convey the Property free and clear of all Encumbrances, as provided in the Sale Order, subject to any rights of way or easements of record.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

5.1.    **Power and Authority**.  All requisite action (corporate, trust, partnership or otherwise) has been taken by Purchaser in connection with entering into this Agreement, the documents and instruments referenced herein, and the consummation of the transaction contemplated hereby.  No consent, authority, licensing or approval of any partner, shareholder, trustee, trustor, beneficiary, creditor, investor, regulatory authority or other party is required for Purchaser to execute and deliver this Agreement and the instruments and documents referenced herein or consummate the transaction contemplated by this Agreement. The individual(s) executing this Agreement and the instruments referenced herein on behalf of Purchaser have the legal power, right, and actual authority to bind Purchaser to the terms and conditions hereof and thereof.

5.2.    **Sufficient Funds**.  The transaction contemplated by this Agreement is a "Cash Transaction", and Purchaser has as of the date hereof, and will have as of the Closing, sufficient funds in cash in its possession to pay the Purchase Price and the Earnest Money Deposit as the same become due and payable under this Agreement, without obtaining financing or funding from outside funding sources.

5.3.    **Certain Relationships**.  Purchaser represents and warrants to Seller (i) that neither Purchaser nor any Person or entity that directly or indirectly owns any interest in Purchaser nor any of its officers, directors or members is a Person or entity with whom U.S. Persons or entities are restricted from doing business under regulations of the Office of Foreign Asset Control ("OFAC") of the U.S. Department of the Treasury (including those named on OFAC's Specially Designated and Blocked Persons List) or under any statute, executive order (including, but not limited to, Executive Order 13224 ("Executive Order") signed on September 24, 2001 and titled "Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism"), or other governmental action, (ii) that Purchaser's activities do not violate the International Money Laundering Abatement and Financial Anti-Terrorism Act of 2001 or the regulations or orders promulgated thereunder (as amended from time to time, the "Money Laundering Act"), and (iii) that so long as this Agreement is in full force and effect, Purchaser shall comply with the Executive Order and with the Money Laundering Act.

5.4.    **Foreign Person**.  Purchaser is not a "foreign person" as defined in §1445(f)(3) of the Internal Revenue Code and the regulations promulgated thereunder.

## ARTICLE VI
## CONDITIONS TO CLOSING

6.1.    **Conditions to Obligations of Each Party**.  The respective obligations of each Party to consummate the transactions contemplated hereby shall be subject to the satisfaction at or prior to the Closing of the following conditions:

6.1.1.    **Sale Order**. The Bankruptcy Court shall have entered the Sale Order.

6.2.    **Additional Conditions to Obligations of Purchaser**. The obligations of the Purchaser to consummate the transactions contemplated hereby are subject to satisfaction or waiver by the following additional conditions:

6.2.1.    **Representations and Warranties**.  The representations and warranties of Seller set forth in this Agreement shall be materially true and correct as of the Effective Date and as of the Closing Date, as if made as of such time (except to the extent that such representations and warranties expressly speak as of another date, in which case such representations and warranties shall be true and correct as of such date).

6.2.2.    **Agreements and Covenants**.  Seller shall have performed and complied with all of its covenants hereunder in all material respects through the Closing.

7

6.2.3.   **Documents**.  All of the documents, instruments and agreements required to be executed and/or delivered by Seller on or prior to Closing pursuant to **Section 7.1.1** of this Agreement shall have been executed by the parties thereto other than the Purchaser and delivered to the Purchaser.

6.3.   **Additional Conditions to Obligations of Seller**.  The obligations of Seller to consummate the transactions contemplated hereby are subject to satisfaction or waiver by Seller of the following additional conditions:

6.3.1.   **Representations and Warranties**.  The representations and warranties of the Purchaser set forth in this Agreement shall be materially true and correct as of the Closing Date, as if made as of such time (except to the extent that such representations and warranties expressly speak as of another date, in which case such representations and warranties shall be true and correct as of such date).

6.3.2.   **Agreements and Covenants**.  Purchaser shall have paid the full Purchase Price performed and complied with all of its other covenants hereunder in all material respects through the Closing.

6.3.3.   **Documents**.  All of the documents, instruments and agreements required to be executed and/or delivered by Purchaser on or prior to Closing pursuant to **Section 7.1.2** of this Agreement shall have been executed by the parties thereto other than Seller and delivered to Seller.

## ARTICLE VII
## CLOSING; DELIVERIES AND ACTIONS TAKEN AT THE CLOSING

7.1.   **Closing Date**. The Closing of the purchase and sale of the Property and any other transactions contemplated in this Agreement shall occur no later than the date that is five (5) Business Days after the date of the entry of the Sale Order or such other later date as the parties may mutually agree.  The parties agree that TIME IS OF THE ESSENCE with respect to the occurrence of the Closing Date. The Closing shall be held via escrow and wire transfer through the offices of Seller's attorney.

7.1.1.   **Deliveries by Seller at the Closing**. At the Closing, Seller shall cause to be executed and delivered to Purchaser the following documents with respect to the Property being conveyed:

7.1.1.1.   a duly executed and acknowledged Bargain and Sale Deed;

7.1.1.2.   a Quitclaim Bill of Sale conveying title to the Remaining Personal Property:

7.1.1.3.   two (2) counterparts of a duly executed Closing Statement setting forth all closing adjustments and prorations for the Property (the "<u>Closing Statement</u>");

8

Purchase and Sale Agreement<br>for 711 Knox Road, Aurora, NY

17429967.12

7.1.1.4.  two (2) counterparts of duly executed Water Supply Assignment and Assumption Agreements (as hereinafter defined);

7.1.1.5.  a Non-Foreign Person Affidavit signed by Seller;

7.1.1.6.  a copy of the Sale Order; and

7.1.1.7.  such other agreements, instruments, and documents of conveyance and transfer executed by Seller, in form and substance reasonably acceptable to Purchaser, as may be reasonably necessary or desirable to convey the Property to Purchaser free and clear of all Encumbrances, except as otherwise expressly provided in this Agreement.

7.1.2.    **Deliveries by the Purchaser at the Closing**. At the Closing, Purchaser shall cause to be delivered to Seller the following:

7.1.2.1.  the Purchase Price, by wire transfer of immediately available funds (subject to prorations and adjustments, including, but not limited to, a credit for the Earnest Money Deposit) by no later than 2:00 p.m. (eastern time);

7.1.2.2.  two (2) counterparts of a Closing Statement setting forth all closing adjustments and prorations for the Property;

7.1.2.3.  two (2) counterparts of duly executed Water Supply Assignment and Assumption Agreements (as hereinafter defined); and

7.1.2.4.  such other agreements, instruments, and documents as Seller may reasonably request to consummate the purchase and sale transaction contemplated hereby.

**ARTICLE VIII**
**TERMINATION**

8.1.    **Termination.**  This Agreement may be terminated at any time prior to Closing:

8.1.1.    by mutual written agreement of Purchaser and Seller;

8.1.2.    by Seller or Purchaser, by written notice to the other, if the Bankruptcy Court has not granted the Sale Order by July 15, 2024;

8.1.3.    by Seller, by written notice to Purchaser, if the Closing shall not have occurred on or before the date that is ten (10) Business Days after the date of entry of the Sale Order (as may be extended by written agreement of Purchaser and Seller); provided, however, that Seller is not in material breach of any of its representations and warranties contained in this Agreement and has not failed in any material respect to perform any of its obligations hereunder;

9

Purchase and Sale Agreement
for 711 Knox Road, Aurora, NY

8.1.4.    by Purchaser, by written notice to Seller, if there shall have been a material breach by Seller of any of its representations, warranties, covenants or agreements contained in this Agreement, which breach would result in the failure to satisfy one or more of the conditions set forth in this Agreement, and such material breach or other event or condition shall be incapable of being cured or, if capable of being cured, shall not have been cured within twenty-one (21) calendar days after written notice thereof shall have been received by Seller; provided, that Purchaser is not in material breach of this Agreement as of such date;

8.1.5.    by Seller, if there shall have been a material breach by Purchaser of any of its representations, warranties, covenants or agreements contained in this Agreement, which breach would result in the failure to satisfy one or more of the conditions set forth in this Agreement, and such material breach or other event or condition shall be incapable of being cured or, if capable of being cured, shall not have been cured within ten (10) calendar days after written notice thereof shall have been received by Purchaser; provided, that no Seller is in material breach of this Agreement as of such date; or

8.1.6.    by Purchaser on or after the date the Sale Order ceases to be in full force and effect, or is revoked, rescinded, vacated, materially modified, reversed or stayed, or otherwise rendered ineffective by a court of competent jurisdiction.

**ARTICLE IX**
**EVIDENCE OF TITLE AND WATER SUPPLY AGREEMENTS**

9.1.    **Abstract of Title.**  Within thirty (30) days following the Effective Date, Seller shall, deliver to Purchaser (or its attorneys) a 60-year title abstract and tax search of the Property (the "Title Search"). Purchaser shall be responsible for obtaining a commitment for title insurance prepared by a title company of Purchaser's choice covering the Property (the "Title Commitment"), committing the Title Company to issue to Purchaser, upon the recording of the Bargain and Sale Deed, an ALTA fee title insurance policy in the full amount of the Purchase Price, together with legible copies of all documents referenced in Schedules B-1 or B-2 to the Title Commitment. Purchaser shall be responsible for paying the cost of the Title Search at the Closing, and Purchaser shall be solely responsible for the cost of the procurement and issuance of the Title Commitment and the premium for the title insurance policy, such responsibility shall survive the Closing or cancellation of this Agreement.

9.2.    **Condition to Title**. The Property shall be sold and conveyed, and Purchaser shall purchase the Property, (i) free and clear of all Liens pursuant to Section 363(f) of the Bankruptcy Code, with such Liens to attach to the consideration to be received by Seller in the same priority and subject to the same defenses and avoidability, if any, as before the Closing, and (ii) subject to: (a) the terms and conditions of the Sale Order, (b) such title exceptions affecting the Property as the Title Company (or any other reputable title insurance company licensed to do business in the State of New York) shall, at regular rates, be willing to omit as exceptions to coverage, and (c) those matters listed in Exhibit "C-1" to this Agreement (collectively, the "Permitted Exceptions"). Seller

and Purchaser hereby expressly agree that the state of title set forth in the Sale Order and Exhibit "C-1" hereto, including the Permitted Exceptions, reflect good, marketable, insurable and acceptable title to the Property.

      9.3.    **Survey**. Purchaser shall have the right, but not the obligation, to order a new survey of the Property (a "Survey"), at Purchaser's sole cost and expense and, if Purchaser elects to obtain a Survey, Purchaser shall deliver a copy of the Survey to Seller upon receipt. Notwithstanding the foregoing, Closing shall not be subject to or conditioned upon Purchaser's or Seller's receipt of or Title Company's review a Survey.

      9.4.    **Approval of Water Supply Agreements**. Within thirty (30) days following the Effective Date, Seller shall deliver to Purchaser (or its attorneys) copies of the existing agreements between Seller and the owners of three residential properties located adjacent to the Property (collectively, the "Water Supply Agreements") pursuant to which Seller furnishes water to such property owners on the terms and conditions set forth in the Water Supply Agreements. Seller shall, at the time of Closing, assign to Purchaser all of Seller's rights under the Water Supply Agreements, and Purchaser shall assume all of Seller's obligations thereunder pursuant to written assignment and assumption agreements (collectively, the "Water Supply Assignment and Assumption Agreements").

**ARTICLE X**
**CLOSING ADJUSTMENTS**

      10.1.    **Apportionment**. The following shall be apportioned on the Closing Statement against sums due Seller at Closing:

          10.1.1.    Seller shall pay for the New York real property transfer tax due, if any, in connection with this transaction.

          10.1.2.    Purchaser shall pay all recording fees and other charges and fees payable in connection with the recording of the Bargain and Sale Deed.

          10.1.3.    Purchaser shall also pay for (1) the examination and search fees incurred by the Title Company to prepare the Title Search; (2) the examination and search fees incurred by the Title Company to acquire the Title Commitment, (3) all premiums charged on the owner's policy of title insurance issued to Purchaser pursuant to the Title Commitment, including, without limitation, the costs of any endorsements or extended title insurance coverage requested by Purchaser, and (4) the charges for preparing the Survey, if applicable.

          10.1.4.    Each party shall bear its own attorneys' fees in connection with its negotiation, due diligence investigation and conduct of the transaction.

      10.2.    **Real Estate Taxes and Other Charges**. Real estate taxes, utilities, including but not limited to water charges, sewer, rents and fuel, and all other customary items shall be adjusted, apportioned and allowed as of the Closing Date, if necessary by an estimated tax calculation, with

11

the Closing Date being a day of income and expense to the Purchaser.  If at any time up to the Closing Date, the Property or any part thereof shall be or shall have been affected by an assessment or assessments for municipal improvements whether or not confirmed or completed an whether or not payable in installments, then for purpose of this Agreement, the proportional share of all of the unpaid installments of any such assessment(s), which are to become due and payable after the delivery of the Bargain and Sale Deed contemplated hereunder, shall be paid by the Purchaser. Installments allocable to period prior to the Closing and unpaid as of the Closing Date shall be paid by Seller or allowed as a reduction in the Purchase Price.

## ARTICLE XI
## POSSESSION

11.1.   **Right to Possession**.  Right to possession of, and control over, the Property shall transfer to Purchaser on the Closing Date.  On the Closing Date, Seller shall:

    11.1.1.   Transfer possession to Purchaser of the Property in AS-IS, WHERE IS condition.

    11.1.2.   Transfer and deliver to Purchaser all keys, pass keys, pass codes, security codes, locks and safe combinations and all other similar items in Seller's possession as Purchaser may require to obtain occupation and control of the Property.

    11.1.3.   Make available to Purchaser originals of all documents, instruments and agreements in Seller's possession that are required to be transferred to Purchaser by this Agreement.

11.2   **Limited Right to Post-Occupancy**. Notwithstanding the foregoing and provided that Seller notifies Purchaser prior to the entry of the Sale Order, Seller shall have the right to store, maintain, and remove the Excluded Items from the library until December 31, 2024 (the "Post-Occupancy"), the terms and conditions substantially set forth in **Exhibit D**.

## ARTICLE XII
## AS-IS, WAIVER AND RELEASE

12.1.   As a material inducement to the execution and delivery of this Agreement by Seller and the performance by Seller of its duties and obligations hereunder, Purchaser does hereby acknowledge, represent, warrant and agree, to and with Seller, that (i) Purchaser is purchasing the Property in an "AS-IS" condition as of the Closing Date with respect to any facts, circumstances, conditions and defects, latent or patent; (ii) Seller has no obligation to repair or correct any such facts, circumstances, conditions or defects or compensate Purchaser for same; (iii) Purchaser has undertaken all such physical inspections and examinations of the Property as Purchaser deems necessary or appropriate under the circumstances, and that based upon same, Purchaser is and will be relying strictly and solely upon such inspections and examinations and the advice and counsel of its agents and officers, and Purchaser is and will be fully satisfied that the Purchase Price is fair and adequate consideration for the Property; (iv) Seller is not making and has not made any warranty or representation with respect to all or any part of the Property (including, but not limited

**Purchase and Sale Agreement**
**for 711 Knox Road, Aurora, NY**

17429967.12

to, any matters contained in documents made available or delivered to Purchaser in connection with this Agreement as an inducement to Purchaser to enter into this Agreement and thereafter to purchase the Property or for any other purpose); and (v) by reason of all of the foregoing, Purchaser shall assume the full risk of any loss or damage occasioned by any fact, circumstance, condition or defect pertaining to the physical and financial condition of the Property, including without limitation the presence of any asbestos containing material, hazardous, toxic or radioactive waste, substance or materials in, on, under or about the Property, and Purchaser hereby expressly and unconditionally waives and releases Seller and all of their parents, subsidiaries, Affiliates and partnerships, and its and their respective officers, directors, shareholders, partners, agents and employees, and their respective successors, heirs and assigns and each of them (individually and collectively, the "Released Parties") from any and all rights and claims against Seller and/or the Released Parties with respect to the condition of the Property, including without limitation any rights of Purchaser under the State or Federal Comprehensive Environmental Response, Compensation and Liability Act, as amended from time to time, or similar Laws.  Purchaser acknowledges and agrees that the foregoing waiver and release includes all rights and claims of Purchaser against Seller pertaining to the condition of the Property, whether heretofore or now existing or hereafter arising, or which could, might, or may be claimed to exist, of whatever kind or nature, whether known or unknown, suspected or unsuspected, liquidated or unliquidated, each as though fully set forth herein at length, which in any way arise out of, or are connected with, or relate to, the condition of the Property.  The foregoing provisions shall survive the Closing Date and the consummation of the transaction contemplated by this Agreement.

**ARTICLE XIII**
**DEFAULT**

13.1.  **Seller Default**.  In the event that Seller shall be in material default hereunder for any reason other than Purchaser's default, Purchaser may deliver a written notice to Seller stating with particularity the alleged default of Seller, the action required by Seller to cure such default, and Purchaser's intent to exercise its remedies provided below if the default is not cured.  Seller shall have twenty-one (21) days after receipt of such notice to cure the alleged default to Purchaser's reasonable satisfaction (and the Closing Date shall be delayed, if necessary, until the end of such twenty-one (21) day period).  In the event such default is not cured within such twenty-one (21) day period, then Purchaser may elect, as its sole and exclusive remedy, to seek to enforce specific performance only for failure to cause the Property to be conveyed in accordance with the terms and provisions hereof (without any reduction in the Purchase Price) or to terminate this Agreement by written notice to Seller and the Title Company, whereupon Purchaser shall be entitled to a full refund of the Earnest Money Deposit.  It is expressly understood and agreed that the remedy of specific performance shall not be available to enforce any other obligation of Seller hereunder other than a failure to cause the Property to be conveyed in accordance with the terms and provisions of this Agreement.  Purchaser shall be deemed to have elected to terminate this Agreement if Purchaser fails to file suit for specific performance against Seller in Bankruptcy Court, or, with the permission of Bankruptcy Court, in a court having jurisdiction in the county and state in which the Property is located, on or before thirty (30) days following the date upon which the Closing was to have occurred pursuant to this Agreement.  Notwithstanding anything to the contrary contained herein, Purchaser shall have no right to specific performance of this Agreement, nor shall Seller have any authority or obligation to transfer the Property to Purchaser

13

pursuant to this **Article XIII** absent the entry of a Sale Order by the Bankruptcy Court authorizing and directing such conveyance of the Property by Seller to Purchaser.

13.2.    **Purchaser Default**.  In the event that Purchaser shall be in default hereunder for any reason other than Seller's default, Seller may deliver a written notice to Purchaser stating with particularity the alleged default of Purchaser, the action required by Purchaser to cure such default and Seller's intent to terminate this Agreement if the default is not cured.  Purchaser shall have ten (10) days after receipt of such notice to cure the alleged default to Seller's reasonable satisfaction (and the Closing Date shall be delayed, if necessary, until the end of such ten (10) day period).  In the event such default is not cured within such ten (10) day period, then Seller may, as Seller's sole and exclusive remedy for such default, terminate this Agreement by written notice to Purchaser and the Title Company, whereupon Seller shall be entitled to retain the Earnest Money Deposit as full liquidated damages for such default of Purchaser.  It is hereby agreed that Seller's damages in the event of a default by Purchaser hereunder are uncertain and difficult to ascertain, and that the Earnest Money Deposit constitutes a reasonable liquidation of such damages and is intended not as a penalty, but as full liquidated damages.  Purchaser covenants not to bring any action or suit challenging the amount of liquidated damages provided hereunder in the event of such default.  Notwithstanding anything to the contrary contained herein, this provision shall in no way affect or impair Seller's right of recovery under any indemnity given by Purchaser in favor of Seller under this Agreement.

## ARTICLE XIV
## WAIVER OF INSPECTION, VIOLATIONS, AND LOCAL REQUIREMENTS

14.1.    Purchaser expressly waives any and all right to an inspection of the Property by a licensed inspector, licensed contractor or licensed engineer prior to the Closing Date.

14.2.    Notwithstanding the foregoing, Seller grants Purchaser and any Representative of Purchaser, after reasonable notice to Seller, reasonable access to conduct a final walk through of the Property with all utilities in service within forty-eight (48) hours prior to the Closing to ensure that all conditions of this Agreement have been met by Seller.

14.3.    Purchaser shall accept the Property subject to any and all violations of law, rules, regulations, ordinances, orders or requirements issued by any Federal, state, county, municipal or other department or governmental agency having jurisdiction against or affecting the Property (collectively, "Violations").  Seller shall have no obligation to cure or remove any Violations existing as of the Effective Date.

14.4.    To the extent the Town of Aurora, County of Erie, State of New York, or any other governmental agency or authority having jurisdiction (collectively, "Governmental Authorities") imposes requirements for issuance certificates of occupancy, certificates of compliance, certificates of inspection of sanitary sewer and/or storm sewer fixtures or facilities, or any other inspection and/or certification requirements in connection with and as a condition to the sale of the Property (collectively, "Local Requirements"), Purchaser shall be deemed to have waived all such Local Requirements to the extent the same are waivable.  To the extent any such Local

**Purchase and Sale Agreement
for 711 Knox Road, Aurora, NY**

17429967.12

Requirement or Local Requirements are not waivable by Purchaser, Purchaser shall comply with the Local Requirement(s) in question at Purchaser's sole cost.

## ARTICLE XV
## BROKER

15.1.    **Broker Commission**.    In connection with the consummation of the sale contemplated by this Agreement, Seller shall be solely responsible for paying a broker's commission to Hanna CRE from the proceeds of the Purchase Price and pursuant to the terms of a separate agreement in an amount not to exceed five percent (5%) of the gross profit.    No commissions shall be due or payable to Hanna CRE unless and until the Closing contemplated hereby occurs.    Purchaser and Seller each represent and warrant to the other that, except for the Hanna CRE, they have not employed, retained or consulted with any other broker, agent or finder in connection with the solicitation of Purchaser, the negotiations in connection with this Agreement or the purchase and sale referenced herein.

## ARTICLE XVI
## BIDDING PROCEDURES AND ALTERNATIVE TRANSACTION

16.1.    **Sale Motion**.    The Parties acknowledge that this Agreement is subject to approval of the Bankruptcy Court, which approval will include, among other things, issuance by the Bankruptcy Court of a Bidding Procedures Order directing the manner in which a bidding procedure will be conducted for solicitation of competing offers from third parties for the purchase of the Property.    Depending upon the outcome of the bidding procedure, this Agreement may be subject to termination by Seller, as hereinafter provided.    Seller shall file a motion to approve this Agreement (the "Sale Motion") and to establish reasonable bidding procedures (the "Bidding Procedures") within twenty-one (21) days of the Effective Date of this Agreement.

16.2.    **Higher Bids**.    This Agreement is subject to higher and better offers pursuant to the Bidding Procedures to be established by the Bankruptcy Court, and is subject to termination pursuant to **Article VIII**.

16.3.    **Alternative Transaction**.    If the Bankruptcy Court shall enter a final Sale Order approving a purchase of the Property by an Alternative Bidder (as hereinafter defined), then Seller shall terminate this Agreement, by written notice to Purchaser, Purchaser shall be entitled to receive a refund of the Earnest Money Deposit, and Seller shall be free to consummate a sale of the Property to the Alternative Bidder (and "Alternative Transaction").

16.4.    **The Bidding Procedures**.    Subject to the approval by the Bankruptcy Court, Bidding Procedures shall include the following:

16.4.1.    the procedures for solicitation of competing offers from third parties for the purchase of the Property (each, a "Alternative Bidder");

16.4.2.    any bid submitted by an Alternative Bidder shall include proof of funds and a signed Purchase and Sale Agreement along with a marked copy showing any changes from this Agreement;

**Purchase and Sale Agreement
for 711 Knox Road, Aurora, NY**

16.4.3.    any bid submitted by an Alternative Bidder must exceed the Purchase Price set forth in this Agreement by Ten Thousand Dollars ($10,000.00) (the "Initial Overbid");

16.4.4.    any subsequent bidding after the Initial Overbid shall be in minimum increments of $100,000.00, with minimum subject to modification in the Seller's sole and absolute discretion;

16.4.5.    the procedures for an auction to determine the highest and best offer for the Property (the "Successful Bidder");

16.4.6.    such further terms as are determined to be necessary by Seller in order to obtain Bankruptcy Court approval of the Bidding Procedures; and

16.4.7.    Purchaser shall be allowed to participate in the bidding process along with Alternative Bidders.

16.5.    **Backup Bidder**.  In the event that the Purchaser is not the Successful Bidder in the bidding process, the Purchaser's bid (as reflected in this Agreement or in any higher bid placed by Purchaser during the bidding process) shall remain irrevocable as the backup bidder (the "Backup Bidder") until the earliest of: (i) a period of sixty (60) days from the Sale Order, or (ii) the closing of a sale with the Successful Bidder.

## ARTICLE XVII
## MISCELLANEOUS

17.1.    **Amendment**. This Agreement shall not be amended, modified, supplemented, or revoked, except by a writing signed by Seller and Purchaser.

17.2.    **Governing Law**.  This Agreement shall be governed by and construed, interpreted and enforced in accordance with the Laws of the State of New York without regard to conflicts of Laws or choice of Laws principles thereof that would cause the application of the Laws of any jurisdiction other than the State of New York.

17.3.    **Binding Effect**.  This Agreement shall bind the parties hereto, their respective heirs, successors and assigns.  Except as set forth in **Section 17.5** hereof, neither Purchaser nor Seller may assign its interest hereunder without the prior written approval of the other party.

17.4.    **Notices**.  All notices required under this Agreement shall be in writing and shall be: (i) personally delivered; (ii) sent by certified mail, return receipt requested, postage pre-paid; or (iii) sent by nationally recognized overnight air courier service at the expense of sender, addressed to the parties hereto at their respective addresses set forth below.  Such notice or other communication shall be deemed given upon delivery, or if delivery is refused, upon refusal to accept delivery. Notice hereunder may be given at the following addresses:

If to Seller:                    The Diocese of Buffalo, N.Y.
                                 795 Main Street

|  | Buffalo, New York 14203 |
|---|---|
|  | Attn: Richard Suchan |

With a copies to:                  Bond Schoeneck & King PLLC
110 W. Fayette Street
One Lincoln Center
Syracuse, New York 13202
Attn:  Charles Sullivan, Esq.
         Jeffrey Eaton, Esq.
Email: csullivan@bsk.com
        jeaton@bsk.com

Bond, Schoeneck & King PLLC
200 Delaware Avenue
Suite 900
Buffalo, New York 14202
Email: swheeler@bsk.com
Attn: Sarah Wheeler, Esq.

If to Purchaser:                 World Mission Society, Church of God
a New Jersey Nonprofit Corporation
Email: Eduard.Rodriguez@zionusa.org
Attn: Eduard Rodriguez

With a copy to:               Augello & Matteliano, LLP
403 Main Street, Suite 420
Buffalo, New York 14202
Email:   traugello@damglaw.com
Attn:   Thomas R. Augello, Esq.

The above notwithstanding, notice may be given by email from one party's attorney to the other party's attorney, with a copy by first class mail, addressed to the respective attorney above. Notice upon brokers, realtors, or other third parties shall be deemed courtesy copies only.

    17.5.  **Time for Performance**.  Time shall be of the essence for purposes of this Agreement.

    17.6.  **Assignability**.  Purchaser shall not have the right to assign this Agreement and its rights hereunder without Seller's prior written consent, unless such assignment is to a single asset entity in which Purchaser owns a controlling interest, in which case, Seller's consent shall not be required, provided, however, that upon such assignment, Purchaser shall in no way be released or relieved of any of its obligations under this Agreement.

17

Purchase and Sale Agreement
for 711 Knox Road, Aurora, NY

17429967.12

17.7.    **Number and Gender**.  Whenever required by the context or use in this Agreement, the singular word shall include the plural word and the masculine gender shall include the feminine and/or neuter gender, and vice versa.

17.8.    **Captions**.  The paragraph titles, headings and/or captions contained herein have been inserted solely as a means of reference and convenience.  Such captions shall not affect the interpretation or construction of this Agreement and shall not define, limit, extend or otherwise describe the scope of this Agreement or the intent of any provision hereof.

17.9.    **Counterparts and Electronic Delivery**.  This Agreement may be executed in any number of counterparts, each of which, when executed, shall be deemed to be an original, all of which shall be deemed to be one and the same instrument.  This Agreement may be delivered by Facsimile or email transmission, and facsimile, email, or photocopies of the fully executed Agreement shall have the same force and effect as originals.

17.10.    **Legal Counsel**.  Purchaser and Seller acknowledge that they have been, or have had the opportunity to be, represented by legal counsel in connection with this Agreement and that this Agreement is the product of extensive negotiations between the parties.  Purchaser and Seller agree that the fact that this Agreement or one or more provisions hereof were drafted by one party or the other shall not affect the meaning or interpretation of this Agreement.

17.11.    **Waiver**.  No action taken pursuant to this Agreement, including any investigation by or on behalf of any party, shall be deemed to constitute a waiver by any party taking such action of compliance with any representation, warranty, covenant, or agreement contained herein.  The waiver by any party hereto of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

17.12.    **Third Party Beneficiaries**. Nothing in this Agreement is intended, nor shall anything herein be construed, to confer any rights, legal or equitable, in any Person other than the parties hereto and their permitted successors and assigns.  There are no third party beneficiaries to this Agreement.

17.13.    **Cooperation and Further Assurances**.  The Parties shall use their respective commercially reasonable efforts to (a) take or cause to be taken all actions, and to do or cause to be done all other things, necessary, proper or advisable to expeditiously satisfy the closing conditions set forth herein and to consummate the transactions contemplated hereby as promptly as practicable and evidence the consummation of the transactions contemplated hereby, and (b) obtain in a timely manner all necessary waivers, consents and approvals and to effect all necessary registrations and filings in connection with the foregoing.  Seller shall assist with such other post-closing matters as Purchaser may reasonably request, provided that the performance of such matters is within Seller's ordinary course of business and does not require an order of the Bankruptcy Court.

17429967.12

17.14.  **No Merger**. Except as otherwise expressly provided herein, the provisions of this Agreement containing agreements between the parties relating to actions occurring after Closing shall not be merged into the instruments of Closing but shall expressly survive and be enforceable according to their terms.

17.15.  **Notification of Certain Matters**.  From time to time prior to the Closing Date, the Parties shall promptly notify each other of the occurrence or non-occurrence of any event or circumstance that as applicable, indicates (a) that any of the representations and warranties set forth herein may not be, will not be, or are not, true and correct, or (b) any failure on its part to comply with or satisfy, in any material respect, any covenant, agreement or condition to be complied with or satisfied by it pursuant hereto (any such notification, a "Required Notification"); provided, however, that in each case, such disclosure shall not be deemed to (i) amend or supplement any Schedule hereto, or (ii) cure any breach of such representation, warranty, covenant or agreement or satisfy any condition set forth herein.

17.16.  **Entire Agreement**. This Agreement, including the exhibits and schedules, contains the entire agreement between Seller and Purchaser pertaining to the transaction contemplated hereby and fully supersedes all prior agreements and understandings between Seller and Purchaser pertaining to such transaction. If any provision hereof is determined by a court of competent jurisdiction to be invalid or unenforceable, the remainder of this Agreement shall nonetheless remain in full force and effect. This Agreement may be amended, modified, or supplemented only by an instrument in writing signed by the parties.

17.17.  **Escrow Agent and Earnest Money Deposit.** The Earnest Money Deposit made by Purchaser under the terms of this Agreement shall be held by the Seller's attorneys, **Bond, Schoeneck & King, PLLC** in a non-interest-bearing attorney's trust account, in accordance with and subject to the following provisions:

(a)  Escrow Agent, without risk to Escrow Agent, except for willful misconduct or fraud, shall place the Earnest Money Deposit in a non-interest bearing bank attorney trust account maintained at a commercial bank, savings bank or savings and loan association.

(b)  At the Closing, if any, Escrow Agent shall disburse the Earnest Money Deposit to Seller, and said Earnest Money Deposit shall be credited to the Purchase Price.

(c)  Upon receipt of written demand therefor signed by Seller, stating that Purchaser have defaulted in the performance of Purchaser's obligations under this Agreement and that Seller has terminated this Agreement on account of said default of Purchaser, Escrow Agent shall, subject to the provisions of **Section 17.17(g)**, disburse the Earnest Money Deposit to Seller; provided, however, that Escrow Agent shall not honor such demand until not less than five (5) days after the date on which Escrow Agent shall have given notice to Purchaser (in the manner specified in this Agreement for notices to be given).

(d)  Upon receipt of written demand therefor signed by Purchaser, stating that this Agreement has been terminated and that Purchaser are entitled under the terms of this Agreement to the return of the Earnest Money Deposit, Escrow Agent shall, subject to the provisions of **Section 17.17(g)**, disburse the Earnest Money Deposit to Purchaser; provided,

**Purchase and Sale Agreement**
**for 711 Knox Road, Aurora, NY**

however, that Escrow Agent shall not honor such demand until not less than five (5) days after the date on which Escrow Agent shall have given notice to Seller (in the manner specified in this Agreement for notices to be given).

(e)    If an action or proceeding is commenced by either party to determine the rights of the parties to the Earnest Money Deposit, all attorneys' fees and court costs of the prevailing party shall be borne by whoever shall not prevail in such action or proceeding.

(f)    It is agreed that the duties of Escrow Agent are only as herein specifically provided, are purely ministerial in nature and that Escrow Agent shall incur no liability whatsoever except for willful misconduct or fraud. Seller and Purchaser hereby release Escrow Agent from any act done or omitted to be done by Escrow Agent in good faith in the performance of Escrow Agent's duties hereunder. If requested at Closing, Seller and/or Purchaser shall execute and deliver general releases in the usual form to Escrow Agent.

(g)    Escrow Agent is acting only as a stakeholder with respect to the Earnest Money Deposit. If any dispute shall arise as to whom the Earnest Money Deposit is to be disbursed, Escrow Agent shall not disburse the Earnest Money Deposit to either party but in such event shall hold the same until receipt by Escrow Agent of a written authorization signed by Seller and Purchaser directing the disposition of same, or in the absence of such authorization, Escrow Agent may hold the Earnest Money Deposit until the final determination of the rights of the parties in an appropriate action or proceeding. If such written authorization is not given, or an action or proceeding for such determination is not begun and diligently continued, Escrow Agent may, but is not required to, bring any appropriate action or proceeding for interpleader or other leave to place the Earnest Money Deposit in court pending such determination. All costs of such action or proceeding, including, without limitation, attorneys' fees of Escrow Agent are to be borne by the party who shall not prevail in such action or proceeding. Upon delivery of the Earnest Money Deposit in the manner herein provided, Escrow Agent shall have no further liability hereunder or otherwise. Escrow Agent shall have the right to represent Seller in any dispute between Purchaser and Seller with respect to the Earnest Money Deposit.

(h)    Escrow Agent has executed this Agreement solely to acknowledge Escrow Agent's receipt of the Earnest Money Deposit by check subject to collection, and to evidence Escrow Agent's agreement to act as escrow agent in accordance with the provisions of this **Section 17.17.**

**[Signature Pages Follow]**

Purchase and Sale Agreement
for 711 Knox Road, Aurora, NY

17429967.12

**In Witness Whereof** the parties have executed this Agreement as of the day and year first written above.

**SELLER**: Diocese of Buffalo

_(signature)_
Signature

_Richard C Suchan_
Name

_Chief Operating Officer_
Title

**[Seller Signature Page – 711 Knox Road, Town of Aurora, New York]**

21

**Purchase and Sale Agreement
for 711 Knox Road, Aurora, NY**

17429967 12

**PURCHASER:** World Mission Society, Church of God A NJ Nonprofit Corporation

_____
Signature

JOO CHEOL KIM
_____
Name

PRESIDENT
_____
Title

**[Purchaser Signature Page – 711 Knox Road, Town of Aurora, New York]**

**ESCROW AGENT**:  Bond, Schoeneck & King, PLLC

Signature

Name   Jeffrey D. Eaton

Title   Senior Counsel

**[Escrow Agent Signature Page – 711 Knox Road, Town of Aurora, New York]**

23

Purchase and Sale Agreement
for 711 Knox Road, Aurora, NY

17429967.12

## Exhibit A-1

Property Sketch



Exhibit A

**Purchase and Sale Agreement**
**for 711 Knox Road, Aurora, NY**

17429967.12

Case 1-20-10322-CLB,   Doc 3090,   Filed 08/19/24,   Entered 08/19/24 16:17:44,
Description: Main Document  , Page 40 of 53

## Exhibit A-2

Legal Description of the Property

### PARCEL A

ALL THAT TRACT OR PARCEL OF LAND, situate in the Town of Aurora, County of Erie and State of New York, being part of Lot No. 48, Township 9, Range 6 of the Holland Land Company's Survey, bounded and described as follows:

BEGINNING at a point in the center line of Knox Road, distant 2232 feet southerly from its intersection with the center line of Willardshire Road; thence westerly at an exterior angle of 87° 36', 2097.17 feet to a point; thence northeasterly at an interior angle of 73° 00' 30", 345.47 feet to a point; thence westerly at an exterior angle of 71° 37' 30", 597.40 feet to a point in the easterly line of Lot No. 56, distant 12.63 feet southerly from the northeast corner of lands in said Lot No. 56 conveyed to Fred H. Reuter by deed recorded in Erie County Clerk's Office in Liber 3514 of Deeds at page 75 on March 25, 1944 (designated as Parcel A therein); thence northerly along said east line of Lot No. 56 forming an interior angle of 86° 50' with last above line, 316.92 feet to the northwest corner of lands in Lot No. 48 conveyed to Fred H. Reuter by deed aforesaid (designated as Parcel B therein); thence north 88° 30' east along the north line of lands so conveyed to Fred H. Reuter, 1200 feet to a point in the west line of the middle third of Lot No. 48; thence south 25' east, 257 feet; thence north 88° 05' east along the north line of lands so conveyed to said Fred H. Reuter, 1405 feet to a point in the center line of Knox Road being the northeast corner of lands conveyed to Fred H. Reuter by aforesaid deed; thence southerly along the said center line of Knox Road, 360 feet to the place of beginning.

### PARCEL B

ALL THAT TRACT OF PARCEL OF LAND, situate in the Town of Aurora, County of Erie and State of New York, being part of Lot No. 48, Township 9, Range 6 of the Holland Land Company's Survey, bounded and described as follows:

BEGINNING at a point in the center line of Knox Road distant 2232 feet southerly from its intersection with the center line of Willardshire Road; thence westerly at an interior angle of 87° 36.', 2097.17 feet to a point; thence southwesterly at an interior angle of 106° 59' 30", 189.95 feet to a point; thence southerly at an interior angle of 170° 04', 638.55 feet to a point; thence easterly at an interior angle of 83° 46', 206.85 feet to a point; thence easterly at an interior angle of 178° 52', 166.90 feet to a point; thence easterly at an interior angle of 181° 05' 425 feet to a point; thence southeasterly at an interior angle of 210º 14', 45 feet to a point; thence southeasterly at an interior angle of 196° 09', 100 feet to a point; thence southeasterly at an interior angle of 176° 47', 50 feet to a point; thence southeasterly at an interior angle of 158° 33', 53 feet to a point; thence northeasterly at an interior angle of 150° 15', 527 feet to a point; thence northeasterly at an interior angle of 165° 57', 35 feet to a point; thence northeasterly at an interior angle of 158° 13', 80 feet to a point; thence northeasterly at an exterior angle of 162° 15' 218 feet to a point; thence easterly at an interior angle of 203º42', 400 feet to a point in the center line of Knox Road distant 406.35 feet northerly from the south line of said Lot No. 48 as measured along said center line of said Knox Road; thence northerly along said center line of Knox Road 734.67 feet to the place of beginning.

Purchase and Sale Agreement
for 711 Knox Road, Aurora, NY

17429967.12

**Consolidated Appendix 0389**

**PARCEL C**

ALL THAT TRACT OR PARCEL OF LAND, situate in the Town of Aurora, County of Erie and State of New York, being part of Lots Nos. 47, 48, 55 and 56, Township 9, Range 6 of the Holland Land Company's Survey, bounded and described as follows:

BEGINNING at a point in the easterly line of said Lot No. 56, distant 2191.5 feet southerly from the center line of Willardshire Road as measured along said east line of Lot No. 56, being the northeast corner of lands in said Lot No. 56 conveyed to Fred H. Reuter by deed recorded in Erie County clerk's Office in Liber 3514 of Deeds at page 75 on March 25, 1944 (designated as Parcel A therein); thence southerly along said east line of Lot No. 56, 12.63 feet to a point; thence easterly at an interior angle of 93° 10', 597.40 feet to a point; thence southwesterly at an interior angle of 71° 37' 30", 535.42 feet to a point; thence southerly at an exterior angle of 170° 04', 638.55 feet to a point; thence westerly at an interior angle of 96° 14', 273.15 feet to a point; thence southerly at right angles about 825 feet to the Cazenovia Creek (formerly called the Buffalo Creek); thence westerly along the Cazenovia Creek, about 135 feet to the east line of Lot No. 55; thence southerly along said east line of Lot No. 55 to the center line of said Cazenovia Creek; thence northwesterly and northerly along said center line of Cazenovia Creek about 1965 feet to the northwesterly corner of lands in Lot No. 56 conveyed to Fred H. Reuter by aforesaid deed; thence northeasterly, northerly and easterly along the northerly and westerly lines of lands so conveyed to Fred H. Reuter by aforesaid deed the following 6 courses and distances: (1) North 66° 16' east, 188.60 feet; (2) North 9° 46' east, 268 feet; (3) North 13° 47' west, 105 feet; (4) North 36° 11' east, 106.8 feet; (5) South 73° 37' east, 273 feet and (6) South 87° 42' east, 439 feet to the point or place of beginning.

Exhibit A

Purchase and Sale Agreement
for 711 Knox Road, Aurora, NY

17429967.12

Case 1-20-10322-CLB,   Doc 3090,   Filed 08/19/24,   Entered 08/19/24 16:17:44,
Description: Main Document  , Page 42 of 53

## Exhibit B

Bargain and Sale Deed

**THIS INDENTURE**, made the _____ day of _____ 2024,

BETWEEN

**Diocese of Buffalo**, a New York special act corporation created by the New York State Legislature pursuant to Chapter 568 of the Laws of 1951, having an office at 795 Main Street, Buffalo, New York 14203, party of the first part,

and,

**World Mission Society, Church of God a NJ Nonprofit Corporation**, a New Jersey not-for-profit corporation authorized to conduct business in New York, having an address at 880 Jackson Avenue, New Windsor, New York 12553, party of the second part,

**WITNESSETH** that the said party of the first part, in consideration of One Dollar ($1.00 and No More), lawful money of the United States, paid by the party of the second part, do hereby grant and release unto the party of the second part, the theirs or successors and assigns of the party of the second part forever,

**ALL THAT TRACT AND PARCEL OF LAND,**

Pursuant to Sections _____ of the _____, the Bankruptcy Court of _____ approved the sale contemplated herein by an Order dated _____ and located at Index No. _____ (the "Order"), attached hereto as **<u>Schedule A</u>** shall be incorporated herein and shall be understood to be a part hereof.

TOGETHER with all right, title and interest, if any, of the party of the first part, in and to any streets and roads abutting the above-described premises to the center lines thereof; TOGETHER with the appurtenances and all the estate and rights of the party of the first part in and to said premises; TO HAVE AND TO HOLD the premises herein granted unto the party of the second part, the heirs or successors and assigns of the party of the second part forever.

AND the party of the first part, in compliance with Section 13 of the Lien Law, covenants that the party first part will receive the consideration for this conveyance and will hold the right to receive such consideration as a trust fund to be applied first for the purpose of paying the cost of the improvement and will apply the same first to the payment of the cost of the improvement before using any part of the total of the same for any other purpose.

The word "party" shall be construed as if it read "parties" whenever the sense of this indenture so requires.

Exhibit B                    Purchase and Sale Agreement
                             for 711 Knox Road, Aurora, NY

17429967.12

IN WITNESS WHEREOF, the party of the first part has duly executed this deed the day and year first above written.

### DIOCESE OF BUFFALO

_____
Signature

_____
Name

_____
Title

STATE OF NEW YORK          )
                          )SS.:
COUNTY OF ERIE             )


On the _____ of _____ in the year 2024, before me, the undersigned, a notary public in and for said state, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his/her/their capacity, and that by his/her/their signature on the instrument, the individual or the person upon behalf of which the individual acted, executed the instrument.


_____
Notary Public

**Exhibit C-1**

**PERMITTED EXCEPTIONS**

Exhibit C

Purchase and Sale Agreement
for 711 Knox Road, Aurora, NY

17429967.12

## Exhibit D

POST-OCCUPANCY AGREEMENT

**REAL PROPERTY**: a portion of real property located in the Town of Aurora, County of Erie, New York, commonly known as 711 Knox Road, Aurora, New York, Tax Map No. 163.00-3-23 (the "Real Property")

**SELLERS**:     Diocese of Buffalo

**PURCHASER**:   World Mission Society, Church of God a NJ Nonprofit Corporation

**SELLER'S ATTORNEY**: Bond, Schoeneck & King, PLLC, Attn: Charles Sullivan, Esq.; Jeffrey Eaton, Esq.; and Sarah Wheeler, Esq.

**BUYER'S ATTORNEY**: Augello & Matteliano, LLP, Attn: Thomas R. Augello, Esq.

WHEREAS, Seller and Purchaser (collectively, the "Parties") have entered into to that certain Purchase and Sale Agreement, dated May _____, 2024 (the "Agreement"), with respect to the above-described Real Property;

WHEREAS, due to constraints outside the Parties reasonable control, Seller requires additional time to remove religious materials and texts (the "Excluded Items") currently located on the Real Property, more specifically, located in the library (the "Library");

WHEREAS, Seller and/or its agents or contractors shall have access to the Library, together with ingress and egress through the Real Property, during reasonable business hours and upon reasonable notice to Purchaser, to remove the Excluded Items;

WHEREAS, Seller and/or its agents or contractors shall remove the Excluded Items on or before December 31, 2024 (the "Occupancy Period");

WHEREAS, the Parties hereby agree to provide for a hold back of sale proceeds due to Seller under the Agreement until such a time as Seller and/or its agents or contractors removes the Excluded Items from the Library, the terms and conditions of which are outlined below (the "Post-Occupancy Agreement"); and

NOW THEREFORE, in consideration of the mutual promises and covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.     The Parties agree the per diem value of Seller's sole use and occupancy of the Library after Closing is _____ ($_____.00) (the "Per Diem Rate"). At Closing, Seller shall withhold from the sale proceeds received an amount equal to the Per Diem Rate multiplied by the number of days remaining in the calendar year (the "Withheld Funds"). The Withheld Funds

|  | |
|---|---|
| **Exhibit D** | **Purchase and Sale Agreement**<br>**for 711 Knox Road, Aurora, NY** |

shall be deposited with Seller's Attorney and held in escrow until the Excluded Items are removed from the Real Property.

2.    Upon notification that the Excluded Items were removed from the Library, Seller's Attorney shall calculate the number of days the Excluded Items remained in the Library after Closing and multiply the same by the Per Diem Rate (the "Rent"). Seller's Attorney shall release to Purchaser the Rent from the Withheld Funds. Any Withheld Funds remaining after the deduction of Rent shall be promptly released to Seller.

3.    During the Occupancy Period, Purchaser affirmatively agrees to ensure the Library remains locked, with access and use strictly limited to Seller and/or its agents or contractors.

4.    Seller's attorneys shall not be liable for any act or omission to act under this Post-Occupancy Agreement, except for its own gross negligence or willful misconduct. The Seller's attorney may act upon any instrument or signature believed by it to be genuine and may assume that any person purporting to give any notice or instruction hereunder, reasonably believed by it to be authorized, has been duly authorized to do so. In the event that Seller's attorney should at any time be confronted with inconsistent or conflicting claims or demands by the parties hereto, Seller's attorneys shall have the right to interplead said parties in any court of competent jurisdiction and request that such court determine such respective rights of the parties with respect to this Agreement, and upon doing so, Seller's attorneys shall be released from any obligations or liability to either party as a consequence of any such claims or demands. After the Withheld Funds are disbursed, Seller's attorneys' duties and obligations hereunder shall cease and this Post-Occupancy Agreement shall terminate.

5.    Notices. All notices, demands or request provided for or permitted to be given pursuant to this Escrow Agreement must be in writing. All notices, demands and requests to be sent to the Parties shall be personally delivered, emailed, or sent by mail, postage prepaid, or delivered by a recognized overnight or same day courier or delivery service and addressed to the intended recipient of such notice at the address or email for such Party as set forth below or otherwise provided to the other Parties. All such notices, demands, or requests shall be effective on personal delivery or, upon electronic transmission, or if mailed, three (3) days following deposit in the mail as required by this Section.

6.    Seller's financial obligations arising out of or relating to or in connection with the storage of the Excluded Items during the Occupancy Period shall at no time exceed the amount of the Withheld Funds.

7.    Purchaser, as record title owner, shall be responsible for the payment and maintenance of any utilities servicing the Library and Real Property and the real property taxes and assessments affecting the Library and the Real Property.

8.    This Post-Occupancy Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which, when taken together, constitute one

**Exhibit D**                    **Purchase and Sale Agreement**
                                 **for 711 Knox Road, Aurora, NY**

and the same instrument. Moreover, signatures transmitted electronically by email, facsimile, or PDF, among others, shall be binding as if original.

9.     Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to them in the Post-Occupancy Agreement.

10.     Any provision of the Post-Occupancy Agreement not expressly amended or modified herein shall remain in full force and effect.

11.     Neither this Post-Occupancy Agreement, nor any rights or obligations under it, may be assigned by either party without the prior written consent of the other party.

12.     The recitals of this Post-Occupancy Agreement are hereby incorporated herein as if fully set forth.

[SIGNATURE PAGE TO FOLLOW]

**Exhibit D**

**Purchase and Sale Agreement<br>for 711 Knox Road, Aurora, NY**

17429967.12

IN WITNESS WHEREOF, the undersigned have executed this Post-Occupancy Agreement as of this 12 day of ~~May~~, 2024.
                    June

SELLER:            THE DIOCESE OF BUFFALO


_____
Signature

Richard C. Suchan
Name

Chief Operating Officer
Title


PURCHASER:        WORLD MISSION SOCIETY, CHURCH OF GOD A NJ NONPROFIT CORPORATION

_____
Signature

JOO CHEOL KIM
Name

PRESIDENT
Title


17429967 12                    Exhibit D        Purchase and Sale Agreement        for 71

## **Exhibit 3**

(to Bidding Procedures Order)

Notice of Auction and Sale Hearing

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | |
| The Diocese of Buffalo, N.Y., | ) | Case No. 20-10322 (CLB) |
| | ) | |
| Debtor. | ) | Chapter 11 |
| | ) | |

### *NOTICE OF AUCTION AND SALE HEARING*

PLEASE TAKE NOTICE OF THE FOLLOWING:

1.      On July 18, 2024, the Diocese filed the *Motion for Entry of Orders (I)(A) Approving Bidding Procedures for the Sale of Certain Real Property at 711 Knox Road, East Aurora, New York; (B) Authorizing and Approving the Form of Purchase Agreement; (C) Scheduling an Auction and Hearing to Consider the Sale; and (D) Approving the Form and Manner of Service of Notice of Auction and Sale Hearing; (II) Approving the Sale Free and Clear of Liens, Claims, Encumbrances and Other Interests; and (III) Granting Related Relief* [Docket No. 3031] (the "Sale Motion")[1].

2.      The Diocese is seeking to sell certain real property located at 711 Knox Road, East Aurora, New York 14052 (the "Property") to World Mission Society, Church of God a NJ Nonprofit Corporation or such other purchaser who may submit the highest or otherwise best offer for the Property.

3.      On ____, 2024, the United States Bankruptcy Court for the Western District of New York (the "Bankruptcy Court") entered an order [Docket No. _____] (the "Bidding Procedures Order") approving bidding procedures (the "Bidding Procedures") and granting other relief related to the proposed sale of the Property.  The Bidding Procedures approved by the Court are attached as ***Exhibit 1*** to the Bidding Procedures Order.  Pursuant to the Bidding Procedures Order, if the Diocese receives more than one Qualified Bid for the Property, an Auction for the Property shall take place on October 28, 2024 at 12:00 noon (prevailing Eastern time) at the offices of Bond, Schoeneck & King, PLLC, The Avant Building, Suite 900, 200 Delaware Avenue, Buffalo, New York 14202-2107.  Only parties that have submitted Qualified Bids in accordance with the Bidding Procedures by the Bid Deadline may participate in the Auction.  Any party that wishes to take part in this process and submit a bid for the Property must submit a Qualified Bid prior to the Bid Deadline and in accordance with the Bidding Procedures.

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Sale Motion.

4.    The Sale Hearing to consider approval of the sale of the Property to the Successful Bidder or Back-Up Bidder free and clear of all liens, claims, encumbrances and other interests will be held before the before the Honorable Carl L. Bucki, United States Bankruptcy Court for the Western District of New York, at the United States Courthouse, 2 Niagara Square, Buffalo, NY 14202 on October 29, 2024 at 11:00 a.m. (prevailing Eastern time), or at such other time thereafter as counsel may be heard. The Sale Hearing may be adjourned from time to time without further notice to creditors or parties in interest other than reflected on the Bankruptcy Court's docket or by announcement of the adjournment in open court on the date scheduled for the Sale Hearing.

5.    Parties can choose to appear either (i) in person at the Robert H. Jackson Courthouse, 2 Niagara Square, Buffalo, New York or (ii) telephonically (call in 1-571-353-2301, Courtroom ID 483077448#, and security pin 9999#).

6.    Objections, if any, to the sale, or the relief requested in the Sale Motion must: (a) be in writing; (b) comply with the Bankruptcy Rules and the Local Rules; (c) be filed with the Clerk of the Bankruptcy Court for the Western District of New York (Buffalo Division), as soon as practicable in advance of the Sale Hearing; and (d) be served upon (i) counsel to the Diocese, Bond, Schoeneck & King, PLLC, One Lincoln Center, Syracuse, New York 13202, Attn: Stephen A. Donato, Charles J. Sullivan, Grayson T. Walter, Justin S. Krell and Jeffrey D. Eaton (ii) the Office of the United States Trustee for the Western District of New York, 300 Pearl Street, Suite 401, Buffalo, NY 14202. Attn:  Joseph W. Allen, (iii) counsel to the Official Committee of Unsecured Creditors, Pachulski, Stang, Ziehl & Jones, LLP, 10100 Santa Monica Blvd., 13th Floor, Los Angeles, California, 90067-4003, Attn. James I. Stang, and 780 Third Avenue, 34th Floor, New York, New York, 10017-2024, Attn. Ilan Scharf, and (iv) those persons who have formally appeared and requested service in this case pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedure. UNLESS AN OBJECTION IS SERVED AND FILED IN ACCORDANCE WITH THIS NOTICE, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT AND THE BANKRUPTCY COURT MAY GRANT THE RELIEF REQUESTED IN THE MOTION WITHOUT FURTHER HEARING OR NOTICE.

7.    This Notice is subject to the fuller terms and conditions of the Sale Motion, the Bidding Procedures Order, and the Bidding Procedures, which shall control in the event of any conflict and the Diocese encourages parties-in-interest to review such documents in their entirety. Parties interested in receiving more information regarding the sale of the Property or obtaining a copy of any of the foregoing documents may make a written request to counsel to the Diocese, Bond Schoeneck & King, PLLC, One Lincoln Center, Syracuse, New York, 13202, Attn: Stephen A. Donato, Charles J. Sullivan, Grayson T. Walter, Justin S. Krell and Jeffrey D. Eaton. In addition, copies of the Sale Motion, the Bidding Procedures Order, the Bidding Procedures and this Notice can be obtained free of charge at https://case.stretto.com/dioceseofbuffalo and are on file with the Clerk of the Bankruptcy Court.

Dated: _____, 2024

BOND, SCHOENECK & KING, PLLC

By:___/s/ *Charles J. Sullivan*_____
Stephen A. Donato
Charles J. Sullivan
Grayson T. Walter
Justin S. Krell
Jeffrey D. Eaton
One Lincoln Center
Syracuse, NY 13202-1355
Telephone: (315) 218-8000
Fax: (315) 218-8100
Emails:    sdonato@bsk.com
             csullivan@bsk.com
             gwalter@bsk.com
             jkrell@bsk.com
             jeaton@bsk.com

*Attorneys for The Diocese of Buffalo, N.Y.*

3

18240355.v3-8/19/24
Case 1-20-10322-CLB,    Doc 3090,    Filed 08/19/24    Entered 08/19/24 16:17:44,
Description: Main Document , Page 53 of 53

# Notice Recipients

District/Off: 0209−1                    User: admin                    Date Created: 8/19/2024

Case: 1−20−10322−CLB                    Form ID: pdforder              Total: 6

**Recipients of Notice of Electronic Filing:**

| | | |
|---|---|---|
| aty | Charles J. Sullivan | csullivan@bsk.com |
| aty | Ilan D Scharf | ischarf@pszjlaw.com |
| aty | Stephen A. Donato | sdonato@bsk.com |

TOTAL: 3

**Recipients submitted to the BNC (Bankruptcy Noticing Center):**

| | | | | |
|---|---|---|---|---|
| db | The Diocese of Buffalo, N.Y. | 795 Main Street | Buffalo, NY 14203 | |
| pr | Charles Mendolera | c/o The Diocese of Buffalo, N.Y. | 795 Main Street | Buffalo, NY 14203 |
| smg | Office of the U.S. Trustee | 300 Pearl Street, Suite 401 | Olympic Towers | Buffalo, NY 14202 |

TOTAL: 3

# CONSOLIDATED APPENDIX DOCUMENT NO. 13

```
UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NEW YORK
-------------------------------------------------x
In Re:                          1-20-10322(CLB)
                                Chapter 11
                                Tax ID/EIN: 16-0743984
The Diocese of Buffalo, NY,
                  Debtor.
                                Buffalo, New York
-------------------------------------------------x
```

**TELEPHONIC HEARING**                **August 15, 2024**


TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE CARL L. BUCKI
UNITED STATES BANKRUPTCY JUDGE


APPEARANCES

```
FOR DEBTOR:              BOND, SCHOENECK & KING, PLLC
                         BY:  CHARLES SULLIVAN, ESQ.
                         BY:  JEFFREY D. EATON, ESQ.
                         One Lincoln Center
                         Syracuse, New York 13202

CREDITORS                PACHULSKI, STANG, ZIEHL & JONES LLP
COMMITTEE:               BY:  ILAN D. SCHARF, ESQ.
                         780 Third Avenue
                         34th Floor
                         New York, New York 10017-2024

TRUSTEE:                 OFFICE OF THE U.S. TRUSTEE
                         BY:  JOSEPH W. ALLEN, ESQ.
                         Olympic Towers
                         300 Pearl Street, Suite 401
                         Buffalo, New York 14202




TRANSCRIBER:             Diane S. Martens
                         dmartensreporter@gmail.com


(Proceedings recorded by electronic audio recording,
 transcript produced by computer.)
```

In Re:  Diocese of Buffalo - 20-10322

1              **P R O C E E D I N G S**

2                    *          *          *

3

4       (**WHEREUPON**, proceedings were held via teleconference.)

5       **THE COURT:**  Good afternoon, this is Judge Bucki.

6       We are here to consider a motion that was filed on

7    behalf of the Diocese of Buffalo New York.

8       Preliminarily, I remind everyone online that Local

9    Bankruptcy Rules prohibit the recording or rebroadcasting of

10   any portion of today's proceeding.

11      And I also ask everyone to please identify yourself each

12   time you speak.  We need that to facilitate the preparation

13   of a transcript, should one be necessary or requested.

14      Let me ask do I have anyone appearing -- I want to take

15   appearances -- do I have any appearances on behalf of the

16   Diocese of Buffalo?

17      **MR. SULLIVAN:**  Yes, your Honor, good afternoon, your

18   Honor.  It's Charles Sullivan and Jeffrey Eaton on behalf of

19   the Diocese.

20      **THE COURT:**  All right.  Thank you.

21      Do I have anyone appearing on behalf of the Official

22   Committee of Unsecured Creditors?

23      **MR. SCHARF:**  Yes, your Honor, Ilan Scharf, Pachulski,

24   Stang Ziehl & Jones on behalf of the Committee.

25      **THE COURT:**  All right.  Thank you.

Consolidated Appendix 0405

In Re:  Diocese of Buffalo - 20-10322

1    Do I have anyone appearing on behalf of the Parish

2  Steering Committee?

3    (No audible response.)

4    **THE COURT:**  Apparently not.

5    Do I have the United States Trustee appearing today?

6    **TRUSTEE ALLEN:**  Yes, your Honor, Joseph Allen for the

7  U.S. Trustee.

8    **THE COURT:**  All right.  Thank you.

9    And then who else do I have appearing, please?

10    (No audible response.)

11    **THE COURT:**  All right.  Well, I thank everyone who is

12  appearing and we welcome the parties who are observing in the

13  courtroom and we welcome everyone who is observing online and

14  we certainly encourage and support your presence and

15  participation.

16    Mr. Sullivan, this is your motion so I'll let you speak

17  first.

18    **MR. SULLIVAN:**  Your Honor, thank you.

19    Your Honor, to begin with, with the Court's permission

20  I'd like to first address the motion that appears at docket

21  number 3031.

22    As the Court knows, there was two motions on today:

23    One is for the sale of property located at 711 Knox Road

24  in East Aurora, New York.

25    And the other is the property located at 42 Grant

In Re:  Diocese of Buffalo - 20-10322


1   Street, North Tonawanda, New York.

2        Your Honor, I'd like to address, with the Court's

3   permission, the East Aurora property first.

4        **THE COURT:**  All right.

5        **MR. SULLIVAN:**  So, your Honor, that's the motion that

6   appears on the docket at docket number 3031.

7        And in that motion, the Diocese is seeking entry of two

8   separate orders, your Honor.

9        The first is an order approving the bidding procedures

10  and granting the related relief that's set forth in the

11  motion and that's the Order that we're asking the Court to

12  consider entering in connection with today's hearing.

13       But then the second prong of the motion, your Honor,

14  seeks an Order approving the sale of the property which would

15  be presented to the Court, your Honor, at a separate hearing,

16  not at today's hearing.

17       Your Honor, the property in question is located at

18  711 Knox Road in East Aurora, New York.  This is property

19  that's owned by the Diocese of Buffalo.  This property, the

20  real property which consists of about 117 acres and the

21  improvements on the property were formerly used as the campus

22  for the former Christ the King Seminary which ceased

23  operations some time ago, your Honor.

24       In connection with today's hearing, of course, as I

25  mentioned, the Diocese is seeking only the first prong or

In Re:  Diocese of Buffalo - 20-10322

1   phase of the relief which is specifically entry of the

2   Bankruptcy Order that's attached to the motion.

3       We're also seeking authorization and approval of the

4   proposed Form of Purchase Agreement that's appended to the

5   motion and asking the Court to schedule an auction and sale

6   hearing to take place and then, finally, approving the form

7   and manner of notice that is provided for in the motion.

8       Your Honor, the terms of sale, I'd certainly refer to

9   the motion and the form of the Stalking Horse purchase

10  agreement for the full terms of sale.  But for purposes of

11  today's hearing, I wanted to identify the material terms of

12  that purchase and sale agreement.

13      Your Honor, the Stalking -- the identified Stalking

14  Horse purchaser is World Mission Society Church of God.  The

15  proposed purchase price is $3,800,000.  And I will note that

16  the Stalking Horse purchaser has tendered a deposit of

17  $380,000.  The purchase, of course, is subject to higher and

18  better bids which is why the Diocese is requesting an

19  opportunity to solicit those bids and to conduct an auction

20  sale in the event that the -- in the event that the

21  hearing -- other bids are submitted.

22      The agreement also provides for a post-occupancy

23  agreement under which the Diocese would be permitted until

24  12/31 of this year, your Honor, to remove certain items of

25  personal property from the premises.  It's not, I don't

In Re:  Diocese of Buffalo - 20-10322

1  think, your Honor, it's specifically contemplated that the

2  entirety of that time will be necessary but it is something

3  that has been requested and agreed to by the Stalking Horse

4  purchaser and made part of that agreement to give the Diocese

5  some time to remove a library and certain related items out

6  of one of the buildings on the premises, your Honor.

7       **THE COURT:**  But you were very careful --

8       **MR. SULLIVAN:**  I --

9       **THE COURT:**  Mr. Sullivan, let me ask you a question.

10      You were very careful in the way you phrased the

11  statement that you made.

12      Are the personal items assets of the Diocese or are they

13  assets of Christ the King Seminary or are they assets of a

14  different entity?

15      **MR. SULLIVAN:**  Your Honor, I think many of those

16  assets -- and I'll ask Mr. (indiscernible) -- but many of

17  those assets are of a different entity that's affiliated with

18  the Diocese.  And there may be some -- I believe there are

19  some items of personal property that belong to the Diocese.

20      **THE COURT:**  All right.  So you're looking to remove

21  those items but not necessarily -- they may or may not be

22  property of the bankruptcy estate is what you're saying?

23      **MR. SULLIVAN:**  That is correct, your Honor.

24      **THE COURT:**  All right.  Go ahead.

25      **MR. SULLIVAN:**  Your Honor, to give the Court a little

In Re:  Diocese of Buffalo - 20-10322

1   bit more background about the proposed sale, as the Court

2   will recall, the Diocese sought authorization to employ Hanna

3   Commercial Real Estate as its real estate broker.  Once Hanna

4   was engaged, it undertook an extensive bargaining effort

5   related to this property and multiple parties were contacted

6   and expressed an interest in the property.  And the Stalking

7   Horse purchaser agreement represents the highest and best

8   offer that was developed as a result of that (extraneous

9   noise) (indiscernible).

10       Your Honor, we are proposing that the property be

11  advertised for sale for an additional period of 60 days and

12  that we would provide the form of notice that is outlined in

13  Paragraphs 10 and 11 of the motion, which includes, among

14  other things, your Honor, providing notice of the sale to the

15  Office of the U.S. Trustee, all notice of appearing parties

16  and other creditors, parties (indiscernible) to the case but,

17  also, to all of those parties who have expressed any bona

18  fide interest in acquiring the property to date, your Honor,

19  to see if any of those interested parties would come forward

20  and express bids through this process.

21       Your Honor, the proposed bidding procedures include,

22  among other terms, that the potential bidder would be

23  required to submit -- any potential bidder would be required

24  to submit a competing offer on the form of the Stalking Horse

25  Purchase Agreement marked against that agreement to show any

In Re:  Diocese of Buffalo - 20-10322

1  changes, along with proof of financial wherewithal to proceed

2  with the transaction, your Honor.  All is described more

3  fully in the motion which the Diocese would, would certainly

4  contemplate would be in consultation with the Committee

5  concerning the wherewithal of any other purchaser to acquire

6  the property.

7       The bidding procedures also provide that due diligence

8  must be completed before the bid deadline so that there will

9  be no contingency for further diligence on the property, your

10 Honor, after that date.

11      The initial minimum overbid is proposed to be $100,000

12 which is the same amount as the bidding increments for any

13 bidding that would take place at an auction, should there be

14 competing bids.  Your Honor, this proposed sale involved no

15 break-up fee, or expense reimbursements to the Stalking Horse

16 purchaser.

17      Any competing bid must be accompanied by a deposit

18 reflecting 10 percent of the proposed purchase price and a

19 commitment to be the backup bidder in the event that the

20 successful -- the sale to the successful bidder does not

21 close, your Honor.

22      Your Honor, we have asked the Court to set a bid

23 deadline of approximately 60 days after entry of the Bidding

24 Procedure is ordered and if there are competing bids, your

25 Honor, which we certainly hope there will be, we would ask

In Re:  Diocese of Buffalo - 20-10322

1  that a, that an auction take place, you know, shortly after

2  that, after the Diocese and the Committee have had an

3  opportunity to look at the qualified bids.

4       Your Honor, I think lining up on the calendar, we're

5  suggesting approximately the week of October 23rd for the

6  deadline of submitting competing bids and the week of

7  October 28th for a sale hearing, should that be necessary.

8       And, finally, your Honor, we're asking that the proposed

9  Form of the Notice of the Sale Hearing as set forth in the

10  motion be approved.

11       Your Honor, the Diocese respectfully asserts that the

12  proposed sale is within the sound business judgment of the

13  Diocese and will benefit the Diocese, its estate and

14  creditors.

15       I'm happy to respond to any questions that the Court may

16  have concerning the proposed bidding procedures.

17       **THE COURT:**  All right.  I have some questions but before

18  I get there, let me ask:  Does anyone else on line want to

19  speak to this motion?

20       **MR. SCHARF:**  Your Honor, we've reviewed the motion.

21  It's necessarily straightforward bidding procedure and,

22  therefore, we think it makes sense for the sale of this

23  property.

24       **THE COURT:**  You're amenable to the proposal of $100,000

25  increments in the bidding.

In Re:  Diocese of Buffalo - 20-10322

1    **MR. SCHARF:**  Yeah, I mean, given the size of the

2    property, it makes sense to avoid spending too much time with

3    de minimis increments given professionals attending an

4    auction (indiscernible) probably outweigh the (indiscernible)

5    sometimes.  Or small increments, your Honor.

6    **THE COURT:**  All right.  Okay.  So you're supporting the

7    application?

8    **MR. SCHARF:**  Yes, your Honor.

9    **THE COURT:**  Anyone else want to speak to the Court?

10   **TRUSTEE ALLEN:**  Your Honor, the U.S. Trustee has no

11   objection.  We did review both motions and we did focus on

12   the bidding increments and we note that, in light of the fact

13   that there's no break-up fee being proposed, we think the

14   bidding increments are reasonable and are within a range of

15   reasonableness as far as we can tell from case law that

16   addresses the bidding increments.

17   **THE COURT:**  All right.  Anyone else want to speak?

18   (No audible response.)

19   **THE COURT:**  I have some questions.

20   Mr. Sullivan, I'm not sure if it was you or one of your

21   colleagues that was appearing before me when the motion was

22   brought to approve the appointment of an auctioneer, but at

23   that time I asked for copies of title documentation which I

24   received and I issued the suggestion that I would be looking

25   at that title to see if there were any issues that required

In Re:  Diocese of Buffalo - 20-10322

1  particular attention.  And there are two such issues and, of

2  course, the title documents are a matter of public record and

3  so we have looked at those.

4       It appears that the property was originally acquired

5  some time around 1959 and then was eventually conveyed to an

6  ent -- it was acquired by the Diocese and then conveyed to an

7  entity called St. John Vianney Seminary and then St. John

8  Vianney Seminary reconveyed the property in February of 20 --

9  of 1987 back to the Diocese.

10      And in the deeds, which are deeds that you provided the

11  Court with copies of, it contains the following language:

12  That deed was subject to a 99-year lease of the above premise

13  to Christ the King Seminary made as of September 1, 1974.

14      So, my reading of this is that the property may be owned

15  by the Diocese but is subject to a 99-year lease.  What are

16  your expectations and the expectations of any proposed

17  purchaser with regard to this limitation of a lease and if,

18  indeed, the entity Christ the King Seminary is a separate

19  legal entity, will they be retaining the benefits of a

20  99-year lease?

21      **MR. SULLIVAN:**  Your Honor, with respect to that lease,

22  as I indicated, the Christ the King Seminary has ceased its

23  operations and is no longer functioning as a Seminary and

24  your Honor, the Board of Trustees of Christ the King Seminary

25  has already authorized the relinquishment of the release in

In Re:  Diocese of Buffalo - 20-10322

1    question and it is our expectation that, upon entry of this

2    Bidding Procedures Order, we will make an application to the

3    New York State Attorney General's Office for approval of that

4    relinquishment by -- not we, but the Seminary corporation

5    will for approval of that relinquishment which we anticipate

6    will happen within three, four weeks, well within the period

7    of time that we've proposed for the marketing, such that as

8    of the point in time that the auction sale takes place, we

9    will be able to announce to the purchasers that the lease has

10   been relinquished and terminated.

11        **THE COURT:**  Do you expect that authorization to be in

12   place prior to the publication and noticing of the proposed

13   sale?

14        **MR. SULLIVAN:**  We do not, your Honor.  And we certainly

15   can adjust the notification to identify that fact but what we

16   would propose is that it would be confirmed orally at the

17   time of -- or confirmed to any interested party prior to,

18   prior to the auction.

19        **THE COURT:**  All right.  Is there any consideration being

20   exchanged for the relinquishment of that lease?

21        **MR. SULLIVAN:**  There is not, your Honor.

22        **THE COURT:**  All right.  But that is something that

23   you're aware of and that you expect to be resolved?

24        **MR. SULLIVAN:**  Correct, your Honor.

25        **THE COURT:**  All right.  What is your expectation as to

In Re:  Diocese of Buffalo - 20-10322

1   what will be done with the proceeds of this sale.

2       **MR. SULLIVAN:**  Your Honor, it is our expectation that

3   the proceeds of sale after, obviously, satisfaction of, you

4   know, any loss associated with the sale of the property,

5   would be held and used to fund, in part, a contribution by

6   the Diocese to an eventual Chapter 11 plan reorganization.

7       **THE COURT:**  All right.  That brings me to the main

8   question of the day.  And that's the application of the

9   Cy-près Doctrine in the State of New York.  And I have a

10  complicated question so you have to bear with me while I go

11  through it.  It is a complicated question.

12      In 1893, the New York State Legislature adopted what was

13  called the Altman Act (phonetic) whose purpose was to

14  reinstate the Cy-près Doctrine into New York State.  And

15  there are three subsequent cases that are particular interest

16  to the court.

17      There's the case of *St. Joseph's Hospital v. Bennett*

18  decided by the New York Court of Appeals in 1939.  And I'll

19  give you the citation, 281 N.Y. 114.

20      There's the case of the matter of *Scott*, also decided by

21  the New York Court of Appeals but in 1960.  And it's found at

22  8 N.Y.2d 419.

23      And there's the case of *Lefkowitz v. Lebensfeld*

24  decided by the Appellate Division and it can be found at

25  68 A.D.2d 488.  And I'll quote from that last decision.

In Re:  Diocese of Buffalo - 20-10322

1      It said:  When a charitable donation is made for a

2  specific purpose, a trust will be implied in the sense that

3  the donated property will be required to be used for the

4  purposes for which it was given.

5      And the key language of that decision, in my view, is

6  that a trust is implied.

7      Which then brings us to Section 541 of the Bankruptcy

8  Code.  11 U.S.C. Section 541(c)(2) says a restriction on the

9  transfer of a beneficial interest of the debtor in a trust

10  that is enforceable under applicable non-Bankruptcy law is

11  enforceable in a case under this Title.

12      And Section 541(d) says:  Property -- and I'm

13  paraphrasing here -- property in which the debtor holds as of

14  the commencement of the case only legal title and not an

15  equitable interest, becomes property of the estate only to

16  the extent of the debtor's legal title to such property but

17  not to the extent of an equitable interest in such property

18  that the debtor does not hold.

19      So, I'm looking at both the New York State law and the

20  Bankruptcy Code to see where this property falls into that

21  mix.  And then we go back to the public records.  The public

22  records show that in the fall of 1959, the Diocese conducted

23  what was called the Seminary Fund Drive whose purpose was

24  specifically to find that -- to raise money to finance the

25  construction of a Seminary.  As part of that undertaking, a

15

In Re:  Diocese of Buffalo - 20-10322

1    gentleman by the name of Fred Reuter (phonetic) executed

2    three deeds which together transferred the property in East

3    Aurora to the Diocese of Buffalo.  Two of those three deeds

4    were made for no consideration.

5         And my question is this:  If, indeed, the Seminary

6    property was acquired and developed through the use of

7    donations made for a particular purpose, would the Cy-près

8    Doctrine now operate to restrict the use of those proceeds?

9         That's a complex question and I'm not necessarily

10   waiting for your -- expecting that you'll have a full answer

11   but I'm interested to know if you have something you'd like

12   to say.

13        **MR. SULLIVAN:**  Your Honor, I, I'm not prepared to,

14   obviously, fully respond to the Court's question at this

15   time.  I would note that the instrument of conveyance makes

16   no references to restrictions.  But I don't have a full

17   response to the Court's observation and questions at this

18   moment.

19        **THE COURT:**  All right.  Here is -- I mean, the bottom

20   line is that you're looking for the Court approval today of

21   sale methodology.  There's no question in my mind that the

22   Diocese has legal title.  That's supported by the deeds that

23   you provided to the Court.

24        It's a question of whether the property is held in

25   trust.  My inclination -- and I've carefully reviewed all of

In Re:  Diocese of Buffalo - 20-10322

1  your -- your entire motion.  My inclination is to approve the

2  proposed methodology of sale and to authorize the sale but to

3  require that the proceeds be placed in escrow until we can

4  have a final resolution as to whether or not there are trust

5  limitations that restrict the use of these proceeds.  And --

6      **MR. SULLIVAN:**  Yes, your Honor.

7      **THE COURT:**  And I think the issue is rather complex.

8  And I'm certainly not going to rule on an issue of this

9  complexity without the benefit of argument from, from you and

10  from all other interested counsel and, perhaps, from other

11  parties that may have a beneficial interest in that trust

12  arrangement if it exists.

13      And, of course, I'm operating with a very limited set of

14  public records.  I have no idea of what other evidence you

15  may wish to present relative to the limitations that may

16  exist with the use of the money.  But my inclination is to

17  approve your proposal for sale, to convert this asset into

18  liquid, into a liquid asset that we can argue about without

19  having the cost and the expense of maintenance and to require

20  that the proceeds be placed into escrow for further decision

21  by the Court.

22      And that's my inclination today.  I'd hear any

23  opposition to that inclination but that's where I think I'm

24  heading.

25      Anything you'd like to say?

In Re:  Diocese of Buffalo - 20-10322

1    **MR. SULLIVAN:**  Your Honor, I certainly understand what

2    the Court is saying, and allowing the sale to go forward, I

3    think certainly benefits the estate at this time because,

4    frankly, your Honor, this property has become burdensome to

5    the estate and it does at least allow us to achieve a goal

6    of, as the Court indicated, converting this to a liquid form

7    pending resolution of this issue.

8    **THE COURT:**  All right.  Anyone else?

9    **MR. SCHARF:**  Your Honor.

10   **THE COURT:**  Yes.

11   **MR. SCHARF:**  We certainly don't believe that there's any

12   restrictions on this property but I think the course of

13   action your Honor has proposed authorizing a sale ultimately

14   and putting the proceeds aside subject to some further

15   briefing does make sense.

16   **THE COURT:**  All right.

17   Mr. Allen, anything you'd like to say?

18   **TRUSTEE ALLEN:**  No, your Honor.

19   **THE COURT:**  I'm not making any ruling today on cy-près

20   limitations on the use of proceeds of this property.  I think

21   that's premature, both on the fact and the law.  I have not

22   accorded anyone the benefit of providing a full presentation

23   of relevant facts and I certainly do not expect parties to be

24   prepared on the law on a question that the Court is raising,

25   perhaps, for the first time for your consideration.

In Re:  Diocese of Buffalo - 20-10322

1    Although, I did allude to this issue when I asked for counsel
2    to provide me with copies of the deeds at the time of the
3    hearing to appoint the -- to select the appointment of a real
4    estate broker.
5         So, I certainly want -- I'm not making any decision
6    today on how the proceeds can be used or must be used.  I
7    think that's premature and I want to give all parties a full
8    opportunity to present both facts and law on the question of
9    the appropriate distribution of these funds.
10        And I think it's important and I think the motion
11   adequately states that the property is not being used at this
12   time.  And when you have property that's not being used, it
13   can be a burden -- and I accept the representations made by
14   counsel in their motion that this property may be burdensome
15   and there's no one disputing that fact.  So I'm going to
16   certainly authorize it.  And we're talking about a very
17   significant dollar amount, not as high as was projected when
18   a real estate broker was appointed, but still significant.
19   $3.8 million is not an insignificant sum.
20        And taking into account all of the rationale that is set
21   forth in the moving papers as well as in the oral argument
22   today, I'm going to authorize a sale of the property with the
23   terms and conditions that you describe.  And with one
24   additional term and that is that all proceeds be held in
25   escrow until further order of the Court.  And that further

9

In Re:  Diocese of Buffalo - 20-10322

1   Order --

2       **MR. SULLIVAN:**  Yes, your Honor.

3       **THE COURT:**   -- of the Court will be entertained upon

4   proper motion.  And I am somewhat concerned as to who should

5   get notice on that.  Because the -- as in any trust, the

6   beneficiaries of the trust may not be necessarily the parties

7   that are on notice of the bankruptcy proceeding.  So I'll

8   address that issue down the road when someone asks to release

9   the trust or release the monies that are being held in escrow

10  because, presumably, we will have a sale occurring in due

11  course.

12      So, the motion is granted, as I said, subject to the one

13  condition that the property be -- that the proceeds be held

14  in escrow until further order of the Court.  All right?

15      **MR. SULLIVAN:**  Your Honor, that is understood.

16      Your Honor, if I may just propose some specific dates.

17  It sounds as though we're going to be submitting to the Court

18  a revised order.  We had proposed approximately 60 days, or

19  60 days out would be the date submission deadline.

20      Your Honor, in order to provide time for the Order to be

21  submitted to the Court, considered by the Court, entered and

22  then notice that will be given, I'd like to propose that the

23  bid submission deadline -- and we'll plug this into the Order

24  that we'll submit to chambers -- be October 23 with

25  October 28 being set as the date for the auction sale, should

In Re:  Diocese of Buffalo - 20-10322

1   one be necessary.

2       And the sale hearing, your Honor, I would propose be,

3   you know, as, as reasonably soon after October 28 as the

4   Court's schedule would permit.  So, perhaps -- October 28 is

5   a Monday, your Honor -- perhaps some point during that week

6   we would request an opportunity for the sale hearing.

7       **THE COURT:**  All right.  Let me take a look at our

8   calendar.  Now I assume, I mean, we're assuming here that

9   you'll be able to get the revised order to the Court with

10  some dispatch and that you'll be able to publish the notice

11  shortly?

12      **MR. SULLIVAN:**  Yes, your Honor.  And that's, in part,

13  why I, I actually nudged the date out a little bit when I

14  said October 23, your Honor, because, you know, 60 days from

15  today would be on or about October 15th.  That's why I'm

16  proposing a little bit more than a week, your Honor, to allow

17  some additional time.

18      **THE COURT:**  The Court has an open day on October 29, if

19  that works for you.

20      **MR. SULLIVAN:**  Your Honor, that should be fine.

21      **THE COURT:**  I mean, we also could make time on the

22  afternoon of the 28th but I don't know how -- what sort of

23  problems you might run into with the auction, if that's to

24  occur.

25      **MR. SULLIVAN:**  Your Honor, I think having it the next

In Re:  Diocese of Buffalo - 20-10322

1  day probably would make the most sense, if that works for the

2  Court.

3      Would morning say 10 a.m. or 11 a.m. be possible for the

4  Court?

5      **THE COURT:**  11 a.m. is fine.  I could do 10, as well, if

6  that's, if that's more convenient.  Either 10 or 11.

7      **MR. SULLIVAN:**  Your Honor, let's say 11 a.m.

8      **THE COURT:**  Eleven a.m.

9      **MR. SULLIVAN:**  If that's acceptable -- let me ask the

10  other parties on line.

11      Is that date acceptable to everyone -- are those dates

12  acceptable to everyone else?

13      **MR. SCHARF:**  Your Honor, the 28th for the auction and

14  29th for the hearing works for the Committee.

15      **THE COURT:**  Mr. Allen, is that date all right for you.

16      (No audible response.)

17      **THE COURT:**  Well, we may have lost Mr. Allen but we'll

18  put that October 29th at 11:00 as an appropriate date for

19  hearing any further arguments on the final sale.  All right.

20      **MR. SULLIVAN:**  Okay, thank you, your Honor.

21      **THE COURT:**  You're welcome.

22      **MR. SULLIVAN:**  Thank you, your Honor.

23      **THE COURT:**  Now you want --

24      **MR. SULLIVAN:**  Your Honor, if I may go ahead, your

25  Honor.

22

In Re:  Diocese of Buffalo - 20-10322

1    **THE COURT:**  You have a second motion, as well.

2    **MR. SULLIVAN:**  Yes, your Honor.

3    The second motion appears at docket number 3029 and this

4    is for the sale of a storage building located at 42 Grant

5    Street in North Tonawanda, New York.

6    And, your Honor, with the Court's permission, I'm going

7    to streamline my presentation a little bit.  I think there's

8    a lot of similarity in terms of the way these procedures are

9    constructed and I think there are a lot of the same

10    considerations at play.  So I'm tending to streamline my

11    presentation a little bit and sort of rely on some of the

12    argument I've already made your Honor.

13    We are seeking approval of bidding procedures, your

14    Honor.  The proposed Stalking Horse purchaser of this

15    property which is a warehouse property, your Honor, is

16    Skillen, Inc. and there is a proposed purchase price of

17    $42,000 and a deposit of $4,200 has been received from the

18    Stalking Horse purchaser.

19    Your Honor, this, this property is also being presented

20    for sale subject to higher and better offers but given the

21    nature of this property, your Honor, and the relative size of

22    the purchase price, your Honor, we don't think that such a

23    long period of marketing is justified and we're asking for a

24    shorter period of time:  30 days rather than 60 days to

25    provide notice of this sale, your Honor.  This has also been

In Re:  Diocese of Buffalo - 20-10322

1    exposed to marketing through Hanna Commercial Real Estate,

2    your Honor.

3         And we would propose that there be bidding increments of

4    $2,000, with that same amount being the initial minimum

5    overbid.  And the other bidding procedures as set forth in

6    the motion be approved.

7         Your Honor, subject to any questions the Court may have,

8    we're also requesting entry of a bidding procedure and order

9    as described today.

10        **THE COURT:**  I read through your papers and it's not

11   clear to me what prior uses this property had.  I know it

12   references a warehouse of some kind but was it previously

13   used for religious purposes?

14        **MR. SULLIVAN:**  No, your Honor, I actually believe that

15   this was for storage of maintenance equipment, lawn mowers

16   and things of that nature.

17        **THE COURT:**  All right.  Is it attached to a parish or a

18   former parish or other church property.

19        **MR. SULLIVAN:**  Your Honor, it's my understanding that it

20   is not.

21        **THE COURT:**  All right.  Well, anyone else want to speak

22   to the motion?

23        (No audible response.)

24        **THE COURT:**  All right.

25        **MR. SCHARF:**  Your Honor, similarly to the other motion,

In Re:  Diocese of Buffalo - 20-10322

1  we think that the proposed bid procedures make sense and

2  (indiscernible) type of property and the proposed sale price

3  here.

4       THE COURT:  And, Mr. Allen, do you have anything you

5  would like to say?

6       (No audible response.)

7       THE COURT:  You may be muted.

8       (No audible response.)

9       THE COURT:  Well, in any event, I also read this motion,

10  the significance is much less than the Seminary property.

11  It's a much smaller parcel and a much smaller proposed sale

12  price.  I think the procedures that have been presented are

13  appropriate and, in my view, are, are a proper way to try to

14  liquidate an asset that, according to the papers, is no

15  longer necessary for use by the Diocese.

16       So the motion is granted.

17       Do you need dates for that as well, Mr. Sullivan?

18       MR. SULLIVAN:  Yes, your Honor.

19       And if it's all right with the Court, and with the

20  understanding -- well, so let's look at this.  Bear with me.

21       Your Honor, again, we're, we're looking at approximately

22  30 days on this one.  I would suggest that bids, competing

23  bids be submitted no later than September 20.  Again, I'm

24  building in a little bit of time here for the submission and

25  entry of the Orders.

25

In Re:  Diocese of Buffalo - 20-10322

1      **THE COURT:**  Okay.

2      **MR. SULLIVAN:**  With a similar, you know, going into next

3  week.  Your Honor, actually the 23rd is not possible for me

4  but, perhaps, September 24th for the auction sale, should one

5  be required.

6      **THE COURT:**  Well --

7      **MR. SULLIVAN:**  And --

8      **THE COURT:**  Right now on the 24th, we have a time

9  reserved for your motion involving the automatic stay as it

10 applies to Parishes.

11     **MR. SULLIVAN:**  Your Honor.

12     **THE COURT:**  I'm happy to hear it at the same time.

13     **MR. SULLIVAN:**  Thank you for pointing that out, your

14 Honor, and reminding me.  I think if we could back into it

15 with the sale hearing being that same day would make sense.

16     **THE COURT:**  All right.  10:00 hearing right now.  We

17 reserved time at 10:00 that morning on the extension of the

18 stay to Parishes.  We can do this at the same time.

19     **MR. SULLIVAN:**  That's certainly fine with the Diocese,

20 your Honor.

21     **THE COURT:**  All right.

22     **MR. SULLIVAN:**  So backing into that date, your Honor, I

23 would propose that the auction sale, should one be needed, to

24 take place on the 23rd.

25     **THE COURT:**  All right.

In Re: Diocese of Buffalo - 20-10322

1     **MR. SULLIVAN:** And that the bid submission deadline be
2 September 19th.
3     **THE COURT:** All right. That's fine. Is that -- are
4 those dates troublesome to anyone online?
5     (No audible response.)
6     **THE COURT:** Apparently not.
7     Why don't you incorporate those into the form of a final
8 order and submit it to the Court.
9     **MR. SULLIVAN:** Yes, your Honor.
10    **THE COURT:** All right. And so the motion is granted
11 with those dates, with the expectation that those dates will
12 be incorporated into the final order.
13    Is there anything else to come before the --
14    **MR. SULLIVAN:** Thank you, your Honor.
15    **THE COURT:** Thank you, as well.
16    Is there anything else that anyone wants to bring to the
17 Court?
18    (No audible response.)
19    **THE COURT:** All right. I hear nothing further.
20    I thank you all for your attention and participation. I
21 look for submission of a revised order, revised orders.
22    But with that, we stand in recess.
23    **MR. SULLIVAN:** Thank you very much, your Honor.
24    **THE COURT:** Thank you, as well.
25    **MR. SCHARF:** Thank you, your Honor.

In Re: Diocese of Buffalo - 20-10322

1    **THE COURT:**  Thank you.

2    (WHEREUPON, proceedings adjourned.)

3

4

5

6                *          *          *

7              **CERTIFICATE OF TRANSCRIBER**

8

9         In accordance with 28, U.S.C., 753(b), I

10   certify that this is a true and correct record of proceedings

11   from the official audio recording of the

12   proceedings held in the United States Bankruptcy Court

13   for the Western District of New York before the

14   Honorable Carl L. Bucki on August 15, 2024.

15

16

17   S/ Diane S. Martens

18   Diane S. Martens
     Transcriber

19

20

21

22

23

24

25

# CONSOLIDATED APPENDIX DOCUMENT NO. 14

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NEW YORK
_____

In re:                                                    )
                                                          )
                                                          )        Case No. 20-10322 (CLB)
The Diocese of Buffalo, N.Y.,                             )
                                                          )        Chapter 11
                          Debtor.                         )
_____                )

### ORDER PURSUANT TO SECTIONS 105 AND 363 OF THE BANKRUPTCY CODE (A) APPROVING THE SALE OF CERTAIN REAL PROPERTY AT 711 KNOX ROAD, EAST AURORA, FREE AND CLEAR OF LIENS, CLAIMS, OBLIGATIONS, INTERESTS AND ENCUMBRANCES; (B) AUTHORIZING THE DIOCESE TO CONSUMMATE THE TRANSACTIONS RELATED THERETO; AND (C) GRANTING RELATED RELIEF

Upon the motion [Docket No. 3031] (the "Sale Motion")[1], filed by The Diocese of Buffalo,

N.Y. (the "Diocese"), for entry of an order (this "Order") approving the sale of certain real property

located at 711 Knox road, East Aurora, New York 14052 (the "Property") to World Mission

Society, Church of God, a NJ Nonprofit Corporation (the "Purchaser"), free and clear of all

Encumbrances, authorizing the Diocese to consummate all transactions related to the proposed

sale of the Property (the "Sale Transaction") and granting related relief; and the Court having

entered an order on August 19, 2024 [Docket No. 3090] (the "Bidding Procedures Order")

approving certain bidding procedures for the sale of the Property, among other relief; and the

Diocese having held an auction (the "Auction") for the Property on October 28, 2024; and the

Purchaser having been determined to have submitted the highest and best bid for the Property at

the Auction; and the Purchaser having entered into a purchase agreement dated June 12, 2024 (the

"Purchase Agreement") that was approved by the Court pursuant to the Bidding Procedures Order;

and a hearing to approve the Sale Transaction having been held on October 29, 2024 (the "Sale

---

[1] Capitalized terms used, but not defined herein, shall have the same meaning ascribed to such terms in the Sale Motion.

18662214.v3

Hearing"); and all interested parties having been afforded an adequate opportunity to be heard; and the Court having reviewed and considered: (i) the Sale Motion, and (ii) the arguments of counsel made and the evidence presented at the Sale Hearing; and it appearing that the relief requested in the Sale Motion and approval of the Sale Transaction with the Purchaser is in the best interests of the Diocese, its estate, and its creditors; and upon the record of the Sale Hearing and the Diocese's chapter 11 case (the "Chapter 11 Case"); and after due deliberation thereon; and good cause appearing therefor;

### IT IS HEREBY FOUND AND DETERMINED THAT:[2]

A.    This Court has jurisdiction and authority to hear and determine the Sale Motion pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue of this Chapter 11 Case and the Sale Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

B.    The statutory predicates for the relief sought herein are sections 105 and 363 of title 11 of the United States Code (11 U.S.C. § 101 *et seq*., the "Bankruptcy Code", and Rules 2002, 6004, and 9014 of the Federal Rules for Bankruptcy Procedure (the "Bankruptcy Rules").

C.    This Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a). Time is of the essence in effectuating the Purchase Agreement and proceeding with the Sale Transaction. The Court expressly finds that there is no just reason for delay in the implementation of this Order, and expressly directs that the stay contemplated by Bankruptcy Rule 6004(b) is hereby vacated to any extent necessary to permit the immediate effectiveness of this

---

[2] The findings of fact and conclusions of law set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to these proceedings by Bankruptcy Rule 9014. To the extent any of the following findings constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

18662214.v3

Order. This Order shall be effective immediately upon its entry and the parties may consummate the transactions contemplated in the Sale Motion immediately upon entry of this Order.

     D.     The Bidding Procedures Order approved, among other things, certain notice and bidding procedures for the Auction and the Sale Hearing. The Bidding Procedures Order provided that it was immediately effective upon entry and such Order is a final and non-appealable order and remains in full force and effect.

     E.     As evidenced by the Certificates of Service [Docket Nos. 3042, 3055, 3070, 3099, 3107, 3158, and 3171] filed with the Court, proper, timely, adequate and sufficient notice of the Sale Motion, the Auction, and the Sale Hearing has been provided in accordance with the terms of the Bidding Procedures Order and Bankruptcy Code sections 102(1) and 363(b) and Bankruptcy Rules 2002, 6004, 9006, 9007 and 9014 to all persons and entities entitled to such notice. No other or further notice of the Sale Motion (and any transactions contemplated thereby), the Sale Hearing, or the entry of this Order is necessary or shall be required.

     F.     A reasonable opportunity to object or be heard regarding the requested relief has been afforded to all interested persons and entities.

     G.     On October 28, 2024, the Diocese conducted the Auction in accordance with the Bidding Procedures Order, which process was non-collusive, fair and reasonable, and conducted in good faith within the meaning of section 363(m) of the Bankruptcy Code. The Purchaser acted in good faith in all respects of its participation in the bid process and Auction. Neither the Diocese nor the Purchaser have engaged in any conduct that would prevent the application of section 363(m) of the Bankruptcy Code or cause the application of, or implicate, section 363(n) of the Bankruptcy Code to the consummation of the Sale Transaction. The Auction afforded a full, fair and reasonable opportunity for any Qualified Bidder to make an offer for the Property.

3

18662214.v3

H.      At the Auction, the Purchaser entered the highest and best bid, offering the sum of $4,200,000.00 in cash, without adjustments (the "Purchase Price"), for the Property in accordance with the terms of the Purchase Agreement.  Accordingly, the Purchaser was determined to be the Successful Bidder.  The Purchase Agreement represents a fair and reasonable offer to purchase the Property under the facts and circumstances of the Chapter 11 Case, and the form and total consideration to be realized by the Diocese pursuant to the Purchase Agreement constitute a transfer of the Property at fair market value.  Approval of the Purchase Agreement and the consummation of the transactions contemplated thereby is in the best interests of the Diocese, its creditors, its estate, and all other parties in interest.

I.      The Diocese has articulated a sufficient business justification under the standard set forth in *In re Lionel Corp.*, 722 F.2d 1063 (2d Cir. 1983) and has otherwise demonstrated a sufficient basis and the existence of compelling circumstances requiring it to sell the Property as contemplated in the Sale Motion and the terms set forth herein.  Such an action is an appropriate exercise of the Diocese's reasonable business judgment and is in the best interests of the Diocese, its creditors, and its estate.

J.      The Purchaser, the Diocese and their professionals have complied with the Bidding Procedures Order in all material respects and in good faith.

K.      The offer of the Purchaser and the total consideration to be realized by the Diocese: (i) is the highest and best offer received by the Diocese; (ii) is fair and reasonable; and (iii) is in the best interests of the Diocese, its creditors and its estate.  The Diocese's determination that the Purchaser's offer constitutes the highest and best offer for the Property constitutes a valid and sound exercise of the Diocese's reasonable business judgment.

18662214.v3

L.       The Sale Transaction was negotiated and entered into in good faith, based upon arm's-length negotiations and without collusion or fraud of any kind. The Purchase Price to be paid by the Purchaser was not controlled by an agreement among potential bidders. Neither the Purchaser nor any of its affiliates, officers, directors, managers, shareholders, or any of their respective successors or assigns is an "insider" of the Diocese, as that term is defined in section 101(31) of the Bankruptcy Code.

M.       The Purchaser would not have entered into the Purchase Agreement and would not consummate the transactions contemplated thereby, thus adversely affecting the Diocese, its estate, and its creditors, if the sale of the Property to the Purchaser were not free and clear of all Encumbrances (as set forth in the Purchase Agreement) of any kind or nature whatsoever to the greatest extent permitted under sections 105(a) and 363 of the Bankruptcy Code and other applicable law, whether such Encumbrances are known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, recorded or unrecorded, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, noticed or unnoticed, perfected or unperfected, allowed or disallowed, disputed or undisputed, whether accruing prior to or subsequent to the commencement of the Case, whether imposed by agreement, understanding, law, equity or otherwise, relating to, accruing or arising at any time prior to the Closing (as defined in the Purchase Agreement).

N.       The Diocese may sell the Property free and clear of all Encumbrances of any kind or nature whatsoever, to the greatest extent permitted under sections 105 and 363 of the Bankruptcy Code and other applicable law, whether such Encumbrances are known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, recorded or unrecorded, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, noticed or unnoticed,

18662214.v3

perfected or unperfected, allowed or disallowed, disputed or undisputed, whether accruing prior to

or subsequent to the commencement of the Chapter 11 Case, whether imposed by agreement,

understanding, law, equity or otherwise, relating to, accruing or arising at any time prior to the

Closing, because, in each case, one or more of the standards set forth in Bankruptcy Code section

363(f) has been satisfied.  Accordingly, all persons having Encumbrances of any kind or nature

whatsoever against or in any of the Property shall be forever barred, estopped, and permanently

enjoined from pursuing or asserting such Encumbrances against the Property, the Purchaser, or

any of its assets, property, successors, or assigns.

O.    The transfer of the Property to the Purchaser shall be a legal, valid and effective

transfer of the Property and shall vest the Purchaser with all right, title and interest in and to the

Property.

P.    All findings of fact and conclusions of law announced by the Court at the Sale

Hearing are incorporated herein.

**NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED
THAT:**

1.    The Sale Motion is GRANTED, as set forth herein.

2.    All objections to the Sale Motion or to the relief granted herein that have not been

withdrawn, waived or settled, and all reservations of rights included therein, are overruled on the

merits.

3.    Notice of the hearing on the Sale Motion was fair and adequate under the

circumstances and complied in all respects with 11 U.S.C. § 102(1) and Bankruptcy Rules 2002,

6004, 9006, 9007 and 9014.

6

### Approval of the Sale Transaction

4.      The Purchaser is hereby designated as the Successful Bidder for the Property.  The Purchase Agreement is approved in its entirety.  The sale of the Property to the Purchaser, as contemplated in the Sale Motion, is approved pursuant to sections 105(a) and 363 of the Bankruptcy Code.  The Diocese and its officers, directors, employees and agents are hereby authorized to take such actions as are necessary to consummate the transaction contemplated in the Sale Motion, and in connection therewith, are hereby authorized to execute and deliver any agreements, instruments and documents that may be reasonably necessary or desirable to implement and effectuate the provisions of this Order and the transactions approved hereby and to take all further actions as may reasonably be requested by the Purchaser for the purpose of selling, assigning, transferring, granting, conveying, conferring and delivering the Property to the Purchaser, all without further order of this Court.

### Transfer of the Property

5.      Pursuant to sections 105(a), 363(b) and 363(f) of the Bankruptcy Code, the Property shall be transferred to the Purchaser at the Closing free and clear of all Encumbrances of any kind or nature whatsoever and all such Encumbrances shall attach to the net cash proceeds of the transactions in the order of their priority, with the same validity, force and effect that they now have as against the Property, subject to any claims and defenses the Diocese or any other party may possess with respect thereto, and the proceeds of the Sale Transaction shall be held by the Diocese in accordance with paragraph 17 of the Bidding Procedures Order, and shall not be disbursed except as directed by further order of this Court.

6.      The Purchaser shall not be liable or obligated, or assume or in any way be responsible for, any liabilities or obligations of the Diocese or its estate (whether direct or indirect,

7

18662214.v3

liquidated or unliquidated, choate or inchoate, or contingent or fixed) arising before or after the consummation of the Sale Transaction. All persons or entities holding Encumbrances of any kind or nature with respect to the Property are hereby barred, estopped, and permanently enjoined from asserting, prosecuting or otherwise pursuing such Encumbrances against the Purchaser, its successors or assigns, or the Property. This Order is and shall be effective as a determination that all such Encumbrances shall be and are, without further action by any person or entity, released with respect to the Property as of the date of the Closing of the transactions contemplated in the Sale Motion.

7.    All property taxes, to the extent such taxes are due and owing on the Property, shall be paid on the closing date on the sale of the Property, from the Property sale proceeds. All Encumbrances on the Property shall be and hereby are deemed to be divested, canceled, terminated, and discharged. This Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state or local government agency, department or office. A copy of this Order may be filed with the appropriate clerk or recorded with the recorder to act to cancel any of the Encumbrances or other encumbrances of record.

8.    Each and every federal, state and local government agency or department and all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds and other similar persons are hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Purchase Agreement and this Order. This Order is and shall be binding upon and govern the acts of all persons and entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal and local officials,

8

and all other persons and entities who may be required by operation of law, the duties of their office or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease, and each of the foregoing persons and entities is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the Purchase Agreement and to cancel, terminate and release Encumbrances on the Property.

9.      The Purchaser is deemed a purchaser in good faith of the Property and thus entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code, including, without limitation, in the event that this Order is modified on appeal or reversed.

10.     The provisions of 11 U.S.C. § 363(n) have not been violated, and the transfer of the Property shall be deemed for all purposes to constitute a transfer for reasonably equivalent value and fair consideration under the Bankruptcy Code and any other applicable law and no damages may be assessed against the Purchaser or any other party pursuant to section 363(n) of the Bankruptcy Code.

11.     The provisions of Bankruptcy Rule 6004(h) shall not apply to stay consummation of the transactions contemplated by the Sale Motion, and the Diocese and the Purchaser are hereby authorized to consummate such transactions immediately upon entry of this Order.

12.     This Order shall be binding in all respects upon all creditors of, and holders of equity interests in, the Diocese (whether known or unknown), any holders of Encumbrances, all parties in interest in this Chapter 11 Case, the Purchaser and all successors and assigns of the Purchaser, the Diocese, and any subsequent trustees appointed in the Chapter 11 Case or upon a conversion to chapter 7 under the Bankruptcy Code.  Nothing contained in any chapter 11 plan

9

confirmed in this Chapter 11 Case, or in any related confirmation order, disclosure statement, or order approving disclosure statement shall conflict with or derogate from the provisions of this Order, this Order and the transactions being in contemplation of, in furtherance of and in connection with such chapter 11 plan.

### Additional Provisions

13.    The Back-Up Bid for the Property is a bid of $4,100,000.00 in cash from Slosson Educational Publications, Inc. (the "Back-Up Bidder").

14.    If for any reason the Purchaser fails to consummate the Sale Transaction, then (i) the Back-Up Bidder will be deemed to be the purchaser of the Property for the amount of the Back-Up Bid and the Diocese and the Back-Up Bidder shall thereupon be authorized and directed to close the Sale Transaction, without further Order of the Court, and (ii) all references in this Order to (a) the Purchaser shall be deemed to mean the Back-Up Bidder, and (b) the Purchase Agreement shall be deemed to mean the purchase agreement between the Diocese and the Back-Up Bidder.

15.    The automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified to the extent necessary to implement the terms and provisions of this Order.

16.    The Closing of the Sale Transaction shall occur in accordance with the terms and conditions of the Purchase Agreement unless the Diocese, in its discretion, and the Purchaser agree otherwise in writing.

17.    This Court shall retain jurisdiction to determine any dispute, issue, or other matter arising in connection with the Sale Transaction or this Order.

18.    Pursuant to the *Order Authorizing Employment and Retention of Howard Hanna Professionals as Real Estate Broker to the* Diocese [Docket No. 2784], the Diocese is authorized

10

to pay Howard Hanna Professionals a broker's commission of $126,000.00 from the proceeds of the Sale Transaction.

19.    The Diocese is authorized to perform such acts and expend such funds as may be necessary to implement the terms and provisions of this Order.

Dated: November **20**, 2024
       Buffalo, New York



_____
Hon. Carl L. Bucki
Chief United States Bankruptcy Judge

FILED
NOV 2 0 2024
BANKRUPTCY COURT
BUFFALO, NY

11

18662214.v3

# EXHIBIT "B"

PURCHASE AND SALE AGREEMENT

This PURCHASE AND SALE AGREEMENT (this "Agreement"), dated as of the __18th___ day of October 2024 (the "Effective Date"), is entered into between **THE DIOCESE OF BUFFALO, N.Y.**, a New York special act corporation created by the New York State Legislature pursuant to Chapter 568 of the Laws of 1951, having an address at 795 Main Street, Buffalo, NY 14203 ("Seller"), and **SLOSSON EDUCATIONAL PUBLICATIONS, INC.**, a New York for profit corporation having an address at 538 Buffalo Rd, East Aurora, N.Y. ("Purchaser"; each a "Party", and collectively, the "Parties").

## RECITALS

WHEREAS, Seller is the owner of real property located in the Town of Aurora, County of Erie, and State of New York, commonly known as **711 Knox Road, Tax Map Parcel No. 163.00-3-23** in the Town of Aurora, County of Erie, and State of New York, which is shown outlined on the property sketch attached hereto as **Exhibit A-1**, and is more particularly described on **Exhibit A-2** attached hereto (together with all improvements and fixtures located thereon, the "Property").

WHEREAS, on February 28, 2020 (the "Petition Date") Seller filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (11 U.S.C. § 101 et seq., the "Bankruptcy Code") with the United States Bankruptcy Court for the Western District of New York (the "Bankruptcy Court"), commencing Seller's chapter 11 case (this "Bankruptcy Case");

WHEREAS, Seller continues to operate its business and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, Seller retained Hanna Commercial Real Estate ("Hanna CRE") to serve as a real estate broker with respect to the proposed sale of the Property;

WHEREAS, Seller listed the Property for sale with Hanna CRE beginning on or about November 2, 2023;

WHEREAS, subject to the terms and conditions hereof, Seller desires to sell to Purchaser, and Purchaser desires to purchase the Property from Seller;

WHEREAS, the transaction contemplated by this Agreement is subject to the approval of the Bankruptcy Court, which approval will include, among other things, issuance by the Bankruptcy Court of a Bidding Procedures Order directing the manner in which a bidding procedure will be conducted for solicitation of competing offers from third parties for the purchase of the Property; and

WHEREAS, depending upon the outcome of bidding pursuant to the Bidding Procedures Order, this Agreement and the transactions contemplated herein will be consummated pursuant to a sale order to be entered in the Bankruptcy Case, or, in the alternative, this Agreement may be terminated by Seller, as hereinafter provided.

WHEREAS, the Purchaser believes that its planned use of the property will be beneficial to the community and will be in accord with Christian customs and values, including those of the

Catholic Church. Purchaser also believes that its planned use of the property meets all restrictions. It is therefore respectfully prayed that this Property Sale Agreement be accepted by the Diocese.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

**ARTICLE I**
**DEFINITIONS**

For purposes of this Agreement (including any Exhibits or Schedules attached hereto), the following terms shall have the meanings ascribed to them below, unless the context clearly requires otherwise:

1.1     **"Bankruptcy Case"** shall have the meaning given to it in the Recitals to this Agreement.

1.2     **"Bankruptcy Code"** shall have the meaning given to it in the Recitals to this Agreement.

1.3     **"Bankruptcy Court"** shall have the meaning given to it in the Recitals to this Agreement.

1.4     **"Bargain and Sale Deed"** shall mean the deed to be delivered at Closing by Seller to Purchaser in the form attached hereto as **Exhibit B**.

1.5     **"Bidding Procedures"** shall mean the bidding procedures governing the process by which the sale of the Property shall occur, which are attached to the Bidding Procedures Order as Exhibit 1.

1.6     **"Bidding Procedures Order"** shall mean an order of the Bankruptcy Court: (i) approving the terms of this Agreement, subject to higher and better bids; (ii) establishing procedures for Seller's solicitation of competing offers to purchase the Property from third parties; (iii) establishing procedures for an auction to determine the highest or otherwise best offer for the Property; and (iv) scheduling a hearing to consider entry of the Sale Order.

1.7     **"Business Day(s)"** shall mean calendar days, exclusive of Saturdays, Sundays and holidays on which banking institutions in New York are authorized by Law to close.

1.8     **"Claim"** shall mean any claim within the meaning of section 101(5) of the Bankruptcy Code.

1.9     **"Closing"** shall mean the closing of the transaction as set forth in Section 7.1 of this Agreement.

1.10     **"Closing Date"** shall mean the date of Closing.

2

1.11    **"Encumbrance"** shall mean any Lien, Claim, Interest, or defect in title, whether imposed by Law, agreement, understanding or otherwise.  For the avoidance of doubt, rights of way and easements of record shall not be considered an Encumbrance under this Agreement.

1.12    **"Effective Date"** shall mean October 18, 2024.

1.13    **"Escrow Agent"** shall mean the Seller's attorneys, Bond, Schoeneck & King, PLLC.

1.14    **"Excluded Items"** shall mean any and all religious materials and texts located within the library on the day of Closing.

1.15    **"Interest"** shall mean any interest in, or related to, the Property within the meaning of section 363(f) of the Bankruptcy Code, and all mortgages, Leases, or other interests, pledges, security interests, rights of setoff, successor liabilities, conditions, obligations to allow participation, agreements or rights, rights asserted in litigation matters, competing rights of possession, obligations to lend, matters filed of record that relate to, evidence or secure an obligation of Sellers (and all created expenses and charges) of any type under, among other things, any document, instrument, agreement, affidavit, matter filed of record, cause, or state or federal law, whether known or unknown, legal or equitable, and all Liens, rights of offset, replacement liens, adequate protection liens, charges, obligations.

1.16    **"Law"** shall mean all federal, state and local laws, ordinances, rules, regulations, standards, and Orders.

1.17    **"Leases"** shall mean all leases, subleases, licenses, concessions, options, extension letters, assignments, termination agreements, subordination agreements, nondisturbance agreements, estoppel certificates and other agreements, whether written or oral, and any amendments or supplements to any of the foregoing.

1.18    **"Liability"** shall mean any liability or obligation of whatever kind or nature (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated and whether due or to become due).

1.19    **"Lien"** shall mean any charge against or Interest in the Property to secure payment of a debt or performance of an obligation (statutory or otherwise), deed of trust, mortgage, pledge, security interest, security agreement, hypothecation, preference, priority, or right of recovery.

1.20    **"Order"** shall mean any award, decision, injunction, judgment, order, ruling, subpoena, or verdict entered, issued, made, or rendered by any court, or administrative agency.

1.21    **"Permitted Exception"** shall have the meaning given to such term in Section 9.2.

1.22    **"Person"** shall mean any individual, corporation, general or limited partnership, limited liability company, joint venture, estate, trust, association, or other legal organization.

Purchase and Sale Agreement
for 711 Knox Road, Aurora, NY

18312103.v1

1.23    **"Proceeding"** shall mean any action, demand, complaint, inquiry, suit, injunction, dispute, arbitration, audit, hearing, investigation, litigation, citation, notice of violation (or similar notice), or suit (whether civil or criminal) commenced, brought, conducted, or heard by or before, or otherwise involving, any Person.

1.24    **"Property"** shall have the meaning given to such term in the Recitals of this Agreement.

1.25    **"Remaining Personal Property"** shall mean any items of equipment and personal property, aside from the Excluded Items, remaining on the Property on the day of the Closing.

1.26    **"Sale Order"** shall mean an Order of the Bankruptcy Court in form and substance reasonably acceptable to Purchaser and Seller authorizing the sale of the Property to Purchaser in accordance with the terms and conditions set forth herein, free and clear of any Encumbrances pursuant to section 363(f) of the Bankruptcy Code.

1.27    **"Tax"** and **"Taxes"** shall mean individually or collectively, as appropriate, any and all U.S. or non-U.S., federal, state, county, local, municipal or other taxes, charges, imposts, rates, fees, levies or other assessments.

1.28    **"Title Company"** shall mean a reputable title company to be selected by Purchaser.

1.29    **"Transaction"** shall mean the purchase and sale of the Property contemplated by this Agreement.

## ARTICLE II
## AGREEMENTS TO SELL AND PURCHASE; RELATED MATTERS

2.1.    **Agreement to Sell and Purchase the Property.**  On the Closing Date, subject to the performance of the parties of the terms and provisions of this Agreement and satisfaction of the terms and conditions set forth in the Sale Order, Seller shall sell, convey, assign, transfer, and deliver to Purchaser, and Purchaser shall purchase, acquire, and accept from Seller, the Property, free and clear of all Encumbrances, except as otherwise expressly provided in this Agreement.

2.2.    **Condition of Property.**  Seller is selling and Purchaser is acquiring the Property "AS IS" "WHERE IS", and with all faults, as provided in **ARTICLE XII** below.

2.3.    **Personal Property.**  Seller shall have the right at any time prior to Closing to remove from the Property any religious items and other equipment and personal property which Seller elects to remove and retain. For the avoidance of doubt, the pews shall be considered religious items under this Agreement. Purchaser agrees to accept possession of the Property at Closing with any Remaining Personal Property included in the sale (at no additional cost to Purchaser) on an "AS IS" "WHERE IS" basis.  Seller shall deliver to Purchaser at Closing a quitclaim bill of sale conveying Seller's interest in any such Remaining Personal Property. To the extent any such Remaining Personal Property is owned by an entity affiliated with Seller, Seller shall deliver to Purchaser a quitclaim bill of sale executed by such affiliated entity.

Purchase and Sale Agreement
for 711 Knox Road, Aurora, NY

18312103.v1

2.4.    **Building Systems and Fixtures.**  Notwithstanding the foregoing, Seller agrees not to remove from the Property any of the following to the extent they are in place on the Property as of the Effective Date of this Agreement, and that all such items shall be included in the sale to Purchaser, as fixtures to the Property:  any natural gas and electric fixtures, facilities, appliances and wiring, fixtures and related equipment, all emergency generators, engines, boilers, elevators, incinerators, motors, heating, ventilation, and air conditioning equipment, affixed cabinetry, sinks, basins, water closets, lavatory fixtures, faucets, and pipes, all electrical and telephone systems, components, wiring, transformers, electrical boxes, switches, lighting fixtures, and bulbs, any sprinkler systems, fire prevention and extinguishing apparatus, any central music and public address systems, any burglar alarms, security systems and equipment, remote control devices for overhead doors, any window shades, awnings, screens, blinds, installed carpeting, drapes, and curtains. Seller makes no representation or warranty that any of the foregoing items are in place on the Property.

### ARTICLE III
### PURCHASE PRICE

3.1.    **Purchase Price**.  The Purchase Price for the Property shall be THREE MILLION NINE HUNDRED THOUSAND AND 00/100 DOLLARS ($_3,900,000.00) (the "<u>Purchase Price</u>"), payable as follows:

    3.1.1.    **Deposit.**  Purchaser has furnished a certified check payable to Bond, Schoeneck & King, as escrow agent in the amount of THREE HUNDRED NINETY THOUSAND DOLLARS ($3,900,000) (the earnest money deposit).

    3.1.2.    **Balance**.  The balance of the Purchase Price shall be paid, plus or minus Closing adjustments, as the case may be, in wire transferred funds of United States currency to Seller in accordance with the terms of the Sale Order.

3.2.    **Cash Transaction**. Purchaser acknowledges that Purchaser's representation below that the transaction contemplated herein is a "Cash Transaction" was a determinative factor in Seller's acceptance of Purchaser's offer. To that end, Purchaser shall, on or before the Effective Date, provide Seller with evidence reasonably satisfactory to Seller confirming Purchaser's ability to purchase the Property pursuant to this Agreement without obtaining financing or funding from outside funding sources ("<u>Proof of Funds</u>").

### ARTICLE IV
### REPRESENTATIONS AND WARRANTIES OF SELLER

Seller makes no representations or warranties, express or implied, except those expressly contained or incorporated in this Agreement. All of the representations and warranties of Seller contained in this Agreement are to the best of Seller's knowledge, made as of the Effective Date, and except as otherwise set forth herein, shall merge with the Quitclaim Deed and shall not survive

the Closing. Subject to the foregoing, Seller represents and warrants unto Purchaser as of the date hereof, as follows:

4.1.　**Organization**.　Seller is a New York corporation created by the New York State Legislature pursuant to Chapter 568 of the Laws of 1951, duly organized, validly existing, and in good standing under the laws of the State of New York, and subject to the Bankruptcy Court's entry of the Sale Order, Seller has the legal power, right and authority to enter into this Agreement and the instruments referenced herein, and to consummate the transaction contemplated herein.

4.2.　**Power and Authority**.　All requisite corporate action has been taken by Seller in connection with entering into this Agreement, the documents and instruments referenced herein, and the consummation of the transaction contemplated hereby.　Subject to the Bankruptcy Court's entry of the Sale Order, no consent, authority, licensing, or approval of any partner, shareholder, trustee, trustor, beneficiary, creditor, investor, or other party is required for Seller to execute and deliver this Agreement and the instruments and documents referenced herein or consummate the transaction contemplated by this Agreement. The individual(s) executing this Agreement and the instruments referenced herein on behalf of Seller have the legal power, right, and actual authority to bind Seller to the terms and conditions hereof and thereof.

4.3.　**Consents**.　Subject to the Bankruptcy Court's entry of the Sale Order, no consent, approval, waiver, license, permit, or certificate of authority any other third Person is required in connection with the execution, delivery or performance by Seller of this Agreement or the consummation by Seller of the transactions contemplated hereby.

4.4.　**Foreign Person**. Seller is not a "foreign person" as defined in §1445(f)(3) of the Internal Revenue Code and regulations promulgated thereunder, which Seller shall so certify at Closing (via "Non-Foreign Person Affidavit").

4.5.　**Encumbrances**.　Except as otherwise expressly provided in this Agreement, at the Closing, Seller will convey the Property free and clear of all Encumbrances, as provided in the Sale Order, subject to any rights of way or easements of record.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

5.1.　**Power and Authority**.　All requisite action (corporate, trust, partnership or otherwise) has been taken by Purchaser in connection with entering into this Agreement, the documents and instruments referenced herein, and the consummation of the transaction contemplated hereby.　No consent, authority, licensing or approval of any partner, shareholder, trustee, trustor, beneficiary, creditor, investor, regulatory authority or other party is required for Purchaser to execute and deliver this Agreement and the instruments and documents referenced herein or consummate the transaction contemplated by this Agreement. The individual(s) executing this Agreement and the instruments referenced herein on behalf of Purchaser have the legal power, right, and actual authority to bind Purchaser to the terms and conditions hereof and thereof.

6

5.2. **Sufficient Funds**. The transaction contemplated by this Agreement is a "Cash Transaction", and Purchaser will have as of the Closing, sufficient funds in cash in its possession to pay the Purchase Price and the Earnest Money Deposit as the same become due and payable under this Agreement, without obtaining financing or funding from outside funding sources. Steven W Slosson is the sole shareholder of Slosson Educational Publications, Ins. He will be using both funds held currently by the corporation and personal funds to complete the purchase. For that reason, he is providing proof of funding from both the corporation and his personal account.

5.3. **Certain Relationships**. Purchaser represents and warrants to Seller (i) that neither Purchaser nor any Person or entity that directly or indirectly owns any interest in Purchaser nor any of its officers, directors or members is a Person or entity with whom U.S. Persons or entities are restricted from doing business under regulations of the Office of Foreign Asset Control ("OFAC") of the U.S. Department of the Treasury (including those named on OFAC's Specially Designated and Blocked Persons List) or under any statute, executive order (including, but not limited to, Executive Order 13224 ("Executive Order") signed on September 24, 2001 and titled "Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism"), or other governmental action, (ii) that Purchaser's activities do not violate the International Money Laundering Abatement and Financial Anti-Terrorism Act of 2001 or the regulations or orders promulgated thereunder (as amended from time to time, the "Money Laundering Act"), and (iii) that so long as this Agreement is in full force and effect, Purchaser shall comply with the Executive Order and with the Money Laundering Act.

5.4. **Foreign Person**. Purchaser is not a "foreign person" as defined in §1445(f)(3) of the Internal Revenue Code and the regulations promulgated thereunder.

## ARTICLE VI
## CONDITIONS TO CLOSING

6.1. **Conditions to Obligations of Each Party**. The respective obligations of each Party to consummate the transactions contemplated hereby shall be subject to the satisfaction at or prior to the Closing of the following conditions:

6.1.1. **Sale Order**. The Bankruptcy Court shall have entered the Sale Order.

6.2. **Additional Conditions to Obligations of Purchaser**. The obligations of the Purchaser to consummate the transactions contemplated hereby are subject to satisfaction or waiver by the following additional conditions:

6.2.1. **Representations and Warranties**. The representations and warranties of Seller set forth in this Agreement shall be materially true and correct as of the Effective Date and as of the Closing Date, as if made as of such time (except to the extent that such representations and warranties expressly speak as of another date, in which case such representations and warranties shall be true and correct as of such date).

6.2.2. **Agreements and Covenants**. Seller shall have performed and complied with all of its covenants hereunder in all material respects through the Closing.

6.2.3. **Documents**. All of the documents, instruments and agreements required to be executed and/or delivered by Seller on or prior to Closing pursuant to **Section 7.1.1** of this Agreement shall have been executed by the parties thereto other than the Purchaser and delivered to the Purchaser.

6.3. **Additional Conditions to Obligations of Seller**. The obligations of Seller to consummate the transactions contemplated hereby are subject to satisfaction or waiver by Seller of the following additional conditions:

6.3.1. **Representations and Warranties**. The representations and warranties of the Purchaser set forth in this Agreement shall be materially true and correct as of the Closing Date, as if made as of such time (except to the extent that such representations and warranties expressly speak as of another date, in which case such representations and warranties shall be true and correct as of such date).

6.3.2. **Agreements and Covenants**. Purchaser shall have paid the full Purchase Price performed and complied with all of its other covenants hereunder in all material respects through the Closing.

6.3.3. **Documents**. All of the documents, instruments and agreements required to be executed and/or delivered by Purchaser on or prior to Closing pursuant to **Section 7.1.2** of this Agreement shall have been executed by the parties thereto other than Seller and delivered to Seller.

## ARTICLE VII
## CLOSING; DELIVERIES AND ACTIONS TAKEN AT THE CLOSING

7.1. **Closing Date**. The Closing of the purchase and sale of the Property and any other transactions contemplated in this Agreement shall occur no later than the date that is five (5) Business Days after the date of the entry of the Sale Order or such other later date as the parties may mutually agree. The parties agree that TIME IS OF THE ESSENCE with respect to the occurrence of the Closing Date. The Closing shall be held via escrow and wire transfer through the offices of Seller's attorney.

7.1.1. **Deliveries by Seller at the Closing**. At the Closing, Seller shall cause to be executed and delivered to Purchaser the following documents with respect to the Property being conveyed:

7.1.1.1. a duly executed and acknowledged Bargain and Sale Deed;

7.1.1.2. a Quitclaim Bill of Sale conveying title to the Remaining Personal Property:

8

**Purchase and Sale Agreement**
**for 711 Knox Road, Aurora, NY**

18312103.v1

7.1.1.3. two (2) counterparts of a duly executed Closing Statement setting forth all closing adjustments and prorations for the Property (the "<u>Closing Statement</u>");

7.1.1.4. two (2) counterparts of duly executed Water Supply Assignment and Assumption Agreements (as hereinafter defined);

7.1.1.5. a Non-Foreign Person Affidavit signed by Seller;

7.1.1.6. a copy of the Sale Order; and

7.1.1.7. such other agreements, instruments, and documents of conveyance and transfer executed by Seller, in form and substance reasonably acceptable to Purchaser, as may be reasonably necessary or desirable to convey the Property to Purchaser free and clear of all Encumbrances, except as otherwise expressly provided in this Agreement.

7.1.2. **Deliveries by the Purchaser at the Closing.** At the Closing, Purchaser shall cause to be delivered to Seller the following:

7.1.2.1. the Purchase Price, by wire transfer of immediately available funds (subject to prorations and adjustments, including, but not limited to, a credit for the Earnest Money Deposit) by no later than 2:00 p.m. (eastern time);

7.1.2.2. two (2) counterparts of a Closing Statement setting forth all closing adjustments and prorations for the Property;

7.1.2.3. two (2) counterparts of duly executed Water Supply Assignment and Assumption Agreements (as hereinafter defined); and

7.1.2.4. such other agreements, instruments, and documents as Seller may reasonably request to consummate the purchase and sale transaction contemplated hereby.

## ARTICLE VIII
## TERMINATION

8.1. **Termination.** This Agreement may be terminated at any time prior to Closing:

8.1.1. by mutual written agreement of Purchaser and Seller;

8.1.2. by Seller, by written notice to Purchaser, if the Closing shall not have occurred on or before the date that is ten (10) Business Days after the date of entry of the Sale Order (as may be extended by written agreement of Purchaser and Seller); provided, however, that Seller is not in material breach of any of its representations and warranties contained in this

9

Purchase and Sale Agreement<br>for 711 Knox Road, Aurora, NY

18312103.v1

Agreement and has not failed in any material respect to perform any of its obligations hereunder;

8.1.3.　by Purchaser, by written notice to Seller, if there shall have been a material breach by Seller of any of its representations, warranties, covenants or agreements contained in this Agreement, which breach would result in the failure to satisfy one or more of the conditions set forth in this Agreement, and such material breach or other event or condition shall be incapable of being cured or, if capable of being cured, shall not have been cured within twenty-one (21) calendar days after written notice thereof shall have been received by Seller; provided, that Purchaser is not in material breach of this Agreement as of such date;

8.1.4.　by Seller, if there shall have been a material breach by Purchaser of any of its representations, warranties, covenants or agreements contained in this Agreement, which breach would result in the failure to satisfy one or more of the conditions set forth in this Agreement, and such material breach or other event or condition shall be incapable of being cured or, if capable of being cured, shall not have been cured within ten (10) calendar days after written notice thereof shall have been received by Purchaser; provided, that no Seller is in material breach of this Agreement as of such date; or

8.1.5.　by Purchaser on or after the date the Sale Order ceases to be in full force and effect, or is revoked, rescinded, vacated, materially modified, reversed or stayed, or otherwise rendered ineffective by a court of competent jurisdiction.

## ARTICLE IX
## EVIDENCE OF TITLE AND WATER SUPPLY AGREEMENTS

9.1.　**Abstract of Title.** Within thirty (30) days following the Effective Date, Seller shall, deliver to Purchaser (or its attorneys) a 60-year title abstract and tax search of the Property (the "Title Search"). Purchaser shall be responsible for obtaining a commitment for title insurance prepared by a title company of Purchaser's choice covering the Property (the "Title Commitment"), committing the Title Company to issue to Purchaser, upon the recording of the Bargain and Sale Deed, an ALTA fee title insurance policy in the full amount of the Purchase Price, together with legible copies of all documents referenced in Schedules B-1 or B-2 to the Title Commitment. Purchaser shall be responsible for paying the cost of the Title Search at the Closing, and Purchaser shall be solely responsible for the cost of the procurement and issuance of the Title Commitment and the premium for the title insurance policy, such responsibility shall survive the Closing or cancellation of this Agreement.

9.2.　**Condition to Title.** The Property shall be sold and conveyed, and Purchaser shall purchase the Property, (i) free and clear of all Liens pursuant to Section 363(f) of the Bankruptcy Code, with such Liens to attach to the consideration to be received by Seller in the same priority and subject to the same defenses and avoidability, if any, as before the Closing, and (ii) subject to: (a) the terms and conditions of the Sale Order, (b) such title exceptions affecting the Property as the

Title Company (or any other reputable title insurance company licensed to do business in the State of New York) shall, at regular rates, be willing to omit as exceptions to coverage, and (c) those matters listed in Exhibit "C-1" to this Agreement (collectively, the "Permitted Exceptions"). Seller and Purchaser hereby expressly agree that the state of title set forth in the Sale Order and Exhibit "C-1" hereto, including the Permitted Exceptions, reflect good, marketable, insurable and acceptable title to the Property.

9.3.   **Survey**. Purchaser shall have the right, but not the obligation, to order a new survey of the Property (a "Survey"), at Purchaser's sole cost and expense and, if Purchaser elects to obtain a Survey, Purchaser shall deliver a copy of the Survey to Seller upon receipt. Notwithstanding the foregoing, Closing shall not be subject to or conditioned upon Purchaser's or Seller's receipt of or Title Company's review a Survey.

9.4.   **Approval of Water Supply Agreements**. Within thirty (30) days following the Effective Date, Seller shall deliver to Purchaser (or its attorneys) copies of the existing agreements between Seller and the owners of three residential properties located adjacent to the Property (collectively, the "Water Supply Agreements") pursuant to which Seller furnishes water to such property owners on the terms and conditions set forth in the Water Supply Agreements. Seller shall, at the time of Closing, assign to Purchaser all of Seller's rights under the Water Supply Agreements, and Purchaser shall assume all of Seller's obligations thereunder pursuant to written assignment and assumption agreements (collectively, the "Water Supply Assignment and Assumption Agreements").

## ARTICLE X
## CLOSING ADJUSTMENTS

10.1.   **Apportionment**. The following shall be apportioned on the Closing Statement against sums due Seller at Closing:

10.1.1.   Seller shall pay for the New York real property transfer tax due, if any, in connection with this transaction.

10.1.2.   Purchaser shall pay all recording fees and other charges and fees payable in connection with the recording of the Bargain and Sale Deed.

10.1.3.   Purchaser shall also pay for (1) the examination and search fees incurred by the Title Company to prepare the Title Search; (2) the examination and search fees incurred by the Title Company to acquire the Title Commitment, (3) all premiums charged on the owner's policy of title insurance issued to Purchaser pursuant to the Title Commitment, including, without limitation, the costs of any endorsements or extended title insurance coverage requested by Purchaser, and (4) the charges for preparing the Survey, if applicable.

10.1.4.   Each party shall bear its own attorneys' fees in connection with its negotiation, due diligence investigation and conduct of the transaction.

**Purchase and Sale Agreement
for 711 Knox Road, Aurora, NY**

18312103.v1

10.2.   **Real Estate Taxes and Other Charges**. Real estate taxes, utilities, including but not limited to water charges, sewer, rents and fuel, and all other customary items shall be adjusted, apportioned and allowed as of the Closing Date, if necessary by an estimated tax calculation, with the Closing Date being a day of income and expense to the Purchaser. If at any time up to the Closing Date, the Property or any part thereof shall be or shall have been affected by an assessment or assessments for municipal improvements whether or not confirmed or completed an whether or not payable in installments, then for purpose of this Agreement, the proportional share of all of the unpaid installments of any such assessment(s), which are to become due and payable after the delivery of the Bargain and Sale Deed contemplated hereunder, shall be paid by the Purchaser. Installments allocable to period prior to the Closing and unpaid as of the Closing Date shall be paid by Seller or allowed as a reduction in the Purchase Price.

## ARTICLE XI
## POSSESSION

11.1.   **Right to Possession**. Right to possession of, and control over, the Property shall transfer to Purchaser on the Closing Date. On the Closing Date, Seller shall:

  11.1.1.   Transfer possession to Purchaser of the Property in AS-IS, WHERE IS condition.

  11.1.2.   Transfer and deliver to Purchaser all keys, pass keys, pass codes, security codes, locks and safe combinations and all other similar items in Seller's possession as Purchaser may require to obtain occupation and control of the Property.

  11.1.3.   Make available to Purchaser originals of all documents, instruments and agreements in Seller's possession that are required to be transferred to Purchaser by this Agreement.

11.2   **Limited Right to Post-Occupancy**. Notwithstanding the foregoing and provided that Seller notifies Purchaser prior to the entry of the Sale Order, Seller shall have the right to store, maintain, and remove the Excluded Items from the library until December 31, 2024 (the "Post-Occupancy"), the terms and conditions substantially set forth in **Exhibit D**.

## ARTICLE XII
## AS-IS, WAIVER AND RELEASE

12.1.   As a material inducement to the execution and delivery of this Agreement by Seller and the performance by Seller of its duties and obligations hereunder, Purchaser does hereby acknowledge, represent, warrant and agree, to and with Seller, that (i) Purchaser is purchasing the Property in an "AS-IS" condition as of the Closing Date with respect to any facts, circumstances, conditions and defects, latent or patent; (ii) Seller has no obligation to repair or correct any such facts, circumstances, conditions or defects or compensate Purchaser for same; (iii) Purchaser has undertaken all such physical inspections and examinations of the Property as Purchaser deems necessary or appropriate under the circumstances, and that based upon same, Purchaser is and will be relying strictly and solely upon such inspections and examinations and the advice and counsel

12

**Purchase and Sale Agreement
for 711 Knox Road, Aurora, NY**

of its agents and officers, and Purchaser is and will be fully satisfied that the Purchase Price is fair and adequate consideration for the Property; (iv) Seller is not making and has not made any warranty or representation with respect to all or any part of the Property (including, but not limited to, any matters contained in documents made available or delivered to Purchaser in connection with this Agreement as an inducement to Purchaser to enter into this Agreement and thereafter to purchase the Property or for any other purpose); and (v) by reason of all of the foregoing, Purchaser shall assume the full risk of any loss or damage occasioned by any fact, circumstance, condition or defect pertaining to the physical and financial condition of the Property, including without limitation the presence of any asbestos containing material, hazardous, toxic or radioactive waste, substance or materials in, on, under or about the Property, and Purchaser hereby expressly and unconditionally waives and releases Seller and all of their parents, subsidiaries, Affiliates and partnerships, and its and their respective officers, directors, shareholders, partners, agents and employees, and their respective successors, heirs and assigns and each of them (individually and collectively, the "Released Parties") from any and all rights and claims against Seller and/or the Released Parties with respect to the condition of the Property, including without limitation any rights of Purchaser under the State or Federal Comprehensive Environmental Response, Compensation and Liability Act, as amended from time to time, or similar Laws.  Purchaser acknowledges and agrees that the foregoing waiver and release includes all rights and claims of Purchaser against Seller pertaining to the condition of the Property, whether heretofore or now existing or hereafter arising, or which could, might, or may be claimed to exist, of whatever kind or nature, whether known or unknown, suspected or unsuspected, liquidated or unliquidated, each as though fully set forth herein at length, which in any way arise out of, or are connected with, or relate to, the condition of the Property.  The foregoing provisions shall survive the Closing Date and the consummation of the transaction contemplated by this Agreement.

## ARTICLE XIII
## DEFAULT

13.1.  **Seller Default**. In the event that Seller shall be in material default hereunder for any reason other than Purchaser's default, Purchaser may deliver a written notice to Seller stating with particularity the alleged default of Seller, the action required by Seller to cure such default, and Purchaser's intent to exercise its remedies provided below if the default is not cured.  Seller shall have twenty-one (21) days after receipt of such notice to cure the alleged default to Purchaser's reasonable satisfaction (and the Closing Date shall be delayed, if necessary, until the end of such twenty-one (21) day period).  In the event such default is not cured within such twenty-one (21) day period, then Purchaser may elect, as its sole and exclusive remedy, to seek to enforce specific performance only for failure to cause the Property to be conveyed in accordance with the terms and provisions hereof (without any reduction in the Purchase Price) or to terminate this Agreement by written notice to Seller and the Title Company, whereupon Purchaser shall be entitled to a full refund of the Earnest Money Deposit.  It is expressly understood and agreed that the remedy of specific performance shall not be available to enforce any other obligation of Seller hereunder other than a failure to cause the Property to be conveyed in accordance with the terms and provisions of this Agreement.  Purchaser shall be deemed to have elected to terminate this Agreement if Purchaser fails to file suit for specific performance against Seller in Bankruptcy Court, or, with the permission of Bankruptcy Court, in a court having jurisdiction in the county and state in which the Property is located, on or before thirty (30) days following the date upon

which the Closing was to have occurred pursuant to this Agreement. Notwithstanding anything to the contrary contained herein, Purchaser shall have no right to specific performance of this Agreement, nor shall Seller have any authority or obligation to transfer the Property to Purchaser pursuant to this **Article XIII** absent the entry of a Sale Order by the Bankruptcy Court authorizing and directing such conveyance of the Property by Seller to Purchaser.

13.2.    **Purchaser Default.**   In the event that Purchaser shall be in default hereunder for any reason other than Seller's default, Seller may deliver a written notice to Purchaser stating with particularity the alleged default of Purchaser, the action required by Purchaser to cure such default and Seller's intent to terminate this Agreement if the default is not cured. Purchaser shall have ten (10) days after receipt of such notice to cure the alleged default to Seller's reasonable satisfaction (and the Closing Date shall be delayed, if necessary, until the end of such ten (10) day period). In the event such default is not cured within such ten (10) day period, then Seller may, as Seller's sole and exclusive remedy for such default, terminate this Agreement by written notice to Purchaser and the Title Company, whereupon Seller shall be entitled to retain the Earnest Money Deposit as full liquidated damages for such default of Purchaser. It is hereby agreed that Seller's damages in the event of a default by Purchaser hereunder are uncertain and difficult to ascertain, and that the Earnest Money Deposit constitutes a reasonable liquidation of such damages and is intended not as a penalty, but as full liquidated damages. Purchaser covenants not to bring any action or suit challenging the amount of liquidated damages provided hereunder in the event of such default. Notwithstanding anything to the contrary contained herein, this provision shall in no way affect or impair Seller's right of recovery under any indemnity given by Purchaser in favor of Seller under this Agreement.

## ARTICLE XIV
## WAIVER OF INSPECTION, VIOLATIONS, AND LOCAL REQUIREMENTS

14.1.    Purchaser expressly waives any and all right to an inspection of the Property by a licensed inspector, licensed contractor or licensed engineer prior to the Closing Date.

14.2.    Notwithstanding the foregoing, Seller grants Purchaser and any Representative of Purchaser, after reasonable notice to Seller, reasonable access to conduct a final walk through of the Property with all utilities in service within forty-eight (48) hours prior to the Closing to ensure that all conditions of this Agreement have been met by Seller.

14.3.    Purchaser shall accept the Property subject to any and all violations of law, rules, regulations, ordinances, orders or requirements issued by any Federal, state, county, municipal or other department or governmental agency having jurisdiction against or affecting the Property (collectively, "Violations"). Seller shall have no obligation to cure or remove any Violations existing as of the Effective Date.

14.4.    To the extent the Town of Aurora, County of Erie, State of New York, or any other governmental agency or authority having jurisdiction (collectively, "Governmental Authorities") imposes requirements for issuance certificates of occupancy, certificates of compliance, certificates of inspection of sanitary sewer and/or storm sewer fixtures or facilities, or any other inspection and/or certification requirements in connection with and as a condition to the sale of

the Property (collectively, "Local Requirements"), Purchaser shall be deemed to have waived all such Local Requirements to the extent the same are waivable. To the extent any such Local Requirement or Local Requirements are not waivable by Purchaser, Purchaser shall comply with the Local Requirement(s) in question at Purchaser's sole cost.

**ARTICLE XV**
**BROKER**

15.1.  **Broker Commission**.  In connection with the consummation of the sale contemplated by this Agreement, Seller shall be solely responsible for paying a broker's commission to Hanna CRE from the proceeds of the Purchase Price and pursuant to the terms of a separate agreement in an amount not to exceed five percent (5%) of the gross profit.  No commissions shall be due or payable to Hanna CRE unless and until the Closing contemplated hereby occurs.  Purchaser and Seller each represent and warrant to the other that, except for the Hanna CRE, they have not employed, retained or consulted with any other broker, agent or finder in connection with the solicitation of Purchaser, the negotiations in connection with this Agreement or the purchase and sale referenced herein.

**ARTICLE XVI**
**BIDDING PROCEDURES AND ALTERNATIVE TRANSACTION**

16.1.  **Sale Motion**.  The Parties acknowledge that this Agreement is subject to approval of the Bankruptcy Court, which approval will include, among other things, issuance by the Bankruptcy Court of a Bidding Procedures Order directing the manner in which a bidding procedure will be conducted for solicitation of competing offers from third parties for the purchase of the Property.  Depending upon the outcome of the bidding procedure, this Agreement may be subject to termination by Seller, as hereinafter provided.  Seller shall file a motion to approve this Agreement (the "Sale Motion") and to establish reasonable bidding procedures (the "Bidding Procedures") within twenty-one (21) days of the Effective Date of this Agreement.

16.2.  **Higher Bids**.  This Agreement is subject to higher and better offers pursuant to the Bidding Procedures to be established by the Bankruptcy Court, and is subject to termination pursuant to **Article VIII**.

16.3.  **Alternative Transaction**.  If the Bankruptcy Court shall enter a final Sale Order approving a purchase of the Property by an Alternative Bidder (as hereinafter defined), then Seller shall terminate this Agreement, by written notice to Purchaser, Purchaser shall be entitled to receive a refund of the Earnest Money Deposit, and Seller shall be free to consummate a sale of the Property to the Alternative Bidder (and "Alternative Transaction").

16.4.  **The Bidding Procedures**.  Subject to the approval by the Bankruptcy Court, Bidding Procedures shall include the following:

16.4.1.    the procedures for solicitation of competing offers from third parties for the purchase of the Property (each, a "Alternative Bidder");

15

**Purchase and Sale Agreement**
**for 711 Knox Road, Aurora, NY**

16.4.2.   any bid submitted by an Alternative Bidder shall include proof of funds and a signed Purchase and Sale Agreement along with a marked copy showing any changes from this Agreement;

16.4.3.   any bid submitted by an Alternative Bidder must exceed the Purchase Price set forth in this Agreement by Ten Thousand Dollars ($10,000.00) (the "Initial Overbid");

16.4.4.   any subsequent bidding after the Initial Overbid shall be in minimum increments of $100,000.00, with minimum subject to modification in the Seller's sole and absolute discretion;

16.4.5.   the procedures for an auction to determine the highest and best offer for the Property (the "Successful Bidder");

16.4.6.   such further terms as are determined to be necessary by Seller in order to obtain Bankruptcy Court approval of the Bidding Procedures; and

16.4.7.   Purchaser shall be allowed to participate in the bidding process along with Alternative Bidders.

16.5.   **Backup Bidder**.  In the event that the Purchaser is not the Successful Bidder in the bidding process, the Purchaser's bid (as reflected in this Agreement or in any higher bid placed by Purchaser during the bidding process) shall remain irrevocable as the backup bidder (the "Backup Bidder") until the earliest of: (i) a period of sixty (60) days from the Sale Order, or (ii) the closing of a sale with the Successful Bidder.

## ARTICLE XVII
## MISCELLANEOUS

17.1.   **Amendment**. This Agreement shall not be amended, modified, supplemented, or revoked, except by a writing signed by Seller and Purchaser.

17.2.   **Governing Law**.  This Agreement shall be governed by and construed, interpreted and enforced in accordance with the Laws of the State of New York without regard to conflicts of Laws or choice of Laws principles thereof that would cause the application of the Laws of any jurisdiction other than the State of New York.

17.3.   **Binding Effect**.  This Agreement shall bind the parties hereto, their respective heirs, successors and assigns.  Except as set forth in **Section 17.5** hereof, neither Purchaser nor Seller may assign its interest hereunder without the prior written approval of the other party.

17.4.   **Notices**.  All notices required under this Agreement shall be in writing and shall be: (i) personally delivered; (ii) sent by certified mail, return receipt requested, postage pre-paid; or (iii) sent by nationally recognized overnight air courier service at the expense of sender, addressed to the parties hereto at their respective addresses set forth below.  Such notice or other

communication shall be deemed given upon delivery, or if delivery is refused, upon refusal to accept delivery. Notice hereunder may be given at the following addresses:

|  |  |
|---|---|
| If to Seller: | The Diocese of Buffalo, N.Y.<br>795 Main Street<br>Buffalo, New York 14203<br>Attn: Richard Suchan |
| With a copies to: | Bond Schoeneck & King PLLC<br>110 W. Fayette Street<br>One Lincoln Center<br>Syracuse, New York 13202<br>Attn:  Charles Sullivan, Esq.<br>          Jeffrey Eaton, Esq.<br>Email: csullivan@bsk.com<br>          jeaton@bsk.com |
|  | Bond, Schoeneck & King PLLC<br>200 Delaware Avenue<br>Suite 900<br>Buffalo, New York 14202<br>Email: swheeler@bsk.com<br>Attn: Sarah Wheeler, Esq. |
| If to Purchaser: | Slosson Educational Publications, Inc<br>538 Buffalo Rd<br>East Aurora, NY  14052<br><br>Email: slosson@slosson.com<br>Attn: Steve Slosson |
| With a copy to: | E Peter Pfaff<br>Law Offices of E Peter Pfaff<br>673 Main St  Ste 5<br>East Aurora, NY  14052<br>Email:   peter@epeterpfaff.com<br>Attn:   Peter Pfaff |

The above notwithstanding, notice may be given by email from one party's attorney to the other party's attorney, with a copy by first class mail, addressed to the respective attorney above. Notice upon brokers, realtors, or other third parties shall be deemed courtesy copies only.

17.5.  **Time for Performance**.   Time shall be of the essence for purposes of this Agreement.

17

Purchase and Sale Agreement<br>for 711 Knox Road, Aurora, NY

18312103.v1

17.6.   **Assignability**.  Purchaser shall not have the right to assign this Agreement and its rights hereunder without Seller's prior written consent, unless such assignment is to a single asset entity in which Purchaser owns a controlling interest, in which case, Seller's consent shall not be required, provided, however, that upon such assignment, Purchaser shall in no way be released or relieved of any of its obligations under this Agreement.

17.7.   **Number and Gender**.  Whenever required by the context or use in this Agreement, the singular word shall include the plural word and the masculine gender shall include the feminine and/or neuter gender, and vice versa.

17.8.   **Captions**.  The paragraph titles, headings and/or captions contained herein have been inserted solely as a means of reference and convenience.  Such captions shall not affect the interpretation or construction of this Agreement and shall not define, limit, extend or otherwise describe the scope of this Agreement or the intent of any provision hereof.

17.9.   **Counterparts and Electronic Delivery**.  This Agreement may be executed in any number of counterparts, each of which, when executed, shall be deemed to be an original, all of which shall be deemed to be one and the same instrument.  This Agreement may be delivered by Facsimile or email transmission, and facsimile, email, or photocopies of the fully executed Agreement shall have the same force and effect as originals.

17.10.  **Legal Counsel**.  Purchaser and Seller acknowledge that they have been, or have had the opportunity to be, represented by legal counsel in connection with this Agreement and that this Agreement is the product of extensive negotiations between the parties.  Purchaser and Seller agree that the fact that this Agreement or one or more provisions hereof were drafted by one party or the other shall not affect the meaning or interpretation of this Agreement.

17.11.  **Waiver**. No action taken pursuant to this Agreement, including any investigation by or on behalf of any party, shall be deemed to constitute a waiver by any party taking such action of compliance with any representation, warranty, covenant, or agreement contained herein.  The waiver by any party hereto of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

17.12.  **Third Party Beneficiaries**. Nothing in this Agreement is intended, nor shall anything herein be construed, to confer any rights, legal or equitable, in any Person other than the parties hereto and their permitted successors and assigns.  There are no third party beneficiaries to this Agreement.

17.13.  **Cooperation and Further Assurances**.  The Parties shall use their respective commercially reasonable efforts to (a) take or cause to be taken all actions, and to do or cause to be done all other things, necessary, proper or advisable to expeditiously satisfy the closing conditions set forth herein and to consummate the transactions contemplated hereby as promptly as practicable and evidence the consummation of the transactions contemplated hereby, and (b)

obtain in a timely manner all necessary waivers, consents and approvals and to effect all necessary registrations and filings in connection with the foregoing. Seller shall assist with such other post-closing matters as Purchaser may reasonably request, provided that the performance of such matters is within Seller's ordinary course of business and does not require an order of the Bankruptcy Court.

17.14.  **No Merger.** Except as otherwise expressly provided herein, the provisions of this Agreement containing agreements between the parties relating to actions occurring after Closing shall not be merged into the instruments of Closing but shall expressly survive and be enforceable according to their terms.

17.15.  **Notification of Certain Matters.**  From time to time prior to the Closing Date, the Parties shall promptly notify each other of the occurrence or non-occurrence of any event or circumstance that as applicable, indicates (a) that any of the representations and warranties set forth herein may not be, will not be, or are not, true and correct, or (b) any failure on its part to comply with or satisfy, in any material respect, any covenant, agreement or condition to be complied with or satisfied by it pursuant hereto (any such notification, a "Required Notification"); provided, however, that in each case, such disclosure shall not be deemed to (i) amend or supplement any Schedule hereto, or (ii) cure any breach of such representation, warranty, covenant or agreement or satisfy any condition set forth herein.

17.16.  **Entire Agreement.** This Agreement, including the exhibits and schedules, contains the entire agreement between Seller and Purchaser pertaining to the transaction contemplated hereby and fully supersedes all prior agreements and understandings between Seller and Purchaser pertaining to such transaction. If any provision hereof is determined by a court of competent jurisdiction to be invalid or unenforceable, the remainder of this Agreement shall nonetheless remain in full force and effect. This Agreement may be amended, modified, or supplemented only by an instrument in writing signed by the parties.

17.17.  **Escrow Agent and Earnest Money Deposit.** The Earnest Money Deposit made by Purchaser under the terms of this Agreement shall be held by the Seller's attorneys, **Bond, Schoeneck & King, PLLC** in a non-interest-bearing attorney's trust account, in accordance with and subject to the following provisions:

(a)     Escrow Agent, without risk to Escrow Agent, except for willful misconduct or fraud, shall place the Earnest Money Deposit in a non-interest bearing bank attorney trust account maintained at a commercial bank, savings bank or savings and loan association.

(b)     At the Closing, if any, Escrow Agent shall disburse the Earnest Money Deposit to Seller, and said Earnest Money Deposit shall be credited to the Purchase Price.

19

(c)    Upon receipt of written demand therefor signed by Seller, stating that Purchaser have defaulted in the performance of Purchaser's obligations under this Agreement and that Seller has terminated this Agreement on account of said default of Purchaser, Escrow Agent shall, subject to the provisions of **Section 17.17(g)**, disburse the Earnest Money Deposit to Seller; provided, however, that Escrow Agent shall not honor such demand until not less than five (5) days after the date on which Escrow Agent shall have given notice to Purchaser (in the manner specified in this Agreement for notices to be given).

(d)    Upon receipt of written demand therefor signed by Purchaser, stating that this Agreement has been terminated and that Purchaser are entitled under the terms of this Agreement to the return of the Earnest Money Deposit, Escrow Agent shall, subject to the provisions of **Section 17.17(g)**, disburse the Earnest Money Deposit to Purchaser; provided, however, that Escrow Agent shall not honor such demand until not less than five (5) days after the date on which Escrow Agent shall have given notice to Seller (in the manner specified in this Agreement for notices to be given).

(e)    If an action or proceeding is commenced by either party to determine the rights of the parties to the Earnest Money Deposit, all attorneys' fees and court costs of the prevailing party shall be borne by whoever shall not prevail in such action or proceeding.

(f)    It is agreed that the duties of Escrow Agent are only as herein specifically provided, are purely ministerial in nature and that Escrow Agent shall incur no liability whatsoever except for willful misconduct or fraud. Seller and Purchaser hereby release Escrow Agent from any act done or omitted to be done by Escrow Agent in good faith in the performance of Escrow Agent's duties hereunder. If requested at Closing, Seller and/or Purchaser shall execute and deliver general releases in the usual form to Escrow Agent.

(g)    Escrow Agent is acting only as a stakeholder with respect to the Earnest Money Deposit. If any dispute shall arise as to whom the Earnest Money Deposit is to be disbursed, Escrow Agent shall not disburse the Earnest Money Deposit to either party but in such event shall hold the same until receipt by Escrow Agent of a written authorization signed by Seller and Purchaser directing the disposition of same, or in the absence of such authorization, Escrow Agent may hold the Earnest Money Deposit until the final determination of the rights of the parties in an appropriate action or proceeding. If such written authorization is not given, or an action or proceeding for such determination is not begun and diligently continued, Escrow Agent may, but is not required to, bring any appropriate action or proceeding for interpleader or other leave to place the Earnest Money Deposit in court pending such determination. All costs of such action or proceeding, including, without limitation, attorneys' fees of Escrow Agent are to be borne by the party who shall not prevail in such action or proceeding. Upon delivery of the Earnest Money Deposit in the manner herein provided, Escrow Agent shall have no further liability hereunder or otherwise. Escrow Agent shall have the right to represent Seller in any dispute between Purchaser and Seller with respect to the Earnest Money Deposit.

(h)    Escrow Agent has executed this Agreement solely to acknowledge Escrow Agent's receipt of the Earnest Money Deposit by check subject to collection, and to evidence Escrow Agent's agreement to act as escrow agent in accordance with the provisions of this **Section 17.17.**

**Purchase and Sale Agreement
for 711 Knox Road, Aurora, NY**

18312103.v1

[Signature Pages Follow]

Purchase and Sale Agreement
for 711 Knox Road, Aurora, NY

18312103.v1

**In Witness Whereof** the parties have executed this Agreement as of the day and year first written above.

**SELLER**: Diocese of Buffalo

_____
Signature

_____
Name

_____
Title

**[Seller Signature Page – 711 Knox Road, Town of Aurora, New York]**

22

**Purchase and Sale Agreement
for 711 Knox Road, Aurora, NY**

**PURCHASER**:  Slosson Educational Publications, Inc

Signature

Steven W. Slosson

President of Slosson Educational
Publications, Inc

**[Purchaser Signature Page – 711 Knox Road, Town of Aurora, New York]**

**ESCROW AGENT:**  Bond, Schoeneck & King, PLLC

_____
Signature

_____
Name

_____
Title

**[Escrow Agent Signature Page – 711 Knox Road, Town of Aurora, New York]**

24

Purchase and Sale Agreement
for 711 Knox Road, Aurora, NY

18312103.v1

Exhibit A-1

Property Sketch



Exhibit A

Purchase and Sale Agreement
for 711 Knox Road, Aurora, NY

18312103.v1

Case 1-20-10322-CLB,    Doc 3340,    Filed 11/20/24,    Entered 11/20/24 14:38:58,
Description: Main Document  , Page 37 of 46

## Exhibit A-2

Legal Description of the Property

### PARCEL A

ALL THAT TRACT OR PARCEL OF LAND, situate in the Town of Aurora, County of Erie and State of New York, being part of Lot No. 48, Township 9, Range 6 of the Holland Land Company's Survey, bounded and described as follows:

BEGINNING at a point in the center line of Knox Road, distant 2232 feet southerly from its intersection with the center line of Willardshire Road; thence westerly at an exterior angle of 87° 36', 2097.17 feet to a point; thence northeasterly at an interior angle of 73° 00' 30", 345.47 feet to a point; thence westerly at an exterior angle of 71° 37' 30", 597.40 feet to a point in the easterly line of Lot No. 56, distant 12.63 feet southerly from the northeast corner of lands in said Lot No. 56 conveyed to Fred H. Reuter by deed recorded in Erie County Clerk's Office in Liber 3514 of Deeds at page 75 on March 25, 1944 (designated as Parcel A therein); thence northerly along said east line of Lot No. 56 forming an interior angle of 86° 50' with last above line, 316.92 feet to the northwest corner of lands in Lot No. 48 conveyed to Fred H. Reuter by deed aforesaid (designated as Parcel B therein); thence north 88° 30' east along the north line of lands so conveyed to Fred H. Reuter, 1200 feet to a point in the west line of the middle third of Lot No. 48; thence south 25' east, 257 feet; thence north 88° 05' east along the north line of lands so conveyed to said Fred H. Reuter, 1405 feet to a point in the center line of Knox Road being the northeast corner of lands conveyed to Fred H. Reuter by aforesaid deed; thence southerly along the said center line of Knox Road, 360 feet to the place of beginning.

### PARCEL B

ALL THAT TRACT OF PARCEL OF LAND, situate in the Town of Aurora, County of Erie and State of New York, being part of Lot No. 48, Township 9, Range 6 of the Holland Land Company's Survey, bounded and described as follows:

BEGINNING at a point in the center line of Knox Road distant 2232 feet southerly from its intersection with the center line of Willardshire Road; thence westerly at an interior angle of 87° 36.', 2097.17 feet to a point; thence southwesterly at an interior angle of 106° 59' 30", 189.95 feet to a point; thence southerly at an interior angle of 170° 04', 638.55 feet to a point; thence easterly at an interior angle of 83° 46', 206.85 feet to a point; thence easterly at an interior angle of 178° 52', 166.90 feet to a point; thence easterly at an interior angle of 181° 05' 425 feet to a point; thence southeasterly at an interior angle of 210° 14', 45 feet to a point; thence southeasterly at an interior angle of 196° 09', 100 feet to a point; thence southeasterly at an interior angle of 176° 47', 50 feet to a point; thence southeasterly at an interior angle of 158° 33', 53 feet to a point; thence northeasterly at an interior angle of 150° 15', 527 feet to a point; thence northeasterly at an interior angle of 165° 57', 35 feet to a point; thence northeasterly at an interior angle of 158° 13', 80 feet to a point; thence northeasterly at an exterior angle of 162° 15' 218 feet to a point; thence easterly at an interior angle of 203° 42', 400 feet to a point in the center line of Knox Road distant 406.35 feet northerly from the south line of said Lot No. 48 as measured along said center line of said Knox Road; thence northerly along said center line of Knox Road 734.67 feet to the place of beginning.

Exhibit A                    Purchase and Sale Agreement
                             for 711 Knox Road, Aurora, NY

**PARCEL C**

ALL THAT TRACT OR PARCEL OF LAND, situate in the Town of Aurora, County of Erie and State of New York, being part of Lots Nos. 47, 48, 55 and 56, Township 9, Range 6 of the Holland Land Company's Survey, bounded and described as follows:

BEGINNING at a point in the easterly line of said Lot No. 56, distant 2191.5 feet southerly from the center line of Willardshire Road as measured along said east line of Lot No. 56, being the northeast corner of lands in said Lot No. 56 conveyed to Fred H. Reuter by deed recorded in Erie County clerk's Office in Liber 3514 of Deeds at page 75 on March 25, 1944 (designated as Parcel A therein); thence southerly along said east line of Lot No. 56, 12.63 feet to a point; thence easterly at an interior angle of 93° 10', 597.40 feet to a point; thence southwesterly at an interior angle of 71° 37' 30", 535.42 feet to a point; thence southerly at an exterior angle of 170° 04', 638.55 feet to a point; thence westerly at an interior angle of 96° 14', 273.15 feet to a point; thence southerly at right angles about 825 feet to the Cazenovia Creek (formerly called the Buffalo Creek); thence westerly along the Cazenovia Creek, about 135 feet to the east line of Lot No. 55; thence southerly along said east line of Lot No. 55 to the center line of said Cazenovia Creek; thence northwesterly and northerly along said center line of Cazenovia Creek about 1965 feet to the northwesterly corner of lands in Lot No. 56 conveyed to Fred H. Reuter by aforesaid deed; thence northeasterly, northerly and easterly along the northerly and westerly lines of lands so conveyed to Fred H. Reuter by aforesaid deed the following 6 courses and distances: (1) North 66° 16' east, 188.60 feet; (2) North 9° 46' east, 268 feet; (3) North 13° 47' west, 105 feet; (4) North 36° 11' east, 106.8 feet; (5) South 73° 37' east, 273 feet and (6) South 87° 42' east, 439 feet to the point or place of beginning.

**Exhibit B**

Bargain and Sale Deed

**THIS INDENTURE**, made the ____ day of _____ 2024,

BETWEEN

**Diocese of Buffalo**, a New York special act corporation created by the New York State Legislature pursuant to Chapter 568 of the Laws of 1951, having an office at 795 Main Street, Buffalo, New York 14203, party of the first part,

and,

_____, a _____, having an address at _____, party of the second part,

**WITNESSETH** that the said party of the first part, in consideration of One Dollar ($1.00 and No More), lawful money of the United States, paid by the party of the second part, do hereby grant and release unto the party of the second part, the theirs or successors and assigns of the party of the second part forever,

**ALL THAT TRACT AND PARCEL OF LAND,**

Pursuant to Sections _____ of the _____, the Bankruptcy Court of _____ approved the sale contemplated herein by an Order dated _____ and located at Index No. _____ (the "Order"), attached hereto as **Schedule A** shall be incorporated herein and shall be understood to be a part hereof.

TOGETHER with all right, title and interest, if any, of the party of the first part, in and to any streets and roads abutting the above-described premises to the center lines thereof; TOGETHER with the appurtenances and all the estate and rights of the party of the first part in and to said premises; TO HAVE AND TO HOLD the premises herein granted unto the party of the second part, the heirs or successors and assigns of the party of the second part forever.

AND the party of the first part, in compliance with Section 13 of the Lien Law, covenants that the party first part will receive the consideration for this conveyance and will hold the right to receive such consideration as a trust fund to be applied first for the purpose of paying the cost of the improvement and will apply the same first to the payment of the cost of the improvement before using any part of the total of the same for any other purpose.

The word "party" shall be construed as if it read "parties" whenever the sense of this indenture so requires.

IN WITNESS WHEREOF, the party of the first part has duly executed this deed the day and year first above written.

|  |  |
|---|---|
| Exhibit B | Purchase and Sale Agreement<br>for 711 Knox Road, Aurora, NY |

18312103.v1

## DIOCESE OF BUFFALO

_____
Signature

_____
Name

_____
Title

STATE OF NEW YORK          )
                           )SS.:
COUNTY OF ERIE             )

On the _____ of _____ in the year 2024, before me, the undersigned, a notary public in and for said state, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his/her/their capacity, and that by his/her/their signature on the instrument, the individual or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

Exhibit C-1

**PERMITTED EXCEPTIONS**

Exhibit C

Purchase and Sale Agreement
for 711 Knox Road, Aurora, NY

18312103.v1

**Exhibit D**

POST-OCCUPANCY AGREEMENT

**REAL PROPERTY**: a portion of real property located in the Town of Aurora, County of Erie, New York, commonly known as 711 Knox Road, Aurora, New York, Tax Map No. 163.00-3-23 (the "Real Property")

**SELLERS**:    Diocese of Buffalo

**PURCHASER**: _____

**SELLER'S ATTORNEY**: Bond, Schoeneck & King, PLLC, Attn: Charles Sullivan, Esq.; Jeffrey Eaton, Esq.; and Sarah Wheeler, Esq.

**BUYER'S ATTORNEY**: _____

WHEREAS, Seller and Purchaser (collectively, the "Parties") have entered into to that certain Purchase and Sale Agreement, dated _____, 2024 (the "Agreement"), with respect to the above-described Real Property;

WHEREAS, due to constraints outside the Parties reasonable control, Seller requires additional time to remove religious materials and texts (the "Excluded Items") currently located on the Real Property, more specifically, located in the library (the "Library");

WHEREAS, Seller and/or its agents or contractors shall have access to the Library, together with ingress and egress through the Real Property, during reasonable business hours and upon reasonable notice to Purchaser, to remove the Excluded Items;

WHEREAS, Seller and/or its agents or contractors shall remove the Excluded Items on or before December 31, 2024 (the "Occupancy Period");

WHEREAS, the Parties hereby agree to provide for a hold back of sale proceeds due to Seller under the Agreement until such time as Seller and/or its agents or contractors removes the Excluded Items from the Library, the terms and conditions of which are outlined below (the "Post-Occupancy Agreement"); and

NOW THEREFORE, in consideration of the mutual promises and covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.    The Parties agree the per diem value of Seller's sole use and occupancy of the Library after Closing is _____ ($____.00) (the "Per Diem Rate"). At Closing, Seller shall withhold from the sale proceeds received an amount equal to the Per Diem Rate multiplied by the number of days remaining in the calendar year (the "Withheld Funds"). The Withheld Funds

**Consolidated Appendix 0474**

shall be deposited with Seller's Attorney and held in escrow until the Excluded Items are removed from the Real Property.

2.    Upon notification that the Excluded Items were removed from the Library, Seller's Attorney shall calculate the number of days the Excluded Items remained in the Library after Closing and multiply the same by the Per Diem Rate (the "Rent"). Seller's Attorney shall release to Purchaser the Rent from the Withheld Funds. Any Withheld Funds remaining after the deduction of Rent shall be promptly released to Seller.

3.    During the Occupancy Period, Purchaser affirmatively agrees to ensure the Library remains locked, with access and use strictly limited to Seller and/or its agents or contractors.

4.    Seller's attorneys shall not be liable for any act or omission to act under this Post-Occupancy Agreement, except for its own gross negligence or willful misconduct. The Seller's attorney may act upon any instrument or signature believed by it to be genuine and may assume that any person purporting to give any notice or instruction hereunder, reasonably believed by it to be authorized, has been duly authorized to do so. In the event that Seller's attorney should at any time be confronted with inconsistent or conflicting claims or demands by the parties hereto, Seller's attorneys shall have the right to interplead said parties in any court of competent jurisdiction and request that such court determine such respective rights of the parties with respect to this Agreement, and upon doing so, Seller's attorneys shall be released from any obligations or liability to either party as a consequence of any such claims or demands. After the Withheld Funds are disbursed, Seller's attorneys' duties and obligations hereunder shall cease and this Post-Occupancy Agreement shall terminate.

5.    Notices. All notices, demands or request provided for or permitted to be given pursuant to this Escrow Agreement must be in writing. All notices, demands and requests to be sent to the Parties shall be personally delivered, emailed, or sent by mail, postage prepaid, or delivered by a recognized overnight or same day courier or delivery service and addressed to the intended recipient of such notice at the address or email for such Party as set forth below or otherwise provided to the other Parties. All such notices, demands, or requests shall be effective on personal delivery or, upon electronic transmission, or if mailed, three (3) days following deposit in the mail as required by this Section.

6.    Seller's financial obligations arising out of or relating to or in connection with the storage of the Excluded Items during the Occupancy Period shall at no time exceed the amount of the Withheld Funds.

7.    Purchaser, as record title owner, shall be responsible for the payment and maintenance of any utilities servicing the Library and Real Property and the real property taxes and assessments affecting the Library and the Real Property.

8.    This Post-Occupancy Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which, when taken together, constitute one

**Exhibit D**                      **Purchase and Sale Agreement**
**for 711 Knox Road, Aurora, NY**

18312103.v1

and the same instrument. Moreover, signatures transmitted electronically by email, facsimile, or PDF, among others, shall be binding as if original.

9.     Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to them in the Post-Occupancy Agreement.

10.     Any provision of the Post-Occupancy Agreement not expressly amended or modified herein shall remain in full force and effect.

11.     Neither this Post-Occupancy Agreement, nor any rights or obligations under it, may be assigned by either party without the prior written consent of the other party.

12.     The recitals of this Post-Occupancy Agreement are hereby incorporated herein as if fully set forth.

[SIGNATURE PAGE TO FOLLOW]

**Exhibit D**

**Purchase and Sale Agreement
for 711 Knox Road, Aurora, NY**

18312103.v1

IN WITNESS WHEREOF, the undersigned have executed this Post-Occupancy Agreement as of this ___ day of _____, 2024.

SELLER:              THE DIOCESE OF BUFFALO

_____
Signature

_____
Name

_____
Title

PURCHASER: _____

_____
Signature

_____
Name

_____
Title

Exhibit D                    Purchase and Sale Agreement
                             for 711 Knox Road, Aurora, NY

18312103.v1

Consolidated Appendix 0477

# Notice Recipients

District/Off: 0209−1               User: admin               Date Created: 11/20/2024

Case: 1−20−10322−CLB          Form ID: pdforder          Total: 7

**Recipients of Notice of Electronic Filing:**

aty     Charles J. Sullivan          csullivan@bsk.com
aty     Ilan D Scharf               ischarf@pszjlaw.com
aty     Jeffrey D. Eaton            jeaton@bsk.com
aty     Stephen A. Donato           sdonato@bsk.com

TOTAL: 4

**Recipients submitted to the BNC (Bankruptcy Noticing Center):**

db      The Diocese of Buffalo, N.Y.          795 Main Street          Buffalo, NY 14203
pr      Charles Mendolera          c/o The Diocese of Buffalo, N.Y.          795 Main Street          Buffalo, NY 14203
smg     Office of the U.S. Trustee          300 Pearl Street, Suite 401          Olympic Towers          Buffalo, NY 14202

TOTAL: 3

# CONSOLIDATED APPENDIX DOCUMENT NO. 15

```
UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NEW YORK
--------------------------------------------------x
In Re:                              1-20-10322(CLB)
                                    Chapter 11

The Diocese of Buffalo, NY,
                                    September 24, 2024
               Debtor.              Buffalo, New York
--------------------------------------------------x
The Diocese of Buffalo, N.Y.,       A.P. 1-20-01016(CLB)
               Plaintiff,
v.

JMH 100 Doe, et al.,
               Defendant.
--------------------------------------------------x
```

**HEARING**


TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE CARL L. BUCKI
UNITED STATES BANKRUPTCY JUDGE


```
TRANSCRIBER:        Diane S. Martens
                    dmartensreporter@gmail.com
```


(Proceedings recorded by electronic audio recording,
 transcript produced by computer.)

```
APPEARANCES

DEBTOR:                 BOND, SCHOENECK & KING, PLLC
                          BY:  STEPHEN A. DONATO, ESQ.
                          BY:  BRENDAN M. SHEEHAN, ESQ.
                          BY:  CHARLES J. SULLIVAN, ESQ.
                          BY:  GRAYSON T. WALTER, ESQ.
                        One Lincoln Center
                        Syracuse, New York 13202

CREDITORS               PACHULSKI, STANG, ZIEHL & JONES LLP
COMMITTEE:                BY:  ILAN D. SCHARF, ESQ.
                        780 Third Avenue
                        34th Floor
                        New York, New York 10017-2024
                                 -and-
                        GLEICHENHAUS, MARCHESE & WEISHAAR, P.C.
(Via telephone)           BY:  SCOTT BOGUCKI, ESQ.
                        43 Court Street, Suite 930
                        Buffalo, New York 14202

TRUSTEE:                OFFICE OF THE U.S. TRUSTEE
(Via telephone)         BY:  JOSEPH W. ALLEN, ESQ.
                        Olympic Towers
                        300 Pearl Street, Suite 401
                        Buffalo, New York 14202

PARISHES:               WOODS OVIATT GILMAN, LLP
                          BY:  TIMOTHY LYSTER, ESQ.
                        1900 Bausch & Lomb Place
                        Rochester, New York 14604
                                 -and-
                        ELSAESSER ANDERSON, CHTD
(Via telephone)           BY:  J. FORD ELSAESSER, ESQ.
                        320 East Neider Avenue
                        Suite 102
                        Coeur d'Alene, Idaho 83815

SURVIVORS:              THE LAW OFFICES OF STEVE BOYD PC
                          BY:  STEPHEN BOYD, ESQ.
                        510 Clinton Square
                        Rochester, New York 14604

SURVIVORS:              JEFF ANDERSON & ASSOCIATES, PA
                          BY:  STACEY BENSON, ESQ.
                        366 Jackson Street
                        Suite 100
                        St. Paul, Minnesota 55101
```

APPEARANCES - CONTINUED

```
FOR CREDITORS:        MARSH LAW FIRM, PLLC
(Via telephone)        BY:  CORI IACOPELLI, ESQ.
                      31 Hudson Yards
                      11th Floor
                      New York, New York 10001-2170

CVA CLAIMANTS:        LIPSITZ GREEN SCIME CAMBRIA LLP
(Via telephone)        BY:  AMY KELLER, ESQ.
                      42 Delaware Avenue
                      Suite 120
                      Buffalo, New York 14202

WAUSAU:               GOLDBERG SEGALLA LLP
                       BY:  ADAM ROSS DURST, ESQ.
                      665 Main Street
                      Buffalo, New York 14203

SELECTIVE:            KENNEY SHELTON LIPTAK NOWAK LLP
                       BY:  JUDITH TREGER SHELTON, ESQ.
                      The Calumet Building
                      233 Franklin Street
                      Buffalo, New York 14202
                              -and-
                      COUGHLIN DUFFY LLP
                       BY:  WILLIAM CORBETT, JR., ESQ.
                      350 Mount Kemble Avenue
                      Morristown, New Jersey 07962
                               -and-
                      GIBBONS PC
                       BY:  ROBERT KEVIN MALONE, ESQ.
                      One Gateway Center
                      Newark, New Jersey 07102

SURVIVORS:            CHIACCHIA & FLEMING LLP
(Via telephone)        BY:  DANIEL J. CHIACCHIA, ESQ.
                      5113 South Park Avenue
                      Buffalo, New York 14075

CONTINENTAL:          CROWELL & MORING LLP
(Via telephone)        BY:  MIRANDA TURNER, ESQ.
                      1001 Pennsylvania Avenue NW
                      Washington, D.C. 20004
```

```
         APPEARANCES - CONTINUED


PIC, U.S. FIRE:        O'MELVENY
(Via telephone)           BY: TANCRED V. SCHIAVONI, ESQ.
                       Times Square Tower
                       7 Times Square
                       New York, New York 10036
                                 -and-
(Via telephone)        CLYDE & CO/NJ
                          BY:  MARIANNE MAY, ESQ.
                       340 Mt. Kemble Avenue
                       Morristown, New Jersey 07960


NATIONAL UNION:        CARLTON FIELDS
(Via telephone)           BY:  NORA VALENZA-FROST, ESQ.
                       Chrysler Building
                       405 Lexington Avenue
                       36th Floor
                       New York, New York 10174-3699


HANOVER:               RIVKIN RADLER LLP
(Via telephone)           BY:  BRIAN R. ADE, ESQ.
                       25 Main Street
                       Court Plaza North
                       Hackensack, New Jersey 07601-7021


UTICA MUTUAL          RIVKIN RADLER LLP
CENTURY:                  BY:  PAUL GORFINKEL, ESQ.
(Via telephone)        926 R R Plaza
                       Uniondale, New York 11556


SURVIVORS:             LAW OFFICES OF MITCHELL GARABEDIAN
(Via telephone)           BY:  MITCHELL GARABEDIAN, ESQ.
                       100 State Street, 6th Floor
                       Boston, Massachusetts  02109
```

```
APPEARANCES - CONTINUED

MGM:                    GERBER CIANO KELLY BRADY LLP
(Via telephone)          BY:  WILLIAM P. MONIGAN, JR., ESQ.
                        100 Corporate Place
                        Ste. 210
                        Rocky Hill, Connecticut 06067


TRAVELERS:              DENTONS US LLP
(Via telephone)          BY:  GEOFFREY M. MILLER, ESQ.
                        1221 Avenue of the Americas
                        New York, New York 1002


KS-DOES:                KEVIN T. STOCKER, ESQ.
                        2645 Sheridan Drive
                        Tonawanda, New York 14150


FIREMAN'S FUND:         WHITE AND WILLIAMS LLP
                         BY:  SIOBHAIN P. MINAROVICH, ESQ.
                        7 Times Square, Suite 2900
                        New York, New York 10036-6524
CREDITORS:              PUSATIER ABBOTT SUGARMAN & MARTIN LLP
                         BY:  RICHARD ABBOTT, ESQ.
                        2464 Elmwood Avenue
                        Buffalo, New York 14217
```

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1

2                          **P R O C E E D I N G S**

3                    *           *           *

4

5      **THE COURT:**  We're here, of course, in the case of the

6  Diocese of Buffalo.  And we have three motions that needs

7  consideration today.

8      Let's begin by welcoming the parties who are present in

9  the courtroom and if parties could begin by noticing their

10  appearance.

11      **MR. DONATO:**  Thank you, your Honor.  Good morning.

12      Steve Donato, Grayson Walter, Brendan Sheehan and

13  Charles Sullivan for the Diocese.

14      Also here in the courtroom is our chief operating

15  officer and the Bishop will be here, as well.

16      **THE COURT:**  All right.  Thank you.

17      **MR. SCHARF:**  Good morning, your Honor, Ilan Scharf,

18  Pachulski, Stang, Ziehl & Jones on behalf of the Committee.

19      **THE COURT:**  Thank you.

20      The recording system works by speaking into the

21  microphone so if you can make sure that you follow that.

22      **MR. BO D:**  Thank you.  Good morning, your Honor, nice to

23  see you.

24      Stephen Boyd with Stacey Benson here representing a

25  number of creditors.

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1        **THE COURT:**  All right, thank you.

2        **MR. DURST:**  Good morning, your Honor, Adam Durst on

3    behalf of Employers Insurance Company of Wausau.

4        **THE COURT:**  All right, thank you.

5        **MR. CHIACCHIA:**  Dan Chiacchia representing 25 creditors.

6        **THE COURT:**  Thank you.

7        **MR. ABBOTT:**  Richard Abbott representing three

8    creditors.

9        **THE COURT:**  All right, thank you.

10       **MS. IACOPELLI:**  Good morning, your Honor.  Cori

11   Iacopelli from Marsh Law Firm representing a number of

12   creditors.

13       **THE COURT:**  All right.  Thank you.

14       **MR. STOC ER:**  Good morning, everybody.  Kevin Stocker on

15   behalf of numerous creditors.

16       **THE COURT:**  All right.  Thank you.

17       **MR. L STER:**  Good morning, your Honor, Tim Lyster, Woods

18   Oviat Gilman.

19       And I'm joined by my cocounsel, by phone, Ford Elsaesser

20   of Elsaesser Anderson on behalf of the parishes and certain

21   other affiliated entities.

22       **THE COURT:**  All right.  Thank you.

23       Anyone else?

24       (No response.)

25       **THE COURT:**  Anyone else on the line that wants to note

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1  their appearance?

2      **MS. ELLER:** Amy Keller on behalf of the Lipsitz Green

3  (indiscernible) claimants.

4      **THE COURT:** All right, thank you.

5      Anyone else?

6      (Talking over each other.)

7      **THE COURT:** There are two voices going at the same time.

8  So if you could note your appearance once more.

9      **MR. GARABAEDIAN:** Mitchell Garabaedian representing

10 creditors.  Good morning, your Honor.

11     **THE COURT:** All right.  Thank you.

12     **MR. MALONE:** Morning, your Honor, Robert Malone.

13     **THE COURT:** All right.  Thank you.

14     **MR. MALONE:** With me is William Corbett of Coughlin

15 Midlige & Garland and Judy Shelton of Kenney and Shelton for

16 Selective Insurance.

17     **THE COURT:** All right.  Thank you for joining us.

18     Anyone else?

19     **MR. MONIGAN:** Good morning, your Honor, William Monigan

20 from Gerber Ciano for MGM Insurance Company.

21     **THE COURT:** All right.  Thank you.

22     Anyone else?

23     (Talking over each other.)

24     **THE COURT:** I heard your voice but it was a little bit

25 muffled.  So if you could re-note your appearance.

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1      **MS. TURNER:**  I apologize.

2      Good morning, your Honor, Miranda Turner for Continental

3  Insurance.

4      **THE COURT:**  All right.  Thank you.

5      **MR. GORFIN EL:**  Paul Gorfinkel for Utica Mutual

6  Insurance Company and (indiscernible) Insurance Company.

7      **THE COURT:**  All right.  Thank you.

8      Anyone else?

9      **MS. VALEN A FROST:**  Good morning, your Honor, Nora

10  Valenza-Frost for National Union Fire Insurance Company of

11  Pittsburgh, Pennsylvania.

12      **THE COURT:**  All right.  Thank you for joining us.

13      Anyone else?

14      **MS. MINAROVICH:**  Good morning, your Honor, Siobhain

15  Minarovich, White and Williams for Firemens Fund Insurance

16  Company.

17      **THE COURT:**  All right.  Thank you.

18      Anyone else?

19      **MR. ELSAESSER:**  Ford Elsaesser for the Parishes, your

20  Honor, thank you.

21      **THE COURT:**  Thank you.

22      And, of course, your cocounsel already noted your

23  appearance but we welcome you.

24      Who else do we have?

25      **MR. SCHIAVONI:**  Your Honor, this is Tancred Schiavoni,

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1   O'Melveny & Myers on behalf of Pacific Employees.

2        And, your Honor, with great respect, I ask that, given

3   the nature of the motions before the Court, that any party

4   that is going to oppose the preliminary injunction, I would

5   ask that they identify when they speak who the creditors are

6   that they actually represent.  And they don't have to name

7   the name of the claimant but they can refer to a pleading

8   with the POC number.  I just don't think it's adequate to

9   come in and introduce themselves on an issue that is a

10  conflict among creditors --

11       **THE COURT:**  All right.  Your --

12       **MR. SCHIAVONI:**  -- (indiscernible) represent numerous

13  creditors.

14       **THE COURT:**  Your voice was somewhat muffled.  I think I

15  got most of what you said but I'm not sure that I got all of

16  it.  So if you could try speaking more directly into your

17  device, perhaps I can, I can get the full --

18       **MR. DONATO:**  Your Honor --

19       **MR. SCHIAVONI:**  Yes, your Honor.

20       **MR. DONATO:**  -- who's speaking?

21       **MR. SCHIAVONI:**  Thank you very much, your Honor.

22       I'm just asking, your Honor, that if someone is going to

23  speak against the preliminary injunction, that they

24  identify who the creditors they represent.  They don't have

25  to name the names of individuals.  We respect the

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1    confidentiality of that.

2        But if they have a pleading where it lists the POC

3    numbers on behalf of those particular creditors, they could

4    provide at least those POC numbers, in light of the fact that

5    there is a conflict among the claimants that they

6    represent -- this is a multi-party representation -- as to

7    who they're speaking on behalf of.  It's not enough just to

8    say one represents multiple creditors, just like I shouldn't

9    be introducing myself as representing multiple carriers.

10   I've identified who my client is.

11       **THE COURT:**  I heard what you said now but your voice was

12   also muffled when you noted your appearance.  So if you could

13   give that to us again, as well.

14       **MR. SCHIAVONI:**  Well, that's the most important part,

15   your Honor.

16       Tancred Schiavoni on behalf of Pacific Employers

17   Insurance.

18       **THE COURT:**  All right.  Well, I heard what you said but

19   I'll consider that as we go along if I think it's necessary.

20       Anyone else on line that wants to note their appearance?

21       **MS. MA :**  Yes.

22       (Talking over each other.)

23       **MS. MA :**  Apologies.  Marianne May from Clyde & Co for

24   U.S. Fire and Pacific Employers.

25       **THE COURT:**  All right.  Thank you.

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016


1      And then I heard another voice that came on about the

2  same time.

3      **MR. BOGUC I:**  Apologies.  And good morning, your Honor.

4      Scott Bogucki, cocounsel to the Committee.

5      **THE COURT:**  All right.  Thank you.

6      Anyone else?

7      **MR. ADE:**  Good morning, your Honor, this is Brian Ade.

8  I represent Hanover Insurance Company.

9      **THE COURT:**  All right.  Thank you.

10      Anyone else?

11      **MR. MILLER:**  Good morning, your Honor, Geoff Miller on

12  behalf of Travelers.

13      **THE COURT:**  All right.  Thank you.

14      Anyone else?

15      **MR. ALLEN:**  Your Honor, Joseph Allen for the U.S.

16  Trustee, monitoring.

17      **THE COURT:**  All right.  Thank you.

18      Anyone else?

19      (No response.)

20      **THE COURT:**  Of course we welcome all those who are just

21  listening in.

22      This, of course, is a public hearing and so we welcome

23  all the audience and, of course, we note their appearance of

24  those who prefer not.

25      There are three motions.  Usually I try to take the

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1    easiest first, although sometimes I'm mistaken in making that

2    assumption but we do have a report back on a sale of real

3    property.

4         Mr. Donato, what can you tell us?

5         **MR. DONATO:**  Yes, your Honor, I'm going to ask Charles

6    Sullivan, my partner, to address the Court.

7         **THE COURT:**  All right.

8         Mr. Sullivan.

9         **MR. SULLIVAN:**  Your Honor, good morning.

10        Your Honor, the motion before the Court relates to

11   property owned by the Diocese of Buffalo which is located at

12   42 Grant Street at North Tonawanda, New York.

13        The improvements exist of a storage building and a shop

14   that was formerly used by the Diocese to house property

15   maintenance equipment, your Honor.

16        The procedural history behind this motion, your Honor,

17   the motion seeking to approve the bidding procedures and to

18   authorize the sale was filed on July 18, 2024, at docket

19   number 3029.

20        On August 19, your Honor entered its -- the Court's

21   Bidding Procedures Order approving the bidding procedures and

22   granting the related relief at docket number 3089.

23        Your Honor, following entry of the Bidding Procedures

24   Order, the Diocese caused the notice of auction and a hearing

25   and a Bidding Procedures Order to be served as provided in

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1   the Bidding Procedures Order.

2       And the Diocese also arranged for publication of the

3   notice of the sale, as provided in the Bidding Procedures

4   Order.

5       Your Honor, as a result of those efforts, one competing

6   bid was received by the Diocese before the bid deadline of

7   September 19, 2024.

8       So, therefore, your Honor, an auction did occur

9   yesterday.  That competing bidder was -- bid was submitted by

10  John and Marlene O'Brien (phonetic) and because of that

11  submission of the bid, the Diocese conducted an auction sale

12  at our offices here in Buffalo yesterday, your Honor,

13  beginning at noon.  That auction was conducted by attorney

14  Jeffrey Eaton of my firm on behalf of the Diocese.

15      In attendance at the auction were a representative of

16  Skillen Inc., which the Court will recall is the stalking

17  horse bidder, also a representative of Mr. And Mrs. O'Brien,

18  the competing bidder and real estate brokers representing the

19  interested parties and the Diocese were also in attendance.

20      And, finally, your Honor, Ms. Brittany Michael of

21  Pachulski, Stang, Ziehl & Jones appeared virtually on behalf

22  of the Committee to monitor the auction.

23      Your Honor, as a result of competitive bidding at the

24  auction, Mr. And Mrs. O'Brien were the successful bidders

25  with a purchase price of $80,000.

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1    I'll note for the record, your Honor, that the stalking

2  horse purchase price was $43,000.  So the auction yielded an

3  increase of $37,000 as a result of the competitive bidding.

4    Also, your Honor, under the terms of the Bidding

5  Procedures Order, Skillen, Inc. was selected as the backup

6  bidder at a purchase price of $77,000.  So, therefore, your

7  Honor, in the event that the sale is not consummated with the

8  successful bidder, the -- Skillen, Inc. will -- that bid

9  remains open as the backup bid, your Honor, pursuant to the

10  terms of both the purchase agreement and the Bid Procedures

11  Order.

12    Your Honor, the Diocese respectfully submits that it has

13  demonstrated a sound business judgment for proceeding with

14  the sale of this property.  As was detailed at the hearing on

15  the bidding procedures, your Honor, this property is no

16  longer used by the Diocese and ownership of the property has

17  become burdensome to the Diocese and its estate.

18    Your Honor, the sale process has been conducted in a

19  fair, open, and competitive manner that was calculated to

20  maximize the value of the property for the estate.

21    As described in the motion, the property was marketed

22  extensively by the debtor's broker prior to filing the

23  motion, your Honor.

24    And then following entry of the Bidding Procedures

25  Order, additional noticing of the proposed sale was

12

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1    disseminated in accordance with the Bidding Procedures Order.

2        I respectfully submit that the sale is beneficial to the

3    estate and is justified.

4        Further, your Honor, the sale of the property to O'Brien

5    represents an arm's length transaction and O'Brien have

6    represented to the Diocese that they have not engaged in any

7    collusion with respect to their bid or the proposed sale,

8    your Honor.

9        Therefore, the Diocese asserts that the successful

10   bidder and the backup bidder are entitled to the protections

11   of Section 363(m) of the Bankruptcy Code.

12       So, therefore, your Honor, unless the Court has

13   questions, I respectfully request that the Court enter an

14   order authorizing the sale to the successful bidder, or in

15   the alternative if that sale is not consummated, your Honor,

16   that the Debtor be permitted to proceed with a closing with

17   the backup bidder pursuant to the terms of the Bidding

18   Procedures Order.

19       **THE COURT:**  I assume someone is holding the required

20   deposit?

21       **MR. SULLIVAN:**  That's correct, your Honor.

22       **THE COURT:**  All right.

23       Anyone want to speak to this particular motion on the

24   sale of the property?

25       **MR. SCHARF:**  The Committee consents to the relief, your

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1  Honor.  As Mr. Sullivan noted, we attended the auction and

2  are happy with the result.  Showing that sometimes when you

3  have an arm's length buyer, another arm's length buyer comes

4  forward, you almost double the purchase price.  So it was a

5  successful auction.

6      **THE COURT:**  Well, the experience of the Court is that it

7  takes two people to really get a fair value.  If they're

8  bidding against each other, they'll come up with what we hope

9  is maximum value for the benefit of the estate.  I am also

10  satisfied with the sale and the sale procedures and will

11  authorize the sale and approve it.

12      If there's any necessary orders, you can submit them to

13  the Court.

14      **MR. SULLIVAN:**  Yes, we will, your Honor, thank you.

15      **THE COURT:**  Thank you.

16      Well, that then brings us to our, I suppose, our

17  featured attraction which is an application asking for a

18  preliminary injunction.

19      Mr. Donato, it's your motion so I'll let you speak

20  first.

21      **MR. DONATO:**  Thank you, your Honor.

22      Steven Donato, Bond Schoeneck & King, counsel for the

23  Diocese.

24      Before the Court are, I guess, two more motions:  The

25  motion of the Diocese to extend the preliminary injunction

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1    and also a motion to establish default judgment procedures.

2         As we -- as I was preparing for the hearing, we came to

3    the conclusion that it is, we think it's necessary to

4    determine which defendants have defaulted, which defendants

5    have a right to even be heard today.

6         It's difficult to assess our opposition when, for

7    example, the Anderson Law Firm filed a joinder to the

8    Committee's opposition to the Preliminary Injunction.  Well,

9    the Anderson firm represents hundreds and hundreds of

10   plaintiffs in this, in the case, survivors but the Anderson

11   Firm didn't file an answer.  (Indiscernible), another law

12   firm.  So they -- a series of them and I have a detailed list

13   of who filed them.  Right now we've got joinders from the

14   Marsh firm, Garabaedian firm, Anderson firm.  They have all

15   defaulted.

16        As we noted in our motion when we originally made our

17   application for the Preliminary Injunction, we made the

18   observation that there were many defendants that had not

19   answered the Preliminary Injunction Adversary Proceeding.

20   You observed in your decision in January of 2024 the same

21   thing.  We had made the observation and then you also made

22   that observation.

23        Now, we have not pursued actual default judgments yet.

24   We thought it was appropriate to file a procedures motion.

25   And the reason we do that primarily is to insure that

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1  survivor identification is absolutely protected and that

2  there's confidentiality, which is something that all the

3  parties, including the Diocese, take obviously extremely

4  seriously.  And so we filed the default procedures motion.

5      And as set forth in the motion, there are over 700

6  defaults.  So there's only 816 defendants.  I anal guys that

7  if I'm going to go into a battle, I need to know who's, who's

8  battling.  And right now we've got the law firms of Marsh,

9  Garabaedian, Anderson.  They represent hundreds and hundreds

10 of survivors and they're trying to participate here.  Well,

11 they didn't answer.  So that is why we made the Default

12 Procedures Motion.  And we're asking that the Court enter

13 approval of that.

14     Now late last night we got a note from the Committee.

15 The Committee wrote a letter.  So first thing I'm trying to

16 figure out is:  What is the Committee doing in this

17 particular issue?  This is a Default Procedures Motion.  It's

18 aimed at individual survivors who did not file answers.  It

19 has nothing to do with the Creditors Committee and I don't

20 know why the Creditors Committee would enter this situation.

21 We'll have the same argument next -- when we're here on

22 October 10.

23     **THE COURT:**  Isn't this all connected?  We have a hearing

24 on October 10th and some of those parties are represented by

25 the same firms that you identified as not being responsive to

16

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1    this Adversary Proceeding.

2        But even if I was to grant your relief on the Adversary

3    Proceeding, whether by Preliminary Injunction or more

4    generally on final judgment --

5        **MR. DONATO:**  Mm-mm.

6        **THE COURT:**  -- that nothing that I would decide would

7    preclude them from bringing an application for stay relief.

8        **MR. DONATO:**  I agree with that.

9        **THE COURT:**  And, in fact, 17 parties have brought that

10   application.  And it would appear that those are the 17 test

11   cases that they want to pursue in order to get a final

12   decision of what the type of -- what the liabilities are

13   going to be.

14       **MR. DONATO:**  I think that's right, your Honor.

15       **THE COURT:**  I mean, isn't that really the critical

16   question?  Keep in mind, bankruptcy court has a broad

17   jurisdiction, probably broader than any court in this

18   country.  But it also has limited jurisdiction, in that we

19   cannot by statute decide liability on personal injury claims.

20   Which means this has to go to another court, either to

21   District Court -- probably unlikely -- or to state court

22   where these actions arose.

23       So, isn't really the question at this point, now that we

24   have the motion set up for October 10th asking in 17

25   individual cases permission to proceed in state court with

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1  their lawsuits, isn't really the question of when are we

2  going to allow that to proceed and if we allow it to proceed?

3  I mean, this is just preliminarily.  No matter how I decide

4  today's motion, I'm still going to have a motion on

5  October 10th to decide when and where they're going to be

6  allowed to proceed with their litigation.

7      **MR. DONATO:**  I think that makes sense.  I make a couple

8  observations, I guess.

9      We would submit that based on the fact that there's 716

10  or 20 defaults, I don't even know who's opposing the

11  Preliminary Injunction today.  But if the Court continued the

12  Preliminary Injunction -- I have to think about that but I'm

13  not sure that a motion to lift the stay then has merit.

14  Because if you have -- enter a Preliminary Injunction,

15  basically what do we want.  We want you to direct us to

16  mediation.  We want you to direct us to appoint new

17  mediators.  We've got to give this another shot.

18      **THE COURT:**  I know you reference two additional

19  mediators.

20      **MR. DONATO:**  Yes.

21      **THE COURT:**  But there's nothing -- it's not a motion for

22  me to authorize the appointment of an additional mediator.

23      **MR. DONATO:**  No, completely agree.  It's basically

24  trying to give you an update on where we are in this case and

25  the fact that we have had trouble getting the Committee to

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1   even come to the mediation sessions.  We need a fresh look.

2   Why anyone would delegate a bankruptcy case to a state court

3   judge, I don't, I don't think that's appropriate.

4       Now, I understand on 10/10, however, there is a request

5   that you actually stand aside and allow the state court to

6   address issues that are before you.  So, I guess what I'm

7   thinking is is that we think -- first of all, as far as

8   today's hearing, any joinders by a defaulting party shouldn't

9   even be considered.  So I got to figure out who's actually

10  opposing this.  I think it is appropriate to enter the

11  Preliminary Injunction, I guess, and assess what happens on

12  10/10.  But I have to think about this.

13      If the Preliminary Injunction is entered, I very well --

14  we very well may take the position the Preliminary Injunction

15  trumps their ability to seek to lift the stay.

16      As a practical matter we have to get parties in a room.

17  It could open the floodgates for litigation at some point, I

18  guess, but that cannot be in the best interest of what is

19  happening here.  Okay.

20      For example, as the Committee notes, nothing's happened

21  in these cases, there's no discovery, there's nothing.  So,

22  the idea of the Committee is why don't we pick some test

23  cases, okay.  How did that test case get chosen?  We believe

24  and we'll file this -- and again I realize we're not arguing

25  the 10/10 hearings today but obviously anticipated that we

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1  would have this exchange.  We anticipate as far as 10/10,

2  that we're going to be raising all kinds of issues including

3  what the Committee is doing?  Why is the Committee involved

4  in a motion to lift the stay?

5      So what we think should happen is, instead of opening

6  the floodgates causing unbelievable chaos, okay, frankly,

7  we'd like your Honor to -- and I know the mediation causes

8  distance, the cost of the mediation privilege.  But what we

9  think is appropriate is basically enter a temporary pause.

10  I'm not looking for a two-year Preliminary Injunction or

11  anything like that.  A temporary pause.

12      Frankly, I think what I respectfully request is that you

13  consider appointing new mediators.  There's no criticism to

14  the existing mediators.  They've done an excellent job.

15  We're at a point now where they cannot move forward with

16  these mediators and, frankly, the Committee agrees with me.

17      So at this point -- and I know you're following the

18  other cases -- and Judge Glenn in Rockville Center when faced

19  with a dismissal motion, they didn't wait for any motion to

20  appoint the mediators.  He made a decision and said everybody

21  needs to get back in this room and I'm going to start with a

22  fresh perspective.  I'm going to appoint Paul Finn and

23  retired Bankruptcy Judge Shelley Chapman.

24      I've spoken to Paul Finn.  He has the bandwidth and the

25  desire to get in this case.  And the Rockville Center case

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1   has not been officially settled but, as I understand it,

2   there has been tremendous movement and that is all as a

3   result of the two mediators Judge Glenn appointed just

4   recently.

5        There's no reason to allow the kind of havoc that would

6   occur with litigation against hundreds and hundreds of

7   parishes.  As the Committee indicated, it's in the infancy.

8   The Committee wrote in their, in their response -- which I,

9   again, I'm not sure they should be entering -- they said

10  that, you know, don't worry, the state courts will expedite

11  discovery.  We're going to ask for discovery in regard to the

12  issues raised on 10/10, okay.  There are all kinds of

13  statements in the motion which we believe are not supported.

14       The other point is that if you lift the stay or at least

15  don't grant the Preliminary Injunction, we're going to have a

16  scenario where we have the haves and the have-nots.  You're

17  going to have unsecured creditors who will have a judgment.

18  I know that the Committee has indicated that they won't

19  enforce the judgment.

20       The Lipsitz firm, however, indicated they're not

21  listening to the Creditors Committee.  The Lipsitz firm, they

22  filed their pleading yesterday -- Ms. Keller's on the

23  phone -- and her statement was we're not following anything.

24  We want to sue whoever we want, whenever we want and we want

25  to enforce our judgment.  So I don't know how to square that

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1  because the Creditors Committee at least recognizes that

2  they're not going to be able to enforce the judgments.

3      So, where we are is that we think it is appropriate at

4  this stage for you to do what Judge Glenn did and Judge Glenn

5  did it from the bench and he appointed Finn, Paul Finn, and

6  Judge Shelley Chapman.  I don't want to have discussions, I

7  don't want polls.  I don't want to be asking 50 million

8  people if they want these people or not.  They have appeared

9  to make movement and we got to get movement.  We are four

10  plus years into this case and we can't get the Creditors

11  Committee to come to mediation.  So there is something wrong.

12      But rather than opening the floodgates for litigation

13  and then parking this case for, what, two years?  There's

14  nothing happened, okay, they look at the file they read the

15  complaint.  They put the answers in, now they're going to do

16  discovery, things like that.  That's the solution?  That is

17  not a solution.

18      And I indicated their papers say they picked test cases.

19  I have no idea what that basis is.  We want discovery on

20  that.  If they truly want to assess the value of the claims,

21  they just can't cherrypick the best ones, right?  They have

22  to, they have to, as far as I'm concerned, if we ever got to

23  that point, there has to be a mixture.  There are many of

24  these complaints that are going to be dismissed for lack of

25  notice.  The Diocese has no notice.

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1        So let me back up for a minute -- because I'm actually

2   going in two separate motions plus the one that's on for

3   October 10th -- to refocus for a minute.

4        As far as I'm concerned, I respectfully submit there's

5   no opposition to the default procedures motion.  Creditors

6   Committee does not have standing to enter a default judgment.

7   Creditors Committee says we should file separate individual

8   default judgments.  So that we should be filing 716 motions

9   in this court?  No, that's where we file the omnibus motion.

10  We also want to insure that no impacts concerning

11  confidentiality occur.  That's why we filed our procedures

12  motion.

13       I would submit the Committee doesn't have standing to

14  object to it.  No responses came in from anybody else and we

15  should at least get an order approving the default procedures

16  and let us move forward with it.  Why?  So I can assess do I

17  have 700 oppositions today to the Preliminary Injunction or

18  do I have 15?  Or do I have 20?  And I can't determine that

19  because all these law firms defaulted.

20       I'm amazed that -- you wrote your decision on January 9.

21  We gave them the headsup in our pleadings when we filed them

22  in the fall and you specifically pointed out that there were

23  many, many people who defaulted.  Nine plus months and no one

24  does anything.  That's amazing to me.  Now last night I saw a

25  local law firm scrambling in here to put an answer in which

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1  is obviously late.  So I guess I'd have to acknowledge that

2  one party -- none of these key players, not Marsh,

3  Garabaedian, Anderson -- none of those players but someone

4  did submit a late answer yesterday.

5      So, it is -- just elements of fairness.  In order for us

6  to analyze and assess the opposition, we got to know who has

7  the right to oppose.  So I think that that is a gating issue

8  to start this procedure out.

9      Now, I'm not troubled by it.  We'll move it quickly,

10 right.  We set forth -- we'll move fast.  But what do we do

11 while we're doing that?  We do a couple other things.  We, we

12 have you appoint new mediators.  You direct us to go back to

13 mediation.  You direct us to meet at least once a month.  You

14 direct us to provide some update to you, or the mediators

15 provide some update to you.  Is there nothing happening?  I

16 understand the sensitive mediation privilege but, you know,

17 those kinds of things.

18     Let's get this back on track.  We need new, new blood.

19 We need the new mediators and, as I indicated, I've already

20 spoken to Paul Finn and he said he is ready.  So I

21 understand there's no motion before you but Judge Glenn did

22 it sua sponte because he saw that his case was in trouble

23 possibly going to be dismissed.  There's no dismissal motion

24 here but we have a similar kind of stress.  What we got to do

25 is to get in a room and set -- and go back to mediation.

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1        As far as I made that comment about the test cases,

2    we're really troubled by that, okay, and we're going to want

3    discovery.  Because how did they pick the test cases?  Did

4    they just pick what they believe are the most rosy?  That

5    doesn't help set values.  That just skews the chart so that

6    if -- and we'll address this on 10/10.  But we think we have

7    a right to discovery.  I want to understand how did they make

8    those determinations.

9        I'd also like to know whether the, whether the victims,

10   the survivors, are aware that there is going to be a have and

11   have-not situation.  Someone sitting next to you may have a

12   judgment and so -- and many, many others won't.  They'll be

13   the lion's shares because they're using test cases they're

14   going to be standing on the side lines.  So how does that

15   work?  Unsecured creditors need to be treated equally under

16   the Bankruptcy Code.  Now you've got these haves and

17   have-nots.  You've got these preferential type survivors.

18   How do the lawyers feel about that?  How does state court

19   counsel feel that doesn't have anyone that's actually in, in,

20   you know, pursuing the litigation?  Are they happy to just

21   sit on the sidelines?  These are all things that we're going

22   to have to address at our hearing on 10/10.

23       I also raised -- we also raised another issue.  Now, the

24   Diocese -- and this is sincere but it gets twisted.  The

25   Diocese is absolutely sensitive, extremely sensitive to the

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1  perils incurred by the survivors.  And we've read their

2  pleadings often and they talk about the fact that they would

3  like to be able to share their experiences and that there is

4  a therapeutic value and we fully respect that.

5      We proposed in our pleadings that your Honor adopt the

6  approach adopted by Judge Harner in Baltimore.  And Judge

7  Harner set up a procedure that I believe was very effective

8  and it helped with the communication between the survivors

9  and the Diocese and the Bishop.  And that procedure entailed

10  a situation where survivors who do want to be able to talk

11  about their experiences, come to this court.  They come into

12  this court, they actually talk to you.  The Bishop would be

13  here, absolutely.

14      And the idea would be -- you know, there's been words

15  like we've muffled the victims, we're trying to quiet them

16  down, you know these type of, you know, slang words which we

17  think are inappropriate.  However, we think it is appropriate

18  to have survivors be able to tell their story but I think

19  they should do it in this court to you, with the Bishop here

20  so that people can take, you know, do what's necessary,

21  rather than being caught up in some legal proceeding with

22  depositions and objections and all that other stuff.

23  Survivors don't need to go through that nightmare.  What

24  survivors, I believe -- and I don't think all of them do, but

25  anyone that wants to, I believe it would be a very

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1  therapeutic approach to have them come here and talk to you

2  and to tell you what's transpired.

3      Because of the mediation -- your Honor, I've been

4  appearing for you for 30 years.  However, you know, you're a

5  hands-on judge, but because of the mediation, you haven't

6  been able to be as hands-on.  And what we're trying to do,

7  frankly, is have you be more hands-on -- again I'm

8  (indiscernible) mediation piece.  But one of the ways to be

9  more hands-on is for you to interact directly with, with the

10  survivors.  And it worked.  I've spoken to many, many people

11  in the Baltimore case.  I am told that it worked, meaning it

12  helped survivors tell their story and it helped the Diocese

13  and the Bishop to understand the perils that occurred.

14      **THE COURT:**  But I assume that was after the point or as

15  part of the confirmation process?

16      **MR. DONATO:**  No, there's no confirmation.  So Baltimore

17  doesn't even, they're not even -- they had like one mediation

18  session.  They're in their infancy.

19      So what, what happened was there were discussions among

20  the parties of this concept.  Look, survivors are not able to

21  tell their story, you know, they can't go into state court,

22  you're blocking them, that kind of thing and then those

23  lawyers came up with this approach which I have now explored.

24      I have all the pleadings.  I have read all the Orders

25  entered by Judge Harner.  And I, I think it would be --

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1    separate and apart from anything else we're doing, I think
2    that we should -- that the Court should seriously consider
3    implementing that procedure.  We're ready to go.  If
4    survivors want to talk, we could set something up inside 30
5    days and we would set that up and come here.
6        I don't know if your Honor looked at the pleadings in
7    Baltimore but you'll see that there's procedures.  The
8    information that's provided is absolutely protected.  It
9    cannot be used, you know, that kind of thing so that a
10   survivor could come to court and feel comfortable that if he
11   or she wants to tell their story, it is held in the utmost
12   confidence.  We think that that would help this case overall
13   and we respectfully request that you consider entering that
14   type of an Order in order to at least try to help with the
15   communication between the parties.
16       So, obviously there's a lot here and I have a lot more
17   but, you know, kind of summing it up just from the standpoint
18   of where are we.  I believe that no question that mediation
19   is still the best way to go.  I talked to you about how to do
20   it.  But why would we just allow another court, state court,
21   to get in the middle of this case, stand on the sidelines?
22       Again, we've had self-serving statements from the
23   Committee like:  Don't worry, it will go fast.  It's --
24   they're going to the end of the line.  There are hundreds of
25   CVA cases in the system now.  They don't just show up and say

1   to the state court judge:  By the way, we're, you know,

2   whoever we are and move us to the front of the line.  So

3   there's no basis for that.

4        That's another area of discovery that we want because

5   they're trying to suggest in their motion oh, your Honor, no

6   harm, no foul, this thing will go really really fast.

7   Nothing could be further from the truth.  Mediation is the

8   best path at this point.

9        By the way, I've communicated with Mediator NeMoyer.  He

10  is aware that we are at least requesting a change.  I wanted

11  to make certain that he was aware of that.  And as I

12  indicated, I think the Committee is in agreement with the

13  fact that mediators need to change.

14       So what we ask is today we ask you to basically set the

15  default procedures and the default judgments so that we can

16  move forward and I can figure out who actually in this

17  courtroom is actually properly objecting to the Preliminary

18  Injunction.

19       The -- I ask that the Court consider doing exactly what

20  Judge Glenn did and on a sua sponte basis.  Again, I'm not

21  looking for a two-year stay.  What I am looking for is to get

22  everyone focused, to get -- to have your Honor direct we --

23  in our reply we cited Judge credits letter.  And Judge

24  Kressel -- as you know, he's retired now but he was Minnesota

25  judge that handled many, many of the Diocesan cases.  And we

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1   put in a quote from Judge Kressel which basically said:

2   Everyone get back in a room, lay your issues aside, focus on

3   the survivors, focus on the fact that survivors are passing

4   away, focus on the fact that every day that we delay, there

5   is no recompense for the survivors.  And that's what -- and

6   he couched -- we put in our footnote in our response, we, it

7   was very -- we took the words to heart.  This is the way to

8   say it:  The Diocese absolutely is desirous of trying to work

9   something out.

10      They have -- we're on open book, right?  We're not

11  hiding anything.  All you need to do is to go to the website.

12  We have our financial statements right there.  It's not like

13  we have assets that we're hiding, something like that.  We

14  have laid it out, okay.  Unfortunately, you know, there's a

15  perception by the Creditors Committee that they just want

16  more.  Just wanting more when it doesn't exist is, you know,

17  is a problem.

18      So I believe a fresh look, new mediators coming in

19  basically in a short time period.  I've indicated I think it

20  makes sense to use the mediators from Rockville Center.  As I

21  said, we set the procedures, we will move immediately to

22  pursue the procedures under default judgments.  Set the

23  mediation on a tight timeframe.  We have, I indicated we

24  report to you at least -- we have a mediation at least once a

25  month.  Every month we report to you with monthly updates,

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1  whether it's us or the mediator.  The idea is to keep your

2  Honor close, as close as possible to what's transpiring and

3  allow you to actively monitor the cases as they go through

4  the mediation process.

5      We think with all of those items plus adopting the

6  approach that was adopted in Baltimore, we think that that

7  will help, help somewhat with communications between the

8  survivors and the Diocese and the Bishop.

9      I have a lot of other points to make but, you know, your

10  Honor, I've been before you many times.  That's really the

11  thrust.  At this stage continue the Preliminary Injunction,

12  direct the parties back into the room and let's take a short

13  period of time to see if we can work this out but also help

14  the survivors by approving that Baltimore approach.

15      **THE COURT:**  Let me ask because it sort of stuck out in

16  your papers.

17      No offer has been made in papers to me but there is

18  representations or references to $100 million offer from the

19  Diocese as a contribution.  Where that money's coming from?

20  I have no idea.

21      **MR. DONATO:**  I actually put it in the pleadings:  25

22  percent is coming from the Diocese and 75 percent is coming

23  from the parishes.

24      **THE COURT:**  Well, I just want to get some

25  clarification --

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1      **MR. DONATO:**  Okay.

2      **THE COURT:**  -- on the matter.

3      **MR. DONATO:**  Mm-mm.

4      **THE COURT:**  There's one thing that sort of stuck out at

5  me here and I'm just asking because I want to know the

6  answer.

7      **MR. DONATO:**  Okay, no problem.

8      **THE COURT:**  Paragraph 8 of your, I think this was the --

9  your last reply.  Dated September 23rd so it came in

10  yesterday and I had the opportunity to read it.

11      **MR. DONATO:**  (Indiscernible.)

12      **THE COURT:**  And reading it took priority over other

13  things that I was expecting to do last night.

14      **MR. DONATO:**  (Indiscernible.)

15      **THE COURT:**  But I did read it and there's one thing that

16  stuck out.  Paragraph 8.

17      **MR. DONATO:**  Okay.

18      **THE COURT:**  And towards the end it says -- let me make

19  sure.  That may not be the paragraph that I'm referring to.

20      I'm sorry, Paragraph 26 on Page 11.

21      And you say, and I'll quote what you say here.

22      "What the Committee fails to understand is that the

23  Diocese and related entities have done everything possible to

24  attempt to fund a global settlement for abuse claimants

25  including an ambitious plan to consolidate Parishes within

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1    the Diocese, sell real estate and provide extensive financial

2    disclosures to the Committee showing that the Diocese and

3    related entities will be contributing all available assets to

4    a proposed settlement."

5        I have the list of properties that are on the schedules

6    that are owned by the Diocese which has some attractive

7    properties but, as we previously had argument on, some of the

8    most valuable may be limited in terms of accessibility to the

9    money, particularly the seminary property which I raised the

10   issue last time that there be no distribution of that money

11   until further order of the court because it looks -- there's

12   an issue, a serious issue, as to whether or not you're going

13   to be able to use any of that money for purposes of the

14   settlement.

15       **MR. DONATO:**  Understood.  Understood.

16       **THE COURT:**  And there may be other limitations.

17       But my question here is, are you -- the suggestion of

18   this paragraph and I just want to know if it's true or not --

19   the suggestion is that the Parishes that are being closed

20   were selected with a mind for finding which ones have the

21   potential through a sale to generate money to pay for this --

22   to pay for this settlement.

23       **MR. DONATO:**  I think that that was a factor but not a

24   driving factor.  I think that through the Rightsizing Program

25   that's been implemented by the Diocese -- well-reported.

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1    It's on the news every day.  The idea is to just simply

2    assess to insure that all parishioner's needs are fulfilled.

3    So, for example, decisions -- and again I wasn't on the

4    frontline but this is my understanding -- just take two

5    Parishes that are 2 miles apart, you know, that kind of a

6    thing, and one of those would have to close.  Many factors

7    that went into merging those two.  And I have people here

8    that could, you know, from the Diocese that could give you

9    more detail.  But the idea is once that Rightsize decision is

10   made, that does free up some property.  There's no question

11   that property's in play and we've been talking to the

12   Creditors Committee about that.

13       Frankly, your Honor, we're running liquidation sales.

14   We sold something yesterday.  We're, we're, you know, trying

15   to sell all the things.  We're doing it as we talk, okay.

16   We're doing everything we possibly can.

17       But to answer your question, I do not believe that a

18   merger or decision to merge a Parish, that the sole decision

19   was based on asset value.  That has to be a consideration but

20   I can't tell you that was the driving --

21       **THE COURT:**  But for those that are closing, the

22   expectation then is that the proceeds of liquidation would

23   somehow then become available to pay the settlement?

24       **MR. DONATO:**  In large part, absolutely.  The problem is

25   we have been encountering a bad market.  We've got property

1   in downtown Buffalo which now post-Pandemic, nobody goes to

2   the office any more.  So we're having issues with that.

3        **THE COURT:**  Speak more directly into the microphone.

4        **MR. DONATO:**  Oh, I'm so sorry.

5        So -- the answer is yes.  And I can't tell you 100

6   percent.  It's obviously, a residual cost and things like

7   that.  But the answer is yes and we've told the Creditors

8   Committee that.  And we've been trying to work with them.

9   That, it is -- I guess it's hand in hand.  The Diocese does

10  need to be restructured from the standpoint of number of

11  Parishes and that will result in excess property.  And we

12  will move to liquidate that excess property and pay a

13  significant part of the qualifying residual liabilities would

14  go into the settlement pot.  We are doing everything we can

15  to try to get this deal done.

16       **THE COURT:**  Since you raised the issue --

17       **MR. DONATO:**  Mm-mm.

18       **THE COURT:**  -- let me ask this.

19       Don't we need to address the same Cy Pres issue that we

20  had to address with the seminary property that if people

21  donated to a particular Parish, they did not donate to the

22  Diocese, they donated to a particular purpose which was for

23  the benefit of that Parish.  Under the Cy Pres Doctrine of

24  New York State, doesn't that donation need to go for a

25  similar fulfilling purpose to serve the people of that

1  community, rather than for what you're suggesting in your

2  papers that it would need to, to be utilized for purposes of

3  a settlement?  I know this is multiple questions.  But I'm a

4  judge.  I can ask multiple questions.

5      **MR. DONATO:**  I'm trying to stay with you here.

6      **THE COURT:**  And if that's the case, if it's being

7  utilized for that purpose, or the intention, is that

8  something that we can even allow and still satisfy the

9  condition of 1120 -- 1129 to get a confirmed plan that that's

10  to be not in derogation of any legal standard?

11      **MR. DONATO:**  If those gifts are truly restricted gifts,

12  then we do have a problem.

13      I don't know that.  I know that you've raised this

14  issue -- and I fully respect it and I know that you entered

15  the Order.

16      **THE COURT:**  I'm not deciding it.

17      **MR. DONATO:**  Oh, I know, I know.

18      **THE COURT:**  I'm just telling you --

19      **MR. DONATO:**  I understand.

20      **THE COURT:**  -- it's an issue.

21      **MR. DONATO:**  But to answer your question directly, if

22  your example that those are restricted gifts, unless we can

23  go to the donor and have the donor redirect, right -- this is

24  assuming they're restricted gifts -- we can -- there's a

25  couple ways to do it.  You can go to the donor and ask them

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1   to go around -- you can ask the donor to un-restrict.

2       **THE COURT:**  Well, take the seminary that was built in

3   1960.  So unless somebody was very, very young.

4       **MR. DONATO:**  With a lot of money, right.

5       **THE COURT:**  And with a lot of money at that early age,

6   most of them are dead.

7       **MR. DONATO:**  Exactly.  So to answer your question

8   directly.  That is absolutely a potential problem.  We have

9   not seen this as much but we are obviously aware of it,

10  especially in view of your observations dealing with the

11  last, you know, sale request.  So that's just another

12  problem.

13      And what that does, if that's accurate, then I could

14  give up everything I have and it apparently won't be enough

15  for the Creditors Committee because actually I'm taking some

16  things off the table if they're truly restricted dollars that

17  cannot be -- as you indicated, a restricted gift cannot be

18  used to pay creditors claims.  It has to be basically rolled

19  into a similar type charitable mission.  So I fully agree

20  with you.  As I indicated, I do not believe that we have a Cy

21  Pres with a lot of this Parish property but, but I cannot

22  tell you that unequivocally.

23      What we do need to do is we have excess property.  We

24  need to liquidate that property.  What I was getting to when

25  I walked away from the mike was you know, the Creditors

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1   Committee says sell everything.  Well, even if we tried to

2   sell everything, it's not easy to sell a church.  It's not

3   easy to sell some of these old buildings.

4        First of all, as I'm sure your Honor knows that I'm

5   Catholic and I go.  There are, there's deferred maintenance

6   on a lot of these properties.  It just has to be.  It's been

7   financial trouble, you know, here for quite a while.  So can

8   we turn it into money?  I think so.  Can we turn it into the

9   money that the Creditors Committee thinks?  I don't think so.

10  And then, of course, if I turn it into money, I got to come

11  to you and we got to assess whether we can use that money to

12  even try to help the resolution of this case.  So I do agree

13  that there's an issue.

14       **THE COURT:**  All right.  Go ahead.

15       **MR. DONATO:**  So.

16       **THE COURT:**  I mean I only raised -- I mean you raised

17  the issue in your papers and so it stuck out and so I wanted

18  to ask.

19       **MR. DONATO:**  Okay.  I kind of argued all over the place.

20  I'm going to just take a moment to see if there's specific

21  points that I want to...

22       I do want to point this out.  I think it's clear.  So

23  the -- our motion today, just so that we're clear, we are

24  relying on the evidentiary record that we created during the

25  fall when we had our hearing.  Of course we had testimony

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1   from our COO Rick Suchan, our Chancellor Melissa Potzler, our

2   insurance man John Scholl and our -- Jim Murray our special

3   insurance counsel.  So I simply want to cite that those are

4   all -- that's all part of the evidence in the record.

5       We looked at the *Sears Holdin* case written by Judge

6   Lane, recent decision in December of -- excuse me, April of

7   this year in which he makes the ruling that when dealing with

8   a Preliminary Injunction, the Court can rely on affidavits,

9   depositions, sworn testimony, the docket, the petition, the

10  schedules, judicial notice, that kind of a thing.  So I just

11  wanted to make certain so that we're clear that we are

12  relying on that evidentiary record that was created when we

13  were here I think November 27th or something like that.

14      I want to make one observation.  This is a little bit

15  along the lines of the Parish discussion that we were having.

16  So, in our pleadings we had made a couple observations.

17  First we had said that, you know, we are trying every which

18  way to get a deal done and we even bid against ourselves,

19  okay, just so you're aware.  I mean, that's we're just trying

20  to --

21      **MR. SCHARF:**  Your Honor, I'm just going to object to

22  disclosure of mediation discussions.

23      **THE COURT:**  I don't know where he's going with it but

24  your observation is well taken.  I mean, for, as we all know,

25  when a mediator is appointed, I stay out of their -- of

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1    involvement in it.  The reason why is because the information

2    that's exchanged among mediators is maybe information that I

3    will have to decide a factual dispute with relation to.  So I

4    stay away from mediation, as I properly should.  When a

5    mediator is appointed, they're acting as mediators and don't

6    report to the Court unless everybody consents to it.

7         **MR. SCHARF:**  Okay, I will refrain from that.

8         My point is this.  We have pointed out to the Creditors

9    Committee that through the offers -- again, not getting into

10   numbers -- but just through the mediation process when we

11   made offers, we have received part of that offer from

12   Parishes who have no claims or have very few claims and

13   actually have assets.  So that opening the floodgates and

14   allowing the litigation to continue will actually put us in a

15   position where the pot could shrink because a Parish that has

16   assets that has no claims against it, they don't need a

17   channeling injunction.  Now we are a Catholic family and

18   we're trying to pursue that way.

19        We made this observation on multiple occasions, and the

20   Creditors Committee doesn't seem to get it.  Some of our most

21   affluent Parishes do not have claims against them but they're

22   putting money in the pot.  If this whole thing comes

23   unraveled, that pot gets smaller because I'm not going to be

24   able to get a Parish that has no need to do any of this, they

25   don't have any claims against them, to continue to put money

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1    on the table.  So I just wanted to make that observation.

2         In the shared insurance -- I haven't looked at it yet.

3    Excuse me, your Honor.  In the shared insurance piece, we

4    have talked about the Baltimore approach.  We have talked

5    about the default judgments.

6         But, your Honor, there is an open issue and that is

7    whether moving ahead against shared insurance will violate

8    362(a)(3).  You made that observation early in this case.

9    And, of course, because we're trying to resolve the cases, we

10   didn't file any application or motion specifically, you know,

11   to get that ruling.

12        But as I just referenced, Jim Murray's affidavit which

13   is in evidence and his testimony, when you look at his

14   affidavit, you'll determine 548 claims, 548 claims impact

15   shared insurance.

16        I would submit to you that those 548 claims, if they

17   move forward, they will be impacting on the Diocese shared

18   insurance and they will be impacting and reducing the shared

19   insurance.  Now, my adversary will say no, no, no there's no

20   aggregate limits, you know, for a certain period of time.

21   But they just overlook the fact that there are per occurrence

22   limits.  And that has a -- the specific potential limiting

23   the fact what my adversary says oh, no, no, no, just open the

24   floodgates, don't worry about it, you know, there's no issues

25   because during those years, '73 to '86 there's no aggregate

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1  limit.  But they fail to mention -- and it's put forth in

2  Mr. Murray's testimony -- that, you know, besides the shared

3  insurance, there are 548, those claims impact shared

4  insurance.

5      And so I think another thing that we should be doing, in

6  addition to moving ahead with the default, in addition to

7  moving ahead with the Baltimore approach, in addition to

8  moving ahead with the mediators, we should also file an

9  application so that we can get this issue ripe before you

10  because we believe this 548 claims that are impacted, again,

11  I know your Honor didn't rule.  You know, you were careful

12  when you wrote.  But you did observe -- we had made the

13  argument that if the Diocese owns the policy and the Parishes

14  say -- excuse me, and the Parishes pursue it, okay, there's

15  an impact on that policy and that erodes our coverage which

16  is a violation of the stay because it's property of the

17  estate.

18      All I'm asking is in addition to other things we've been

19  asking, let's get that issue before you.  Because if moving

20  forward does impact the Diocese, then that's a violation of

21  the Stay and I think that that impacts our -- your

22  determination as to whether you would continue with the

23  Preliminary Injunction or not.  So I also request that we, we

24  implement a procedure for that.  And as I indicated, based on

25  the evidence in the record before you, 548 of those claims

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1  are implicated.

2     **THE COURT:**  Let me ask you this.  We're dealing with --

3  I think we have -- my understanding is we have more claims in

4  this Diocese than any other Diocese that has filed bankruptcy

5  in this state.

6     **MR. DONATO:**  I think that's true, although Baltimore is

7  up to 800 plus.  So --

8     **THE COURT:**  We have over 900 claims.

9     **MR. DONATO:**  Right, but there's a lot of duplicates for

10  us, but go ahead.

11     **THE COURT:**  And that's not in New York State, in any

12  event.

13     **MR. DONATO:**  Okay, agreed.  You're right.  You did ask

14  State of New York.

15     **THE COURT:**  So we have a lot of claims.  And every claim

16  is different.  Some have insurance.  Some have no insurance.

17  So, I hear your argument that some of them may have shared

18  insurance but not all of them.

19     So let me ask the most difficult instance for you.

20  Let's take a claim predating 1973, no insurance.  No evidence

21  of insurance.  But a claim that arises both as against --

22  they've asserted a claim, perhaps, against the Diocese but

23  also against a Parish.  May or may not have money, some do,

24  some don't.  You're looking for a -- and we can go through

25  the claims one by one and decide does it implicate insurance,

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1    does it implicate shared insurance and the like.

2        But your motion asks for a general order staying

3    everything.  And let's focus the worst example for you -- and

4    I'm cherrypicking here.

5        **MR. DONATO:**  Understood.

6        **THE COURT:**  The worst example for you.  Predating 1973,

7    predating the insurance program the Diocese implemented

8    around that time.  Predating the existence of any known

9    policy and probably with no insurance.   *rd e  har a* says

10   that -- or -- well, it says what it says but it deals with

11   the question of whether you can ever put together a plan that

12   does not satisfy -- a nonconsensual plan that gives benefits

13   to third-parties.  And arguably -- and you can disagree with

14   me if you'd like -- if that Parish would not -- you know a

15   creditor objects, there's no basis for me to grant a release

16   to that Parish.

17       Why should I authorize a blanket Preliminary Injunction

18   as to that particular claim and prevent that claimant from

19   pursuing its rights against the Parishes?

20       **MR. DONATO:**  It's a tough question.  We're asking for a

21   pause -- we're not asking for a permanent injunction -- we're

22   asking for a pause.  We believe that even if actions are

23   commenced without insurance, there are serious issues of

24   adverse precedent.  We believe that the Diocese will

25   absolutely have to monitor, assuming it's just an action

1   against the Parishes, I understand if the stay is lifted

2   that's different that the Diocese will have to monitor it,

3   pour costs diverted to efforts from the mediation and trying

4   to do that.

5        So the hard part is I agree with you.  I don't have

6   that, that tie to say, well, your Honor, you know, you're

7   impacting insurance, there's an automatic stay issue.  But

8   there's a greater case kind of approach here and I think that

9   the risks of adverse precedent are very serious.  My

10  adversary says no.  But just think about it.

11       If you have a perpetrator and that perpetrator has

12  multiple claims and there's a trial on one, well, once that

13  determination is made, there -- it's going to be pretty hard

14  to, you know, start all over for the next one involving that

15  particular perpetrator.  That type of adversary precedent for

16  us, we believe, is sufficient enough for you to at least

17  continue the pause.  Again, not asking for any kind of a

18  permanent injunction.  As a practical matter moving forward

19  on any insured claims, what's that going to result in, you

20  know, as a practical matter, and, again, you got the delays,

21  et cetera.

22       I guess my most important comment is we are asking for a

23  relatively short period of time and during that period, I

24  think the interest of the entire case, right, rather than

25  having skirmishes even, you know, just for the uninsured

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1   pre-'73, we think that that does not help move the case

2   forward.

3       We think your 105(a) powers are absolutely intact.

4    *rd e* did nothing in regard to your ability to enter an

5   injunction against a third-party for a period of time.  I

6   don't think there's any questions, multiple cases -- we put

7   them in our pleadings -- that   *rd e* didn't impact that at

8   all and other bankruptcy judges have already done that.

9       So, to answer your question, we think that the risks of

10  adverse precedent are serious.  We are not asking for a

11  long-time period under the circumstances.  It's sort of like

12  if we let a couple out of the corral, you know, it's just

13  going to start causing all kinds of chaos.  And I think in

14  the interest of the case, to be able to force people to focus

15  on the issues at hand rather than scattershot litigation, I

16  think that that would -- that's an appropriate exercise for

17  you.  It is not a 362(a)(3) argument, I recognize that.  But

18  it's still, we believe, is within your power under 105(a) and

19  because of that, we think that's important.

20      One other comment.  My adversary when, when the

21  opposition says, you know, we can't meet the four-part test.

22  And, you know, we read your decision and you cited the

23   *isher  rice* decision in the Second Circuit and they are

24  ignoring the teachings of  *isher  rice*.  So  *isher  rice* said

25  one of the factors is likelihood of success on the merits in

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1   our case confirming a reorganization plan or the existence of

2   a serious legal issue.  That second prong, my adversary has

3   just ignored.  As we pointed out in our pleadings, that

4   separate serious legal issue is the 362(a)(3).

5        So I'm moving off of your exact question but I want to

6   make this point.  If they're just allowed to move ahead

7   roughshot, that starts impacting insurance.  That's

8   irreparable harm.  We lose any part of our insurance with

9   regard to the Diocese, that's irreparable harm.  So on

10   *isher  rice*, it's interesting:  My adversary just ignores

11   it.  You cited it.  It's the likelihood of success or the

12   existence of a serious legal question.  And that's the

13   teachings in the Second Circuit that you relied on.

14        So just -- I'm sure my adversary's going to say we

15   haven't satisfied any of the prongs or the four-part test.  I

16   simply wanted to make that observation.  I think we did

17   because the serious legal issue is just what we've been

18   talking about:  The erosion of shared insurance.

19        We've talked a little bit about this but just make a

20   couple observations if the litigation is permitted to pursue,

21   to continue then against Parishes, your Honor, you cited it,

22   we cited it, indemnity claims, contribution claims, things

23   like that.  I think you had -- I can't remember the words --

24   like a vortex or something, kind of going around and around.

25   I think that still exists.  My adversary says there's no

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1    written, there's no written indem -- doesn't matter.  Okay.

2    There's common law indemnification.  And under the

3    circumstances what does the Diocese do?  The Diocese supports

4    the Parishes.  That's what the Diocese does.  That's why it's

5    in existence.

6        **THE COURT:**  Let me ask you.  Even if I denied your

7    motion, though, which asks for a blanket stay, perhaps of

8    limited duration, perhaps temporary, whatever, or even if I

9    denied it after a trial, that doesn't change the section, the

10   stay under Section 362.  So that still leaves most people

11   with -- most plaintiffs with uncertainty as to whether or not

12   they might be caught by one of these provisions of

13   coinsurance or impact on Diocesan assets and the like.

14       So, even if I denied your motion, would that not

15   necessitate more of the type of motions that we're having on

16   October 10th by the 17 plaintiffs that are looking for stay

17   relief?

18       **MR. DONATO:**  I guess that's possible.  I see where

19   you're going.  I guess that's possible.  I guess if you

20   denied our motion, if you deny our motion, we still would

21   have a right, I believe, to come into the Court and assert

22   that the stay has been violated as a result of the

23   discussions we're having.  So we would still have that

24   ability.

25       I guess what I'm looking for or asking is kind of taking

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1   more of a macro approach.  These questions are hard for me to

2   answer.  The pre-'73, that's hard to answer.  But taking a

3   macro prospective, getting more directly involved in this

4   case, doing what Judge Kressel did, direct these parties back

5   into a room, appoint new mediators, let's give this another

6   shot.  I don't understand why we can't get the Committee to

7   (indiscernible.)

8        THE COURT:  All right.  Mr. Scharf.

9        MR. DONATO:  Just doublechecking, thank you so much.

10       I didn't mention but the Committee acknowledges that

11  there's 200 -- sorry.  Our proof sets forth that there's 272

12   *o art*  claims and I just want to put that on the record.  So

13  that at least in this regard, there's a  *o art*  stay for 272.

14  That came from Melissa Potzler's testimony at the evidentiary

15  hearing.

16       THE COURT:  Mm-mm.

17       MR. DONATO:  I did make the observation.  I did it

18  quick.  I just want to make certain.

19       So I got the Committee opposing the Preliminary

20  Injunction but the Committee making some proposals not

21  enforcing judgments, things like that.  The Lipsitz firm who

22  represents a whole handful of plaintiffs, they're here saying

23  no, your Honor, if you don't grant that Preliminary

24  Injunction, we're going hog wild.  We want judgments, we want

25  everything, we're suing whoever we want, whatever we want, et

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1  cetera.  So I just want to point that out.  The Committee has

2  filed an objection which we obviously think is inappropriate.

3  But the Lipsitz firm, once again, is extremely aggressive and

4  they're not willing to even enter into any of these

5  limitations.  They just want to go.

6      THE COURT:  For four and a half years we had this case

7  before anyone filed a motion for stay relief.

8  (Indiscernible) really serious in prosecuting any action for

9  whatever reason because people are getting older or because

10  the witnesses may not be available or because they want to

11  have a test case, whatever reason.

12      MR. DONATO:  Mm-mm.

13      THE COURT:  They could have brought a motion for stay

14  relief.  We've had motions for stay relief every week, every

15  (indiscernible).  So I don't know:  How serious is everybody

16  until just recently when we finally got the first motions for

17  stay relief in this case?

18      MR. DONATO:  That's a fair observation.  That's a fair

19  observation.

20      Your Honor, I think that is it for my presentation.  I

21  would like an opportunity, just short, to respond to my

22  adversary's multiple arguments that I'm sure he'll be making.

23      THE COURT:  I'm here all day.  All right.

24      MR. DONATO:  Thank you so much.

25      THE COURT:  All right.  I'll be happy to hear responses

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1  but I want to hear the other side first and, of course, we

2  have other counsel besides Mr. Scharf that wants to speak.

3       Mr. Scharf.

4       **MR. DONATO:**  Thank you, your Honor.

5       **MR. SCHARF:**  Thank you, your Honor.

6       I'll note that counsel for more than 500 survivors filed

7  joinders to the opposition filed by the Committee.  And I'd

8  like to address just some of the issues that Mr. Donato

9  raised on default issues first but they're kind of

10 intertwining both motions at the same time.  And noting that

11 a decision on default is not before your Honor today, I just

12 want to respond to those points.  And I'll intertwine that

13 with discussions in our opposition to the motion on the --

14 for a Preliminary Injunction, as well.

15      I'll note from the outset, your Honor, that the Parishes

16 are trying to obtain the benefits of bankruptcy without being

17 in bankruptcy  in particular, namely the automatic stay which

18 was something that was front and center in the    *rd e*

19 decision, and I think that later on I'll focus on footnote 2

20 in the majority opinion of   *rd e* because I think it's very

21 important to look at that in context here, especially when

22 we're talking about the 105 injunction.

23      I think we should go back and look at the history of

24 this Adversary Proceeding for that's the Preliminary

25 Injunction, the complaint was filed back in 2020 right off

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1    the bat early in the bankruptcy case.  The Committee opposed

2    it, multiple survivors opposed it, all the survivors opposed

3    it at that time.  And there was -- and the negotiations

4    between the Diocese and Committee resulted in a stipulation

5    that resolved the issues sought by the Diocese, resolved to

6    the complaint on a temporary basis and provided for a process

7    to exchange information, receive information from the Diocese

8    including written information about the Diocese's financial

9    condition, as well as files pertaining to the CVA cases, in

10   particular, personnel files for any priests or any, any

11   clergy that had been identified as an abuser in a proof of

12   claim.  Those have all been turned over to the Committee.

13   State court counsel who represent Committee members, as well

14   as Committee members, have access to those.  So -- and that's

15   important just because later on we'll be talking about state

16   court cases and how they can proceed.

17        A lot, a lot of -- not all of it, but a lot of written

18   discovery, though, would be sought has already been compiled

19   by the Diocese, reviewed by the Diocese for privilege and

20   produced in electronic format.  So it should be a relatively

21   simple process to take that from one set of production and

22   produce it in a state court case.

23        And so we resolved it.  We extended that stipulation

24   from time to time for years and part of that was to undertake

25   the mediation process.  We undertook a mediation process that

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1  began with Judge Kaplan and his efforts and continued with

2  Judge NeMoyer and his efforts.  And throughout that time --

3  your Honor just noted -- nobody filed a motion for stay

4  relief.  We filed them now.  Not we, certain survivors filed

5  them now.

6      But I will note that part of the reason and the timing

7  for that was informed by we were here last November on a

8  hearing for stay relief -- I'm sorry, for a Preliminary

9  Injunction and your Honor entered your decision in January

10  staying issuing the Preliminary Injunction.  And, frankly, I

11  think parties were informed by that decision, said we're

12  going to take a stop, look and listen until  *rd e* is

13  decided.  We did, and I think that informed people's decision

14  not to file motions for stay relief until now.

15      And so looking through the procedures and defaults, I

16  think there's a course of action in this case that needs to

17  be looked at.  I don't think default is as simple an issue as

18  it's perceived to be because the Diocese's course of action,

19  the Committee's course of action, survivors's course of

20  action all set out that led us to the point where there was a

21  stop, look and listen.  Everybody was staying litigation

22  efforts and not just filing answers needlessly because there

23  had been a stipulation on the Preliminary Injunction.  And

24  then, frankly, the motion for Preliminary Injunction was

25  opposed by many, many survivors, including through appearance

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1   on the record.  Survivors did file joinders to the

2   Committee's opposition.

3       I note -- and again I will have to go back and we'll

4   review the full record but I believe the Anderson firm did

5   file at docket number 316 in the Adversary Proceeding a

6   joinder on behalf of all their clients.  So they're -- and

7   this is, again, back in November of 2023.  So there has been

8   a course of action of opposing and appearing in opposition by

9   many of the plaintiffs -- sorry, many of the state court

10  counsels on behalf of their clients, on behalf of the sex

11  abuse survivors and the defendants of Adversary Proceeding in

12  opposition to the Preliminary Injunction and clearly in

13  opposition to the complaint.  So I think that there's a more

14  organized way, frankly, to assess defaults.  These are very

15  complicated procedures.  It's going to be a process, it's

16  going to be an administrative process.  It's going to be a

17  costly administrative process for professional and

18  paraprofessional time to do this.

19      From the outset, your Honor, we note that the -- did

20  note in our letter that we submitted yesterday, this motion

21  was filed 11 days ago.  We asked for an adjournment.  We were

22  not given an adjournment.  In my professional practice,

23  unless there is an emergency, I always grant adjournments.

24  So we're just asking for a 10-day adjournment to kind of

25  really delve into the procedures here and maybe give your

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1   Honor a more fulsome response.  And, again, recognizing we're

2   not talking of the merits of any particular default.  But it

3   seems to me that rather than creating an administrative and

4   costly process, file ten defaults and let's have them

5   litigated and addressed and there will be precedential and

6   provide insight for the rest of the cases.  It just seems

7   like a simpler cleaner process.

8        So as I said, there's -- as we said in our letter,

9   there's really no basis for the default, no need for complex

10  procedures, hundreds of survivors appeared.

11       In addition, your Honor, the Court, I believe, has an

12  independent duty to assess the propriety of a Preliminary

13  Injunction before it's issued.  Certainly, this was

14  considered by the Court under Section 362, under Section 105

15  and your Honor did issue a Preliminary Injunction.  And we do

16  think that the state of the law has changed in connection

17  with what your Honor's authority under Section 105 is, what

18  Bankruptcy Court's authority is under Section 105 is, in

19  light of footnote 2 in   *rd e* which, you know, there's been a

20  long -- I think there's been a debate about the limits of

21  Section 105 since the Bankruptcy Code was enacted in 1978.

22  And there are limits and I think those limits have become

23  narrower over time.  I think that the change in the law

24  certainly would require that any Preliminary Injunction on a,

25  quote, unquote, default would have to be reconsidered, at the

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1    very least.  So rather than create a burdensome process,

2    let's address the issues head on and a process that gives us

3    more than 11 days to respond.

4        I'll turn now -- I note that with respect to the

5    Preliminary Injunction, the Committee filed an opposition.

6    It is certainly appropriate for the Committee to file

7    opposition.  We certainly have standing for all matters, to

8    appear on all matters in the case.  The Diocese seems very

9    happy to invite the Parishes who are not defendants in the --

10   or plaintiffs or parties in the Adversary Proceeding to file

11   its motion and appear here today.  So, your Honor, the

12   Committee has appeared.  It certainly has standing to appear

13   in any matter in the bankruptcy case.

14       In fact, in the Diocese of Rochester, they didn't raise

15   standing but in the Diocese of Rochester -- and we can go

16   back and get the pinpoint cites -- the Diocese in that case

17   opposed the Committee's standing to appear in a similar

18   Adversary Proceeding and that was overruled right off the

19   bat, again, based on Section 109, I believe Section 109 which

20   gives the Committee -- or 1109, rather, which gives the

21   Committee broad standing in the bankruptcy case.  And I think

22   that the Supreme Court's recent decision in Truk (phonetic)

23   granting the insurers the larger amount of standing certainly

24   shows the expansive nature of bankruptcy standing.  So I

25   don't think that there's much of a basis to assess the

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1    Committee's -- or to oppose the Committee's appearance on a

2    basis of standing.  And certainly we're standing here with

3    500 sur -- 500 plus survivors having joined in the opposition

4    or filed a opposition.

5        I feel a little bit, your Honor, like this is d j  vu

6    all over again.  We're here in front of your Honor on a

7    Preliminary Injunction.  The factual record is the same.

8    There is one distinct difference, your Honor.

9        Last November when we were here on the Preliminary

10   Injunction hearing, we were scheduled to go into a mediation

11   session the very next day.  As we noted, we were promised to

12   get a number that next day, or from the insurers and that was

13   on the record.  We didn't.  So we were going into a mediation

14   last November, there's a promise that we were going to get

15   something, and we were moving forward.  We did not inform

16   your Honor or consider us at an impasse in the mediation

17   process last November.

18       This is different.  Your Honor, without getting into the

19   numbers or divulging the mediation -- any mediation

20   communications, it is clear that the insurance companies and

21   the Diocese have not put a sufficient settlement on the table

22   to satisfy the Committee.  And that's why we're here because

23   they haven't done so.  So, we have given the Diocese and its

24   insurers four and a half years to come up with their process.

25   I feel like the Diocese is grasping at straws a little bit

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1  here because they're trying to stop any litigation from going

2  forward.

3      And that's the same thing with the default process that

4  they're grasping at straws.  We think a process with test

5  cases makes sense.  Last November and this is -- we attached

6  the transcript so your Honor would have the benefit of seeing

7  the transcript from that hearing, to our opposition.  You

8  know, Mr. Finnegan came up here and said that even the state

9  court cases go forward, if the Preliminary Injunction was

10  denied back then, the expectation we had as the Committee, as

11  well as the plaintiff's lawyers who represent members of the

12  Committee, is that a limited number of cases would go

13  forward.

14      At the end of my presentation, I'm going to ask Mr. Boyd

15  to come up and talk about the state court process.  He's a

16  state court lawyer.  He's a resident here in Buffalo and he's

17  partnered with the Anderson firm to talk about what a state

18  court case may look like and how it may proceed.

19      The expectation is not that hundreds of cases would

20  proceed in lockstep all at once gumming up the system.  It

21  would essentially be that certain cases would go forward

22  first.  You always have to have the first cases.

23      And so when Mr. Donato said there's trouble getting the

24  Committee to mediation, it's true because they're not giving

25  us an offer that is sufficient to bring us back to mediation.

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1  We think we are at an impasse right now.  We understand that

2  that is a term of art, we understand that that is not a word

3  we throw around lightly.  I think it's the first time in my

4  professional career I've informed a Court we're at an impasse

5  in mediation.

6      There's -- and Mr. Donato's said there's been no

7  discovery, state court cases will get gummed up.  We already

8  discussed that there has been some document discovery at

9  least prepared by the Diocese and cases can move forward

10  relatively quickly, as Mr. Boyd will discuss.

11      We also want to note that Mr. Donato spent a lot of time

12  talking about the Diocese of Rockville Center's recent

13  mediation change by Judge Glenn and how that process seems to

14  be resolving.  I think that one thing Mr. Donato left off is

15  that -- and we note that there were stay relief, Parish stay

16  was lifted.  The Preliminary Injunction was denied in the

17  Diocese of Rockville and there were four cases that were

18  ready to go to trial in October.  We think that the

19  settlement, or any settlement that may come in the Diocese of

20  Rockville is highly informed by the fact that there were four

21  cases not going -- not released but trial ready in October.

22  I --

23      **THE COURT:**  October of?

24      **MR. SCHARF:**  Next month.  They were trial ready to go

25  next month.

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1      **THE COURT:**  This coming month?

2      **MR. SCHARF:**  Yes.

3      And in terms of, you know, we did file a motion for stay

4      relief and, again, we think that the Preliminary Injunction

5      should be denied.  That means cases can go forward against

6      the Parishes or the non-debtor entities -- there's more than

7      just Parishes but non-debtor entities.  We filed the stay

8      relief motions to go after -- to have cases go forward

9      against the Diocese itself.  So it would be the complete, no

10     defendants not pointing at each other, no, you know -- every

11     defendant would be at the table.  And we were very selective

12     in those cases in the sense that we made sure that the cases

13     are almost entirely close to '73 abuse when we know the

14     Diocese had its insurance.  We have evidence of insurance,

15     clear evidence of insurance on post-'73 because from the

16     Diocese as a Debtor in Possession as opposed to the

17     non-debtor entities.  But Diocese as Debtor in Possession we

18     have to be very mindful of not depleting this estate's

19     assets.

20     In terms of the Parishes and the effect this may have on

21     the Parishes, we are open to discussing a test case process

22     with the Diocese.  The Diocese's position is this is an all

23     or nothing proposition.  And we are open to discussing the

24     test case process but when the Diocese presents us with an

25     all or nothing proposition, here's a Preliminary Injunction

1  take it or leave it, it's, it's, you know, we're forced into

2  a position where we have to oppose it as to its entirety.

3      In addition, your Honor, stay relief does not park a

4  case.  I'm quoting Mr. Donato's terms:  Denial of a

5  Preliminary Injunction does not park a case.  In the Diocese

6  of Rochester, the Diocese of Rockville Center in New York,

7  there were -- let me talk about Rochester, it's in the

8  Western District of New York.

9      There was, the Parishes stay was denied three and a half

10  years into the case.  There has been a settlement in

11  principal including a plan that, unfortunately, crossed paths

12  with  rd e so it has to be reworked a little bit.  That's

13  happened in a couple of cases across the country and in the

14  state.  But there is a settlement with the Diocese.  I have

15  to believe it was informed by the risk of Parish litigation,

16  or the risk of litigation going forward.

17      Litigation informs the insurance companies.  Frankly,

18  when there's no litigation going forward where we're at an

19  absolute standstill, it affords the insurance companies the

20  ability to sit on the sidelines and collect gains on their

21  investments.  It allows the Diocese to hold its purse strings

22  tight, the Parishes, as well, because there's no risk to

23  them.  Litigation creates risk.

24      And if Mr. Donato is correct and there are hundreds of

25  cases that would be dismissed or many cases that would be

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1    dismissed, I think our, our assessment is different.  But I'm
2    surprised the Diocese wants to keep those cases on this
3    basis.  So there's decisions in litigation in the state court
4    that has the jurisdiction to adjudicate these cases is
5    absolutely appropriate and informs both parties as motions
6    are granted, motions are denied, motions for summary judgment
7    are partially granted, partially denied.  The facts are
8    solidified and it becomes a sharper approach.

9        Mr. Donato's noted that in the test case scenario, the
10   "haves" and "have-nots" in terms of plaintiffs who may have a
11   judgment versus plaintiffs who don't have a judgment.  We've
12   been very careful here to make sure that if -- to request of
13   your Honor, if Preliminary Injunction is denied, we want to
14   make a concession that nobody will enforce a judgment either
15   against insurance or against any property of a non-debtor
16   entity without coming back to your Honor for some further
17   relief with respect to that.

18       Part of that is because we want to make sure the assets
19   themselves are preserved for distribution to many survivors.
20   For example, if there are six cases involving similar fact
21   patterns against one particular non-debtor defendant, one
22   trial, one decision, one verdict may in -- will inform the
23   other claims that involve the same fact patterns.  And, so,
24   therefore, we don't want to -- we want to make sure that
25   we're not making distributions to individual survivors and

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1  really creating a situation where "haves" and "have-nots" --

2  there have been cases in the past where there are liquidated

3  claims.  The one that I think we cite -- we cited a couple in

4  our pleadings way back when.

5      One in particular is in the Diocese of Wilmington,

6  Delaware -- I think this is in our original objection to the

7  first Preliminary Injunction -- the Diocese of Wilmington,

8  Delaware, Judge Sontchi presided over that case.  He was on

9  the bench at the time and he allowed cases to go forward -- a

10  case to go forward against one Parish and there came back

11  with a $3.5 million judgment, not enforceable against it,

12  that was part two, and that claim was addressed in the claim

13  and that creditor voted in favor of the plan and many

14  others -- I think it was almost a hundred percent unanimous

15  vote in favor of the plan.

16      So there are ways to deal with creditors that have a

17  liquidated judgment versus creditors who do not have a

18  liquidated judgment.  Bankruptcy courts do it all the time.

19  That's just the nature of bankruptcy.  And it won't be

20  preferential clients.

21      Again, we think that the cases that have been

22  selected -- and, frankly, cases that will go forward against

23  Parishes if the Preliminary Injunction is denied -- will

24  inform and create a benefit for everybody.  Mr. Donato talked

25  about using a process similar to that in Baltimore.  There

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1    was a similar process, I think two weeks ago in the

2    Archdiocese of Santa Fe's bankruptcy case.  It's something

3    that has been done more recently at the beginning of a case.

4    But the decision to have that kind of process and to sit in

5    front of a court and tell their story in a way that is

6    essentially off the record but informs the judge is something

7    that survivors -- and we'll talk about it -- that's the first

8    time we heard the proposal is when Mr. Donato put it in the

9    pleading last night.  So we think that we can discuss it but

10   that really should be the survivors' choice.  It should

11   never, ever, ever be imposed on a survivor.  It's their

12   choice as to where they want to share.

13        The other thing we can't ignore is that we do have four

14   and a half years of history in this case.  There is some

15   history prior to litigation and, you know, the Baltimore

16   process or Santa -- San Francisco process is not necessarily

17   appropriate at this time.  Again, we'll consider it and

18   discuss it but I don't think it's fair to try to respond to

19   that in a way that we can provide some commitment today.

20        Mr. Donato also notes or states that the Diocese is an

21   open book with respect to its financials.  The Diocese's

22   audited financial statements are on the record.  I don't

23   think that the Parishes are on the -- are public.  In

24   addition, I don't know if your Honor -- and, again, we're

25   responding to issues that were raised by Mr. Donato.

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1      There was recently I think the local NBC affiliates did

2  a news, a series of news pieces, Charlie was the reporter

3  (indiscernible).  There was I believe a three-part series.

4  If your Honor hasn't seen it, it's very informative and I

5  think one of the themes in that was that the Diocese's

6  process with respect to its little R -- reorganization of its

7  Parishes.  I think they call it the Road to Renewal is an

8  incredibly opaque process and that was being -- that's not my

9  position.  That's the position of parishioners who were

10  interviewed for this piece.  So there is opaqueness within

11  the Diocese's family of assets, the Diocese enterprise.

12      So, your Honor did, did raise -- I'd like to address the

13  specific factors that pertain to Bankruptcy Code Sections 362

14  and 105 but, first, I'd like to respond -- and again I know

15  this is not before your Honor today but I do want to address

16  it.  In, in -- you're raising the issue, as your Honor did,

17  with respect to the seminary property as to a Cy Pres

18  Doctrine under New York law, we can brief this more fully

19  down the road.  I just like to lay out a couple things.

20      In terms of donor intent, the law typically requires

21  like written clear intent of what the property was going to

22  be used for.  So if the donor, if -- I'll use my synagogue as

23  an example.  If I throw $20 into the charity box at the

24  synagogue and it's not destined for anything, that $20 can go

25  to any, any use.  If I throw $20 into the building fund, that

Case 1:25-cv-00538-MAV   Document 6-1   Filed 08/20/25   Page 552 of 708

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1    can only be used for the building fund.  And so I think that,

2    you know, the law on what property is restricted because of

3    donor intent and you have to have pretty clear instructions.

4         I think with respect to real property, there's an

5    additional issue under the Bankruptcy Code which is unless

6    there's a deed restriction, the Diocese, I believe, takes the

7    position of a bona fide purchaser in good faith and

8    therefore, unless there's a deed restriction, I think you may

9    have a Bankruptcy Code override of Cy Pres or restriction.

10   And again, we don't see the donor restrictions here in a very

11   clear way.  So we can brief those very fully down the road.

12        The Diocese is resting on the evidentiary record from

13   the last hearing where we had testimony from four witnesses,

14   Mr. Scholl, Ms. Potzler, Mr. Murray and Mr. Suchan and I

15   believe three of them, Mr. Scholl, Ms. Potzler and Mr. Suchan

16   were cross-examined before your Honor and they were all

17   deposed.

18        Let's address Section 362(a)(1).  If the Diocese is

19   named in the complaint, the Second Circuit's decision of

20    *o art*  is very clear that those cases are stayed and we are

21   not arguing that those cases are not stayed.  Somebody can

22   come in and seek relief from the stay to sever -- somebody

23   can try to move to sever on their own without coming in for

24   stay relief and take the risk that your Honor may say it's,

25   it's a violation of the stay.

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1     But we believe that  *o art*  is very clear and,

2   therefore, there is really no need to issue a Preliminary

3   Injunction for any case where the Diocese isn't named in the

4   complaint.

5     Let's talk about Section 362(a)(3) and this gets into

6   does, does the continuation of the litigation affect property

7   of the debtor.  And here the Diocese really focuses on

8   insurance.  And there was the pre-'73 insurance where the

9   Diocese appeared to take the position that the Diocese must

10  be a co-insurer in --

11      (Extraneous noise.)

12    **MR. SCHARF:**  -- any pre-'73 -- pre-'73 policies.  The

13  evidence for the. Pre-'73 policies is business records of the

14  Parishes, reports of the Parishes to the Diocese of what

15  insurance they may have.  Mr. Scholl, I believe, testified.

16      (Extraneous noise.)

17    **MR. SCHARF:**  That there was -- and we cite this in our

18  brief.

19      (Extraneous noise.)

20    **MR. SCHARF:**  Mr. Scholl testified that -- your Honor,

21  I'm going to pause and just ask.  We're going to have a dirty

22  record.

23    **THE COURT:**  We have some voices that seem to be coming

24  in as background noise.  If you're online, please mute your

25  phone until we will give you an opportunity to speak in due

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1   course.

2       Mr. Scharf, continue.

3       **MR. SCHARF:**  So the Diocese, Mr. Scholl did testify that

4   there is no evidence of any insurance policy that I -- that

5   covers the Diocese, names the Diocese as a coinsured, as well

6   as the Parish pre-1973.

7       On the post-'73 policies -- and I think your Honor may

8   still have the, I don't know if you did, I think we left the

9   big, the big board with all the insurance --

10      **THE COURT:**  I have the chart.

11      **MR. SCHARF:**  -- policies that you can reference.

12      **THE COURT:**  It takes half my library, so.

13      **MR. SCHARF:**  I am sure it will be a valuable piece of

14  art at the end of this case.

15      And so it's -- and, again, it's part of the evidentiary

16  record as well as basically taken from pleadings of the

17  Diocese.  Post-'73, the record's very clear:  There's one

18  year where there's an insolvent insurer but for every other

19  year they had insurance with per occurrence limits but no

20  aggregate limits and no limits on defense costs.

21      So with the roadblock or with the process the Committee

22  is proposing, your Honor, we would agree to where nobody can

23  enforce on a judgment.  There's no risk to the insurance

24  company because the defense costs are not capped.  They're

25  not, they're non-eroding policies.  So, the defense costs can

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1    be paid for post-'73 for Parish defense counsel.  If stay

2    relief goes forward on October 10th for post, for those --

3    for the post-'73 cases against the Diocese, insurance will

4    pay the defense costs, has to pay the defense costs and,

5    therefore, you know, again, non-eroding policies.  So it,

6    it's not -- there is no effect on the Diocese's asset because

7    it doesn't deplete that asset.  It just uses it to pay the

8    defense costs.  It doesn't remove anything from the aggregate

9    limits, the per occurrence limits or what would be available

10   to pay a judgment.

11       **THE COURT:**  Well, it depends on the policy.  Some are

12   wasting policies and some are not.

13       **MR. SCHARF:**  None of the post-'73 policies are wasting

14   policies with respect to -- none of them are wasting

15   policies -- until '86 -- I'm sorry, between '73 and '86, are

16   not wasting policies.  Those are very clearly not wasting

17   policies.

18       **MR. DONATO:**  Your Honor, there's evidence in the record

19   of Mr. Murray comprehensive policies, et cetera.  It seems

20   like Mr. Scharf is starting to testify --

21       **MR. SCHARF:**  I'm not --

22       **MR. DONATO:**  -- and I don't think that's proper.

23       **MR. SCHARF:**  I'm not testifying.  I'm referring to the

24   evidentiary record.

25       **THE COURT:**  I reviewed the record yesterday so I'm

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1    familiar with the record which presents information relative

2    to the policies.  But, I mean, this is argument so go ahead.

3        **MR. SCHARF:**  Thank you.

4        And so Judge Glenn in his opinion very clearly said it's

5    not a wasting policy, not wasting no insurance -- no defense

6    costs are wasting.  Those are not, not affecting property of

7    estate in such a way that Section 362(a)(3) would be

8    affected.  And, again, I think your Honor has pointed out

9    that -- the Diocese hasn't tied that particular provision to

10   any -- or the effect of that particular provision or any

11   insurance policy to a specific case, if there is a

12   specific -- and they've had four and a half years to do so.

13   Because they can't.  So, again, the record was clear.  We

14   don't think Section 362(a)(3) provides any basis whatsoever,

15   any basis whatsoever to issue the Preliminary Injunction.

16       And that brings us down to Section 105(a) and, again, we

17   point to note two of the majority decision -- opinion in

18   *rd e* where the Court said that, you know, this is not an

19   unlimited, an unlimited right, you have to really be able to

20   tie Section 105 to another provision of the Bankruptcy Code,

21   that is being the provision of the Bankruptcy Code.  It can't

22   be tied to Section 362.  It can't be tied to any other

23   section.  So we feel that Section 105 is simply unavailable.

24       But we can also discuss Section 105 on the merits.  The

25   Diocese has not met its burden under Section 365 (sic).

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1    Let's talk about likelihood of success on the merits.  The

2    Diocese does accuse us of ignoring a legal issue.  There is

3    no legal issue, no complicated legal issue.  Section 362 is

4    pretty clear and we think that the facts where there are no

5    wasting limits, especially as to defense costs means that

6    there's no, no complicated legal issue.  But there is no

7    likelihood of success on the merits at this time in this case

8    where the Diocese is going to propose a plan that will be

9    confirmable.  We think that having cases move forward in

10   state court would actually be a lever to help get this case

11   to a point where there can be a plan because, again,

12   litigation will inform people:  The Diocese, the insurers,

13   the plaintiffs, the abuse survivors what the legal issues

14   are, what juries may do, what courts may do in state court.

15   And so we feel that litigation going forward will actually

16   increase the likelihood of resolving the case as it did in

17   Rochester, as it did in Rockville Center, as it did in the

18   Diocese of Great Falls and other cases where stay relief was

19   either grant -- either stay relief was granted or preliminary

20   injunction was denied.

21       In terms of imminent irreparable harm to the estate,

22   again, the estate will not suffer irreparable harm.  The

23   collateral estoppel issues, again, I would like to point your

24   Honor to Judge Glenn's decision in Rockville Center.  It was

25   pretty black and white.  The fact that Mr. Donato's example

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1    for an adverse precedent, if you have multiple cases against

2    the same perpetrator, means that you, that you're not going

3    to start over again with respect to that perpetrator.  I

4    think that if you had three cases in a row, three different

5    plaintiffs teed up in state court, the defense, the Diocese

6    or a Parish would be arguing that you have to try each case

7    separately and each case would be, each jury would have to

8    consider the cases on the merits, each court would have to

9    consider the case on the merits.  The fact record may be

10   similar but that's the record.  That's the record that's

11   presented, not necessarily the decisions or what is binding

12   about -- the results of the record may not -- would not be

13   binding on each other.  No judicial decisions would be

14   binding on a different case, different plaintiff and, you

15   know, but the evidence may be shared.  And, again, there's

16   some efficiency there to sharing evidence in other cases.

17        In terms of indemnity or contribution, I don't believe

18   they've been filed on the record.  And, again, Judge Glenn

19   addressed this in his decision, you know, when you have an

20   indemnity or contribution claim, A, those are, those arise in

21   the future, it's possible that -- and if there is ever

22   indemnity or contribution claim that's filed late and somehow

23   makes it past standards to allow a late filed claim -- and,

24   again, we note there's no written indemnity obligation and a

25   contribution claim is what it is but the contribution claim

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1   has not been filed, not been asserted, there's no dollar

2   amount.

3       But if there is an indemnity or contribution claim, that

4   would be paid in bankruptcy dollars.  That would be another

5   general unsecured claim.  It's not going to be a dollar for

6   dollar reduction.  It may affect the pool of funds available

7   to pay survivors in a bankruptcy case but -- out of the

8   debtor's estate but it certainly won't affect the ability to

9   collect against non-debtor entities or what the non-debtor

10  entities would pay.

11      In terms of the public weight, it's very clear here --

12  and, again, I'll point you to the prior decisions of

13  Rochester and Rockville Center and New York State addressing

14  this issue that New York State's legislature clearly decided

15  that there's a public interest in allowing CVA cases to go

16  forward, not holding them back.  And they recognize all of

17  the Diocese's arguments in terms of the Diocese's charitable

18  mission and what it does for parishioners.  When the

19  legislature made that determination to allow CVA cases to go

20  forward, it clearly decided that there's a public interest

21  weighs in favor of allowing litigation to go forward.  Based

22  on the record, we think the Diocese -- it's very clear to us

23  the Diocese has not met its burden.

24      I'll pause here I'll ask if your Honor has any questions

25  for me or your Honor wants me to address and, if not, I'll

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1   reserve some time in case.

2       **THE COURT:**  I'll certainly allow you to reserve time.

3       **MR. SCHARF:**  Thank you.

4       **THE COURT:**  But you've addressed I think what I was

5   hoping to see addressed.

6       **MR. SCHARF:**  Thank you.  I appreciate that, your Honor.

7       **THE COURT:**  All right.

8       **MR. SCHARF:**  Mr. Boyd may want to speak about what state

9   court cases would look like in terms of actually proceeding

10  to litigation.

11      **THE COURT:**  All right.

12      **MR. DONATO:**  Your Honor, at the outset I have an

13  objection.  Mr. Boyd is associated with the law firms that

14  failed to answer the hundred -- hundreds of Preliminary

15  Injunction complaints and, as such, as I indicated, I don't

16  think it's fair.  I don't think it's appropriate.  We should

17  know who has the right to object to this Preliminary

18  Injunction.  There's no question that the Anderson clients

19  did not file an answer.  They defaulted.  As I indicated,

20  they filed a joinder yesterday.

21      But if they defaulted, we should have the right to know

22  whether it's a proper default or not.  Allowing him to

23  testify -- or to speak, sorry, now is inappropriate under the

24  circumstances.  That's why we started the argument by

25  setting -- asking to set the default judgment procedures so I

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1  can figure out do I have 700 oppositions or do I have 10.  So
2  I respectfully submit Mr. Boyd, who's part of the firm that
3  defaulted on the answers, should not be permitted to address
4  the court.
5      **MR. SCHARF:**  Your Honor, if Mr. Donato and his client
6  were so confident in the defaults, why didn't they just file
7  default motions why are we here on a Preliminary Injunction?
8      **THE COURT:**  My general practice, if you haven't figured
9  it out already, is that I let people talk.
10      **MR. DONATO:**  Sure, understood.
11      **THE COURT:**  And there always was a joke in this court
12  that -- when we had two judges now we only have one active
13  judge in this district, in this part of the district -- that
14  if you end up in front of me, expect a long hearing, if you
15  end up in front of my colleague, expect a short hearing.
16  Because I always want to hear what people have to say.
17      And so I'll hear Mr. Boyd.  Go ahead.
18      **MR. DONATO:**  Just --
19      **MR. BO D:**  Thank you, your Honor.
20      **MR. DONATO:**  -- one other thing, just quickly, your
21  Honor -- sorry, just different issue.  I'm not sure what
22  Mr. Boyd's going to talk about but if you're going to talk
23  about the hearings on 10/10, I'll just observe --
24      **MR. BO D:**  I'm not.
25      **MR. DONATO:**  Okay.

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1      **MR. BO D:**  Thank you.

2      **THE COURT:**  All right.

3      **MR. BO D:**  Just anecdotally, your Honor, I represent a

4   Committee member in Baltimore and I find it interesting that

5   when I went down to my very first hearing down there with

6   Judge Harner, she was immediately quoting Judge Bucki's very

7   first hearing in Buffalo.  So when I come to Buffalo and now

8   I'm hearing about Judge Harner, I wonder if there's some

9   relationship between the two cities that begin with a B.

10       The other thing I want to say about Baltimore is I did

11   attend the three hearings in which survivors came.  The

12   survivors didn't come to speak to Judge Harner.  They came to

13   speak to Cardinal Lori who was present and three days worth

14   of agonizing hearings took place and Cardinal Lori listened

15   to them, as did Judge Harner.  Cardinal Lori has also met

16   with that Committee three or four times.

17       The Child Victims Act in Maryland took effect on

18   October 1st last year.  If it were a child it would be

19   celebrating its first birthday in a couple of weeks.  If this

20   bankruptcy were a child, it would be starting kindergarten

21   last week.  I'm not sure if the time for that type of hearing

22   to have survivors come in and speak to the Court and maybe

23   Bishop Fisher, if he's not on vacation, is now because we're

24   just about five years into this.

25       With regard to state court, your Honor, I served as

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1    liaison counsel for Judge Chimes, who is the state Supreme

2    Court justice who oversees the cases of the Child Victims Act

3    in the Eighth Judicial District, and I think in the Seventh,

4    as well.  Judge Chimes issued a Case Management Order for the

5    bankruptcy filing here specific to clergy cases.  She

6    actually has two Case Management Orders:  One for the public

7    schools and other entities and a clergy Case Management

8    Order.  As I recall, that Case Management Order calls for

9    exchange of demands, which are demands for Bill of

10   Particulars and 25 question interrogatories.  Following the

11   demands, those responses would be exchanged.  That process is

12   probably a three- to six-month process, followed by

13   depositions of the parties.

14        In terms of my experience with the public school cases

15   we've handled, Judge Chimes and Judge Bersani (phonetic) and

16   Judge Furlong once paper discovery is done, generally give

17   about two to three months to get the depositions done.

18        And then following that there is a period where if --

19   just like any other personal injury case -- if the defendant

20   wants some sort of an examination -- usually in public school

21   cases, it's been a neuropsychological evaluation -- they have

22   some period of time to do that.  The judges have generally

23   given them two to three months to get those examinations

24   completed and discovery, expert disclosures exchanged.

25   That's about a year.

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1    One of the things that gets lost in the language of the

2 actual statute that we call the Child Victims Act is that it

3 came with a trial preference.  So just like any other

4 negligence case in New York State where if a person is over

5 the age of 70, they can apply for a trial preference.  Every

6 Child Victims Act case automatically has a trial preference.

7 So once it's trial ready -- which as I said would be in about

8 a year -- then the trial must be held a year later.  That

9 puts us close to year seven in this case.  And year seven

10 from a standards and goals perspective for both civil lawyers

11 and judges in the judiciary and everyone involved, year seven

12 is embarrassing.  It's not as embarrassing as year eight and

13 it's not as embarrassing as year nine.  We have to get going.

14 And that's all I have to say, in terms of the process.

15    Judge Leo Fallon, once advised me -- I didn't want to

16 take a complex case and he said to me:  Steve, it's just

17 another negligence case, just get the discovery, do the

18 depositions, and go to trial.  And that's what this is.

19    Thank you, your Honor.

20    **THE COURT:**  All right.  Thank you.

21    Let me ask anyone else in the courtroom who wants to say

22 anything?

23    Mr. Lyster.

24    **MR. L STER:**  Thank you, your Honor.

25    We can agree that we're at a crossroads, your Honor, but

1    not the direction to take.  And, as Mr. Donato said, we need

2    to go back to mediation and there's been much discussion of

3    how the cases would proceed, context with regard to other

4    cases.  We haven't heard any commitment to, you know, return

5    to the table, discuss global resolution of this case through

6    the bankruptcy process and nothing that's been discussed with

7    regard to, you know, over 800 state court actions proceeding

8    will help in that process, nor will that litigation help get,

9    you know, claimants paid nor get them paid quickly.  And it,

10   it, so -- it won't ultimately help the claimants or

11   resolution of this matter.  There's over 800 state court

12   actions and as your Honor, I think, was starting to get at,

13   you know, that's far different than the other Diocesan cases

14   in New York State.  It's, it's far more actions, hundreds

15   more state court actions.  This, this case is more complex.

16   There's more state court actions, relatedly there's more

17   insurers.  This is far more complex.

18        And there's just, this is such a rosy picture that's

19   being painted of, you know, starting these actions,

20   proceeding with test cases and somehow that will help to go

21   get claimants paid but it's just not, and it's clear, your

22   Honor, even from what's been said that it's not.  And just

23   quickly from what Mr. Boyd indicated, it would be at least

24   over a year to get through just initial status conferences,

25   discovery, examinations.  And in the meantime, what's left

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1    out from that, again, is apparently, you know, no commitment

2    to discussions, mediation, you know, actually arriving at an

3    amount for all claimants to be paid.

4         And there's, your Honor, there is no, there are no test

5    cases.  There's no test cases -- there's no agreement on

6    which cases will proceed.  The Committee has mentioned 17

7    motions for relief, you know, having been filed.  Those, of

8    course, are scheduled to be heard on October 10th.  But as

9    the Parishes have been concerned, you know, we've heard from

10   the Lipsitz Green firm, you know, and they filed papers.

11   They have -- they represent more than double that amount of

12   claimants.  They represent more than 40 claimants and, and as

13   the Parishes have been concerned, they've agreed to none of

14   these concessions.  So, all of this discussion of test cases

15   is, is misdirected.  Discussion of, you know, not enforce,

16   giving mind to the stay and the effect of the stay, agreeing,

17   you know, essentially not to violate the stay, an agreement

18   not to enforce judgments, that, your Honor, none of that is

19   actually correct.  And we can see that already even based on

20   the papers that have been filed by the Lipsitz Green firm.

21   And who knows, you know, who else is out there.

22        So, what, what we know actually from the papers is that

23   there's no agreement among the claimant body as a whole, the

24   over 900 claimants, as to test cases and which cases would

25   proceed, how they would proceed, whether they would violate

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1    the stay, whether they would seek to actually enforce a

2    judgment against Parishes and other Catholic affiliates.

3    And, your Honor, we would assume that that would be the case.

4    I mean, we would assume those issues will, will be present

5    and are extremely problematic.  We cannot have in this case

6    cases going forward, you know, by different firms, issues

7    with the stay, whether they're going to enforce a judgment

8    and it's simply unruly and part of it is because of the

9    complexity of this case and the volume of the cases.  And

10   also the positions.

11        As I've mentioned, your Honor, this is just differently

12   situated and the Lipsitz Green firm is a good example of that

13   and we know, you know, what their intentions are.  I'm not

14   trying to categorize those intentions.  They advocate very

15   zealously for their clients and I appreciate that but I'm

16   simply stating what's in the papers.  So there's no agreement

17   for test cases and all we know is that cases would proceed to

18   judgment and potentially there'd be attempted judgment

19   enforcement against Parishes.  And, you know, so we need,

20   your Honor, the injunction to sort this out.

21        **THE COURT:**  I haven't -- early on in this case, at least

22   three years ago, the Committee and the debtor came to the

23   Court and asked for an opportunity to have mediation.  And I

24   heard them and I granted that request.  And we had started

25   out with Judge Kaplan then we moved over to Judge NeMoyer,

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1    both very capable people.  And I was satisfied with their
2    ability to handle these matters.  And if there was going to
3    be a successful mediation, those were the types of people
4    that would do it.
5        Now, I think everyone is in agreement it has not -- it
6    hasn't worked.  And there are some people who argue that the
7    only way to give a settlement is to give people a trial date.
8    And aren't we rapidly approaching that point where mediation
9    just isn't working?
10       **MR. L STER:**  Respectfully, we're not there yet, your
11   Honor.  And I do believe that Mr. Donato did a good job of
12   pointing to other cases including recently Rockville Center.
13   There is, there is history in these Diocesan cases where you
14   come, you come to a point and then appoint new mediators and
15   can have a different result.  So that, that is the case in
16   other Diocesan cases.  It is common to have to appoint other
17   mediators for whatever the reason and, you know, no, you
18   know, no characterization of why that is.  But it certainly
19   is the case.  It's certainly the case.  And so, it can be
20   successful.  Mediation can be successful and it has been
21   successful in, in other Diocesan cases, including by
22   appointing, you know, a new mediator, or mediators.
23       And the Parishes do strongly support Mr. Donato and the
24   Diocese position that this is the time.  This is the time to
25   do exactly that:  To appoint new mediators to give that a

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1   chance, as has been successful in other Diocesan cases

2   including even the Diocese of Rockville Center which, you

3   know, much of us here have followed and it's been, you know,

4   very contentious.  It has seemed -- just public knowledge --

5   your Honor, I mean, it has seemed that the Diocese of

6   Rockville Center, you know, couldn't be settled, that a

7   global resolution couldn't be reached, you know, additional

8   mediators have been appointed and that, that that is the

9   direction, your Honor, that the Parishes respectfully submit

10  is the direction to go here and that this is the appropriate

11  time to do it.  Also to give that pause and injunction, you

12  know, to sort out any of these other issues before the cases

13  would proceed.  So mediation can still be effective and

14  that's been shown to be the case in many other Diocesan

15  cases.

16      And we've got to step back, your Honor.  At other

17  context, you know, we're talking as if, you know, two

18  years -- and let's just cut through, your Honor.  Let's say

19  maybe a case can get to trial in two years, okay.  I mean,

20  it's at least a year, from what's been discussed, more than a

21  year, I think really a year and a half, from what's been

22  described as far as getting through discovery and potentially

23  getting a trial date.  You then have to get on the trial

24  calendar, so let's say two years.

25      In the time that this case has been pending, this

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1    bankruptcy case, let's look now at the Parishes who, as

2    correctly stated in Mr. Donato and the Diocese's papers,

3    would, would, along with other Catholic affiliated entities,

4    be contributing most of the money to the claimants.  It was

5    just announced by the Diocese that the Parishes, through the

6    reshaping process and Road to Renewal and including, your

7    Honor, because of changing demographics among Catholics and

8    including because of the priest shortage, the severe priest

9    shortage will now in the next, you know, nine months,

10   approximately, to June of next year, go from 160 Parishes to

11   79 Parishes.  That's, that's striking, your Honor, and,

12   again, it, it -- and I'm in no way comparing, you know, that

13   to the pain of the survivors.  I don't want to do that at

14   all.  The Parishes absolutely want to address and resolve the

15   abuse claims, address the survivors.

16        But the reality is, your Honor, and, you know, through

17   June of 2025, there's going to be about half as many Parishes

18   to do that.  And what does that mean?  What does that mean?

19   Even the nuts and bolts, your Honor, if litigation were to

20   proceed through that time, I mean, we would be appearing in

21   state court and, you know, in realtime saying, you know, hold

22   on, your Honor, let's adjourn this, you know, is this Parish

23   being closed, is it merged.  I mean we wouldn't even be able

24   to get a handle around those, you know, who the defendant is,

25   you know, in realtime as these, as these closures take place.

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1  So there's significant hurdles to those cases proceeding.

2      But the bottom line is, you know, to provide, you know,

3  to pay the, to pay the survivors, provide compensation to the

4  survivors.  They can never be compensated but to try to do

5  that and litigation proceeding against the Parishes will

6  deplete dollar for dollar the Parishes' available assets and

7  the other Catholic-affiliated entities who, as has been

8  stated, would be called upon to pay, you know, three,

9  three-quarters of the pot to claimants as far as what's, you

10  know, could be proposed at this point.  And, so, it just

11  absolutely would deplete the monies available to survivors

12  through the costs of litigation and through time, your Honor.

13      If another two years goes by before these cases go

14  forward, it's, it's less relevant what that, what the

15  judgment amount is, you know, for that particular claim

16  because there's, there's far less money from the Diocesan

17  family perspective to contribute to any pot.

18      And insurers are not incentivized by that strategy, your

19  Honor.  They're incentivized to wait because they won't see a

20  global resolution can be reached, that a release can be

21  released, you know, as to all of their insured.  And in the

22  meantime, you have issues, you know, Parishes, as has been

23  mentioned in the papers, may need to consider their own, you

24  know, bankruptcy cases and what does that mean, as well.  It

25  all means less money available for claimants.

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1    **THE COURT:**  Well, let me ask.  The fact that we -- you

2    heard what Mr. Boyd represented to the Court and, in fact, in

3    your arguments you sort of leaped on it and accepted it that

4    we're looking at at least a year before these cases are going

5    to be trial ready, even if -- whether it be because I lift

6    the stay, I don't impose a stay on Parishes or whether

7    because I address the motions, 17 motions that I have on

8    October 10th -- and it's going to take at least a year before

9    any of these cases are trial ready.

10    Why not continue with mediation while they're preparing

11    for trial?  You can still mediate a case even though you're

12    preparing for trial.

13    **MR. L STER:**  Your Honor, it's an enormous distraction

14    and depletion of assets during that time.  And it's just

15    misdirected to alert that it's needed, you know, that it's

16    needed to convince the Catholic family to, you know, you

17    know, contribute more moneys.  It's misdirected to say that

18    that causes the insurers to settle.  And the focus needs to

19    be on mediation.

20    And just what is the ultimate goal?  I mean, the reverse

21    of that is if it can't, if there's not going to be a trial in

22    two years, you know, why are, why are we proceeding with that

23    process?  And, your Honor, the parties don't truly dispute

24    that ultimately large judgments could be rendered in these

25    cases.  So, it -- what is the benefit of, of the litigation?

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1    I mean, these cases are resolved through mediation and

2  Mr. Donato correctly pointed out -- and there's been some

3  discussion back and forth on this -- the impetus, you know,

4  with regard to settlement, I agree with Mr. Donato, was

5  appointment of new mediators and return to mediation, not

6  litigation going forward in any of these cases.

7    And I do, again, place that in the context, your Honor,

8  of just the extraordinary complexity here.  There's over 800

9  cases.  That's far more cases and far more complexity with

10  regard to the claimants and the insurance here.  And there

11  absolutely is no process.  There's no test cases.  There's no

12  process.  There's no agreement on how to move forward.  And

13  your Honor had correctly pointed out several times these

14  issues, these issues with respect to the applicability of the

15  stay and, you know, they haven't, you know -- and the issues

16  with regard to default judgments.

17    So, these still need to be resolved before any cases

18  would need to go forward and an injunction should be in place

19  with mediation in the meantime.  It should not be a surprise.

20  That has been what's been discussed in this case to, you

21  know, address these issues, address the issues of the stay

22  beforehand.  And, so, even if, even if the Court was headed

23  in that direction, there should be an injunction in the

24  meantime and for that to be fully, fully developed with, you

25  know, at some time down the road for that to happen, and in

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1   the meantime, you know, for a mediation to progress and a

2   strong direction for mediation to progress as has been

3   described, to participate monthly reports, new mediators, and

4   that's what, you know, should happen here while those issues

5   are addressed.  They're the issues that have been already

6   telegraphed numerous times before, you know, cases would

7   proceed.

8        **THE COURT:**  All right.

9        **MR. L STER:**  And, your Honor, I'll just note a few

10  things.  The Parishes have, have filed claims in this case.

11       **THE COURT:**  Although I accept Mr. Donato's

12  representation, some of your Parishes have no liabilities.

13       **MR. L STER:**  Have no liability on abuse claims, your

14  Honor?

15       **THE COURT:**  Yes.

16       **MR. L STER:**  Yes, that's correct.  But if your Honor is

17  getting, you know, back to that question as to, you know,

18  uninsured claims, that is still an issue because you would

19  have a situation where, you know, as to that particular

20  Parish, you know there's still a race to the courthouse.  I

21  mean, if there's one uninsured claim that is sued by a

22  claimant represented by the Lipsitz Green firm and they're

23  moving forward not seeking stay relief, get a judgment,

24  enforce that judgment against the Parish, I mean, that's just

25  a classic race to the courthouse.

1      And, so, even, even as to a single uninsured claim

2   against a Parish, we don't know if that Parish has, you know,

3   other insured claims that would become an issue.  That's

4   possible.  But we do know regardless, it's a limited pot, pot

5   of moneys and it's a limited pot of moneys and that can be

6   contributed and should be contributed for the benefit of all

7   claimants.  Individual Parishes, you know, being forced to,

8   you know, potentially file bankruptcy does not help the

9   claimants as a whole.  I mean, there could be a Parish that

10  has -- there are Parishes with, you know, limited amount of

11  assets with many claims against them.  And to the extent that

12  those Parishes are then caused to file bankruptcy, you know,

13  that, that does not help resolve those, those claimants'

14  claims and get them paid, as they're discharged in the

15  bankruptcy cases of those Parishes and the limited monies

16  that those Parishes might be able to otherwise contribute are

17  depleted through litigation and then causing them to file and

18  then not, not contributed to the pot.

19      So, you know, that's why we have not seen that being

20  done in other cases.  I haven't heard anyone point to, you

21  know, individual Diocesan cases with individual Parish

22  bankruptcy filings.  And part of the reason for that is

23  because these do ultimately need to be resolved through

24  mediation, you know, through the global mediation process.

25  And that's what I do believe, your Honor, the Diocese has

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1   established its entitlement to here.

2           **THE COURT:** All right. Thank you.

3           Anyone else in the courtroom that wants to speak?

4           **MR. DURST:** Just briefly, your Honor.

5           There's been a lot of discussion today of issues that

6   kind of overlap between the motion that's before the Court

7   today and the motion that is going to be occurring, the

8   hearing that's occurring in October. So I just want to

9   address some of that overlap. And, of course, we reserve all

10  of our rights to address the motion, or the hearing in

11  October, as well.

12          The first issue is there's been a lot of statements

13  today regarding the amount of available insurance and the

14  obligations of the various insurers. Obviously the Court is

15  aware that there's an ongoing Adversary Proceeding that is

16  set to address some of those issues but that has not gone

17  forward because of the progress made during the course of

18  mediation. Obviously, to the extent litigation opens up, it

19  might have to open up with regard to everything which could

20  not only impact estate assets, it could impact the

21  availability of coverage for claims both in litigation and

22  not litigation that go forward as a result of any of the

23  various stays.

24          Separately, with regard to the mediation, the Committee

25  said both that it wasn't engaging in the mediation because it

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1    wasn't told a number and also that the number was too low.

2    Just so the Court's clear, the insurers have continued to

3    work.  We have put together a collective number and the

4    Committee knows what it is.  We've never been told by the

5    Committee -- or, more importantly, the Committee's selected

6    mediator who's been appointed to this case:  Judge NeMoyer --

7    that that number was insufficient or warranted the

8    declaration of an impasse.

9         So, instead, the Committee promised to show up to

10   mediation if we shared that number and then they simply

11   changed their mind.  So the insurers remain engaged.  We

12   remain interested in continuing negotiations and efforts to

13   resolve this case on a global basis.

14        That's all I have.  Thank you.

15        **THE COURT:**  Thank you.

16        Anyone else in the courtroom that wants to speak before

17   I hear people on line?

18        (No response.)

19        **THE COURT:**  All right.  Anyone on the line want to add

20   anything?

21        **MR. SCHIAVONI:**  Your Honor, if I could.

22        Your Honor, I'd like to make three points briefly.

23        The first point is your Honor has heard a lot from the

24   Committee about other cases and motivations in other cases

25   and whether they led to settlements or not.  None of those

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1   statements are supported by declaration or exhibits.  It's

2   just what counsel thinks.

3       And I would submit, your Honor, if we had seen pleadings

4   on that, we would have submitted a declaration asserting that

5   really these arguments are wrong, they're not well-founded

6   and that's not really what happened in these other cases.

7       The related point to that, your Honor, is we have filed,

8   Pacific, a request for judicial notice.  Everyone's hands in

9   this case are tied about what can be said and we're not

10  saying anything about what has occurred in the mediation.

11  But we did submit something to sort of on a point where we

12  were included but that what has happened behind the scene is

13  not what is being presented here today and that there are

14  strategic reasons and tactical reasons why the Anderson firm,

15  which Judge Warren has found, is heavily extended through

16  litigation financing from a hedge fund --

17      **MR. SCHARF:**  Objection, your Honor.  There's no such

18  finding.

19      **MR. SCHIAVONI:**  -- is pressing so hard to have its --

20      **THE COURT:**  I have an objection to your comment before.

21      Mr. Scharf.

22      **MR. SCHARF:**  There's been no such finding by Judge

23  Warren, your Honor.

24      **THE COURT:**  Well, it's only argument and I won't

25  acknowledge one way or the other.  I'm not taking this as

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1    evidence.

2        Go ahead.

3        **MR. SCHIAVONI:**  Your Honor, that's point one.

4        Point two is I think there was a point where Mr. Donato

5    couldn't remember something -- and I'm more at fault normally

6    for that.  I think what he was going to say was that the

7    Parishes have, even the Parishes with no insurance, he has

8    previously argued and (indiscernible) evidence that they have

9    contribution and indemnity claim back against the Diocese.

10   So, you know, the claims sort of in his contention in prior

11   pleadings has been that they mirror back on the Diocese that

12   would lead to subrogation claims, too.

13       And then the third point, your Honor, is:  Should the

14   decision be made here to, you know, lift the injunction and

15   allow cases to go forward on a lift stay basis?  I just, you

16   know, we will just want to preserve our right, your Honor, to

17   come back to you to say, you know, that we would like,

18   Pacific, would like discovery on a defending assay (phonetic)

19   (indiscernible) basis on issues that go to the coverage case

20   and that, you know, we have held our fire on that and stood

21   back on it.  But if our hand is forced, it's like we're going

22   to have no choice, too, but to go forward, you know, quite

23   aggressively, and, like, we have held our fire and not done

24   that right now but if Jeff Anderson is going to go forward,

25   we're going to really have no choice.

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1          Thank you, your Honor.  That's all I have.

2          **THE COURT:**  Thank you.

3          Anyone else on the line want to speak?

4          **MS. TURNER:**  Your Honor, I just want to echo what

5    Mr. Durst said in terms of the insurers continuing to favor

6    mediation and continuing to work towards a consensual

7    resolution and continuing to engage in good faith.  We are

8    supportive of that process.  We have been working very

9    hard over the last however many months and we will continue

10   to do so.

11          Thank you.

12          **THE COURT:**  Well, thank you.

13          Anyone else?

14          **MR. ELSAESSER:**  Your Honor, just very briefly.  I won't

15   add anything to Mr. Lyster's argument but there are just two

16   quick things, one of which came up in the one of the

17   insurers' arguments which is really more ahead of October

18   10th than today.

19          But it is, I think, probably almost a certainty that if

20   the cases go forward either from the, from the -- if you were

21   to rule against this injunction or if you were to grant

22   partially or all of the motions on October 10th, that the

23   carriers would feel compelled to move ahead quickly on the

24   coverage action which has essentially been kind of a

25   handshake mediation stay for since the beginning.

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1           The other quick point I wanted to make as a person who's

2      been involved in certainly, if not more than anyone,

3      certainly as many as anyone has been involved in these for

4      both representing Diocese and Parishes, much is made, and

5      quite rightly so, about the frustration arising from the

6      delay and the four years plus that we're into -- into

7      Buffalo.  That's unfortunately but true the cases that have

8      resolved, the last few cases that have been resolved with

9      complete finality and paid all the payments under the plan

10     coincidentally were two of our cases:  Santa Fe and Guam.

11     And I can assure you that in each of those cases, there were

12     times where -- just like in Rockville Center which has

13     already been alluded to many times -- where either one side

14     or another side or all three sides when I include the

15     insurers, throw up their hands and say there's just, there's

16     just no way.  I mean, it's happened, it's happened before.

17     And nobody, I can assure you that nobody on any side of the

18     case expected either Guam or Santa Fe to go four years.

19     Unfortunately, that's, you know, for better or worse, is

20     becoming the norm.

21           I just want to urge that let's not give up on mediation,

22     anything we can do to keep that process going, regardless of

23     how you ultimately rule on this matter or the October 10th

24     matter, I think it's also critical that mediation resume in a

25     full speed ahead mode as well, your Honor.

5

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1    Thank you.

2    **THE COURT:**  All right.  Thank you.

3    Anyone else on the line that wants to speak?

4    **MS. ELLER:**  Just briefly, your Honor.

5    **THE COURT:**  Yes, please.

6    **MS. ELLER:**  Thank you, your Honor.

7    Just briefly, my understanding is that we were

8    essentially here to address the impact that the  *rd e  har a*

9    decision was going to have going forward.  And I feel like a

10   lot of the arguments today have been about maintaining the

11   status quo and the debtor and the Parishes' request to

12   essentially maintain the status quo and continue to attempt

13   mediation which apparently has not been close to a success.

14   **THE COURT:**  Well, let me just say I'm well aware of the

15   fact that, as all good attorneys -- that good attorneys will

16   try to get their points before the judge even in advance of a

17   hearing and a lot of the arguments, I know, is really more

18   directed to the October 10th hearing than today.

19   But I certainly welcome the issue that this was keyed up

20   for and that's the  *rd e  har a* implication.  So, you're

21   certainly welcome to address that.

22   **MS. ELLER:**  Thank you, your Honor.

23   So essentially, your Honor, my point is really I feel

24   like the arguments are going towards the hearings that are

25   coming up in October not the hearing for today.  And I feel

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1    like there hasn't really been a strong indication from the

2    debtor or the Parishes as to how they're going to reach this,

3    what they'll need, a hundred percent consensual plan to go

4    forward.

5         And the Supreme Court essentially indicated that they

6    can't do what they previously, I believe, were trying to do

7    which is, you know, force some type of a resolution down the

8    victims' throat and the Supreme Court said you can't do that.

9         So, your Honor had already issued a decision that

10   essentially indicated that if the Supreme Court reversed the

11   Second Circuit -- which it did -- how could the Court

12   temporarily continue to grant relief that it can't grant

13   permanently.

14        And so, your Honor, our position is that the debtor has

15   failed to meet its burden of proving on an individual

16   case-by-case basis its entitlement to a Preliminary

17   Injunction under 362.  And under the   rd e   har a decision,

18   the Court makes clear that it doesn't have the authority

19   under the Code to continue to grant these injunctive reliefs

20   for non-debtors, which is what they're looking for.

21        To the extent that they, you know, want to continue to

22   argue the October 10th motions, I mean, that's not

23   (indiscernible) so I'm not going to be heard on that.

24        **THE COURT:**  All right.  Thank you.

25        Anyone else on line?

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1      **MS. MILLER:**  Good afternoon, your Honor, it's Shavell

2  Miller (phonetic), White and Williams for Firemens Fund.

3      **THE COURT:**  Yes.

4      **MS. MILLER:**  Just very briefly.

5      As counsel to an insurer in both (indiscernible) and

6  Rockville Center, I just want to echo the comments that

7  Mr. Schiavoni made about disagreeing with certain statements

8  that were made regarding litigation or settlement in those

9  cases and the fact that statements being made by counsel are

10  going to impact this Court if somehow factual (indiscernible)

11  were to be offered, it would likely to be (indiscernible).

12      **THE COURT:**  Thank you for your comment.

13      Anyone else?

14      (No response.)

15      **THE COURT:**  All right.  Mr. Donato, you wanted to

16  reserve some time for rebuttal?

17      **MR. DONATO:**  Thank you very much, your Honor.

18      Just a couple of observations.  Not a lot.  I want to

19  just touch base on a couple of things alluded to by Mr.

20  Scharf at the outset.

21      So, I'm confused by what the Committee's doing.  During

22  their presentation, Mr. Scharf said several things like we,

23  we made the motions to lift the stay, you know, we -- okay.

24  Committee's got to stay in its lane.  We don't think the

25  Committee is staying in its lane.  If we're seeking default

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1  judgments, those are individual cases.  Creditors Committee,

2  in our opinion, should not be entering at all.

3      So that I observe that as far as the procedures motion,

4  I respectfully submit there's been no opposition because the

5  Committee doesn't have, has no role in this.  This is aimed

6  at Anderson and all the other individuals who simply read

7  your decision in January and ignored you for nine months and

8  continue to ignore you.

9      So I respectfully submit as far as the default judgment

10  procedures, I'd ask that you enter an order approving the

11  default judgment procedures today.  There's no opposition.

12  We will then move swiftly to sort out the 720 plus or minus

13  defaulters so that, again, I think it's only appropriate that

14  the Diocese has a fair playing field.  Because the Diocese

15  doesn't know who has the right to object and who doesn't.

16      And as I indicated, Mr. Anderson for Mr. Finnegan filed

17  a pleading yesterday for like 300 or hundreds and hundreds of

18  individuals saying I join with the Committee's opposition.

19  Well, if they didn't answer and that's a default, they don't

20  have a right to be here.  Effectively -- in fact, not

21  effectively, you said in your decision, presumably if the

22  defendants defaulted, then they're not objecting to the

23  extension of Preliminary Injunction.  And I think that's

24  exactly right.  So that I want to just emphasize that.

25      I respectfully submit that we have established

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1    appropriate grounds for the default procedures to be entered

2    today.  Obviously it's just a procedures motion.  The

3    suggestion that we file 720 motions in this court and just

4    bury the clerk is just absurd.  And remember that the default

5    procedures motion was, in large part, designed to protect the

6    identity of the survivors.

7        So I respectfully submit that we've carried our burden

8    and that one of the things we should do today is enter the

9    order approving the default procedures.

10       As far as the default procedure judgment and comments

11   made by the Committee, Mr. Scharf, first of all, and I have

12   an excellent professional relationship.  We are battling

13   every day but professionalism is there, no question about it.

14       I was surprised by Mr. Scharf's comment that, you know,

15   he had asked for an adjournment and it was denied.  I think

16   that adjournment was outside the court today.  So I don't

17   have any prior requests for adjournments.  So, when --

18   usually Mr. Scharf's right, excellent cooperation, et cetera,

19   but the request was made before the hearing started today but

20   it was made today, okay.  Because we have set forth, we

21   think, just a basic element of fairness as a precursor to

22   dealing with the Preliminary Injunction, the Diocese should

23   know who is actually on the other side and who has that

24   right.  So I just wanted to make that observation because the

25   professional courtesy does exist.  No question.

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1       There was a nice discussion about footnote 2 in Purdue.
2    Okay, I just read it again.  All it says is that you can't
3    use 105 in order to force a nonconsensual release on a
4    third-party.  It doesn't say anything about whether you have
5    the authority under 105 to enter injunctions in regard to
6    managing your case, avoiding negative impacts on the Diocese.
7    We cited three cases, or four cases, in our briefs,
8    specifically post  *rd e* that specifically said
9    notwithstanding Purdue, and as the Court knows, while there's
10   a very interesting decision and I thought the dissent was
11   very interesting, the holding was very narrow, right.  They
12   made -- they said we don't talk about all of these other
13   things.  We're just talking about third-party releases.  So I
14   thought it was interesting because I read footnote 2 again
15   and all it says is you can't use 105 for a third-party
16   release.  That doesn't address the point.  There's no
17   question that you have the authority to enter a Preliminary
18   Injunction under 105(a), notwithstanding Purdue.
19       And, in fact, my understanding is is that Judge Lane --
20   so Judge Lane as you know took over for Judge Drain in White
21   Plains.  And so as soon as the  *rd e  har a* decision came
22   down from the Supreme Court, I think it was the next day,
23   Judge Lane entered a 105 injunction and said nobody is suing
24   the Sacklers (phonetic) until you get back into court and we
25   address the issues, et cetera.  So there's no question you

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1   have the authority to issue a 105 injunction.

2       There was a lot of discussion about this issue.  I was

3   in court November and I said we had a resolution -- or not

4   resolution, you know, we had moved the carriers to a good

5   number.  And we went to mediation and I wasn't able to share

6   the number.  The facts are the number's been shared.  There

7   is no issue about it.  The Committee knows -- I will not

8   share the number.  I'm sensitive to the mediation privilege.

9   But the number has been shared and the Committee has had it

10  and they've had it for quite a while.  So there's no issue.

11  I know Mr. Scharf had to make a big deal about that but the

12  bottom line is they have the number and the number is large.

13  I will not get into the amount.

14      You know, there's been a lot of discussion about test

15  cases, right.  And as I indicated, for our hearings on 10/10,

16  which, frankly, we're going to ask you to adjourn because we

17  need extensive discovery concerning that.  Test cases don't

18  work.  Respectfully, test cases don't work.  The facts of

19  these cases are absolutely unique.  What occurred to these

20  individual survivors is obviously horrendous but it was

21  individualized facts.  We respectfully submit test cases

22  don't, don't work.  So you get a judgment on a unique set of

23  facts concerning one situation.  I don't think that that

24  translates over to say, okay, now everyone on every case here

25  has a value of whatever it was.

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1     Now I would respectfully submit there's a flaw in regard

2  to the approach to try to use test cases and, as I indicated,

3  and we'll put it in our responses to the October 10 hearing.

4  We have no, no understanding of how they got to the test

5  cases.  We've had no involvement in the test cases.  We're

6  going to ask for discovery.  I want to understand what their

7  thought process is.  If they cherrypick what they think are

8  the best cases so that they're going to, quote, ring the bell

9  as the state court counsel like to talk about, right, that's

10  not indicative.  That's just taking -- you know, it's a bell

11  curve but they're taking on the fringe.  The idea is to take

12  a mix of cases if we ever got to that point.  Test cases in

13  your opinion do not work because these are individualized

14  torts, they're horrendous, but they're specifically fact

15  relevant to each particular survivor.

16     **THE COURT:**  Well, let me ask.  We have over 800

17  lawsuits.  Some probably have serious liability.  Some

18  probably have very weak cases.  It probably goes the gamut.

19  You can pick out the worst cases where there's going to be

20  big judgments and you're going to find there may very well be

21  some cases in there where it's going to be no cause of

22  action.  What's to prevent the Diocese from cherrypicking

23  their own cases and saying, well, we want these 17 cases to

24  be heard in state court and if you get judgment by summary

25  judgment in favor of the Diocese, so be it?  You could do the

103

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1    same thing if you wanted to.

2        **MR. DONATO:**  We could but, as I've indicated and as I'll

3    conclude:  It's not time.  It is not time.  It is still

4    appropriate to pause and focus on the mediation.  But to

5    answer your question directly, you're right.  If we ever got

6    to that point, the Diocese could propose, or have some

7    discussion about, you know, test cases.  But my first comment

8    was upon further reflection, we don't think test cases work.

9    These are individualized torts with their own facts.  I do

10   not think that there is really a tremendous amount of

11   precedential value for these test cases because they're so

12   unique and, unfortunately, terrible.  So, I guess that is

13   possible.  But, of course, as I'm going to argue here in a

14   moment, at this stage the Preliminary Injunction should be

15   extended.

16       I've made the comment that Mr. Scharf uses the phrase

17   "we" or the word "we".  And I just respectfully request that

18   we need to focus on their role versus the state court counsel

19   role.  Somebody blows an answer, that's not the Committee's

20   job, okay.  You're handling -- you're representing clients in

21   a bankruptcy case and you miss a deadline, Creditors

22   Committee can't come running in to try to save you, and

23   that's what's happening.  That's inappropriate.  The

24   Creditors Committee is out of its lane in regard to the

25   default judgment procedures.  They shouldn't even be heard

104

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1    and that's why I respectfully submit there's been no

2    opposition from anyone with skin in the game, so to speak,

3    and I request the evidentiary order on default procedures.

4         The comment about the "haves" and the "have-nots", I

5    think that this is absolutely critical.  You know, Judge

6    Cangilos-Ruiz before she retired in the Syracuse case talked

7    about the "haves" and the "have-nots" and basically she said,

8    you know, you can tell me that you won't enforce the

9    judgment -- speaking to the Creditors Committee -- but she

10   said the bottom line is you're going to have an unsecured

11   survivor with an unliquidated claim standing next to a

12   secured or a survivor with a judgment, you may not enforce

13   the judgment.  That will give a leg up.  That will create

14   disparate treatment when it comes time to negotiate plan

15   treatment -- and this is Judge Cangilos-Ruiz making these

16   observations -- that the individual that has the judgment is

17   going to say whoa, whoa, whoa, I got the judgment.  I went

18   through all this pain.  I retold my story.  I did the state

19   court trial, et cetera, I deserve more.

20        I think that that's a slippery slope.  We have to be

21   extremely careful about having a situation where you have

22   unsecured claims and you have unsecured judgment claims which

23   probably doesn't make any sense but I think that that's a

24   key, key piece and I don't think -- I think the Committee's

25   trying to have you take the bait.  And I think taking that

105

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1    bait brings us down an avenue that we should not be because

2    survivors are unsecured claims.  And putting them in a

3    position of some having judgments and some not, I believe is

4    absolutely inappropriate and sets forth disparate treatment

5    between the two -- between the unsecured creditors.

6        I appreciate the fact that the Committee will explore

7    the proposal that I talked about from Judge Harner.  I

8    appreciate that.  And I agree with Mr. Boyd, the purpose is

9    to talk to the Bishop but it was in bankruptcy court and

10   obviously they spoke to Judge Harner, as well.  But we think

11   that that would be a very good healing process.  And I think

12   Mr. Boyd indicated that -- I think he was pleased with what

13   transpired in Baltimore.  So I think that that's something,

14   in addition to entering the order on a default procedures, I

15   think that that's something that we can implement today -- or

16   start to implement today to move forward.

17       Mr. Scharf indicated he wants to talk to the Committee.

18   Obviously that's appropriate and he should do that but I

19   would anticipate this is the opportunity.  We have been

20   accused of muffling the victims, tamping down the victims.

21   We are doing nothing of the kind.  And, frankly, we're making

22   it easier, rather than having a survivor have to testify in a

23   deposition with five lawyers in a room, all that kind of

24   stuff, objections, et cetera, versus having the peace and

25   comfort of being able to talk directly to you and the Bishop

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1   in a private setting.  So I appreciate the Committee's

2   willingness to explore this.  And I think it, I think it's

3   definitely something we should do.

4       I'm a little puzzled at my adversary, Mr. Scharf,

5   starting to cite TV shows to you, okay, I don't know what

6   he's talking about.  You know, he's got -- as I indicated, I

7   objected (extraneous noise) because I thought there was some

8   testimony going on.  You know, he wants you to be watching

9   the TV or something.  So I didn't get that.

10      Just a comment on the no aggregate limits.  Mr. Scharf

11  continues to say '73 to '86, no ag limits, no impact on the

12  Diocese, et cetera.  He continued.  He didn't address it with

13  you.  He didn't address the per occurrence limits.

14      And what could happen is there could be a resolution

15  whereby an insurance carrier pays a claim against the Parish

16  and then takes the position it's the same occurrence.  So if

17  there's liability also for the Diocese, take the position

18  it's the same occurrence so that their occurrence limits

19  actually do dissipate shared insurance.

20      My adversary doesn't want to talk about that.  He just

21  wants to say no aggregate limits, no aggregate limits.  But

22  when you have occurrence limits, you have a wasting or

23  eroding possibility on joint, on joint policies.

24      In regard to Mr. Boyd's testimony -- excuse me, his

25  presentation, in fact, I thought he did testify.  I make the

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1  observation and I think one of the carriers made it, as well,

2  this motion has been pending for a very long time and it

3  would seem to me that instead of having Mr. Boyd testify to

4  you about stuff that he may or may not actually know, this

5  should be in the pleading.  We should have an opportunity.

6  He says oh, no, no, it's not going to take very long but by

7  the time he was done, he said it's going to be at least two

8  years.  He didn't even talk about dispositive motions, right.

9  We've been doing this a long time.  Besides the paper

10  discovery, the depositions, all that kind of discovery, then

11  there's always a period for dispositive motions.  So you got

12  to add that piece in.  So we're more like two and a half to

13  three years away.  And as we've observed, I think the

14  Committee's trying to give you the most optimistic timeframe.

15      So I appreciate the fortitude of Mr. Boyd because he

16  didn't come in and say we're going to get this wrapped up in

17  six months.  But, frankly, by not talking about dispositive

18  motions -- and, also, what's the basis for the Committee or

19  Mr. Boyd saying there would be preference to the CVA actions?

20  What I mean by that is there may be some chatter about CVA

21  actions generally should be moved quickly.  There's nothing

22  that I've seen -- again, I didn't have an opportunity to

23  respond because it was all oral today -- there's nothing I

24  have seen in regard to the -- I'm sorry.  I lost my train of

25  thought here.  Sorry.

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1      So, there's no basis that a CVA claim in this case would

2   jump the line to move ahead of other CVA cases.  So there may

3   be some general things saying courts move CVA cases, okay.

4   But there's nothing, nothing that I'm aware of and, frankly,

5   I'm going to ask you to extend the Preliminary Injunction and

6   if my adversary wants to submit a pleading on this, we'll at

7   least have an opportunity to respond because, again, I think

8   most of Mr. Boyd's presentation is testimony about what's

9   going on in the state court action.

10      Today we're asking you to pause a little bit further.

11   We're asking you not to open the floodgates.  We're asking

12   you to direct the parties back to mediation.  We are asking

13   you to replace the mediators with the Rockville Center

14   mediators.  We are asking you to approve the default

15   procedures motion.  We are asking you to approve a procedure

16   so that we will start to file 362(a)(3) stay violation motion

17   so that you have it in front of you in order to address that.

18      As I had shared with you, there are hundreds and

19   hundreds of cases based on the evidence in the record,

20   Mr. Murray's declaration, that shared insurance is impacted

21   548 I think is what I had said and we think that that makes

22   sense because we do -- and, again, you had made the

23   observation in your own decision that that could be a basis

24   for a stay violation.  And, therefore, we would like to set a

25   procedure, obviously proper notice, give our adversaries

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1    enough time to respond, have a reply and then set a time for

2    oral argument so that this Court can make its determination

3    on a 362(3)(A) issues.

4         We ask, of course, that the Judge Harner scenario, you

5    know, be implemented.  And what we ask for short time period

6    is for you to enter a preliminary or continue the Preliminary

7    Injunction.

8         We're going to have hearings on October 10.  We are, we

9    are going to be asking that those hearings be moved.  We have

10   extensive discovery issues that we have.  I know it's not

11   before you.  I just want you to be aware.  We have extensive

12   discovery issues.  There's a tremendous amount of

13   self-serving statements in those motions that we are going to

14   want to explore.  So we'll put our pleadings in and address

15   the court, you know, on October 10th about those issues but I

16   did want you to be aware that we believe we have significant

17   discovery needs in regard to those motions.

18        **THE COURT:**  So on October 10th, you're going to raise

19   that issue?

20        **MR. DONATO:**  Exactly.  I mean, I could say:  Your Honor,

21   I want discovery but, you know, I think it's more appropriate

22   for us to file a pleading.  Contrary to what my adversary

23   did, right.  They could have filed a pleading talking about

24   the state court delays and they just came up and testified.

25   What we'll do is we'll file a pleading, set forth our reasons

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1   for, you know, our opposition, et cetera and obviously we can

2   address that on October 10th.

3       But there is no reason at this stage to open the

4   floodgates.  There is no injury and there's no hurt that's

5   going on.  Let's direct these parties back to mediation.

6   Let's keep the short leash on it like we talked.  30 days.

7   Mandatory 30 days, no scheduling, don't have to chase anybody

8   around about mediation, I've got this, I've got that.  Has to

9   happen once a month and we have to have a report to you at

10  least giving you something -- I would presume through

11  hopefully the new mediators.

12      And that's what I would ask at this stage to enter the

13  Preliminary Injunction, to allow that process to occur and,

14  respectfully, I think that is the best way to go.

15      If you deny the Preliminary Injunction and allow the

16  floodgates to open, I do not believe that will help.  You

17  asked Mr. Lyster a tough question.  You said, you know, can I

18  just -- you didn't say it this way but could you open the

19  floodgates but also mediate.  And we have great concerns

20  about that because what our adversary says we want the

21  floodgates open because we've got to set values.  So, based

22  on what Mr. Boyd said plus my piece about dispositive

23  motions, we're two and a half years away.  So it's

24  inconsistent.  If you're going to mediate, you mediate.  But

25  if you're going to litigate, then they say, well, okay, I got

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1    to get determinations of value.  That's not going to happen

2    for two and a half years.  That's what I'm concerned about.

3    I've seen this case and that is why I'm asking -- go ahead,

4    your Honor.

5        **THE COURT:**  Let me ask.

6        Denying the motion doesn't necessarily mean opening the

7    floodgates, whatever that means.  I mean, I could deny this

8    motion, say I'm not going to give you a universal stay but

9    that everybody needs to be aware that Section 362 will still

10   apply in many instances and then they have to decide whether

11   362 applies.  And for many attorneys -- I'm not speaking for

12   anyone in particular -- but for most attorneys they want a

13   comfort order before they start moving, risking the

14   possibility of a contempt proceeding.  So even if I were to

15   say motion denied for you, they may have to sit back and say

16   well am I subject to 362 notwithstanding the decision of the

17   court to deny a Preliminary Injunction?  And then they'll --

18   many, I'm not saying all --

19       **MR. DONATO:**  No.

20       **THE COURT:**  -- but many careful lawyers will still bring

21   a 362 motion.  We see it all the time on our stay relief

22   calendar.  People come here and they say:  Judge, we don't

23   think the stay applies but in an abundance of caution, we

24   want to confirm that with you.

25       So, are we really opening the floodgates if I deny your

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1  motion?

2      **MR. DONATO:**  I think you are.  What I would say is:  Not

3  today.  If we can't get this resolved, there probably will be

4  a day.  But not today.

5      We've got an opportunity to choose new life here.  If

6  you crack the door open -- and you are right, there's no

7  question we are on this.  So if somebody goes ahead and

8  starts moving ahead and impacting our shared interest but

9  that's a totally different deal.  Now I'm coming in here, I'm

10  pursuing sanctions against lawyers that I'm also trying to

11  mediate with to settle.  That's not a good mix.  That's an

12  oil and water kind of thing.

13      You know, I mean, we're all professional but it's a

14  little hard -- I go ahead and make an application to hold

15  Mr. Boyd in contempt, it's going to be a little hard for me

16  to walk across the street and say:  Hey, Mr. Boyd how about

17  we settle the case.  I think that that's going down a

18  dangerous, dangerous, you know, avenue.  And not today.

19  That's all.  And just see.  For now put us back in the

20  mediation room, direct these parties to get back together.

21  Follow Judge Kressel's direction that he set every Diocese

22  case that has been filed that's gotten to the end, has

23  resulted through mediation.

24      If -- I don't know, your Honor, if you're following

25  Rockville Center but I am.  I appear at just about every

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1    hearing.  If you want to follow the most contested intense

2    vitriolic case, that's it.  And if these mediators can pull

3    this off, we should have them here.  We can get this case

4    done.

5        Thank you, your Honor.

6        **THE COURT:**  Mr. Scharf, you also asked an opportunity

7    for rebuttal.

8        **MR. SCHARF:**  Thank you, your Honor.

9        Start with I just pulled up the CVA online.  Section 4,

10   and I'm quoting:  Establishes a special trial preference for

11   cases which have been revived pursuant to this Act.

12       So this is a statutory case, your Honor, trial

13   preference.

14       Your Honor, we've been here for four and a half years.

15   We're approaching year five.  The Diocese's consistent

16   position has been:  Not today.  Not today.  Not today to

17   allow litigation to go forward.

18       Today is the day to deny them Preliminary Injunction.

19   Today is the day to allow the parties to begin the litigation

20   process.  We recognize that cases are not going to go to

21   trial tomorrow.

22       Mr. Lyster raised concerns that, as did Mr. Donato, that

23   we will not be able to negotiate if litigation is proceeding.

24   And that is not correct.  We can always negotiate.  And if

25   it's appropriate, we can go back to mediation.  We can walk

1 14

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1   and chew gum at the same time.  So they are not binary

2   options.  We can do both at the same time.  And allowing

3   litigation, certain -- denying the Preliminary Injunction --

4   and we'll hear some more argument on the 10th about allowing

5   litigation to go forward -- will move the cases forward.

6       Mr. Donato started off by expressing confusion as to why

7   the Committee was taking the lead here.  The Committee is

8   entirely composed of survivors.  The Committee speaks for the

9   survivors with one voice in this case in an organized way.

10  The Committee has standing to do so and it's appropriate for

11  the Committee to do so and it's appropriate for the Committee

12  to weigh in on anything the Diocese is doing with respect to

13  survivors.  And your Honor has allowed us to do that.  We

14  thank you for that and we will continue to do so to the best

15  of our ability.

16      We also note that there has been no motion made to

17  request mediation.  It was raised in the response filed

18  yesterday.  I think the Diocese is asking you to order it

19  sua sponte or to come to the process sua sponte.  We ask

20  that, to the extent anything is teed up, it be done so on a

21  proper motion on notice making it (indiscernible) 14 days,

22  just to give us an opportunity to understand it, and let's go

23  forward.

24      With respect to the defaults, I don't really need to get

25  back into that discussion but, again, just want to reiterate

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1   the Committee is speaking because it's not just defaulting

2   law firms.  We're trying to default survivors and its

3   process, we think, is not a good use of the state resources

4   for the Diocese to be engaging in that kind of process that

5   they've proposed.

6        We did not propose filing 700 separate default motions.

7   We think 10 test cases probably makes sense and we can

8   address the fact because the fact patterns are all pretty

9   similar, if not identical.  And that would just be a lot less

10  onerous all around.

11       It's interesting that Mr. Donato says he doesn't want to

12  seek sanctions against people and then try to mediate with

13  them but he's perfectly happy -- the Diocese is perfectly

14  happy submitting these all for default on this particular

15  issue.

16       So, the Diocese opines, the Parishes opine and argue

17  that test cases don't work because we don't really have test

18  cases.  We, quote, unquote, they say -- they accuse us of

19  cherrypicking cases.  We selected a wide range of cases and

20  we'll address that at an appropriate time.

21       The Diocese has refused to engage in a discussion about

22  an orderly process and that's clear here today.  They've

23  refused to engage in a process to go forward and have a

24  finite number of litigations continue.  It seems to be an

25  all-or-nothing proposition with the Diocese.  If the Diocese

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1  thinks we have cherrypicked cases, come back to us and we're

2  happy to consider a more fulsome process with cases that the

3  Diocese may wish to use (phonetic).

4      Sorry, I'm responding to a lot of argument.  I

5  apologize.  I'm just going over my notes here.

6      There's not going to be 800 cases going forward, as

7  Mr. Lyster said.  Some of them are stayed by the fact that

8  the Diocese is in the caption and those can be subject to a

9  separate stay relief process.  And some of the cases may be

10  brought before you on a separate stay relief motion.  Parties

11  will have to assess what is going on.

12      The Diocese, insurance companies talked about the fact

13  that they have provided the insurance number to the Diocese.

14  I really -- that opened the door.  I want to respond without

15  disclosing the number.

16      On February -- on November 28th we were promised that

17  when we show up to mediation on November 29th and 30th, we

18  were going to be given a number from the insurers.  We were

19  not.  Not on those dates.  We got a number from the insurers

20  shortly before August 17.  Clearly the number --

21      **UNIDENTIFIED SPEA ER:**  Your Honor, I object.  I don't

22  think this is really relevant (indiscernible) and the basis

23  of what occurred is not supported by a declaration.

24      **THE COURT:**  Go ahead.

25      Let me -- we all know that mediation only works, if at

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1  all, because the judge doesn't know what's happening in the

2  mediation.

3      **MR. SCHARF:**  Okay.

4      **THE COURT:**  So let me -- I accept your rep -- that

5  there's two perspectives at least, that there may have been a

6  hard number given, maybe there wasn't as hard as somebody

7  else thought.  That's not going to affect my outcome of what

8  I'm going to decide.  So let's move on in that instance.

9      **MR. SCHARF:**  We're open to -- there's been a lot of

10 citations to the Diocese -- discussion about the Diocese of

11 Rockville Center.  I would like to respond to Mr. Schiavoni's

12 three points that there's no pleading or declaration about

13 this.

14     I think what we're doing is we have, we have pointed

15 your Honor to the decisions in Rockville Center, to the

16 record in Rockville Center, to the record in other cases.  In

17 the opposition we filed today and the opposition we filed

18 last November which we incorporated by reference, and

19 everything we're doing now is arguing and the question about

20 what is the effect of those decisions, the effect of

21 litigation proceeding, that's clearly counsel's opinion.

22     (Extraneous noise)

23     **MR. SCHARF:**  The Diocese has one perspective.  We have a

24 different perspective, and we shared that with you.  So I

25 don't think that's an --

                                                             118
        In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016


1          (Extraneous noise.)

2        **MR. SCHARF:**  -- appropriate objection.  Frankly, there

3    is --

4          (Extraneous noise.)

5        **MR. SCHARF:**  -- an insurance Adversary Proceeding

6    pending.  From our perspective maybe that should go forward

7    at this point, as well.  That's a discussion for a different

8    day but it's been raised by the insurance companies.

9          We'll note in the Diocese of Rockville Center there has

10   been insurance litigation that has proceeded in the District

11   Court and it would in all likelihood proceed in the District

12   Court because the reference is the insurance companies seem

13   to file motions to withdraw the reference automatically in

14   these cases.  And so that litigation has been proceeding in

15   the District Court since the Rockville Center case filed and

16   there has been no adverse impact on the Diocese's insurance

17   and we've come to resolution, I believe, in those cases.

18       **THE COURT:**  Well, at least we'll find out somewhat, if I

19   were to grant stay relief, we'll find out at least part of

20   that question of whether or not they're going to provide a

21   defense.

22       **MR. SCHARF:**  Yes.

23         And then in terms of the aggregate limits and the

24   occurrence limits, I think that our adversary is conflating

25   two issues.  There's the per occurrence limits which is the

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1    indemnity amount that's paid for the judgment, for the

2    verdict, that goes to the plaintiff.

3         And, you know, there's a per occurrence limit of

4    300,000.  That's what you get for each occurrence.  That

5    doesn't deplete the available defense costs.  The record is

6    very clear on that.  And, your Honor, I think has the

7    policies in front of him -- in front of you from the last

8    Preliminary Injunction hearing so it's in the record and it's

9    the same record that's being relied on.

10        Your Honor, maintaining the status quo right now puts us

11   at risk and the likelihood of having the status quo back here

12   whenever the next motion for Preliminary Injunction is teed

13   up or if there's no litigation going forward, we are very

14   concerned that the status quo we have today and the impasse

15   we have today will continue into the future.

16        Cases need to get to litigation.  Parties settle as

17   cases proceed -- sometimes on the courthouse steps, sometimes

18   before.  But we need to have that process moving forward,

19   even though we recognize it will be some time before cases

20   get to trial.  We can continue negotiation during that time.

21        And we think that the stay should not be granted, the

22   Preliminary Injunction should not be granted and, of course,

23   we'll be here in a couple of weeks on the motions for stay

24   relief.

25        **THE COURT:**  All right.  Thank you.

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1    I sometimes hesitate to ask but I always ask but is

2    there anything else that anyone wants to say?

3    (No response.)

4    **THE COURT:**  All right.  Thank you.

5    I took considerable time yesterday and today trying to

6    prepare my thoughts so you're going to get a partial decision

7    out of me but that's all you're going to get today, and I

8    want to give you some direction of where I think the concerns

9    of the court are.

10    It was only yesterday that I learned that the mediation

11    had problems.  I'm not saying that it fell apart but it's

12    obvious that there are problems with it, with the process.

13    And why is that?  It's the nature of mediation.  The Court

14    appoints a mediator and the instruction -- the implicit

15    instruction of the Court is try to mediate this but don't

16    tell me anything about it.  And there's a simple reason

17    because I, if the mediation doesn't succeed, then I have to

18    decide the merits of the case and I should not know the facts

19    that were given in confidence during the mediation process.

20    I have to hear only admissible evidence and proof and not the

21    arguments or the shouting or whatever goes on in the

22    mediation process or the representations made which may not

23    include admissible evidence.

24    So, I have no idea what was happening with the

25    mediation, nor should I.  And it was only yesterday in the

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1    papers as I was reading the sup -- the reply affidavit that

2    it started to appear that the mediation was having some

3    trouble.  And at least the just by the mere suggestion that

4    another mediator should be selected or added on.  I'm not

5    going to speak to what I'm going to do on that mediation,

6    other than to say that that's just something that's new to me

7    in terms of information on the status of the mediation.

8        It was in 2021 when I was first asked to appoint a

9    mediator.  It may have been in December of 2020, that I

10   accepted the argument that mediation would save tremendous

11   delay in trying to get a result that was beneficial for

12   victims.  And that argument was presented by the Diocese and

13   it was supported by the Creditors Committee.  And there was

14   essentially no opposition to that motion.

15       And then about a year later, there was a request for the

16   appointment of a second mediator which I also accepted and

17   now we're going into not -- almost four years since we

18   first -- not quite four years but almost four years since the

19   notion of a mediator was first identified and addressed.

20       I'm going to have to give some thought to that as to

21   whether or not another mediator is appropriate or whether we

22   need to just move forward as if we have no mediator and hope

23   that everyone will work together to try to come up with a

24   settlement in the meantime.  I'm not ruling against a

25   mediator.  I'm not ruling in favor of it.  I'm just saying

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1   that I have to give that some thought.

2       We have before us really two motions and I'm just going

3   to address those two motions today.  This is really a part of

4   a series of motions.

5       We have 17 independent motions that have been filed for

6   consideration on October 10th.  And those are 17 motions by

7   individual claimants who are seeking permission to proceed to

8   trial with their claims against the Diocese.  And I recognize

9   that much of the argument today, as good lawyers always do,

10  they try to get the issue before the judge to give a

11  preliminary thought in terms of argument and I recognize it

12  but it is what it is.

13      Much of the argument today really isn't about today's

14  motion.  It's about the motions on October 10th.  And all

15  proper but it's really about the motions on October 10th and

16  I'm not going to rule on those 17 motions until we come to

17  October 10th.

18      What I do have in front of me are two motions.

19      The first is a motion asking for me to impose a broad

20  stay for the benefit of Parishes.  I'm going to reserve

21  decision on that and will issue a written opinion in due

22  course.

23      We have a second motion asking for a procedure to assert

24  default judgments.  The second motion I'm going to adjourn to

25  December 10th as well.  I agree with Mr. Scharf that he

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1   really has not had adequate opportunity to go and address a

2   motion of that significance and I think that I should give

3   him that additional time to go and do that.  But beyond that,

4   there is, I want to tell you what issues bother me with that

5   motion so you can address them.  I'm not making a ruling on

6   this but I'm letting you know what's bothering me about that

7   motion.

8       We're dealing with bankruptcy rule 7055 which says that

9   applications for default judgment in bankruptcy proceedings

10  are governed by Rule 55 of the Federal Rules of Civil

11  Procedure.  The Federal Rules of Civil Procedure allow the

12  entering of a default judgment in one of two ways.  If it is

13  a complaint for a dollar judgment, a default judgment can be

14  entered by the check of the court.  If it is a request for

15  something else, then it has to be entered by the Court.

16      And that's what we have.  We don't have a request for a

17  dollar judgment saying you owe me $10 and, therefore, there's

18  no response, give me a judgment for $10.  That's the clerk

19  can enter.

20      What you're asking for here is injunctive relief and the

21  rules are quite clear, I think, on this.  Rule 55(b)(2), it

22  says the Court may conduct hearings or make referrals when to

23  enter or effectuate judgment, it needs to conduct a hearing,

24  determine the amount of damages, establish the truth of any

25  allegation by evidence, or investigate any other matter.

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1     So before I grant a judgment by default, I can

2  investigate anything I want.  Or I think that's relevant -- I

3  wouldn't say anything that I want but anything that's

4  relevant to the matter.  And if, indeed, I deny a Preliminary

5  Injunction, which would suggest that I'm going to deny any

6  injunction beyond what Section 362 already provides, then

7  taking a default makes no relevance because even if someone

8  has defaulted, if I'm not going to give you the relief

9  anyway, it doesn't make any sense to proceed.  And I think

10 you'll have some sense on that when I issue my written

11 decision on the first motion of whether or not I'm going to

12 allow a preliminary or temporary injunction for the benefit

13 of the various Parishes.

14     And we've addressed this already, I think, seven times

15 and there were times when I thought it was appropriate --

16 limited but appropriate, and many of those times were with

17 support from the Creditors Committee who, as Mr. Scharf has

18 appropriately indicated, he represents victims.  And I

19 recognize that.  And he supported in many instances some of

20 those Preliminary Injunctions.

21     Initially I was concerned that we didn't even have the

22 information.  We didn't even know whether there was

23 insurance.  And so I granted a Preliminary Injunction to

24 allow the collection of that information.  Then we allowed

25 various other temporary injunctions for a variety of reasons,

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1   one of which was to allow the mediation to proceed.  And then

2   most recently and there were -- this came at least twice

3   before the Court, the Court had concerns as to the effect of

4   the  *rd e  har a* decision.

5       I'm sure most everyone here knows what the  *rd e  har a*

6   decision is.  It's a decision by the Supreme Court that

7   changed the applicable law that occurs in this District.  We

8   previously were subject to the rulings of the Second Circuit

9   relative to granting an injunction and a plan for the benefit

10  of third-parties.  It was the decision in  *rd e  har a* of

11  the Second Circuit that was appealed and was reversed.  And,

12  so, whatever the Second Circuit says was fine and dandy when

13  that was the applicable law.

14      Now that it's been reversed by the Supreme Court, I have

15  to apply the Supreme Court decision to what I'm going to deal

16  with in the motion that's before me today.  And so we knew

17  that this was coming.  The Supreme Court granted permission

18  to argue the case, I believe, last November.  It was set for

19  last year.  It was set for oral argument, I believe in

20  December.  And in its wisdom the Supreme Court took until

21  June 27th to issue its decision.

22      And this is the first time in this case, although I just

23  published another decision just a few weeks ago dealing with

24   *rd e  har a*, this is the first time in the Diocese case

25  that I have to decide:  What is the impact of the  *rd e*

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1    *har a* decision of the Supreme Court on the ability of this

2    Court to grant an injunction for the benefit of Parishes?

3        And I think that is of such interest that I want to put

4    it in writing. And so I'm going to do that.

5        So, the two motions before me you have what I've -- I've

6    addressed them. The motion for a Preliminary Injunction, I'm

7    going to write on. The motion for setting a procedures for

8    default judgment, I have concerns about but I think it's only

9    fair to both sides and all sides to have an opportunity to

10   address those. And since you're already going to be here on

11   December 9th -- October 10th, I'm adjourning that till

12   October 10th and I'll hear arguments.

13       But we have to consider those arguments in light of what

14   I'm going to decide on the other motion for a Preliminary

15   Injunction and I will try my best -- as I don't have a bevy

16   of associates to help me with the writing. I do the writing

17   myself. And I will try my best to get that out to you in

18   advance of October 10th so you have the benefit of my

19   thoughts and we'll certainly make that available for your

20   consideration and review.

21       If there's other parties who are just listening that

22   want to be on the email list of that decision when I render

23   it, we would be happy to add you to the list. So I know we

24   have representatives of the press here. If you want the copy

25   of it when I issue it, we'll send it out the same afternoon

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1   just let my staff know and we'll be happy to go and share

2   that with you.

3       But I want to reserve decision on the main issue today.

4       Aside from that, the arguments raise a host of other

5   issues and I'm not going to address them today.  We're told

6   that some people think there's a need for a new mediator.

7   Some people think that I need to -- I may need to take other

8   actions.  I think I do need to take other actions because now

9   that the mediation has a problem, we got to move forward.  I

10  don't want this to be a case like what Charles Dickens

11  described in *Bleak Ho se* where parties were litigating for

12  years and years and the litigation only stopped when the

13  monies available to pay legal fees ended.

14      So we're not going to get into that posture.  I don't

15  want us to end up in that posture.  And so I'm very concerned

16  on how to bring this matter forward.  The arguments I accept

17  fully by everybody:  That the victims have suffered for a

18  long time, and I recognize that this has been a long case.

19  But when everybody came to me saying please allow for

20  mediation, that's the best way to try to achieve a result, I

21  accepted that.  And I think that was we tried.  And I

22  publicly thanked Judge Kaplan and Judge NeMoyer.  They tried.

23      If it's not to be, we got to come up with a plan B,

24  whether that's a new mediator or whether that's pressing the

25  matters toward conclusion in some other fashion, that I'm

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1   going to have to give consideration to.  I'm reserving on

2   that question.

3        At the moment I'm thinking of the possibility of a Case

4   Management Order of some kind.  I'm thinking of the

5   possibility of a status conference as allowed by Section 105.

6   I haven't decided that because, as I said, this is a new

7   problem about which I was not aware until yesterday when I

8   read the reply brief, which I think was filed yesterday.  So

9   it's -- and we read it as promptly as we could.

10       So, I'm not sure where I'm going, whether I'm going to

11  ask for a status conference or not but I'm giving thought to

12  those issues.  So on the main issue, I'm reserving decision.

13       Are there any questions?

14       MR. DONATO:  Just one.  It's just a procedural.  I

15  understand the adjournment and I think you did originally say

16  December 10th, but I know --

17       THE COURT:  If I said December -- the only calendar

18  matter that we have -- well, we have a return date for the

19  sale of the seminary property later in October but the date

20  that we have for the 17 motions for stay relief is on

21  October 10th.

22       MR. DONATO:  The only thing --

23       THE COURT:  So this is being adjourned to October 10th.

24       MR. DONATO:  Sure.  And all that works fine.

25       And I'm wondering does it make sense to set a date that

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1    the Committee would file its response so that we could file a
2    reply and have a full opportunity to present on October 10th?
3    I presume it's not going to be beneficial for the Committee
4    to file the objection the day before anyway because you've
5    got to have an opportunity.  So I don't know if that
6    makes any sense.  Maybe you could file it on the --
7         **MR. SCHARF:**  How about five days before the hearing?
8         **MR. DONATO:**  That's fine.
9         **THE COURT:**  That's fine.
10        **MR. DONATO:**  Okay.  Thank you.
11        **THE COURT:**  I take -- when we have a major case, I try
12   to get here early with the recognition that -- I practiced
13   law for 18 years before I took this job, and I recognize that
14   people got time squeezes.  And if somebody -- and just so
15   everyone knows, if a document comes in late, we will make our
16   best efforts -- obviously, if it comes in two minutes before
17   10 o'clock, it's just impossible to read it.  But as long as
18   it comes in a reasonable time, we try to accommodate that.
19        And the last thing I did yesterday before I left for
20   home was to check the docket to see if anything else was
21   filed because we try our best to go and keep on top of that.
22   But we try not to get cranky.  So try to not give us cause to
23   do that and get it in in a reasonable amount of time so that
24   I can read it, okay.
25        **MR. SCHARF:**  I'll certainly try to check the Monday

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1   Night football schedule before we submit any further motions.

2       **MR. DONATO:**  Yeah, good point.

3       **THE COURT:**  At least in this town everybody was happy.

4   All right.

5       Anything else?

6       (No response.)

7       **THE COURT:**  All right.  One other thing.  What time are

8   we scheduled on October 10th?

9       **THE CLER :**  October 10th at 11 a.m.

10      **THE COURT:**  All right.  I have been known to just go on

11  forever without breaks.  There's a lot to be argued on

12  October 10th.  I will try to build in a short break sometime

13  if it's going to be going for a lengthy time.

14      **MR. SCHARF:**  Since we noticed up the motion, if it makes

15  sense, if the Court has time, we can move it up to 10 a.m.

16      **THE COURT:**  Everyone's been noticed at 11 so we'll leave

17  it at 11.

18      **MR. DONATO:**  Understood.

19      **THE COURT:**  And we'll take it from there.  Okay.

20      (WHEREUPON, proceedings adjourned.)

21

22

23

24

25

In Re: Diocese of Buffalo - BK 20-10322/A.P. 01016

1

2

3                          *           *           *

4                     CERTIFICATE OF TRANSCRIBER

5

6            In accordance with 28, U.S.C., 753(b), I

7    certify that this is a true and correct record of proceedings

8    from the official audio recording of the

9    proceedings held in the United States Bankruptcy Court

10   for the Western District of New York before the

11   Honorable Carl L. Bucki on September 24, 2024.

12

13

14   S/ Diane S. Martens

15   Diane S. Martens
     Transcriber
16

17

18

19

20

21

22

23

24

25

# CONSOLIDATED APPENDIX DOCUMENT NO. 16

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NEW YORK
--------------------------------------------------------

In re

     THE DIOCESE OF BUFFALO, N.Y.,          BK 20-10322 CLB


                      Debtor.                <u>DECISION & ORDER</u>
--------------------------------------------------------

                  **Bond, Schoeneck & King, PLLC**
                  Stephen A. Donato, Esq., of counsel
                  One Lincoln Center
                  Syracuse, New York 13202-1355
                  Attorneys for The Diocese of Buffalo, N.Y.

                  **Blank Rome LLP**
                  James R. Murray, Esq., of counsel
                  1825 Eye Street NW
                  Washington, District of Columbia 20006
                  Attorneys for The Diocese of Buffalo, N.Y.

                  **Pachulski Stang Ziehl & Jones LLP**
                  Ilan D. Scharf, Esq., of counsel
                  780 Third Avenue, 34th Floor
                  New York, New York 10017
                  Attorneys for Official Committee of Unsecured Creditors

                  **Burns Bair LLP**
                  Timothy W. Burns, Esq., of counsel
                  10 E. Doty Street, Suite 600
                  Madison, Wisconsin 53703-3392
                  Special Insurance Counsel for Official Committee of Unsecured
                  Creditors

                  **Elsaesser Anderson, CHTD.**
                  J. Ford Elsaesser, Esq., of counsel
                  320 East Neider Avenue, Suite 102
                  Coeur d' Alene, Idaho 83815
                  Co-Counsel for Parish Steering Committee

                  **Goldberg Segalla LLP**
                  Jonathan Schapp, Esq., of counsel
                  665 Main Street
                  Buffalo, New York 14203-1425
                  Attorneys for Employers Insurance Company of Wausau and
                  Wausau Underwriters Insurance Company

BK 20-10322CLB                                                                 2

> Plevin & Turner LLP
> Miranda Turner, Esq., of counsel
> 1701 Pennsylvania Ave, NW, Suite 200
> Washington, District of Columbia 20006
> Attorneys for The Continental Insurance Company
>
> O'Melveny & Myers LLP
> Adam P. Haberkorn, Esq., of counsel
> 1301 Avenue of the Americas, Suite 1700
> New York, New York 10019-6022
> Attorneys for Pacific Employers Insurance Company
>
> Patrick H. NeMoyer, J.S.C. (Retired)
> 80 Squire Drive
> Orchard Park, New York 14127
> Mediator
>
> John - AB714Doe
>
> Office of the U.S. Trustee
> Joseph W. Allen, Esq.
> Olympic Towers
> 300 Pearl Street, Suite 401
> Buffalo, New York 14202

Carl L. Bucki, Chief U.S.B.J., W.D.N.Y.

Pursuant to 11 U.S.C. § 105(d), we now consider limitations and conditions that might promote a more expeditious and economic handling of this case.

The Diocese of Buffalo, N.Y., filed a petition for relief under Chapter 11 of the Bankruptcy Code on February 28, 2020. No one questions the enormous complexities of this case. More than 900 claims have been filed by parties seeking to recover damages for alleged instances of sexual abuse. Insurers have disputed coverage, and for some claims, insurance appears not to exist. Meanwhile, the Diocese reports a

need to restructure its operations.  To this end, it has announced the closing or merger of more than half of its affiliated parishes.  Monthly operating reports indicate financial losses.  The debtor has filed asset schedules which suggest access to limited resources for the satisfaction of claims.  All the while, the debtor has paid more than $17 million on professional fees and expenses.

In a previous opinion in this case, we observed that "[g]iven the complexity of issues, contested litigation will take years if not decades to complete." *In re Diocese of Buffalo*, 634 B.R. 839 (Bankr. W.D.N.Y. 2021).  For this reason, we have urged all parties to work in good faith for a settlement.  To assist this process, we have appointed respected retired judges to serve as mediators.  On several occasions, at the debtor's request, we granted temporary stays of litigation against parishes and affiliates, in order to allow time to focus on settlement negotiations.  We have authorized the Diocese to employ an insurance archivist to complete an exhaustive search for insurance polices.  Of course, some delays are inevitable, such as those caused by a need to await the deadline for filing claims.  But despite best efforts to achieve a settlement, negotiations have thus far failed.  As this case approaches the fifth anniversary of its filing, no plan of reorganization has been proposed.  Concerned for this lack of progress, the Court directed the debtor and invited all interested parties to attend a status conference on December 11, 2024.

Section 105(d)(1) of the Bankruptcy Code states that on its own motion, the Court "shall hold such status conferences as are necessary to further the expeditious and economical resolution of the case." Additionally, subdivision (2) of section 105(d)

provides that unless inconsistent with another provision of the Bankruptcy Code or with the Federal Rules of Bankruptcy Procedure, the Court "may issue an order at any such conference prescribing such limitations and conditions as the court deems appropriate to ensure that the case is handled expeditiously and economically."

Enacted in 2005, section 105(d)(2) grants authority to mandate steps that will advance the development of a confirmable plan. Under the statute, these broad powers may be exercised only after the status conference that is permitted under the first subdivision of section 105(d). Here, at the conference on December 11, we allowed full opportunity for all interested parties to offer their recommendations regarding the management of this case. Having carefully considered all comments, we now issue the directions recited hereinafter. The Court will divide its discussion into three parts: first, the continuation of negotiations with assistance of an additional mediator; second, the imposition of limitations and conditions on mediation; and third, the scheduling of proceedings to confirm the availability of estate assets.

Continuance of Mediated Negotiations

Due to the failure of negotiations, the Court is increasingly reluctant to restrain the litigation of disputes. Thus, on September 30, 2024, we denied the debtor's motion for another temporary stay of actions against parishes and affiliates. *See In re Diocese of Buffalo*, 663 B.R. 197 (Bankr. W.D.N.Y. 2024). Then on November 22, 2024, we granted limited stay relief to 17 claimants seeking to determine abuse claims against the Diocese itself in state court. *See In re Diocese of Buffalo*, ___ B.R. ___, 2024 WL 5001744 (Bankr. W.D.N.Y. 2024). Nonetheless, as stated in the later of these

decisions, we reject any suggestion "that stay relief and mediation are preclusive alternatives. Our decision to grant stay relief does not prevent concurrent discussions and may even create additional incentives for serious negotiations." 2024 WL 5001744, at *4. Accordingly, we now look to promote and encourage the continuation of settlement discussions.

The debtor as well as the Creditors' Committee and various other interested parties have urged the appointment of an additional mediator. Previously, the Court expressed its reluctance to consider this possibility without first hearing the views of one of the current mediators. *See In re Diocese of Buffalo*, __ B.R. __, 2024 WL 5001744 at *4 (Bankr. W.D.N.Y. 2024). The December 11th conference provided an opportunity to receive this input.

The Honorable Patrick NeMoyer, a retired Justice of the Appellate Division of the New York State Supreme Court, has served as the primary mediator for the past two years. At the status hearing, Justice NeMoyer expressed his belief that the selection of an additional mediator with bankruptcy experience might facilitate a settlement. Justice NeMoyer advised that he would remain available to assist the quick involvement of any additional mediator. The position of the current mediator is not inconsistent with the request of debtor's counsel to allow negotiations for several more months. Fearing that the parties may have reached an impasse, the Court does not want further discussions to serve as an excuse for delay. However, at the status conference, we also heard the assurances of numerous counsel that their clients desire to resume mediation in good faith.

BK 20-10322CLB                                                          6

Litigation is expensive in both dollars and delay.  To avoid these costs, the parties must renew their commitment to seek a fair and realistic settlement.  Based on representations at the status conference, the Court finds that the appointment of an additional mediator is necessary and appropriate to facilitate a resolution. If such efforts are not successful in the near term, however, we may have no reasonable alternative but to compel a more robust resumption of litigation, particularly on issues such as insurance coverage.

The various parties have suggested the names of several potential mediators. Most are retired judges and all appear well qualified to serve in this role.  At the current stage of negotiations, however, the Court prefers not to show deference to the views of any participant.  Instead, we have conducted an independent consideration of qualified candidates.  Based on this review, the Court has selected Melanie Cyganowski to serve as mediator.  As a retired bankruptcy judge for the Eastern District of New York, Cyganowski enjoys broad knowledge and experience in the field of bankruptcy law.  In addition, her background includes familiarity with the community that the debtor serves.  She previously resided in Buffalo and has conducted scholarly research on the practice of law in this region.  *See* Melanie Cyganowski & H.A. Zionts, *Survey: The Buffalo Polish-American Legal Experience*, 30 Buff. L. Rev. 161 (1981). Perhaps most significantly, before making its selection, the Court spoke with Judge Cyganowski and was impressed with her knowledge of and familiarity with the special challenges of a Diocesan bankruptcy.

## Limitations and Conditions of Mediation

Mediation is appropriate when used to facilitate a more prompt resolution of disputes. No one should view the continuation of mediated negotiations as a departure from a commitment to resolve this matter as quickly as practicable. All creditors deserve a resolution of their claims. The debtor is entitled to seek the opportunity of a fresh start. With a desire to advance these objectives, the Court will impose the following additional protocols:

1. All parties are directed to cooperate and to attend any session at which the mediators may request their presence. If any party refuses to participate, Mediator Cyganowski may contact the Court by simple letter to request the issuance of an Order to Show Cause why active engagement should not be compelled.

2. The debtor shall pay the fees and expenses of the mediator, but shall be reimbursed for one-half of those fees and expenses by the Reimbursement Defendants identified on Schedule 1 to the prior mediation order of March 31, 2023.

3. Without offering any details about discussions, the mediator shall report periodically to the Court about whether the parties are making progress in their negotiations.

4. September 1, 2025, is set as the deadline by which the debtor shall file a disclosure statement and plan of reorganization. Upon a demonstration of adequate progress in negotiations, the Court might allow a short extension of this deadline. If the debtor is unable to file a disclosure statement and plan within the time limit, the Court will consider a fuller resumption of litigation, including but not necessarily limited

to actions involving the scope of insurance coverage in either state or federal court.

The Court otherwise places its trust in the appointed mediators, and will therefore mandate no particular methodology for negotiations. For example, Mediator Cyganowski may choose to conduct sessions remotely or in person. At all times, upon proper motion, any party may seek further guidance from the Court.

Availability of Assets

At the status conference, the debtor reported that it had committed to pay at least $100 million toward a settlement. In response to questions about the source of any such funds, counsel advised that the Diocese might utilize proceeds from the liquidation of real property that is titled either in the debtor's own name or in parishes that are now being closed.

Section 1129(a)(3) of the Bankruptcy Code allows confirmation of a plan only when it "has been proposed in good faith and not by any means forbidden by law." A concern is whether some properties are held in trust for a particular purpose and might therefore not be available to fund a settlement. As they proceed with negotiations, parties must realize that the availability of real estate proceeds is in question. To resolve this uncertainty and thereby to facilitate the development of a plan that the Court can confirm, we need to begin the process of determining the accessibility of assets, particularly under the *cy pres* doctrine of New York law.

On July 18, 2024, the Diocese filed a motion to authorize the sale of real property that had been previously used as a seminary at 711 Knox Road in East Aurora, New York. During a hearing on that request, the Court asked about the same

issue that we identify above as to whether the sale proceeds might be subject to an implied trust. For this reason, in approving the sale, the Court signed an order on November 20, 2024, which stated that the proceeds "shall not be disbursed except as directed by further order of the Court." Inasmuch as the parties will soon resume settlement negotiations, the time has come to determine the availability of seminary proceeds. Are these funds general assets of the Diocese, or are they held in trust to fulfill the specific intentions of donors? The answer may determine whether proceeds are an asset of the estate that are available to fund a plan. See 11 U.S.C. §541(d). Accordingly, the Court directs the debtor to seek access to these funds by motion to be set for hearing no later than the end of February 2025. Notice of this motion should be served on the Official Committee of Unsecured Creditors, on the Parish Steering Committee, on the Office of the United States Trustee, and on all parties who have requested service of papers. To assist the Court with its deliberations, the debtor's moving papers should include a report about the source of funding for property acquisition and development. At the hearing, the Court will entertain argument from any person claiming a beneficial interest in the property. We also invite other motions to clarify the availability of proceeds from parish properties.

Conclusion

For the reasons stated herein, the Court will appoint Melanie Cyganowski, a retired bankruptcy judge from the Eastern District of New York, to serve as a joint mediator to assist with negotiations regarding the terms of a plan of reorganization. All parties shall follow the aforesaid guidelines for mediation. By appropriate motion,

BK 20-10322CLB                                                                    10

the debtor shall move for authority to use proceeds from the sale of the seminary

property. Otherwise, to the extent allowed under 11 U.S.C. § 105(d)(2), the Court will

reserve the option to issue further orders prescribing such limitations and conditions

as may be appropriate to ensure the expeditious and economic handling of this case.

    So ordered.

Dated: January 13, 2025
      Buffalo, New York

_____
Hon. Carl L. Bucki, Chief U.S.B.J., W.D.N.Y.



FILED

JAN 1 3 2025

BANKRUPTCY COURT
BUFFALO, NY

# Notice Recipients

District/Off: 0209−1              User: admin                    Date Created: 1/13/2025
Case: 1−20−10322−CLB            Form ID: pdforder              Total: 11

**Recipients of Notice of Electronic Filing:**

| | | |
|---|---|---|
| aty | Adam P. Haberkorn | ahaberkorn@omm.com |
| aty | Ford Elsaesser, Jr | ford@eaidaho.com |
| aty | Ilan D Scharf | ischarf@pszjlaw.com |
| aty | James R Murray | Jim.Murray@BlankRome.com |
| aty | Jonathan Schapp | jschapp@goldbergsegalla.com |
| aty | Miranda Turner | mturner@plevinturner.com |
| aty | Stephen A. Donato | sdonato@bsk.com |
| aty | Timothy W. Burns | tburns@burnsbair.com |

TOTAL: 8

**Recipients submitted to the BNC (Bankruptcy Noticing Center):**

| | | | | |
|---|---|---|---|---|
| smg | Office of the U.S. Trustee | 300 Pearl Street, Suite 401 | Olympic Towers | Buffalo, NY 14202 |
| | Elsaesser Anderson, CHTD. | J. Ford Elsaesser, Esq., of counsel | 320 East Neider Avenue, Suite 102 | Coeur d' Alene, Idaho 83815 |
| | Patrick H. NeMoyer, J.S.C. (Retired) | 80 Squire Drive | Orchard Park, New York 14127 | |

TOTAL: 3

# CONSOLIDATED APPENDIX DOCUMENT NO. 17

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | |
| The Diocese of Buffalo, N.Y., | ) | Case No. 20-[ 10322 ] |
| | ) | |
| | ) | Chapter 11 |
| Debtor. | ) | |
| | ) | |

### AFFIDAVIT OF CHARLES MENDOLERA REGARDING THE DIOCESE'S ASSETS AND OPERATIONS AND IN SUPPORT OF THE CHAPTER 11 PETITION AND FIRST DAY PLEADINGS

STATE OF NEW YORK     )
COUNTY OF ERIE          )  ss.:

Charles Mendolera, being duly sworn, deposes and states as follows:

1.      I am the Executive Director of Financial Administration ("Executive Director") for The Diocese of Buffalo, N.Y. (the "Diocese"). I have worked in the Diocese's finance department since 2004. Prior to being appointed as Executive Director in April 2019, I served as the Diocese's Controller and before that as Director of Accounting. I am familiar with the assets, liabilities and sources of income for the Diocese.

2.      I make this Affidavit based upon: (a) my personal knowledge of certain facts stated herein, (b) information supplied to me by others associated with the Diocese, (c) my review of relevant documents, and (d) upon my experience and knowledge of Diocesan operations. If I were called to testify, I would testify to the facts as set forth herein. I am authorized by the Diocese to submit this Affidavit.

3.      On February 28, 2020 (the "Petition Date"), the Diocese will file a voluntary petition under chapter 11 of title 11 of the United States Code (11 U.S.C. § 101 et seq., the "Bankruptcy Code") commencing its chapter 11 reorganization case (this "Chapter 11 Case").

3501438.2

4.    Contemporaneously with the petition, the Diocese will also be filing a number of motions and applications seeking various types of relief on an expedited basis (collectively the "First Day Motions").  The First Day Motions seek relief aimed at facilitating a smooth transition into this Chapter 11 Case, permitting the Diocese to continue its mission by maintaining employee compensation, maintaining the goodwill and morale of the employees, parishioners, clerics and others who rely on the programs and services provided by the Diocese and preserving and maintaining the property available to satisfy the Diocese's creditors.  I have reviewed each of the First Day Motions and am familiar with their contents.  I respectfully submit that all of the First Day Motions are vital to the Diocese's reorganization efforts and expedited approval of the First Day Motions is important to the Diocese's successful reorganization.

## OPERATIONS

5.    The Diocese, through its central administrative offices (a) provides *operational support* to the Catholic parishes, schools and certain other Catholic entities that operate within the territory of the Diocese (each, an "Other Catholic Entity" or "OCE"); (b) conducts school operations through which it provides parish schools with financial and educational support; (c) provides comprehensive risk management services to the OCEs; (d) administers a lay pension trust and a priest pension trust (collectively, the "Pension Trusts") for the benefit of certain employees and priests of the OCEs; and (e) provides administrative support for St. Joseph Investment Fund, Inc. ("SJIF").

a.    *Operational Support*.  The Diocese provides operational and functional support to the OCEs in the areas of finance, building & properties, legal, human resources,

3501438.2

stewardship and communications, canonical tribunal, schools, evangelization and catechesis, pastoral services and clergy services.

b. ***School Operations***.  The Diocese provides financial support to Catholic elementary and high schools operating within the territory of the Diocese.

c. ***Risk Management***.   The Diocese maintains and manages a risk management program for itself and a large number of OCEs, inclusive of property, liability, Workers' Compensation, short-term disability, etc.  The Diocese also administers a medical self-insurance program which provides coverage to employees of the Diocese and certain other participating OCEs.  The risk management and health insurance programs are more fully described in the discussion below with respect to the Diocese's Self-Insurance Motion (defined below).

d. ***Pension Trusts.***  The Diocese sponsors and administers a priest's retirement plan, and contributes to a frozen pension plan for lay employees, each of which are described in greater detail in connection with the discussion of the Diocese's Wages Motion (as defined below).

e. ***SJIF***.   The Diocese provides administrative support to the St. Joseph Investment Fund, Inc.  SJIF was incorporated as a separate not-for-profit entity in 2006.  The purpose of SJIF is to receive funds from participants (which include the Diocese, parishes and other qualified organizations) that are pooled and collectively invested.   All funds of the participants are separately accounted for by SJIF.  A board of directors oversees the operation of SJIF and an investment committee of the board is responsible for adopting an investment policy and reviewing performance.  The Diocese provides personnel to assist SJIF with accounting and administrative functions.

- 3 -

3501438.2

## REVENUE AND EXPENSES

6.     The Diocese is a not-for-profit Religious Corporation under New York State law. For the past several years, the Diocese's expenses have exceeded its revenue.  Gross revenue for the fiscal year ending on August 31, 2019 ("2018/2019") was approximately $13.1 million while expenses before taking into account certain non-recurring activity were approximately $18.1 million.  Gross revenue for the fiscal year ending on August 31, 2018 ("2017/2018") was approximately $18.1 million and expenses before taking into account certain non-recurring activity were approximately $19.9 million.  In addition, the Diocese has expended nearly $20 million over the past two fiscal years in connection with voluntary settlement payments to abuse victims as part of its Independent Reconciliation and Compensation Program.

7.     The primary source of revenue used by the Diocese to support its operations comes from parish assessments.  The Diocese assesses parishes an annual amount based primarily on historical parish offeratory.  Assessments are due on a monthly basis.  Assessments are collected for general Diocesan purposes and also for the purposes of supporting elementary education and priest retirement obligations.  Additional sources of operating funds include (i) revenue from the annual Fund for the Faith appeal which is run in conjunction with Catholic Charities, (ii) contributions and bequests from the faithful, and (iii) realized investment gains.

## FINANCIAL UNCERTAINTY

8.     On January 28, 2019, the New York State Legislature passed the Child Victims Act (A.2683/S.2440) (the "CVA").  New York's Governor signed the legislation on February 14, 2019. This legislation modified the statute of limitations and created a one-year "window" during which victims of child sex abuse whose claim may have been time-barred may commence a timely civil

- 4 -

3501438.2

action. In addition, the CVA extends the statute of limitations for claims that were not time-barred on its date of passage, permitting such child victims to commence timely civil actions until they reach 55 years of age.

9.    From the opening of the CVA window on August 14, 2019 through the Petition Date, approximately 250 lawsuits have been filed against the Diocese by plaintiffs who are seeking damages as a result of alleged abuse. In addition, demand letters and or notices have been received from other claimants who have not yet commenced lawsuits against the Diocese. The Diocese anticipates that in excess of 400 individuals may assert abuse claims for which they may seek to hold the Diocese responsible. The Diocese may have insurance coverage for some of the CVA claims it will face.

## PURPOSE AND GOALS OF THE CHAPTER 11 FILING

10.    The Diocese does not seek Chapter 11 relief to shirk or avoid responsibility for any past misconduct by clergy or for any decisions made by Diocesan authorities when addressing that misconduct. The Diocese does not seek bankruptcy relief to hide the truth or deny any person a day in court. In fact, the Diocese is committed to pursuing the truth and has never prohibited any person from telling his/her story or speaking his/her truth in public. The Diocese has publicly disclosed perpetrators. The Diocese has made and requires criminal referrals to be made for all credible allegations of sexual abuse. The Diocesan Apostolic Administrator, The Most Reverend Edward B. Scharfenberger has acknowledged past shortcomings by the Diocese and have attempted to offer aid and comfort to victims of abuse. The Diocese has established standards for the training and background assessment of all employees, clerics and volunteers who will likely interact with children and young people.

3501438.2

11.     The Diocese has commenced this Chapter 11 Case in order to (a) provide an orderly claims administration process that will ensure a more equitable distribution of funds to creditors, including victims of abuse; and (b) bring about a reorganization of the Diocese that will ensure that the mission of the Diocese may continue to be fulfilled in service of the Catholic faith.

## **FIRST DAY MOTIONS**

12.     To further the Diocesan mission and continue operations, the Diocese respectfully requests that the following First Day Motions be granted.[1]

I.     **Motion for Entry of an Order Authorizing the Diocese to File Portions of Schedule F, the Master Creditor Mailing Matrix, and Other Pleadings and Documents Under Seal (the "Motion to File Under Seal")**

13.     Many of the unsecured creditors in this Chapter 11 Case are individuals whose claims against the Diocese are premised on allegations of sexual abuse ("Abuse Claimants"). Some Abuse Claimants have filed tort claims against the Diocese following the passage of New York's Child Victims Act (the "CVA Plaintiffs"). Many, but not all, of the CVA Plaintiffs have elected to file their litigation claims against the Diocese pseudonymously, with their real identity to be revealed only to the defendants in the course of litigation and with the understanding that their identities would not be publicly disclosed. Other Abuse Claimants are non-litigants who contacted the Diocese pre-petition, either with or without the assistance of counsel, and asserted claims of abuse by Diocesan employees or agents with the understanding that the Diocese would protect their identities and keep their claims confidential. The Diocese has previously entered into out-of-court settlements with some of those Abuse Claimants where the Diocese agreed to keep

---

[1]  Capitalized terms used but not defined in this affidavit have the meanings ascribed to them in the respective First Day Motions.

3501438.2

the Abuse Claimant's name confidential but did not require the Abuse Claimant to keep the settlement confidential.

14.    In light of the sensitive nature of the claims of the CVA Plaintiffs and other Abuse Claimants, to avoid causing unnecessary additional anguish or embarrassment, and to encourage such individuals to feel safe and secure in advancing their claims without fear of retribution or reprisal, the Diocese submits that it would be inappropriate and potentially harmful to require the public disclosure of identifying information relating to individuals who have, either informally, formally, or through filing a lawsuit, notified the Diocese of allegations of abuse by clergy members or other persons employed by Catholic entities or otherwise subject to Diocesan supervision.

15.    The Diocese has been operating under confidentiality restrictions for some time, and believes that it is imperative that the decision to come forward and identify oneself as an Abuse Claimant be left to the individuals in question, and that such accommodations can be made without adversely affecting the rights of any other parties in interest.

16.    The Diocese respectfully requests permission to protect the identities of CVA Plaintiffs and other Abuse Claimants while providing them notice of this Chapter 11 Case and notice of such events and motions as is required by the Bankruptcy Code and applicable Bankruptcy Rules.  The Diocese further seeks to share names and contact information for CVA Plaintiffs and other Abuse Claimants with the Court and Bankruptcy Clerk under seal.  It is proposed that CVA Plaintiffs and those Abuse Claimants currently represented by counsel be given notices in the Diocese's Chapter 11 Case only through their respective counsel.  The Diocese, through this Motion, seeks leave of the Court to serve notice of this Chapter 11 Case, and other

3501438.2

requisite notices, directly on Abuse Claimants who have advised the Diocese of potential claims but have not yet identified counsel, without disclosing those Abuse Claimants' names or addresses to other parties.

## II. Motion for Entry of Interim and Final Orders (A) Authorizing the Use of Cash Collateral, and (B) Granting Adequate Protection (the "Cash Collateral Motion")

17.     As of the Petition Date, the Diocese is indebted to M&T pursuant to the following transactions and documents:

(i)     On April 1, 2013, the Diocese executed and delivered to M&T that certain Letter of Credit Agreement, pursuant to which the Diocese agreed to reimburse M&T for any payment made by M&T under a letter of credit issued for the benefit of the Diocese (the "LOC Agreement").

(ii)    Pursuant to the LOC Agreement, M&T issued to the New York State Worker's Compensation Board (the "WCB") a letter of credit in the amount of approximately $4.8 million (the "Letter of Credit") to secure the Diocese's obligations under its self-insured worker's compensation program. The WCB has made no attempt to draw upon the Letter of Credit and, upon information and belief, there exists no cause for the WCB to do so.

(iii)   To secure any obligations to M&T that might arise under the LOC Agreement if and when WCB were to draw upon the Letter of Credit, the Diocese (a) deposited approximately $5.1 million in securities into a blocked account (the "Blocked Account") held at M&T pursuant to a Securities Account Control Agreement dated October 11, 2019 (the "SACA"), and (b) granted to M&T a security interest in the securities in the Blocked Account as well as any other property of the Diocese in the possession or control of M&T pursuant to a Security Agreement dated October 11, 2019 (the "Security Agreement" and together with the LOC Agreement, the Letter of Credit, and the SACA, the "Prepetition Secured Debt Documents"). The securities held in the Blocked Account, as well as any cash or other collateral subject to M&T's lien under the Prepetition Secured Debt Documents, are collectively referred to in this Motion as the "Prepetition Collateral."

- 8 -

18.     The Diocese seeks to use cash (other than cash or securities held in the Blocked Account) existing on or after the Petition Date that may be part of the Prepetition Collateral (the "Cash Collateral").

19.     The Diocese has consulted with M&T regarding its continued use of Cash Collateral and M&T supports the relief requested in the Motion.

20.     The Diocese has an urgent need to use Cash Collateral.  Pursuant to the Security Agreement with M&T, the Prepetition Collateral includes, among other things, cash held by the Diocese in several accounts at M&T, including, without limitation, the Diocese's primary operating account (the "Operating Account"), as well as a segregated account for the payment of medical claims under the Diocese's self-insured health plan (the "Catholic Partnership Health Account").

21.     As described more fully in the Diocese's Cash Management Motion (defined below), the Diocese relies upon its Operating Account to collect accounts receivable which are then used to fund other accounts within the Diocese's cash management system from which disbursements for payroll, vendor and utility payments, and other ordinary course expenses are made.  The Diocese also relies upon the cash in the Catholic Partnership Health Account to pay self-insured medical claims.  The Diocese does not have sufficient unencumbered cash in its cash management accounts held at other institutions to fund its business operations and pay operating expenses.  Accordingly, absent the ability to use Cash Collateral, the Diocese would not be able to pay wages, utility charges, medical claims, and other critical operating expenses.

22.     In order to adequately protect any interest M&T may have in the Cash Collateral, the Diocese proposes to grant M&T, to the extent of any diminution in the value of its interest in

3501438.2

the Prepetition Collateral, and effective as of the Petition Date, perfected replacement security interests in, and valid, binding, enforceable and perfected liens (the "Rollover Liens"), on all of the Diocese's cash, deposit accounts, and investment property in the possession of, or subject to the control of, M&T, and all proceeds of the foregoing, whether in existence on the Petition Date or thereafter created, acquired or arising (collectively, the "Postpetition Collateral") provided, however, that the Postpetition Collateral shall not include, and the Rollover Liens shall not attach to, any funds or property held by the Diocese (i) for the purpose of administering its self-insurance or charitable gift annuity programs, (ii) which represent trust fund taxes or employee payroll deductions, or (iii) which are endowed funds or subject to donor restrictions on use.

23.    Because M&T's claim against the Diocese is contingent upon the WCB drawing down the Letter of Credit, and because the value of the Blocked Account is already in excess of M&T's potential exposure under the Letter of Credit, the Diocese submits that the proposed Rollover Liens more than adequately protect M&T's interest (if any) in the Cash Collateral.

24.    The Diocese submits that, for the reasons set forth herein and in the Motion, immediate access to Cash Collateral is necessary to allow the Diocese to continue to operate and to preserve the value of the Diocese's estate for the benefit of all parties in interest.  Moreover, M&T as the sole party with an interest in Cash Collateral has consented to such use.

**III.    Motion for Entry of Interim and Final Orders Authorizing the Diocese to (A) Pay Prepetition Compensation and Reimbursable Employee Expenses, (B) Pay and Honor Medical and Other Benefits and (C) Continue Employee Benefit Programs (the "Wages Motion")**

25.    The Diocese respectfully requests that the Court enter interim and final orders authorizing, but not directing, the Diocese to (a) pay prepetition compensation, reimbursable business expenses, benefit plans, deductions and payroll taxes, all as described herein, (b) pay and

- 10 -

honor medical and other benefit plans, on a post-petition basis, and (c) continue employee benefit programs.

26.    The Diocese's employees are essential to the administration of the Diocese's Chapter 11 Case, preservation of assets and continuation of the Diocese's mission.  In addition to providing religious guidance and facilitating religious services and activities in the Diocese, the Diocese's employees also provide other critical functions including, without limitation, finance, human resources, risk management, informational technology, legal, catholic education, evangelization and catechesis, stewardship and communications, pastoral and clergy services, canonical tribunal, archives and building and grounds maintenance.  Without these employees, the Diocese would be unable to provide these services to individuals of the Roman Catholic faith, parishes and schools within the Diocese and would also be unable to provide necessary support for a plan of reorganization to benefit all creditors.

27.    The Diocese currently (i) employs 138 full-time employees including both non-clergy employees and active priests, and 51 part-time employees (collectively, the "Employees"); (ii) provides direct payments and benefits to 152 retired priests (the "Retired Clergy") and (iii) provides a stipend and benefits to 16 current seminarians (the "Seminarians").  Sixty (60) of the full-time Employees are salaried and 78 are paid on an hourly basis.  Two of the part-time Employees are salaried, and 49 are paid on an hourly basis.  The Diocese also employs 59 per diem employees paid on an hourly basis (the "Temporary Workers").  The Diocese has one Employee entitled to commissions as the Director of Camp Turner.[2]

---

[2] The Director of Camp Turner is entitled to a commission for facility rentals in the amount of 25% of the gross paid rental receipts above the minimum annual rental receipts of $32,000, subject to certain conditions.

3501438.2

28.     The vast majority of the Employees, Retired Clergy, Seminarians and Temporary Workers rely exclusively on the compensation and benefits they receive from the Diocese to provide for their daily living expenses and these Employees, Retired Clergy, Seminarians and Temporary Workers would be exposed to significant financial difficulties if the Diocese were not permitted to continue paying such compensation and benefits in the ordinary course of its business.

29.     To minimize the personal hardship that the Employees, Retired Clergy, Seminarians and Temporary Workers would suffer if prepetition obligations are not paid when due or as expected, and to maintain morale and stability in the Diocese during this critical time, the Diocese seeks authorization to (a) pay and honor, in its sole discretion, certain prepetition claims for the following items, each as described below: Compensation, Reimbursable Business Expenses and Benefit Plans, together with all other benefits that the Diocese has historically provided to its Employees, Retired Clergy, Seminarians and Temporary Workers in the ordinary course of business (collectively, the "Employee Wages and Benefits"), (b) pay all administrative costs associated with Employee Wages and Benefits, (c) continue to pay and provide the Employee Wages and Benefits in the ordinary course of business on and following the Petition Date, and (d) withhold (as applicable) and remit Deductions and Payroll Taxes as described below.

30.     ***Compensation***.    The Diocese's Central Administrative Office non-clergy Employees and Temporary Workers are paid bi-weekly in arrears, through the end of the prior week.  There are 4 days of wages earned by these Employees and Temporary Workers prior to the Petition Date that constitute prepetition wages which are due to be paid on March 12, 2020.  Based upon historical data, the average bi-weekly aggregate payroll for the Diocese's Central Administrative Office non-clergy Employees and Temporary Workers is approximately $228,000,

- 12 -

3501438.2

including applicable taxes and deductions. The Diocese estimates that $91,200 in prepetition payment obligations to non-clergy Employees and Temporary Workers has accrued prior to the Petition Date and remains unpaid.

31.     The Diocese's active clergy Employees (the "Active Priests"), are paid monthly in arrears. Based upon historical data, the average monthly aggregate payroll for the Active Priests is approximately $110,000 including applicable taxes and deductions. The Diocese estimates that $110,000 in prepetition payment obligations to Active Priests has accrued prior to the Petition Date and remains unpaid.

32.     Retired Clergy receive monthly payments of approximately $166,000 per month, inclusive of applicable taxes and deductions. The Diocese estimates that $166,000 in prepetition payment obligations to Retired Clergy has accrued prior to the Petition Date and remains unpaid.

33.     Seminarians average monthly aggregate stipends total approximately $2,500, with no applicable taxes or deductions. The Diocese estimates that no prepetition stipends to Seminarians remains unpaid as of the Petition Date.

34.     The Diocese estimates that total prepetition unpaid compensation for Employees (including Active Priests), Retired Clergy and Temporary Workers as of the Petition Date totals $367,200 (the "Unpaid Compensation"). The Diocese believes that it does not owe any Employee, Temporary Worker or Seminarian a prepetition amount in excess of the $13,650 cap on priority claim amounts imposed by section 507(a)(4) of the Bankruptcy Code. Accordingly, the Diocese is not seeking authority to pay any amount over the $13,650 cap to any Employee, Temporary Worker or Seminarian.

3501438.2

35.    Items of Unpaid Compensation were due and owing on the Petition Date because, among other things:

    a.   the Chapter 11 Case was filed during the Diocese's regular payroll periods;

    b.   some checks issued to Employees, Retired Clergy, Seminarians and Temporary Workers prior to the Petition Date may not have been presented for payment or cleared the banking system and, accordingly, have not been honored and paid as of the Petition Date; and

    c.   Employees, Retired Clergy, Seminarians and Temporary Workers have not yet been paid all their salaries and wages for services performed prior to the Petition Date because the Diocese pays payroll in arrears.

36.    ***Reimbursable Business Expenses***.  Prior to the Petition Date and in the ordinary course of business the Diocese has reimbursed Employees for certain reasonable and customary expenses incurred on behalf of the Diocese ("Business Expenses").  As of the Petition Date, the Diocese's unpaid Business Expenses for Employees total less than $25,000.  In addition, it is possible that certain Employees may have incurred prepetition Business Expenses for which they have not yet submitted requests for reimbursement and will submit such requests to the Diocese after the Petition Date.

37.    The Business Expenses are incurred by Employees on the Diocese's behalf and with the understanding that they will be reimbursed.  Accordingly, to avoid harming Employees who may have incurred Business Expenses, by this Motion the Diocese requests the authority, to be exercised in its sole discretion, to: (a) continue paying Business Expenses in accordance with

- 14 -

3501438.2

prepetition practices; (b) modify their prepetition policies relating thereto as they deem appropriate; and (c) pay all Business Expenses that relate to the prepetition period.

38.    ***Benefit Plans***.    The Diocese provides eligible Employees and their eligible dependents with various employee benefits as follows (collectively, the "Benefit Plans"):

a.    *Medical Plan: Employees*.    The Diocese's health coverage is provided through an independent self-insured health plan (the "Self-Insured Health Plan") for its eligible Employees, as set forth in greater detail in the Diocese's Self-Insurance Motion (defined below). The Diocese pays approximately $98,000 monthly in advance to the Self-Insured Health Plan.  As of the Petition Date, no payments are owed by the Diocese under the Self-Insured Health Plan.

b.    *Medical Plan: Active Priests.*    Employees who are Active Priests are separately insured through Blue Cross Community Blue, and the Diocese pays approximately $155,000 per month to Blue Cross to cover these premiums for Active Priests.  As of the Petition Date the Diocese believes that there are no premium payments owed to Blue Cross for insurance coverage for Active Priests.

c.    *Medical Plan: Retired Clergy*. Retired Clergy are insured through Aetna Silver Script and Supplement Medical Benefit Plan.  Retired Clergy are also reimbursed for Medicare supplement premiums.  The Diocese pays approximately $53,000 per month to Aetna to cover these premiums.  Further, Medicare reimbursement obligations for Retired Clergy are paid monthly and total approximately $22,000 per month, including supplemental pension payments. As of the Petition Date, the Diocese believes that there are no premium payments owed to Aetna. The Diocese anticipates that $22,232 in payments are outstanding for Medicare reimbursements and supplemental pension payments to Retired Clergy as of the Petition Date.

3501438.2

   d. *Dental Plans*.  The Diocese provides dental coverage through Pro-Dental for its eligible Employees. Pro-Dental is paid by the Diocese in arrears based on claims processed, and the estimated amount owed by the Diocese as of the Petition Date is $20,000.  The Diocese pays the entire amount of these monthly premiums for single employees, and for family coverage, $25.00 per month is collected from participating Employees through payroll deductions.

   e. *Vision Plan*. The Diocese sponsors a vision plan for its eligible Employees through VSP Vision.  The entire amount of their monthly premium, approximately $8 per month for a single employee and $21 for family coverage, is paid by participating Employees through payroll deductions.  As of the Petition Date, no vision insurance premiums are owed to VSP Vision by the Diocese.

   f. *Paid Time Off ("PTO")*.  The Diocese provides PTO to its Employees, the amount and accrual rate of which is based generally on an Employee's length of service and level within the Diocese's organization.  Ordinarily, when an Employee elects to take PTO, that Employee is paid his or her regular hourly or salaried rate.  Employees are paid for unused PTO when they cease employment with the Diocese.  The Diocese estimates that its Employees have accrued no greater than $450,000 of accrued but unused PTO as of January 15, 2020.  This amount, however, is not a current cash payment obligation, as Employees are only entitled to cash payment for accrued and unused PTO when employment is terminated.  Any such payout of PTO to a terminated Employee would be subject to the cap imposed by section 507(a)(4) of the Bankruptcy Code for any pre-petition portion of this payment.  Moreover, the Diocese anticipates that its Employees will utilize any accrued PTO in the ordinary course of business, which will not create any cash flow requirements beyond the Diocese's normal payroll obligations.

3501438.2

g.      *New York State Short-Term Disability Insurance*. The Diocese provides short-term disability benefits for all of its Employees as required by New York State law through ShelterPoint Life Insurance Co. The Diocese pays approximately $300,000 in premiums to ShelterPoint Life Insurance Co. each year, in quarterly installments. As of the Petition Date, the Diocese is current with respect to its payment obligations for short-term disability benefits.

h.      *Life Insurance*.  The Diocese sponsors basic life insurance for its eligible Employees. Employees working more than 28 hours per week are eligible for this benefit, which is paid by the Diocese.  Eligible Employees receive life insurance benefits of 1.5x their annual salary, rounded up to the nearest $1,000, with a maximum benefit of $150,000. The Diocese pays Renaissance Life Insurance approximately $1,510 per month, in advance, for this benefit. As of the Petition Date, the Diocese is current with respect to its payment obligations to Renaissance Life Insurance.

i.      *Long-Term Disability Insurance*. The Diocese sponsors long-term disability benefits covering those Employees working more than 28 hours per week. The Diocese pays approximately $1,167.24 per month, in advance, to Northwestern Mutual Life for this benefit. As of the Petition Date, the Diocese is current with respect to its long-term disability insurance premium payments to Northwestern Mutual Life.

j.      *Supplemental Life Insurance and Long-Term Care Insurance*. The Diocese sponsors supplemental life insurance and long-term care insurance for current and former Bishops through Security Mutual Life Insurance Company of New York.  Only three (3) current and former Bishops receive this benefit. The Diocese pays a total of approximately $10,000 annually, in quarterly increments, in advance, to Security Mutual Life Insurance Company of New York for

3501438.2

this benefit. As of the Petition Date, no supplemental life insurance or long-term care insurance premium is owed to Security Mutual Life Insurance Company of New York by the Diocese.

k.      *Paid Family Leave*. The Diocese pays paid family leave premiums for its Employees. This is paid on a quarterly basis to ShelterPoint Life Insurance Co., as administrator for the Diocese's paid family leave program. The approximate annual premium is $200,000, paid quarterly. The Diocese does not have any outstanding obligations for paid family leave premiums as of the Petition Date.

l.      *Flexible Spending Plans*. The Diocese sponsors flexible spending plans (medical/dental and dependent care) for its Employees. P&A Group, Inc. manages the flexible spending plan and charges the Diocese an administrative fee of $189 per month. The Diocese pays the administrative fees on a monthly basis. As of the Petition Date, approximately $47,222 is owed to P&A Group, Inc. for withholdings and administrative fees under the Flexible Spending Plans.

m.      *Health Reimbursement Account.* P&A Group, Inc. manages the Diocese's Health Reimbursement Account and charges the Diocese an administrative fee of $166.50 per month for non-clergy Employees, $390.00 per month for Retired Clergy and $40.50 per month for Seminarians. The Diocese's monthly contribution to the Health Reimbursement Account on behalf of Employees, Retired Clergy and Seminarians is approximately $5,000. As of the Petition Date, no administrative fees are outstanding to P&A Group, Inc. and approximately $5,000 is owed to P&A Group, Inc. for the Diocese's contributions under the Health Reimbursement Account.

n.      *403(b) Plan.* The Diocese also offers non-clergy Employees the opportunity to participate in a defined contribution qualified retirement plan under section 403(b) of the Internal Revenue Code. The Diocese makes a core contribution of between 2% and 6% based on

the age and length of service for each non-clergy Employee, with a further matching contribution of 100% for Employees with 5 or more years of service. AIG Retirement Services administers the plan, and charges a quarterly fee of $20,000, paid in arrears on April 1. As of the pay period end date of February 22, 2020, the Diocese's core contributions and employer matches under the 403(b) Plan were current, however quarterly fees remained outstanding in the amount of approximately $6,600.

        o.    *Retirement Plans.* The Diocese sponsors and administers a Priests Retirement Plan, the Retirement Plan for Secular Priests of the Diocese of Buffalo, New York (Priest Plan) (the "Priest Plan"), a multi-employer, non-qualified defined benefit pension plan covering all priests incardinated in the Diocese of Buffalo. The Diocese also contributes to a defined benefit pension plan for lay employees, the Diocese of Buffalo New York Retirement Plan (Lay Plan) (the "Lay Plan") that was frozen as of January 1, 2016. Upon freezing the Lay Plan, each participant's annual accrued benefit at the normal retirement date would remain the same as it was as of December 31, 2015, except for participants not vested at that time, for which vesting service will continue to be credited beyond January 1, 2016. Contributions to the Lay Plan will continue at a reduced rate until the plan is fully funded. Each of the Priest Plan and the Lay Plan are managed by independent boards of trustees. Plan assets for the Priest Plan and the Lay Plan are invested in separate investment trusts. The Diocese makes contributions to the Priest Plan on a quarterly basis, and as of the Petition Date approximately $700,000 is outstanding for this contribution. The Diocese makes contributions to the Lay Plan on a monthly basis in the amount of approximately $61,300. The Diocese submits this monthly contribution amount, along with the

collected contributions of other Lay Plan participants, to the Lay Plan. As of the Petition Date, no amounts are outstanding for the Diocese's contributions to the Lay Plan.

39.    *Workers' Compensation.* The Diocese provides workers' compensation benefits ("Workers' Compensation Benefits") to all of its Employees and Temporary Workers. These benefits are covered primarily under the Diocese's self-insured workers' compensation insurance program, which is administered by USI Insurance Services, LLC, for the first $600,000 per occurrence with respect to any workers compensation claims. This benefit is also addressed in the Self-Insurance Motion, filed contemporaneously herewith. USI Insurance Services charges $742.50 per claim for indemnification and $160 per claim for medical benefits as an administration fee for each self-insured claim, paid monthly in arrears. The Diocese anticipates that approximately $3,000 in obligations to USI Services, LLC is owed as of the Petition Date.

40.    Excess workers compensation coverage is provided by Star Insurance Company. The annual workers' compensation premium paid to Star Insurance Company is approximately $130,000 and was paid annually in July for the Diocese's 2019-2020 fiscal year. The Diocese does not believe there are any outstanding payments due to Start Insurance Company for excess workers compensation coverage premiums.

41.    Failure to maintain workers compensation insurance could result in the institution of administrative or legal proceedings against the Diocese and its officers. By this Motion, the Diocese seeks authority to continue paying and/or contesting in good faith, as appropriate in the Diocese's business judgment, all amounts related to workers' compensation claims that arose prior to the Petition Date, including, without limitation, any payments to insurers required as a result of

- 20 -

such claims and wage loss makeup obligations, as they become due in the ordinary course of the Diocese's business.

42.    ***Deductions***. During each applicable pay period, the Diocese routinely withholds certain amounts from Employees' pay that the Diocese is required to transmit to third parties. Some examples of such withholding include HRA and FSA contributions, 403(b) contributions, United Way donations, child support payments, wage garnishments, and other pre-tax and after-tax deductions payable pursuant to certain of the benefit plans discussed herein (such as an Employee's share of health care benefits and insurance premiums, legally-ordered deductions, fees and assessments and miscellaneous deductions) (collectively, the "Deductions").

43.    The Diocese forwards the Deductions to the appropriate third-party recipients.  On average, the Diocese deducts approximately $24,000 in non-tax items from its non-clergy Employees' paychecks each bi-weekly pay period and an additional $4,000 in non-tax items from Active Priests' monthly paychecks. Retired Clergy's monthly Deductions are approximately $55,000.  Due to the commencement of the Chapter 11 Case, however, certain Deductions that were deducted from Employees', Active Priests' and Retired Clergy payments may not have been forwarded to the appropriate third-party recipients prior to the Petition Date.

44.    ***Payroll Taxes***. Further, the Diocese is required by law to withhold from its Employees' wages amounts related to federal and state income taxes and Social Security and Medicare taxes for remittance to the appropriate federal or state taxing authority (collectively the "Withheld Amounts").  On average, the Diocese pays approximately $24,800 in payroll taxes, including deductions from its non-clergy Employees' paychecks and employer contributions, for each bi-weekly pay period and an additional $17,000 for Active Priests for each monthly payroll.

3501438.2

Approximately $14,000 in payroll taxes, including deductions from Retired Clergy monthly payments and Diocese contributions, is paid for Retired Clergy. The Diocese must match from its own funds Social Security and Medicare taxes (collectively, the "Employer Payroll Taxes" and, together with the Withheld Amounts, the "Payroll Taxes"). The Diocese believes that accrued but unpaid Payroll Taxes as of the Petition Date totals $56,000.

45.     The Diocese believes that the Deductions and Payroll Taxes, to the extent that they remain in the Diocese's possession, constitute monies held in trust and therefore are not property of the Diocese's bankruptcy estate. Accordingly, by this Motion the Diocese seeks authorization, but not direction, to forward any unpaid Deductions and Payroll Taxes to the appropriate third-party recipients and taxing authorities and to continue to forward the Deductions and Payroll Taxes to the appropriate third-party recipients and taxing authorities on a post-petition basis, in the ordinary course of business, as routinely done prior to the Petition Date.

46.     In order to retain Employees and Temporary Workers and support Retired Clergy and Seminarians in furtherance of the Diocese's mission, the Diocese must have authority to pay or otherwise satisfy the Employee Wages and Benefits as summarized above. The amounts requested to be paid pursuant to this Motion are reasonable compared with the importance and necessity of the Diocese's payments to Employees, Retired Clergy, Seminarians and Temporary Workers and the harm that these individuals and the Diocese would likely suffer if these amounts are not paid.

47.     The Diocese's books and records indicate that in no instance should the amount owing to any Employee on account of the Employee Wages and Benefits as of the Petition Date exceed the sum of $13,650, which amount is allowable as a priority claim under sections 507(a)(4)

3501438.2

and 507(a)(5) of the Bankruptcy Code. Moreover, the Diocese only seeks authority to make payments to Employees up to the combined statutory maximum of $13,650 on account of wages and compensation earned within 180 days before the date of the filing of a petition, allowed as a priority claim under section 507(a)(4) and contributions to employee benefit plans allowed as a priority claim under section 507(a)(5).

48.    As part of the relief requested in the Wages Motion, the Diocese also seeks authority to pay the Deductions and Payroll Taxes to the appropriate third-party recipients and taxing authorities. Indeed, certain of these amounts are not property of the Diocese's estate because they have been withheld from paychecks on another party's behalf. *See* 11 U.S.C. § 541(b). The Deductions principally represent earnings which Employees, Retired Clergy, Seminarians and Temporary Workers have designated for deduction from Employee paychecks and payment to third-party recipients. The failure to pay the Deductions could result in significant hardship. It is even possible that garnishments from wages result in funds that are not the Diocese's property, but rather must be withheld from paychecks for payment to third parties. Moreover, if the Diocese cannot remit these amounts, Employees, Retired Clergy, Seminarians and Temporary Workers may face legal action due to the Diocese's failure to make these payments. Additionally, the failure to pay Payroll Taxes may subject the Diocese and its officers to federal or state liability.

49.    Based upon the foregoing, the Diocese respectfully requests that the Court enter an Order authorizing the Diocese to pay or otherwise satisfy, in the ordinary course of business, the Employee Wages and Benefits. Such relief is justified because the failure to pay any such amounts will likely disrupt the services that the Employees, Retired Clergy, Seminarians and Temporary

Workers provide to the Diocese and ultimately, the Diocese's ability to successfully administer its Chapter 11 Case.

**IV.     Motion for Entry of Interim and Final Orders (I) Authorizing the Continued Maintenance of the Diocese's Self-Insurance Programs; and (II) Authorizing the Payment of Prepetition Obligations in Respect Thereof (the "Self-Insurance Motion")**

50.     The Diocese requests that the Court enter interim and final orders allowing the Diocese to continue to maintain its self-insurance program for property, casualty, workers' compensation and both general and automobile liability risks (the "SIP") and its self-insured health program (the "SIHP", and, collectively with SIP, the "Self-Insurance Programs"). The Diocese also seeks entry of an order authorizing, but not directing, the Diocese in its discretion, to pay any prepetition claims, premiums, defense costs, obligations and administrative costs related to the Self-Insurance Programs, and authorizing banks to honor checks and other withdrawals, whether for pre- or postpetition periods, for amounts representing payments or reimbursement of claims payable under the Self-Insurance Programs. To the extent coverage may be available under the Self-Insurance Programs' policies for claims made pursuant to the New York Child Victims Act (the "CVA"), the Diocese is not seeking authority to pay such claims at this time. The Diocese proposes to address all CVA claims, as well as any insurance coverage which may be available to cover them, in connection with its plan of reorganization.

51.     An order granting the requested relief is necessary to minimize unnecessary disruption to the Diocese and other participants in the Self-Insurance Programs and to continue the insurance coverage funded with their premium payments. The Diocese is not requesting the assumption or rejection of any executory contracts in connection with this Motion.

3501438.2

52.    ***The Self-Insurance Program***.  The Diocese has implemented the SIP as a means

of ensuring that the Diocese and certain Other Catholic Entities (collectively, the "SIP

Participants") have adequate insurance protection at a reasonable price by spreading risk among a

large number of participants and leveraging their collective buying power to secure excess

coverage at favorable rates.

53.    Under the SIP, the Diocese coordinates and administers a self-insurance program

providing coverage and risk management services for itself and each of the SIP Participants.  The

SIP currently provides self-insurance coverage, subject to applicable excess policies, for (i) direct

and indirect property loss, business interruption and equipment breakdown (ii) general liability

claims, including personal injury, employee benefits, sexual misconduct, employment practices,

directors and officers, school board legal liability, cyber liability, errors and omissions, as well as

automobile liability, and (iii) workers' compensation.

54.    The SIP utilizes third party insurance brokers to assist the Diocese in purchasing

appropriate excess coverage and administer various risk management programs.  The SIP also

utilizes third party claims administrators to oversee the administration and payment of workers'

compensation claims in compliance with New York State statutes.

55.    The Diocese funds the SIP primarily by billing each SIP Participant a ratable

portion of the projected overall cost of administering the program and paying claims, using

allocation methodologies which take into account numerous different ratable exposure bases.  The

Diocese strives to achieve a consistent and fair allocation of premium costs among the SIP

Participants.  For fiscal year 2019-2020, the Diocese has budgeted approximately $7.4 million in

premium revenue related to the SIP. This premium revenue is used to pay administrative costs of the program, to pay claims for losses, and to pay premiums for excess coverage.

56.     Under the SIP, the Diocese is responsible for paying all claims for losses by any SIP Participant, up to the point of available excess coverage. The Diocese has a $100 million excess policy with Travelers which provides coverage for property and business interruption losses in excess of the $500,000 Diocesan self-insured retention ("SIR") on a per occurrence basis. For general and automotive liability, the Diocese is responsible for paying claims of up to the $250,000 per occurrence SIR, with $14.75 million of excess coverage provided through National Catholic Risk Retention Group and an additional $25 million through W.R. Berkley. The Diocese also pays the first $600,000 per occurrence with respect to any workers compensation claims. Claims above the $600,000 SIR are paid by an excess insurance carrier, currently Star Insurance Co. If there are surplus SIP Funds remaining at the end of a fiscal year after payment of all costs and expenses related to the program, such surplus funds are deposited by the Diocese into a segregated reserve account and used to offset future obligations under the program.

57.     The Diocese employs two full-time claims professionals with a combined sixty years of insurance claims handling experience who establish the case-specific reserves for each claim as well as calculate the reserves necessary to satisfy unknown claims that may have been incurred but not yet reported in accordance with standard insurance industry practice. As of the Petition Date, the SIP program had established case-specific reserves in the amount of approximately $350,000 for property damage claims, $2,850,000 for non-CVA general liability claims, and $7,200,000 for workers compensation claims. Reserves for workers compensation claims are either held directly by the New York Workers Compensation Board or held in an

3501438.2

investment account at Wilmington Trust (a subsidiary of M&T Bank) to collateralize a letter of credit issued by M&T Bank in favor of the Workers Compensation Board. All other program reserves are invested in the St. Joseph Investment Fund.

58.     The SIP provides a practical, cost-effective way to manage risk for the SIP Participants under a single, comprehensive insurance program. If the SIP is not continued, the Diocese, together with each of the SIP Participants, will be forced to purchase separate insurance policies covering each entity and their respective properties. Upon information and belief, each of the Diocese and the other SIP Participants would incur substantially higher costs to obtain their own individualized insurance (with or without a retention or deductible) than what they are currently assessed under the SIP. Moreover, without the broad collective risk profile provided by the SIP, certain types of coverage and available coverage limits may simply not be available on an individualized basis or on commercially reasonable terms.

59.     The Diocese seeks to continue to maintain the SIP for itself and on the behalf of the SIP Participants and to pay claims under the SIP in accordance with past practice and in the ordinary course of business. The Diocese believes that the maintenance of the SIP is in the best interest of the estate and its creditors.

60.     ***The Self-Insured Health Program***. The Diocese also coordinates and administers the SIHP, which provides voluntary self-insured medical coverage for Diocesan employees, employees other Catholic entities, and their dependents (the Diocese, together with such other participating employers, the "SIHP Participants"). The SIHP currently provides health insurance coverage for approximately 408 individuals.

- 27 -                                                                3501438.2

61.     The SIHP utilizes a third-party administrator to assist the Diocese in processing claims and establishing appropriate financial contributions for the SIHP Participants and their employees.    Independent Health Association, Inc. ("Independent Health") serves as the administrator.  Independent Health administers SIHP coverage through First Choice, a self-funded, tailored-network plan available for large group employers in Western New York.

62.     As the administrator for the SIHP, Independent Health evaluates reimbursement claims submitted by healthcare providers, determines the appropriate amounts owed, and coordinates payment of claims.  Independent Health bills the amount of any allowed claims and a per-capita administrative fee to the SIHP on a bi-weekly basis.  The dollar value of claims payable to Independent Health in any given billing cycle varies depending upon the medical services utilized from time to time by SIHP beneficiaries.  The administrative fee paid to Independent Health is, on average, approximately $15,000 per month.

63.     Each of the SIHP Participants pays premiums to cover the costs of providing coverage for its respective employees and their dependents under the SIHP.  SIHP premiums are paid on a per-head basis and are calculated based upon the prior year's claim experience.  In the event the SIHP experiences claims in excess of those budgeted, all SIHP Participants are required to contribute additional funds on a ratable basis to ensure the program remains fully funded.  All funds related to the SIHP are maintained by the Diocese in a separate segregated account at M&T Bank and are used to pay claims and other costs of administration.

64.     In the event a SIHP beneficiary requires extraordinary levels of medical care, the SIHP maintains a stop-loss policy with HM Insurance Group, Inc. ("HM"), which provides coverage for claims of any individual in excess of $175,000 per year.  Premiums for the stop-loss

policy are paid directly to HM. The Diocese estimates that the ongoing monthly cost associated with maintaining SIHP stop-loss coverage is approximately $19,000.

65.     As of the Petition Date, the Diocese estimates that it has reserves for the SIHP of approximately $1,000,000, which it believes to be sufficient to cover all known and anticipated claims under the program for the current fiscal year.

66.     A majority of the funds used to fund the Self-Insurance Programs are derived from sources other than the Diocese for the purpose of providing risk management services to Other Catholic Entities. The Diocese believes that it holds these funds in trust for the benefit of such Other Catholic Entities and that they are therefore not property of the Diocese's bankruptcy estate. However, to the extent such funds could be characterized as estate assets, the Diocese believes the importance of maintaining appropriate insurance coverage for itself and the other participants in the Self-Insurance Programs without interruption justifies the relief sought in this Motion.

67.     For the reasons described above, and in view of the Diocese's need to maintain appropriate risk management programs to support its reorganization efforts and to ensure continued health care coverage for 408 individuals, authorizing the Diocese to continue to maintain the Self-Insurance Programs and to pay claims and other obligations under those programs in the ordinary course of business is in the best interests of all parties in interest in this case. The continuance of the Self-Insurance Programs is essential to the Diocese's ability to minimize disruption during this Chapter 11 Case and to maximize the value of its estate for the benefit of its creditors. Thus, the Diocese respectfully requests authorization (but not direction) to fully retain in place the existing Self-Insurance Programs and to honor prepetition obligations related thereto.

3501438.2

### V. Motion for Interim and Final Orders (A) Authorizing, But Not Directing, the Diocese to (I) Continue Using Existing Bank Accounts, Banking Practices and Business Forms, (II) Maintain Investment Accounts and Practices, and (III) Continue Using Payment Cards, and (B) Granting Limited Relief from the Requirements of Bankruptcy Code Section 345(b) (the "Cash Management Motion")

68.     The Diocese respectfully requests that the Court enter interim and final orders authorizing the Diocese (i) continue to use, with the same account numbers, its existing Bank Accounts (as defined below), (ii) treat the Bank Accounts as debtor-in-possession accounts; (iii) continue to use, in their present form, all correspondence and business forms (including, without limitation, letterhead, purchase orders and invoices) and other documents relating to its Bank Accounts existing immediately before the Petition Date, without reference to its status as a debtor-in-possession; (iv) maintain its prepetition investment practices, and (v) continue use of certain payment cards.

69.     The Diocese further requests that the Court authorize all banks and institutions at which any of the Bank Accounts are maintained (collectively, the "Banks") to continue to maintain, service and administer the Bank Accounts, including charging any undisputed, outstanding service charges owed to the Banks on the Petition Date, and that each of the Banks be authorized and directed to receive, process, honor, and pay (i) all post-petition checks, drafts, wire transfers and other electronic payment requests (to the extent of funds on deposit) together with (ii) any prepetition checks or payment requests, but solely to the extent they relate to payments or obligations approved by separate order of this Court.

70.     **Bank Accounts**.    In the ordinary course of business, the Diocese utilizes the following accounts to receive, hold and distribute funds (collectively, the "Bank Accounts"), each of which is described in more detail below:

| Account name | Depositary Institution | Last four digits of account number |
|---|---|---|
| Operating Account | M&T Bank | 1200 |
| Diocesan Purchasing Division Account ("DPD Account") | M&T Bank | 5004 |
| National Collections Account | M&T Bank | 6516 |
| Catholic Partnership Health Account | M&T Bank | 1230 |
| Disbursement Account | HSBC Bank | 9447 |
| Dental Account | HSBC Bank | 7226 |
| Payroll Accounts | HSBC Bank | 4140 and 4174 |
| Charitable Gift Annuities Account ("CGA Payments Account") | Key Bank | 5423 |
| Self-Insurance Fund ("SIP Account") | Bank of America | 2016 |
| HRA Account | M&T Bank | 1539 |
| FSA Account | M&T Bank | 1547 |
| Department Bank Accounts | Various | See Exhibit C |

71.    *Operating Account (xx1200)*.  The Operating Account is the Diocese's primary account and is used to hold most of the Diocese's cash and to transfer funds to other Bank Accounts as necessary.

72.    *DPD Account (xx5004)*.  The DPD Account is used by the Diocese's purchasing division to procure goods and services on a collective basis for the Diocese and other Catholic institutions.  By consolidating its purchasing efforts with parishes, schools and other entities, the Diocese leverages the buying power of all participants to obtain better pricing and other terms offered by vendors for volume purchases.  Among other things, the Diocese uses funds in the DPD Account to purchase audio-visual equipment, cafeteria and kitchen supplies, apparel and vestments, office supplies and equipment, and various other church ware and religious goods, and then bills each parish, school or other purchaser for their respective portion of the purchase price.

73.    *National Collections Account (xx6516)*.  The National Collections Account is used by the Diocese to hold monies collected from second offertory collections or other appeals for the purpose of supporting national Catholic initiatives and which are payable by the Diocese to the

3501438.2

United States Conference of Catholic Bishops.  The Code of Canon Law mandates the fundamental principle regarding donor intent.  The canonical principle stipulates that "offerings given by the faithful for a certain purpose can be applied only for that same purpose." *See* Canon 1284 § 3.

74.    *Catholic Partnership Health Account (xx1230)*.  The Catholic Partnership Health Account holds segregated funds collected from participants in the Diocese's Self-Insurance Health Care Plan ("SIHP") and used to pay health insurance claims, administrative costs, stop-loss premiums and other costs related to providing the SIHP.

75.    *Disbursement Account (xx9447)*.  The Disbursement Account is used to pay the Diocese's accounts payable to vendors and service providers for goods and services procured outside of the purchasing department.

76.    *Dental Account (xx7226)*.  The Dental Account is used to fund claims for dental insurance coverage for the Diocese's employees and retired priests.

77.    *Payroll Accounts (xx4140 and xx4174)*.  The Payroll Accounts are used to fund payroll, benefits, and other payments to employees of the Diocese and retired priests.

78.    *CGA Payments Account (xx5423)*.  The CGA Payments Account is part of the Diocese's charitable gift annuity program, which is described in greater detail below.  From time to time, and in accordance with the requirements of the annuity program, the Diocese liquidates securities held in the CGA Investment Account (defined below).  The proceeds of such liquidation are deposited into to the CGA Payments Account and used to make payments to annuitants.

79.    *SIP Account (xx2016)*.  The SIP Account is used in connection with the Diocese's self-insurance program ("SIP") to pay covered property, casualty, workers compensation, automobile and general liability claims, as well as to make payments to carriers for the Diocese's

3501438.2

excess insurance policies.  The Diocese has by separate motion requested authorization to continue the SIP in the ordinary course of business and seeks to continue the use of this account in connection with that request.

80.    *HRA Account (xx 1539)*.  The HRA Account is used to fund contributions to health reimbursement accounts for Diocesan employees who are enrolled in the high deductible health plan.

81.    *FSA Account (xx1547)*.  The FSA Account is funded entirely through employee contributions via payroll deduction and is used to fund those employees' flexible spending accounts.

82.    *Department Bank Accounts*.  The Diocese maintains a number of low-balance accounts which are utilized by various departments within the Diocese for specific purposes related to their respective departmental functions.   A full list of these accounts is attached hereto as ***Exhibit C***.

83.    ***Investment Accounts***.  In addition to its Bank Accounts, the Diocese maintains the following investment accounts in the ordinary course of its business (collectively, the "Investment Accounts"):

84.    *St. Joseph Investment Fund, Inc.*  The Diocese's non-cash investments are held primarily in an account with St. Joseph Investment Fund, Inc. ("SJIF").  SJIF is a not-for-profit corporation formed in 2006 to maintain pooled investments on behalf of the Diocese and various separately incorporated Catholic entities in conformity with Canon Law and the New York State Prudent Management of Institutional Funds Act.  SJIF's affairs are governed by its Certificate of Incorporation and By-laws.  As SJIF is a separate and distinct legal entity, the debts and liabilities

of SJIF lie solely with SJIF and are not guaranteed or payable by the Roman Catholic Church, the Diocese or any other person or entity. Similarly, the debts and liabilities of the Roman Catholic Church and the Diocese are solely their own and are not guaranteed or payable by SJIF.

85.    SJIF's purpose is to maximize investment returns through economies of scale and to provide participants with the opportunity to invest in harmony with the teaching and beliefs of the Roman Catholic Church. SJIF provides for administration and protection of temporal goods, as required by Canon Law. SJIF is exempted from certain federal and state securities laws pursuant to the Philanthropy Protection Act of 1995. *See, e.g.*, 15 U.S.C. §§ 77c(a)(4), 78c(a)(12)(A)(v), 80a-3(c)(10), 80a-3a.

86.    The participants in SJIF include: the Diocese, parishes, cemeteries, and other Catholic entities. As of December 31, 2019, SJIF had approximately $147 million in total assets under management, the majority of which constitute investments by entities other than the Diocese. Of the approximately $21.8 million in Diocesan funds under management, approximately $9.6 million is specifically designated for the payment of retired priest medical benefits, for seminarian programs, and to support the Diocese's obligations under its self-insurance program, and approximately $12.1 million is unrestricted and available for use at the discretion of the Diocese.

87.    SJIF manages both a short-term fund which seeks to provide current income while maintaining liquidity and which invests primarily in investment grade short term debt securities and high quality money market instruments, as well as a long-term fund which seeks to provide a blend of capital growth and current income by investing assets in a blend of equity securities, fixed income securities, institutional commingled mutual funds, and hedge funds of funds, with the goal of achieving the following allocation targets:

- 34 -

| Asset Class | Target % | Permissible Ranges | Target Benchmark |
|---|---|---|---|
| **Equity** | **47%** | **37 - 57%** | |
| Domestic Large Cap | 17% | 12 - 22% | S&P 500 |
| Domestic Small Cap | 7% | 4 - 10% | S&P 600 |
| International Equities | 23% | 17 - 29% | Various non-US equity market benchmarks |
| **Fixed** | **26%** | **10 - 35%** | |
| Domestic Core | 13% | 8 - 25% | Barclays Aggregate |
| Emerging Market | 3% | 0 - 6% | Local Currency Sovereign EM Debt |
| Global Multi-Sector | 5% | 0 - 8% | S&P/Citigroup WGBI |
| Absolute Return | 5% | 0 - 8% | Barclays Aggregate |
| **Alternatives** | **17%** | **12 - 22%** | |
| REITs | 3.5% | 0 - 7% | FTSE NAREIT Equity REIT |
| Natural Resource Equity | 3.5% | 0 - 7% | S&P Global Natural Resources |
| Hedge Fund of Funds | 10% | 7 - 13% | HFRI Hedge Fund of Funds Index |
| **Multi-Asset Managers** | **10%** | **5 - 15%** | |
| Global Asset Allocation | 10% | 5 - 15% | 50%/50% Global Stocks/Bonds |

88.    SJIF is managed by its board of directors, and investment oversight activities are delegated to the board's investment committee. The current members of the board, together with information regarding their qualifications, are as follows (*members of the investment committee are denoted in bold*):

- **Jennifer C. Balbach**, Chair; Partner, Summer Street Capital Partners, LLC; BA, Psychology, Harvard College, Cambridge, MA; MBA, Tuck School of Business at Dartmouth. Ms. Balbach has been a manager of a private equity fund for 19 years and serves on 4 other boards in the Buffalo area.

- **David P. Bauer**; National Fuel Gas Supply Corporation; BA, Accounting, Boston College, Boston, MA. Mr. Bauer has been employed by National Fuel for ten years and is a member of its Retirement Committee, which oversees the trust investments of National Fuel's various retirement benefit plans. Previously employed as a Senior Manager at PricewaterhouseCoopers. He serves on 2 other boards in the Buffalo area.

- Patrick Bohen; Advisor and member of the Leadership Group at Dopkins Wealth Management in Buffalo, NY. He is also a board member of the Leadership Council of The Massachusetts General Hospital Cancer Center. He has a BA in International Relations from Canisius College and over 20 years in the investment and financial

- 35 -

industry. Additionally, he is an active volunteer in the community and serves on another outside investment board.

- <u>Eileen C. Crotty</u>; Chief Financial Officer of Hodgson Russ LLP, B.S. Accounting from Canisius College. She formerly served on the Audit Committee of The Diocese of Buffalo, N.Y. She currently serves on the Canisius College Council on Accountancy, of which she was past chair.

- **Andrew W. Dorn Jr.**; Partner, Energy Solutions Consortium, LLC.; BS State University of New York at Buffalo; MBA, Canisius College, Buffalo, New York. Past President and CEO of the Greater Buffalo Savings Bank and the Jamestown Savings Bank. Currently, a Director of Financial Institutions, Inc. and the Western New York Foundation. Past Chair of D'Youville College and member of the investment committees of Sisters of Charity Hospital in Buffalo, NY; D'Youville College, St. Joseph's Collegiate Institute and the Northern Chautauqua Community Foundation.

- **Carrie B. Frank**; Healthcare Executive; B.S., Accounting from Canisius College, Buffalo, NY. Mrs. Frank held leadership positions in various healthcare delivery and financial capacities in her 36-year professional career. Former Vice President at Excellus Health Plan and CFO and COO of Buffalo General and Kaleida Health. Mrs. Frank currently serves on several volunteer boards and on two other investment committees.

- <u>Sister Dorothy Mueller</u>; Copywriter and Donor Relations Coordinator for Our Lady of Victory Homes of Charity, is a member of the Stella Niagara Franciscans; BS Education from Rosary Hill/Daemen College; MS in Education from Xavier University, Cincinnati, Ohio; Sister was an educator, served her religious community as Finance Director for 20 years and Provincial Minister for 8 years. She currently serves as a member of the Board of Directors for Daemen College and chairs its Audit Committee.

- **Edward P. Schneider**; Executive Director, University at Buffalo Foundation, Inc. (1976-Present); B.S., Accounting, Canisius College, Buffalo NY, 1974; MBA, State University of New York at Buffalo, 1980; currently director of 2 community not-for-profit organizations and investment committee member for 4 other organizations.

- **Edward F. Walsh, Jr.**; President and Chief Operating Officer, Walsh Duffield Companies, Inc.; BA (American Studies) Williams College, Williamstown, MA, 1976; Mr. Walsh has been employed in the insurance industry since 1977. Mr. Walsh is currently a director or trustee of 7 community human service organizations and foundations.

3501438.2

- **Lee C. Wortham**; Chief Operating Officer, Barrantys, LLC; BS Canisius College, Buffalo, NY; MBA, New York Institute of Technology, Westbury, NY. Mr. Wortham has over 35 years of experience in the financial services industry. Mr. Wortham is Chairman of the Roswell Park Alliance Foundation, Vice Chairman of Evans Bancorp, Inc., serves on the Board of the Patrick P. Lee Foundation and is a member of the Canisius College Board of Trustees where he is Chair of the Investment Committee.

89.     SJIF retains multiple investment managers to provide investment advice as to appropriate investments and to manage various portfolios of securities. The investment managers are selected by the Investment Committee and approved by the Board of Directors. All investment managers are registered with the Securities and Exchange Commission as "investment advisers" pursuant to the Investment Advisers Act of 1940. The performance of investment managers is reviewed and evaluated quarterly.

90.     NEPC, LLC ("NEPC") has been engaged as an independent consultant to provide consultant services with respect to investment policy development and risk control, asset allocation strategy, investment manager searches, and investment performance analysis. NEPC consultants meet quarterly with the Investment Committee to review performance trends and investment market projections.

91.     Custody services for SJIF are provided by US Bank, St. Louis, Missouri for separately managed portfolios. Custody services for multi-investor funds held by SJIF are provided by various custodians, including Bank of New York Mellon, The Northern Trust Co., Deutsche Bank Trust Co., and Citco.

92.     The Diocese and SJIF have entered into an administrative contract pursuant to which the Diocese supplies SJIF with the services of certain of its employees to assist in

- 37 -

maintaining participant and accounting records relating to the funds, and SJIF reimburses the Diocese for such services.

93.    *CGA Investment Account*.  The Diocese maintains a charitable gift annuity program pursuant to N.Y. Insurance Law § 1110, which allows the Diocese to enter into agreements with donors under which the Diocese receives gifts for the benefit of itself and other Catholic entities in exchange for its agreement to make annuity payments calculated based upon the actuarial projected lifespan of the annuitant.  Gifts received through this program are invested in an account (the "CGA Investment Account") maintained by the Diocese with Christian Brothers Investment Services, Inc. ("CBIS") and are used to fund quarterly payments to the annuitants during their lifetimes.  Upon the death of an annuitant, the remaining corpus of the gift becomes the property of the beneficiary named in the annuity agreement, which can be the Diocese or a parish, school, religious order, or other Catholic entity separate from the Diocese.  As of the Petition Date, all of the gifts in the program other than one are designated for a beneficiary other than the Diocese.

94.    The Diocese holds a permit, issued by the New York State Department of Financial Services ("DFS"), to run its charitable gift annuity program, and it submits annual reports and it submits annual reports and undergoes periodic audits by DFS with respect to the program. Investments in the CBIS Account are overseen by CBIS in consultation with the Diocese, and are made in accordance with the statutory requirements set forth in the N.Y. Insurance Law.

95.    As of the Petition Date, the value of the CGA Investment Account was approximately $434,216 and the Diocese was administering 24 annuity accounts established by 8 individual annuitants.  Annuity payments due under the program amount to approximately $21,273 annually.

- 38 -

3501438.2

96.     *LOC Collateral Account*.  As described more fully in the Diocese's Self-Insurance Motion, the Diocese is self-insured for workers compensation claims.  Like most self-insured organizations, the New York Workers Compensation Board ("WCB") has required that the Diocese post security to cover potential workers compensation liabilities.  The Diocese has fulfilled this requirement in part through an irrevocable standby letter of credit (the "WCB LOC") issued to WCB by M&T Bank on behalf of the Diocese in the amount of approximately $4.8 million.  The Diocese's repayment obligations to M&T Bank under the WCB LOC are collateralized by a restricted securities account (the "LOC Collateral Account") held with Wilmington Trust, N.A (a subsidiary of M&T Bank).  As of the Petition Date the LOC Collateral Account had a market value of approximately 5.1 million.

97.     *DOB Brokerage Account*.  Lastly, the Diocese maintains a brokerage account at M&T Bank (the "DOB Brokerage Account").  The DOB Brokerage Account does not typically maintain a balance but is used to receive and liquidate securities that may be gifted or bequeathed to the Diocese and other Catholic entities in the Buffalo area.

98.     **Payment Cards**.  The Diocese uses the following types of payment cards:

99.     *Prepaid Visa Cards*.  The Diocese utilizes 25 PEX Visa Prepaid Cards to manage business expenses for the Diocese and its employees.  Those cards are issued through Fifth Third Bank, N.A., and The Bancorp Bank.  The PEX Visa Prepaid Cards function similarly to a debit card.  The Diocese maintains a deposit in the amount of approximately $40,000 with Fifth Third Bank and any purchases made with the PEX Visa Prepaid Cards are deducted from the amount on deposit.  Periodically, the Diocese will replenish the deposit from its Operating Account.

100.    *Gas Cards*.  The Diocese has six Exxon Mobile Gas Cards which are used to purchase fuel for Diocesan vehicles and employees.  On average, the Diocese incurs less than $1,000 per month in fuel charges and the balance on the Exxon Mobile Gas Cards are paid in full at the end of each billing cycle in the ordinary course of business and generally costs the Diocese less than $1,000 a month.

101.    **Business Forms**.  In the ordinary course of business, the Diocese uses multiple check types associated with the Bank Accounts.  Additionally, the Diocese uses a variety of correspondence and business forms including, but not limited to, letterhead, purchase orders and invoices.  To minimize the expense and disruption to the Diocese's estate associated with developing and/or purchasing entirely new forms, the delay in conducting business prior to obtaining such forms and the confusion of employees, vendors and suppliers, the Diocese seeks authority to continue to use all correspondence and business forms as they existed immediately prior to the Petition Date, without reference to the Diocese's status as debtor-in-possession.  The Diocese will use its reasonable best efforts to mark "debtor-in-possession" on business forms as soon as reasonably practicable following the Petition Date.

102.    The Diocese respectfully requests that the Court authorize it to continue using its prepetition Bank Accounts rather than closing them and opening new post-petition accounts.  Closing the Diocese's Bank Accounts would cause disruption to the Diocese's operations and fulfillment of its mission.  As described above, the Diocese's maintains a sophisticated system of special purpose Bank Accounts in order to facilitate the orderly collection, management and disbursement of funds in the ordinary course of its business.  If the Diocese were required to open new accounts as of the Petition Date, it would unnecessarily distract the Diocese's key business

3501438.2

office personnel in an office that is already operating at maximum capacity. In addition, changing accounts would also cause disruptions in essential deposit and automated debit activity, potentially leading to loss of revenue, missed payments or overdraws and therefore causing harm to the Diocese's operations. As a result, the Diocese respectfully submits it is appropriate to maintain its prepetition Bank Accounts and practices.

103.     The continued use of the existing Bank Accounts will facilitate the Diocese's transition into this chapter 11 case by, among other things, avoiding administrative inefficiencies and expenses and minimizing delays in payment of post-petition debts. The Diocese respectfully submits that parties in interest will not be harmed by the continued maintenance of its Bank Accounts because, with the assistance of professionals, the Diocese has implemented appropriate mechanisms to ensure that unauthorized payments will not be made on account of obligations incurred prior to the Petition Date.

104.     The Diocese submits that maintaining the existing Bank Accounts will facilitate the Diocese's ability to collect, deposit and account for receipts and pay post-petition bills. Closing the Bank Accounts would require the Diocese to open new accounts and arrange alternative procedures for electronic and manual transfers to and from the Bank Accounts. The result would be a disruption of processing payments, and similarly would disrupt wire transfers, payroll obligations, and post-petition obligations to vendors and other creditors.

105.     The Diocese also requests authority to preserve various reporting and accounting mechanisms, such as signatory authorizations and accounting systems central to the maintenance of the Bank Accounts. The interruption or termination of such reporting and accounting mechanisms would undermine the utility of the Bank Accounts. In accordance with existing

3501438.2

practices, the Diocese will maintain strict records of all receipts and disbursements from the Bank

Accounts during the pendency of this case and will ensure that its records properly distinguish

between pre-petition and post-petition transactions and report accordingly to the U.S. Trustee.

106.     The Diocese also respectfully submits that maintenance of the Bank Accounts will

avoid delays in payments to administrative creditors, ensure a smooth transition into chapter 11,

and facilitate the Diocese's efforts to complete this Chapter 11 Case rapidly and successfully.

Thus, the Diocese respectfully requests that its existing Bank Accounts be deemed debtor-in-

possession accounts and that the maintenance and continued use of those accounts, in the same

manner and with the same account numbers, styles and document forms as those employed during

the prepetition period, be authorized subject only to a prohibition against honoring prepetition

checks without specific authorization from this Court.

107.     Strict adherence to the U.S. Trustee Guidelines in this Chapter 11 Case would

significantly disrupt the ordinary financial operations of the Diocese, reducing efficiencies and

causing unnecessary expense, while providing little benefit to creditors.  The Diocese respectfully

requests that the Court waive the requirements of the U.S. Trustee Guidelines in this Chapter 11

Case as requested herein.

108.     To minimize expenses and disruption to the Diocese's chapter 11 estate, the

Diocese respectfully requests authority to continue to use all correspondence and business forms

(including letterhead, purchase orders, envelopes, charitable solicitation material, invoices and the

like) as such forms were in existence immediately before the Petition Date, without reference to

the Diocese's status as debtor-in-possession.  The Diocese also requests authorization to use the

existing check stock without the "debtor-in-possession" label for checks that it manually writes

until such check stock runs out.  As soon as practicable after the Petition Date, the Diocese will include "debtor-in-possession" on the checks it prints electronically.  Upon depletion of the Diocese's check stock and/or business forms stock, the Diocese will obtain new check stock and/or business form stock reflecting its status as a debtor-in-possession.

109.    By virtue of the nature and scope of the Diocese's operations and the number of suppliers of goods and services with whom the Diocese transacts on a regular basis, it is important that the Diocese be permitted to continue to use its existing checks and other business forms without alteration or change, except as requested herein.  Indeed, because it would appear that parties doing business with the Diocese will be aware of the Diocese's status as debtor-in-possession as a result of the widely publicized nature of this Chapter 11 Case as well as the communications and notice of commencement of this Chapter 11 Case the Diocese intends to distribute to such parties, changing business forms is unnecessary and would be unduly burdensome.  Moreover, if the Diocese is required to change its current business forms, the new forms may cause confusion to the Diocesan employees, vendors and donors.  The Diocese also believes that it would be costly and disruptive to cease using all existing forms and to purchase new stationery and business forms.  Accordingly, the Diocese seeks a waiver of the U.S. Trustee Guidelines with respect to the continued use of its business forms and checks.

110.    The Diocese requests further relief from adherence to the U.S. Trustee Guidelines to the extent doing so would require that all receipts and all disbursements of estate funds be by check with a notation representing the reason for the disbursement.  Considering the nature of the Diocese's operations, in certain instances, it may be necessary for the Diocese to conduct transactions by debit, wire or ACH Payments and other similar methods, as discussed above.  The

Diocese maintains accurate records and will be able to properly account for any such transactions. The Diocese, therefore, requests that its Banks be authorized to continue to pay, honor and execute any and all debit instructions, wires and ACH Payments issued and drawn on the Bank Accounts after the Petition Date.

111.    In accordance with its contractual arrangements with the Banks, the Diocese incurs periodic service charges and other fees, costs, charges and expenses to the Banks in connection with the maintenance of the Bank Accounts (collectively, the "Service Charges"). Payment of the prepetition Service Charges is in the best interests of the Diocese and all parties in interest in this Chapter 11 Case, as it will prevent any disruption to the Bank Accounts. Further, because the Banks have setoff rights for the Service Charges, payment of prepetition Service Charges should not alter the rights of unsecured creditors in this Chapter 11 Case. Accordingly, by this Motion, the Diocese also seeks authority to pay, at the Diocese's sole discretion, the prepetition Service Charges, if any.

112.    The Diocese respectfully requests authority to continue to its prepetition investment practices and to maintain each of its Investment Accounts in the ordinary course of business. By retaining its prepetition investment practices and Investment Accounts, the Diocese will be able to earn reasonable returns on its investments, as contemplated by section 345(a) of the Bankruptcy Code, without incurring the administrative costs and compliance risk associated with converting its holdings to cash or U.S. Government Securities.

113.    The Diocese's investment practices with respect to SJIF and the CGA Investment Account are sophisticated and overseen by independent professional outside financial advisors who ensure that a diversified mix of investments is maintained to achieve moderate targeted

- 44 -

growth with minimal exposure to down-side risk in any particular investment. Moreover, the Diocese is itself a large, financially sophisticated organization that employs a professional accounting staff of fifteen (15) individuals devoted to proper oversight and management of the Diocese's finances. Moreover, the Diocese has retained Rick Szekelyi of Phoenix Management Services to serve as its financial advisor in this Chapter 11 Case. Mr. Szekelyi is a certified public accountant and has substantial experience helping companies reorganize through chapter 11 and advising them with respect to the management of their finances. Accordingly, the Diocese is not seeking to make unnecessarily risky or speculative investments, but merely to deploy its resources consistent with the recommendations of its professional advisors in an organized and diversified manner as most institutions of similar size do in the ordinary course.

114.    The Diocese has approximately $30 million in its Investment Accounts. The Diocese has a long track record of responsibly investing its funds (both restricted and unrestricted) to achieve reasonable growth with limited risk. Indeed, the Diocese uses the income generated from its holdings in SJIF to fund portions of its annual budget, and the CGA Investment Account is held and managed for the purpose of creating income to fund the Diocese's obligations to pay annuitants. If the Diocese were forced to liquidate its current holdings and instead invest in treasury securities or to maintain a collateralized deposit account in strict compliance with section 345(b), it would not be able to obtain a comparable rate of interest or growth, and the reduced income available could force the Diocese to curtail portions of its mission or, with respect to the CGA Investment Account, violate state law which dictates how charitable annuity funds must be invested. Moreover, the reduction in income inherent in disinvesting from SJIF would negatively affect creditors to the extent SJIF funds may be unrestricted and available to pay creditor claims.

3501438.2

115.    In addition to the problem of replacing a valuable revenue stream, the Diocese respectfully submits that the sheer size of its investments will make it difficult and unnecessarily expensive, if not outright impossible, to obtain a bond or collateral securities to cover the full amount invested in SJIF and/or to find an authorized depository willing to take on such a deposit.

116.    The Diocese submits that each of the custodians for the Diocese's investments in SJIF, and each of the financial institutions with which the other Investment Accounts are held, are large, stable, and financially secure institutions, which, in many cases, are on the U.S. Trustee's list of approved depositories.  Accordingly, the Diocese respectfully submits that there is no reason to believe the institutions with whom the Investment Accounts are held present an unreasonable risk of loss.

117.    As described herein, the Diocese's Investment Accounts represent just a part of the Diocese's sophisticated financial management system, and are critical to the Diocese's ability to continue its ordinary course practices in administering its self-insurance programs and the charitable gift annuity program.  Forcing the Diocese to liquidate the Investment Accounts and set up alternative arrangements would require a substantial amount of time and effort which would distract from the Diocese's ability to focus on its goal of reorganizing and confirming a plan of reorganization.  Moreover, if the Diocese were required to bring the CGA Investment Account and the LOC Collateral Account into strict compliance with section 345(b), the Diocese would be forced to violate its obligations under New York law and to breach its contractual commitments to M&T Bank.

118.    The Diocese respectfully submits that appropriate safeguards are in place which render strict adherence with the investment requirements of section 345(b) unnecessary.  First, the

- 46 -

3501438.2

Diocese is already subject to statutory requirements under New York state laws which mandate the prudent and responsible investment of its funds. Second, the Diocese has engaged the assistance of independent professional outside financial advisors who actively monitor the Diocese's Investment Account portfolios and ensure that a diversified mix of investments is maintained to achieve moderate targeted growth with minimal exposure to down-side risk in any particular investment. Third, the investment guidelines for SJIF and the CGA Investment Account direct that the Diocese's investments are comprised primarily of professionally managed mutual funds and other securities which are widely traded and thus exposed to constant market scrutiny and valuation – reducing the risk of unexpected or severe fluctuations in value and avoiding unduly speculative investments in favor of steady growth over a long-term investment horizon. Fourth, the size and diversification built into the Diocese's portfolios means that any increase or decrease in value of a particular investment is unlikely to have a substantial impact on the overall value of the Diocese's holdings. Because each of the Diocese's Investment Accounts is comprised of a diversified portfolio of securities, the failure of any individual investment should result in minimal adverse effects on the overall value of its investments.

119.    As explained in detail above, the Diocese derives many benefits from the continuation of its current investment program. Most notably, the Diocese's investments provide it with a reliable and steady source of income upon which it relies to fund ordinary course operations as well as its obligations under the charitable annuity program. The Diocese also benefits from economies of scale in joining with other investors in SJIF to take advantage of professional advisory services which would be much more expensive in the absence of a pooled investment vehicle like SJIF. Moreover, keeping the Investment Accounts in place benefits the

- 47 -

Diocese benefits by allowing it to remain in compliance with its statutory and contractual obligations.

120.    The Diocese's estate will suffer if it is not allowed to continue its existing investment program.  As noted above, the Diocese will lose out on a valuable source of revenue which it simply will not be able to replicate if forced to comply with the requirements of section 345(b).  Second, it is highly unlikely that the Diocese could even procure a bond or collateral security to cover the significant amount of investments currently held in the Investment Accounts.  Even if such security could be obtained, it would almost certainly be at an extraordinary expense to the Diocese's estate and would need to be funded out of unrestricted funds, to the detriment of the Diocese's creditors.

121.    The only realistic way for the Diocese to strictly comply with section 345(b) would be to liquidate the holdings in each of the Investment Accounts, reducing the current investment positions to cash, and then to place such cash into a deposit account with one of the U.S. Trustee's authorized depositories.  The Diocese respectfully submits that doing so would be neither practical nor prudent, and that doing so would put the Diocese at risk of failing to comply with its state law obligations under the New York Prudent Management of Institutional Funds Act and/or section 1110 of the New York Insurance Law to act as a prudent investor of the funds placed under its control, as well as to violate its contractual obligation to M&T Bank to maintain the LOC Collateral Account at Wilmington Trust.

122.    Accordingly, for the reasons set forth herein, the Diocese respectfully requests that it be authorized to continue to maintain its existing Bank Accounts and banking practices, business

3501438.2

forms, Investment Accounts and investment practices, as requested in the Cash Management Motion.

### VI. Motion for Entry of Interim and Final Orders Authorizing the Diocese to Pay Prepetition Taxes and Regulatory Fees (the "Taxes Motion")

123.    The Diocese seeks authority to pay, in its sole discretion, in the ordinary course of its business and on its normal due dates, all undisputed prepetition sales, gross receipts, utility-users, federal excise and use, and certain other governmental taxes, including any amounts subsequently determined to be owing upon audit (collectively, the "Taxes"), regulatory fees, including, but not limited to, federal, state and local regulatory fees (the "Regulatory Fees"), and permit or other licensing fees (the "Licensing Fees," and together with the Taxes and Regulatory Fees, the "Taxes and Fees") to the respective federal, state and local taxing authorities and other governmental agencies (each a "Taxing Authority" and collectively, the "Taxing Authorities"), including all Taxes and Fees subsequently determined upon audit to be owed for periods prior to the Petition Date.

124.    In the ordinary course of its business, the Diocese is required to pay Taxes and Fees. The Diocese must remit these Taxes and Fees to the various governmental entities of the jurisdictions in which the Diocese conduct business.  The process by which the Diocese remits the Taxes and Fees varies, depending on the nature of liability at issue and the Taxing Authority to which the relevant payment is made.

125.    As of the Petition Date, the Diocese believes that it is current with respect to the payment of Taxes and Fees except that approximately $1,594.00 is owed for certain sales taxes incurred with respect to the Diocese's cafeteria operations and its purchasing division. Additionally, certain Taxes may have accrued prepetition but have not yet come due for payment.

- 49 -

126.    The Diocese pays the Taxes and Fees to the Taxing Authorities on a periodic basis with funds drawn by checks or by means of electronic fund transfers whether sent directly to the Taxing Authorities or sent to a third-party administrator who pays the appropriate Taxing Authorities. Prior to the Petition Date, certain Taxing Authorities were sent checks or electronic transfers in respect of such obligations that may not have cleared the Diocese's banks or other financial institutions as of the Petition Date.

127.    Certain Taxing Authorities may assert that the Taxes and Fees are so-called "trust fund" taxes that the Diocese is required to collect from third parties and hold in trust for the benefit of such Taxing Authorities. Even if some of the Taxes and Fees would not ordinarily be considered "trust fund" taxes in a particular jurisdiction, failure to pay the Taxes and Fees may adversely affect the Diocese's good standing in a jurisdiction, potentially impairing its ability to engage in certain transactions and continue to conduct its business. In addition, some Taxing Authorities may audit the Diocese, if such Taxes and Fees are not timely paid, which would needlessly divert the Diocese's attention from its reorganization efforts. Finally, to the extent that any Taxes and Fees remain unpaid by the Diocese, the Diocese's directors and officers may be subject to lawsuits or criminal prosecution during the pendency of this Chapter 11 Case. Any such lawsuit or criminal prosecution (and the ensuing potential liability) would distract the Diocese and its leadership from effectuating the Diocese's reorganization, to the detriment of all parties in interest in this Chapter 11 Case.

128.    Any delay in paying the obligations relating to the Taxes and Fees would be detrimental to the Diocese, its creditors, and its estate. Indeed, the Diocese's ability to manage and run its operations with as little disruption as possible requires, in part, that it remain in good

3501438.2

standing with the relevant Taxing Authorities.  For the foregoing reasons, the Diocese submits that the relief requested herein is necessary and appropriate and is in the best interests of the Diocese's estate, its creditors, and other parties in interest.

> **VII.    Motion for Entry of Interim and Final Orders (A) Prohibiting Utility Companies from Altering, Refusing or Discontinuing Service on Account of Prepetition Amounts Due, (B) Determining Adequate Assurance of Payment For Post-Petition Utility Services Under 11 U.S.C. § 366, and (C) Establishing Procedures for Determining Adequate Assurance of Payment (the "Utilities Motion")**

129.    The Diocese respectfully requests that the Court enter interim and final orders, (a) prohibiting those utility companies that provide service to the Diocese (each a "Utility Company" and, collectively, the "Utility Companies") from altering, refusing or discontinuing service on account of prepetition amounts due, (b) determining that the Diocese's furnishing of deposits to Utility Companies, upon their timely request for adequate assurance, in an amount equal to two weeks of the Diocese's estimated average usage as calculated over the past year, constitutes adequate assurance of payment, and (c) establishing a procedure to address assertions by Utility Companies that they are entitled to additional adequate assurance.

130.    The Diocese's ongoing operations require the Diocese to maintain uninterrupted utility services, including electricity, natural gas, telephone, water, waste removal, internet and other services.  Termination of a utility service would cause immediate and irreparable harm to the Diocese's operations and critical reorganization efforts.

131.    The Diocese receives utility services from several different providers for multiple facilities.  These facilities include: the Saint Stanislaus residence at 123 Townsend, Bishop Grosz residence at 125 Townsend, the Archbishop Walsh Academy, Buffalo State Newman Center, Camp Turner, St. Joseph's Cathedral, the Catholic Center, Monsignor Conniff Residence, Bishop

3501438.2

Head Residence, Mother Teresa Home, Newman Center at University at Buffalo, Niagara Catholic School, O'Hara Residence, and St. Gianna Molla Outreach Center. The Diocese is generally current with respect to the payment of its prepetition obligations for all utility services and none of the Utility Companies hold prepetition deposits.

132.    Here, the Diocese proposes to provide each Utility Company, upon request, a cash Deposit equal to two weeks' average historical usage, calculated over the past year, and adequate funds have been budgeted for payment of all post-petition utility services. Based upon the foregoing, the Diocese believes that most, if not all, of the Utility Companies have adequate assurance of payment even *without* the Diocese's proposed Deposit. When the offered Deposit is complemented by the Diocese's ability to pay postpetition invoices through access to cash from continued operations, such assurance of payment significantly alleviates—if not eliminates—any honest concern of nonpayment on the part of the Utility Companies, and is therefore adequate.

133.    The Diocese submits that it satisfies the requirements of section 366 by proposing a Deposit as an acceptable form of adequate assurance of payment. The Diocese has also proposed reasonable procedures that will allow for a Utility Company to submit an Assurance Request and for the scheduling of a hearing thereon. The Diocese anticipates that in conjunction with the Diocese's proposed Deposits, the Diocese will maintain post-petition liquidity, and therefore, the Utility Companies will not suffer any prejudice.

**VIII.    Motion for Entry of Interim and Final Orders Authorizing the Diocese to (I) Honor Prepetition Insurance Premium Financing Agreements and (II) Enter Into New Premium Financing Agreements in the Ordinary Course of Business (the "Insurance Premium Financing Motion")**

3501438.2

134.     The Diocese respectfully requests that the Court enter interim and final orders authorizing the Diocese to (i) honor its prepetition insurance premium financing agreements and (ii) enter into new premium finance agreements in the ordinary course of business.

135.     The Diocese is largely self-insured for most risks.   However, the Diocese does maintain excess insurance policies through a number of third-party insurers (collectively, the "Insurance Policies").   The Insurance Policies are essential to the preservation of the Diocese's business and the proper functioning of its self-insurance program.

136.     It is not always economically advantageous for the Diocese to pay the premiums on all of the Insurance Policies on a lump-sum basis.   Accordingly, in the ordinary course of business, the Diocese finances the premiums on some of their Insurance Policies by entering into premium finance agreements with premium finance companies.

137.     Currently, the Diocese finances excess property insurance premiums pursuant to a premium financing agreement (the "Property Agreement") with BankDirect Capital Finance ("BankDirect").   Pursuant to the terms of the Property Agreement, prior to the Petition Date, the Diocese made a cash down payment to BankDirect in the amount of $50,985.00 and financed the remaining $458,879.00 of premiums covered by the Property Agreement.   In exchange for these financing terms, the Diocese agreed to pay ten monthly installment payments in the amount of $46,727.00 including a total finance charge of $8,391, representing an annual interest rate of 3.97%.   In addition, the Diocese granted BankDirect a security interest in unearned premiums, dividend payments, and all payments on account of loss which result in reduction of any unearned premium.

3501438.2

138.    The Diocese also finances certain excess liability and auto insurance premiums pursuant to a financing agreement ("Package Agreement", together with the Property Agreement, the "Premium Financing Agreements") with BankDirect.  Prior to the Petition Date, the Diocese made a cash down payment to BankDirect in the amount of $81,568.79 and financed the remaining $802,790.65 of premiums covered by the Package Agreement.  In exchange for these financing terms, the Diocese agreed to pay ten monthly installment payments in the amount of $81,568.79 including a total finance charge of $12,897.25, representing an annual interest rate of 3.49%.  In addition, the Diocese granted BankDirect a security interest in unearned premiums, dividend payments, and all payments on account of loss which result in reduction of any unearned premium.

139.    If the Diocese is not able to pay its financing obligations under the Premium Financing Agreements, BankDirect could attempt to seek modification of the automatic stay to terminate the various underlying insurance policies in order to recoup its losses.  If such modification were permitted, the Diocese would then be required to obtain replacement insurance on an expedited basis and at tremendous cost to the Diocese's estate.  If the Diocese was required to obtain replacement insurance and pay a lump-sum premium in advance, this payment would likely be greater than what the Diocese currently pays.  Even if BankDirect was not permitted to terminate the underlying insurance policies, any interruption of payment would have a severe, adverse effect on the Diocese's ability to obtain a new policy or finance premiums in the future.

140.    In view of the importance of maintaining insurance coverage with respect to the Diocese's business activities, its obligations under its self-insurance program and New York law, and the preservation of the Diocese's cash flow and estate by financing the insurance premiums, the Diocese believes it is in the best interests of its estate to authorize the Diocese to honor its

3501438.2

financing obligations under the Premium Financing Agreements. Any other alternative would likely require considerable additional cash expenditures and would ultimately reduce available distributions for unsecured creditors.

141.    In addition, because the Premium Financing Agreements and the Insurance Policies may expire during the course of the Chapter 11 Case, the Diocese seeks authority to renew the Premium Financing Agreements and enter into other similar agreements in connection with the continuation of Insurance Policies in the ordinary course of the Diocese's business, without further Court approval. The Diocese will need continued excess insurance coverage throughout the entire duration of the Chapter 11 Case. The Diocese respectfully submits that renewal of the Premium Financing Agreements falls squarely within the ordinary course of its business, and, but for the constraints of section 364 of the Bankruptcy Code, the Diocese would not need the Court's prior approval to renew these agreements. To reduce the administrative burden, as well as the expense of operating as debtor-in-possession, the Diocese seeks the Court's authority now to renew the Premium Financing Agreements or enter into new insurance financing agreements for the Insurance Policies, if and when necessary.

142.    In light of the importance of maintaining excess insurance coverage and preserving the Diocese's liquidity by financing the insurance premiums, the Diocese believes it is in the best interests of its estate and all stakeholders to honor its prepetition financing obligations, and to renew the Premium Financing Agreements or enter into similar premium financing agreements for the Insurance Policies, as necessary.

- 55 -

3501438.2

## IX. Motion for Entry of an Order Pursuant to Bankruptcy Rules 1007(c) and 9006(b)(1) Extending Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases and Statements of Financial Affairs (the "<u>Motion to Extend Time to File Schedules</u>")

143.     The Diocese respectfully requests that the Court enter an order extending the time

to file its schedules of assets and liabilities, schedules of current income and expenditures,

schedules of executory contracts and unexpired leases and statements of financial affairs

(collectively, the "<u>Schedules and Statements</u>") through and including March 31, 2020 (an

extension of 17 days, for a total of 31 days from the Petition Date), without prejudice to the

Diocese's ability to request additional time should it become necessary.

144.     The Diocese anticipates that there will be more than 700 creditors and interested

parties involved in this Chapter 11 Case, including over 400 individuals whose claims relate to

alleged instances of abuse and whose names and other identifying information will be sought to

be filed under seal to protect their privacy.  Given the need for confidentiality, preparing the

Schedules and Statements accurately and with sufficient detail and adherence to confidentiality

requires significant attention from the Diocese's personnel and advisors.  Further, the Diocese's

personnel will be heavily involved with public relations outreach in the days following the Petition

Date, to facilitate the stabilization of the Diocese's operations and in support of its mission.

145.     In addition to the reasons set forth above, the Diocese respectfully submits that the

complexity of its operations, the limited staff available to perform the required internal review of

financial records and affairs, the numerous critical operational and mission stabilization matters

that the Diocese's personnel must address in the early days of this Chapter 11 Case, the pressure

incident to the commencement of this Chapter 11 Case, and the fact that certain prepetition

3501438.2

invoices may not be received or entered into the Diocese's accounting system prior to the Petition Date provide ample cause justifying the requested extension of the deadline to file the Schedules and Statements.

146.    The Diocese submits that focusing the attention of key personnel on critical operational and chapter 11 compliance issues during the early days of this Chapter 11 Case will help the Diocese make a smoother transition into chapter 11 and, therefore, will ultimately maximize the value of the Diocese's estate for the benefit of creditors and all parties in interest. Consequently, it is in the best interests of the Diocese and its creditors to obtain an extension of the filing deadline set forth under Bankruptcy Rule 1007(c), which would provide the Diocese with a total of 31 days from the Petition Date to file the Schedules and Statements.

### X.    Applications to Appoint Stretto as Notice and Claims Agent and as Administrative Advisor (the "Stretto Applications")

147.    The Diocese is seeking separate orders appointing Stretto[3] as the notice and claims agent for this Chapter 11 Case (the "Claims Agent") and authorizing the retention of Stretto to assist the Diocese as an advisor with respect to certain case management and administrative tasks (the "Administrative Advisor").

148.    The Diocese anticipates that there will be more than 700 creditors or other interested entities to be noticed in these cases, including over 400 individuals whose claims relate to alleged instances of abuse and whose names and other identifying information the Diocese is seeking to maintain under seal out of respect for their privacy.  Utilization of a Claims Agent will relieve the Court and the Diocese of a significant administrative burden, and will also provide a

---

[3]    Stretto is the trade name of Bankruptcy Management Solutions, Inc. and its subsidiaries.

3501438.2

mechanism by which proofs of claim can be filed confidentially and by which any party in interest who wishes to effect notice on all creditors, including those whose names and addresses are filed under seal, may do so without the necessity to disclose any confidential identifying information. Moreover, Stretto's expertise in serving as an Administrative Advisor will assist the Diocese in carrying out its duties and obligations under chapter 11, particularly as it relates to soliciting and tabulating votes with respect to a proposed chapter 11 plan of reorganization.

149.    The Diocese respectfully submits that authorizing the relief requested in the Stretto Applications is in the best interests of the Diocese's estate and all parties in interest, and particularly appropriate in this Chapter 11 Case due to not only the large number of creditors and parties-in-interest involved but also due to the confidential nature of many of the claims and claimants' identities.  Accordingly, the Diocese respectfully requests that the Court approve Stretto as both Claims Agent and Administrative Advisor.

## **CONCLUSION**

150.    For the reasons set forth herein, and in the First Day Motions, the Diocese respectfully requests that the Court grant the relief requested in the First Day Motions and provide such other and further relief as the Court may deem just and proper.

3501438.2

**Consolidated Appendix 0685**

Dated:  February 27, 2020

_____
Charles Mendolera
Executive Director of Financial
Administration

Sworn to before me this
27th day of February 2020.

Notary Public

MAUREEN C. RAZMUS
Notary Public - State of New York
Qualified in Erie Co. No. 01RA6286971
My Commission Expires August 5, 2021

3501438.2

# CONSOLIDATED APPENDIX DOCUMENT NO. 18

**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF NEW YORK**

In re:

The Diocese of Buffalo, N.Y.,

Case No.: 20-10322
Chapter 11 Case

Debtor,

**AFFIDAVIT OF REV. PETER J. KARALUS REGARDING STRUCTURE AND
PRE-FILING HISTORY OF THE DIOCESE OF BUFFALO AND IN SUPPORT OF THE
CHAPTER 11 PETITION AND FIRST DAY PLEADINGS**

STATE OF NEW YORK    )
COUNTY OF ERIE        )  ss.:

Reverend Peter J. Karalus, being duly sworn, deposes and states as follows:

1.      I am the Vicar General and Moderator of the Curia for the Roman Catholic Diocese

of Buffalo.  I have served in such capacity since September 10, 2018.  Prior to that time, I served

as a pastor in several parishes within the territory of the Diocese (as that term is defined below),

and I am familiar with the mission, history, and structure of the Catholic Church in Western New

York.

2.      The Diocese of Buffalo, N.Y. (the "Diocese"), is a not for profit corporation

organized pursuant to a special act of the New York Legislature as described in paragraph 19

below.  The Diocese is the secular legal embodiment of the Diocese of Buffalo, a juridic person

recognized under Canon Law (as that term is defined below).

3.      On February 28, 2020 (the "Petition Date"), the Diocese filed a voluntary petition

commencing the above-captioned case (this "Chapter 11 Case") under chapter 11 of Title 11 of

the United States Code (11 U.S.C. 101 et seq.; the "Bankruptcy Code").

3500838.4 2/27/2020

4.    I am the Vice President of the Diocese.  I am authorized to submit this Affidavit on behalf of the Diocese in connection with its voluntary chapter 11 petition and the first-day motions and applications filed with the Court contemporaneously herewith (the "First Day Motions").

5.    I make this Affidavit based upon my personal knowledge of the facts set forth herein, upon information supplied to me by others associated with the Diocese, upon my review of relevant documents and upon my experience and knowledge of Diocesan operations.  If I were called to testify, I would testify accordingly to the facts set forth herein.

6.    The First Day Motions seek relief aimed at facilitating a smooth transition into this Chapter 11 Case, assisting the Diocese in continuing its mission by maintaining employee compensation, maintaining the goodwill and morale of the employees, parishioners, clerics and others who rely on the programs and services provided by the Diocese, and preserving and maintaining the property available to satisfy creditors of the Diocese.  I respectfully submit that all of the First Day Motions are vital to the Diocese's reorganization efforts and expedited approval of the First Day Motions is important to the Diocese's successful reorganization.  The First Day Motions and financial structure of the Diocese are further described in the First Day Affidavit of Charles Mendolera submitted contemporaneously herewith.

## CANON LAW STRUCTURE AND ORGANIZATION

7.    It is a matter of faith that the Catholic Church (the "Church")[1] was founded by Jesus Christ to carry out the mission to teach, sanctify and serve the needs of others.  The Church is a worldwide community with over 1.2 billion members who adhere to a common creed.  The *Code*

---

[1] As used herein, "Church" means the universal Catholic Church (i.e., the "one, holy, catholic and apostolic church" of Catholic belief, seated in the Vatican and headed by Pope Francis).  For the avoidance of doubt, particular places of worship are referred to herein as "churches" without capitalization.

3500838.4 2/27/2020

*of Canon Law*[2] establishes the internal organizational structure and procedures to be followed within the Church. Canon Law also identifies property rights and agency relationships among the various structures within the community of the Church.

8.      While the Church is organized in a hierarchical structure it is not a monolithic corporate entity. A variety of organizations operate in ecclesiastical harmony to carry out the mission of the Church. The Church is organized by territorial districts, the most common of which is a diocese.[3] A diocese usually is defined by a geographic area and is created to serve the community of Latin Rite Catholics present in that area. The bishop of a diocese is appointed by The Pope.[4]

9.      An apostolic administrator may be appointed by the Pope to lead a diocese in the event of the resignation, removal or death of its bishop. An apostolic administrator holds substantially the same authority as a bishop to administer the temporal and spiritual affairs of a diocese. Following the resignation of Bishop Richard Malone on December 4, 2019, The Most Reverend Edward B. Scharfenberger, Bishop of the Diocese of Albany, New York, was simultaneously appointed (effective immediately on such date) by Pope Francis as the Apostolic Administrator of the Diocese.

10.     The territory of the Diocese is co-extensive with the counties of Erie, Niagara, Genesee, Orleans, Chautauqua, Wyoming, Cattaraugus and Allegany in New York State.

---

[2] Canon Law comes from several sources of Church law that together establish the internal organizational structure and relationships among the entities and organizations that comprise the Church. Canon Law was originally codified in 1917, and amended by Pope John Paul II on January 25, 1983. *See*, 1983 Code of Canon Law c.1-1752 (1983) ("Canon Law").

[3] Canon Law, c. 369

[4] *Id.* at c. 377 §1

3500838.4 2/27/2020

11.     The Diocese maintains a number of administrative offices and ministries, necessary to advance the mission of teaching, sanctifying and serving.  These include the Offices of the Bishop, Chancery, Marriage Tribunal, Finance, Vocations, Computer Services, Human Resources, Communications, Advancement, Evangelization and Parish Life, Sacramental and Family Life, Catholic Schools, Research and Planning, Buildings and Properties, Pastoral Services, Pro-Life, Safe Environment, Victims Assistance, Priests Personnel and Archives, Lifelong Faith Formation, Catechumenate, Youth, Young Adults, and Insurance Services.

12.     Within the territory of a diocese are separately constituted parishes.[5] Like a diocese, a parish usually is defined territorially.[6]

13.     "Juridic persons" are constituted pursuant to Canon Law or by a special grant of competent authority given through a decree, and they have perpetual existence unless extinguished in accordance with Canon Law.  Juridic persons within the Church are either aggregates of persons or things, ordered for a purpose which is in keeping with the mission of the Church.  Similar to the civil law concept of a corporation, a juridic person is distinct and separate from any natural person, and from other juridic persons.  A "public" juridic person is a type of juridic person that fulfills its purposes in the name of the Church.  Dioceses and parishes are considered separate public juridic persons.[7]

14.     Each public juridic person "owns" all property it has acquired. A juridic person possesses property in order to carry out its mission to teach, sanctify, and serve.  These purposes are broadly defined as the conduct of worship, the support of employees and ministers, and the

---

[5] *Id.* at c. 374

[6] *Id.* at c. 515

[7] Juridic personality is articulated in the 1983 Code in canons 113-123.

3500838.4 2/27/2020

works of the apostolate.[8]  Canon Law requires the ownership of property to be protected by valid means under secular civil law, and permits the formation of secular legal entities, like the Diocese, to hold property and conduct the business of a public juridic person.

15.     The administration of property is the responsibility of a public juridic person's administrator,[9] such as a diocesan bishop (or apostolic administrator) over the property of a diocese or a pastor over the property of a parish.  The administrator of the property of a public juridic person must exercise this responsibility in concert with a finance council.[10]  It is a fundamental canonical understanding that property owned by one public juridic person cannot be simultaneously owned or controlled by another.

16.     The persons who populate a diocese or a parish are first of all those who are baptized and live in communion with the successor of St. Peter (The Pope, otherwise known as the Supreme Pontiff of the Roman Catholic Church) and those in communion with him.[11]  Among the baptized are laypersons and clerics.[12]  Clerics are also called sacred ministers and perform many of the liturgical services within the worship of the Church.  Clerics are deacons, priests or bishops. There are other individuals who contribute to the mission of the Church by joining together through common life and the profession of the evangelical counsels of poverty, chastity, and obedience ("Religious").[13] Religious may be either laypersons or clerics.  If a Religious is not a cleric, that person is referred to as a sister or brother.

---

[8] 1983 Code c.1254.  The works of the apostolate include activities associated with easing human suffering, promoting the general welfare, and advancing the social mission of the Church: feeding the hungry, clothing the naked, welcoming the stranger, caring for the sick, offering education, and any other activity that can promote the good of an individual and society.

[9] *Id.* at c.1279 § 1.

[10] *Id.* at c.1280.

[11] *Id.* at c. 204.

[12] *Id.* at c. 207 § 1.

[13] *Id.* at c. 207 § 2.

3500838.4 2/27/2020

17.    While there are a variety of forms by which Religious are organized in institutes of consecrated life, they are most often referred to as religious orders.[14]  These institutes, formed around the charism of a founder recognized by appropriate ecclesiastical authority, enjoy a certain level of autonomy and conduct their internal operations independently of any diocese (or other juridic persons).  This is most commonly seen in the conduct of their proper apostolates; such as schools, healthcare, and monastic communities.  Each institute of consecrated life is its own independent public juridic person.  They are bound to the Church in a special way, but they are not part of the hierarchical constitution of the Church.  Members of an institute of consecrated life are not subject to the supervision or discipline of the bishop of the diocese wherein they reside, unless they are employed in service of a parish, school or other institution that is subject to a bishop's oversight.

18.    There are 22 communities of Religious men, and 17 communities of Religious women present in the territorial boundaries of our Diocese at this time.

## NEW YORK CORPORATE STRUCTURE

A.    **The Diocese**

19.    Under New York Law, the Diocese is an incorporated legal entity formed pursuant to a Special Legislative Act with its own corporate structure and governance, separate from the other Catholic entities within its territory that are described in parts "B" through "F" below (the "Other Catholic Entities").

20.    The juridic person of the Diocese of Buffalo was canonically established on April 23, 1847.  Thereafter, a corporation was formed on October 30, 1897 to constitute the Diocese of Buffalo under New York law.  Such initial corporation was dissolved and the Diocese as it exists

---

[14] Institutes of Consecrated Life are covered in canons 573-746 of the 1983 Code.

3500838.4 2/27/2020

today was reincorporated on May 19, 1951 by a special act of the New York State Legislature

(Chapter 568 of the Laws of 1951 (the "Special Act")).  The Special Act provides that the three

trustees of the Diocese are the Bishop, the Vicar General and the Chancellor as required under

Canon Law.

21.     As noted above, the Diocese serves an 8-county region in western New York.

There are currently 161 parishes (each, a "Parish," and collectively, the "Parishes") and

approximately 594,315 Catholic individuals in the territory of the Diocese.  These individuals are

served by 144 active Diocesan priests, 84 Religious priests that reside in the Diocese, 25 extern

priests[15] and 129 permanent deacons.  Deacons are men ordained for the ministry of the word

(catechetics and preaching), service to the poor, and liturgical assistance.  Deacons may preside at

baptisms, officiate at marriages, and provide for the funeral rites apart from the celebration of the

Eucharist.  The Diocese employs more than 240 people, which includes both clergy and laity.

**B.    The Parishes**

22.     The secular legal embodiments of the parishes extant within the Diocese are non-

member corporations ("Parish Corporations") formed under New York's Religious Corporation

Law.  Pursuant to Article 5 of the Religious Corporations Law, each of the Parish Corporations is

governed by a Board of Trustees comprised of the Bishop, the Vicar General of the Diocese, the

Pastor of the Parish and two lay members of the Parish.  The Bishop of the Diocese is the president

of each Parish Corporation, the Vicar General is the vice president and the Pastor is the secretary-

treasurer (all serving *ex-officio* in accordance with New York law).

---

[15] An extern priest is priest incardinated in another diocese or institute of consecrated life who comes with the permission of the diocesan bishop to exercise ministry in the territory of the Diocese of Buffalo. Incardination is the bond that exists between a cleric and a diocese or institute of consecrated life.

3500838.4 2/27/2020

23.     Each Parish Corporation owns the real and personal property that is used in its ministry.  Each Parish holds its own meetings, appoints its own councils and committees, establishes its annual budget, and maintains its own books, records, bank accounts and employee payroll.

24.     In 2019, throughout the 161 parishes in the Diocese there were 934 marriages, 2,646 infant baptisms, 2,750 First Communions and 2,912 Confirmations.

25.     Within the Diocese, there are 34 elementary schools and one middle school (including certain schools that are designated as parish schools and certain other schools that are designated as regional schools) that serve approximately 7,759 students.  Numerous Parish Corporations also own, maintain and operate cemeteries.

26.     The Parish Corporations located within the Diocese are not under the fiscal or operating control of the Diocese. The Parish Corporations have not sought bankruptcy relief and are not debtors in this bankruptcy proceeding.

## C.     Independent Catholic Schools (Elementary and Secondary)

27.     There are four elementary and twelve secondary Catholic schools in the territory of the Diocese that are separately operated and governed by Religious or private not-for-profit organizations (the "Independent Schools").  Such Independent Schools serve approximately 4,800 students.

28.     Five of the Independent Schools (Bishop Timon-St. Jude (Buffalo), Notre Dame (Batavia), St. Mary's (Lancaster), Archbishop Walsh Academy (Olean) and Cardinal O'Hara (Tonawanda)) were formerly affiliated with the Diocese.  Such schools separated from the Diocese and were incorporated (chartered) by the New York State Board of Regents in 1991.  Each of these

3500838.4 2/27/2020

schools occupies a building that is owned by the Diocese and leased to the entity that operates the school.

29.    The Independent Schools are not under the fiscal or operating control of the Diocese, have not sought bankruptcy relief and are not debtors in this bankruptcy proceeding.

**D.    Catholic Ministry Entities**

30.    There are several not-for-profit corporations that work to carry out various ministries of the Church within the territory of the Diocese ("Catholic Ministry Entities"). All of the Catholic Ministry Entities were created under New York Not-for-Profit Corporation law or other New York organizational statutes to carry out a variety of works of the apostolate. The Catholic Ministry Entities are not under the fiscal or operating control of the Diocese, have not sought bankruptcy relief and are not debtors in this bankruptcy proceeding. Each maintains its own books and records, bank accounts and employee payroll. The Catholic Ministry Entities include the following:

**i.    Catholic Charities**

31.    Catholic Charities of the Diocese of Buffalo, Inc. ("Catholic Charities") was incorporated pursuant to Chapter 256 of the Laws of 1917 on November 23, 1923. The purpose of Catholic Charities is to aid, support, advise, and conduct, by itself or in cooperation with any religious, charitable, benevolent or educational corporation, a wide variety of human services for the benefit of persons within the Diocese.

32.    Catholic Charities is a not-for-profit New York corporation with members. The members include (all serving *ex-officio*): the Bishop of the Diocese, any active Auxiliary Bishop(s) of the Diocese, the Vicar General/Moderator of the Curia of the Diocese, the Chancellor of the Diocese and the Chief Executive Officer of Catholic Charities.

3500838.4 2/27/2020

33.     The affairs, property, business and policies of Catholic Charities are under the charge, control and direction of the Board of Trustees, subject to certain reserved powers of the Members.

34.     Catholic Charities maintains administrative and service offices in Erie and Niagara Counties, and satellite offices in Erie, Cattaraugus, Allegany, Chautauqua, Genesee, Orleans, Wyoming and Niagara Counties.  Catholic Charities provides assistance to people in need without regard to religious, racial, ethnic or economic background.

### ii.     Christ the King Seminary

35.     Christ the King Seminary (the "Seminary") was chartered as a New York State education corporation by the New York State Board of Regents on June 28, 1974.  The Seminary is a New York not-for-profit corporation having the following as members (all serving *ex-officio*): the Bishop of the Diocese, the Vicar General/Moderator of the Curia of the Diocese, the Chancellor of the Diocese and the Rector of the Seminary.  The Seminary is governed by a board of trustees, which is composed of the members and those other trustees elected by the members.

36.     The purpose of the Seminary is to educate men to the Catholic priesthood as well as the education of permanent deacons and lay ecclesiastical ministers.

### iii.     Catholic Cemeteries

37.     Catholic Cemeteries of the Roman Catholic Diocese of Buffalo, New York, Inc. ("Catholic Cemeteries") was incorporated as a not-for-profit corporation under New York law on December 29, 2008.

38.     The members of Catholic Cemeteries, who serve *ex officio*, are the Bishop of the Diocese, the Vicar General/Moderator of the Curia of the Diocese, and the Chancellor of the Diocese.

3500838.4 2/27/2020

39.     The purpose of Catholic Cemeteries is to carry out the sacred religious function of the burial of the deceased.

### iv.    St. Adalbert's Response to Love Center

40.     St. Adalbert's Response to Love Center (The "Response to Love Center") was incorporated as a New York not-for-profit corporation on December 18, 2006.

41.     The Members of the Response to Love Center, who serve *ex officio*, are the Bishop of the Diocese, the Vicar General/Moderator of the Curia of the Diocese, a pastor or pastoral administrator from a Parish Corporation, and a local Felician Sister appointed by the Provincial of the Felician Sisters.

42.     The purpose of the Response to Love Center is to assist and meet the needs of poverty-stricken individuals and families with programs and services that empower people to take responsibility for their lives and encourage self-sufficiency through dignity and compassion.

### v.    Our Lady of Victory

43.     Our Lady of Victory Institutions, Inc. was incorporated on February 5, 2014 as a New York not-for-profit corporation. The sole member of Our Lady of Victory Institutions, Inc. is the Diocese.

44.     The purpose of Our Lady of Victory Institutions, Inc. is to support and serve as the sole member of two separate operating not-for-profit corporations: Our Lady of Victory Homes of Charity, and Baker Hall d/b/a Baker Victory Services. These operating corporations provide a broad range of social services, including behavioral health care, residential treatment services, services for the developmentally disabled, education services, outpatient services and foster care.

3500838.4 2/27/2020

### vi.    Catholic Health Systems, Inc.

45.    Catholic Health Systems, Inc. ("Catholic Health") was incorporated on August 14, 1985 as a New York not-for-profit corporation.  The members of Catholic Health include the Diocese and Trinity Health Corporation.

46.    The affairs, property, business and policies of Catholic Health are under the charge, control and direction of the Catholic Health Board of Directors except for those matters subject to the reserved powers of the members.

47.    Catholic Health is a non-profit health care system that provides care to the people of Western New York through access to hospitals, long-term care facilities, primary care centers, emergency centers and several other community ministries.

### vii.    Housing Corporations

48.    New York State Housing Development Corporation provides subsidized housing to persons of low income primarily through U.S. Department of Housing and Urban Development funding and Section 8 rent subsidies (the "Federal Housing Programs").

49.    In the territory of the Diocese, there are a number of not-for-profit corporations (the "Housing Corporations") each of which has developed a separate housing project funded by the Federal Housing Programs.  The Housing Corporations have members that include, among others, the Bishop of the Diocese, the Vicar General/Moderator of the Curia of the Diocese, the Chancellor of the Diocese, the Diocesan Director of Catholic Charities, the Chief Executive Officer of Catholic Charities, and the Diocesan Director of Older Adult Services, each of whom serve *ex officio.*

3500838.4 2/27/2020

50.     Each Housing Corporation holds its own meetings, owns its own property, maintains its own bank accounts, has its own Board of Directors, employs its own employees and maintains its own books, records and employee programs.

**E.     St. Joseph Investment Fund, Inc.**

51.     St. Joseph Investment Fund, Inc. ("SJIF") was incorporated on August 30, 2006 as a New York not-for-profit corporation.  The members of SJIF, all of whom serve *ex officio*, are the Bishop of the Diocese, Vicar General/Moderator of the Curia of the Diocese, Chancellor of the Diocese, the President of Catholic Charities and the Rector/President of the Seminary.

52.     The purpose of SJIF is to receive funds from the Diocese, Parish Corporations and Other Catholic Entities to invest in harmony with the teachings and beliefs of the Church and to provide a fund for the pooling of investments.  Each participant enters into a written participation agreement with SJIF with respect to the delivery of funds for investment, the investment strategies for the funds as part of collectively invested pools of funds, fees of SJIF for administration and management of the collective investment funds, and procedure for return of any proceeds of the invested funds including any investment return after payment of fees.

53.     The SJIF Board of Directors is responsible for investment, reinvestment and custody of all investment assets of SJIF.  The Board of Directors either directly or as delegated to the Board's Investment Committee monitors performance, and periodically reports to investors and at least annually reports to the members.

54.     SJIF employs multiple investment managers to provide investment advice as to appropriate investments and to manage various portfolios of securities. The investment managers are selected by the Investment Committee and approved by the Board of Directors.

3500838.4 2/27/2020

55.    NEPC, LLC ("NEPC") has been engaged as an independent consultant to provide consulting services with respect to investment policy development and risk control, asset allocation strategy, investment manager searches, and investment performance analysis for SJIF.

56.    Custody services for SJIF are provided by US Bank, St. Louis, Missouri for separately managed portfolios.  Custody services for multi-investor funds held by SJIF are provided by various custodians, including Bank of New York Mellon, The Northern Trust Co., Deutsche Bank Trust Co., and Citco.

57.    The Diocese and SJIF have entered into an administrative services contract pursuant to which the Diocese supplies SJIF with the services of certain of its employees to assist in maintaining participant and accounting records relating to the funds, and SJIF reimburses the Diocese for such services.

58.    SJIF provides responsible administration and protection of temporal goods as required by Canon Law for the Diocese, Parish Corporations, and other charitable organizations operated in connection with the Diocese.

59.    SJIF has not sought bankruptcy relief and is not a debtor in this chapter 11 proceeding.

F.    **The Foundation**

60.    The Foundation of the Roman Catholic Diocese of Buffalo, N.Y., Inc. (the "Foundation") was incorporated as a New York not-for-profit corporation on December 27, 1996. The members of the Foundation, all of whom serve *ex officio*, include the Bishop of the Diocese, Vicar General/Moderator of the Curia of the Diocese, the Chancellor of the Diocese, the Chief Executive Officer of Catholic Charities and the President/Rector of the Seminary.

- 14 -

3500838.4 2/27/2020

61.    The purpose of the Foundation is to financially support the ministries of the Diocese and the Other Catholic Entities.

62.    The Foundation has not sought bankruptcy relief and is not a debtor in this bankruptcy proceeding.

## REASONS FOR BANKRUPTCY

63.    The Diocese does not seek Chapter 11 relief to shirk or avoid responsibility for any past misconduct by clergy or for any decisions made by Diocesan authorities when addressing that misconduct.  The Diocese does not seek bankruptcy relief to hide the truth or deny any person a day in court.  In fact, the Diocese is committed to pursuing the truth and has never prohibited any person from telling his/her story or speaking his/her truth in public.  The Diocese has publicly disclosed perpetrators.  The Diocese has made and requires criminal referrals to be made for all credible allegations of sexual abuse.  The Diocesan Apostolic Administrator, The Most Reverend Edward B. Scharfenberger, has acknowledged past shortcomings by the Diocese and has attempted to offer aid and comfort to victims of abuse.  The Diocese has established standards for the training and background assessment of all employees, clerics and volunteers who will likely interact with children and young people.

64.    The Diocese is a not-for-profit religious corporation with limited resources, including limited insurance coverage which may be applicable to claims of persons seeking remedies under the Child Victims Act ("CVA").  The Diocese acknowledges its moral obligation to compensate victims of abuse fairly and equitably.  Consistent with this moral obligation, it cannot allow any single plaintiff to recover a disproportionate share of the limited funds available from the Diocese simply because the plaintiff's case goes to trial first.  Similarly, the Diocese

3500838.4 2/27/2020

cannot ignore the valid claims of other creditors who stand on equal footing with the CVA claimants as general unsecured creditors of the Diocese.

65.    Beyond its obligation to creditors, the Diocese has a fundamental and moral obligation to the Catholic faithful it serves, and to the donors who have entrusted the Diocese with the material fruits of their lives' labor, to continue the ministries of the Church in fulfillment of the canonical and secular legal purposes of the Diocese. In order to do this, the Diocese must survive.

66.    The Diocese's goals in seeking chapter 11 relief are two-fold: first, to protect and preserve its assets that are properly available for distribution to unsecured creditors; second, the Diocese must continue the work of the Church to the fullest extent possible, using the resources dedicated to that purpose.

67.    A swift exit from bankruptcy is of the utmost importance given the Diocese's limited resources and because it is a not-for-profit religious corporation. The Diocese is dependent upon the charity of its faithful to sustain its very existence. This Chapter 11 Case may cast a shadow upon the Diocese, the Parish Corporations, and the various Other Catholic Entities and their numerous ministries. I respectfully submit that the best way to alleviate any of these concerns is to emerge from chapter 11 as soon as possible.

I swear, under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated:  February **27** , 2020

Rev. Peter J. Karalus
Vicar General, Moderator of the Curia, and Corporate Vice President of the Diocese of Buffalo, N.Y.

- 16 -

3500838.4 2/27/2020

Sworn to before me this
27th day of February ____, 2020.


_Maureen C. Razmus_
Notary Public


MAUREEN C. RAZMUS
Notary Public - State of New York
Qualified in Erie Co. No. 01RA6286971
My Commission Expires August 5, 2021

3500838.4 2/27/2020